Nos. 23-3216; 23-3225

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

COMMONWEALTH OF KENTUCKY, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

———————————

PETITION FOR REVIEW OF A FINAL AGENCY ACTION OF THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY

———————————

**EPA'S CONSOLIDATED RESPONSE IN OPPOSITION TO
PETITIONERS' MOTIONS FOR A STAY PENDING REVIEW**

———————————

TODD KIM
*Assistant Attorney General*

*Of Counsel:*
ROSEMARY HAMBRIGHT KABAN        ALEXANDRA L. ST. ROMAIN
DANIEL P. SCHRAMM               *U.S. Department of Justice*
  *Office of the General Counsel*   *Environment and Natural Resources*
  *U.S. Environmental Protection*     *Division*
    *Agency*                       *P.O. Box 7611*
  *Washington, DC*                *Washington D.C. 20044-7611*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................. 3

    I.    Statutory Background ......................................................... 3

    II.   Factual Background ........................................................... 4

        A.   Implementation of the Good Neighbor Provision .................... 4

        B.   2015 NAAQS and Kentucky's Good Neighbor SIP Submission ................................................................ 7

        C.   EPA's Disapproval of Kentucky's Submission ..................... 12

        D.   EPA's Good Neighbor Plan .................................... 17

    III.   Procedural Background ..................................................... 18

ARGUMENT ..................................................................................... 20

    I.    The Motion Should Be Denied on Venue Grounds or Transferred to the D.C. Circuit ......................................... 20

    II.   Kentucky Is Unlikely to Succeed on the Merits. ............................... 21

        A.   EPA Acted Within Its Statutory Oversight Role. ................... 23

        B.   EPA Reasonably Determined Kentucky's Submission Failed to Comply with the Good Neighbor Provision ............. 25

        C.   EPA Reasonably Evaluated SIP Submissions Using Up-To-Date Air Quality Data ..................................... 29

    III.   Kentucky Has Not Shown Irreparable Harm Absent a Stay. ............. 33

i

IV.    The Balance of Equities and Public Interest Disfavor a Stay..............37

CONCLUSION ........................................................................................39

CERTIFICATES OF COMPLIANCE ....................................................40

CERTIFICATE OF SERVICE..............................................................41

# TABLE OF AUTHORITIES

## CASES

*Air Pollution Control Bd. v. EPA*,
739 F.2d 1071 (6th Cir. 1984)........................................................5, 31

*Appalachian Power v. EPA*,
249 F.3d 1032 (D.C. Cir. 2001) ........................................................24

*Ass'n of Irritated Residents v. EPA*,
686 F.3d 668 (9th Cir. 2012)...............................................................23

*Breeze Smoke, LLC v. FDA*,
18 F.4th 499 (6th Cir. 2021)........................................................22, 27

*Catawba Cnty. v. EPA*,
571 F.3d 20 (D.C. Cir. 2009) ..............................................................13

*Cmty. for a Better Arvin v. EPA*,
786 F.3d 1169 (9th Cir. 2015)............................................................11

*EPA v. EME Homer City Generation, L.P.*,
572 U.S. 489 (2014).......................................4, 5, 7, 17, 23, 25, 37, 38

*Gen. Motors Corp. v. United States*,
496 U.S. 530 (1990)...............................................................................3

*Genon Rema, LLC v. EPA*,
722 F.3d 513 (3d Cir. 2013)................................................................24

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007)..............................................................................32

*Maryland v. EPA*,
958 F.3d 1185 (D.C. Cir. 2020) .....................................................5, 15

*Mass. Bldg. Trades Council v. Dep't of Labor*,
21 F.4th 357 (6th Cir. 2021)................................................................33

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)........................................................................20

*Midwest Ozone Grp. v. EPA*,
   61 F.4th 187 (D.C. Cir. 2023) ..........................................................7

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).........................................................................21

*Nken v. Holder*,
   556 U.S. 418 (2009) .......................................................................20

*North Carolina v. EPA*,
   531 F.3d 896 (D.C. Cir. 2008) ...........................................14, 15, 28

*North Dakota v. EPA*,
   730 F.3d 750 (8th. Cir. 2013)..........................................................24

*Noxell Corp. v. Firehouse No. 1 Bar-B-Que Rest.*,
   760 F.2d 312 (D.C. Cir. 1985) ........................................................21

*Oklahoma v. EPA*,
   723 F.3d 1201 (10th. Cir. 2013)................................................25, 31

*RMS of Ga., LLC v. EPA*,
   64 F.4th 1368 (11th Cir. 2023)........................................................21

*Ruckelshaus v. Monsanto Co.*,
   463 U.S. 1315 (1983)......................................................................37

*Sampson v. Murray*,
   415 U.S. 61 (1974)..........................................................................34

*Sierra Club v. EPA*,
   356 F.3d 296 (D.C. Cir. 2004) ........................................................31

*Sierra Club v. EPA*,
   671 F.3d 955 (9th Cir. 2012)...........................................................30

iv

*Sierra Club v. EPA*,
   793 F.3d 656 (6th Cir. 2015)................................................................24

*Sierra Club v. EPA*,
   939 F.3d 649 (5th Cir. 2019)................................................................29

*Sierra Club v. Slater*,
   120 F.3d 623 (6th Cir. 2017)................................................................22

*St. Marys Cement, Inc. v. EPA*,
   782 F.3d 280 (6th Cir. 2015)..........................................................21, 22

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016)................................................................24

*Train v. NRDC*,
   421 U.S. 60 (1975)................................................................................3

*Union Elec. Co. v. EPA*,
   427 U.S. 246 (1976)........................................................................3, 24

*Westar Energy, Inc. v. EPA*,
   608 F. App'x 1 (D.C. Cir. 2015) .....................................................7, 25

*Winter v. NRDC*,
   555 U.S. 7 (2008) ................................................................................37

*Wisconsin v. EPA*,
   938 F.3d 303 (D.C. Cir. 2019) .....................5, 6, 8, 12, 15, 18, 30, 39

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................33

## STATUTES

5 U.S.C. §§ 701-06 ...............................................................................21

42 U.S.C. § 7401(b)(1)............................................................................3

42 U.S.C. §§ 7407-09 ................................................................................3

42 U.S.C. § 7410(a) ..................................................................................3

42 U.S.C. § 7410(a)(2)(A) ..................................................................14, 23

42 U.S.C. § 7410(a)(2)(D) ..................................................................14, 25

42 U.S.C. § 7410(a)(2)(D)(i)(I) ..............................1, 4, 5, 6, 7, 23, 24, 32

42 U.S.C. § 7410(c)(1) .........................................................................4, 17

42 U.S.C. § 7410(k)(3) ....................................................................4, 7, 23

42 U.S.C. § 7410(k)(5) .............................................................................4

42 U.S.C. §§ 7426(b)-(c) ........................................................................24

42 U.S.C. §§ 7501-15 ...............................................................................4

42 U.S.C. § 7502(c)(3) ...........................................................................31

42 U.S.C. § 7604 ....................................................................................12

42 U.S.C. § 7604(a)(2) ...........................................................................30

42 U.S.C. § 7607(b)(1) ......................................................................20, 21

42 U.S.C. § 7607(d)(1) ...........................................................................21

42 U.S.C. § 7607(d)(9) ...........................................................................21

## FEDERAL REGISTER

63 Fed. Reg 57356 (Oct. 27, 1998) .........................................................7

76 Fed. Reg. 48208 (Aug. 8, 2011) ..........................................................6

80 Fed. Reg. 65292 (Oct. 26, 2015) .........................................................7

81 Fed. Reg. 53284 (Aug. 12, 2016) ......................................................29

81 Fed. Reg. 74504 (Oct. 26, 2016) ...................................................6, 29

83 Fed. Reg. 33730 (July 17, 2018) ...................................................8, 30

84 Fed. Reg. 30920 (June 28, 2019)......................................................30

85 Fed. Reg. 12232 (Mar. 2, 2020) ...................................................9, 26

86 Fed. Reg. 23054 (April 30, 2021)......................................................12

86 Fed. Reg. 45870 (Aug. 17, 2021) .....................................................13

86 Fed. Reg. 67329 (Nov. 26, 2021) .....................................................31

87 Fed. Reg. 9498 (Feb. 22, 2022) ................................... 14, 26, 27, 32

88 Fed. Reg. 9336 (Feb. 13, 2023)........................... 1, 5, 6, 7, 9, 11, 12, 13, 14, 15,
16, 17, 23, 25, 26, 28, 30, 32, 33, 34,

88 Fed. Reg. 36654 (June 5, 2023).....................................................17

**INTRODUCTION**

Under the Clean Air Act's ("Act") "Good Neighbor Provision," 42 U.S.C. § 7410(a)(2)(D)(i)(I), states must ensure that their emissions do not significantly contribute to other states' air-quality problems. In 2015, EPA revised national air-quality standards for ozone, which required states to prepare plans to attain and maintain the new standards, including Good Neighbor requirements. Numerous states, including Kentucky, submitted plans for EPA's review proposing *no* new emissions reductions to address ozone pollution in downwind states. Upon careful evaluation, EPA disapproved 21 submissions for not adequately addressing their Good Neighbor obligations. 88 Fed. Reg. 9336, 9338 (Feb. 13, 2023) ("Final Rule") (Ex. 1).

Parties from twelve states challenge the Final Rule in eight circuit courts. Petitioners the Commonwealth of Kentucky ("Kentucky") and the Commonwealth of Kentucky Energy and Environment Cabinet ("Kentucky Cabinet") each filed stay motions. Their motions should be denied.

At the outset, Petitioners are not entitled to relief in this Court because venue is improper, and this threshold issue should be resolved before the stay motions. *See* EPA Mot. to Dismiss or Transfer ("Venue Mot."), ECF No. 8 (*Kentucky*); ECF No. 4 (*Kentucky Cabinet*). The Act requires that actions like the Final Rule be

litigated in the D.C. Circuit to avoid the significant risk of conflicting rulings regarding issues of national import.

Regardless, Petitioners are not entitled to a stay. First, Petitioners' challenges are unlikely to succeed because the record supports EPA's disapproval and should be upheld. Kentucky relied on EPA's modeling, which consistently shows that Kentucky's emissions contribute to downwind ozone pollution. Under the Act, Kentucky should have analyzed whether those emissions contributions were significant, and if so, it should have included enforceable provisions to prohibit those emissions. It did not.

Second, Petitioners have established no irreparable harm from the Final Rule—which does not require Petitioners to do *anything*—or from the federal implementation plan EPA was obligated to promulgate, which would impose only minimal compliance burdens for Kentucky sources while this litigation is resolved.

Third, the balance of equities and the public interest disfavor a stay, which would hamstring EPA's ability to address Kentucky's harmful emissions to downwind states while litigation proceeds, leaving those in multiple downwind states to suffer not only worse air quality but also increased regulatory burdens under the Act's escalating requirements for areas that do not attain compliance with EPA's air-quality standards.

## BACKGROUND

### I.    Statutory Background

The Act seeks "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare," 42 U.S.C. § 7401(b)(1), and to control air pollution through a system of shared federal and state responsibility, *see Gen. Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). The Act, as amended, "reflect[s] congressional dissatisfaction with the progress of existing air pollution programs and a determination to 'take a stick to the states' in order to guarantee the prompt attainment and maintenance of specified air quality standards." *Union Elec. Co. v. EPA*, 427 U.S. 246, 249 (1976) (Marshall, J.) (quoting *Train v. NRDC*, 421 U.S. 60, 64 (1975) (Rehnquist, J.)). "These Amendments sharply increased federal authority and responsibility in the continuing effort to combat air pollution." *Train*, 421 U.S. at 64.

The Act directs EPA to establish and revise National Ambient Air Quality Standards ("NAAQS"), limiting the concentration of certain pollutants in the ambient air. 42 U.S.C. §§ 7407-09. Each time EPA sets a NAAQS, states must adopt and submit state implementation plans ("SIPs") to implement and enforce that NAAQS. *Id.* § 7410(a). Areas that do not attain the NAAQS ("nonattainment areas") are subject to attainment deadlines, and failure to meet those deadlines

leads to increasingly stringent emissions-reduction requirements.  42 U.S.C.

§§ 7501-15.

To prevent states' emissions from significantly contributing to downwind

states' air-pollution problems, SIPs must contain, *inter alia*, "adequate provisions"

"prohibiting" emissions that "will" contribute significantly to nonattainment, or

interfere with maintenance, of the NAAQS in other states. *Id*. § 7410(a)(2)(D)(i)(I).

The Act requires EPA to review states' submissions for compliance with the Act.

*Id.* § 7410(k)(3).  If EPA disapproves a SIP, it must promulgate a federal

implementation plan ("FIP").  *Id.* § 7410(c)(1).  There is no requirement for EPA

to provide states with opportunities to correct a deficient SIP before issuing a

federal plan.[1]  *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 508-09

(2014).

## II.     Factual Background

### A.     Implementation of the Good Neighbor Provision

Ozone-precursor pollutants are emitted from thousands of geographically

dispersed sources and travel great distances; many states have problems attaining

---

[1] In stating that "[t]he [Act] requires that when a SIP is found inadequate, EPA 'shall require the State to revise the plan as necessary to correct such inadequacies,'" Ky. Mot. at 8, Kentucky misleadingly quotes a separate provision of the Act, 42 U.S.C. § 7410(k)(5), EPA's discretionary authority to issue "SIP calls," which is wholly distinct from EPA's mandatory duty to promulgate a FIP upon disapproval of a SIP submission under 42 U.S.C. § 7410(c)(1).

and maintaining ozone NAAQS due to emissions from other states.  88 Fed. Reg.
at 9371; *EME Homer*, 572 U.S. at 496-97.  Given the broad culpability for ozone
problems and "the vagaries of the wind," EPA and state regulators face a "thorny
causation problem" in addressing interstate ozone pollution. *EME Homer*, 572 U.S.
at 497, 514.  The Good Neighbor Provision was enacted to hold upwind states to
their fair share so downwind states do not bear the regulatory compliance burden
alone.  *Air Pollution Control Bd. v. EPA*, 739 F.2d 1071, 1091-92 (6th Cir. 1984);
*Wisconsin v. EPA*, 938 F.3d 303, 314 (D.C. Cir. 2019); *Maryland v. EPA*, 958 F.3d
1185, 1203-04 (D.C. Cir. 2020).

In light of the challenging task of allocating upwind responsibility and
through decades of experience, EPA has developed a 4-step framework to
implement the Good Neighbor Provision for ozone, and this framework gives
meaning to each critical statutory term.  42 U.S.C. § 7410(a)(2)(D)(i)(I); Response
to Comments ("RTC") at 431 (Ex. 2).  Under this framework, a state or EPA
would:

> (1) identify downwind "nonattainment" and "maintenance" receptors
> (monitoring sites that "will" not attain or struggle to maintain the NAAQS in
> a future year);
>
> (2) determine if upwind-state "emissions" "contribute" to those downwind
> receptors applying a screening threshold;

(3) evaluate the "amount[]" of contribution that is "significant[]" or "interfere[s] with maintenance" through a multifactor analysis, including cost-effectiveness; and

(4) ensure the plan "contain[s] adequate provisions" "prohibiting" those emissions.

42 U.S.C. § 7410(a)(2)(D)(i)(I); *see also Wisconsin*, 938 F.3d at 310-11 (describing the four steps).

At Step 2, EPA has consistently determined an upwind state is "contributing" to a receptor, and subject to further analysis at Step 3, if its emissions contribute an amount of 1% or more of the NAAQS.  *Wisconsin*, 938 F.3d at 311.  This threshold was first adopted in the Cross-State Air Pollution Rule (CSAPR) as a refinement on prior approaches to determining contribution, 76 Fed. Reg. 48208, 48236-38 (Aug. 8, 2011), and reaffirmed as appropriate for more protective ozone NAAQS in the CSAPR Update, 81 Fed. Reg. 74504, 74518 (Oct. 26, 2016).  *See* Final Rule at 9370-72.  For the 2015 NAAQS of 70 parts per billion ("ppb"), 1% of the NAAQS is 0.70 ppb.[2]

---

[2] For the previous 2008 ozone NAAQS of 75 ppb, 1% is 0.75 ppb.  Thus, using a 1 ppb threshold for the 2015 NAAQS as Kentucky advocated, *see* Submission at 19, would relax the stringency at Step 2 compared to the threshold EPA used for the less protective 2008 NAAQS. *See* 88 Fed. Reg. at 9374 (explaining that the August Memo did not support using 1 ppb for every state).

EPA has applied this general framework for decades,[3] and courts, including the Supreme Court, have consistently upheld the framework as "permissible, workable, and equitable." *EME Homer*, 572 U.S. at 524; *see also, e.g.*, *Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 189 n.1 (D.C. Cir. 2023); *Westar Energy, Inc. v. EPA*, 608 F. App'x 1, 3-4 (D.C. Cir. 2015).

While many states, including Kentucky, generally followed this framework, EPA does not require states to use it. But regardless of a state's approach, the Act obligates EPA to independently evaluate whether a submission contains "adequate provisions" to comply with the Good Neighbor Provision. 42 U.S.C. §§ 7410(a)(2)(D)(i)(I); 7410(k)(3). Because many small upwind contributions combine to generate downwind ozone problems ("collective contribution"), EPA applies "a consistent set of policy judgments across all states" and evaluates alternative approaches to ensure consistency and equity. 88 Fed. Reg. at 9338-42, 9381.

## B.    2015 NAAQS and Kentucky's Good Neighbor SIP Submission

To protect public health and welfare, in 2015, EPA strengthened the ozone NAAQS to 70 ppb. 80 Fed. Reg. 65292 (Oct. 26, 2015) ("2015 NAAQS"). This update required each state to submit a plan to meet its Good Neighbor obligations

---

[3] *See, e.g.*, 63 Fed. Reg. 57356 (Oct. 27, 1998).

"as expeditiously as practicable." *See Wisconsin*, 938 F.3d at 313-20.  In March

and August of 2018, EPA issued memoranda to provide modeling results and other

information that could aid states in developing their plans.  *See* Exs. 3 ("March

Memo"), 4 ("August Memo").

The March Memo provided modeling projections of ozone levels and

contributions in 2023 based on 2011 data ("2011-based modeling").  March Memo

at 3-5.  But information in the memorandum "[wa]s not a final determination

regarding states' obligations under the good neighbor provision," and EPA made

clear that "[a]ny such determination would be made through notice-and-comment

rulemaking."  *Id.* at 2.  EPA routinely updates air-quality modeling, and Good

Neighbor actions are typically informed by the most recent modeling.  For

example, in approving Kentucky's Good Neighbor SIP for the 2008 ozone

NAAQS in July 2018 (later corrected to a disapproval for other reasons), EPA

relied on updated modeling issued well after the 2011 SIP submission deadline for

the 2008 NAAQS and even after EPA had promulgated a partial FIP for Kentucky

and other states in the 2016 CSAPR Update.  *See* 83 Fed. Reg. 33730, 33731 (July

17, 2018).

The March Memo also included Attachment A, listing stakeholder-provided

ideas of potential ways to address 2015 NAAQS Good Neighbor obligations,

which EPA clearly stated that it did not necessarily endorse but invited feedback. *See* Final Rule at 9340.

The August Memo suggested a potential flexibility to the Step 2 methodology, stating that "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent [of the NAAQS] threshold, at Step 2 of the 4-step framework in developing their SIP[s]." August Memo at 4. The Memo, however, provided only a generalized nationwide comparison of upwind-state contribution at 1 ppb versus 1% of the NAAQS. *Id.* EPA did not endorse this higher threshold for states to use without further analysis.[4] Rather, the Memo stated: "EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation," and "[f]ollowing these recommendations does not ensure that the EPA will approve a SIP revision in all instances where the recommendations are followed." *Id.* at 1.

Kentucky filed its Good Neighbor submission on January 11, 2019. *See* Ex. 5 ("Submission"). The Commonwealth generally followed EPA's 4-step

---

[4] For an example of the type of analysis states could have conducted, see 85 Fed. Reg. 12232, 12238 (Mar. 2, 2020), where EPA proposed to approve a 1 ppb threshold for Iowa under three receptor-specific factors. *See also* Final Rule at 9373 (reviewing EPA's experience and finding that constructing this analysis *for* states is not a good use of agency resources).

framework but relied on several novel theories to conclude that it need not take any action to satisfy its Good Neighbor obligations, despite its own conclusion that it contributed to at least one downwind receptor. *Id.* at 18-46.

Kentucky used EPA's 2011-based modeling from the March Memo to identify nonattainment and maintenance receptors and Kentucky's contributions. *Id.* at 18-19. It determined that the Commonwealth was projected to contribute to five receptors at greater than 0.70 ppb: four nonattainment receptors and one maintenance receptor. *Id.* at 19. Its highest contribution was projected to be 1.52 ppb at a maintenance receptor in Harford, Maryland (above even the alternative 1 ppb threshold).[5]

Kentucky sought to eliminate its "linkage" to the four nonattainment receptors using a 1 ppb threshold, citing the August Memo. Kentucky provided no technical analysis, as contemplated by the August Memo, to demonstrate that a 1 ppb contribution threshold would be appropriate based on the "facts and circumstances" in Kentucky. *See* August Memo at 1. Instead, Kentucky simply stated that it "agree[d]" with the use of a 1 ppb threshold and used the memo as justification to eliminate 4 of its 5 linkages. Submission at 19.

---

[5] Harford County is part of the Baltimore, Maryland ozone nonattainment area, which is now in "Moderate" nonattainment due to continuing ozone levels violating the NAAQS, *see* Declaration of Rona Birnbaum ¶ 95 (Ex. 6).

While acknowledging "Kentucky would still be linked to the Harford, Maryland maintenance [receptor]" after applying a higher 1 ppb contribution threshold, the Commonwealth nevertheless determined that it need not take any action to address those contributing emissions because, in its view, upwind states should have lower responsibilities to maintenance receptors, which, in theory, are already attaining the NAAQS.[6] *Id.* at 19, 45.

Rather than analyze the feasibility of additional emissions reductions, Kentucky pointed to existing state and Federal controls, stating that those controls, along with some expected upcoming retirements and fuel switches from coal to gas at power plants in Kentucky would be sufficient to satisfy the Commonwealth's Good Neighbor obligations. *Id.* at 20-33. Notably, these claimed retirements and fuel switches were not included in the Submission as enforceable measures. *See Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1175-76 (9th Cir. 2015) (to be creditable, measures must be included in SIP). Kentucky concluded its analysis by

---

[6] In Appendix C of the Submission, Kentucky included modeling performed by Alpine Geophysics, which identified Harford, Maryland as a *nonattainment* receptor to which Kentucky contributes 2.07 ppb in 2023. Submission, App. C at 35. Kentucky offered no explanation for the discrepancy between this modeling and EPA's. *See also supra* n.5. Also in Appendix C was a proposal from the Midwest Ozone Group to evaluate "significance" based on the proportion of contribution from each state. This approach would have given Kentucky a responsibility of 0.02 ppb at the Harford, Maryland receptor. Submission, Appx. C. at 40-41. Kentucky provided no explanation of its views on this approach and did not implement such reductions. Final Rule at 9369, 9376.

arguing that downwind states should implement controls before upwind states. Submission at 33, 40, 45-46. But it did not explain how such a proposal would be consistent with the Act and applicable caselaw requiring that states prohibit their own significant contributions to downwind states—regardless of other contributing sources to the same air-quality problem—in concert with the downwind attainment schedule. *See Wisconsin*, 938 F.3d at 318-20.

## C.   EPA's Disapproval of Kentucky's Submission

EPA's assessment of 2015 NAAQS Good Neighbor SIPs was delayed while it addressed the remand of another Good Neighbor rule for the 2008 ozone NAAQS in *Wisconsin*. Final Rule at 9365.[7] EPA approved SIPs during this time where the basis for approval was clear. *Id.* at 9362. Downwind stakeholders brought suit against EPA under 42 U.S.C. § 7604 for failing to act on many other states' Good Neighbor SIPs (including Kentucky's), ultimately resulting in a January 31, 2023, deadline for EPA to take action.[8] During this time, EPA also updated its 2023 modeling projections from a 2011-based platform to a 2016-based one, taking into consideration input from state regulators and modelers. *Id.* at

---

[7] In light of the remand, EPA disapproved Kentucky's 2008 ozone NAAQS Good Neighbor SIP as noted by Kentucky, Ky. Mot. at 3, and promulgated a FIP for the Commonwealth as part of the Revised CSAPR Update. 86 Fed. Reg. 23054 (April 30, 2021) (upheld in *Midwest Ozone Grp. v. EPA*, No. 21-01146 (D.C. Cir. 2023)).

[8] *See, e.g.*, *Downwinders at Risk et al. v. Regan*, No. 21-cv-03551 (N.D. Cal.).

9339.  EPA used the new modeling in SIP actions as it became available.  *See, e.g.*, 86 Fed. Reg. 45870 (Aug. 17, 2021) (approving Maine and New Hampshire SIPs).  The 2016-based modeling followed the same approach as the 2011-based modeling but incorporated updated emissions data and a new set of meteorological data.  Final Rule at 9339-50.

Consistent with EPA's practice and Kentucky's approach in the Submission, EPA evaluated Kentucky's Submission using the 4-step framework while fully considering any alternative approaches within that framework that the Commonwealth put forward.  *Id.* at 9338.  At Step 2, EPA found that Kentucky did not provide any state-specific technical justification for using a 1 ppb contribution threshold, as contemplated by the August Memo.  *Id.* at 9356, 9372-73.[9]

Because Kentucky acknowledged being linked to at least one receptor, EPA evaluated each of Kentucky's arguments as to why that contribution should not

---

[9] In commenting on a pre-submission draft of Kentucky's SIP, EPA recommended that the Commonwealth review the August Memo in developing its rationale for relying on a 1 ppb threshold.  *See* Submission at 236, ¶ 5.  However, EPA did not say merely citing the August Memo would be an acceptable rationale.  As clear from the text of the August Memo, Kentucky would have needed to provide fact-specific support for relying on a 1 ppb threshold.  Moreover, in providing input on a pre-submission draft, EPA did not (and cannot) make any guarantees about a SIP's approvability.  *Cf.* Ky. Cab. Mot. at 7-8; *see Catawba County v. EPA*, 571 F.3d 20, 34 (D.C. Cir. 2009) ("An agency pronouncement is not deemed a binding regulation merely because it may have some substantive impact, as long as it leave[s] the administrator free to exercise his informed discretion."); *see also* Final Rule at 9373.

trigger to new emissions-reduction obligations.  EPA rejected Kentucky's argument that it had no obligations to maintenance receptors beyond continuing on-the-books controls.  Final Rule at 9356.  EPA found Kentucky's conclusion inconsistent with *North Carolina v. EPA*, which held that EPA and states must give independent effect to the "interfere with maintenance" clause in the Good Neighbor Provision, because otherwise there would be "no protection for downwind areas that, despite EPA's predictions, still find themselves struggling to meet NAAQS due to upwind interference."  531 F.3d 896, 910-11 (D.C. Cir. 2008); *see also* 87 Fed. Reg. 9498, 9508, 9514 (Feb. 22, 2022) ("Proposal") (Ex. 7) (discussing caselaw upholding EPA's application of this provision).  Without an adequate alternative approach to addressing maintenance receptors, EPA could not accept Kentucky's position.  Final Rule at 9356.

Kentucky also sought to take credit for anticipated emissions reductions resulting from certain plant closures and fuel switches.  Submission at 20-33.  But EPA explained that was insufficient to show Kentucky satisfied the requirements of the Good Neighbor Provision.  Final Rule at 9356.  EPA explained that the emissions reductions Kentucky identified were not included as measures in its SIP, and, therefore, the emissions were not adequately "prohibited" through permanent and enforceable requirements.  42 U.S.C. § 7410(a)(2)(A) & (D); Final Rule at 9376-77.  Further, EPA explained that its 2016-based modeling already accounted

14

for the existing and future controls that Kentucky identified in its Submission, as well as an additional coal retirement at one unit and additional fuel switches at two coal units.  *See* Final Rule at 9356.  Even after taking these reductions into account, the record still showed Kentucky's pollution contributing to downwind air-quality problems in 2023.  *Id.*

Additionally, EPA disagreed with Kentucky's argument that downwind states should implement their own controls before upwind states consider reducing emissions.  *Id.* at 9356, 9340-41; RTC at 455-57.  The D.C. Circuit has made clear that, regardless of other contributing factors to a downwind receptor, each state must be held responsible for its own significant contribution.  *Wisconsin*, 938 F.3d at 324; *North Carolina*, 531 F.3d at 921.  And in *Maryland*, the D.C. Circuit reaffirmed that upwind states must eliminate their significant contributions as expeditiously as practicable, regardless of the degree of emissions reductions the downwind state has itself achieved.  958 F.3d at 1203-04; *see also* Final Rule at 9340-41.

EPA also found that Kentucky failed to explain why it did not implement certain approaches proposed by the Midwest Ozone Group, appended to the Submission and seemingly endorsed by the Commonwealth.  *See* Final Rule at 9356 n.128, 9376.

Finally, EPA explained that there was nothing unlawful in its consideration of updated air-quality information and that consideration of the whole record strengthened the basis for its final decision.  Final Rule at 9365-67.  EPA explained that the Good Neighbor Provision requires a forward-looking analysis of air-quality conditions and contribution in a future year, so analytical data should not be arrested as of some past date.  *Id.* at 9566; RTC 60-62.  EPA also explained that despite slight changes, its 2023 modeling was generally consistent with its prior modeling in terms of which states were shown to be linked to downwind air-quality problems.  Final Rule at 9367.  In EPA's independent air-quality analysis, Kentucky was one of three states, along with Alabama and Minnesota, whose contribution to nonattainment or maintenance receptors in the 2016-based modeling was greater than 1% of the NAAQS but less than 1 ppb.  *Id.* at 9373.[10] EPA observed that many states' emissions, including Kentucky's, have remained high enough over time that in every round of EPA modeling—each capturing varying meteorological conditions and the latest emission reductions—those states contribute to air pollution to some set of downwind receptors.  Final Rule at 9367.

---

[10] EPA also found that Kentucky contributed 1.57 ppb to a "violating monitor" receptor in Lake Park, Ohio in the Cleveland "Moderate" nonattainment area. Final Rule at 9354, Table III.C.2 & n.82.  EPA identified these additional receptors based on monitoring data in the Final Rule, and states' linkages to these receptors strengthened EPA's Step 2 conclusions.  *See* Final Rule at 9349.

EPA stated that this "common result" provides more evidence of an ozone-transport problem from those states, not less.  *Id*.

Because the record reflects that Kentucky is contributing to ozone levels at downwind nonattainment and maintenance receptors, but Kentucky did not adequately analyze that contribution for significance or include enforceable provisions to address it, EPA disapproved the Submission.  *Id*. at 9356.

## D.    EPA's Good Neighbor Plan

The Final Rule triggered EPA's duty to promulgate a FIP "at any time within 2 years."  42 U.S.C. § 7410(c)(1); *EME Homer*, 572 U.S. at 509 ("EPA is not obligated to wait two years or postpone its action even a single day . . . .").  Subject to consent decree deadlines[11] and given the obligation to act as expeditiously as practicable and in time for the 2023 ozone season to relieve public health and regulatory burdens on downwind states, EPA signed the Good Neighbor Plan on March 15, 2023, promulgating an integrated set of FIP requirements for 23 states.  88 Fed. Reg. 36654 (June 5, 2023); Birnbaum Decl. ¶¶ 6-8, 87-95.  The Good Neighbor Plan establishes cost-effective emissions-control requirements through an interstate trading program for power plants, similar to long-running programs in which Kentucky's plants already participate, and through emissions limits based on conventional emissions-control measures for certain, high-emitting

---

[11] *See Sierra Club et al. v. Regan*, No. 3:22-cv-01992-JD (N.D. Cal. Jan. 24, 2023).

units in other industries.  *Id.* ¶¶ 9-14, 18-21, 44, 50-51.  Consistent with D.C.

Circuit rulings binding on EPA, *e.g.*, *Wisconsin*, 938 F.3d at 318, the Good

Neighbor Plan phases in emissions reductions in alignment with statutory

attainment dates, at an achievable pace.  *Id.* ¶¶ 16, 45-54, 70-82.

The Good Neighbor Plan will take effect on August 4, 2023.  *Id.* ¶¶ 22-23.

Absent a stay, Kentucky power plants would begin participating in the trading

program during the 2023 ozone season, which ends September 30.[12]  *Id.* ¶ 32.  The

emissions reductions EPA sought to incentivize in 2023 through the trading

program can be achieved using facilities' existing controls, requiring minimal lead

time.  *Id.* ¶ 44-45, 51.  Through 2025, the program reapplies the same strategies

implemented in two prior rules, the CSAPR Update and the Revised CSAPR

Update.  *Id.* ¶ 29, 46-48, 51, 73, 78.

## III.    Procedural Background

Numerous states and interested parties have challenged the Final Rule in

multiple circuits.[13]  Kentucky and Kentucky Cabinet petitioned for review of the

---

[12] Given the Court's administrative stay of the Final Rule, ECF No. 28, it is unclear
whether any emissions reductions may be achieved from Kentucky power plants in
the 2023 ozone season.

[13] *See, e.g.*, *West Virginia v. EPA*, No. 23-1418 (4th Cir.); *Texas v. EPA*, No. 23-
60069 (5th Cir.) (consolidated); *Arkansas v. EPA*, No. 23-1320 (8th Cir.); *Nev.
Cement Co. v. EPA*, No. 23-682 (9th Cir.); *Utah v. EPA*, No. 23-9509 (10th Cir.);
*Alabama v. EPA*, No. 23-11173 (11th Cir.); *Utah v. EPA*, Nos. 23-1102, *et al.*
(D.C. Cir.) (consolidated).

Final Rule in this Court on March 13, 2023, and March 17, 2023, respectively. *See Kentucky*, No. 23-3216, ECF No. 1; *Kentucky Cabinet*, No. 23-3225, ECF No. 1. EPA has moved to transfer the petitions to the D.C. Circuit or dismiss them for improper venue, as it has in other circuits.[14] Over two months later, on May 23, 2023, Kentucky moved to stay the Final Rule as it relates to Kentucky. *Kentucky*, ECF No. 24-1. On June 1, 2023, Kentucky Cabinet also moved to stay the Final Rule as it relates to Kentucky. *Kentucky Cabinet*, ECF No. 14-1.[15] This Court issued an administrative stay pending the resolution of Kentucky's stay motion. ECF No. 28.

---

[14] A divided Fifth Circuit motions panel denied EPA's venue motion filed in that Court in an unpublished, non-precedential order that does not bind its own merits panel ("*Texas* Order"). *Texas*, No. 23-60069 (5th Cir. May 1, 2023), ECF No. 269 at 24. Additionally, an administrative panel of the Eighth Circuit denied EPA's venue motions without explanation, and a motions panel of the Tenth Circuit has referred the venue motions to the merits panel. *See, e.g.*, *Arkansas*, No. 23-1320 (8th Cir.), ECF No. 5269098; *Utah*, No. 23-9509 (10th Cir. Apr. 28, 2023), ECF No. 010110851717. EPA moved the D.C. Circuit to confirm it is the exclusive venue to review the Final Rule, and to expedite consideration of petitions before it. *See Utah*, No. 1102 (D.C. Cir. May 15, 2023), ECF No. 1999261.

[15] Similar stay motions were filed in the Fifth, Eighth, Ninth, Tenth, and Eleventh Circuits. *See, e.g.*, *Texas*, No. 23-60069 (5th Cir.); *Arkansas*, No. 23-1320 (8th Cir.), *Nevada Cement Co. v. EPA*, 23-682 (9th Cir.); *Utah*, No. 23-9509 (10th Cir.), *Alabama v. EPA*, No. 23-11173 (11th Cir.). The *Texas* Order granted motions to stay the Final Rule as it relates to Texas's and Louisiana's SIP disapproval (later staying as to Mississippi as well), and the Eighth Circuit granted stays for Arkansas and Missouri without explanation. *See, e.g.*, *Arkansas*, No. 23-1320 (8th Cir. May 26, 2023), ECF No. 5280996. Motions remain pending in the Ninth, Tenth, and Eleventh Circuits.

## ARGUMENT

Petitioners' motions should be denied. First, venue is improper. Second, Petitioner fails to make a "clear showing" that the "extraordinary and drastic remedy" of a stay is warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). All four stay factors—(1) strong likelihood of success on the merits, (2) irreparable injury to movant absent a stay, (3) substantial injury to other parties interested in the proceeding, and (4) the public interest, *see Nken v. Holder*, 556 U.S. 418, 426 (2009)—weigh against a stay here.

## I.    The Motion Should Be Denied on Venue Grounds or Transferred to the D.C. Circuit.

Congressional intent dictates that the D.C. Circuit decide motions to stay any portion of the Final Rule. Under the Act, the D.C. Circuit is the exclusive venue for review of any final action that is either "nationally applicable" or "based on a determination of nationwide scope or effect" made and published by EPA.  *See* 42 U.S.C. § 7607(b)(1).  The Final Rule is nationally applicable because it directly applies to SIP submissions from 21 states using the same approach to assess states' Good Neighbor obligations.  Alternatively, the Final Rule is "based on a determination of nationwide scope or effect" because EPA applied nationwide policy judgments and technical analyses in evaluating whether numerous states' emissions cross state boundaries and impair NAAQS compliance by other states, and EPA so found when it published the Final Rule.  Thus, the petitions must be

heard in the D.C. Circuit.  *See, e.g.*, *Kentucky*, No. 23-3216, Venue Mot. at 9-17.

EPA respectfully requests that the Court first determine venue and defer

consideration of the stay motions, because venue is "inextricably bound up with

the remedial decision" of whether a stay should issue.  *Noxell Corp. v. Firehouse*

*No. 1 Bar-B-Que Rest.*, 760 F.2d 312, 315 (D.C. Cir. 1985) (quotation omitted).

Keeping these petitions (and stay motions) in regional circuits is inefficient

and risks inconsistent results, undermining Congress's intent to centralize review

of "national" SIP issues in the D.C. Circuit.  *See* Venue Mot. at 15-16.  Consistent

with 42 U.S.C. § 7607(b)(1), this Court should transfer both the petition and the

stay motion to the D.C. Circuit or dismiss them for improper venue.  *See RMS of*

*Ga., LLC v. EPA*, 64 F.4th 1368, 1375 (11th Cir. 2023) (transferring challenge,

including a pending motion to intervene).

## II.   Kentucky Is Unlikely to Succeed on the Merits.

Under the applicable Administrative Procedure Act ("APA") standard of

review, 5 U.S.C. §§ 701-06, EPA's decisions are afforded great deference.[16]

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983).  Petitioners must make a clear showing that the Final Rule is likely

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

[16] As an action on SIPs, the Final Rule is not subject to the Act's standard-of-review provision.  *See* 42 U.S.C. §§ 7607(d)(1), (9).  However, the standard under the APA is the same.  *St. Marys Cement v. EPA*, 782 F.3d 280, 285 (6th Cir. 2015).

the law." *Sierra Club v. Slater*, 120 F.3d 623, 632 (6th Cir. 2017).  EPA must

simply "examine the relevant data and articulate a satisfactory explanation for its

action." *St. Marys Cement*, 782 F.3d at 285 (cleaned up).

Petitioners fail to make the required showing.  To start, Kentucky Cabinet

fails to analyze the merits of its claims *at all*.  Its conclusory statement that "[t]he

Cabinet is likely to succeed on the merits," Ky. Cab. Mot. at 18-19, is bereft of any

support and falls far short of demonstrating any likelihood of success on the merits.

Because a petitioner must demonstrate that all four factors weigh in favor of a stay,

Kentucky Cabinet's stay motion should be denied on this basis alone.  *See Breeze*

*Smoke, LLC v. FDA*, 18 F.4th 499, 508 (6th Cir. 2021) (denying stay solely based

on movant's failure to demonstrate a strong likelihood of success on the merits).

Moreover, rather than refute EPA's careful reasoning, Kentucky

mischaracterizes the Act's cooperative-federalism framework and caselaw,

ignoring both EPA's statutory obligation to review SIPs for compliance with the

Act and the importance of up-to-date data in the Good Neighbor Provision's

forward-looking analysis.  *See* Ky. Mot. 11-18.  Kentucky further mischaracterizes

its own Submission, the March and August Memos, the Good Neighbor Plan, and

the administrative record.  *Id.*; *see also id.* at 3-9.  Because Kentucky's Submission

failed to address the Commonwealth's downwind impacts, EPA properly

disapproved it.

### A.    EPA Acted Within Its Statutory Oversight Role.

SIPs must comply with the Good Neighbor Provision.  42 U.S.C.
§ 7410(a)(2)(D)(i)(I).  EPA may approve a SIP submission only "*if* it meets all of
the [Act's] applicable requirements."  *Id.* § 7410(k)(3) (emphasis added).  For
Good Neighbor SIPs, EPA must assess whether the submission contains "adequate
provisions" to eliminate significant contribution, and EPA's framework for
evaluating compliance is consistent with its longstanding, statutorily based
approach.  *See supra* Background II.A; *EME Homer*, 572 U.S. at 514-15, 518, 524;
Final Rule at 9338.

Kentucky misunderstands what it means for states to drive the regulatory
process under the Act.  Ky. Mot. 13-14.  While states enjoy wide discretion in
*formulating* SIPs, 42 U.S.C. § 7410(a)(2)(A), the Act requires EPA to ensure SIPs
meet the Act's statutory requirements.  *Id.* § 7410(k)(3); *see Union Electric*, 427
U.S. at 249-50.  EPA must therefore determine whether SIPs contain "necessary or
appropriate" "control measures" and "adequate provisions." *Id.* § 7410(a)(2)(A),
(a)(2)(D)(i)(I).  These determinations require independent evaluation, statutory
interpretation, and supplemental technical analyses by EPA as the expert agency.
*See Ass'n of Irritated Residents v. EPA*, 686 F.3d 668, 677 (9th Cir. 2012)
(highlighting EPA's "affirmative duty" to ensure SIPs demonstrate attainment).

This is especially true in the context of interstate pollution. Distinct from other SIP contexts, the Act grants EPA enhanced authority to enforce the Good Neighbor Provision. Sections 7426(b)-(c) empower EPA to impose federal requirements whenever it grants administrative petitions alleging Good Neighbor violations, outside the SIP process of § 7410(k). *See Genon Rema, LLC v. EPA*, 722 F.3d 513, 522-24 (3d Cir. 2013); *see also Appalachian Power v. EPA*, 249 F.3d 1032, 1045-47 (D.C. Cir. 2001) (upholding EPA's interpretation of § 7410(a)(2)(D)(i)(I) as a "functional prohibition" on emissions that "EPA may deploy either singly or in tandem" with § 7426). EPA's unilateral authority under §§ 7426(b)-(c) dispenses with Kentucky's argument that EPA must defer to upwind states' Good Neighbor determinations.

Kentucky cites non-binding Fifth Circuit caselaw to minimize EPA's role in the SIP process. *See, e.g.*, Ky. Mot. 3 (quoting preliminary-stay holding in *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016)). This narrow interpretation, however, thwarts Congress's mandate that EPA ensure SIP compliance with all provisions of the Act. It is also inconsistent with the views of this Court and other circuits, which recognize EPA may not simply rubber stamp a SIP submission. *See Sierra Club v. EPA*, 793 F.3d 656, 670 (6th Cir. 2015) (finding EPA violated the Act when it approved redesignation requests that did not require necessary measures); *North Dakota v. EPA*, 730 F.3d 750, 761 (8th. Cir. 2013) (EPA "is left with more

than the ministerial task of routinely approving SIP submissions") (citing
*Oklahoma v. EPA*, 723 F.3d 1201, 1206, 1208-10 (10th. Cir. 2013)).  Thus, even
where states are given the primary responsibility to develop SIPs, the Act's
cooperative federalism approach contemplates an active role for both participants.
*See EME Homer*, 572 U.S. at 509; RTC 424-32.

Here, EPA did not disapprove Kentucky's Submission for failing to strictly
follow the 4-step framework or relying on a particular set of modeling, but rather
because the record shows Kentucky contributes to air-quality problems in other
states, and the Submission did not satisfactorily evaluate that contribution for
"significance," nor "contain adequate provisions... prohibiting" its significant
contribution. *See supra* Background I.; 42 U.S.C. § 7410(a)(2)(D).  Upon reaching
this result, EPA was required to disapprove Kentucky's SIP, consistent with EPA's
statutory oversight role. *See, e.g.*, *Westar*, 608 F. App'x at 3-4.

### B.    EPA Reasonably Determined Kentucky's Submission Failed to Comply with the Good Neighbor Provision.

EPA carefully considered Kentucky's Submission and conducted its own,
independent analysis.  Final Rule at 9356, 9366.  EPA ultimately concluded that
the Submission did not comply with the Good Neighbor Provision, a determination
likely to be upheld.

Under any dataset in the record, Kentucky's attempts to dismiss its
contribution to downwind ozone problems were inconsistent with EPA's

25

judicially-upheld analysis under the Good Neighbor Provision (including potential flexibilities suggested in the 2018 memoranda) and caselaw.  None of Kentucky's arguments to the contrary is persuasive:  EPA made no policy change from the March or August Memos, and its updated modeling simply confirmed that Kentucky's emissions contribute to downwind ozone problems.  Even under Kentucky's chosen 2011-based modeling, the Submission should be disapproved. *See* RTC at 298.

In the Submission, Kentucky identified four nonattainment receptors and one maintenance receptor to which the Commonwealth contributed more than 1% of the 2015 NAAQS.  Submission at 18-19.  Under EPA's framework, Kentucky next would have been expected to consider potential emissions reduction opportunities.  Final Rule at 9343.  While Kentucky did not do this, EPA fully considered each of Kentucky's alternative approaches.

*First*, EPA reasonably determined that Kentucky's application of a 1 ppb contribution threshold, instead of 0.70 ppb (1% of the NAAQS), was technically unsupported.  Proposal at 9509.  The August Memo provided that states should adequately support using the higher 1 ppb contribution threshold, August Memo at 1, which EPA has interpreted as needing receptor- and state-specific analysis.  *See*, *e.g.*, 85 Fed. Reg. 12232, 12237-38 (Mar. 2, 2020).  But Kentucky provided no technical analysis.  Proposal at 9509; Final Rule at 9356; RTC 298.

Instead, Kentucky merely stated that it "agree[d]" with the use of a 1 ppb threshold.  Submission at 19.  EPA never suggested that states could simply use the 1 ppb threshold without further analysis.  *See supra* n.4 (explaining that EPA conducted such an analysis as to Iowa but does not intend to supplement future submissions).  Given the lack of any technical analysis to support using a 1 ppb threshold under the facts and circumstances relevant to Kentucky and its linked receptors, EPA reasonably concluded that the Submission did not support approval of the higher threshold.  *See* Proposal at 9509; RTC 298; *Breeze Smoke*, 18 F.4th at 503 (stay movant unlikely to succeed on merits when movant's application did not contain sufficient scientific data to comport with agency guidance).

Kentucky complains that "EPA penalizes Kentucky" for relying exclusively on the August Memo, questioning why the Commonwealth should be required to provide technical support for its reliance on a 1 ppb threshold when it "agree[s] with EPA's recommendation."  Ky. Mot. at 18; *see* Ky. Cab. Mot. at 18. But this argument misstates the August Memo, which only provided a nationwide average assessment[17] and cautioned that "[f]ollowing these recommendations does not ensure that the EPA will approve a SIP revision in all instances . . . as the guidance

---

[17] State-specific circumstances can vary from a nationwide average. *See, e.g.*, RTC at 295-97 (explaining that a 1 ppb threshold for states linked to Texas would cause too much upwind-state contribution to be lost at Texas receptors).

may not apply to the facts and circumstances underlying a particular SIP."  August Memo at 1.

Kentucky is therefore also incorrect that EPA's rejection of its 1 ppb threshold was based on unlawful policy change.  Ky. Mot. at 18.  The plain language of the August Memo and EPA's consistent application of it make clear— EPA has not changed its policy.  EPA's concerns for recognizing alternative thresholds going forward, *see* Final Rule at 9373-75, reflect EPA's broader thinking and do not amount to a policy change in the Final Rule.  Nevertheless, as explained *supra* note 6, Kentucky was linked above 1 ppb in both its Submission and in EPA's final air-quality analysis, so this issue is not dispositive.

*Second*, EPA reasonably determined that the Submission lacked justification for Kentucky's treatment of a maintenance receptor to which Kentucky acknowledged it was contributing above 1 ppb.  Kentucky's view that the "interfere with maintenance" clause is satisfied by relying only on existing emissions controls was inconsistent with the Act.  Final Rule at 9348 (discussing *North Carolina*, 531 F.3d at 910-11, which held that EPA and states must give independent effect to this clause).  Maintenance receptors are those for which the data indicates a risk of future nonattainment under varying meteorological conditions—a concern borne out for Harford, Maryland, which continues to be in nonattainment.  *See supra* n.5.  EPA reasonably determined that Kentucky's

interpretation was not approvable. And, *contra* Ky. Mot. at 6, EPA reasonably concluded that, to the extent Kentucky sought to take credit for upcoming emissions reductions to address its contribution to that receptor, these reductions were already accounted for in EPA's modeling and not included as enforceable measures in the SIP. *See supra* Background II.C.

For these reasons, EPA reasonably disapproved Kentucky's Submission, under the Commonwealth's chosen 2011-based modeling and the August Memo. EPA did not rigidly apply each component of its own 4-step framework but applied the Act and case law, and EPA considered Kentucky's alternative approaches.

### C.    EPA Reasonably Evaluated SIP Submissions Using Up-To-Date Air-Quality Data.

Because EPA reasonably disapproved Kentucky's Submission under the Commonwealth's chosen 2011-based modeling, this Court need not address Kentucky's criticism of EPA's consideration of the most accurate air-quality data. Ky. Mot. 11-17. *See Sierra Club v. EPA*, 939 F.3d 649, 687 (5th Cir. 2019) (upholding EPA's SIP approval based on state's chosen modeling without reaching merits of EPA's modeling). But if considered, this argument, too, falls flat.

Nothing in the Act prohibits EPA from considering the most accurate, up-to-date data to evaluate Good Neighbor obligations, and EPA consistently considers such data. *See, e.g.*, 81 Fed. Reg. 53284, 53284-86 (Aug. 12, 2016); 81 Fed. Reg. 74504, 74507 (Oct. 26, 2016). It would be "anomalous" for EPA to ignore the

most reliable data for making projections, as the Good Neighbor Provision focuses on air-quality conditions in a *future* year, here 2023. *Wisconsin*, 938 F.3d at 321-22; Final Rule at 9366. EPA's consideration of this information upholds its duty to act reasonably, whereas limiting its review to outdated data risks arbitrariness. *See Sierra Club v. EPA*, 671 F.3d 955, 967-68 (9th Cir. 2012) (finding arbitrary and capricious EPA's failure in SIP review to consider newly available data).

Further, Kentucky's complaint is transparently self-serving: Kentucky did not dispute EPA's ability to consider post-submission analysis and modeling when EPA used such data as a basis to approve other Kentucky SIPs. *See, e.g.*, 83 Fed. Reg. 33730, 33731 (July 17, 2018) (approving 2008 ozone NAAQS Good Neighbor SIP based on updated modeling); 84 Fed. Reg. 30920, 30926-27 (June 28, 2019) (approving a sulfur dioxide attainment SIP from Kentucky based in part on supplemental analysis and modeling developed after EPA received the submission). Just as nothing prohibited EPA from considering the most accurate data when it acted on those submissions, nothing prevents EPA from doing so here.

Kentucky's allegations of delay are irrelevant. Ky. Mot. at 11-13. Nothing in the Act prevents EPA from relying on data post-dating EPA's procedural deadline to act on a SIP submission. The only remedy for EPA's failure to perform a nondiscretionary duty is a court-ordered deadline to act. *See* 42 U.S.C. § 7604(a)(2). Missing a deadline under the Act does not nullify EPA's authority to

implement the Act's requirements.  This Court rejected a similar argument by

Jefferson County, Kentucky in *Air Pollution Control District v. EPA*, when the

county asserted EPA's delay was grounds for granting its administrative petition

that asked EPA to require emissions reductions from an upwind state's source.

739 F.2d at 1079-80.  In relevant part, the Court concluded that the only remedy

for agency delay is an order compelling agency action.  *Id.* at 1080; *accord*

*Oklahoma*, 723 F.3d at 1223-24.  There is therefore no legal basis to support

Kentucky's argument in the present case that EPA should be prohibited from

considering new modeling due to its delay in acting on the Submission.

Kentucky mistakenly relies on *Sierra Club v. EPA*, 356 F.3d 296 (D.C. Cir.

2004) and EPA's actions in other contexts to argue that EPA's "longstanding

policy" requires limiting its analysis to modeling "available at the time of SIP

development," Ky. Mot. 16; *see also* Ky. Cab. Mot. at 18-19.  No such

"longstanding policy" exists.  *See, e.g.*, 86 Fed. Reg. 67329, 67332 (Nov. 26, 2021)

("[I]t would be inappropriate for the EPA to ignore monitoring data that clearly

establish, as a factual matter, that the [state's] attainment demonstration failed to

provide for attainment.").

Further, that case and the EPA actions that Kentucky cites address a

different Act requirement that states incorporate a "*current* inventory of *actual*

emissions" in nonattainment plans.  42 U.S.C. § 7502(c)(3) (emphasis added); RTC

31

61.  By contrast, the Good Neighbor Provision requires analyzing whether emissions "will" contribute to another state's ozone problem, which is a forward-looking analysis, here focused on the year 2023.  The data Kentucky had available *and* the additional data EPA considered were both relevant to this evaluation.

In considering updated modeling, EPA committed no "surprise switcheroo." *See* Mot. 15 (quotation omitted).  As in the August Memo, the March Memo sharing the 2011-based modeling contained multiple caveats and did not provide that using the 2011-based modeling would guarantee EPA's approval of a SIP submission.  March Memo at 1-4; Final Rule at 9340.  The 2016-based modeling released at proposal and refined at final in response to comments did not constitute a change in policy, but rather uses the most up-to-date information.[18]  The modeling identified Kentucky as linked to downwind nonattainment and maintenance receptors in 2023, Proposal at 9508, and reinforced EPA's determination that Kentucky potentially "contribute[s] significantly to nonattainment in, or interfere[s] with maintenance" of the NAAQS in downwind states.  42 U.S.C. § 7410(a)(2)(D)(i)(I); Proposal at 9508; Final Rule at 9367; RTC at 201-03; *see also Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170-71

---

[18] For the same reason, the Final Rule does not implicate any "reliance interest" in EPA's 2011-based modeling.  *Cf.* Ky. Mot. at 15-16.

(2007) (holding that an ability to comment in rulemaking was "unlikely" to create "unfair surprise").

Under any version of EPA's modeling, Kentucky is contributing to downwind air-quality problems. There was no "switch[]" in EPA's ultimate determination, nor can Kentucky claim "surprise" by the updated modeling's results. If the Court considers this argument (which it need not), Kentucky still cannot succeed on the merits.

## III.    Kentucky Has Not Shown Irreparable Harm Absent a Stay.

Kentucky fails to carry its burden of establishing irreparable harm absent a stay. Irreparable harm must be "both certain and great," *i.e.*, "actual and not theoretical," *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), nor "speculative," *Mass. Bldg. Trades Council v. Dep't of Lab.*, 21 F.4th 357, 387 (6th Cir. 2021). Petitioners identify no such harm.

Petitioners' failure to make such a showing is unsurprising. The Final Rule does not require Petitioners to do *anything* and thus effects no irreparable harm itself. *See* 88 Fed. Reg. at 9364. Accordingly, Petitioners allege harm associated with the separate Good Neighbor Plan, Ky. Mot. at 19-20; Ky. Cab. Mot. 19-20, but Petitioners are free to challenge that separate action in the D.C. Circuit. Petitioners have not asserted that the Good Neighbor Plan is incontestable, such that they could not challenge (and move to stay) that FIP in separate litigation.

Thus, Petitioners have not carried their burden to show that harm traceable to the Good Neighbor Plan is irreparable absent a stay in *this* case.  *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate . . . relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." (citation omitted)).

Moreover, Petitioners have not demonstrated certain and great irreparable harm from the Good Neighbor Plan.  To start, Petitioners' allegations of "disruption" to the cooperative-federalism framework are incorrect for the reasons explained *supra* Argument II.A.  *See* Ky. Mot. at 19, Ky. Cab. Mot. at 19-20.  And the Good Neighbor Plan preserves compliance flexibility.  Birnbaum Decl. ¶81 (the FIP "does not require or mandate any specific pollution control installation").  Kentucky may always replace the FIP with a SIP that complies with the Act.  Final Rule at 9362.  This is precisely how the Act's cooperative federalism framework was designed to work.

Petitioners' claims of urgency are inflated.  The Good Neighbor Plan does not require the extensive immediate action that Kentucky Cabinet suggests.  *See* Ky. Cab. Mot. at 19.  Through 2025, the trading program will encourage Kentucky power plants to run their *existing* pollution controls and make modest "combustion control" upgrades at two plants—a reapplication of strategies successfully implemented under recent rules.  Birnbaum Decl. ¶¶ 45-49, 72.  Compliance is

readily achievable in these years. *Id.* ¶¶ 69-78. Indeed, as Kentucky acknowledges, the Good Neighbor Plan does not phase in emissions reductions consistent with SCR technology until the 2026-2027 ozone season. Ky. Mot. at 8 n.1. That schedule provides the time needed to install those controls if sources choose to do so or to pursue alternative compliance strategies; indeed, the Kentucky example Petitioners cite was described under oath as ensuring "safe, reliable, and lowest-reasonable-cost service" for years to come. Birnbaum Decl. ¶¶ 49-52, 80 & n.24.

Petitioners also fail to show that the Good Neighbor Plan will increase electricity prices and decrease power grid reliability. Ky. Mot. at 19-20; Ky. Cab. Mot. at 19. Their concerns misunderstand the Good Neighbor Plan and—far from being certain or great—are unfounded.

First, Petitioners' fears of increased costs of electricity are not supported by evidence. As EPA's analysis revealed, the FIP's "effect on retail electricity prices... [is] projected to be exceedingly small." Birnbaum Decl. ¶ 60 (citing projected changes in electricity prices of 0% in 2023 and on the order of 0-1% through 2030). The total compliance costs associated with the FIP are comparable to, or even less than the costs associated with prior interstate transport rules that have been judicially upheld. Birnbaum Decl. ¶ 10. Compliance costs are projected to be even lower when the Inflation Reduction Act is considered. *See id.* ¶ 61.

These minimal burdens, coupled with cost-savings and other benefits from the Plan, are unlikely to create "economic hardship" for Kentucky's citizens.  *See* Ky. Cab. Mot. at 19; Birnbaum Decl. ¶¶ 80-82, 95.

Petitioners' concerns about the effect on grid reliability are also groundless. In finalizing the Good Neighbor Plan, EPA ensured that it will not "disrupt[] the reliable operation of the bulk power grid."  Birnbaum Decl. ¶¶ 39-42; *see also id.* ¶¶ 53, 58-59, 77-78, 80 (explaining that the Good Neighbor Plan is "readily achievable" and "designed so as not to threaten resource adequacy or otherwise degrade electric system reliability in any state or region").  EPA assessed power capacity reserve margins and confirmed that "reserve margin projections under the Plan remain consistent with baseline projections and are at or above target reserve margins"; "[f]or all [NERC] reliability assessment regions and for all years, adequate reserve margins are projected to be maintained."  *Id.* ¶¶ 58-59.  Invoking "reliability" as a reason to block EPA power plant rules is nothing new.  Yet, "[t]here has not been, nor have Declarants identified, a single instance where implementation of [other] EPA trading programs has caused an adverse reliability impact," *id.* ¶ 24.  The Good Neighbor Plan does not threaten to disrupt Kentucky's electric services.  Petitioners' purported harms are therefore built on speculation and cannot justify a stay.

Finally, Petitioners' monthslong delay in moving to stay blunts a "claim of urgency and counsels against the grant of a stay." *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1318 (1983). Because Petitioners have demonstrated no irreparable harm from the Final Rule—or the Good Neighbor Plan—a stay is not warranted here.

## IV.    The Balance of Equities and Public Interest Disfavor a Stay.

Petitioners gloss over the remaining factors and likewise fail to show "that the balance of equities tips in [their] favor, and that a[] [stay] is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The Good Neighbor Provision addresses the serious problem of upwind states' emissions significantly contributing to downwind air-quality problems. *EME Homer,* 572 U.S. at 497-99. Though its emissions impact multiple downwind states, Kentucky proposed to do *nothing* to limit its emissions.

A stay would leave no law on the books to address Kentucky's harmful emissions to other states under the 2015 ozone NAAQS, delaying EPA's efforts to implement Congress's mandate to upwind states to reduce emissions as expeditiously as practicable. *See* Birnbaum Decl. ¶¶ 83-89. In line with that mandate, the Good Neighbor Plan was designed to encourage emissions reductions beginning in 2023, which is the last year that air-quality monitoring data can be used to inform whether areas have attained the NAAQS. *Id.* ¶¶ 88-92. Thus, in

addition to its public health benefits, the timing of the Good Neighbor Plan was designed to potentially relieve regulatory burdens faced by downwind nonattainment areas and comply with prior rulings. *Id.* ¶¶ 89-95. A stay would upend this planning, with cascading administrative challenges for both EPA and state air agencies. *Id.* ¶¶ 93-96.

Indeed, Kentucky's emissions are linked to ozone nonattainment areas spanning five states: Michigan, Ohio, New Jersey, New York, and Connecticut. Each of these areas has been classified to "Moderate" nonattainment, triggering a wave of mandatory requirements. *Id.* ¶ 90. Without relief from upwind-state emissions in 2023, these areas (and others that stand to benefit) are at greater risk of failing to attain by the 2024 attainment deadline, thus triggering reclassification to "Serious" and another wave of mandatory statutory requirements. *Id.* ¶¶ 88-95. Staying the Final Rule as to Kentucky would be inequitable, impeding downwind states' efforts to attain the NAAQS and letting Kentucky "reap[] the benefits . . . without bearing all the costs," *EME Homer*, 572 U.S. at 495.

Petitioners' contrary arguments are unpersuasive, merely reiterating points made in their merits- and harm-factor analysis, which fail for the reasons described above. Their concerns about grid reliability are unfounded, *supra* Argument III, and past delay does not justify more delay on matters of important public health protection. Indeed, further delay contravenes the Act's requirements. *See supra*

Background II.C.  Nor has prior delay prejudiced Kentucky, as the updated

modeling was not dispositive to EPA's disapproval, *see supra* Argument II.B, and

the statute does not require EPA to give states time to correct deficiencies before

issuing a FIP.  *See* Background II.D.

Petitioners incur no harm, but the impacts of Kentucky's failure to address

its role in poor air quality are occurring now, affecting millions of citizens and

imposing unfair regulatory burdens on those downwind.  *See Wisconsin*, 938 F.3d

at 314.  These factors weigh heavily in favor of denying Petitioners' stay motions.

## CONCLUSION

For these reasons, the Court should deny Petitioners' stay motions.

Respectfully submitted,

TODD KIM
Assistant Attorney General

Of Counsel:

ROSEMARY HAMBRIGHT KABAN
DANIEL P. SCHRAMM
U.S. Environmental Protection Agency
Office of General Counsel
Washington, DC

 *s/ Alexandra L. St Romain*
ALEXANDRA L. ST. ROMAIN
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0490
Sarah.izfar@usdoj.gov

June 16, 2023

## CERTIFICATES OF COMPLIANCE

I hereby certify that this motion complies with the requirements of Fed. R. App. P. 27(d)(2)(A) and this Court's June 7, 2023, order, *see Kentucky*, ECF No. 30, because it contains 8,862 words according to the count of Microsoft Word, excluding the parts of the motion exempted by Fed. R. App. P. 32(f), and therefore is within the word limit of 5,200 words.

I further certify that this motion complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally-spaced font, and is double-spaced, except for headings, block quotes, and footnotes.


Dated: June 16, 2023

 *s/ Alexandra L. St. Romain*
ALEXANDRA L. ST. ROMAIN

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing EPA's response in opposition to Kentucky's motion for a stay pending review on all registered counsel through the Court's electronic filing system (CM/ECF).

Dated: June 16, 2023

*s/ Alexandra L. St. Romain*
ALEXANDRA L. ST. ROMAIN