Nos. 23-3216; 23-3225

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

———————————

COMMONWEALTH OF KENTUCKY, et al.,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents*.

———————————

PETITION FOR REVIEW OF A FINAL AGENCY ACTION OF THE UNITED
STATES ENVIRONMENTAL PROTECTION AGENCY

———————————

**EPA'S APPENDIX TO CONSOLIDATED RESPONSE IN OPPOSITION
TO PETITIONERS' MOTIONS FOR A STAY PENDING REVIEW
(VOL. 2)**

———————————

TODD KIM
*Assistant Attorney General*

*Of Counsel:*
ROSEMARY HAMBRIGHT KABAN    ALEXANDRA L. ST. ROMAIN
DANIEL P. SCHRAMM    *U.S. Department of Justice*
  *Office of the General Counsel*    *Environment and Natural Resources*
  *U.S. Environmental Protection*      *Division*
    *Agency*    *P.O. Box 7611*
  *Washington, DC*    *Washington D.C. 20044-7611*

## <u>TABLE OF CONTENTS</u>

EPA, Final Rule, *Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 9336 (Feb. 13, 2023) ...................................................................................Ex. 1

EPA, 2015 Ozone NAAQS Interstate Transport SIP Disapprovals – Response to Comments (RTC) Document (Jan. 31, 2023) ...................................................Ex. 2

EPA, Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I) (Mar. 27, 2018) ("March Memo") ...........................................................................................Ex. 3

EPA, Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards (Aug. 31, 2018) ("August Memo") ...........................................................................................Ex. 4

Kentucky Energy and Environment Cabinet, Final Kentucky Infrastructure State Implementation Plan: 2015 Ozone National Ambient Air Quality Standards (Jan. 2019) ("Submission") .....................................................................................Ex. 5

Declaration of Rona Birnbaum ("Birnbaum Declaration"), Signed June 7, 2023 .......................................................................................Ex. 6

EPA, Proposed Rule, *Air Plan Disapproval; Kentucky; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards*, 87 Fed. Reg. 9498 (Feb. 22, 2022). ...............................................................Ex. 7

**EXHIBIT 5 (cont.)**

Kentucky Energy and Environment Cabinet, Final Kentucky Infrastructure State Implementation Plan: 2015 Ozone National Ambient Air Quality Standards (Jan. 2019) ("Submission")



**Final Technical Support Document**

As an example, consider some selected monitors designated by EPA in its March 2018 memorandum as nonattainment (Table 9-3). Using OSAT/APCA contribution results for the four noted monitors, contributions from Mexico and Canada range between 0.44 and 1.24 ppb and boundary conditions have modeled contribution of between 17.53 and 24.67 ppb. Should a state request relief from the Mexican and Canadian contribution (as noted above) and request relief from a reasonable proportion of the boundary condition values (presumed to be of international anthropogenic origin), all of these monitors could also demonstrate attainment with the 70 ppb NAAQS.

**Table 9-3. International Contribution to Select Nonattainment Monitors and Anticipated Average Ozone Design Values (ppb) with Reasonable Proportion of Boundary Condition Relief.**

| Site ID | State | County | 2023 Avg DV | Mex/Can Contrib. | Boundary Contrib. | 2023 DV 2% Relief | 2023 DV 5% Relief | 2023 DV 7% Relief | 2023 DV 11% Relief |
|---|---|---|---|---|---|---|---|---|---|
| 480391004 | Texas | Brazoria | 74.0 | 0.44 | 24.02 | 73.0 | 72.3 | 71.8 | 70.9 |
| 484392003 | Texas | Tarrant | 72.5 | 1.24 | 24.38 | 70.7 | 70.0 | 69.5 | 68.5 |
| 482011039 | Texas | Harris | 71.8 | 0.47 | 24.67 | 70.8 | 70.0 | 69.6 | 68.6 |
| 551170006 | Wisconsin | Sheboygan | 72.8 | 0.69 | 17.53 | 71.7 | 71.2 | 70.8 | 70.1 |

In this particular example, assuming a reasonable 2% of the boundary conditions as international anthropogenic contribution, two of the three Texas monitors show demonstrated attainment with the 2015 NAAQS. Assuming a 7% relief of the boundary conditions as international anthropogenic contribution, the Sheboygan, Wisconsin monitor joins the two Texas monitors in demonstrated attainment. And with an assumption that 11% of the contribution from modeled boundary conditions could be attributed to international anthropogenic contribution to the Texas monitors, all four of the selected EPA-identified nonattainment monitors would show attainment with the 70 ppb NAAQS.

Additionally, should a state like Wisconsin choose to conduct source apportionment studies on the 4km domain, their starting point for the calculation would begin with an average 2023 DV of 71.7 ppb; only 0.8 ppb from attainment. One may reasonably assume that a 4km source attribution analysis would show an approximately consistent amount of Canadian/Mexican and boundary condition contribution as the 12km results above, requiring an even lower (or no) percentage of boundary condition relief to demonstrate modeled attainment.

## 9.4 ALTERNATE SIGNIFICANCE THRESHOLD

Some states argue that significant contribution threshold of 1% of NAAQS (0.70 ppb for 2015 ozone NAAQS) value is arbitrary and has never been supported by any scientific argument. Concerns have been raised that this value is more stringent than current 2016 EPA Significant Impact Level (SIL) guidance of 1.0 ppb which is designed as an individual source or group of sources' contribution limit (Boylan, 2018). There is a potential for states to submit SIP revision citing SIL as acceptable for total state anthropogenic contribution threshold. In these cases,



under Step 2 of the four-step process, states may wish to review their contribution to downwind receptors and request relief from the 1% threshold in lieu of using an alternate value. In the example below, we review Texas nonattainment and maintenance monitors as defined by EPA's March 2018 memo. In the Table 9-4, we have also included the OSAT/APCA contributions documented by EPA in that memo.

**Table 9-4. EPA 12km OSAT/APCA contributions to Texas nonattainment and maintenance monitors. Blue + orange cells indicate states significantly contributing with 1% threshold. Orange cells indicate states significantly contributing with > 1ppb threshold.**

| Site ID | State | County | Ozone DV (ppb) | | EPA OSAT/APCA Significant Contribution (ppb) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2023 Avg DV | 2023 Max DV | AR | IL | LA | MS | MO | OK |
| 480391004 | Texas | Brazoria | 74.0 | 74.9 | 0.90 | 1.00 | 3.80 | 0.63 | 0.83 | 0.90 |
| 484392003 | Texas | Tarrant | 72.5 | 74.8 | 0.78 | 0.29 | 1.71 | 0.27 | 0.38 | 1.71 |
| 482011039 | Texas | Harris | 71.8 | 73.5 | 0.99 | 0.88 | 4.72 | 0.79 | 0.88 | 0.58 |
| 482010024 | Texas | Harris | 70.4 | 72.8 | 0.29 | 0.34 | 3.06 | 0.50 | 0.38 | 0.20 |
| 481210034 | Texas | Denton | 69.7 | 72.0 | 0.58 | 0.23 | 1.92 | 0.33 | 0.24 | 1.23 |
| 482011034 | Texas | Harris | 70.8 | 71.6 | 0.54 | 0.51 | 3.38 | 0.39 | 0.63 | 0.68 |

As can be seen in this example, should the significant contribution threshold be raised from 1% of NAAQS (0.70 ppb) to a greater than 1.0 ppb limit, Arkansas, Illinois, Mississippi, and Missouri would all have their contribution linkages broken to all six monitors and the only state linked to the monitor with the highest design value (Brazoria) would be Louisiana, with significant contribution (3.80 ppb) greater than all other 1% linked states combined (3.68 ppb).

## 9.5 PROPORTIONAL CONTROL BY CONTRIBUTION ("RED LINES")

In EPA's March 2018 memorandum, the agency also recognizes that consideration can be given to states based on their relative significant impact to downwind air quality monitors compared to other significant contributing states and whether the contribution values are sufficiently different enough that each state should be given a proportional responsibility for assisting in downwind attainment. Under an analysis like this, reductions should be allocated in proportion to the size of their contribution to downwind nonattainment.

Using the Harford, MD (240251001) monitor and the OSAT-derived significant contribution results from the 4km modeling from Table 8-5, we see the following calculations based on the required 0.2 ppb reduction necessary for this monitor to demonstrate attainment with the 2015 ozone NAAQS.

In the example for Harford, each significantly contributing (based on 1% NAAQS) upwind State must (1) achieve less than 0.70 ppb significant contribution or (2) the monitor must achieve

**ALPINE
GEOPHYSICS**

Final Technical Support Document

attainment (70.9 pbb). From these assumptions, the reduction necessary for attainment is 0.2 ppb from 71.1 ppb 2023 base case average design value.

**Table 9-5. Proportional contribution and reductions associated with significantly contributing upwind states to Harford, MD (240251001) monitor in 4km modeling domain.**

| Region | Relative Contribution | | | Required Reduction |
|--------|-------|------|---|-------|
| | ppb | % | | ppb |
| VA/DC | 3.92 | 22% | | 0.04 |
| OH | 3.02 | 17% | | 0.03 |
| PA | 2.70 | 15% | | 0.03 |
| WV | 2.52 | 14% | | 0.03 |
| KY | 2.07 | 12% | | 0.02 |
| IN | 1.81 | 10% | | 0.02 |
| IL | 1.05 | 6% | | 0.01 |
| TX | 0.90 | 5% | | 0.01 |
| Total | 17.99 | 100% | | 0.20 |

Using this monitor as an example, we can see that as a result of the proportional reduction requirement associated with the relative significant contribution from each upwind state, a range of 0.04 ppb (from the Virginia/DC OSAT region) to a 0.01 ppb reduction (from Illinois and Texas) would be calculated using this method. From these results, each upwind state would then need to craft a GNS revision to generate reductions associated with this proportional amount.

Similarly, using the Brazoria, TX (480391004) monitor and the OSAT/APCA-derived significant contribution results from EPA's 12km modeling (Tsirigotis, 2018), we see the following calculations (Table 9-6) based on the required 3.1 ppb reduction necessary for this monitor to demonstrate attainment with the 2015 ozone NAAQS.

**Table 9-6. Proportional contribution and reductions associated with significantly contributing upwind states to Brazoria, TX (480391004) monitor in 12km modeling domain.**

| Region | Relative Contribution | | | Required Reduction |
|--------|-------|------|---|-------|
| | Ppb | % | | ppb |
| LA | 3.80 | 51% | | 1.57 |
| IL | 1.00 | 13% | | 0.41 |
| AR | 0.90 | 12% | | 0.37 |
| OK | 0.90 | 12% | | 0.37 |
| MO | 0.88 | 12% | | 0.36 |
| Total | 7.48 | 100% | | 3.10 |



**ALPINE
GEOPHYSICS**

**Final Technical Support Document**

In this example, each significantly contributing (again based on 1% NAAQS) upwind State must also (1) achieve the 0.70 ppb significant contribution or (2) the monitor must achieve attainment (70.9 pbb). From these assumptions, the reduction necessary for attainment is 3.1 ppb from 74.0 ppb 2023 base case average design value.

Using this monitor, we can see that as a result of the proportional reduction requirement associated with the relative significant contribution from each upwind state, a range of 3.80 ppb (from Louisiana) to a 0.88 ppb reduction (from Missouri) would be calculated using this method. From these results, each upwind state would then need to craft a GNS revision to generate reductions associated with this proportional amount.

## 9.6 ADRESSING MAINTENANCE WITH 10 YEAR EMISSION PROJECTION

As an alternative to maintenance monitors being accorded the same weight as nonattainment monitors, states may choose to indicate that no additional control would be needed to address a maintenance monitor if the upwind state can show that either the monitor is likely to remain in attainment for a period of 10 years or that the upwind state's emissions will not increase for 10 years after the attainment date. Such an approach is consistent with Section 175A of the Clean Air Act which provides:

> *(a) Plan revision*
> *Each State which submits a request under section 7407 (d) of this title for redesignation of a nonattainment area for any air pollutant as an area which has attained the national primary ambient air quality standard for that air pollutant shall also submit a revision of the applicable State implementation plan to provide for the maintenance of the national primary ambient air quality standard for such air pollutant in the area concerned for at least 10 years after the redesignation. The plan shall contain such additional measures, if any, as may be necessary to ensure such maintenance.*

It is also consistent with the John Calcagni memorandum of September 4, 1992 (Calcagni, 1992), entitled "Procedures for Processing Requests to Redesignate Areas to Attainment", which contains the following statement on page 9:

> *"A State may generally demonstrate maintenance of the NAAQS by either showing that future emissions of a pollutant or its precursors will not exceed the level of the attainment inventory, or by modeling to show that the future mix of source and emission rates will not cause a violation of the NAAQS. Under the Clean Air Act, many areas are required to submit modeled attainment demonstrations to show that proposed reductions in emissions will be sufficient to attain the applicable NAAQS. For these areas, the maintenance demonstration should be based upon the same level of modeling. In areas where no such modeling was required, the State should be able to rely on the attainment inventory approach. In both instances, the demonstration should be for a period of 10 years following the redesignation. "*



**ALPINE GEOPHYSICS**

Final Technical Support Document

Using the Harford, MD (240251001) monitor as an example, assuming previous steps and determining that this monitor would now be considered a maintenance monitor using the EPA methods, we would look at the upwind states that were determined to contribute significantly to this receptor in the 2023 model simulation.

As seen in Table 9-7, any of the following linked states may then make the claim that as their emissions are projected to decrease over a ten year period (the following example is illustrative in nature and uses a twelve year trend based on EPA's 2023en modeling platform summaries[12]) and would demonstrate maintenance of the NAAQS by showing that their future emissions of a pollutant or its precursors will not exceed the level of the attainment inventory.

**Table 9-7. Emission trend of annual anthropogenic NOx emissions (tons) for 1% linked states to Harford, MD monitor.**

| State | Annual Anthropogenic NOx Emissions | | | |
|---|---|---|---|---|
| | 2011 (Tons) | 2023 (Tons) | Change (Tons) | Change (%) |
| District of Columbia | 9,404 | 4,569 | -4,834 | -51% |
| Illinois | 506,607 | 293,450 | -213,156 | -42% |
| Indiana | 444,421 | 243,954 | -200,467 | -45% |
| Kentucky | 327,403 | 171,194 | -156,209 | -48% |
| Michigan | 443,936 | 228,242 | -215,694 | -49% |
| Ohio | 546,547 | 252,828 | -293,719 | -54% |
| Pennsylvania | 562,366 | 293,048 | -269,318 | -48% |
| Texas | 1,277,432 | 869,949 | -407,482 | -32% |
| Virginia | 313,848 | 161,677 | -152,171 | -48% |
| West Virginia | 174,219 | 136,333 | -37,886 | -22% |

---

[12] ftp://ftp.epa.gov/EmisInventory/2011v6/v3platform/reports/2011en_and_2023en/2023en_cb6v2_v6_11g_state_sector_totals.xlsx

**ALPINE
GEOPHYSICS**

# 10.0 REFERENCES

Abt. 2014. Modeled Attainment Test Software – Users Manual. Abt Associates Inc., Bethesda, MD. April. (http://www.epa.gov/ttn/scram/guidance/guide/MATS_2-6-1_manual.pdf).

Alpine. 2017a. "Good Neighbor" Modeling for the Kentucky 2008 8-Hour Ozone State Implementation Plan - Final Modeling Protocol. Alpine Geophysics, LLC. October.

Alpine. 2017b. "Good Neighbor" Modeling for the Kentucky 2008 8-Hour Ozone State Implementation Plan - Final Modeling Report. Alpine Geophysics, LLC. November.

Alpine. 2018a. Midwest Ozone Group 2011 WRF Model Application and Performance Evaluation Report. Alpine Geophysics, LLC. February.

Alpine. 2018b. Ozone Model Performance Evaluation of MOG 4km Modeling Domains. Alpine Geophysics, LLC. June.

Arnold, J.R., R.L. Dennis, and G.S. Tonnesen. 2003. "Diagnostic Evaluation of Numerical Air Quality Models with Specialized Ambient Observations: Testing the Community Multiscale Air Quality Modeling System (CMAQ) at Selected SOS 95 Ground Sites", *Atmos. Environ.*, Vol. 37, pp. 1185-1198.

Arnold, J.R.; R.L. Dennis, and G.S. Tonnesen. 1998. Advanced techniques for evaluating Eulerian air quality models: background and methodology. In: Preprints of the 10th Joint Conference on the Applications of Air Pollution Meteorology with the Air & Waste Management Association, January, Phoenix, Arizona. American Meteorological Society, Boston, Massachusetts, paper no. 1.1, pp. 1-5.

Arunachalam, S. 2009. Peer Review of Source Apportionment Tools in CAMx and CMAQ. University of North Carolina Institute for the Environment, Chapel Hill, NC. August 31. (http://www.epa.gov/scram001/reports/SourceApportionmentPeerReview.pdf).

Boylan, J. W. 2004. "Calculating Statistics: Concentration Related Performance Goals", paper presented at the EPA PM Model Performance Workshop, Chapel Hill, NC. 11 February.

Boylan, J. W. (May 4, 2018). *Georgia EPD Comments on EPA's March 27, 2018 Interstate Transport Memo* [Memorandum]. Air Protection Branch, Georgia EPD.

Byun, D.W., and J.K.S. Ching. 1999. "Science Algorithms of the EPA Models-3 Community Multiscale Air Quality (CMAQ) Modeling System", EPA/600/R-99/030.

Calcagni. J. (September 4, 1992). *Procedures for Processing Requests to Redesignate Areas to Attainment* [Memorandum]. Research Triangle Park, NC: U.S. EPA, Office of Air Quality Planning and Standards. Retrieved from https://www.epa.gov/sites/production/files/2016-03/documents/calcagni_memo_-_procedures_for_processing_requests_to_redesignate_areas_to_attainment_090492.pdf

Carter, W.P.L. 1999. Documentation of the SAPRC-99 Chemical Mechanism for VOC Reactivity Assessment, Draft report to the California Air Resources Board, Contracts 92-329 and 95-308, 9/13/99.

Coats, C.J. 1995. Sparse Matrix Operator Kernel Emissions (SMOKE) Modeling System, MCNC Environmental Programs, Research Triangle Park, NC.

Colella, P., and P.R. Woodward. 1984. The Piecewise Parabolic Method (PPM) for Gas-dynamical Simulations. *J. Comp. Phys.*, 54, 174201.



Emery, C., E. Tai, and G. Yarwood. 2001. "Enhanced Meteorological Modeling and Performance Evaluation for Two Texas Episodes", report to the Texas Natural Resources Conservation Commission, prepared by ENVIRON, International Corp, Novato, CA.

Emery, C.A., E. Tai, E., R. E. Morris, G. Yarwood. 2009a. Reducing Vertical Transport Over Complex Terrain in CMAQ and CAMx; AWMA Guideline on Air Quality Models Conference, Raleigh, NC, October 26-30, 2009.

Emery, C.A., E. Tai, R.E. Morris, G. Yarwood. 2009b. Reducing Vertical Transport Over Complex Terrain in Photochemical Grid Models; 8th Annual CMAS Conference, Chapel Hill, NC, October 19-21, 2009.

Emery, C., E. Tai, G. Yarwood and R. Morris. 2011. Investigation into approaches to reduce excessive vertical transport over complex terrain in a regional photochemical grid model. *Atmos. Env.*, Vol. 45, Issue 39, December 2011, pp. 7341-7351. (http://www.sciencedirect.com/science/article/pii/S1352231011007965).

ENVIRON and UCR. 2004. "Modeling Protocol for the CENRAP 2002 Annual Emissions and Air Quality Modeling." ENVIRON International Corporation and University of California at Riverside. November.

ENVIRON and Alpine. 2005. CONCEPT Emissions Modeling User's Guide. ENVIRON International Corporation, Novato, CA. Alpine Geophysics, LLC, Arvada, CO. May 27 (http://www.ladco.org/reports/rpo/emissions/new_emissions_model_concept_introdu ction_alpine_environ.pdf)

ENVIRON. 2015. User's Guide Comprehensive Air-quality Model with extensions Version 6.3. ENVIRON International Corporation, Novato, CA. March. (http://www.camx.com/files/camxusersguide_v6-3.pdf).

EPA. 1991. "Guidance for Regulatory Application of the Urban Airshed Model (UAM), "Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, Research Triangle Park, N.C.

EPA. 1999. "Draft Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-hr Ozone NAAQS". Draft (May 1999), U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Research Triangle Park, N.C

EPA. 2001. "Guidance Demonstrating Attainment Air Quality Goals for PM2.5 and Regional Haze". Draft Final (17 February 2005), U.S. Environmental Protection Agency, Atmospheric Sciences Modeling Division, Research Triangle Park, N.C.

EPA. 2003a. A Conceptual Model to Adjust Fugitive Dust Emissions to Account for Near Source Particle Removal in Grid Model Applications, prepared by Tom Pace, U.S. EPA, August. http://www.epa.gov/ttn/chief/emch/invent/statusfugdustemissions_082203.pdf.

EPA. 2003b. National Emission Inventory QA and Augmentation Memo, prepared by Anne Pope, U.S. EPA, June. http://www.epa.gov/ttn/chief/emch/invent/qaaugmementationmemo_99nei_60603.p df

EPA. 2005a. Guidance on the Use of Models and Other Analyses in Attainment Demonstrations for the 8-hr Ozone NAAQS -- Final. U.S. Environmental Protection Agency, Atmospheric Sciences Modeling Division, Research Triangle Park, N.C. October.

**ALPINE
GEOPHYSICS**

EPA. 2005b. Technical Support Document for the Final Clean Air Interstate Rule – Air Quality Modeling. U.S. Environmental Protection Agency, Office of Air Quality and Planning Standards, Research Triangle Park, North Carolina, 27711. March.

EPA. 2005c. "Regional Haze Regulations and Guidelines for Best Available Technology (BART) Determinations". Fed. Reg./Vol. 70, No. 128/Wed. July, Rules and Regulations, pp. 39104-39172. 40 CFR Part 51, FRL-7925-9, RIN AJ31.

EPA. 2007. Guidance on the Use of Models and Other Analyses for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5 and Regional Haze. U.S. Environmental Protection Agency, Research Triangle Park, NC. EPA-454/B-07-002. April. (http://www.epa.gov/ttn/scram/guidance/guide/final-03-pm-rh-guidance.pdf).

EPA. 2010. Technical Support Document for the Transport Rule. Docket ID No. EPA-HQ-OAR-2009-0491. Air Quality Modeling. U.S. Environmental Protection Agency, Office of Pair Quality Planning and Standards, Air Quality Assessment Division, Research Triangle Park, NC. June.

EPA. 2014a. Motor Vehicle Emissions Simulator (MOVES) – User Guide for MOVES2014. Assessment and Standards Division, Office of Transportation and Air Quality, U.S. Environmental Protection Agency. (EPA-420-B-14-055). July. (http://www.epa.gov/oms/models/moves/documents/420b14055.pdf).

EPA. 2014b. Motor Vehicle Emissions Simulator (MOVES) –MOVES2014 User Interface Manual. Assessment and Standards Division, Office of Transportation and Air Quality, U.S. Environmental Protection Agency. (EPA-420-B-14-067). July. (http://www.epa.gov/oms/models/moves/documents/420b14057.pdf).

EPA. 2014c. Motor Vehicle Emissions Simulator (MOVES) –MOVES2014 Software Design Reference Manual. Assessment and Standards Division, Office of Transportation and Air Quality, U.S. Environmental Protection Agency. (EPA-420-B-14-058). December. (http://www.epa.gov/oms/models/moves/documents/420b14056.pdf).

EPA. 2014d. Meteorological Model Performance for Annual 2011 WRF v3.4 Simulation, U.S. Environmental Protection Agency. November 2014.

EPA. 2014e. Draft Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5, and Regional Haze, U.S. Environmental Protection Agency. December 2014.

EPA. 2015b. Air Quality Modeling Technical Support Document for the 2008 Ozone NAAQS Transport Assessment. U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. January. (http://www.epa.gov/airtransport/O3TransportAQModelingTSD.pdf).

EPA. 2016a. Technical Support Document (TSD) Preparation of Emissions Inventories for the Version 6.3, 2011 Emissions Modeling Platform. U.S. Environmental Protection Agency. August 2016.

EPA. 2016b. Air Quality Modeling Technical Support Document for the 2015 Ozone NAAQS Preliminary Interstate Transport Assessment. U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. December 2016.

EPA. 2017a. Technical Support Document (TSD) Additional Updates to Emissions Inventories for the Version 6.3, 2011 Emissions Modeling Platform for the Year 2023. U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. October

2017. https://www.epa.gov/sites/production/files/2017-11/documents/2011v6.3_2023en_update_emismod_tsd_oct2017.pdf

EPA. 2017b. Use of Photochemical Grid Models for Single-Source Ozone and secondary PM2.5 impacts for Permit Program Related Assessments and for NAAQS Attainment Demonstrations for Ozone, PM2.5 and Regional Haze. Memorandum from Tyler Fox, U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards. August 2017. https://www3.epa.gov/ttn/scram/guidance/clarification/20170804-Photochemical_Grid_Model_Clarification_Memo.pdf

Gery, M. W., G.Z. Whitten, J.P. Killus, and M.C. Dodge. 1989. A photochemical mechanism for urban and regional-scale computer modeling. *J. Geophys. Res.* 94, 12925-12956.

Gilliam, R. 2010. Evaluation of Multi-Annual CONUS 12 km WRF Simulations. U.S. Environmental Protection Agency, NREL, Atmospheric Modeling and Analysis Division. (http://epa.gov/scram001/adhoc/gilliam2010.pdf).

Kemball-Cook, S., Y. Jia, C. Emery, R. Morris, Z. Wang and G. Tonnesen. 2004. Comparison of CENRAP, VISTAS and WRAP 36 km MM5 Model Runs for 2002, Task 3: Meteorological Gatekeeper Report. http://pah.cert.ucr.edu/aqm/cenrap/ppt_files/CENRAP_VISTAS_WRAP_2002_36km_MM5_eval.ppt. December.

Michalakes, J., J. Dudhia, D. Gill, J. Klemp and W. Skamarock. 1998. Design of a Next-Generation Regional Weather Research and Forecast Model. Mesoscale and Microscale Meteorological Division, National Center for Atmospheric Research, Boulder, CO. (http://www.mcs.anl.gov/~michalak/ecmwf98/final.html).

Michalakes, J., S. Chen, J. Dudhia, L. Hart, J. Klemp, J. Middlecoff and W. Skamarock. 2001. Development of a Next-Generation Regional Weather Research and Forecast Model. Developments in Teracomputing: Proceedings of the 9th ECMWF Workshop on the Use of High Performance Computing in Meteorology. Eds. Walter Zwieflhofer and Norbet Kreitz. World Scientific, Singapore. Pp. 269-276. (http://www.mmm.ucar.edu/mm5/mpp/ecmwf01.htm).

Michalakes, J., J. Dudhia, D. Gill, T. Henderson, J. Klemp, W. Skamarock and W. Wang. 2004. The Weather Research and Forecast Model: Software Architecture and Performance. Proceedings of the 11th ECMWF Workshop on the Use of High Performance Computing in Meteorology. October 25-29, 2005, Reading UK. Ed. George Mozdzynski. (http://wrf-model.org/wrfadmin/docs/ecmwf_2004.pdf).

Moore, C.T. et al. 2011. "Deterministic and Empirical Assessment of Smoke's Contribution to Ozone – Final Report. Western Governors' Association, Denver, CO. (https://wraptools.org/pdf/11-1-6-6_final_report_DEASCO3_project.pdf)

Morris, R. E. and T. C. Myers. 1990. "User's Guide for the Urban Airshed Model. Volume I: User's Manual for UAM (CB-IV)" prepared for the U.S. Environmental Protection Agency (EPA-450/4-90-007a), Systems Applications International, San Rafael, CA.

Page. S. (October 27, 2017). *Supplemental Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone national Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* [Memorandum]. Research Triangle Park, NC: U.S. EPA, Office of Air Quality Planning and Standards. Retrieved from



https://www.epa.gov/sites/production/files/2017-10/documents/final_2008_o3_naaqs_transport_memo_10-27-17b.pdf

Simon, H., K. Baker and S. Phillips. 2012. Compilations and Interpretation of Photochemical Model Performance Statistics Published between 2006 and 2012. *Atmos. Env.* 61 (2012) 124-139. December. (http://www.sciencedirect.com/science/article/pii/S135223101200684X).

Skamarock, W. C. 2004. Evaluating Mesoscale NWP Models Using Kinetic Energy Spectra. *Mon. Wea. Rev.*, Volume 132, pp. 3019-3032. December. (http://www.mmm.ucar.edu/individual/skamarock/spectra_mwr_2004.pdf).

Skamarock, W. C., J. B. Klemp, J. Dudhia, D. O. Gill, D. M. Barker, W. Wang and J. G. Powers. 2005. A Description of the Advanced Research WRF Version 2. National Center for Atmospheric Research (NCAR), Boulder, CO. June. (http://www.mmm.ucar.edu/wrf/users/docs/arw_v2.pdf)

Skamarock, W. C. 2006. Positive-Definite and Monotonic Limiters for Unrestricted-Time-Step Transport Schemes. *Mon. Wea. Rev.*, Volume 134, pp. 2241-2242. June. (http://www.mmm.ucar.edu/individual/skamarock/advect3d_mwr.pdf).

Sullivan D.C., Raffuse S.M., Pryden D.A., Craig K.J., Reid S.B., Wheeler N.J.M., Chinkin L.R., Larkin N.K., Solomon R., and Strand T. (2008) Development and applications of systems for modeling emissions and smoke from fires: the BlueSky smoke modeling framework and SMARTFIRE: 17th International Emissions Inventory Conference, Portland, OR, June 2-5. Available at: http://www.epa.gov/ttn/chief/conferences.html.

Tsirigotis, P. (March 27, 2018). *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* [Memorandum]. Research Triangle Park, NC: U.S. EPA, Office of Air Quality Planning and Standards. Retrieved from https://www.epa.gov/sites/production/files/2018-03/documents/transport_memo_03_27_18_1.pdf

UNC. 2008. Atmospheric Model Evaluation Tool (AMET) User's Guide. Institute for the Environment, University of North Carolina at Chapel Hill. May 30. (https://www.cmascenter.org/amet/documentation/1.1/AMET_Users_Guide_V1.1.pdf).

UNC and ENVIRON, 2014a. Three-State Air Quality Modeling Study (3SAQS) – Draft Modeling Protocol 2011 Emissions & Air Quality Modeling. University of North Carolina at Chapel Hill and ENVIRON International Corporation, Novato, CA. July. (http://vibe.cira.colostate.edu/wiki/Attachments/Modeling/3SAQS_2011_Modeling_Protocol_Finalv2.pdf).

UNC. 2015. SMOKE v3.6.5 User's Manual. University of North Carolina at Chapel Hill, Institute for the Environment. (https://www.cmascenter.org/smoke/documentation/3.6.5/html/).

UNC and ENVIRON, 2015a. Three-State Air Quality Modeling Study (3SAQS) – Weather Research Forecast 2011 Meteorological Model Application/Evaluation. University of North Carolina at Chapel Hill and ENVIRON International Corporation, Novato, CA. March 5. (http://vibe.cira.colostate.edu/wiki/Attachments/Modeling/3SAQS_2011_WRF_MPE_v05Mar2015.pdf).

**ALPINE
GEOPHYSICS**

Wesely, M.L. 1989. Parameterization of Surface Resistances to Gaseous Dry Deposition in Regional-Scale Numerical Models. *Atmos. Environ.*, 23, 1293-1304.

Xiu, A. and J.E. Pleim. 2000. Development of a land surface model. Part I: application in a mesoscale meteorology model. *J. App. Met.*, 40, pp. 192-209.

Yantosca, B. 2004. GEOS-CHEMv7-01-02 User's Guide, Atmospheric Chemistry Modeling Group, Harvard University, Cambridge, MA.

Yarwood, G., J. Jung, G. Z. Whitten, G. Heo, J. Mellberg and M. Estes. 2010. Updates to the Carbon Bond Mechanism for Version 6 (CB6). 2010 CMAS Conference, Chapel Hill, NC. October.
(http://www.cmascenter.org/conference/2010/abstracts/emery_updates_carbon_2010.pdf)

Zhang, L., S. Gong, J. Padro, L. Barrie. 2001. A size-segregated particle dry deposition scheme for an atmospheric aerosol module. *Atmos. Environ.*, **35**, 549-560.

Zhang, L., J. R. Brook, and R. Vet. 2003. A revised parameterization for gaseous dry deposition in air-quality models. *Atmos. Chem. Phys.*, **3**, 2067–2082.

**ALPINE
GEOPHYSICS**

## Appendix A

4km Modeling Results for Mid-Atlantic and Lake Michigan Domains Compared To EPA 12km "No Water" Design Value Calculations from March 2018 Memorandum

**ALPINE
GEOPHYSICS**

| | | | | Ozone Design Value (ppb) | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | EPA "No Water" 12km Modeling | | 4km Modeling | | |
| Monitor | State | County | DVb (2011) | DVf (2023) Ave | DVf (2023) Max | DVf (2023) Ave | DVf (2023) Max | 2014-2016 DV |
| 90010017 | Connecticut | Fairfield | 80.3 | 68.9 | 71.2 | 69.2 | 71.5 | 80 |
| 90011123 | Connecticut | Fairfield | 81.3 | 66.4 | 67.8 | 65.5 | 66.8 | 78 |
| 90013007 | Connecticut | Fairfield | 84.3 | 71.0 | 75.0 | 69.7 | 73.6 | 81 |
| 90019003 | Connecticut | Fairfield | 83.7 | 73.0 | 75.9 | 69.9 | 72.7 | 83 |
| 90031003 | Connecticut | Hartford | 73.7 | 60.7 | 61.7 | 61.4 | 62.7 | 74 |
| 90050005 | Connecticut | Litchfield | 70.3 | 57.2 | 57.8 | 57.0 | 57.5 | 72 |
| 90070007 | Connecticut | Middlesex | 79.3 | 64.7 | 66.1 | 63.9 | 65.2 | 79 |
| 90090027 | Connecticut | New Haven | 74.3 | 61.9 | 65.0 | 63.2 | 66.3 | 76 |
| 90099002 | Connecticut | New Haven | 85.7 | 69.9 | 72.6 | 70.3 | 73.0 | 76 |
| 90110124 | Connecticut | New London | 80.3 | 67.3 | 70.4 | 68.2 | 71.3 | 72 |
| 90131001 | Connecticut | Tolland | 75.3 | 61.4 | 62.8 | 61.4 | 62.7 | 73 |
| 100010002 | Delaware | Kent | 74.3 | 57.6 | 60.5 | 58.2 | 61.1 | 66 |
| 100031007 | Delaware | New Castle | 76.3 | 59.2 | 62.0 | 59.3 | 62.1 | 68 |
| 100031010 | Delaware | New Castle | 78.0 | 61.2 | 61.2 | 59.5 | 61.6 | 74 |
| 100031013 | Delaware | New Castle | 77.7 | 60.8 | 62.6 | 61.6 | 63.4 | 70 |
| 100051002 | Delaware | Sussex | 77.3 | 59.7 | 62.6 | 60.4 | 63.3 | 65 |
| 100051003 | Delaware | Sussex | 77.7 | 61.1 | 63.7 | 63.2 | 65.9 | 69 |
| 110010041 | District Of Columbia | District of Columbia | 76.0 | 58.7 | 61.7 | 61.8 | 65.0 | N/A |
| 110010043 | District Of Columbia | District of Columbia | 80.7 | 62.3 | 64.8 | 65.7 | 68.4 | 70 |
| 240030014 | Maryland | Anne Arundel | 83.0 | 63.4 | 66.4 | 65.1 | 68.2 | N/A |
| 240051007 | Maryland | Baltimore | 79.0 | 63.9 | 66.3 | 62.0 | 64.3 | 72 |
| 240053001 | Maryland | Baltimore | 80.7 | 65.3 | 67.9 | 64.0 | 66.7 | 72 |
| 240090011 | Maryland | Calvert | 79.7 | 63.2 | 65.9 | 63.7 | 66.3 | 69 |

Table A-1. 4km and EPA "No Water" 12km Design Value Results for Monitors Located in 4km Mid-Atlantic Modeling Domain.





| Table A-1. 4km and EPA "No Water" 12km Design Value Results for Monitors Located in 4km Mid-Atlantic Modeling Domain. | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Ozone Design Value (ppb) | | | |
| | | | | EPA "No Water" 12km Modeling | | 4km Modeling | |
| Monitor | State | County | DVb (2011) | DVf (2023) Ave | DVf (2023) Max | DVf (2023) Ave | DVf (2023) Max | 2014-2016 DV |
| 240130001 | Maryland | Carroll | 76.3 | 58.8 | 60.9 | 59.4 | 61.5 | 68 |
| 240150003 | Maryland | Cecil | 83.0 | 64.5 | 66.8 | 65.0 | 67.3 | 76 |
| 240170010 | Maryland | Charles | 79.0 | 61.6 | 64.7 | 63.3 | 66.3 | 70 |
| 240199991 | Maryland | Dorchester | 75.0 | 59.4 | 59.4 | 59.4 | 59.4 | 66 |
| 240210037 | Maryland | Frederick | 76.3 | 59.6 | 61.8 | 60.8 | 63.0 | 67 |
| 240251001 | Maryland | Harford | 90.0 | 70.9 | 73.3 | 71.1 | 73.5 | 73 |
| 240259001 | Maryland | Harford | 79.3 | 62.2 | 64.3 | 62.3 | 64.4 | 73 |
| 240290002 | Maryland | Kent | 78.7 | 61.2 | 63.7 | 61.1 | 63.7 | 70 |
| 240313001 | Maryland | Montgomery | 75.7 | 60.0 | 61.0 | 59.8 | 60.8 | 68 |
| 240330030 | Maryland | Prince George's | 79.0 | 60.5 | 62.8 | 61.3 | 63.7 | 69 |
| 240338003 | Maryland | Prince George's | 82.3 | 63.2 | 66.8 | 64.3 | 67.9 | 71 |
| 240339991 | Maryland | Prince George's | 80.0 | 61.0 | 61.0 | 61.4 | 61.4 | 68 |
| 245100054 | Maryland | Baltimore (City) | 73.7 | 59.4 | 60.4 | 58.9 | 60.0 | 69 |
| 250051002 | Massachusetts | Bristol | 74.0 | 61.2 | 61.2 | 61.3 | 61.3 | N/A |
| 250070001 | Massachusetts | Dukes | 77.0 | 64.1 | 66.6 | 65.0 | 67.5 | N/A |
| 250130008 | Massachusetts | Hampden | 73.7 | 59.3 | 59.5 | 60.2 | 60.5 | 68 |
| 340010006 | New Jersey | Atlantic | 74.3 | 58.6 | 60.0 | 59.5 | 60.8 | 64 |
| 340030006 | New Jersey | Bergen | 77.0 | 64.1 | 65.0 | 64.8 | 65.7 | 74 |
| 340071001 | New Jersey | Camden | 82.7 | 66.3 | 69.8 | 65.5 | 68.9 | 69 |
| 340110007 | New Jersey | Cumberland | 72.0 | 57.0 | 59.4 | 56.7 | 59.1 | 68 |
| 340130003 | New Jersey | Essex | 78.0 | 64.3 | 67.6 | 64.3 | 67.6 | 70 |
| 340150002 | New Jersey | Gloucester | 84.3 | 68.2 | 70.4 | 68.8 | 71.0 | 74 |
| 340170006 | New Jersey | Hudson | 77.0 | 64.6 | 65.4 | 63.8 | 66.0 | 72 |
| 340190001 | New Jersey | Hunterdon | 78.0 | 62.0 | 63.6 | 60.8 | 62.3 | 72 |
| 340210005 | New Jersey | Mercer | 78.3 | 63.2 | 65.4 | 61.7 | 63.8 | 72 |


**ALPINE GEOPHYSICS**

| | | | Ozone Design Value (ppb) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | EPA "No Water" 12km Modeling | | 4km Modeling | | |
| Monitor | State | County | DVb (2011) | DVf (2023) Ave | DVf (2023) Max | DVf (2023) Ave | DVf (2023) Max | 2014-2016 DV |
| 340219991 | New Jersey | Mercer | 76.0 | 60.4 | 60.4 | 58.6 | 58.6 | 73 |
| 340230011 | New Jersey | Middlesex | 81.3 | 65.0 | 68.0 | 64.8 | 67.7 | 74 |
| 340250005 | New Jersey | Monmouth | 80.0 | 64.1 | 66.5 | 64.7 | 67.1 | 70 |
| 340273001 | New Jersey | Morris | 76.3 | 62.4 | 63.8 | 61.6 | 62.9 | 69 |
| 340290006 | New Jersey | Ocean | 82.0 | 65.8 | 68.2 | 64.1 | 66.4 | 73 |
| 340315001 | New Jersey | Passaic | 73.3 | 61.3 | 62.7 | 61.0 | 62.3 | 70 |
| 340410007 | New Jersey | Warren | 66.0 | 54.0 | 54.0 | 51.7 | 51.7 | 64 |
| 360050133 | New York | Bronx | 74.0 | 63.3 | 65.0 | 64.7 | 66.4 | 70 |
| 360270007 | New York | Dutchess | 72.0 | 58.6 | 60.2 | 56.8 | 58.4 | 68 |
| 360610135 | New York | New York | 73.3 | 64.2 | 66.5 | 61.5 | 63.7 | 69 |
| 360715001 | New York | Orange | 67.0 | 55.3 | 56.9 | 54.9 | 57.0 | 66 |
| 360790005 | New York | Putnam | 70.0 | 58.4 | 59.2 | 56.7 | 57.5 | 68 |
| 360810124 | New York | Queens | 78.0 | 70.2 | 72.0 | 68.0 | 69.8 | 69 |
| 360850067 | New York | Richmond | 81.3 | 67.1 | 68.5 | 69.6 | 71.0 | 76 |
| 360870005 | New York | Rockland | 75.0 | 62.0 | 62.8 | 61.1 | 63.1 | 72 |
| 361030002 | New York | Suffolk | 83.3 | 74.0 | 75.5 | 70.7 | 72.1 | 72 |
| 361030004 | New York | Suffolk | 78.0 | 65.2 | 66.9 | 64.5 | 66.2 | 72 |
| 361030009 | New York | Suffolk | 78.7 | 67.6 | 68.7 | 66.8 | 67.9 | N/A |
| 361192004 | New York | Westchester | 75.3 | 63.8 | 64.4 | 64.4 | 64.9 | 74 |
| 420110006 | Pennsylvania | Berks | 71.7 | 56.2 | 58.8 | 55.7 | 58.3 | 66 |
| 420110011 | Pennsylvania | Berks | 76.3 | 58.9 | 61.0 | 59.9 | 62.0 | 71 |
| 420170012 | Pennsylvania | Bucks | 80.3 | 64.6 | 66.8 | 64.4 | 66.6 | 77 |
| 420290100 | Pennsylvania | Chester | 76.3 | 58.7 | 60.8 | 59.7 | 61.8 | 73 |
| 420430401 | Pennsylvania | Dauphin | 69.0 | 54.7 | 54.7 | 55.5 | 55.5 | 66 |
| 420431100 | Pennsylvania | Dauphin | 74.7 | 58.3 | 60.1 | 58.7 | 60.5 | 67 |

**Table A-1. 4km and EPA "No Water" 12km Design Value Results for Monitors Located in 4km Mid-Atlantic Modeling Domain.**



**ALPINE GEOPHYSICS**

Final Technical Support Document

| Table A-1. 4km and EPA "No Water" 12km Design Value Results for Monitors Located in 4km Mid-Atlantic Modeling Domain. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Ozone Design Value (ppb) | | | | |
| | | | | EPA "No Water" 12km Modeling | | 4km Modeling | | |
| Monitor | State | County | DVb (2011) | DVf (2023) Ave | DVf (2023) Max | DVf (2023) Ave | DVf (2023) Max | 2014-2016 DV |
| 420450002 | Pennsylvania | Delaware | 75.7 | 60.3 | 62.1 | 61.0 | 62.9 | 72 |
| 420710007 | Pennsylvania | Lancaster | 77.0 | 60.1 | 62.4 | 60.7 | 63.0 | 69 |
| 420710012 | Pennsylvania | Lancaster | 78.0 | 60.2 | 63.3 | 60.4 | 63.5 | 66 |
| 420750100 | Pennsylvania | Lebanon | 76.0 | 58.6 | 58.6 | 58.8 | 58.8 | 71 |
| 420770004 | Pennsylvania | Lehigh | 76.0 | 59.5 | 61.1 | 59.9 | 61.5 | 70 |
| 420890002 | Pennsylvania | Monroe | 66.7 | 52.9 | 55.6 | 52.5 | 55.1 | 65 |
| 420910013 | Pennsylvania | Montgomery | 76.3 | 61.0 | 62.4 | 61.3 | 62.6 | 72 |
| 420950025 | Pennsylvania | Northampton | 76.0 | 58.5 | 60.6 | 57.3 | 59.3 | 70 |
| 420958000 | Pennsylvania | Northampton | 69.7 | 54.8 | 55.9 | 54.7 | 55.8 | 69 |
| 421010004 | Pennsylvania | Philadelphia | 66.0 | 53.9 | 57.1 | 54.6 | 57.9 | 61 |
| 421010024 | Pennsylvania | Philadelphia | 83.3 | 67.3 | 70.3 | 68.0 | 71.0 | 77 |
| 421011002 | Pennsylvania | Philadelphia | 80.0 | 64.7 | 64.7 | 65.4 | 65.4 | N/A |
| 421330008 | Pennsylvania | York | 72.3 | 56.9 | 58.3 | 58.3 | 59.7 | 66 |
| 421330011 | Pennsylvania | York | 74.3 | 58.0 | 60.1 | 58.6 | 60.7 | N/A |
| 440030002 | Rhode Island | Kent | 73.7 | 60.4 | 60.7 | 59.4 | 59.6 | 69 |
| 440071010 | Rhode Island | Providence | 74.0 | 59.5 | 61.1 | 59.7 | 61.3 | 66 |
| 440090007 | Rhode Island | Washington | 76.3 | 62.6 | 64.0 | 62.8 | 64.2 | 68 |
| 510130020 | Virginia | Arlington | 81.7 | 64.9 | 68.3 | 65.9 | 69.4 | 72 |
| 510330001 | Virginia | Caroline | 71.7 | 56.0 | 57.6 | 54.9 | 56.7 | N/A |
| 510360002 | Virginia | Charles | 75.7 | 59.4 | 62.0 | 60.7 | 63.4 | 63 |
| 510410004 | Virginia | Chesterfield | 72.0 | 56.8 | 59.2 | 55.6 | 58.0 | 62 |
| 510590030 | Virginia | Fairfax | 82.3 | 65.1 | 68.1 | 66.2 | 69.2 | 70 |
| 510850003 | Virginia | Hanover | 73.7 | 56.9 | 58.6 | 55.1 | 56.8 | 62 |
| 510870014 | Virginia | Henrico | 75.0 | 58.8 | 61.2 | 57.8 | 60.2 | N/A |
| 511071005 | Virginia | Loudoun | 73.0 | 57.8 | 59.4 | 58.7 | 60.3 | 67 |



| Table A-1. 4km and EPA "No Water" 12km Design Value Results for Monitors Located in 4km Mid-Atlantic Modeling Domain. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Ozone Design Value (ppb) | | | | | |
| | | | | EPA "No Water" 12km Modeling | | 4km Modeling | | |
| Monitor | State | County | DVb (2011) | DVf (2023) Ave | DVf (2023) Max | DVf (2023) Ave | DVf (2023) Max | 2014-2016 DV |
| 511530009 | Virginia | Prince William | 70.0 | 56.2 | 57.8 | 54.8 | 56.4 | 65 |
| 511790001 | Virginia | Stafford | 73.0 | 57.1 | 59.4 | 53.7 | 55.9 | 63 |
| 515100009 | Virginia | Alexandria City | 80.0 | 63.4 | 65.8 | 64.7 | 67.2 | N/A |
| 516500008 | Virginia | Hampton City | 74.0 | 56.9 | 58.4 | 54.9 | 56.4 | 64 |
| 518000004 | Virginia | Suffolk City | 71.3 | 56.2 | 57.5 | 56.4 | 57.8 | 60 |



| | | | | EPA "No Water" 12km Modeling | | 4km Modeling | | |
|---|---|---|---|---|---|---|---|---|
| | | | DVb (2011) | DVf (2023) Ave | DVf (2023) Max | DVf (2023) Ave | DVf (2023) Max | 2014-2016 DV |
| Monitor | State | County | | | | | | |
| 170310001 | Illinois | Cook | 72.0 | 63.2 | 64.9 | 60.8 | 62.5 | 69 |
| 170310032 | Illinois | Cook | 77.7 | 66.6 | 69.5 | 62.8 | 65.5 | 70 |
| 170310064 | Illinois | Cook | 71.3 | 61.1 | 64.3 | 61.0 | 64.1 | N/A |
| 170310076 | Illinois | Cook | 71.7 | 62.7 | 64.7 | 59.4 | 60.6 | 69 |
| 170311003 | Illinois | Cook | 69.7 | 62.4 | 64.4 | 60.1 | 62.1 | 69 |
| 170311601 | Illinois | Cook | 71.3 | 61.5 | 63.9 | 63.3 | 65.7 | 69 |
| 170314002 | Illinois | Cook | 71.7 | 62.3 | 64.3 | 61.5 | 63.5 | 66 |
| 170314007 | Illinois | Cook | 65.7 | 58.0 | 60.0 | 55.5 | 57.5 | 71 |
| 170314201 | Illinois | Cook | 75.7 | 66.8 | 68.8 | 58.8 | 60.6 | 71 |
| 170317002 | Illinois | Cook | 76.0 | 66.8 | 70.3 | 59.1 | 62.2 | 72 |
| 170436001 | Illinois | DuPage | 66.3 | 57.9 | 59.4 | 57.7 | 59.2 | 68 |
| 170890005 | Illinois | Kane | 69.7 | 62.8 | 63.9 | 60.5 | 61.7 | 68 |
| 170971007 | Illinois | Lake | 79.3 | 63.4 | 65.6 | 59.4 | 61.4 | 73 |
| 171110001 | Illinois | McHenry | 69.7 | 61.8 | 62.9 | 59.5 | 60.6 | 68 |
| 171971011 | Illinois | Will | 64.0 | 55.6 | 56.5 | 54.4 | 55.2 | 64 |
| 172012001 | Illinois | Winnebago | 67.3 | 57.5 | 58.0 | 57.1 | 57.7 | 68 |
| 180390007 | Indiana | Elkhart | 67.7 | 54.6 | 56.5 | 55.0 | 56.9 | 61 |
| 180890022 | Indiana | Lake | 66.7 | 58.3 | 60.3 | 54.7 | 56.6 | 67 |
| 180890030 | Indiana | Lake | 69.7 | 61.9 | 64.8 | 56.4 | 59.1 | N/A |
| 180892008 | Indiana | Lake | 68.0 | 60.4 | 60.4 | 56.9 | 58.6 | 65 |
| 180910005 | Indiana | LaPorte | 79.3 | 67.2 | 70.4 | 66.4 | 69.5 | N/A |
| 180910010 | Indiana | LaPorte | 69.7 | 58.9 | 60.9 | 57.7 | 59.7 | 63 |
| 181270024 | Indiana | Porter | 70.3 | 61.8 | 63.3 | 59.6 | 61.1 | 69 |
| 181270026 | Indiana | Porter | 63.0 | 54.4 | 55.3 | 53.1 | 53.9 | 66 |
| 181410015 | Indiana | St. Joseph | 69.3 | 56.9 | 59.9 | 56.8 | 59.9 | 68 |

Table A-2. 4km and EPA "No Water" 12km Design Value Results for Monitors Located in 4km Lake Michigan Modeling Domain.

Ozone Design Value (ppb)



**Final Technical Support Document**

| Table A-2. 4km and EPA "No Water" 12km Design Value Results for Monitors Located in 4km Lake Michigan Modeling Domain. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Ozone Design Value (ppb) | | | | | |
| | | | | EPA "No Water" 12km Modeling | | 4km Modeling | | |
| Monitor | State | County | DVb (2011) | DVf (2023) Ave | DVf (2023) Max | DVf (2023) Ave | DVf (2023) Max | 2014-2016 DV |
| 181411007 | Indiana | St. Joseph | 64.0 | 52.5 | 52.5 | 52.1 | 52.1 | N/A |
| 260050003 | Michigan | Allegan | 82.7 | 69.0 | 71.7 | 70.3 | 73.1 | 75 |
| 260190003 | Michigan | Benzie | 73.0 | 60.6 | 62.3 | 61.0 | 62.7 | 69 |
| 260210014 | Michigan | Berrien | 79.7 | 66.9 | 68.8 | 66.6 | 68.5 | 74 |
| 260270003 | Michigan | Cass | 76.7 | 62.0 | 63.1 | 61.6 | 62.6 | 70 |
| 260810020 | Michigan | Kent | 73.0 | 59.8 | 61.4 | 60.4 | 62.0 | 69 |
| 261010922 | Michigan | Manistee | 72.3 | 60.5 | 61.9 | 59.8 | 61.1 | 68 |
| 261050007 | Michigan | Mason | 73.3 | 60.7 | 62.1 | 60.6 | 62.0 | 70 |
| 261210039 | Michigan | Muskegon | 79.7 | 65.8 | 67.7 | 66.1 | 68.0 | 75 |
| 261390005 | Michigan | Ottawa | 76.0 | 62.3 | 64.0 | 62.7 | 64.4 | 70 |
| 550290004 | Wisconsin | Door | 75.7 | 63.3 | 65.2 | 63.5 | 65.5 | 72 |
| 550590019 | Wisconsin | Kenosha | 81.0 | 64.8 | 67.2 | 59.2 | 61.4 | 77 |
| 550610002 | Wisconsin | Kewaunee | 75.0 | 64.5 | 67.1 | 64.5 | 67.1 | 69 |
| 550710007 | Wisconsin | Manitowoc | 78.7 | 67.6 | 68.7 | 68.3 | 69.5 | 72 |
| 550790010 | Wisconsin | Milwaukee | 69.7 | 60.6 | 62.6 | 61.1 | 63.2 | 64 |
| 550790026 | Wisconsin | Milwaukee | 74.7 | 66.5 | 69.4 | 66.0 | 68.9 | 68 |
| 550790085 | Wisconsin | Milwaukee | 80.0 | 71.2 | 73.0 | 67.4 | 70.5 | 71 |
| 550890008 | Wisconsin | Ozaukee | 76.3 | 67.2 | 70.5 | 64.9 | 68.1 | 71 |
| 550890009 | Wisconsin | Ozaukee | 74.7 | 63.6 | 65.5 | 63.8 | 65.7 | 73 |
| 551010017 | Wisconsin | Racine | 77.7 | 62.2 | 64.8 | 58.6 | 61.1 | N/A |
| 551170006 | Wisconsin | Sheboygan | 84.3 | 72.8 | 75.1 | 71.7 | 74.0 | 79 |
| 551330027 | Wisconsin | Waukesha | 66.7 | 58.1 | 60.1 | 58.2 | 60.3 | 66 |

**ALPINE**
**GEOPHYSICS**

## Appendix B

Midwest Ozone Group Comments on EPA's March 27, 2018 Memorandum Entitled "Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards Under the Clean Air Act Section 110(a)(2)(D)(i)(I)", April 30, 2018

**ALPINE
GEOPHYSICS**

**MIDWEST OZONE GROUP COMMENTS ON EPA'S MARCH 27, 2018 MEMORANDUM ENTITLED "INFORMATION ON THE INTERSTATE TRANSPORT STATE IMPLEMENTATION PLAN SUBMISSIONS FOR THE 2015 OZONE NATIONAL AMBIENT AIR QUALITY STANDARDS UNDER THE CLEAN AIR ACT SECTION 110(a)(2)(D)(i)(I)"[13]**

**April 30, 2018**

Submitted by email to: Norm Possiel (possiel.norm@epa.gov) and Elizabeth Palma (palma.elizabeth@epa.gov)

On March 27, 2018, EPA issued a memorandum entitled "Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air quality Standards Under the Clean Air Act Section 110(a)(2)(D)(i)(I)". This memorandum offers much needed guidance on how a state might develop or review its State Implementation Plan (SIP) to address the interstate transport requirements of the Clean Air Act as stated in Section 110(a)(2)(D)(i)(I). The memorandum also provides a list of flexibilities in analytical approaches for the developing a good neighbor SIP for further discussion between EPA and the states. Significantly the memorandum acknowledges that it has received suggestions from not only from states, but also stakeholders identifying specific approaches that may merit further consideration.

The Midwest Ozone Group (MOG), as one of the stakeholders to have suggested flexibilities for EPA to consider in the development of Good Neighbor SIP guidance, welcomes the opportunity of this letter to acknowledge the March 27, 2018 guidance and to offer additional proposals for your consideration suggestion. In doing so we will acknowledge the Presidential memorandum dated April 12, 2018, which offers some extremely valuable direction to several issues that have a direct impact on the development of approvable Good Neighbor SIPs.

MOG is an affiliation of companies, trade organizations, and associations that draw upon their collective resources to seek solutions to the development of legally and technically sound national ambient air quality management programs.[14]   MOG's primary efforts are to

---

13 Questions or inquiries about these comments should be directed to David M. Flannery, Kathy G. Beckett, or Edward L. Kropp, Legal Counsel, Midwest Ozone Group, Steptoe & Johnson PLLC, 707 Virginia Street East, Charleston West Virginia 25301; 304-353-8000;  dave.flannery@steptoe-johnson.com  and  kathy.beckett@steptoe-johnson.com  and  skipp.kropp@steptoe-johnson.com respectively. These comments were prepared with the technical assistance of Alpine Geophysics, LLC.

14 The members of and participants in the Midwest Ozone Group include: American Coalition for Clean Coal Electricity, American Electric Power, American Forest & Paper Association, Ameren, Alcoa, Appalachian Region Independent Power Producers Association (ARIPPA), Associated Electric Cooperative, Citizens Energy Group, Council of Industrial Boiler Owners, Duke Energy, East Kentucky Power Cooperative, FirstEnergy, Indiana Energy


**ALPINE
GEOPHYSICS**

**Final Technical Support Document**

work with policy makers in evaluating air quality policies by encouraging the use of sound science. MOG has been actively engaged in a variety of EPA issues and initiatives related to the development and implementation of air quality policy, including the development of transport rules, NAAQS standards, petitions under 176A and 126 of the Clean Air Act, implementation guidance, and the development of Good Neighbor state implementation plans. MOG members and participants operate a variety of emission sources including more than 75,000 MW of coal-fired and coal-refuse fired electric power generation in more than ten states. They are concerned about the development of technically unsubstantiated interstate air pollution rules and the impacts on their facilities, their employees, their contractors, and the consumers of their products.

1. **EPA should specifically recognize the benefits of having multiple data sets containing modeling that may be relied upon by states in the development of Good Neighbor SIPs.**

MOG welcomes the following EPA statement about the ability of states to be able to rely upon alternative, equally credible, modeling data:

> States may consider using this national modeling to develop SIPs that address requirements of the good neighbor provision for the 2015 ozone NAAQS. When doing so, EPA recommends that states include in any such submission state-specific information to support their reliance on the 2023 modeling data. Further, states may supplement the information provided in this memorandum with any additional information that they believe is relevant to addressing the good neighbor provisions requirements. States may also choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs. If this is the case, states should submit that information along with a full explanation and technical analysis.

The March 27, 2018, memorandum in Attachment B sets forth both the agency's "3 x 3" modeling data first published in its memorandum of October 27, 2017, as well as its modified "No Water" approach. In addition to these two EPA data sets, MOG has also produced modeling data similar to EPA "3 x 3" modeling based upon a 12km grid which has been suggested by EPA in its proposed approval of the 2008 ozone NAAQS Good Neighbor SIP for Kentucky.[15]

---

Association, Indiana Utility Group, LGE / KU, Ohio Utility Group, Olympus Power, and City Water, Light and Power (Springfield IL).

---

15 83 Fed. Reg. 17123 (April 18, 2018)

**ALPINE
GEOPHYSICS**

We welcome EPA's development of a March 27, 2018, "no water" set of predictions and urge that EPA allow states to be able to rely not only upon EPA's October 27, 2017 "3x3" data set which is currently being relied upon for the approval of Good Neighbor SIP's, but also EPA's "no water" simulation, or any other alternate modeling analysis conducted in a technically credible manner consistent with EPA's attainment demonstration guidance and that meets performance criteria utilized by the agency. This, for example, could be particularly critical to the Milwaukee and Sheboygan monitors that are predicted to be in attainment with the 2015 ozone NAAQS using the "3x3" data but not with the "no water" data simulation. Similarly, EPA should recognize that the March 27, 2018 "no water" data shows the Harford monitor to be in attainment with the 2015 ozone NAAQS even though other equally credible modeling simulations demonstrate nonattainment at this monitor. The uncertainty involved with selecting a single modeling simulation to base such significant policy decisions, such as Good Neighbor demonstrations, should be weighed against the opportunity to select other platforms and simulations with consideration given to state methods that rely on multiple sources of data when found to be of technical merit.

EPA should specifically acknowledge the merit of 4km modeling as an alternative to its "no water" methodology. MOG's 4km modeling results demonstrate that all nonattainment monitors in the East attain the 2015 ozone NAAQS with the exception of Harford MD which has a predicted design value of 71.1 ppb using that 4km modeling. Modeling of this type using a finer grid is specifically recommended under existing EPA guidance which states:

> The use of grid resolution finer than 12 km would generally be more appropriate for areas with a combination of complex meteorology, strong gradients in emissions sources, and/or land-water interfaces in or near the nonattainment area(s).[16]

The guidance goes on to note that in addition to the "primary" modeling analysis, there are various other models, model applications, and tools that can be used to supplement the results of a modeled attainment test. These include the use of multiple air quality models / model input data sets (e.g., multiple meteorological data sets, alternative chemical mechanisms or emissions inventories, etc.). Multiple model configurations can be used to estimate sensitivity and uncertainty of future year design value predictions. For results to be most relevant to the way the agency recommends models be applied in attainment demonstrations, EPA notes it is preferable that such procedures focus on the sensitivity of estimated relative response factors (RRF) and resulting projected design values to the variations inputs and/or model formulations.

For day-to-day forecasts, modelers aim to choose a model with performances close to field observations. The ultimate objective is to deliver a forecast with highest performances to observational conditions. Using this logic, different model configurations could be combined in

---

16 http://www3.epa.gov/scram001/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf



a way to take the best components of each simulation (compared to performance) for each location and time-step in an analysis. No single model configuration or simulation will be most appropriate for every location under every given condition. The use of multiple model simulations using scientifically credible approaches falls within EPA's attainment modeling guidance for weight-of-evidence (WOE) analyses supporting an attainment SIP revision.

An ensemble-like approach using multi-model predictions aims to minimize the uncertainty typically involved with single simulation reliance and done correctly, can provide less uncertain concentrations than any individual simulation. When available, States should be allowed to consider using multiple models and credible applications of these modeled results in preparing SIP attainment demonstrations and predicted future year concentrations.

> **2. EPA should provide guidance to the states on need to properly account for both on-the-books and on-the-way emission reductions related to local sources in areas with problem monitors.**

MOG very much welcomes EPA's recognition of the importance of the assessment of local emissions as one of the added flexibilities being considered. Specifically, EPA offers the following description of this flexibility:

> Assess current and projected local emissions reductions …

Because the modeling currently being used by EPA, states and stakeholders relies on inventories that do not reflect all of the current local control programs or known unit operations that will affect predicted ozone air quality, EPA should not only encourage states and stakeholder to offer updated inventories to account for on-the-books controls, but should also encourage states to take account of anticipated changes in unit retirements not already recognized by the modeling inventory being employed.

This issue  is important to all states, but particularly to upwind states which must determine whether they must commit to additional emissions reductions as they prepare to submit approvable Good Neighbor State Implementation Plans to address the 2015 ozone NAAQS to EPA by the October 2018 deadline. Only through a full assessment of these local emissions reductions can EPA determine whether there are any bases for the imposition of additional emissions controls in upwind states.  This is because additional control requirements in upwind states can only be legally imposed if there is a continuing nonattainment area.[17]

As shown by MOG's  modeling and analyses (Outlook For Future Ozone Transport Program Design at http://midwestozonegroup.com/index.html), when EPA's current emission inventory is modeled using a 4 km grid in critical portions of the East, all monitors in the East

---

17 *EME Homer et al. v EPA*, 134 S. Ct. at 1608.



would achieve attainment of the 2015 ozone NAAQS by 2023 with the sole exception of the Harford Maryland monitor – which has a modeled ozone concentration of 71.1 ppb, only 0.2 ppb above the concentration that would demonstrate achievement of the 2015 ozone NAAQS. EPA's emission inventory, however, does not include a significant number of legally mandated on-the-books and on-the-way local controls that are likely to further reduce the emission of ozone precursors that could bring all monitors in the East into attainment with the 2015 ozone NAAQS. Moreover, EPA's current emission inventory does not take into consideration unit retirements, fuel switching and modifications that have been announced since that inventory was last updated.

MOG's has previously documented that downwind states have many options to reduce their own NOx and VOC contributions.[18]

Maryland has already recognized the need to adopt and implement programs to control emissions from local sources in Maryland and the Northeast. For example, as recently as December 2017[19], the Maryland Department of the Environment identified a series of local controls that it believed would further reduce ozone concentration in the Northeast, including:

- New rules by New York on small generators;
- New Ozone Transport Commission initiatives involving idle reduction;
- After market catalysts on mobile sources;
- Electric and other zero emission vehicles;
- Maryland rules on municipal waste combustors; and
- Maryland's Idle Free Initiative.

In addition, it is significant that the Connecticut Department of Energy and Environmental Protection, Bureau of Air Management has reached the conclusion[20] that attainment in the Northeast cannot be achieved without local controls as is illustrated by the following statement:

> To reach attainment in the NY-NJ-CT nonattainment area, HEDD emissions need to be addressed in all three state portions of the area.
>
> ...

---

[18] Alpine Geophysics "Relative Impact of State and Source Category NOx Emissions on Downwind Monitors Identified Using the 2017 Cross State Air Pollution Rule Modeling Platform", Alpine Geophysics, LLC, January, 2016. http://www.midwestozonegroup.com/files/RelativeImpactofStateandSourceCategoryNOxEmissionsonDownwind MonitorsIdentifiedUsingthe2017CrossStateAirPollutionRuleModelingPlatform.pdf .

[19] See: "A Path Forward for Reducing Ozone in Maryland and the Mid-Atlantic States, Driving With Science", Tad Aburn, Air Director, MDE, December 11, 2017 (slides 60 and 61). http://midwestozonegroup.com/files/Final_Path_Forward_2017_AQCAC_121117.pptx

20 "Reasonably Available Control Technology Analysis under the 2008 8-Hour Ozone National Ambient Air Quality Standard", dated July 17, 2014, http://www.ct.gov/deep/lib/deep/air/ozone/ozoneplanningefforts/ract_2008_naaqs/2014-07-17_-_ct_final_ract_sip_revision.pdf



**ALPINE
GEOPHYSICS**

In sum, to address Connecticut's ozone nonattainment, and Connecticut's good neighbor obligations to downwind states, peak day emissions must be reduced. Thus, "beyond RACT" measures may be warranted for HEDD units on HEDD to meet the state obligation of attainment of the ozone NAAQS as expeditiously as possible.

While Connecticut has called for beyond RACT controls on HEDD units and Maryland has cited New York's rule addressing small generators, the New York State Department of Environmental Conservation has actually conducted an air quality assessment of that rule in which it has concluded[21], that ozone concentrations could be reduced by as much as 4.8 ppb – an extremely significant improvement in ozone air quality (for perspective, 0.7 ppb represents a significant contribution relative to the 2015 ozone NAAQS) in a portion of the East that has historically had high ozone concentrations.

It is imperative that newly announced unit retirements, fuel switching and modifications as well as all emission control programs that will be or are required to be adopted and implemented prior to 2023 be considered and the resultant emissions reductions quantified for use in the good neighbor SIP modeling required by October 2018. A recent review of generating units Wisconsin has identified the following EGUs that will be shut down prior to 2023, and yet, EPA's modeling platform[22] includes their emissions and contribution to ambient ozone concentrations:

| Facility | ORIS | Boiler | 2016 Ozone Season NOx (tons) | 2023 Ozone Season NOx (tons) | Adjusted from 2016 | Reason for Adjustment |
|---|---|---|---|---|---|---|
| Edgewater (4050) | 4050 | 4 | 402.3 | 201.2 | Y | Coal to Gas Conversion |
| Pleasant Prairie | 6170 | 1 | 552.2 | 552.2 | | |
| Pleasant Prairie | 6170 | 2 | 402.8 | 402.8 | | |
| Pulliam | 4072 | 7 | 73.8 | 73.8 | | |
| Pulliam | 4072 | 8 | 224.0 | 224.0 | | |

Failure to consider the effects of those programs and unit retirements destines any such modeling to over-predict ozone concentrations and risk the unlawful imposition of emission control requirements on sources in upwind states. Further, it is highly likely that the inclusion of these emissions reduction will result in all areas demonstrating attainment of the 2015 ozone NAAQS without the need for further additional regional or national emissions reductions programs.

---

[21] "Background, High Electric Demand Day (HEDD) Initiative", New York Department of Environmental Conservation, undated but presumed to be in 2017. http://midwestozonegroup.com/files/New_York_Peakers.pptx

[22] ftp://newftp.epa.gov/air/emismod/2011/v3platform/reports/2011en_and_2023en/2023en_Engineering_Analysis_Unit_File.xls



With respect to EPA's call for an assessment of projected emission reductions, it is significant that when an area is measuring nonattainment of a national ambient air quality standard (NAAQS), the Clean Air Act (CAA) requires that the effects and benefits of local controls be considered first, prior to pursuing regional or national controls.  CAA §107(a) states that "[e]ach State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State." In addition, CAA §110(a)(1) requires that a state SIP "provides for implementation, maintenance, and enforcement" of the NAAQS "in each air quality control region . . . within such State." Moreover, by operation of law, additional planning and control requirements are applicable to areas that are designated to be in nonattainment.

We note with interest the affidavit submitted by Assistant Administrator McCabe in the litigation involving the challenge to the Kentucky Good Neighbor SIP in which Assistant Administrator McCabe stated:

> In order to establish the appropriate future analytic year for purposes of the EPA's analysis, including the air quality modeling, the EPA considers several factors related to anticipated compliance timing of the rulemaking. It is essential to consider how best to align the future analytic year with compliance timing in order for the assessment of significant contribution to nonattainment and interference with maintenance to align with the identified air quality challenge. Compliance timing is informed by the D.C. Circuit's decision in *North Carolina*, where the court held that the EPA should align implementation of its interstate transport rules with a date by which states are required to demonstrate attainment with the applicable NAAQS. 531 F.3d at 911-12. However, the determination as to how to align implementation with the attainment is not ready-made. Rather, the EPA considers several factors including the relevant attainment dates for the NAAQS, timelines necessary for installing appropriate control technologies, whether or not emission reductions preceding the relevant attainment dates (if possible) would further assist downwind areas in demonstrating attainment and maintenance of the NAAQS, or in the event that emission reductions are not feasible by the relevant attainment deadline, what date is as soon as practicable for EPA to require reductions following the relevant attainment deadline.[23]

Equally significant is the following statement appearing in EPA's brief in the same litigation:

[23] Declaration of Janet D. McCabe, at ¶81.



Nonetheless, EPA is mindful of the need to align implementation of emission reductions in upwind states with the applicable attainment dates in downwind areas, as instructed by the court in *North Carolina v. EPA*, 531 F.3d 896, 911-12 (D.C. Cir. 2008).[24]

MOG strongly urges the agency to follow the court holding *North Carolina v. EPA*, 531 F.3d 896, 911-12 (D.C. Cir. 2008), and to provide the states with guidance to align implementation of Good Neighbor SIPs with the date by which states are required to demonstrate attainment with the applicable NAAQS. As the focus on attainment of the 2015 ozone NAAQS continues, there must be an official recognition that air quality will continue to improve between the 2018 due date for Good Neighbor SIPs and the 2023 attainment deadline as a result of CAA programs including Federal Measures, federally mandated state RACT rules, nonattainment infrastructure SIPs, and Good Neighbor SIPs. While the Federal measures, state RACT rules, and nonattainment infrastructure SIPs will all significantly improve air quality in many nonattainment areas, those programs will all be implemented after the Good Neighbor SIPs are due, which means that states will need to carefully consider how best to address those air quality improvements as part of their Good Neighbor SIP submittals.

The failure to include the benefits of these programs in Good Neighbor SIPs will result in over-control of upwind states, which MOG asserts is illegal given the Supreme Court decision in *EPA v. EME Homer City Generation* in which stands for the proposition that EPA cannot require an upwind state to reduce its output of pollution by more than necessary to achieve attainment in every downwind state. The Good Neighbor SIP is a "down payment" on attainment and not a stand-alone attainment program. Numerous control programs will take effect now and between the 2018 Good Neighbor SIP due date and the 2023 attainment deadline. The Good Neighbor SIPs that are due in 2018 must take into account the impact of legally mandated controls on air quality by the attainment date to avoid violating the CAA prohibition against over-control.

### 3. EPA should offer more specific guidance on how to account for international emissions.

MOG applauds both the EPA memorandum of March 27, 2018, and the President's Memorandum of April 12, 2018, for identifying international emissions as a significant matter in need of resolution. Fundamental to addressing this issue is the statement of fact that EPA includes in its March 27, 2018 memorandum:

> EPA recognizes that a number of non-U.S. and non-anthropogenic sources contribute to downwind nonattainment and maintenance receptors.

---

[24] Defendant EPA's Reply to Plaintiff's Opposition to EPA's Cross-Motion for Summary Judgment, <u>Sierra Club v. EPA</u>, Case No. 3:15-cv-JD, Sept. 22, 2015) ED No. 68, p. 7.


**ALPINE**
**GEOPHYSICS**

**Final Technical Support Document**

Beyond mere recognition of the process established under Clean Air Act Section 179B, EPA should immediately acknowledge that known portions of a source apportionment analysis directly attributable to international emissions (such as the Canada/Mexico category) may be subtracted from the design value of a monitor to determine whether it is a problem monitor for purposes of the development of a Good Neighbor SIP. In addition, and pending more refined analysis) we urge that EPA apply a weight of evidence approach to determining some default percentage of the initial conditions and boundary condition portion of the source apportionment analysis that should be deemed to be international in nature to be subtracted from design values to identify problem monitors. Finally, with respect to 179B petitions addressed by the President's April 12, 2018 memo, EPA should provide for the parallel processing of 179B petitions and Good Neighbor SIP's that acknowledge any such petitions.

Set forth in the table below are the results of EPA's most recent source apportionment analysis[25] that for key monitors the significant contribution made by Canada/Mexico emissions (entirely international) and by Boundary Conditions (significantly international).

| Monitor ID | State | County | MDA8 Design Value (ppb) | | | | Contribution (ppb) | |
| | | | 2009-2013 Avg DV | 2009-2013 Max DV | 2023 Avg DV | 2023 Max DV | Can + Mex | IC / BC |
|---|---|---|---|---|---|---|---|---|
| 90010017 | Connecticut | Fairfield | 80.3 | 83 | 68.9 | 71.2 | 1.64 | 16.73 |
| 90013007 | Connecticut | Fairfield | 84.3 | 89 | 71.0 | 75.0 | 1.35 | 17.17 |
| 90019003 | Connecticut | Fairfield | 83.7 | 87 | 73.0 | 75.9 | 1.37 | 17.00 |
| 90099002 | Connecticut | New Haven | 85.7 | 89 | 69.9 | 72.6 | 1.58 | 17.17 |
| 211110067 | Kentucky | Jefferson | 85.0 | 85 | 70.1 | 70.1 | 0.66 | 21.94 |
| 240251001 | Maryland | Harford | 90.0 | 93 | 70.9 | 73.3 | 0.79 | 15.28 |
| 260050003 | Michigan | Allegan | 82.7 | 86 | 69.0 | 71.7 | 0.54 | 11.85 |
| 261630019 | Michigan | Wayne | 78.7 | 81 | 69.0 | 71.0 | 3.13 | 20.06 |
| 360810124 | New York | Queens | 78.0 | 80 | 70.2 | 72.0 | 1.73 | 17.87 |
| 361030002 | New York | Suffolk | 83.3 | 85 | 74.0 | 75.5 | 1.85 | 18.94 |
| 480391004 | Texas | Brazoria | 88.0 | 89 | 74.0 | 74.9 | 0.44 | 24.02 |
| 481130075 | Texas | Dallas | 82.0 | 83 | 69.0 | 69.9 | 0.55 | 24.69 |
| 481210034 | Texas | Denton | 84.3 | 87 | 69.7 | 72.0 | 0.92 | 24.69 |
| 482010024 | Texas | Harris | 80.3 | 83 | 70.4 | 72.8 | 0.28 | 27.83 |
| 482011034 | Texas | Harris | 81.0 | 82 | 70.8 | 71.6 | 0.24 | 25.71 |
| 482011039 | Texas | Harris | 82.0 | 84 | 71.8 | 73.5 | 0.47 | 24.67 |
| 484392003 | Texas | Tarrant | 87.3 | 90 | 72.5 | 74.8 | 1.24 | 24.38 |
| 484393009 | Texas | Tarrant | 86.0 | 86 | 70.6 | 70.6 | 0.77 | 23.79 |
| 550790085 | Wisconsin | Milwaukee | 80.0 | 82 | 71.2 | 73.0 | 0.82 | 16.67 |
| 551170006 | Wisconsin | Sheboygan | 84.3 | 87 | 72.8 | 75.1 | 0.69 | 17.53 |

25 https://www.epa.gov/sites/production/files/2018-03/contributions_from_updated_2023_modeling__0.xlsx



The CAA addresses international emissions directly. Section 179(B) subsection (a) states that:

> Notwithstanding any other provision of law, an implementation plan or plan revision required under this chapter shall be approved by the Administrator if the submitting State establishes  . . .that the implementation plan of such . . . would be adequate to attain and maintain the relevant [NAAQS] . . ., but for emissions emanating from outside of the United States.

If a state is able to demonstrate attainment "but for" international transport after adopting all reasonably available control measures, CAA Section 179(B) requires that EPA approve the CAA-required state implementation plan.

Addressing international emissions is important not only to downwind states but also upwind states that are obligated to submit under CAA Section 110(a)(2)(D) Good Neighbor SIPs. As the U.S. Supreme Court in the Homer City case has ruled, it is essential that Good Neighbor states be required to eliminate "only those 'amounts' of pollutants that contribute to the nonattainment of NAAQS in downwind States...  "EPA cannot require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State. . ."[26] In addition, the D.C. Circuit has commented that ". . . the good neighbor provision requires upwind States to bear responsibility for their fair share of the mess in downwind States." Slip op at 11 (2012). However, this "mess" seems to be related to international emissions for which upwind states have no responsibility.[27] As the Courts have stated, CAA section 110(a)(2)(D)(i)(I) "gives EPA no authority to force an upwind state to share the burden of reducing other upwind states' emissions." *North Carolina v. EPA*, 531 F 2d at 921.

With so many receptors so very close to meeting the NAAQS requirement even recognition of a portion of boundary conditions as attributable to international emissions would have a significant impact on an upwind states responsibilities in the development of approvable Good neighbor SIPs.

### 4. EPA should allow the use of either the APCA or OSAT source apportionment technique as an appropriate tool for conducting source apportionment analysis

MOG welcomes EPA's March 27, 2018 memorandum recognizing the proposal that OSAT be considered an appropriate technique to determine source apportionment in the context of determining significant contribution of an upwind state to a downwind monitor. Within the air quality model used by EPA in calculating future year nonattainment, there exist two alternate techniques that can be used in developing source attribution results; the Ozone

---

26 134 S. Ct. at 1608.
27 696 F.3d at 14.



**ALPINE
GEOPHYSICS**

Source Apportionment Technology (OSAT) and the Anthropogenic Precursor Culpability Assessment (APCA). While EPA certainly believes the APCA technique is appropriate for use in this application, we ask that EPA recognized that the OSAT is also a viable tool for this purpose and provides an already accepted alternative to APCA for any state that would elect to use it.

According to the CAMx model documentation, the OSAT technique provides a robust picture of which emissions sources are contributing to ozone formation because it specifically apportions ozone individually to all source categories, including the "uncontrollable" (e.g., biogenics in EPA's modeling) component. This allows for a separation of attribution for anthropogenic and biogenic contribution to a downwind monitor's modeled concentration.

Accordingly, we urge that EPA to issue guidance to allow state to use either the APCA or OSAT apportionment method when developing their Good Neighbor SIP submittals.

### 5. EPA's methodology for selection and management of impact on maintenance receptors should be reconsidered.

EPA's reliance on the CSAPR methodology to address "interference with maintenance" is not only inconsistent with the CAA, but also inconsistent with both the U.S. Supreme Court and D.C. Circuit decisions on CSAPR. Upon consideration of the reasonableness test, EPA's emphasis upon the single maximum design value to determine a maintenance problem for which sources (or states) must be accountable creates a default assumption of contribution. A determination that the single highest modeled maximum design value is appropriate for the purpose to determining contribution to interference with maintenance is not reasonable either mathematically, in fact, or as prescribed by the Clean Air Act or the U.S. Supreme Court. The method chosen by EPA must be a "permissible construction of the Statute." The CSAPR methodology proposed for use in this NODA is not reasonable in its application, resulting in requirements beyond the CAA and therefore must be revised.

The U.S. Supreme Court in *EPA v. EME Homer City* explains the maintenance concept set forth in the Good Neighbor Provision as follows:

> Just as EPA is constrained, under the first part of the Good Neighbor Provision, to eliminate only those amounts that "contribute…to *nonattainment*," EPA is limited, by the second part of the provision, to reduce only by "amounts" that "interfere with *maintenance*," *i.e.* by just enough to permit an already-attaining State to maintain satisfactory air quality."[28]

Relative to the reasonableness of EPA's assessment of contribution, the U.S. Supreme Court also provides,

---

28 134 S. Ct. at 1064, Ftn 18.



The Good Neighbor Provision . . . prohibits only upwind emissions that contribute significantly to downwind nonattainment. <u>EPA's authority is therefore limited to eliminating . . . the overage caused by the collective contribution</u> . . ."[29] (Emphasis added.)

EPA's use of a modeled maximum design value, when the average design value is below the NAAQS, to define contribution, results in a conclusion that any modeled contribution is deemed to be a significant interference with maintenance. This concept is inconsistent with the Clean Air Act and the U.S. Supreme Court's assessment of its meaning.

As noted by the D.C. Circuit in the 2012 lower case of *EME Homer City v. EPA*, "The good neighbor provision is not a free-standing tool for EPA to seek to achieve air quality levels in downwind States that are *well below* the NAAQS."[30] "EPA must avoid using the good neighbor provision in a manner that would result in unnecessary over-control in the downwind States. Otherwise, EPA would be exceeding its statutory authority, which is expressly tied to achieving attainment in the downwind States."[31] EPA has not justified its proposal as necessary to avoid interference with maintenance.

### 6. In the development of its guidance to the states, EPA should not give maintenance areas the same weight and status as to nonattainment areas.

EPA should avoid its past practice of giving the same weight to the development of controls programs for maintenance areas as nonattainment areas as it considers the guidance it will provide to the states to address the 2015 ozone NAAQS. Maintenance areas should not be subject to the same "significance" test as is applied to nonattainment areas. Maintenance areas do not require the same emission reduction requirements as nonattainment areas, and therefore, require different management.

In the CSAPR Update rule, EPA again applied the nonattainment area significance test to maintenance areas. The CSAPR Update applies the same weight to the development of control programs to address maintenance areas as it does nonattainment areas. This approach is objectionable both because maintenance areas are not subject to the same "significance" test as applies to nonattainment areas and because maintenance areas do not require the same emission reduction requirement as nonattainment areas.

The U.S. Supreme Court opinion in *EPA v. EME Homer City* offered the following on "interference with maintenance,"

---

29 Id. at 1604.
30 *EME Homer City v. EPA*, 696 F.3d 7, 22 (D.C. Cir 2012).
31 Id.

**ALPINE
GEOPHYSICS**

The statutory gap identified also exists in the Good Neighbor Provision's second instruction. That instruction requires EPA to eliminate amounts of upwind pollution that "interfere with maintenance" of a NAAQS by a downwind State. §7410(a)(2)(D)(i). This mandate contains no qualifier analogous to "significantly," and yet it entails a delegation of administrative authority of the same character as the one discussed above. Just as EPA is constrained, under the first part of the Good Neighbor Provision, to eliminate only those amounts that "contribute . . . to *nonattainment*," EPA is limited, by the second part of the provision, to reduce only by "amounts" that "interfere with *maintenance*," i.e., by just enough to permit an already-attaining State to maintain satisfactory air quality. (Emphasis added). With multiple upwind States contributing to the maintenance problem, however, EPA confronts the same challenge that the "contribute significantly" mandate creates: How should EPA allocate reductions among multiple upwind States, many of which contribute in amounts sufficient to impede downwind maintenance" Nothing in *either* clause of the Good Neighbor Provision provides the criteria by which EPA is meant to apportion responsibility.[32]

The D.C. Circuit opinion in *EME Homer City v. EPA*, also informs the maintenance area issue:

The statute also requires upwind States to prohibit emissions that will "interfere with maintenance" of the NAAQS in a downwind State. "Amounts" of air pollution cannot be said to "interfere with maintenance" unless they leave the upwind State and reach a downwind State's maintenance area. To require a State to reduce "amounts" of emission pursuant to the "interfere with maintenance" prong, EPA must show some basis in evidence for believing that those "amounts" from an upwind State, together with amounts from other upwind contributors, will reach a specific maintenance area in a downwind State and push that maintenance area back over the NAAQS in the near future. Put simply, the "interfere with maintenance" prong of the statute is not an open-ended invitation for EPA to impose reductions on upwind States. Rather, it is a carefully calibrated and commonsense supplement to the "contribute significantly" requirement.[33]

MOG urges EPA to abandon its current test for "interference" with maintenance and develop an alternative emission reduction approach that accounts for the fact that maintenance areas are already in attainment. EPA cannot reasonably justify the same level of emission reductions as might be called for with respect to nonattainment areas for maintenance areas. EPA does not address the fact that the CAA uses different terms to address

---

32  134 S. Ct. at 1064, Ftn 18.
33 EME Homer City v. EPA, 96 F.3d 7, 27 Ftn. 25 (D.C. Cir 2012).



maintenance and nonattainment, i.e., "significant contribution to non-attainment versus "interfere with maintenance." EPA improperly implements the terms "significant" and "interference" as being the same and in doing so offers no rationale or legal justification.

EPA's January 17, 2018 brief in the CSAPR Update litigation (*Wisconsin et al. v EPA*, Case No. 16-1406) documents with the following statement on pages 77 and 78 that EPA is ready to concede that a lesser level of control is appropriate in situations not constrained by the time limits of the CSAPR Update:

> Ultimately, Petitioners' complaint that maintenance-linked states are unreasonably subject to the "same degree of emission reductions" as nonattainment linked states must fail. Indus. Br. 25. There is no legal or practical prohibition on the Rule's use of a single level of control stringency for both kinds of receptors, provided that the level of control is demonstrated to result in meaningful air quality improvements without triggering either facet of the Supreme Court's test for over-control. So <u>while concerns at maintenance receptors can potentially be eliminated at a lesser level of control in some cases given the smaller problem being addressed, this is a practical possibility, not a legal requirement.</u> See 81 Fed. Reg. at 74,520. Here, <u>EPA's use of the same level of control for both maintenance-linked states and nonattainment-linked states is attributable to the fact that the Rule considered only emission reduction measures available in time for the 2017 ozone season.</u> Id. at 74,520. Under this constraint, both sets of states reduced significant emissions, without over-control, at the same level of control. Id. at 74,551-52. Accordingly, EPA's selection of a uniform level of control for both types of receptors was reasonable. Emphasis added.

As an alternative to maintenance monitors being accorded the same weight as nonattainment monitors, we urge that EPA advise the states that no additional control would be needed to address a maintenance monitor if the upwind state can show that either the monitor is likely to remain in attainment for a period of 10 years or that the upwind state's emissions will not increase for 10 years after the attainment date. Such an approach is consistent with Section 175A(a) of the Clean Air Act which provides:

> Each State which submits a request under section 7407 (d) of this title for redesignation of a nonattainment area for any air pollutant as an area which has attained the national primary ambient air quality standard for that air pollutant shall also submit a revision of the applicable State implementation plan to provide for the maintenance of the national primary ambient air quality standard for such air pollutant in the area concerned for at least 10 years after the redesignation. The plan shall contain such additional measures, if any, as may be necessary to ensure such maintenance.


**ALPINE
GEOPHYSICS**

It is also consistent with the John Calcagni memorandum of September 4, 1992, entitled "Procedures for Processing Requests to Redesignate Areas to Attainment", which contains the following statement on page 9:

> A State may generally demonstrate maintenance of the NAAQS by either showing that future emissions of a pollutant or its precursors will not exceed the level of the attainment inventory, or by modeling to show that the future mix of source and emission rates will not cause a violation of the NAAQS. Under the Clean Air Act, many areas are required to submit modeled attainment demonstrations to show that proposed reductions in emissions will be sufficient to attain the applicable NAAQS. For these areas, the maintenance demonstration should be based upon the same level of modeling. In areas where no such modeling was required, the State should be able to rely on the attainment inventory approach. In both instances, the demonstration should be for a period of 10 years following the redesignation.

Accordingly, we urge EPA allow this less stringent and effective option for states to respond to maintenance monitors.

**7. To the extent that more than one upwind state contributes to a downwind problem monitor, EPA should allow upwind states to submit a plan that would allow that state to demonstrate either that it has already imposed cost effective controls on its sources or that it is prepared to eliminate its prorate contribution to the portion of the downwind states design value that exceeds the NAAQS.**

MOG is pleased that EPA's March 27, 2018 memorandum recognizes two methods for apportioning responsibility among upwind states to downwind problem monitors. In its memorandum, EPA offers the following statement:

> For states that are found to significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, apportioning responsibility among states.
>
> - Consider control stringency levels derived through "uniform-cost" analysis of NOx reductions.
>
> - Consider whether the relative impact (*e.g.*, parts per billion/ton) between states is sufficiently different such that this factor warrants consideration in apportioning responsibility.



**ALPINE
GEOPHYSICS**

**Final Technical Support Document**

Addressing these issues is particularly important in the situation in which a state's contribution to a downwind problem monitor is greater than the level at which a monitor exceeds the NAAQS. To avoid unlawful over-control, EPA should provide guidance to states allowing them the option of prorating the reduction needed to achieve attainment over all states that contribute/interfere with that monitor. Such a process would allow an individual upwind state the option of addressing only their prorate portion of responsibility for the portion of the problem monitors ozone concentration that exceeds the NAAQS. This situation is illustrated in the situation set out below involving the Harford MD monitor which when modeling at 12km has a predicted 2023 ozone design value of 71.4 ppb (0.5 ppb above the 2015 ozone NAAQS). In the method described, Kentucky's responsibility, for example, to the Harford monitor would be 0.04 ppb versus its overall contribution to that monitor of 1.54 ppb.



**Anthropogenic Contribution (ppb) from 2023 Base Case**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CT | 0.00 | IL | 1.23 | TN | 0.42 | BC | 15.15 |
| DE | 0.07 | IN | 1.76 | South | 1.17 | IC | 0.00 |
| MD | 19.90 | MI | 0.78 | AR | 0.20 | Can/Mex | 0.72 |
| NJ | 0.09 | OH | 3.29 | MO | 0.41 | Bio/Fire | 9.03 |
| NY | 0.13 | WI | 0.23 | OK | 0.41 | | |
| PA | 4.52 | WV | 1.76 | TX | 0.80 | **Total** | **71.40** |
| VA/DC | 5.18 | KY | 1.54 | West | 1.66 | | |
| OthNE | 0.01 | NC | 0.47 | Other | 0.48 | | |



**Final Technical Support Document**

Redlines Reduction Contribution Calculation
Upwind State must achieve less than 0.70 ppb significant contribution or monitor much achieve attainment (70.9 pbb)
Reduction Necessary for Attainment    =    0.50    ppb from    71.40    ppb

| Relative Contribution of Significant Upwind States (ppb and %) | | | Proportional Reduction Requirement (ppb) | | Resulting Concentration After Reduction (ppb) | |
|---|---|---|---|---|---|---|
| VA/DC | 5.18 | 25% | 0.12 | | 5.06 | |
| PA | 4.52 | 22% | 0.11 | | 4.42 | |
| OH | 3.29 | 16% | 0.08 | | 3.21 | |
| IN | 1.76 | 8% | 0.04 | | 1.72 | |
| WV | 1.76 | 8% | 0.04 | | 1.72 | |
| KY | 1.54 | 7% | 0.04 | | 1.50 | |
| IL | 1.23 | 6% | 0.03 | | 1.20 | |
| TX | 0.80 | 4% | 0.02 | | 0.78 | |
| MI | 0.78 | 4% | 0.02 | | 0.76 | |
| Total | 20.86 | 100% | 0.50 | | | |

By proceeding to offer these alternatives approaches for responding to any significant contribution linkage, EPA can minimize the concern over the imposition of prohibited over-control of upwind states.

8. **EPA should not wait for a state to request consideration of exceptional events before acting to exclude them.**

The Clean Air Act and EPA recognize that Exceptional Events have resulted in higher design values for many monitors in both the upwind and downwind states. If not addressed, the use of these higher design values will not only result in unnecessarily stringent, inaccurate nonattainment designations, but also in ultimately higher future year predictions of ozone concentrations and the inaccurate belief that additional control measures are necessary.

EPA's March 27, 2018 memorandum appears to address this situation in offering the flexibility described as follows:

> Consider ... whether downwind areas have considered and/or used available mechanisms for regulatory relief.

This is important because we now have state's that have successfully sought EPA approval for excluding consideration of monitoring data influenced by exceptional events and other states that have not done so.

The importance of the need to exclude data influenced by Exceptional Events is recognized by Congress in the provisions of Clean Air Act §319(b)(3)(B) which provides as follows:

> Regulations promulgated under this section shall, at a minimum, provide that –



*(i) the occurrence of an exceptional event must be demonstrated by reliable, accurate data that is promptly produced and provided by <u>Federal,</u> State, or local government agencies;*

*(ii) a clear causal relationship must exist between the measured exceedances of a national ambient air quality standard and the exceptional event to demonstrate that the exceptional event caused a specific air pollution concentration at a particular air quality monitoring location;*

*(iii) there is a public process for determining whether an event is exceptional; and*

*(iv) there are criteria and procedures for the Governor of a State to petition the Administrator to exclude air quality monitoring data that is directly due to exceptional events from use in determinations by the Administrator with respect to exceedances or violations of the national ambient air quality standards. (Emphasis added.)*

A number of states have already made requests to have the air masses caused by the Canadian wildfires that occurred in 2016 be declared Exception Events – thus allowing monitored data influenced by those events to be excluded from the calculation of the design value for the affected monitor. Among the states submitting these requests are:

**Connecticut** - The Connecticut demonstration related to the May 2016 event was submitted on May 23, 2017.[34] In addition to showing that Canadian wildfire caused the event, the demonstration noted that ". . . the exceedances of May 25-26th cannot be attributed to EGUs operating on high electric demand days as is more typically the case later in the ozone season." EPA concurred in that demonstration on July 31, 2017.

**New Jersey -** The New Jersey demonstration related to the May 2016 was submitted on May 31, 2017.[35] In addition to showing that Canadian wildfire caused the event in New Jersey, the demonstration also noted that the event had had a similar impact on many other states including Wisconsin, Michigan, Illinois, Indiana, Ohio, Pennsylvania and New York. EPA concurred in that demonstration on October 24, 2017.

**Massachusetts** - The Massachusetts demonstration related to the May 2016 event was submitted on May 25, 2017.[36] EPA concurred in that demonstration on September 19, 2017.

**Maryland –** While the Maryland demonstration dated May 26, 2017, nominally addresses July 2016 event, the demonstration report itself includes data which assesses how the design values for Maryland's monitors are affected by both the May and July 2016 events.[37]

---

34 https://www.epa.gov/air-quality-analysis/exceptional-events-documents-ozone-connecticut
35 https://www.epa.gov/air-quality-analysis/exceptional-events-documents-ozone-new-jersey
36 https://www.epa.gov/air-quality-analysis/exceptional-events-documents-ozone-massachusetts
37http://www.mde.state.md.us/programs/Air/AirQualityMonitoring/Documents/MDE_JUL_21_22_2016_EE_demo.pdf

**ALPINE
GEOPHYSICS**

**Pennsylvania –** Pennsylvania has also made a demonstration related to the May 2016 event dated November 2017.[38]

Significantly, several states that have historically had problem monitors have not made similar requests even though these events clearly impact their monitors. Specifically, it appears that New York have elected not to seek any relief at all for the events, while other states have limited their requests to only the May 2016 event and not to the July 2016 event that was identified by Maryland.

It is clear from these demonstrations that the May and July 2016 events were significant and clearly meet the substantive criteria for concurrence by EPA. While the EPA has historically focused on applying Exceptional Event determinations to those monitors that exceed a NAAQS, extending these determinations to all other affected monitors is critical because doing so would assure that all designations are based on appropriate data. In addition, even for monitor whose attainment status is not changed, accounting for these Exceptional Events would lower the design value for that monitor and increase the critical nonattainment value for each monitor (the ozone concentration in the upcoming ozone season that would be high enough to push a monitor into nonattainment). Moreover, as we move to modeling a more recent base case the updated 2016 design values would be directly incorporated into that modeling platform affecting the development of Good Neighbor SIPs and any possible transport rules, state 126 petitions or other planning related to the future attainment year. Finally, appropriately updating these design values would provide a more accurate benchmark for determining if and to what extent upwind states would need to reduce ozone precursor emissions related to transport because that obligation ends when a downwind state achieves attainment of the NAAQS at all monitoring locations.

Accordingly, whether or not a state has requested EPA approval of the exclusion of exceptional events, EPA should invoke its own authority to address those events so that upwind states may have the benefit of correct data as they develop and submit their 2015 ozone NAAQS Good Neighbor SIPs

### CONCLUSION

MOG very much appreciates the opportunity to offer these additional comments on flexibilities need to allow for the development of approvable good neighbor SIPs.

---

38 http://www.elibrary.dep.state.pa.us/dsweb/Get/Document-117484/Ozone%20EE%20Analysis%20May%2024-26-2017.pdf

**Appendix C**

**Presentation – Midwest Ozone Group Preview of 2015 Ozone NAAQS Good Neighbor SIPs**

# MIDWEST OZONE GROUP PREVIEW OF 2015 OZONE NAAQS GOOD NEIGHBOR SIPs

David Flannery
Steptoe & Johnson, PLLC

Gregory Stella
Alpine Geophysics, LLC

May 30, 2018

A PDF version of this document can be located at:
http://www.midwestozonegroup.com/files/MOG_Preview_of_GNS_Development_final.pdf

1

# Support for States

- Using information available from EPA and MOG, how can States develop a technical support document (TSD) for Good Neighbor SIP revisions?

- MOG is making available to the states a TSD with data supporting approvable Good Neighbor SIPs to address EPA-identified nonattainment / maintenance monitors in the eastern US

# Outcome

- Approval of Good Neighbor SIP for 2008 and 2015 ozone NAAQS would obviate new transport rules, 126 petitions and the 176A petition

- Good Neighbor SIPs can be approvable with existing OTB/OTW controls for all states in the East with recognition of the following:

  - Use of the accepted modeling platforms that are appropriate to assess transport, including 12km and 4 km

  - International emissions

  - Proration of upwind state responsibility based upon ppb contribution to downwind monitor

  - Maintenance monitors to be addressed through a no emission increase demonstration

  - Significant contribution to be based on 1 ppb (not 1 %)

3

# Ozone Modeling TSD Development

- Address the four step process for each monitor group based on issues related to each
  - Step 1 – Identify problem monitors
  - Step 2 – Determine state linkages
  - Step 3 – Determine required response
  - Step 4 – Establish enforceable measures

- Use directly or as weight of evidence to support SIP revisions

- Examples provided for four (4) sets of monitors
  - Connecticut/New York, Maryland, Wisconsin/Michigan,  Texas

# New York/Connecticut

# Step 1 – Identify Problem Monitors

## Maintenance only

| Monitor | State | County | DVb (2011) | DVf (2023) Average (ppb) - Nonattainment | | |
|---|---|---|---|---|---|---|
| | | | | Original 12km Modeling | Updated 12km Modeling | 4km Modeling |
| 361030002 | New York | Suffolk | 83.3 | 72.5 | 74.0 | 70.7 |
| 90019003 | Connecticut | Fairfield | 83.7 | 72.7 | 73.0 | 69.9 |
| 90013007 | Connecticut | Fairfield | 84.3 | 71.2 | 71.0 | 69.7 |
| 360810124 | New York | Queens | 78.0 | 70.1 | 70.2 | 68.0 |
| 90099002 | Connecticut | New Haven | 85.7 | 71.2 | 69.9 | 70.3 |
| 90010017 | Connecticut | Fairfield | 80.3 | 69.8 | 68.9 | 69.2 |

| Monitor | State | County | DVb (2011) | DVf (2023) Maximum (ppb) - Maintenance | | |
|---|---|---|---|---|---|---|
| | | | | Original 12km Modeling | Updated 12km Modeling | 4km Modeling |
| 361030002 | New York | Suffolk | 83.3 | 74.0 | 75.5 | 72.1 |
| 90019003 | Connecticut | Fairfield | 83.7 | 75.6 | 75.9 | 72.7 |
| 90013007 | Connecticut | Fairfield | 84.3 | 75.2 | 75.0 | 73.6 |
| 360810124 | New York | Queens | 78.0 | 71.9 | 72.0 | 69.8 |
| 90099002 | Connecticut | New Haven | 85.7 | 73.9 | 72.6 | 73.0 |
| 90010017 | Connecticut | Fairfield | 80.3 | 72.1 | 71.2 | 71.5 |

# Step 2: Linkage assessment (1%)

- Using the linkage calculations from the 12km simulation, Alpine selected the states with linkage to problem receptors (based on the 1% of 70 pbb NAAQS) to define source regions in 4km OSAT simulation

| Monitor | Name | PA | VA/DC | IL | IN | OH | MD | NJ | NY | WV | KY | MI | CT | DE | TX |
|---------|------|----|-------|----|----|----|----|----|----|----|----|----|----|----|----|
| 90019003 | Fairfield, CT | x | x | x | x | x | x | x | x | | | | | | |
| 361030002 | Suffolk, NY | x | x | x | x | x | x | x | | | x | x | x | | x |
| 360850067 | Richmond, NY | x | x | x | x | x | x | x | | x | x | x | | x | x |
| 90013007 | Fairfield, CT | x | x | x | x | x | x | x | x | | | | | | |
| 90099002 | New Haven, CT | x | x | x | x | x | x | x | x | | | | | | |

7

# Step 2: Linkage assessment (>1 ppb)

- Using the linkage calculations from the 12km simulation, Alpine also identified states with linkage to problem receptors > 1 ppb

| Monitor | Name | PA | VA/DC | IL | IN | OH | MD | NJ | NY | DE |
|---------|------|----|-------|----|----|----|----|----|----|----|
| 90019003 | Fairfield, CT | x | x | | | x | x | x | x | |
| 361030002 | Suffolk, NY | x | x | x | x | x | x | x | | |
| 360850067 | Richmond, NY | x | x | x | x | x | x | x | | x |
| 90013007 | Fairfield, CT | x | x | | | x | x | x | x | |
| 90099002 | New Haven, CT | x | x | x | | x | x | x | x | |

8

# Step 3 – Determine Required Response

- No nonattainment receptors: no response needed
- Only problem monitors: maintenance
- Alternative maintenance approaches
  - Demonstrate cost effective controls in place; or
  - 10 year projection with no emission increase

# Step 3: Maintenance Alternative:
# 10 Year Reduction Demonstration

## Annual Anthropogenic NOx Emissions

| State | 2011 (Tons) | 2023 (Tons) | Change (Tons) | Change (%) |
|---|---|---|---|---|
| Connecticut | 72,906 | 37,758 | -35,148 | -48% |
| Delaware | 29,513 | 14,511 | -15,002 | -51% |
| District of Columbia | 9,404 | 4,569 | -4,834 | -51% |
| Illinois | 506,607 | 293,450 | -213,156 | -42% |
| Indiana | 444,421 | 243,954 | -200,467 | -45% |
| Kentucky | 327,403 | 171,194 | -156,209 | -48% |
| Maryland | 165,550 | 88,383 | -77,167 | -47% |
| Michigan | 443,936 | 228,242 | -215,694 | -49% |
| New Jersey | 191,035 | 101,659 | -89,376 | -47% |
| New York | 388,350 | 230,001 | -158,349 | -41% |
| Ohio | 546,547 | 252,828 | -293,719 | -54% |
| Pennsylvania | 562,366 | 293,048 | -269,318 | -48% |
| Texas | 1,277,432 | 869,949 | -407,482 | -32% |
| Virginia | 313,848 | 161,677 | -152,171 | -48% |
| West Virginia | 174,219 | 136,333 | -37,886 | -22% |

As reported by EPA, final CSAPR update summaries

# Maryland

# Step 1: Identify Problem Monitors

- Utilize SIP approvable modeling to demonstrate attainment (EPA Updated 12km)

| Monitor | State | County | DVb (2011) | DVf (2023) Average (ppb) - Nonattainment | | |
|---------|-------|--------|------------|---------------------------|-------------------------|--------------|
| | | | | Original 12km Modeling | Updated 12km Modeling | 4km Modeling |
| 240251001 | Maryland | Harford | 90.0 | 71.4 | 70.9 | 71.1 |

| Monitor | State | County | DVb (2011) | DVf (2023) Maximum (ppb) - Maintenance | | |
|---------|-------|--------|------------|---------------------------|-------------------------|--------------|
| | | | | Original 12km Modeling | Updated 12km Modeling | 4km Modeling |
| 240251001 | Maryland | Harford | 90.0 | 73.8 | 73.3 | 73.5 |

12

# Step 1 : International Contribution

Harford: (only nonattainment monitor at 4km) – 71.1 ppb

- Reduction needed to achieve attainment: 0.2 ppb
- International contribution
  - Canada/Mexico: 0.43 ppb (assumed to be 100% international)
  - Boundary Conditions: no credit for any portion of the 11.34 ppb BC needed to bring monitor into attainment
    - 89% of global NOx emissions are generated outside U.S.
- Weight of Evidence: Harford is likely to be in attainment of the 2015 ozone NAAQS "but for" international emissions

# Step 1: International Emissions

- NOx Emissions influencing boundary condition are overwhelmingly (89%) from international sources:
  - China            21%
  - Int. Shipping     13%
  - USA              11%
  - India             7%
  - Russian Fed.      3%
  - Brazil            3%
  - Iran              2%
  - Indonesia         2%
  - Japan             2%
  - Mexico            2%
  - Int. Aviation     2%
  - Canada            1%
  - Saudi Arabia      1%

- Source: "European Commission, Joint Research Centre (JRC)/PBL Netherlands Environmental Assessment Agency. Emission Database for Global Atmospheric Research (EDGAR)"

14

# Step 2: Linkage assessment (1%)

- Using the linkage calculations from the 12km simulation, Alpine selected the states with linkage to problem receptors (based on the 1% of 70 pbb NAAQS) to define source regions in 4km OSAT simulation

| Monitor | Name | PA | VA/DC | IL | IN | OH | WV | KY | MI | TX |
|---------|------|----|-------|----|----|----|----|----|----|----|
| 240251001 | Harford, MD | x | x | x | x | x | x | x | x | x |

# Step 2: Linkage assessment (> 1 ppb)

- Using the linkage calculations from the 12km simulation, Alpine also identified states with linkage to problem receptors > 1 ppb

| Monitor | Name | PA | VA/DC | IL | IN | OH | WV | KY |
|---------|------|----|----|----|----|----|----|----|
| 240251001 | Harford, MD | x | x | x | x | x | x | x |

16

# Step 3 – Determine Required Response for Maintenance

- No nonattainment receptors (if emissions from Canada/Mexico are recognized)
- If only maintenance, allow the following alternatives
  - Show cost effective controls in place, or
  - 10 year projection with no emission increase

17

# Step 3: Maintenance Alternative: 10 Year Reduction Demonstration

| State | Annual Anthropogenic NOx Emissions | | | |
|---|---|---|---|---|
| | 2011 (Tons) | 2023 (Tons) | Change (Tons) | Change (%) |
| District of Columbia | 9,404 | 4,569 | -4,834 | -51% |
| Illinois | 506,607 | 293,450 | -213,156 | -42% |
| Indiana | 444,421 | 243,954 | -200,467 | -45% |
| Kentucky | 327,403 | 171,194 | -156,209 | -48% |
| Michigan | 443,936 | 228,242 | -215,694 | -49% |
| Ohio | 546,547 | 252,828 | -293,719 | -54% |
| Pennsylvania | 562,366 | 293,048 | -269,318 | -48% |
| Texas | 1,277,432 | 869,949 | -407,482 | -32% |
| Virginia | 313,848 | 161,677 | -152,171 | -48% |
| West Virginia | 174,219 | 136,333 | -37,886 | -22% |

As reported by EPA, final CSAPR update summaries

# Step 3 – Determine Required Response to Nonattainment

- If Harford is designated as nonattainment allow the following alternatives
  - Show cost effective controls in place, or
  - Proportional contribution (a.k.a., 'red lines' approach)

19

# Step 3: "Red Lines" Allocation Alternative

- Upwind states are obligated to reduce emissions but no more than necessary to achieve attainment or eliminate linkage

- CAA does not specify how to allocate among upwind states

- EPA's CSAPR cost based allocation method was upheld by the Supreme Court in part because of the complexity of other approaches

- This situation is much simpler

# Step 3: Red Lines Alternative Harford, MD

**Anthropogenic Contribution (ppb) from 2023 Base Case – 4km OSAT Modeling**

**Redlines Reduction Contribution Calculation – Harford, MD**
**Upwind State must achieve less than 0.70 ppb significant contribution or monitor must achieve attainment**
**Reduction Necessary for Attainment = 0.2 ppb from 71.1 ppb**

| | Relative Contribution of Significant Upwind States (ppb and %) | | Proportional Reduction Requirement (ppb) |
|---|---|---|---|
| VA/DC | 3.92 | 22% | 0.04 |
| OH | 3.02 | 17% | 0.03 |
| PA | 2.70 | 15% | 0.03 |
| WV | 2.52 | 14% | 0.03 |
| KY | 2.07 | 12% | 0.02 |
| IN | 1.81 | 10% | 0.02 |
| IL | 1.05 | 6% | 0.01 |
| TX | 0.90 | 5% | 0.01 |
| **Total** | **17.99** | **100%** | **0.20** |

21



# Wisconsin/Michigan

# Step 1: Identify Problem Monitors

| Monitor | State | County | DVb (2011) | Original 12km Modeling | | Updated 12km Modeling | | 4km Modeling | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | DVf (2023) Ave | DVf (2023) Max | DVf (2023) Ave | DVf (2023) Max | DVf (2023) Ave | DVf (2023) Max |
| 260050003 | Michigan | Allegan | 82.7 | 69.0 | 71.8 | 69.0 | 71.7 | 70.3 | 73.1 |
| 550790085 | Wisconsin | Milwaukee | 80.0 | 65.4 | 67.0 | 71.2 | 73.0 | 67.4 | 70.5 |
| 551170006 | Wisconsin | Sheboygan | 84.3 | 70.8 | 73.1 | 72.8 | 75.1 | 71.7 | 74.0 |

24

# Step 1 (cont.): International Contribution

Sheboygan: (only nonattainment monitor at 4km) – 71.7 ppb

- – Reduction needed to achieve attainment: 0.8 ppb
- – International contribution (from 12km modeling)
  - • Canada/Mexico: 0.69 ppb (assumed to be 100% international)
  - • Boundary Conditions: 17.53 ppb (only need credit for 0.11 ppb – less than 1%- of BC (in addition to Can/Mex) to bring monitor into attainment
    - – 89% of global NOx emissions are generated outside U.S.
- – Weight of Evidence: Sheboygan is likely to be in attainment of the 2015 ozone NAAQS "but for" international emissions

25

# Step 1: International Emissions

- NOx Emissions influencing boundary condition are overwhelmingly (89%) from international sources:

  - China              21%
  - Int. Shipping       13%
  - USA               11%
  - India              7%
  - Russian Fed.        3%
  - Brazil             3%
  - Iran               2%
  - Indonesia          2%
  - Japan              2%
  - Mexico             2%
  - Int. Aviation       2%
  - Canada             1%
  - Saudi Arabia        1%

- Source: "European Commission, Joint Research Centre (JRC)/PBL Netherlands Environmental Assessment Agency. Emission Database for Global Atmospheric Research (EDGAR)"

26

# Step 1 (cont.): Problem Monitors

- Sheboygan, Wisconsin: Maintenance only (assuming international emissions are recognized)
- Allegan, Michigan: Maintenance

# Step 2: Linkage assessment (1%)

| Site ID | State | County | 2023 Avg DV | 2023 Max DV | AR | IL | IN | IA | KS | KY |
|---------|-------|--------|-------------|-------------|-----|------|------|------|------|------|
| 551170006 | Wisconsin | Sheboygan | 72.8 | 75.1 | 0.51 | 15.73 | 7.11 | 0.45 | 0.46 | 0.81 |
| 260050003 | Michigan | Allegan | 69.0 | 71.7 | 1.64 | 19.62 | 7.11 | 0.77 | 0.77 | 0.58 |

| Site ID | State | County | LA | MI | MO | OH | OK | TX | WI |
|---------|-------|--------|------|------|------|------|------|------|------|
| 551170006 | Wisconsin | Sheboygan | 0.84 | 2.06 | 1.37 | 1.10 | 0.95 | 1.65 | 9.09 |
| 260050003 | Michigan | Allegan | 0.70 | 3.32 | 2.61 | 0.19 | 1.31 | 2.39 | 1.95 |

| Site ID | State | County | Can + Mex | Offshore | Fire | Initial & Boundary | Biogenic |
|---------|-------|--------|-----------|----------|------|--------------------|----------|
| 551170006 | Wisconsin | Sheboygan | 0.69 | 0.55 | 0.64 | 17.53 | 7.51 |
| 260050003 | Michigan | Allegan | 0.54 | 0.36 | 0.93 | 11.85 | 8.91 |

EPA  12km APCA contribution calculations

# Step 2: Linkage assessment (> 1 ppb)

| Site ID | State | County | 2023 Avg DV | 2023 Max DV | AR | IL | IN | MI |
|---------|-------|--------|-------------|-------------|------|-------|------|------|
| 551170006 | Wisconsin | Sheboygan | 72.8 | 75.1 | 0.51 | 15.73 | 7.11 | 2.06 |
| 260050003 | Michigan | Allegan | 69.0 | 71.7 | 1.64 | 19.62 | 7.11 | 3.32 |

| Site ID | State | County | MO | OH | OK | TX | WI |
|---------|-------|--------|------|------|------|------|------|
| 551170006 | Wisconsin | Sheboygan | 1.37 | 1.10 | 0.95 | 1.65 | 9.09 |
| 260050003 | Michigan | Allegan | 2.61 | 0.19 | 1.31 | 2.39 | 1.95 |

| Site ID | State | County | Can + Mex | Offshore | Fire | Initial & Boundary | Biogenic |
|---------|-------|--------|-----------|----------|------|---------------------|----------|
| 551170006 | Wisconsin | Sheboygan | 0.69 | 0.55 | 0.64 | 17.53 | 7.51 |
| 260050003 | Michigan | Allegan | 0.54 | 0.36 | 0.93 | 11.85 | 8.91 |

EPA  12km APCA contribution calculations

# Step 3 – Determine Required Response

- No nonattainment receptors (if international emissions are recognized)
- Only problem monitors: maintenance
- Alternative maintenance approaches
  - Show cost effective controls in place;or
  - 10 year projection with no emission increase

# Step 3: Maintenance Alternative: 10 Year Reduction Demonstration

| State | Annual Anthropogenic NOx Emissions | | | |
|---|---|---|---|---|
| | 2011 (Tons) | 2023 (Tons) | Change (Tons) | Change (%) |
| Illinois | 506,607 | 293,450 | -213,156 | -42% |
| Indiana | 444,421 | 243,954 | -200,467 | -45% |
| Kentucky | 327,403 | 171,194 | -156,209 | -48% |
| Louisiana | 535,339 | 373,849 | -161,490 | -30% |
| Michigan | 443,936 | 228,242 | -215,694 | -49% |
| Missouri | 376,256 | 192,990 | -183,266 | -49% |
| Ohio | 546,547 | 252,828 | -293,719 | -54% |
| Oklahoma | 427,278 | 255,341 | -171,937 | -40% |
| Texas | 1,277,432 | 869,949 | -407,482 | -32% |

As reported by EPA, final CSAPR update summaries

# Step 3 – Determine Required Response to Nonattainment

- If Sheboygan is deemed to be nonattainment allow the following alternatives
  - Show cost effective controls in place, or
  - Proportional contribution (a.k.a., 'red lines' approach)

# Step 3: "Red Lines" Allocation Alternative

- Upwind states are obligated to reduce emissions but no more than necessary to achieve attainment or eliminate linkage
- CAA does not specify how to allocate among upwind states
- EPA's CSAPR cost based allocation method was upheld by the Supreme Court in part because of the complexity of other approaches
- This situation is much simpler

33

# Step 3: Red Lines Alternative

**Redlines Reduction Contribution Calculation - Sheboygan, WI**

**Upwind State must achieve less than 0.70 ppb significant contribution or monitor must achieve attainment**

**Reduction Necessary for Attainment = 1.90 ppb from 72.8 ppb**

| | Relative Contribution of Significant Upwind States (ppb and %) | | | Proportional Reduction Requirement (ppb) |
|---|---|---|---|---|
| IL | 15.73 | 50% | | 0.95 |
| IN | 7.11 | 22% | | 0.43 |
| MI | 2.06 | 7% | | 0.12 |
| TX | 1.65 | 5% | | 0.10 |
| MO | 1.37 | 4% | | 0.08 |
| OH | 1.10 | 3% | | 0.07 |
| OK | 0.95 | 3% | | 0.06 |
| LA | 0.84 | 3% | | 0.05 |
| KY | 0.81 | 3% | | 0.05 |
| **Total** | **31.62** | **100%** | | **1.90** |

EPA final CSAPR update 12km APCA contributions



**Texas**

Step 3: Red Lines Alternative

35

# Step 1: Identify Problem Monitors

| Site ID | State | County | 2009-13 Avg DV | 2009-13 Max DV | 2023 Avg DV | 2023 Max DV |
|---|---|---|---|---|---|---|
| 480391004 | Texas | Brazoria | 88.0 | 89 | 74.0 | 74.9 |
| 484392003 | Texas | Tarrant | 87.3 | 90 | 72.5 | 74.8 |
| 482011039 | Texas | Harris | 82.0 | 84 | 71.8 | 73.5 |
| 482010024 | Texas | Harris | 80.3 | 83 | 70.4 | 72.8 |
| 481210034 | Texas | Denton | 84.3 | 87 | 69.7 | 72.0 |
| 482011034 | Texas | Harris | 81.0 | 82 | 70.8 | 71.6 |

EPA 12km design values as published in March 27, 2018 EPA memo

# Step 1 (cont.): International Contribution

Tarrant (484392003) – 72.5 ppb  (12km modeling)

- Reduction needed to achieve attainment: 1.6 ppb
- International contribution
  - Canada/Mexico: 1.24 ppb (assumed to be 100% international)
  - Boundary Conditions: 24.38 ppb (only need credit for 0.36 ppb – 1.5 % of BC -in addition to Can/Mex - to bring monitor into attainment)
    - 89% of global NOx emissions are generated outside U.S.
- Weight of Evidence: This monitor is likely to be in attainment of the 2015 ozone NAAQS "but for" international emissions

37

# Step 1 (cont.): International Contribution

Harris (482011039) – 71.8 ppb  (12km modeling)

- Reduction needed to achieve attainment: 0.9 ppb
- International contribution
  - Canada/Mexico: 0.47 ppb (assumed to be 100% international)
  - Boundary Conditions: 24.67 ppb (only need credit for 0.43 ppb –  1.7 % of BC - in addition to Can/Mex - to bring monitor into attainment)
    - 89% of global NOx emissions are generated outside U.S.
- Weight of Evidence: This monitor is likely to be in attainment of the 2015 ozone NAAQS "but for" international emissions

# Step 1 (cont.): International Contribution

Brazoria (480391004) – 74.0 ppb  (12km modeling)

- – Reduction needed to achieve attainment: 3.1 ppb
- – International contribution
  - • Canada/Mexico: 0.44 ppb (assumed to be 100% international)
  - • Boundary Conditions: 24.02 ppb (only need credit for 2.66 ppb –  11.07% of BC - in addition to Can/Mex - to bring monitor into attainment)
    - – 89% of global NOx emissions are generated outside U.S.
- – Weight of Evidence: This monitor is likely to be in attainment of the 2015 ozone NAAQS "but for" international emissions

# Step 1: International Emissions

- NOx Emissions influencing boundary condition are overwhelmingly (89%) from international sources:
    - China            21%
    - Int. Shipping     13%
    - USA              11%
    - India             7%
    - Russian Fed.      3%
    - Brazil            3%
    - Iran              2%
    - Indonesia         2%
    - Japan             2%
    - Mexico            2%
    - Int. Aviation     2%
    - Canada            1%
    - Saudi Arabia      1%

- Source: "European Commission, Joint Research Centre (JRC)/PBL Netherlands Environmental Assessment Agency. Emission Database for Global Atmospheric Research (EDGAR)"

40

# Step 2: Linkage assessment (1%)

| Site ID | State | County | 2023 Avg DV | 2023 Max DV | AR | IL | LA | MS | MO | OK |
|---------|-------|--------|-------------|-------------|------|------|------|------|------|------|
| 480391004 | Texas | Brazoria | 74.0 | 74.9 | 0.90 | 1.00 | 3.80 | 0.63 | 0.88 | 0.90 |
| 484392003 | Texas | Tarrant | 72.5 | 74.8 | 0.78 | 0.29 | 1.71 | 0.27 | 0.38 | 1.71 |
| 482011039 | Texas | Harris | 71.8 | 73.5 | 0.99 | 0.88 | 4.72 | 0.79 | 0.88 | 0.58 |
| 482010024 | Texas | Harris | 70.4 | 72.8 | 0.29 | 0.34 | 3.06 | 0.50 | 0.38 | 0.20 |
| 481210034 | Texas | Denton | 69.7 | 72.0 | 0.58 | 0.23 | 1.92 | 0.33 | 0.24 | 1.23 |
| 482011034 | Texas | Harris | 70.8 | 71.6 | 0.54 | 0.51 | 3.38 | 0.39 | 0.63 | 0.68 |

| Site ID | State | County | TX | Can + Mex | Offshore | Fire | Initial & Boundary | Biogenic |
|---------|-------|--------|-------|-----------|----------|------|--------------------|----------|
| 480391004 | Texas | Brazoria | 26.00 | 0.44 | 2.31 | 2.05 | 24.02 | 5.60 |
| 484392003 | Texas | Tarrant | 27.64 | 1.24 | 1.18 | 1.34 | 24.38 | 6.44 |
| 482011039 | Texas | Harris | 22.82 | 0.47 | 4.04 | 2.09 | 24.67 | 4.50 |
| 482010024 | Texas | Harris | 25.62 | 0.28 | 4.83 | 0.77 | 27.83 | 2.66 |
| 481210034 | Texas | Denton | 26.69 | 0.92 | 1.23 | 0.87 | 24.69 | 6.42 |
| 482011034 | Texas | Harris | 25.66 | 0.24 | 3.91 | 1.75 | 25.71 | 3.44 |

EPA 12km APCA contribution calculations

41

# 1% Contribution Threshold

- Some states and stakeholders argue that 1% (0.70 ppb) is not scientifically supported and is more stringent than current 2016 EPA Significant Impact Level (SIL) guidance of 1.0 ppb

- Potential for states to submit SIP revision citing SIL as acceptable for total state anthropogenic contribution threshold

- Allow as an alternative that significance occurs if greater than 1 ppb and eliminate linkage with 5 upwind states

# Step 2: Linkage assessment (> 1 ppb)

| Site ID | State | County | 2023 Avg DV | 2023 Max DV | LA | OK | TX |
|---------|-------|--------|-------------|-------------|------|------|-------|
| 480391004 | Texas | Brazoria | 74.0 | 74.9 | 3.80 | 0.90 | 26.00 |
| 484392003 | Texas | Tarrant | 72.5 | 74.8 | 1.71 | 1.71 | 27.64 |
| 482011039 | Texas | Harris | 71.8 | 73.5 | 4.72 | 0.58 | 22.82 |
| 482010024 | Texas | Harris | 70.4 | 72.8 | 3.06 | 0.20 | 25.62 |
| 481210034 | Texas | Denton | 69.7 | 72.0 | 1.92 | 1.23 | 26.69 |
| 482011034 | Texas | Harris | 70.8 | 71.6 | 3.38 | 0.68 | 25.66 |

| Site ID | State | County | Can + Mex | Offshore | Fire | Initial & Boundary | Biogenic |
|---------|-------|--------|-----------|----------|------|--------------------|---------|
| 480391004 | Texas | Brazoria | 0.44 | 2.31 | 2.05 | 24.02 | 5.60 |
| 484392003 | Texas | Tarrant | 1.24 | 1.18 | 1.34 | 24.38 | 6.44 |
| 482011039 | Texas | Harris | 0.47 | 4.04 | 2.09 | 24.67 | 4.50 |
| 482010024 | Texas | Harris | 0.28 | 4.83 | 0.77 | 27.83 | 2.66 |
| 481210034 | Texas | Denton | 0.92 | 1.23 | 0.87 | 24.69 | 6.42 |
| 482011034 | Texas | Harris | 0.24 | 3.91 | 1.75 | 25.71 | 3.44 |

EPA 12km APCA contribution calculations

# Step 3 – Determine Required Response

- No nonattainment receptors (if international emissions are recognized)

- Only problem monitors: maintenance

- Alternative maintenance approaches
  – Show cost effective controls in place; or
  – 10 year projection with no emission increase

# Step 3: Maintenance Alternative: 10 Year Reduction Demonstration

|  | **Annual Anthropogenic NOx Emissions** | | | |
| --- | --- | --- | --- | --- |
| **State** | **2011 (Tons)** | **2023 (Tons)** | **Change (Tons)** | **Change (%)** |
| Arkansas | 232,185 | 132,148 | -100,037 | -43% |
| Illinois | 506,607 | 293,450 | -213,156 | -42% |
| Louisiana | 535,339 | 373,849 | -161,490 | -30% |
| Mississippi | 205,800 | 105,941 | -99,859 | -49% |
| Missouri | 376,256 | 192,990 | -183,266 | -49% |
| Oklahoma | 427,278 | 255,341 | -171,937 | -40% |

As reported by EPA, final CSAPR update summaries

45

# Step 3 – Determine Required Response to Nonattainment

If Tarrant, Harris and/or Brazoria are deemed to be nonattainment, allow the following alternatives

- – Show cost effective controls in place, or
- – Proportional contribution (a.k.a., 'red lines' approach)

# Conclusion

- Approval of Good Neighbor SIP for 2008 and 2015 ozone NAAQS would obviate new transport rules and 126 petitions and the 176A petition

- Good Neighbor SIPs can be approved without new controls for all states in the East with recognition of the following:

- Step 1:
  - Alternative modeling platforms
    - Recognition of the several modeling platforms that are known to be appropriate to assess transport, including 12km and 4 km
    - MOG 4km modeling improves results in NY/CT; MD; MI/WI

# Conclusion (cont.)

Step 1 (cont.):

— Recognition of international emissions

- Allowing credit for only Can/Mex resolves MD
- Allowing additional credit for 1% of BC resolves all monitors in East other than TX
- Allowing additional credit for 2% of BC resolves all monitors in East other than 1 monitor in TX
- Allowing additional credit for 12% of BC resolves all of East, including TX

# Conclusion (cont.)

- Step 2:
  - Allow linkage to be based on impacts greater than 1 ppb (not 1 %) eliminates linkages with TX for the states of AR, MS, MO, OK, IL)
- Step 3:
  - Allow "maintenance" to be addressed through a no emission increase demonstration helps all upwind states
  - For nonattainment, allow states to allocate responsibility for new control. This works particularly well in MD and WI which have only 1 potential nonattainment monitor (if international is not considered). Once ppb contribution to nonattainment is determined, states can calculate the extent to which emissions would need to be reduced or cost-justified

49

# Contact Information

David M. Flannery

Steptoe & Johnson, PLLC

(304) 353-8171

Dave.Flannery@Steptoe-Johnson.com

Gregory M. Stella

Alpine Geophysics, LLC

(828) 675-9045

gms@alpinegeophysics.com

# Appendix D

## Public Hearing

## KENTUCKY DIVISION FOR AIR QUALITY
## NOTICE OF PUBLIC HEARING
## TO REVISE KENTUCKY'S STATE IMPLEMENTATION PLAN

The Kentucky Energy and Environment Cabinet will conduct a public hearing on September 21, 2018, at 10:00 a.m. (EDT) in Conference Room 111 located at 300 Sower Boulevard, Frankfort, Kentucky 40601. This hearing is being held to receive comments on a proposed revision to Kentucky's 2015 Ozone Standard Infrastructure State Implementation Plan (SIP) addressing the Clean Air Act (CAA) Section 110 requirements.

This hearing is open to the public and all interested persons will be given the opportunity to present testimony. The hearing will be held, if requested, at the date, time and place given above. It is not necessary that the hearing be held or attended in order for persons to comment on the proposed submittal to EPA. To assure that all comments are accurately recorded, the Division requests that oral comments presented at the hearing also be provided in written form, if possible. To be considered part of the hearing record, written comments must be received by the close of the hearing. Written comments should be sent to the contact person. All comments must be submitted no later than September 21, 2018.

The full text of the proposed SIP revision is available for public inspection and copying during regular business hours (8:00 a.m. to 4:30 p.m.) at the following location: Division for Air Quality, 300 Sower Boulevard, Frankfort, Kentucky 40601. Any individual requiring copies may submit a request to the Division for Air Quality in writing, by telephone or by fax. Requests for copies should be directed to the contact person. In addition, an electronic version of the proposed SIP revision document and relevant attachments can be downloaded from the Division for Air Quality's website at: **http://air.ky.gov/Pages/PublicNoticesandHearings.aspx.**

The hearing facility is accessible to people with disabilities. An interpreter or other auxiliary aid or service will be provided upon request. Please direct these requests to the contact person. CONTACT PERSON: Lauren Hedge, Environmental Scientist II, Evaluation Section, Division for Air Quality, 300 Sower Boulevard, Frankfort, Kentucky 40601. Phone: (502) 782-6561; E-mail: Lauren.Hedge@ky.gov.

The Energy and Environment Cabinet does not discriminate on the basis of race, color, national origin, sex, age, religion or disability and provides, upon request, reasonable accommodation including auxiliary aids and services necessary to afford an individual with a disability an equal opportunity to participate in all services, programs and activities.



**Energy and Environment Cabinet**
**DIVISION FOR AIR QUALITY**
**Public Hearing**
**September 21, 2018**

| Name: Stephanie Stumbo | TESTIMONY | | | |
|---|---|---|---|---|
| | **Verbal** | **Written** | **None** | **Time limited?** |
| Affiliation/Company: Goss Samford, PLLC | | | ✓ | |
| Address: 2365 Harrodsburg Rd B-325 | | | | |
| City: Lexington   State: Ky   Zip: 40504 | Copy of SOC? | | | |

| Name: Brian Clark | TESTIMONY | | | |
|---|---|---|---|---|
| | **Verbal** | **Written** | **None** | **Time limited?** |
| Affiliation/Company: KPMA | | | ✓ | |
| Address: 2365 Harrodsburg Rd. Suite A-325 | | | | |
| City: Lexington   State: Ky   Zip: 40504 | Copy of SOC? | | | |

| Name: Larry Taylor | TESTIMONY | | | |
|---|---|---|---|---|
| | **Verbal** | **Written** | **None** | **Time limited?** |
| Affiliation/Company: DEP-CO | | | | |
| Address: 300 Fair Oaks Ln Sower Blvd | | | ✓ | |
| City: Frankfort   State: KY   Zip: 40601 | Copy of SOC? | | | |

| Name: Anna Bowman | TESTIMONY | | | |
|---|---|---|---|---|
| | **Verbal** | **Written** | **None** | **Time limited?** |
| Affiliation/Company: DAQ | | | | |
| Address: 300 Sower Blvd. | | | ✓ | |
| City: Frankfort   State: KY   Zip: 40601 | Copy of SOC? | | | |

| Name: | TESTIMONY | | | |
|---|---|---|---|---|
| | **Verbal** | **Written** | **None** | **Time limited?** |
| Affiliation/Company: | | | | |
| Address: | | | | |
| City:   State:   Zip: | Copy of SOC? | | | |



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

September 20, 2018

Mr. Sean Alteri, Acting Director
Kentucky Energy and Environment Cabinet
Department for Environmental Protection
300 Sower Blvd.
Frankfort, Kentucky 40601

Dear Mr. Alteri:

Thank you for your letter dated August 23, 2018, transmitting a prehearing state implementation plan (SIP) revision addressing Kentucky's obligations under the Clean Air Act's Section 110(a)(1) and (2) for the 2015 8-hour ozone National Ambient Air Quality Standard, also known as the "infrastructure" SIP. This certification of compliance with infrastructure requirements is the subject of a public hearing scheduled for September 21, 2018. We have completed our preliminary review of the prehearing package and offer comments in the enclosure.

We look forward to continuing to work with you and your staff. If you have any questions, please contact Ms. Lynorae Benjamin, Chief, Air Regulatory Management Section, at (404) 562-9040, or have your staff contact Mr. Brad Akers at (404) 562-9089.

Sincerely,

R. Scott Davis
Chief
Air Planning and Implementation Branch

Enclosure

**The U.S. Environmental Protection Agency Comments on Kentucky's Prehearing Submittal Regarding the 2015 Ozone Infrastructure State Implementation Plan (SIP)**

<u>Key Comments</u>

**Section 110(a)(2)(D)(i)(I), "Prongs 1 and 2"**

1. The modeling performed by Alpine Geophysics (Alpine) in support of Kentucky's 2015 ozone interstate transport SIP determined downwind nonattainment monitors in 2023 and evaluated the significance of upwind states contributions for the 2015 ozone national ambient air quality standards (NAAQS) based on alternative flexibilities and/or analytics proposed in the EPA's March 27, 2018 Memorandum *(Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone NAAQS under the Clean Air Act Section 110(a)(2)(D)(i)(I)*. As discussed on page 50 of the SIP submission, the use of these flexibilities provide alternative results than the EPA's 2023 modeling platform in terms of downwind receptors and Kentucky's projected contribution. We would like to have further discussions on these differences and below provide examples.

    a. Page 51 - Alpine projects the Harford County, Maryland, monitor as a nonattainment receptor with an average design value of 71.1 parts per billion (ppb). In the submittal, Kentucky indicates that the EPA's modeling platform did not account for newly announced unit retirements, fuel switching and modifications. Please identify any specific emission reductions anticipated in the downwind state that Kentucky believes were not accounted for in the EPA's modeling. To the extent that Kentucky believes anticipated emission reductions would address the average design value of 71.1 ppb identified in the Alpine modeling, Kentucky should also explain how such reductions would address maintenance concerns at this same receptor, given both the EPA modeling and the Alpine modeling identified a maximum design value of 73.3 ppb and 73.5 ppb, respectively.

    b. Page 53 - Kentucky says that the EPA "...did not run separate models to assess how much the emissions from Canada and Mexico contributed to monitors within the U.S. Alpine determined that accounting for the contribution of emissions from Canada and Mexico would impact the attainment status of several monitors." The EPA believes these statements blend different aspects of accounting for contributions from Canada and Mexico. Specifically, the EPA did provide separate contribution data for emissions from in the portions of Canada and Mexico within the modeling domain, as did Alpine. However, Alpine applied these contributions to the projected 2023 design values to lower the design values by the amount of contribution from Canada and Mexico. Please provide more information to support the technical basis for this approach to calculating design values. The application of this approach does not address the maintenance concerns at this same receptor, given both the EPA modeling and the Alpine modeling identified a maximum design value of 73.3 ppb and 73.5 ppb, respectively, and would still be above the NAAQS even without inclusion of the 2023 Canada and Mexico contributions.

    c. Pages 54-55 - Kentucky suggests that the degree of reductions required of upwind states linked to maintenance receptors should be different than that required for upwind states linked to nonattainment receptors. However, Kentucky does not propose how the obligations of upwind states should differ for the former group of upwind states. As noted, the EPA's modeling links emissions from Kentucky to one maintenance receptor in Harford County, Maryland, based on the 1 ppb threshold. The Alpine modeling identifies this receptor as nonattainment, which Kentucky asserts would have an average design value below the NAAQS if certain other factors, addressed in prior comments, were considered. The EPA notes that the obligation to address

maintenance of the NAAQS also applies to receptors identified as nonattainment receptors. Therefore, considering the results of either modeling platform, Kentucky should explain how it has addressed its projected interference to maintenance of the NAAQS at the Harford County receptor.

2. The analysis of Step 1 and Step 2 includes an intricate combination of the EPA's 12-kilometer (km) modeling and Alpine's 4-km modeling. The outcome of this approach appears to be that Kentucky is linked for nonattainment and maintenance (i.e. prong 1 and prong 2) to the receptor in Harford County, Maryland where the 2023 average design value for this site based on Alpine's modeling is 71.1 ppb. The approach in the SIP involves mixing and matching the contribution data from the EPA's modeling with design values from Alpine's modeling. The EPA is unclear as to how this additional information would provide a basis to conclude that Kentucky does not significantly contribute to downwind receptors. An alternative, more straightforward approach would be to rely entirely upon the EPA's projected design values and contribution data and apply the 1 ppb screening threshold established in the EPA's August 31, 2018 Memorandum to the contributions from Kentucky to downwind receptors. Specifically, the EPA's modeling projects that the Harford site will be a maintenance-only receptor with a 2023 average design value of 70.9 ppb. *See* Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards. The EPA's modeling also shows that this site is the only receptor to which Kentucky contributes above 1 ppb. Thus, under this approach Kentucky would only be linked to the maintenance receptor in Harford County, Maryland.

3. The SIP refers to a number of expected electricity generating units (EGU) closures, plans for fuel-switching, and other actions that are expected to reduce future nitrogen oxide (NOx) emissions in Kentucky (page 31). As indicated in comment 1 above, in the SIP revision, please identify which of these actions were not accounted for in the EPA's 2023 modeling. Also, in support of Kentucky's analysis, please provide an estimate of the anticipated ozone season NOx emissions reductions from these actions in 2023. The EPA encourages Kentucky to include information about NOx reduction efforts, costs, and air quality impacts which may help provide the Agency with additional rationales for why further NOx reduction is not needed. In addition, Kentucky should consider including information related to steps 3 (identification of emissions reductions necessary – considering costs and air quality factors – to prevent an identified upwind state from contributing significantly to those downwind monitors) and 4 of EPA's traditional 4-step framework. This discussion should include information about EGU as well as non-EGU sources. If the Commonwealth intends to rely on the anticipated reductions related to these facilities as measures to address its contribution to downwind receptors, then the Commonwealth would need to consider providing a separate SIP revision that incorporates these emission reductions into the SIP and demonstrates how the reductions at these facilities will affect the receptors to which the Commonwealth is linked.

**Section 110(a)(2)(D)(i)(I), "Prong 4"**

4. To obtain full approval for prong 4, a state can either rely on a fully approved regional haze SIP or provide a demonstration in its infrastructure SIP submission that emissions within its jurisdiction do not interfere with other air agencies' plans to protect visibility. The EPA acknowledges Kentucky's ongoing work to obtain a full approval of its regional haze SIP, including a pending SIP submission that would change the Commonwealth's reliance from the Clean Air Interstate Rule to the Cross-State Air Pollution Rule for for certain regional haze requirements.

**General Comments**

**Section 110(a)(2)(D)(i)(I), "Prongs 1 and 2"**

5. Kentucky's prehearing submittal discusses use of a 1.0 ppb threshold in relation to the 2015 EPA Significant Impact Level (SIL) guidance. On April 17, 2018, the EPA released guidance on ozone and particulate matter significant impact levels (SILs) for the prevention of significant deterioration (PSD) permitting program. The EPA has not made the determination that the SIL, developed for source-specific PSD purposes, could be considered an appropriate threshold to use when assessing contribution from an entire-state. The EPA's August 31, 2018, memorandum regarding use of a 1.0 ppb threshold, stated that the amount of upwind collective contribution captured with the 1 percent and 1.0 ppb thresholds was generally comparable and that it may be reasonable and appropriate for states to use a 1 ppb contribution threshold. The EPA recommends Kentucky consider referring to this memorandum as part of its rationale for comparing its contribution to a 1 ppb threshold. *See* Memorandum from Peter Tsirigotis, Director, OAQPS to Regional Air Division Directors, re: Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, available at https://www.epa.gov/sites/production/files/2018-09/documents/contrib_thresholds_transport_sip_subm_2015_ozone_memo_08_31_18.pdf. If Kentucky believes it is appropriate to use the 1 ppb threshold in its SIP development, then the Commonwealth would only be linked to one potential maintenance receptor for the 2015 ozone NAAQS in the EPA's 2023 air quality modeling in Harford County, Maryland (which Alpine modeling identifies as a nonattainment receptor). The EPA notes that the contribution threshold alone was not intended to represent a "significant contribution" as suggested on page 51 of the SIP submission, but rather a contribution that merits more consideration to determine *if* a state impacting a downwind receptor above that threshold will significantly contribute to nonattainment or interfere with maintenance of the NAAQS.

6. On page 31 of the prehearing submission, the EPA notes that Kentucky cites to the Cross-State Air Pollution Rule (CSAPR) Update as part of its interstate transport demonstration for the 2015 ozone NAAQS. The Update trading program provides for reductions of annual and ozone season nitrogen oxides (NOx) and sulfur dioxide emissions from EGUs, and the analyses used to develop the Update rule were based on data and inputs specific to addressing downwind nonattainment and maintenance issues for the 1997 and 2008 ozone NAAQS. The EPA suggests the Commonwealth modify the discussion on page 31 to clarify that the CSAPR trading programs were developed to address states' 110(a)(2)(D)(i)(I) obligations for the 1997 and 2008 ozone NAAQS but may provide NOx emission reduction co-benefits for the 2015 ozone NAAQS.

**Section 110(a)(2)(J) (Consultation)**

7. The EPA recommends that Kentucky include a statement noting that 40 CFR 51.308(i)(4) requires states to maintain continuing consultation procedures with the Federal Land Managers regarding any regional haze plan (or plan revision), and includes progress reports, and that Kentucky maintains such procedures in the Commonwealth's regional haze plan and progress report.

3

**Other Comments**

**Section 110(a)(2)(D)(i)(I), "Prongs 1 and 2"**

8. 401 KAR 51:240 (CSAPR NOx Annual) and 401 KAR 51:250 (CSAPR NOx Ozone Season) are currently listed with other SIP-approved provisions. The EPA suggests that the Commonwealth provide a note that it provided these regulations for approval into the SIP on September 13, 2018.

**NEW YORK STATE DEPARTMENT OF ENVIRONMENTAL CONSERVATION**

Division of Air Resources
625 Broadway, Albany, New York 12233-3250
P: (518) 402-8452 I F: (518) 402-9035
www.dec.ny.gov

**SEP 2 1 2018**

Ms. Lauren Hedge
Division of Air Quality – Evaluation Section
Kentucky Department of Environmental Protection
300 Sower Boulevard
Frankfort, KY 40601

Dear Ms. Hedge:

The New York State Department of Environmental Conservation (DEC) appreciates the opportunity to comment on the Kentucky Department for Environmental Protection's (KY DEP) proposed infrastructure State Implementation Plan (SIP), specifically the interstate transport pollution section pursuant to Clean Air Act (CAA) section 110(a)(2)(D)(i)(I). Otherwise known as the Good Neighbor provision, this section requires states to include adequate measures in their SIPs prohibiting emissions that result in significant contributions to nonattainment or interference with maintenance in downwind areas, such as New York. According to U.S. EPA's 2023 projection modeling, Kentucky significantly contributes to two Connecticut monitors under the 2015 ozone National Ambient Air Quality Standards (NAAQS) that are within the shared New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area (NYMA). DEC therefore has an established interest in KY DEP's transport determination.

DEC commends Kentucky on the reductions in ozone precursor emissions to date, but requests that KY DEP take additional measures to resolve its current significant contributions to the NYMA for the 2015 ozone NAAQS, rather than waiting to see whether its contributions are resolved years into the future. Most importantly, KY DEP should make enforceable commitments for all control measures and operational changes (e.g., unit shutdowns) discussed in this transport analysis. KY DEP relies on 2023 CAMx projection modeling conducted by EPA and Alpine Geophysics in its Good Neighbor demonstration. EPA's 2023 projection modeling is riddled with unenforceable assumptions and inaccuracies that render the results suspect; enclosed are comments submitted by DEC to EPA on the many flaws in its projection modeling associated with its "Cross-State Air Pollution Rule (CSAPR) Close-Out" proposal. Future-year market trends are difficult to predict; EPA has discussed the uncertainty in U.S. Energy Information Administration fuel-use projections, and notes that "[b]ecause of the rapid pace of these power sector changes, it is difficult for sector analysts to fully account for these changing trends in near-term and long-term sector-wide projections. This means that regulatory decisions made today could be based on information that may very well

NEW YORK | Department of
STATE OF | Environmental
OPPORTUNITY | Conservation

2.

be outdated within the next several years."[1] Without enforceable emission limits being implemented at facilities as assumed in the faulty 2023 modeling, there is no guarantee that any emission reductions will actually occur. This serves to underrepresent the extent of downwind nonattainment and maintenance issues, and minimizes the extent of ozone transport from upwind states such as Kentucky. Additional monitors in the New York City metropolitan area, including in New York State, would likely be shown to be significantly impacted by Kentucky if not for the various issues in EPA's modeling. Irrespective of projected future design values and emissions contributions, Kentucky is obligated to resolve its current significant contributions to the New York City metropolitan area, which continues to record exceedances of the 2008 and 2015 ozone NAAQS.

KY DEP claims that "NOx emissions from EGUs will continue to decrease with the implementation of the CSAPR Update," along with unit retirements. Despite the CSAPR Update being fully implemented, Kentucky sources have not been optimizing their existing controls and the NYMA continues to monitor NAAQS exceedances, due in large part to pollution transport from upwind states like Kentucky.

First, KY DEP must apply enforceable limits to assure projected emission reductions take place. The CAA specifically requires SIPs to "include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements."[2] Indeed, a SIP cannot be considered administratively complete unless it includes "[e]vidence that the plan contains emission limitations, work practice standards and recordkeeping/reporting requirements, where necessary, to ensure emission levels."[3] Without specific enforceable emissions limits and control measures, DEC submits that the SIP is incomplete and does not meet the requirements of the CAA and implementing regulations.[4]

KY DEP should institute emission limits consistent with SCR optimization at all EGUs forecasted by U.S. EPA to operate at a 0.1 lb/mmBtu emission rate in 2023, including unit 3 at the Paradise Fossil Plant.[5] While KY DEP touts the shutdown of two coal boilers at Paradise, the remaining unit had 2017 ozone season nitrogen oxide (NOx) emissions of 2,425 tons at an emission rate of 0.223 lb/mmBtu.[6] Had it operated its SCR controls to achieve the assumed rate of 0.1 lb/mmBtu, this one unit by itself would have reduced its 2017 ozone season NOx emissions by an additional 1,338 tons.

[1] "Emission Guidelines for Greenhouse Gas Emissions from Existing Electric Utility Generating Units; Revisions to Emission Guideline Implementing Regulations; Revisions to New Source Review Program," Proposed Rule. Published August 31, 2018. 83 FR 44751.
[2] 42 U.S.C. §7410(a)(2)(A)
[3] 40 CFR Part 51, App. V, §2.2(g)
[4] 42 U.S.C. §7410(a)(2) and 40 CFR 60.24
[5] "2023en_Engineering_Analysis_Unit_File.xls" workbook released with October 27, 2017 Page Memorandum
[6] U.S. EPA Air Markets Program Data

3.

Second, KY DEP should implement emission controls on its major stationary sources based on a more stringent control threshold. New York and other downwind states, such as Connecticut, have already adopted control measures that are considerably more stringent than most upwind states. For example, DEC applies Reasonably Available Control Technology (RACT) requirements statewide on both EGUs and non-EGUs, at a current cost threshold of $5,500 per ton of NOx reduced; meanwhile, many upwind states – including Kentucky – unreasonably rely on EPA's flawed claim that EGU NOx reductions that cost more than $1,400 per ton would not be cost-effective. For the 2017 ozone season, emissions from Kentucky's electric generating sector were 400% (16,000 tons) greater than electric generating emissions in New York, with an average emission rate over 200% higher.[7]

While it is true that ozone concentrations are declining over the long term,[8] KY DEP ignores current trends at monitors in the NYMA. Presented below are ozone design value trends for the Stratford and Westport monitors, which show some variation, but both have design values equal to or higher than in 2009 and exhibit an overall flat or increasing design value trend since 2009.[9] This trend has developed despite continual NOx and volatile organic compound reductions from New York, New Jersey, and Connecticut to fulfill their reasonable further progress obligations pursuant to 2008 ozone NAAQS requirements (with actual reductions having greatly exceeded the required three percent per year), further highlighting the need for upwind emission reductions.



---

[7] U.S. EPA Air Markets Program Data

[8] KY DEP's Proposed Infrastructure State Implementation Plan for the 2015 Ozone National Ambient Air Quality Standards, Table 4 – "Design Values for Kentucky-Linked Downwind Connecticut Monitors"

[9] Note that 2018 design values are preliminary and represent exceedances as of September 5

4.

KY DEP chose to utilize the longstanding contribution threshold of 1% of the standard (i.e., 0.70 ppb for the 2015 NAAQS),[10] though it discussed the validity of using a 1 ppb threshold as an alternative. Despite EPA's August 31, 2018 memorandum analyzing the use of a 1 ppb threshold, DEC believes there is not a sound basis for the piecemeal adoption of such threshold. Rather, the continued use of the 1% threshold is required for consistency across all states and because it is directly tied to the level of the NAAQS; thus, it is a far superior fit to the reductions needed for downwind attainment. If upwind states selectively use a higher contribution threshold while downwind states face a lower, more stringent NAAQS, it will have the inequitable effect of requiring downwind states to reduce their emissions *even more* at greater cost to compensate for upwind states doing *even less* at lower costs. The contribution threshold is tied not only to the linkages established under step 2 of the CSAPR framework, but the resulting emissions budgets for upwind states under step 3. It is unreasonable and clearly inequitable for upwind states, on an ad hoc basis, to use a higher contribution screening threshold at the same time downwind states face a lower NAAQS. For example, while contributions from Kentucky are linked to the two Fairfield, CT monitors at the 1% level, the linkage would not be retained when using a 1 ppb threshold according to the Alpine modeling.[11] Using a higher contribution threshold places the burden of additional reductions at these other downwind monitors entirely on the downwind states (and potentially on other upwind states using a 1% threshold), despite the demonstrable contribution using the settled 1% approach from Kentucky at these monitors. This is clearly not an equitable or cost-effective solution to ensuring downwind states such as New York attain the 2015 ozone NAAQS as expeditiously as practicable, and could mean the difference between attainment and nonattainment.

In summary, we commend Kentucky for reductions in ozone precursor emissions to date, but believe the draft SIP requires significant revisions before it can be considered complete by EPA and in compliance with the requirements of the CAA. If you have any questions in relation to this letter, please contact Mr. Michael Sheehan, Director of the Bureau of Air Quality Planning, at (518) 402-8396.

Sincerely,

Steven E. Flint, PE
Director, Division of Air Resources

Enclosure

---

[10] *See, e.g.*, Cross-State Air Pollution Rule (CSAPR), 76 FR 48208, 48236-38 (Aug. 8, 2011) (using 0.80 ppb as threshold, which is 1% of the 1997 ozone NAAQS); Cross-State Air Pollution Rule Update (CSAPR Update), 81 FR 74504, 74518 (Oct. 26, 2016) (using 0.75 ppb threshold, 1% of the 2008 ozone NAAQS; "much of the ozone nonattainment problem being addressed by this rule is still the result of the collective impacts of relatively small contributions from many upwind states.").
[11] KY DEP's Proposed Infrastructure State Implementation Plan for the 2015 Ozone National Ambient Air Quality Standards, Table 9 – "Kentucky Significant Contribution using 1.0 ppb Significant Threshold"

**OFFICE OF THE COMMISSIONER**

New York State Department of Environmental Conservation
625 Broadway, 14th Floor, Albany, New York 12233-1010
P: (518) 402-8545 | F: (518) 402-8541
www.dec.ny.gov

**AUG 3 1 2018**

Mr. Andrew Wheeler
Acting Administrator
U.S. Environmental Protection Agency
Mail Code: 1101A
1200 Pennsylvania Avenue NW
Washington, DC 20460

Re:  "Determination Regarding Good Neighbor Obligations for the 2008 Ozone
     National Ambient Air Quality Standard," Fed. Reg. Vol. 83, No. 132, Pages
     31915-31939, July 10, 2018
     Docket ID No. EPA-HQ-OAR-2018-0225

Dear Acting Administrator Wheeler:

The New York State Department of Environmental Conservation (DEC) strongly
disagrees with EPA's proposed determination that the Cross-State Air Pollution Rule
(CSAPR) Update fully addresses interstate pollution transport that impairs New York's
ability to meet the 2008 ozone National Ambient Air Quality Standards (NAAQS) (the
Proposed Rule).  For too long, New Yorkers have been subject to increased asthma
and other respiratory illness and even premature mortality due in large part to the
transport of air pollution from out-of-state coal-fired power plants.  On behalf of the
people of New York, I insist that EPA take action now to reduce the upwind pollution
that plagues New York, not kick the can down the road until 2023.

For all the reasons explained more fully in the attachment to this letter, EPA's analysis
that the New York City metropolitan area will meet the 2008 ozone NAAQS by 2023 is
both incredible and irrelevant: incredible because it is based on unreasonable
assumptions and ignores EPA's own actions to allow increased pollution; irrelevant
because the Clean Air Act requires lower ozone now, not in 2023.  Earlier this year, on
July 2, 2018, New York experienced ozone levels in the lower Hudson Valley that were
the highest seen in the past decade – levels that are "very unhealthy" for the general
public, according to EPA's own rating system.  EPA's claim that ozone levels will
improve significantly by 2023 ignores its regulatory proposals this month designed to
increase the consumption of coal and petroleum and allow increased emissions from
coal-fired power plants and motor vehicles.  In fact, it admits in the Regulatory Impact
Analysis for the rollback of the Clean Power Plan that its proposal will increase ozone
levels, causing up to 230 additional deaths from elevated ozone levels (and many more
from particulate matter).[1]  In addition, EPA's conclusion relies on its unsupported

---

[1] "Regulatory Impact Analysis for the Proposed Emission Guidelines for Greenhouse Gas Emissions from
Existing Electric Utility Generating Units; Revisions to Emission Guideline Implementing Regulations;
Revisions to New Source Review Program." EPA OAQPS, August 2018. Table 4-6, page 4-33.

NEW YORK
STATE OF
OPPORTUNITY | Department of
Environmental
Conservation

2.

assumption that upwind power plants will voluntarily run emissions controls, contrary to the documented record that plants do not run their controls unless they are legally required to do so.

Furthermore, EPA's 2023 target for achieving the 2008 ozone standard is an arbitrary target without any basis in the Clean Air Act, seemingly designed to excuse upwind power plants from taking action now to reduce their ongoing contribution to pollution in New York and other locations. EPA does not even bother identifying a legal basis for the 2023 target. In fact, New York was most recently required to achieve compliance with the ozone NAAQS in July 2018, a requirement that is not being met largely due to the 75-95% of New York's ozone that originates out-of-state.[2] EPA is now obligated to reclassify the New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area (hereafter NYMA) to serious nonattainment, which would extend the attainment deadline to July 2021 – with compliance based on ozone levels in 2018-2020, well before the 2023 target date assumed by EPA. Absent additional emission reductions in upwind states, it is extremely unlikely that the NYMA will attain the 2008 ozone NAAQS by that 2021 deadline given the attainment margin of 0.1 parts per billion (ppb) in 2023 that EPA predicts under this proposal.[3] Simply put, EPA's 2023 target date is an arbitrary construct that allows upwind coal-fired power plants to continue polluting without using even the most rudimentary pollution controls.

The additional delay in attaining the 2008 ozone NAAQS in the NYMA will further compromise the health of millions of New York residents. Ozone pollution causes a range of respiratory symptoms and aggravates existing conditions such as asthma and lung disease, and likely causes increased mortality and cardiovascular effects. EPA determined in 2015 that the 2008 NAAQS, at a level of 75 ppb, was no longer considered "requisite to protect public health with an adequate margin of safety, as required by the CAA…"[4] New York's ongoing struggle to attain an outdated health standard intensifies the need for relief from upwind states.

New York and the other NYMA states have already implemented more control measures than most, if not all, of the states in the eastern United States, and many of these controls have been implemented at a much higher cost than the estimated costs for available controls in the upwind states. For example, in New York, the most recently available cost data estimates that the marginal cost of additional NOx reductions is

[2] "updated_2023_modeling_dvs_collective_contributions.xls" workbook released with "Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)" Memorandum from Peter Tsirigotis, Director, EPA OAQPS, to Regional Air Division Directors. March 27, 2018.

[3] "Supplemental Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)." Memorandum from Steven D. Page, Director, EPA OAQPS, to Regional Air Division Directors. October 27, 2017.

[4] "National Ambient Air Quality Standards for Ozone," Final Rule. Published October 26, 2016; effective December 28, 2015. 80 FR 65294.

3.

more than $5,000 per ton of NOx removed.[5]  In contrast, the marginal cost of additional controls EPA has used to determine cost-effectiveness in the CSAPR Update was $800 per ton of NOx removed estimated to optimize existing and operating selective catalytic reduction (SCR) units and $1,400 per ton of NOx removed estimated to turn on idled existing SCR units.  The inequity of control requirements between upwind and downwind states will continue to grow with this proposed action as New York, which will have no more coal-fired power by 2020, is forced to impose additional in-state controls on other sources and consumer products to offset the burden of transported pollution from upwind coal-fired plants.

Finally, EPA should stop subjecting New York and other downwind states to a regulatory form of three card monte, under which it has rejected the requests of New York and other downwind states for action under other provisions of the Clean Air Act based on the availability of the remedy under Section 110(a)(2)(D) that is the basis of CSAPR.  In the past year, EPA has denied requests for action under Section 176A (to add States to the Ozone Transport Region) and Section 126 petitions, claiming that its admittedly incomplete CSAPR remedy will fully address interstate air pollution.  But now, rather than strengthening CSAPR to provide the complete remedy needed, EPA claims its work is done – because the air will somewhat mysteriously become clean enough on its own by 2023.

Respectfully, EPA should avoid such delusional thinking, grounded in inaccurate assumptions and an arbitrary target date, and do the job required by the Clean Air Act – require upwind states to adhere to their good neighbor obligations and reduce the pollution they allow unabated from coal-fired power plants.  EPA should impose more stringent and enforceable control measures that will ensure attainment of the 2008 ozone NAAQS in the NYMA as expeditiously as possible, but no later than the serious nonattainment area compliance deadline of July 20, 2021.

Thank you for your attention and consideration of these views.

Sincerely,

Basil Seggos
Commissioner

Attachment

---

[5] New York State DEC, *DAR-20 Economic and Technical Analysis for Reasonably Available Control Technology (RACT)* (Aug. 8, 2013), *available at* https://www.dec.ny.gov/chemical/91851.html

## Detailed comments on EPA's methodology

EPA's Proposed Rule is based on a critically flawed modeling analysis that purports to show that there will be no remaining nonattainment or maintenance receptors in the eastern United States in 2023. The inaccuracies in EPA's projection modeling include the following:

Unenforceable Control Assumptions
In Step 1 of its analysis, EPA presumes that certain emission reductions will occur, and thus air quality will improve in the future to such a degree that no area in the eastern United States will endure ozone nonattainment or maintenance issues. Many of these claims of emission reductions are dubious and are unlikely to occur without enforceable provisions. EPA's approach is contrary to the fundamental principle behind the statutory obligation that State Implementation Plans (SIPs) must "include enforceable emission limitations" and "contain adequate provisions prohibiting...any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national ambient air quality standard."[1] By declaring future air quality as attaining the National Ambient Air Quality Standards (NAAQS) without requiring the very measures by which that prediction was made, EPA subverts the text and meaning of Clean Air Act (CAA) section 110(a)(2).

EPA's modeling assumed, with no basis in federally enforceable permit limits, that certain electric generating units (EGUs) would operate existing selective catalytic reduction (SCR) units, or install new state-of-the-art nitrogen oxide (NOx) controls, in 2023. Furthermore, EPA assumes –relying solely on historically unreliable Department of Energy predictions[2] – additional emission reductions in its analysis. In reality, actual emissions data from EPA's Air Markets Program show that, of the 72 Cross-State Air Pollution Rule (CSAPR) region EGUs for which EPA assumed optimized SCR operation (i.e., an emission rate of 0.1 lb/mmBtu),[3] over half – 37 units – operated with a NOx emission rate greater than 0.1 lb/mmBtu in the 2017 ozone season, which was the first implementation year for the CSAPR Update (see enclosure).[4] In some cases, actual emissions of individual units were more than 1,000 tons higher than if they had operated according to EPA's 0.1 lb/mmBtu control assumption – for example, unit 1 at the W.H. Zimmer Generating Station in Ohio emitted 1,432 tons more than if it emitted at the 0.1 lb/mmBtu level, and unit 3 at the Paradise Fossil Plant in Kentucky emitted an additional 1,338 tons.

---

[1] Clean Air Act sections 110(a)(2)(A) and 110(a)(2)(i)(I), respectively
[2] U.S. Energy Information Administration's "Annual Energy Outlook Retrospective Review," Table 1 – "AEO Reference Case Projection Results." Available at https://www.eia.gov/outlooks/aeo/retrospective/
[3] "2023en_Engineering_Analysis_Unit_File.xls" workbook released with October 27, 2017 Page Memorandum
[4] Figures ignore two units that had no 2016 or 2017 emissions; five units with 2017 heat input less than 1,000,000 mmBtu, which suggests inconsistent operation not conducive to SCR control; and one unit with no apparent match in the Air Markets Program Data.

EPA claims in its Proposed Rule that it does not need to include enforceable commitments in its projections, stating "...not all of the factors influencing the EPA's modeling projections are or can be enforceable limitations on emissions or ozone concentrations. However, the EPA believes that consideration of these factors contributes to a reasonable estimate of anticipated future ozone concentrations." Enforceability of control measures is a consistent requirement throughout the CAA, whether it be for redesignation to attainment[5] or an attainment SIP.[6] Notably, EPA denied New York's 2008 ozone NAAQS good neighbor SIP, in part, because "the submission did not demonstrate that the emission rates at which [EGUs] in the state operated were the result of enforceable emission limits or other mandatory programs such that the emission rate would not increase."[7] EPA appears to have changed its approach regarding the requirement for enforceable measures without reasonable explanation.

In this case, where over half the units are documented to exceed EPA's assumed rate, the erroneous nature of EPA's rate assumption could not be more clear. Moreover, there will be no more of an incentive for facility owners to operate their SCR controls in 2023 than in 2017. Ozone season NOx emissions in 2017 were 23,000 tons below the cap, and as of the date of these comments, 2018 emissions are on pace to be 51,000 tons below the cap. Given the overabundance of NOx allowances, EGUs can be expected to continue to operate without optimized SCR controls.

The CSAPR program, which allows for banking of allowances, purchasing of allowances to cover excess emissions, and long-term emissions averaging, can be effective at reducing regional emissions when considering a longer timeframe, but does not assure controls will be operated on hot, hazy, and humid summer days when the need for controls is greatest. Despite implementation of the CSAPR Update, the fourth-highest eight-hour ozone concentrations in the NYMA in 2017 and 2018 have continued to exceed the 2008 ozone NAAQS.[8]

Ozone season NOx allowances were valued at only $270 per ton as of August 10, 2018,[9] which is considerably lower than the cost estimates in the now two-year-old CSAPR Update, which EPA reaffirms in its Proposed Rule without any updated analysis: $800 per ton estimated to optimize existing and operating SCR units and

---

[5] Section 107(d)(3)(E)(iii)

[6] Section 172(c)(6)

[7] "Partial Approval and Partial Disapproval of Air Quality Implementation Plans; New York; Interstate Transport Infrastructure SIP Requirements for the 2008 Ozone NAAQS," Final Rule. Published August 26,2016. 81 FR 58850. Emission rates in the New York analysis were based on actual emissions that were projected forward reasonably assuming no change in operation. EPA's 2023 modeling, in contrast, is projecting lower future emissions rates and assuming changes in operations without any requirement to do so, many of which have not actually occurred.

[8] New York State DEC, *High Ozone Values During 2018, available at*
http://www.dec.ny.gov/chemical/38377.html

[9] Argus Air Daily, Issue 18-154, August 10, 2018

$1,400 per ton estimated to turn on idled existing SCR units.[10] Allowance prices never exceeded the $800 per ton threshold during the 2017 ozone season or the 2018 ozone season to date. Absent permanent and enforceable emission limits, it is unreasonable to assume that units will operate already-installed controls, rather than just purchasing cheaper allowances.

Uncertainty in Model Performance

Under the 4-step approach, EPA attempts to determine future air quality through the use of projection inventories and predictive air quality modeling. While this is valid in attempting to compare the potential efficacy of proposed control strategies and other emission reduction scenarios, EPA uses the model results to predict actual air quality in future years. In this way, EPA overly relies on a single analysis using the Comprehensive Air Quality Model with Extensions (CAMx) to determine future air quality. EPA completely ignores, however, a similar, equally valid regulatory model it has developed for the same purpose, the Community Multiscale Air Quality Modeling System (CMAQ),[11] which shows far different results. EPA has not explained or justified its choice of the CAMx model over the CMAQ model.

DEC modeling using the CMAQ platform showed major differences in projected ozone levels when compared to the CAMx model that was used by EPA to support the proposal. Projected design values using CMAQ were up to 9.2 ppb higher – more than 10 percent of the standard – for northeastern region monitors when using the MARAMA 2023 (gamma2) emissions inventory. The greatest differences were at coastal receptors, such as the Susan Wagner (NY) and Westport (CT) monitors – the latter being the current design value monitor for the NYMA nonattainment area. DEC's modeling results are enclosed.

To verify the accuracy of CMAQ modeling at these receptors, DEC projected 2017 design values from a 2011 baseline at the Westport (83 ppb) and Susan Wagner (78 ppb) monitors. The results compare favorably to the actual measured 2017 design values of 83 ppb and 76 ppb, respectively. This lends further credibility to the CMAQ modeling results for 2023 and warrants further analysis by EPA prior to finalization of this proposal.

In a separate action, EPA faulted New York for "not provid[ing] any information to explain why the [Ozone Transport Commission (OTC)] CMAQ modeling results for the Westport, Connecticut and Susan Wagner, New York monitoring sites are dissimilar to

---

[10] "Cross State Air Pollution Rule Update for the 2008 Ozone NAAQS," Final Rule. Published October 26, 2016. 81 FR 74541: "The EPA identifies $800 per ton as a level of uniform control stringency that represents optimizing existing SCR controls that are already operating to some extent…The EPA identifies $1,400 per ton as a level of uniform control stringency that represents turning on idled SCR controls."

[11] "CMAQ provides detailed information about the concentrations of air pollutants in a given area for any specified emissions or climate scenario. Since 1998, when the first version was released, CMAQ has been used to evaluate potential air quality policy management decisions. The model provides reliable information for decision makers about the estimated impacts of different air quality policies." EPA's *CMAQ Fact Sheet, June 2017, available at* https://www.epa.gov/cmaq/cmaq-fact-sheet

other near-by sites or why the CMAQ modeling provides a more representative ozone projection for these two sites compared to the EPA and OTC CAMx based modeling results."[12] This frankly is EPA's responsibility and not New York's. CMAQ was developed, validated, and approved for SIP use by EPA, and as a community air quality model it has been through an intensive performance evaluation. OTC and New York have followed EPA modeling guidance in conducting its projections and CAMx comparison. Before EPA can conclude in the Proposed Rule that ozone design values in 2023 attain by only the narrowest of margins – 0.1 ppb – it must conduct its own analysis of the emission response difference between CMAQ and CAMx since both models were developed by EPA and run by New York consistent with EPA guidance. Because the greatest differences in model performance were witnessed at coastal-area monitors, EPA should also review its methodology for the land/water interface in calculating future design values – for example, whether the water grid cells should be included in the calculation, ignored, or averaged. Given the model disparities, it is crucial to project ozone concentrations at these monitors accurately.

Use of 2023 as a Projection Year
In selecting 2023 as the future year for which new controls could reasonably be expected to be installed, EPA ignores what can be done for the next attainment date for the NYMA (i.e., July 20, 2021). Moreover, since whether or not a state has attained is determined by looking at the three years prior to the deadline, EPA cannot ignore those years in determining whether an upwind state "will contribute" to downwind nonattainment or interfere with maintenance. By failing to assess air quality within an appropriate timeframe, EPA functionally sets an artificial attainment date for the NYMA so that upwind areas are not burdened by controls. This unduly burdens the NYMA because if the area does not attain the standard – as is expected – EPA will be required to reclassify the area to severe nonattainment which brings additional programmatic and emission reductions requirements to the nonattainment area.

EPA argues in its Proposed Rule that future-year projections are appropriate for resolving good neighbor obligations based on its interpretation of the phrase "will contribute" in CAA section 110(a)(2)(D)(i).[13] This interpretation is inconsistent with the plain meaning of section 110 and arbitrary and capricious, particularly in light of EPA's past practice. EPA ignores CAA section 110(a)(2)(d)(i)'s use of the word "emitting," which includes protection against current emissions from upwind sources that are significantly contributing to a downwind areas inability to attain a NAAQS. By ignoring the plain language of the CAA and the fact that once emissions from an upwind area

---

[12] "Air Plan Approval; Kentucky; 2008 Ozone NAAQS Interstate Transport SIP Requirements," Final Rule. Published July 17, 2018, effective August 16, 2018. 83 FR 33753.

[13] CAA section 110(a)(2)(D)(i)(I) reads (emphasis added): "Each implementation plan submitted by a State under this Act shall be adopted by the State after reasonable notice and public hearing. Each such plan shall contain adequate provisions prohibiting, consistent with the provisions of this title, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard.

Page 4 of 6

transport into a downwind nonattainment area in high enough amounts[14] that upwind source is significantly contributing to nonattainment in that downwind area, EPA is denying downwind states a vital tool in their battle against upwind pollution transport. Additionally, CAA section 126(b) is directly linked to section 110(a)(2)(D)(i); it provides that a state "may petition the Administrator for a finding that any major source or group of stationary sources *emits or would emit* any air pollutant in violation of the prohibition of section 110(a)(2)(D)(i)" (emphasis added). Here, EPA is focusing solely on future air quality, ignoring the current situation. The above clauses confirm that *current* air pollution transport cannot be ignored. Indeed, EPA denied New York's 2008 ozone good neighbor SIP, in part, because "the submission used a projection year (2020) to model downwind air quality that is two years beyond the July 11, 2018 [sic] moderate area attainment date for the 2008 ozone NAAQS."[15]

Further, while EPA has emphasized the selection and modeling of 2023 based on a reasonable expectation of the timing needed for installation of new controls, it has consistently failed to state that the optimization it has assumed to support the proposal's conclusions can be addressed through the present application of federally enforceable permit conditions. These enforceable conditions would ensure that the optimization occurs in the time frame needed to address the significant contribution from upwind sources to downwind nonattainment well in advance of the July 20, 2021 attainment deadline for serious areas. This proactive approach for enforceable commitments by the 2021 attainment deadline is necessary to determine what emission reductions are possible, rather than waiting until 2023 to see whether such assumptions have been realized. EPA in the past has shown a greater urgency to have controls in place; for example, with the CSAPR Update, it examined controls available for 2017 implementation in time to assist with moderate nonattainment areas' 2018 attainment deadline.

Rule Reconsiderations, Rollbacks and Petition Denials
EPA's projection modeling did not account for rule changes that EPA is currently considering that could occur by 2023. For example, the Trump administration's plan to roll back clean car standards and EPA's proposal to eliminate the cap on glider trucks, which have the potential to emit 20 to 40 times the NOx of new trucks, will lead to more ozone pollution.[16,17] Likewise, the proposed rollback of the Clean Power Plan (CPP) will result in increased NOx emissions from coal-fired plants that will operate more than would be expected under the CPP.

---

[14] EPA has identified that CSAPR uses a screening threshold of 1 percent of the NAAQS to identify contributing upwind states. "Determination Regarding Good Neighbor Obligations for the 2008 Ozone National Ambient Air Quality Standard," 83 FR 31923.

[15] "Partial Approval and Partial Disapproval of Air Quality Implementation Plans; New York; Interstate Transport Infrastructure SIP Requirements for the 2008 Ozone NAQS," Final Rule. Published August 26, 2016, effective September 26, 2016. 81 FR 58850.

[16] "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks," Notice of Proposed Rulemaking. Published August 24, 2018. 83 FR 42986-43500.
[17] "Repeal of Emission Requirements for Glider Vehicles, Glider Engines, and Glider Kits," Proposed Rule. Published November 16, 2017. 82 FR 53442.

EPA has also followed circular logic when acting on petitions submitted by states seeking relief from ongoing ozone pollution transport from upwind states. In denying a CAA section 176A petition brought by nine ozone transport region states, EPA stated that an expansion of the OTR "would not be the most efficient or effective way to address the remaining interstate transport issues for the 2008 ozone NAAQS in states currently included in the OTR."[18] EPA went on to tout the flexibilities provided by the good neighbor provision and CAA section 126(b), noting that the latter would "provide[] states with an additional opportunity to bring to the EPA's attention specific instances where a source or a group of sources in a specific state may be emitting in excess of what the good neighbor provision would allow."[19] Yet EPA in recent months has denied a CAA section 126(b) petition brought by Connecticut, and has proposed denial of petitions brought by Delaware and Maryland.[20, 21]

Enclosures

---

[18] "Response to December 9, 2013, Clean Air Act Section 176A Petition from Connecticut, Maryland, Massachusetts, New Hampshire, New York, Pennsylvania, Rhode Island and Vermont," Notice of final action on petition. Published and effective November 3, 2017. 82 FR 51250.
[19] *Ibid*, 82 FR 51242.
[20] "Response to June 1, 2016 Clean Air Act Section 126(b) Petition from Connecticut," Notice of final action on petition. Published and effective April 13, 2018. 83 FR 16064.
[21] "Response to Clean Air Act Section 126(b) Petitions from Delaware and Maryland," Notice of proposed action on petitions. Published June 8, 2018. 83 FR 26666.

Modification of EPA's '2023en_Engineering_Analysis_Unit_File.xls'

| Facility | State | ORIS | Boiler | CAMD ID | Unit Type | 2017 NOx (tons) | 2017 Heat Input (mmBtu) | 2017 NOx Rate (lb/mmBtu) | 2016 Heat Input (mmBtu) | 2016 Gross Generation (mWh) | 2016 Capacity Factor | 2016 NOx (tons) | 2023 NOx (tons) | Reason for Adjustment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Greenidge Generation LLC | NY | 2527 | 6 | 1759 | Tangentially-fired | 128.0 | 1,432,134 | 0.179 | | | | | | Optimize SCR to 0.10 lb/mmBtu |
| Massena Energy Facility | NY | 54592 | 001 | 3783 | Combined cycle | 3.9 | 1,930 | 0.490 | 31,503 | 2,070 | 1% | 3 | 2 | Optimize SCR to 0.10 lb/mmBtu |
| Somerset Operating Company (Kintigh) | NY | 6082 | 1 | 2761 | Dry bottom wall-fired boiler | 85.9 | 1,007,915 | 0.171 | 5,561,371 | 581,267 | 24% | 505 | 278 | Optimize SCR to 0.10 lb/mmBtu |
| AMP-Ohio Gas Turbines Galion | OH | 55263 | CT1 | 4363 | Combustion turbine | 1.5 | 19,581 | 0.150 | 30,199 | 2,212 | 2% | 2 | 2 | Optimize SCR to 0.10 lb/mmBtu |
| AMP-Ohio Gas Turbines Napoleon | OH | 55264 | CT1 | 4365 | Combustion turbine | 3.7 | 49,690 | 0.149 | 33,289 | 2,101 | 2% | 2 | 2 | Optimize SCR to 0.10 lb/mmBtu |
| Gen J M Gavin | OH | 8102 | 1 | 3461 | Cell burner boiler | 1,806.2 | 34,470,988 | 0.105 | 34,012,071 | 3,416,578 | 78% | 1,912 | 1,701 | Optimize SCR to 0.10 lb/mmBtu |
| Kyger Creek | OH | 2876 | 1 | 1971 | Wet bottom wall-fired boiler | 173.7 | 5,748,706 | 0.060 | 5,858,620 | 578,434 | 61% | 531 | 293 | Optimize SCR to 0.10 lb/mmBtu |
| Kyger Creek | OH | 2876 | 2 | 1972 | Wet bottom wall-fired boiler | 156.0 | 5,239,657 | 0.060 | 5,352,170 | 528,705 | 55% | 508 | 268 | Optimize SCR to 0.10 lb/mmBtu |
| Kyger Creek | OH | 2876 | 3 | 1973 | Wet bottom wall-fired boiler | 171.4 | 5,407,639 | 0.063 | 5,770,456 | 575,183 | 60% | 562 | 289 | Optimize SCR to 0.10 lb/mmBtu |
| Kyger Creek | OH | 2876 | 4 | 1974 | Wet bottom wall-fired boiler | 174.9 | 5,458,624 | 0.064 | 5,322,115 | 532,642 | 55% | 476 | 266 | Optimize SCR to 0.10 lb/mmBtu |
| Kyger Creek | OH | 2876 | 5 | 1975 | Wet bottom wall-fired boiler | 166.8 | 5,197,417 | 0.064 | 5,663,706 | 563,474 | 59% | 530 | 283 | Optimize SCR to 0.10 lb/mmBtu |
| Miami Fort Power Station | OH | 2832 | 7 | 1895 | Cell burner boiler | 753.3 | 13,190,753 | 0.114 | 15,487,535 | 1,623,286 | 76% | 796 | 774 | Optimize SCR to 0.10 lb/mmBtu |
| Miami Fort Power Station | OH | 2832 | 8 | 1896 | Dry bottom wall-fired boiler | 951.9 | 12,020,331 | 0.158 | 13,026,033 | 1,552,677 | 71% | 1,116 | 651 | Optimize SCR to 0.10 lb/mmBtu |
| W H Sammis | OH | 2866 | 6 | 1961 | Dry bottom wall-fired boiler | 623.4 | 12,207,537 | 0.102 | 13,727,099 | 1,547,935 | 51% | 716 | 686 | Optimize SCR to 0.10 lb/mmBtu |
| W H Zimmer Generating Station | OH | 6019 | 1 | 2683 | Dry bottom wall-fired boiler | 2,971.9 | 30,821,253 | 0.193 | 32,508,515 | 3,762,307 | 66% | 3,240 | 1,625 | Optimize SCR to 0.10 lb/mmBtu |
| Bruce Mansfield | PA | 6094 | 1 | 2770 | Dry bottom wall-fired boiler | 439.8 | 13,541,413 | 0.065 | 14,331,146 | 1,583,080 | 44% | 968 | 717 | Optimize SCR to 0.10 lb/mmBtu |
| Bruce Mansfield | PA | 6094 | 2 | 2771 | Dry bottom wall-fired boiler | 491.4 | 12,677,401 | 0.078 | 20,457,910 | 2,349,576 | 62% | 1,626 | 1,023 | Optimize SCR to 0.10 lb/mmBtu |
| Bruce Mansfield | PA | 6094 | 3 | 2772 | Dry bottom wall-fired boiler | 450.7 | 10,916,224 | 0.083 | 21,689,747 | 2,425,036 | 68% | 2,009 | 1,084 | Optimize SCR to 0.10 lb/mmBtu |
| Cheswick | PA | 8226 | 1 | 3475 | Tangentially-fired | 532.7 | 6,834,411 | 0.156 | 10,586,120 | 1,045,079 | 46% | 2,086 | 529 | Optimize SCR to 0.10 lb/mmBtu |
| Conemaugh | PA | 3118 | 1 | 2065 | Tangentially-fired | 805.4 | 22,358,935 | 0.072 | 20,538,696 | 2,104,248 | 61% | 1,822 | 1,027 | Optimize SCR to 0.10 lb/mmBtu |
| Homer City | PA | 3122 | 1 | 2072 | Dry bottom wall-fired boiler | 963.8 | 10,981,718 | 0.176 | 11,612,798 | 1,171,548 | 47% | 1,438 | 581 | Optimize SCR to 0.10 lb/mmBtu |
| Homer City | PA | 3122 | 2 | 2073 | Dry bottom wall-fired boiler | 443.8 | 4,954,466 | 0.179 | 7,870,946 | 824,348 | 32% | 1,410 | 394 | Optimize SCR to 0.10 lb/mmBtu |
| Homer City | PA | 3122 | 3 | 2074 | Dry bottom wall-fired boiler | 332.8 | 5,795,026 | 0.115 | 13,004,787 | 1,320,226 | 49% | 1,854 | 650 | Optimize SCR to 0.10 lb/mmBtu |
| Keystone | PA | 3136 | 1 | 2089 | Tangentially-fired | 1,057.2 | 24,847,854 | 0.085 | 24,209,336 | 2,471,246 | 74% | 1,859 | 1,210 | Optimize SCR to 0.10 lb/mmBtu |
| Keystone | PA | 3136 | 2 | 2090 | Tangentially-fired | 947.1 | 27,241,115 | 0.070 | 21,909,119 | 2,290,069 | 67% | 1,749 | 1,095 | Optimize SCR to 0.10 lb/mmBtu |
| Montour, LLC | PA | 3149 | 1 | 2124 | Tangentially-fired | 462.8 | 6,412,016 | 0.144 | 11,961,099 | 1,324,219 | 44% | 2,316 | 598 | Optimize SCR to 0.10 lb/mmBtu |
| Montour, LLC | PA | 3149 | 2 | 2125 | Tangentially-fired | 497.9 | 6,528,253 | 0.153 | 11,259,648 | 1,293,343 | 42% | 2,129 | 563 | Optimize SCR to 0.10 lb/mmBtu |
| W A Parish | TX | 3470 | CTSC | 90816 | Combustion turbine | No unit match in CAMD | | | 128,751 | 9,449 | 3% | 6 | 6 | Optimize SCR to 0.10 lb/mmBtu |
| Harrison Power Station | WV | 3944 | 1 | 2553 | Dry bottom wall-fired boiler | 1,038.3 | 19,870,526 | 0.105 | 22,602,245 | 2,366,899 | 81% | 1,235 | 1,130 | Optimize SCR to 0.10 lb/mmBtu |
| Harrison Power Station | WV | 3944 | 2 | 2554 | Dry bottom wall-fired boiler | 911.7 | 21,035,930 | 0.087 | 16,669,936 | 1,787,310 | 61% | 2,004 | 833 | Optimize SCR to 0.10 lb/mmBtu |
| Harrison Power Station | WV | 3944 | 3 | 2555 | Dry bottom wall-fired boiler | 593.1 | 16,440,316 | 0.072 | 21,974,924 | 2,285,081 | 78% | 2,033 | 1,099 | Optimize SCR to 0.10 lb/mmBtu |
| John E Amos | WV | 3935 | 3 | 2540 | Cell burner boiler | 1,581.8 | 28,058,104 | 0.113 | 23,502,465 | 2,438,995 | 54% | 1,268 | 1,175 | Optimize SCR to 0.10 lb/mmBtu |
| Pleasants Power Station | WV | 6004 | 1 | 2673 | Dry bottom wall-fired boiler | 369.4 | 8,842,864 | 0.084 | 15,535,826 | 1,769,486 | 53% | 1,442 | 777 | Optimize SCR to 0.10 lb/mmBtu |
| Pleasants Power Station | WV | 6004 | 2 | 2674 | Dry bottom wall-fired boiler | 1,201.8 | 16,246,221 | 0.132 | 14,784,129 | 1,657,827 | 46% | 1,203 | 739 | Optimize SCR to 0.10 lb/mmBtu |
| Combined Locks Energy Center, LLC | WI | 55558 | B06 | 4988 | Combined cycle | 4.1 | 735,764 | 0.011 | | | | | | Optimize SCR to 0.10 lb/mmBtu |

Modification of EPA's '2023en_Engineering_Analysis_Unit_File.xls'

| Facility | State | ORIS | Boiler | CAMD ID | Unit Type | 2017 NOx (tons) | 2017 Heat Input (mmBtu) | 2017 NOx Rate (lb/mmBtu) | 2016 Heat Input (mmBtu) | 2016 Gross Generation (mWh) | 2016 Capacity Factor | 2016 NOx (tons) | 2023 NOx (tons) | Reason for Adjustment |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Charles R Lowman | AL | 56 | 2 | 54 | Dry bottom wall-fired boiler | 330.5 | 2,831,834 | 0.233 | 3,625,097 | 341,864 | 32% | 592 | 181 | Optimize SCR to 0.10 lb/mmBtu |
| Charles R Lowman | AL | 56 | 3 | 55 | Dry bottom wall-fired boiler | 672.6 | 7,126,321 | 0.189 | 6,577,958 | 552,955 | 60% | 1,096 | 329 | Optimize SCR to 0.10 lb/mmBtu |
| Gorgas | AL | 8 | 10 | 13 | Tangentially-fired | 1,411.1 | 18,792,707 | 0.150 | 19,572,975 | 1,990,583 | 31% | 1,543 | 979 | Optimize SCR to 0.10 lb/mmBtu |
| Dallman | IL | 983 | 31 | 645 | Cyclone boiler | 63.1 | 1,293,979 | 0.098 | 1,970,345 | 182,924 | 61% | 105 | 99 | Optimize SCR to 0.10 lb/mmBtu |
| Dallman | IL | 983 | 32 | 646 | Cyclone boiler | 51.4 | 1,046,686 | 0.098 | 1,368,998 | 127,370 | 42% | 72 | 68 | Optimize SCR to 0.10 lb/mmBtu |
| A B Brown Generating Station | IN | 6137 | 1 | 2797 | Dry bottom wall-fired boiler | 268.6 | 6,384,877 | 0.084 | 1,807,146 | 178,914 | 14% | 151 | 90 | Optimize SCR to 0.10 lb/mmBtu |
| A B Brown Generating Station | IN | 6137 | 2 | 2798 | Dry bottom wall-fired boiler | 312.8 | 5,424,699 | 0.115 | 7,293,656 | 711,512 | 44% | 452 | 365 | Optimize SCR to 0.10 lb/mmBtu |
| Alcoa Allowance Management Inc | IN | 6705 | 4 | 2905 | Cell burner boiler | 327.6 | 8,161,099 | 0.080 | 9,835,484 | 897,069 | 60% | 1,452 | 492 | Optimize SCR to 0.10 lb/mmBtu |
| Cayuga | IN | 1001 | 1 | 706 | Tangentially-fired | 624.9 | 14,794,651 | 0.064 | 10,363,170 | 876,786 | 47% | 1,690 | 518 | Optimize SCR to 0.10 lb/mmBtu |
| Cayuga | IN | 1001 | 2 | 707 | Tangentially-fired | 498.2 | 11,057,752 | 0.090 | 15,407,920 | 1,631,173 | 72% | 2,320 | 770 | Optimize SCR to 0.10 lb/mmBtu |
| Clifty Creek | IN | 983 | 1 | 658 | Wet bottom wall-fired boiler | 178.5 | 4,837,170 | 0.074 | 5,000,634 | 492,403 | 49% | 653 | 250 | Optimize SCR to 0.10 lb/mmBtu |
| Clifty Creek | IN | 983 | 2 | 659 | Wet bottom wall-fired boiler | 172.7 | 4,715,705 | 0.073 | 5,009,274 | 492,801 | 49% | 669 | 250 | Optimize SCR to 0.10 lb/mmBtu |
| Clifty Creek | IN | 983 | 3 | 660 | Wet bottom wall-fired boiler | 149.1 | 4,116,727 | 0.072 | 5,398,978 | 532,096 | 53% | 678 | 270 | Optimize SCR to 0.10 lb/mmBtu |
| Clifty Creek | IN | 983 | 4 | 661 | Wet bottom wall-fired boiler | 239.5 | 4,684,860 | 0.102 | 4,947,507 | 499,943 | 48% | 1,005 | 247 | Optimize SCR to 0.10 lb/mmBtu |
| Clifty Creek | IN | 983 | 5 | 662 | Wet bottom wall-fired boiler | 226.8 | 4,762,480 | 0.095 | 3,907,761 | 394,580 | 38% | 770 | 195 | Optimize SCR to 0.10 lb/mmBtu |
| F B Culley Generating Station | IN | 1012 | 2 | 727 | Dry bottom wall-fired boiler | 98.4 | 1,253,361 | 0.157 | 1,538,899 | 124,969 | 15% | 256 | 77 | Optimize SCR to 0.10 lb/mmBtu |
| F B Culley Generating Station | IN | 1012 | 3 | 728 | Dry bottom wall-fired boiler | 522.7 | 9,457,854 | 0.111 | 4,185,938 | 371,945 | 30% | 262 | 209 | Optimize SCR to 0.10 lb/mmBtu |
| Gibson | IN | 6113 | 1 | 2782 | Dry bottom wall-fired boiler | 582.3 | 14,727,447 | 0.079 | 11,733,169 | 1,331,132 | 49% | 907 | 587 | Optimize SCR to 0.10 lb/mmBtu |
| Gibson | IN | 6113 | 2 | 2783 | Dry bottom wall-fired boiler | 349.5 | 13,177,121 | 0.053 | 13,855,518 | 1,478,671 | 55% | 1,031 | 693 | Optimize SCR to 0.10 lb/mmBtu |
| Gibson | IN | 6113 | 3 | 2784 | Dry bottom wall-fired boiler | 534.5 | 12,927,938 | 0.083 | 16,170,258 | 1,671,182 | 60% | 1,399 | 809 | Optimize SCR to 0.10 lb/mmBtu |
| Gibson | IN | 6113 | 4 | 2785 | Dry bottom wall-fired boiler | 674.0 | 17,003,248 | 0.079 | 13,024,583 | 1,366,687 | 50% | 748 | 651 | Optimize SCR to 0.10 lb/mmBtu |
| Gibson | IN | 6113 | 5 | 2786 | Dry bottom wall-fired boiler | 1,097.1 | 15,009,371 | 0.146 | 12,494,537 | 1,380,171 | 51% | 1,056 | 625 | Optimize SCR to 0.10 lb/mmBtu |
| IPL - Petersburg Generating Station | IN | 994 | 2 | 693 | Tangentially-fired | 470.5 | 11,206,674 | 0.084 | 12,633,662 | 1,219,213 | 83% | 935 | 632 | Optimize SCR to 0.10 lb/mmBtu |
| IPL - Petersburg Generating Station | IN | 994 | 3 | 694 | Tangentially-fired | 526.6 | 13,691,470 | 0.077 | 16,057,203 | 1,476,986 | 79% | 1,527 | 803 | Optimize SCR to 0.10 lb/mmBtu |
| E W Brown | KY | 1355 | 3 | 878 | Tangentially-fired | 219.8 | 5,985,872 | 0.073 | 8,123,757 | 751,399 | 44% | 616 | 406 | Optimize SCR to 0.10 lb/mmBtu |
| East Bend | KY | 6018 | 2 | 2682 | Dry bottom wall-fired boiler | 981.6 | 18,351,963 | 0.107 | 19,801,319 | 1,872,619 | 68% | 1,163 | 980 | Optimize SCR to 0.10 lb/mmBtu |
| Ghent | KY | 1356 | 3 | 886 | Dry bottom wall-fired boiler | 917.7 | 11,486,784 | 0.160 | 12,110,380 | 1,390,969 | 57% | 1,004 | 606 | Optimize SCR to 0.10 lb/mmBtu |
| Ghent | KY | 1356 | 4 | 887 | Dry bottom wall-fired boiler | 353.3 | 14,157,722 | 0.050 | 14,109,599 | 1,515,538 | 70% | 798 | 705 | Optimize SCR to 0.10 lb/mmBtu |
| HMP&L Station 2 | KY | 1382 | H1 | 929 | Dry bottom wall-fired boiler | 174.7 | 2,148,588 | 0.163 | 2,696,002 | 283,894 | 37% | 284 | 135 | Optimize SCR to 0.10 lb/mmBtu |
| HMP&L Station 2 | KY | 1382 | H2 | 930 | Dry bottom wall-fired boiler | 375.8 | 4,386,578 | 0.171 | 4,984,770 | 473,181 | 68% | 366 | 249 | Optimize SCR to 0.10 lb/mmBtu |
| John S. Cooper | KY | 1384 | 2 | 933 | Dry bottom wall-fired boiler | 98.5 | 2,092,482 | 0.094 | 2,396,111 | 244,608 | 27% | 129 | 120 | Optimize SCR to 0.10 lb/mmBtu |
| Paradise | KY | 1378 | 3 | 915 | Cyclone boiler | 2,425.2 | 21,756,305 | 0.223 | 20,552,854 | 2,001,152 | 38% | 1,933 | 1,028 | Optimize SCR to 0.10 lb/mmBtu |
| Chalk Point | MD | 1571 | 1 | 1050 | Dry bottom wall-fired boiler | 128.0 | 2,330,944 | 0.110 | 4,936,193 | 511,067 | 37% | 332 | 247 | Optimize SCR to 0.10 lb/mmBtu |
| Asbury | MO | 2076 | 1 | 1311 | Cyclone boiler | 353.4 | 7,133,970 | 0.099 | 6,766,129 | 595,088 | 72% | 514 | 338 | Optimize SCR to 0.10 lb/mmBtu |
| New Madrid Power Plant | MO | 2167 | 1 | 1357 | Cyclone boiler | 874.6 | 16,225,093 | 0.108 | 8,257,589 | 898,937 | 33% | 3,000 | 413 | Optimize SCR to 0.10 lb/mmBtu |
| New Madrid Power Plant | MO | 2167 | 2 | 1358 | Cyclone boiler | 787.9 | 15,095,626 | 0.104 | 16,685,524 | 1,902,393 | 65% | 3,632 | 834 | Optimize SCR to 0.10 lb/mmBtu |
| Thomas Hill Energy Center | MO | 2168 | MB1 | 1359 | Cyclone boiler | 349.3 | 5,971,757 | 0.117 | 4,037,461 | 343,226 | 49% | 911 | 202 | Optimize SCR to 0.10 lb/mmBtu |
| Thomas Hill Energy Center | MO | 2168 | MB2 | 1360 | Cyclone boiler | 464.9 | 8,617,723 | 0.108 | 8,506,595 | 813,371 | 85% | 2,022 | 425 | Optimize SCR to 0.10 lb/mmBtu |
| Thomas Hill Energy Center | MO | 2168 | MB3 | 1361 | Dry bottom wall-fired boiler | 1,002.7 | 20,110,101 | 0.100 | 18,845,916 | 2,020,355 | 63% | 2,225 | 942 | Optimize SCR to 0.10 lb/mmBtu |
| Carneys Point | NJ | 10566 | 1001 | 3554 | Dry bottom wall-fired boiler | 111.1 | 1,978,408 | 0.112 | 2,356,489 | | 41% | 143 | 118 | Optimize SCR to 0.10 lb/mmBtu |
| Carneys Point | NJ | 10566 | 1002 | 3555 | Dry bottom wall-fired boiler | 133.4 | 2,361,026 | 0.113 | 2,780,239 | | 48% | 150 | 139 | Optimize SCR to 0.10 lb/mmBtu |
| Logan Generating Plant | NJ | 10043 | 1001 | 3524 | Dry bottom wall-fired boiler | 182.9 | 3,260,603 | 0.112 | 3,259,764 | | 38% | 175 | 163 | Optimize SCR to 0.10 lb/mmBtu |
| West Station | NJ | 6776 | 002001 | 2909 | Combustion turbine | 0.6 | 2,613 | 0.443 | 2,962 | 168 | 0% | 1 | 0 | Optimize SCR to 0.10 lb/mmBtu |
| AG - Energy | NY | 10803 | 1 | 3598 | Combined cycle | - | | | | | | | | Optimize SCR to 0.10 lb/mmBtu |
| AG - Energy | NY | 10803 | 2 | 3599 | Combined cycle | - | | | | | | | | Optimize SCR to 0.10 lb/mmBtu |

**Process to compare CAMx and CMAQ models using consistent projection emission inventory:**

Began with EPA 2023 projection modeling utilizing 'en'projection inventory and CAMx, released in Oct 2017 (column L)

Used CAMx to model MARAMA gamma2 projection inventory (column K) to show relative consistency with column L

Used CMAQ to model MARAMA gamma2 projection inventory (column J)

Summarized the difference between CMAQ and CAMx models using MARAMA gamma2 projection inventory (column M)

| State | AQS Code | POC | Latitude | Longitude | Site | DVC 2011 | DVF 2017 3x3 cells MARAMA beta2 emis OTC CMAQ5.0 2 setup | DVF 2020 3x3 cells MARAMA gamma2 emis OTC CMAQ5.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CMAQ5.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CAMx 6.40 setup | DVF 2023 3x3 cells from EPA 2011en/2023en emis | DVF 2023 Difference - CMAQ v CAMx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CT | 09-001-0017 | 1 | 41.003613 | -73.584999 | Greenwich Point Park-Greenwich | 80.3 | 77 | 76.2 | 72.3 | 69.5 | 69.8 | +2.8 |
| CT | 09-001-1123 | 1 | 41.399166 | -73.443100 | Western Conn State Univ-Danbury | 81.3 | 74 | 71.1 | 68.0 | 66.3 | 66.4 | +1.7 |
| CT | 09-001-3007 | 1 | 41.152500 | -73.103104 | Lighthouse-Stratford | 84.3 | 77 | 76.8 | 73.7 | 70.6 | 71.2 | +3.1 |
| CT | 09-001-9003 | 1 | 41.118332 | -73.336700 | Sherwood Island State Park-Westport | 83.7 | 83 | 83.4 | 81.1 | 71.9 | 72.7 | +9.2 |
| CT | 09-003-1003 | 1 | 41.784721 | -72.631699 | McAuliffe Park-East Hartford | 73.7 | 66 | 61.9 | 58.6 | 58.4 | 60.7 | +0.2 |
| CT | 09-005-0005 | 1 | 41.821342 | -73.297302 | Mohawk Mt-Cornwall | 70.3 | 62 | 59.8 | 57.0 | 55.9 | 57.2 | +1.1 |
| CT | 09-007-0007 | 1 | 41.552223 | -72.629997 | Central Valley Hospital-Middletown | 79.3 | 70 | 66.9 | 63.5 | 63.1 | 64.7 | +0.4 |
| CT | 09-009-0027 | 1 | 41.301399 | -72.902901 | Criscuolo Park-New Haven | 74.3 | 67 | 67.8 | 65.1 | 61.5 | 62.3 | +3.6 |
| CT | 09-009-9002 | 1 | 41.260834 | -72.550003 | Hammonasset State Park-Madison | 85.7 | 77 | 73.9 | 69.7 | 69.9 | 71.2 | -0.2 |
| CT | 09-011-0124 | 1 | 41.353619 | -72.078796 | Fort Griswold Park-Groton | 80.3 | 73 | 70.3 | 66.2 | 65.2 | 66.4 | +1.0 |
| CT | 09-013-1001 | 1 | 41.976391 | -72.388100 | Shenipsit State Forest-Stafford | 75.3 | 67 | 63.2 | 59.9 | 59.9 | 61.4 | 0.0 |
| DE | 10-001-0002 | 1 | 38.984749 | -75.555199 | PROPERTY OF KILLENS POND STATE PARK; BEH | 74.3 | 66 | 63.8 | 60.8 | 57.6 | 58.3 | +3.2 |
| DE | 10-003-1007 | 1 | 39.551109 | -75.730797 | | 76.3 | 67 | 64.1 | 61.0 | 58.3 | 59.2 | +2.7 |
| DE | 10-003-1010 | 1 | 39.817223 | -75.563904 | OPEN FIELD | 78.0 | 67 | 66.6 | 63.9 | 60.9 | 61.2 | +3.0 |
| DE | 10-003-1013 | 1 | 39.773888 | -75.496399 | BELLEVUE STATE PARK, FIELD IN SE PORTION | 77.7 | 67 | 65.9 | 62.8 | 60.3 | 60.8 | +2.5 |
| DE | 10-003-2004 | 1 | 39.739445 | -75.558098 | CORNER OF MLK BLVD AND JUSTISON ST, NO T | 75.0 | 65 | 63.6 | 60.7 | 58.2 | | +2.5 |
| DE | 10-005-1002 | 1 | 38.644478 | -75.612701 | Seaford Shipley State Service Center | 77.3 | 67 | 64.9 | 61.6 | 59.6 | 59.7 | +2.0 |
| DE | 10-005-1003 | 1 | 38.779198 | -75.162697 | SPM SITE, NEAR UD ACID RAIN/MERCURY COLL | 77.7 | 69 | 66.4 | 62.7 | 61.1 | 62.4 | +1.6 |
| DC | 11-001-0041 | 1 | 38.897221 | -76.952797 | RIVER TERRACE | 76.0 | 65 | 62.4 | 58.6 | 58.2 | 58.7 | +0.4 |
| DC | 11-001-0043 | 1 | 38.921848 | -77.013199 | MCMILLAN PAMS | 80.7 | 69 | 66.6 | 62.2 | 61.8 | 62.3 | +0.4 |
| ME | 23-001-0014 | 2 | 43.974621 | -70.124603 | DURHAM FIRE STATION | 61.0 | 54 | 51.9 | 49.3 | 48.9 | 49.4 | +0.4 |
| ME | 23-003-1100 | 1 | 46.696430 | -68.032997 | MICMAC HEALTH DEPARTMENT | 51.3 | -8 | -8.0 | -8.0 | -8.0 | | |
| ME | 23-005-2003 | 1 | 43.561043 | -70.207298 | CETL - Cape Elizabeth Two Lights (State | 69.3 | 62 | 60.3 | 57.2 | 56.1 | 56.2 | +1.1 |
| ME | 23-009-0102 | 1 | 44.351696 | -68.226997 | TOP OF CADILLAC MTN (FENCED ENCLOSURE) | 71.7 | 65 | 62.8 | 60.4 | 59.8 | 61.3 | +0.6 |
| ME | 23-009-0103 | 1 | 44.377048 | -68.260902 | MCFARLAND HILL Air Pollutant Research Si | 66.3 | 60 | 57.3 | 54.8 | 54.2 | 55.0 | +0.6 |
| ME | 23-011-2005 | 1 | 44.230621 | -69.785004 | Gardiner, Pray Street School (GPSS) | 62.7 | 55 | 52.2 | 49.5 | 49.9 | 50.5 | -0.4 |
| ME | 23-013-0004 | 2 | 43.917953 | -69.260597 | Marshall Point Lighthouse | 67.7 | 60 | 57.6 | 55.0 | 54.3 | 54.7 | +0.7 |
| ME | 23-017-3001 | 1 | 44.250923 | -70.860603 | | 54.3 | 49 | -8.0 | -8.0 | 44.0 | 43.7 | |
| ME | 23-019-4008 | 1 | 44.735977 | -68.670799 | WLBZ TV Transmitter Building - Summit of | 57.7 | -8 | -8.0 | -8.0 | -8.0 | 46.6 | |
| ME | 23-023-0006 | 1 | 44.005001 | -69.827797 | BOWDOINHAM, MERRYMEETING BAY, BROWN'S PT | 61.0 | 54 | 51.6 | 49.2 | 48.4 | 48.7 | +0.8 |
| ME | 23-029-0019 | 1 | 44.531906 | -67.595901 | Harbor Masters Office; Jonesport Public | 58.3 | 53 | 52.2 | 50.5 | 49.7 | | +0.8 |
| ME | 23-029-0032 | 1 | 44.963634 | -67.060699 | | 53.0 | 49 | -8.0 | -8.0 | -8.0 | | |
| ME | 23-031-0038 | 1 | 43.656765 | -70.629097 | WBFD - West Buxton (Hollis) Fire Departm | 60.3 | 54 | 51.0 | 48.5 | 47.8 | 48.2 | +0.7 |
| ME | 23-031-0040 | 1 | 43.588890 | -70.877296 | SBP - Shapleigh Ball Park | 64.3 | 57 | 54.2 | 51.5 | 51.2 | 51.5 | +0.3 |
| ME | 23-031-2002 | 1 | 43.343166 | -70.21001 | KPW - Kennebunkport Parson'd Way | 73.7 | 65 | 62.2 | 58.7 | 59.2 | 60.1 | -0.5 |
| MD | 24-003-0014 | 1 | 38.902500 | -76.653099 | Davidsonville | 83.0 | 71 | 68.8 | 64.7 | 63.5 | 63.4 | +1.2 |
| MD | 24-005-1007 | 1 | 39.462075 | -76.631302 | Padonia | 79.0 | 69 | 68.2 | 65.0 | 64.2 | 63.9 | +0.8 |
| MD | 24-005-3001 | 1 | 39.310833 | -76.474403 | Essex | 80.7 | 74 | 68.9 | 65.0 | 64.6 | 64.9 | +0.4 |
| MD | 24-009-0011 | 1 | 38.536720 | -76.617203 | Calvert | 79.7 | 73 | 68.9 | 66.2 | 63.1 | 64.2 | +3.1 |
| MD | 24-013-0001 | 1 | 39.444168 | -77.041702 | South Carroll | 76.3 | 67 | 64.1 | 61.3 | 59.0 | 58.8 | +2.3 |
| MD | 24-015-0003 | 1 | 39.701111 | -75.860001 | Fair Hill Natural Resource Management Ar | 83.0 | 73 | 69.9 | 66.3 | 64.0 | 64.5 | +2.3 |
| MD | 24-017-0010 | 1 | 38.504166 | -76.811897 | Southern Maryland | 79.0 | 69 | 65.8 | 62.8 | 61.2 | 61.6 | +1.6 |
| MD | 24-019-9991 | 1 | 38.445000 | -76.111397 | Blackwater NWR | 75.0 | 67 | 64.7 | 62.0 | 60.0 | 60.7 | +2.0 |
| MD | 24-021-0037 | 1 | 39.422760 | -77.375198 | Frederick Airport | 76.3 | 67 | 64.2 | 61.6 | 59.4 | 59.6 | +2.2 |
| MD | 24-023-0002 | 1 | 39.705952 | -79.012001 | Piney Run | 72.0 | 60 | 58.4 | 57.6 | 56.7 | 55.1 | +0.9 |
| MD | 24-025-1001 | 1 | 39.410000 | -76.296700 | Edgewood | 90.0 | 81 | 77.6 | 74.1 | 71.8 | 71.4 | +2.3 |
| MD | 24-025-9001 | 1 | 39.563332 | -76.203903 | Aldino | 79.3 | 70 | 67.1 | 63.7 | 62.0 | 61.8 | +1.7 |

| State | AQS Code | POC | Latitude | Longitude | Site | DVC 2011 | DVF 2017 3x3 cells MARAMA beta2 en is OTC CMAQ5.0 2 setup | DVF 2020 3x3 cells MARAMA gamma2 emis OTC CMAQ5.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CMAQ5.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CAMx 6.40 setup | DVF 2023 3x3 cells from EPA 2011en/2023en emis | DVF 2023 Difference - CMAQ v CAMx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MD | 24-029-0002 | 1 | 39.305199 | -75.797203 | Millington | 78.7 | 68 | 66.8 | 63.7 | 60.9 | 61.2 | +2.8 |
| MD | 24-031-3001 | 1 | 39.114445 | -77.106903 | Rockville | 75.7 | 65 | 63.2 | 59.6 | 59.3 | 60.0 | +0.3 |
| MD | 24-033-0030 | 1 | 39.055279 | -76.878304 | HU-Beltsville | 79.0 | 68 | 65.0 | 61.0 | 60.7 | 60.5 | +0.3 |
| MD | 24-033-8003 | 1 | 38.811939 | -76.744202 | PG Equestrian Center | 82.3 | 70 | 67.6 | 63.7 | 63.1 | 63.2 | +0.6 |
| MD | 24-033-9991 | 1 | 39.028400 | -76.817101 | Beltsville | 80.0 | 69 | 66.3 | 62.4 | 61.4 | 61.0 | +1.0 |
| MD | 24-043-0009 | 1 | 39.565582 | -77.721603 | Hagerstown | 72.7 | 63 | 60.8 | 58.3 | 56.7 | 56.0 | +1.6 |
| MD | 24-510-0054 | 1 | 39.328892 | -76.552498 | Furley | 73.7 | 68 | 62.9 | 59.4 | 60.2 | 59.9 | -0.8 |
| MA | 25-001-0002 | 1 | 41.975803 | -70.023598 | TRURO NATIONAL SEASHORE | 73.0 | 66 | 62.7 | 59.1 | 58.5 | 59.6 | +0.6 |
| MA | 25-003-4002 | 1 | 42.636681 | -73.167397 | MT GREYLOCK SUMMIT | 69.0 | 62 | 60.1 | 58.0 | 56.3 | 56.1 | +1.7 |
| MA | 25-005-1002 | 1 | 41.633278 | -70.879204 | LEROY WOOD SCHOOL | 74.0 | 66 | 63.3 | 59.9 | 60.3 | 61.6 | -0.4 |
| MA | 25-007-0001 | 1 | 41.330467 | -70.785202 | 1 HERRING CREEK RD, AQUINNAH (WAMPANOAG | 77.0 | 71 | 67.5 | 64.5 | 63.8 | 64.1 | +0.7 |
| MA | 25-009-2006 | 1 | 42.474644 | -70.970802 | LYNN WATER TREATMENT PLANT | 71.0 | 65 | 54.9 | 49.7 | 56.8 | 57.5 | -7.1 |
| MA | 25-009-4005 | 1 | 42.814411 | -70.817802 | NEWBURYPORT HARBOR ST PARKING LOT | 70.0 | 63 | 59.7 | 56.5 | 56.7 | 57.2 | -0.2 |
| MA | 25-009-5005 | 1 | 42.770836 | -71.102303 | CONSENTINO SCHOOL | 69.3 | 61 | 58.9 | 56.1 | 56.1 | 56.2 | 0.0 |
| MA | 25-013-0008 | 1 | 42.194382 | -72.555099 | WESTOVER AFB | 73.7 | 65 | 61.3 | 58.1 | 58.2 | 59.3 | -0.1 |
| MA | 25-015-0103 | 1 | 42.400578 | -72.523102 | AMHERST | 64.7 | 57 | 53.7 | 50.9 | 51.4 | 51.9 | -0.5 |
| MA | 25-015-4002 | 1 | 42.298492 | -72.334099 | QUABBIN RES | 71.3 | 62 | 59.7 | 56.6 | 56.0 | 57.0 | +0.6 |
| MA | 25-017-0009 | 1 | 42.626678 | -71.362099 | USEPA REGION 1 LAB | 67.3 | 59 | 56.8 | 54.0 | 53.7 | 54.0 | +0.3 |
| MA | 25-017-1102 | 1 | 42.413574 | -71.482803 | inactive military resv 680 hudson rd sud | 67.0 | 59 | 56.3 | 53.6 | 52.9 | 53.4 | +0.7 |
| MA | 25-021-3003 | 1 | 42.211773 | -71.113998 | BLUE HILL OBSERVATORY | 72.3 | 63 | 60.3 | 55.9 | 58.8 | 59.6 | -2.9 |
| MA | 25-025-0041 | 1 | 42.317371 | -70.968399 | BOSTON LONG ISLAND | 68.3 | 59 | 57.2 | 53.2 | 55.3 | 56.4 | -2.1 |
| MA | 25-025-0042 | 1 | 42.329498 | -71.082603 | DUDLEY SQUARE ROXBURY | 60.7 | 53 | 48.6 | 44.3 | 49.4 | 49.6 | -5.1 |
| MA | 25-027-0015 | 1 | 42.274319 | -71.875504 | WORCESTER AIRPORT | 68.3 | 60 | 57.6 | 54.8 | 54.1 | 54.6 | +0.7 |
| MA | 25-027-0024 | 1 | 42.099697 | -71.619400 | UXBRIDGE | 69.0 | 60 | 57.9 | 55.0 | 54.2 | 54.9 | +0.8 |
| NH | 33-001-2004 | 1 | 43.566113 | -71.496399 | FIELD OFFICE ON THE GROUNDS OF THE FORME | 62.3 | 55 | 52.9 | 50.0 | 50.3 | 50.4 | -0.3 |
| NH | 33-005-0007 | 1 | 42.930473 | -72.272400 | WATER STREET | 62.3 | 55 | 52.6 | 50.2 | 49.4 | 49.7 | +0.8 |
| NH | 33-007-4001 | 1 | 44.270168 | -71.303802 | | 69.3 | 64 | 62.7 | 60.7 | 56.7 | 57.1 | +4.0 |
| NH | 33-007-4002 | 1 | 44.308167 | -71.217697 | CAMP DODGE, GREENS GRANT | 59.7 | 55 | 54.0 | 52.3 | 49.0 | 49.3 | +3.3 |
| NH | 33-009-0010 | 1 | 43.629612 | -72.309601 | LEBANON AIRPORT ROAD | 59.7 | 53 | 52.1 | 50.0 | 48.4 | 48.1 | +1.6 |
| NH | 33-011-1011 | 1 | 42.718662 | -71.522400 | GILSON ROAD | 66.3 | 58 | 56.0 | 53.2 | 52.9 | 53.6 | +0.3 |
| NH | 33-011-5001 | 1 | 42.861752 | -71.878403 | MILLER STATE PARK | 63.0 | 61 | 58.5 | 55.8 | 54.9 | 55.5 | +0.9 |
| NH | 33-013-1007 | 1 | 43.218498 | -71.514503 | HAZEN DRIVE | 64.7 | 57 | 54.2 | 51.5 | 51.2 | 51.6 | +0.3 |
| NH | 33-015-0014 | 1 | 43.075333 | -70.748001 | PORTSMOUTH - PEIRCE ISLAND | 66.0 | 59 | 55.9 | 52.5 | 53.2 | 53.6 | -0.7 |
| NH | 33-015-0016 | 1 | 43.045277 | -70.713799 | SEACOAST SCIENCE CENTER | 66.3 | 59 | 56.1 | 52.7 | 53.4 | 53.8 | -0.7 |
| NH | 33-015-0018 | 1 | 42.862537 | -71.380203 | MOOSEHILL SCHOOL | 68.0 | 60 | 57.2 | 54.4 | 54.3 | 55.1 | +0.1 |
| NJ | 34-001-0006 | 1 | 39.464870 | -74.448700 | Brigantine | 74.3 | 66 | 61.9 | 58.0 | 58.5 | 58.5 | -0.5 |
| NJ | 34-003-0006 | 1 | 40.870438 | -73.991997 | Leonia | 77.0 | 68 | 66.5 | 63.3 | 62.0 | 64.1 | +2.3 |
| NJ | 34-007-1001 | 1 | 39.684250 | -74.861504 | Ancora State Hospital | 82.7 | 72 | 70.3 | 66.9 | 66.3 | 66.3 | +0.6 |
| NJ | 34-011-0007 | 1 | 39.422272 | -75.025200 | Millville | 72.0 | 64 | 62.6 | 58.8 | 57.0 | 57.0 | +1.8 |
| NJ | 34-013-0003 | 1 | 40.720989 | -74.192902 | Newark - Firehouse | 78.0 | 69 | 67.3 | 64.0 | 62.5 | 64.3 | +1.5 |
| NJ | 34-015-0002 | 1 | 39.800339 | -75.212097 | Clarksboro | 84.3 | 74 | 72.4 | 69.1 | 67.5 | 68.2 | +1.6 |
| NJ | 34-017-0006 | 1 | 40.670250 | -74.126099 | Bayonne | 77.0 | 69 | 69.6 | 67.0 | 63.0 | 65.4 | +4.0 |
| NJ | 34-019-0001 | 1 | 40.515263 | -74.806702 | Flemington | 78.0 | 68 | 65.8 | 62.3 | 60.5 | 62.0 | +1.8 |
| NJ | 34-021-0005 | 1 | 40.283092 | -74.742599 | Rider University | 78.3 | 68 | 66.1 | 62.7 | 62.5 | 63.2 | +0.2 |
| NJ | 34-021-9991 | 1 | 40.312500 | -74.872902 | Wash. Crossing | 76.0 | 66 | 63.8 | 60.4 | 59.6 | 60.4 | +0.8 |
| NJ | 34-023-0011 | 1 | 40.462181 | -74.429398 | Rutgers University | 81.3 | 71 | 68.6 | 65.0 | 63.6 | 65.0 | +1.4 |
| NJ | 34-025-0005 | 1 | 40.277645 | -74.005096 | Monmouth University | 80.0 | 71 | 69.4 | 66.0 | 64.2 | 65.4 | +1.8 |
| NJ | 34-027-3001 | 1 | 40.787628 | -74.676300 | Chester | 76.3 | 67 | 64.7 | 61.5 | 59.2 | 62.4 | +2.3 |

| State | AQS Code | POC | Latitude | Longitude | Site | DVC 2011 | DVF 2017 3x3 cells MARAMA beta2 emis OTC CMAQ5.0.2 setup | DVF 2020 3x3 cells MARAMA gamma2 emis OTC CMAQ5.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CMAQ5.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CAMx 6.40 setup | DVF 2023 3x3 cells from EPA 2011en/2023en emis | DVF 2023 Difference - CMAQ v CAMx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NJ | 34-029-0006 | 1 | 40.064831 | -74.444099 | Colliers Mills | 82.0 | 72 | 69.4 | 65.8 | 64.3 | 65.8 | +1.5 |
| NJ | 34-031-5001 | 1 | 41.058617 | -74.255501 | Ramapo | 73.3 | 65 | 63.6 | 60.7 | 60.5 | 61.3 | +0.2 |
| NJ | 34-041-0007 | 1 | 40.924580 | -75.067802 | Columbia WMA | 66.0 | 57 | 55.5 | 52.6 | 51.0 | 54.0 | +1.6 |
| NY | 36-001-0012 | 1 | 42.680752 | -73.757301 | LOUDONVILLE | 68.0 | 61 | 58.5 | 56.1 | 55.7 | 55.4 | +0.4 |
| NY | 36-005-0133 | 1 | 40.867901 | -73.878098 | PFIZER LAB SITE | 74.0 | 71 | 68.0 | 64.5 | 67.9 | 68.0 | -3.4 |
| NY | 36-013-0006 | 1 | 42.499630 | -79.318802 | DUNKIRK | 73.3 | 66 | 64.4 | 61.1 | 59.1 | 59.6 | +2.0 |
| NY | 36-013-0011 | 1 | 42.290710 | -79.589600 | WESTFIELD | 74.0 | 66 | 65.0 | 61.7 | 59.8 | 60.2 | +1.9 |
| NY | 36-015-0003 | 1 | 42.110958 | -76.802200 | ELMIRA | 66.5 | 61 | 59.4 | 57.5 | 55.1 | 54.9 | +2.4 |
| NY | 36-027-0007 | 1 | 41.785549 | -73.741402 | MILLBROOK | 72.0 | 64 | 60.7 | 58.0 | 57.4 | 58.6 | +0.6 |
| NY | 36-029-0002 | 1 | 42.993279 | -78.771500 | AMHERST | 71.3 | 65 | 64.3 | 61.7 | 58.5 | 58.3 | +3.2 |
| NY | 36-031-0002 | 3 | 44.366081 | -73.903099 | WHITEFACE SUMMIT | 70.3 | 64 | 61.9 | 59.6 | 57.5 | 57.5 | +2.1 |
| NY | 36-031-0003 | 1 | 44.393082 | -73.858902 | WHITEFACE BASE | 67.3 | 61 | 59.2 | 57.1 | 55.0 | 55.1 | +2.1 |
| NY | 36-033-7003 | 1 | 44.980576 | -74.695000 | Y001 | 45.0 | -8 | -8.0 | -8.0 | 37.3 | | |
| NY | 36-041-0005 | 1 | 43.449570 | -74.516296 | PISECO LAKE | 66.0 | 59 | 57.7 | 55.6 | 53.7 | 53.7 | +1.9 |
| NY | 36-043-0005 | 1 | 43.685780 | -74.985397 | NICKS LAKE | 62.0 | -8 | 54.7 | 52.8 | 50.8 | 50.5 | +2.0 |
| NY | 36-045-0002 | 1 | 44.087471 | -75.973198 | PERCH RIVER | 71.7 | 65 | 60.5 | 57.0 | 59.2 | 59.0 | -2.2 |
| NY | 36-053-0006 | 1 | 42.730461 | -75.784401 | CAMP GEORGETOWN | 67.0 | 61 | 59.3 | 57.2 | 54.9 | 55.0 | +2.3 |
| NY | 36-061-0135 | 1 | 40.819759 | -73.948303 | CCNY | 73.3 | 70 | 67.7 | 64.7 | 66.4 | 65.3 | -1.7 |
| NY | 36-063-1006 | 1 | 43.223862 | -78.478897 | MIDDLEPORT | 72.3 | 67 | 66.3 | 64.1 | 60.5 | 60.5 | +3.6 |
| NY | 36-065-0004 | 2 | 43.302681 | -75.719803 | CAMDEN | 61.5 | 56 | 54.3 | 52.4 | 50.4 | 50.5 | +2.0 |
| NY | 36-067-1015 | 1 | 43.052349 | -76.059196 | EAST SYRACUSE | 69.3 | 63 | 61.4 | 59.4 | 57.7 | 57.8 | +1.7 |
| NY | 36-071-5001 | 1 | 41.523750 | -74.215302 | VALLEY CENTRAL HIGH SCHOOL | 67.0 | 60 | 57.5 | 55.1 | 53.8 | 55.3 | +1.3 |
| NY | 36-075-0003 | 1 | 43.284279 | -76.463203 | FULTON | 68.0 | 61 | 58.5 | 55.4 | 55.5 | 55.7 | -0.1 |
| NY | 36-079-0005 | 1 | 41.455891 | -73.709801 | MT NINNHAM | 70.0 | 63 | 60.5 | 57.7 | 56.8 | 58.4 | +0.9 |
| NY | 36-081-0124 | 1 | 40.736141 | -73.821503 | QUEENS COLLEGE 2 | 78.0 | 74 | 72.0 | 68.8 | 69.4 | 70.1 | -0.6 |
| NY | 36-083-0004 | 1 | 42.781891 | -73.463600 | GRAFTON STATE PARK | 67.0 | 60 | 57.9 | 55.5 | 54.7 | 54.4 | +0.8 |
| NY | 36-085-0067 | 1 | 40.596642 | -74.125298 | SUSAN WAGNER HS | 81.3 | 78 | 79.5 | 76.9 | 71.1 | 71.9 | +5.8 |
| NY | 36-087-0005 | 1 | 41.182079 | -74.028198 | Rockland County | 75.0 | 67 | 65.5 | 62.4 | 61.5 | 62.0 | +0.9 |
| NY | 36-091-0004 | 1 | 43.012089 | -73.648903 | STILLWATER | 67.0 | 59 | 57.8 | 55.3 | 54.6 | 54.3 | +0.7 |
| NY | 36-101-0003 | 1 | 42.091419 | -77.209801 | PINNACLE STATE PARK | 65.3 | 60 | 58.5 | 56.6 | 54.3 | 54.4 | +2.3 |
| NY | 36-103-0002 | 1 | 40.745289 | -73.419197 | BABYLON | 83.3 | 77 | 75.2 | 71.4 | 72.0 | 72.5 | -0.6 |
| NY | 36-103-0004 | 1 | 40.960781 | -72.712402 | RIVERHEAD | 78.0 | 71 | 68.5 | 65.5 | 65.6 | 66.3 | -0.1 |
| NY | 36-103-0009 | 1 | 40.827991 | -73.057503 | HOLTSVILLE | 78.7 | 73 | 72.9 | 70.4 | 67.7 | 68.5 | +2.7 |
| NY | 36-111-1005 | 1 | 42.144032 | -74.494301 | BELLEAYRE MOUNTAIN | 69.0 | 63 | 60.6 | 58.3 | 56.2 | 57.4 | +2.1 |
| NY | 36-117-3001 | 1 | 43.230862 | -77.171402 | WILLIAMSON | 65.0 | 59 | 56.9 | 54.4 | 53.6 | 53.4 | +0.8 |
| NY | 36-119-2004 | 1 | 41.051922 | -73.763702 | WHITE PLAINS | 75.3 | 73 | 72.7 | 69.5 | 68.1 | 68.1 | +1.4 |
| PA | 42-003-0008 | 1 | 40.465420 | -79.960800 | Lawrenceville | 76.3 | 70 | 67.2 | 65.0 | 63.9 | 65.5 | +1.1 |
| PA | 42-003-0010 | 1 | 40.445576 | -80.016197 | LAT/LON IS APPROXIMATE LOCATION OF SCIEN | 73.7 | 68 | 64.9 | 62.8 | 61.7 | 63.3 | +1.1 |
| PA | 42-003-0067 | 1 | 40.375645 | -80.169899 | South Fayette | 75.7 | 69 | 66.3 | 64.2 | 61.4 | 63.0 | +2.8 |
| PA | 42-003-1008 | 1 | 40.617489 | -79.727661 | Harrison | 80.7 | 73 | 70.6 | 68.2 | 66.4 | 67.1 | +1.8 |
| PA | 42-005-0001 | 1 | 40.814182 | -79.564697 | LAT/LON IS CENTER OF TRAILER | 74.3 | 67 | 63.0 | 60.7 | 60.4 | 60.6 | +0.3 |
| PA | 42-007-0002 | 1 | 40.562519 | -80.503899 | | 70.7 | 65 | 62.9 | 60.8 | 58.1 | 59.5 | +2.7 |
| PA | 42-007-0005 | 1 | 40.684723 | -80.359703 | DRIVEWAY TO BAKEY RESIDENCE | 74.7 | 69 | 66.6 | 64.7 | 62.3 | 63.0 | +2.4 |
| PA | 42-007-0014 | 1 | 40.747795 | -80.316399 | | 72.3 | 66 | 64.0 | 61.9 | 60.7 | 61.0 | +1.2 |
| PA | 42-011-0006 | 1 | 40.514080 | -75.789703 | Kutztown | 71.7 | 62 | 60.0 | 57.2 | 56.1 | 56.2 | +1.1 |
| PA | 42-011-0011 | 1 | 40.383350 | -75.968597 | Reading Airport | 76.3 | 65 | 62.6 | 59.6 | 58.8 | 58.9 | +0.8 |
| PA | 42-013-0801 | 1 | 40.535278 | -78.370796 | | 72.7 | 65 | 63.4 | 61.1 | 59.5 | 60.3 | +1.6 |

| State | AQS Code | POC | Latitude | Longitude | Site | DVC 2011 | DVF 2017 3x3 cells MARAMA beta2 en.is OTC CMAQ5.0 2 setup | DVF 2020 3x3 cells MARAMA gamma2 emis OTC CMAQS.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CMAQS.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CAMx 6.40 setup | DVF 2023 3x3 cells from EPA 2011en/2023en emis | DVF 2023 Difference - CMAQ v CAMx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PA | 42-017-0012 | 1 | 40.107224 | -74.882202 | A420170012LAT/LON POINT IS OF SAMPLING | 80.3 | 70 | 68.1 | 64.6 | 63.8 | 64.6 | +0.8 |
| PA | 42-021-0011 | 1 | 40.309723 | -78.915001 | | 70.3 | 63 | 60.3 | 58.4 | 57.5 | 58.0 | +0.9 |
| PA | 42-027-0100 | 1 | 40.811390 | -77.826999 | LAT/LON=POINT SW CORNER OF TRAILER | 71.0 | 64 | 62.2 | 60.1 | 58.8 | 59.1 | +1.3 |
| PA | 42-027-9991 | 1 | 40.720798 | -77.931900 | Penn State | 72.0 | 64 | 62.8 | 60.8 | 59.1 | 59.8 | +1.7 |
| PA | 42-029-0100 | 1 | 39.834461 | -75.768204 | CHESTER COUNTY TRANSPORT SITE INTO PHILA | 76.3 | 66 | 62.7 | 59.7 | 58.7 | 58.7 | +1.0 |
| PA | 42-033-4000 | 1 | 41.117500 | -78.526199 | MOSHANNON STATE FOREST | 72.3 | 65 | 63.7 | 61.4 | 60.2 | 60.3 | +1.2 |
| PA | 42-043-0401 | 1 | 40.246990 | -76.847000 | A420430401LAT/LON POINT IS AT CORNER OF | 69.0 | 60 | 58.5 | 56.3 | 54.4 | 54.7 | +1.9 |
| PA | 42-043-1200 | 1 | 40.272221 | -76.681396 | A420431100LAT/LON POINT IS AT CORNER OF | 74.7 | 64 | 61.7 | 59.0 | 57.9 | 58.3 | +1.1 |
| PA | 42-045-0002 | 1 | 39.835556 | -75.372498 | A420450002LAT/LON POINT IS OF CORNER OF | 75.7 | 66 | 64.7 | 61.7 | 59.5 | 60.3 | +2.2 |
| PA | 42-049-0003 | 1 | 42.141750 | -80.038597 | | 74.0 | 66 | 65.0 | 61.0 | 58.9 | 59.1 | +2.1 |
| PA | 42-055-0001 | 1 | 39.961109 | -77.475601 | HIGH ELEVATION OZONE SITE | 67.0 | 59 | 56.8 | 54.8 | 53.2 | 53.2 | +1.6 |
| PA | 42-059-0002 | 1 | 39.809330 | -80.265701 | 75 KM SSW OF PITTSBURGH RURAL SITE ON A | 69.0 | 61 | 59.2 | 57.6 | 55.7 | 56.5 | +1.9 |
| PA | 42-063-0004 | 1 | 40.563332 | -78.919998 | | 75.7 | 67 | 65.6 | 63.1 | 61.9 | 62.7 | +1.2 |
| PA | 42-069-0101 | 1 | 41.479115 | -75.578201 | A420690101LAT/LON POINT IS AT CORNER OF | 71.0 | 62 | 60.0 | 57.4 | 55.9 | 55.8 | +1.5 |
| PA | 42-069-2006 | 1 | 41.442780 | -75.623100 | A420692006LAT/LON POINT IS AT CORNER OF | 68.7 | 60 | 58.0 | 55.6 | 54.1 | 54.0 | +1.5 |
| PA | 42-071-0007 | 1 | 40.046665 | -76.283302 | A42071007LAT/LON POINT AT CORNER OF TRA | 77.0 | 65 | 63.1 | 60.8 | 59.5 | 60.1 | +1.3 |
| PA | 42-071-0012 | 1 | 40.043835 | -76.112396 | Lancaster DW | 78.0 | 66 | 63.8 | 61.1 | 59.9 | 60.2 | +1.2 |
| PA | 42-073-0015 | 1 | 40.995850 | -80.346397 | | 71.0 | 64 | 61.4 | 58.4 | 57.2 | 58.0 | +1.2 |
| PA | 42-075-0100 | 1 | 40.337330 | -76.383400 | Lebanon | 76.0 | 65 | 62.5 | 59.7 | 58.7 | 58.6 | +1.0 |
| PA | 42-077-0004 | 1 | 40.611942 | -75.432503 | A42077004LAT/LON POINT IS OF SAMPLING | 76.0 | 66 | 63.7 | 60.4 | 59.5 | 59.5 | +0.9 |
| PA | 42-079-1100 | 1 | 41.209167 | -76.003304 | A42079110LAT/LON POINT IS AT CORNER OF | 65.0 | 56 | 53.0 | 50.8 | 49.8 | 49.9 | +1.0 |
| PA | 42-079-1101 | 1 | 41.265556 | -75.846397 | A420791101LAT/LON POINT IS AT CORNER OF | 64.3 | 56 | 53.7 | 51.4 | 49.9 | 49.9 | +1.5 |
| PA | 42-081-0100 | 1 | 41.250801 | -76.923798 | MONTOURSVILLE | 67.0 | 60 | 56.7 | 54.3 | 53.7 | 53.9 | +0.6 |
| PA | 42-085-0100 | 1 | 41.215015 | -80.484802 | | 76.3 | 68 | 65.1 | 60.5 | 58.9 | 60.0 | +1.6 |
| PA | 42-089-0002 | 1 | 41.083061 | -75.323303 | SWIFTWATER | 66.7 | 58 | 56.2 | 53.5 | 51.5 | 52.9 | +2.0 |
| PA | 42-091-0013 | 1 | 40.112221 | -75.309196 | A420910013LAT/LON POINT IS OF CORNER OF | 76.3 | 66 | 65.3 | 62.2 | 59.7 | 61.0 | +2.5 |
| PA | 42-095-0025 | 1 | 40.628056 | -75.341110 | LAT/LON POINT IS CENTER OF TRAILER | 74.3 | 66 | 62.3 | 59.1 | 58.0 | 58.5 | +1.1 |
| PA | 42-095-8000 | 1 | 40.692223 | -75.237198 | COMBINED EASTON SITE (420950100) AND EAS | 69.7 | 61 | 58.4 | 55.3 | 54.5 | 54.8 | +0.8 |
| PA | 42-099-0301 | 1 | 40.456944 | -77.165604 | A420990301LAT/LON POINT IS AT CORNER OF | 68.3 | 60 | 58.2 | 56.1 | 54.6 | 54.8 | +1.5 |
| PA | 42-101-0004 | 1 | 40.008888 | -75.097801 | Air Management Services laboratory (AMS | 66.0 | 58 | 56.6 | 53.9 | 53.2 | 53.9 | +0.7 |
| PA | 42-101-0024 | 1 | 40.076401 | -75.011497 | North East Airport (NEA) | 83.3 | 73 | 70.8 | 67.2 | 67.1 | 67.2 | +0.1 |
| PA | 42-101-1002 | 1 | 40.035984 | -75.002403 | BAXTER (BAX) | 80.0 | 70 | 68.0 | 64.5 | 64.5 | 64.7 | 0.0 |
| PA | 42-111-9991 | 1 | 39.987801 | -79.251503 | Laurel Hill | 65.0 | 55 | 54.3 | 53.0 | 51.8 | 50.8 | +1.2 |
| PA | 42-117-4000 | 1 | 41.644722 | -76.939201 | PENN STATE OZONE MONITORING SITE | 69.7 | 64 | 61.6 | 59.2 | 57.9 | 57.3 | +1.3 |
| PA | 42-125-0005 | 1 | 40.146667 | -79.902199 | | 70.0 | 63 | 60.1 | 58.4 | 57.5 | 57.6 | +0.9 |
| PA | 42-125-0200 | 1 | 40.170555 | -80.261398 | | 70.7 | 63 | 60.5 | 58.7 | 57.7 | 57.6 | +1.0 |
| PA | 42-125-5001 | 1 | 40.445278 | -80.420799 | | 70.3 | 64 | 61.3 | 59.4 | 57.5 | 57.9 | +1.9 |
| PA | 42-129-0006 | 1 | 40.428078 | -79.692802 | | 71.7 | 65 | 62.2 | 60.0 | 59.5 | 60.1 | +0.5 |
| PA | 42-129-0008 | 1 | 40.304695 | -79.505699 | LAT/LON POINT IS TRAILER | 71.0 | 63 | 61.1 | 58.9 | 58.1 | 58.0 | +0.8 |
| PA | 42-133-0008 | 1 | 39.965279 | -76.699402 | A421330008LAT/LON POINT AT CORNER OF TRA | 72.3 | 62 | 59.3 | 57.0 | 55.7 | 56.9 | +1.3 |
| PA | 42-133-0011 | 1 | 39.860970 | -76.462097 | York DW | 74.3 | 63 | 61.3 | 58.8 | 57.5 | 58.0 | +1.3 |
| RI | 44-003-0002 | 1 | 41.615238 | -71.720001 | AJ | 73.7 | 66 | 63.7 | 60.5 | 59.6 | 60.4 | +0.9 |
| RI | 44-007-1010 | 1 | 41.841572 | -71.360802 | FRANCIS SCHOOL East Providence | 74.0 | 66 | 63.0 | 59.4 | 59.3 | 60.1 | +0.1 |
| RI | 44-009-0007 | 1 | 41.495110 | -71.423698 | US-EPA Laboratory | 76.3 | 69 | 66.2 | 62.8 | 62.6 | 63.6 | +0.2 |
| VT | 50-003-0004 | 1 | 42.887589 | -73.249802 | Morse Airport - State of Vermont Propert | 63.7 | 57 | 54.8 | 52.5 | 51.7 | 51.3 | +0.8 |
| VT | 50-007-0007 | 1 | 44.528389 | -72.868797 | PROCTOR MAPLE RESEARCH CTR | 61.0 | 55 | 53.7 | 51.8 | 49.9 | 49.6 | +1.9 |
| VA | 51-013-0020 | 1 | 38.857700 | -77.059196 | Aurora Hills Visitors Center | 81.7 | 71 | 68.7 | 64.7 | 64.8 | 64.9 | -0.1 |

| State | AQS Code | POC | Latitude | Longitude | Site | DVC 2011 | DVF 2017 3x3 cells MARAMA beta2 emis OTC CMAQS.0.2 setup | DVF 2020 3x3 cells MARAMA gamma2 emis OTC CMAQS.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CMAQS.2.1 setup | DVF 2023 3x3 cells MARAMA gamma2 emis OTC CAMx 6.40 setup | DVF 2023 3x3 cells from EPA 2011en/2023en emis | DVF 2023 Difference - CMAQ v CAMx |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VA | 51-059-0030 | 1 | 38.773350 | -77.104698 | Lee District Park | 82.3 | 72 | 69.9 | 66.1 | 64.9 | 65.1 | +1.2 |
| VA | 51-107-1005 | 1 | 39.024731 | -77.489304 | Broad Run High School, Ashburn | 73.0 | 64 | 61.4 | 58.4 | 57.4 | 57.8 | +1.0 |
| VA | 51-153-0009 | 1 | 38.852871 | -77.634598 | James S. Long Park | 70.0 | 62 | 59.8 | 57.5 | 55.6 | 56.2 | +1.9 |
| VA | 51-510-0009 | 1 | 38.810402 | -77.044403 | Alexandria Health Dept. | 80.0 | 69 | 67.0 | 63.3 | 62.7 | 63.4 | +0.6 |
| VA | 51-003-0001 | 1 | 38.076569 | -78.503998 | Albemarle High School | 66.7 | 59 | 56.4 | 54.1 | 52.5 | 52.9 | +1.6 |
| VA | 51-033-0001 | 1 | 38.200871 | -77.377403 | USGS Geomagnetic Center, Corbin | 71.7 | 62 | 59.9 | 56.7 | 55.4 | 56.0 | +1.3 |
| VA | 51-036-0002 | 1 | 37.344379 | -77.259300 | Shirley Plantation | 75.7 | 66 | 61.2 | 59.7 | 58.2 | 59.4 | +1.5 |
| VA | 51-041-0004 | 1 | 37.357479 | -77.593597 | VDOT Chesterfield Residency Shop | 72.0 | 64 | 60.6 | 58.7 | 56.4 | 56.8 | +2.3 |
| VA | 51-061-0002 | 1 | 38.473671 | -77.767700 | Chester Phelps Wildlife Management Area, | 62.7 | 55 | 54.0 | 51.7 | 48.8 | 49.5 | +2.9 |
| VA | 51-069-0010 | 1 | 39.281021 | -78.081596 | Rest | 66.7 | 58 | 55.5 | 53.4 | 51.8 | 51.4 | +1.6 |
| VA | 51-071-9991 | 1 | 37.329700 | -80.557800 | Horton Station | 63.0 | 56 | 55.6 | 54.5 | 51.8 | 47.1 | +2.7 |
| VA | 51-085-0003 | 1 | 37.606129 | -77.218803 | Turner Property, Old Church | 73.7 | 65 | 60.0 | 57.7 | 56.5 | 56.9 | +1.2 |
| VA | 51-087-0014 | 1 | 37.556519 | -77.400299 | MathScience Innovation Center | 75.0 | 67 | 61.3 | 59.5 | 59.0 | 58.8 | +0.5 |
| VA | 51-113-0003 | 1 | 38.521984 | -78.435799 | Shenandoah National Park, Big Meadows | 70.7 | 64 | 62.0 | 60.2 | 57.3 | 57.0 | +2.9 |
| VA | 51-139-0004 | 1 | 38.663731 | -78.504402 | Luray Caverns Airport | 66.3 | 60 | 58.2 | 56.3 | 53.6 | 53.2 | +2.7 |
| VA | 51-147-9991 | 1 | 37.165501 | -78.306900 | Prince Edward | 62.0 | 56 | 52.8 | 51.4 | 49.3 | 50.3 | +2.1 |
| VA | 51-161-1004 | 1 | 37.283421 | -79.884499 | East Vinton Elementary School | 67.3 | 60 | 58.8 | 56.8 | 54.3 | 53.4 | +2.5 |
| VA | 51-163-0003 | 1 | 37.626678 | -79.512604 | Natural Bridge Ranger Station | 62.3 | 56 | 55.6 | 54.2 | 51.4 | 50.2 | +2.8 |
| VA | 51-165-0003 | 1 | 38.477531 | -78.819504 | ROCKINGHAM CO. VDOT | 66.0 | 60 | 57.8 | 56.0 | 53.4 | 53.7 | +2.6 |
| VA | 51-179-0001 | 1 | 38.481232 | -77.370399 | Widewater Elementary School | 73.0 | 62 | 59.1 | 55.0 | 54.8 | 55.4 | +0.2 |
| VA | 51-197-0002 | 1 | 36.891171 | -81.254204 | Rural Retreat Sewage Treatment Plant | 64.3 | 58 | 56.5 | 54.6 | 52.5 | 51.9 | +2.1 |
| VA | 51-650-0008 | 1 | 37.103733 | -76.387001 | NASA Langley Research Center | 74.0 | 66 | 65.3 | 62.2 | 58.2 | 58.2 | +4.0 |
| VA | 51-800-0004 | 1 | 36.901180 | -76.438103 | Tidewater Community College | 71.3 | 66 | 63.8 | 60.9 | 58.6 | 58.7 | +2.3 |
| VA | 51-800-0005 | 1 | 36.665249 | -76.730797 | VA Tech Agricultural Research Station, H | 69.7 | 61 | 58.6 | 56.4 | 55.2 | 54.7 | +1.2 |



Chase Tower, 17th Floor
P.O. Box 1588
Charleston, WV 25326-1588
(304) 353-8000    (304) 353-8180 Fax
www.steptoe-johnson.com

Writer's Contact Information

(304) 353-8171
Dave.Flannery@steptoe-johnson.com

September 21, 2018

Sean O. Alteri, Director
Kentucky Division for Air Quality
300 Sower Boulevard
Frankfort, Kentucky 40601

RE:    Proposed Infrastructure State Implementation Plan Related to the
2015 Ozone NAAQS.

Dear Director Alteri:

The Midwest Ozone Group (MOG) is pleased to have the opportunity to comment in support of the Good Neighbor SIP portion of Kentucky's proposed Infrastructure State Implementation Plan related to the 2015 ozone NAAQS.

MOG is an affiliation of companies, trade organizations, and associations that draws upon its collective resources to seek solutions to the development of legally and technically sound air quality programs.[1]   MOG's primary efforts are to work with policy makers in evaluating air quality policies by encouraging the use of sound science. MOG has been actively engaged in a variety of issues and initiatives related to the development and implementation of air quality policy, including the development of transport rules, NAAQS standards, nonattainment designations, petitions under Sections 176A and 126 of the Clean Air Act, NAAQS implementation guidance, the development of Good Neighbor state implementation plans (SIPs) and related regional haze and climate change issues.   MOG members and participants operate a variety of emission sources including more than 75,000 MW of coal-fired and coal-refuse fired electric power generation in more than ten states. MOG Members and Participants also own and operate several fossil-fired generating units in the Commonwealth of Kentucky. They are concerned about the development of technically or legally unsubstantiated interstate air pollution actions and the impacts of those actions on their facilities, their employees, their contractors, and the consumers of their products.

While the attached comments will identify several factors that support the Cabinet's proposal, we will highlight only a few in this letter.

---

[1] The members of and participants in the Midwest Ozone Group include: American Coalition for Clean Coal Electricity, American Electric Power, American Forest & Paper Association, American Wood Council, Ameren, Alcoa, Appalachian Region Independent Power Producers Association (ARIPPA), ArcelorMittal, Associated Electric Cooperative, Citizens Energy Group, Council of Industrial Boiler Owners, Duke Energy, East Kentucky Power Cooperative, FirstEnergy, Indiana Energy Association, Indiana Utility Group, LGE / KU, National Lime Association, Ohio Utility Group, Olympus Power, and City Water, Light and Power (Springfield IL).

TERRALEX

Sean O. Alteri, Director
Page 2
September 21, 2018

1. **MOG supports the conclusion that no additional emissions reductions beyond existing and planned controls are necessary to comply with CAA Section 110(a)(2)(D)(i)(I).**

MOG supports the conclusion reached by the Cabinet "that the emissions reductions resulting from on-the-books and on-the-way emissions reductions are adequate to prohibit emissions within Kentucky from significantly contributing to nonattainment, or interfering with the maintenance, of downwind states with respect to the 2015 ozone NAAQS; therefore, meeting the requirements of CAA section 110(a)(2)(D)(i)(I) "prongs 1and 2." MOG not only supports the Cabinet's conclusion but also points out in these comments that such a conclusion is very conservative. MOG offers in these comments, additional data and comments that we believe will further support the conservative nature of the conclusion that no further emission requirements are necessary to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I).

2. **Independent State-of-the-Art Modeling by Alpine Geophysics on behalf of MOG shows that all monitors in the Northeast are at or near attainment of the 2015 ozone NAAQS in 2023.**

Beyond the modeling work performed by EPA, the Cabinet has relied on modeling work performed by Alpine Geophysics on behalf of MOG. This modeling was undertaken to address the concerns about whether modeling with a 12 km grid is sufficiently refined to address the land/water interface issues, Alpine Geophysics undertook to run EPA's modeling platform at a finer 4km grid. When this state-of-the-art modeling is used to assess air quality downwind of Kentucky at the appropriate attainment date, the only remaining nonattainment monitor linked to Kentucky is a single monitor at Harford Maryland which is predicted by Alpine Geophysics to have an average DV in 2023 of only 71.1 ppb (0.2 ppb above the 2015 ozone NAAQS). Remarkably, LADCO's predicted average design value for this monitor using its "water" data is 71.0 ppb (0.1 ppb above the 2015 ozone NAAQS), LADCO's "no water" data shows this monitor to have an average design value of 70.5 ppb (attainment with the 2025 ozone NAAQS) and EPA's predicted average design value for the same monitor is 70.9 ppb (also attainment with the 2015 ozone NAAQS). Accordingly, all monitors in the Northeast are at or near attainment of the 2015 ozone NAAQS in 2023, making it unnecessary to further consider the potential for controls in upwind states.

3. **Mobile sources have the most significant impact on ozone concentrations at the problem monitors identified in this proposal.**

Given the dominant role of mobile sources in impacting on ozone air quality, MOG agrees with the Cabinet that additional local mobile source controls in downwind states are necessary before requiring additional emission reductions from upwind states such as Kentucky. We urge that downwind states take full advantage of all of the authority provided to each of them under the CAA and to reduce mobile source emissions appropriately to assure continued attainment with the 2015 ozone NAAQS.

Sean O. Alteri, Director
Page 3
September 21, 2018

4. **The 1% significant contribution test is inappropriate and should not be applied.**

On August 31, 2018, EPA issued significant new guidance on this matter in which it analyzed 1 ppb and 2 ppb alternatives to the 1% significance level that it has historically used. In that memo, EPA offers the following statement:

Based on the data and analysis summarized here, the EPA believes that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provisions for the 2015 ozone NAAQS.

In the case of Kentucky, EPA's modeling data below show that at the historical 1% threshold, Kentucky would be linked to 4 non-attainment monitors and one maintenance monitor. However, applying the 1 ppb threshold to this data would eliminate any linkage to non-attainment monitor reduce to 1 the linkage to any maintenance monitor. Moving to the 2 ppb threshold would completely eliminate all linkage to any non-attainment or maintenance monitor.

**Conclusion**

As is stated in detail in the attached comments, the Midwest Ozone Group supports the Cabinet's draft Good Neighbor SIP as a conservative justification for the conclusion that no additional emissions reductions beyond existing and planned controls are necessary to mitigate any contribution Kentucky may have to any downwind monitors to comply with CAA section 110(a)(2)(D)(i)(I).

Very truly yours,

David M. Flannery
Legal Counsel
Midwest Ozone Group

cc:    Ms. Lauren Hedge
       Division for Air Quality
       Kentucky Energy and Environmental Cabinet
       300 Sower Boulevard
       Frankfort, KY 40601

# COMMENTS OF THE MIDWEST OZONE GROUP REGARDING THE KENTUCKY ENERGY AND ENVIRONMENTAL CABINET'S PROPOSED REVISION TO KENTUCKY'S 2015 OZONE STANDARD INFRASTRUCTURE STATE IMPLEMENTATION PLAN ADRESSING CLEAN AIR ACT 110 REQUIREMENTS

## SEPTEMBER 21, 2018

# TABLE OF CONTENTS

1.  MOG supports the conclusion that no additional emissions reductions beyond existing and planned controls are necessary to comply with CAA Section 110(a)(2)(D)(i)(I). ...................................................................................... 2

2.  Independent State-of-the-Art Modeling by Alpine Geophysics on behalf of MOG shows that four monitors identified by EPA as nonattainment are actually predicted to be in attainment in 2023............................................................................. 3

3.  Emission trends in the CSAPR Update region have been decreasing for many years and will continue to do so in the immediate future adding assurance that there will be no interference with any downwind maintenance areas.................. 4

4.  Had current air modeling projections taken into account the significant emission reduction programs that are legally mandated to occur prior to 2023, even better air quality would have been demonstrated.............................................. 7

5.  Controls on local sources must be addressed first before any additional emission reductions can be imposed on sources in Kentucky.................................... 9

6.  Consideration of international emissions also adds support to the conclusion that there is no further obligation to reduce emissions................................. 10

7.  Mobile sources have the most significant impact on ozone concentrations at the problem monitors identified in the Cabinet's proposal.............................. 13

8.  2023 is the appropriate year for assessing Good Neighbor SIP requirements related to the 2015 ozone NAAQS.................................................... 19

9.  The Cabinet is correct in calling for the application of an alternative significance threshold............................................................................... 20

10.  An important flexibility that should be considered is an alternative method for determining which monitors should be considered "maintenance" monitors...... 22

11.  In the development of its Good Neighbor SIP, maintenance areas should not be given the same weight and status as nonattainment areas........................... 24

12.  An additional element of conservatism in the Cabinet's proposal is recognition of Kentucky's very limited proportional contribution to the Harford Maryland monitor............................................................................... 27

Conclusion....................................................................................... 28

i

**COMMENTS OF THE MIDWEST OZONE GROUP REGARDING THE KENTUCKY ENERGY AND ENVIRONMENTAL CABINET'S PROPOSED REVISION TO KENTUCKY'S 2015 OZONE STANDARD INFRASTRUCTURE STATE IMPLEMENTATION PLAN ADRESSING CLEAN AIR ACT 110 REQUIREMENTS**

The Midwest Ozone Group (MOG) is pleased to have the opportunity to comment[1] on the proposed Infrastructure State Implementation Plan (SIP) by the Kentucky Energy and Environmental Cabinet ("Cabinet") related to the 2015 ozone National Ambient Air Quality Standard (NAAQS). While the full proposal relates to the requirements of Section 110(a)(2) of the federal Clean Air Act (CAA), these comments will be limited to the interstate transport provisions. MOG strongly supports the Cabinet's proposed plan as fully satisfying the requirements CAA section 110(a)(2)(D)(i)(I) regarding the interstate transport for the 2015 ozone NAAQS. .

MOG is an affiliation of companies, trade organizations, and associations that draws upon its collective resources to seek solutions to the development of legally and technically sound air quality programs.[2] MOG's primary efforts are to work with policy makers in evaluating air quality policies by encouraging the use of sound science. MOG has been actively engaged in a variety of issues and initiatives related to the development and implementation of air quality policy, including the development of transport rules, NAAQS standards, nonattainment designations, petitions under Sections 176A and 126 of the Clean Air Act, NAAQS implementation guidance, the development of Good Neighbor state implementation plans (SIPs) and related regional haze and climate change issues. MOG members and participants operate a variety of emission sources including more than 75,000 MW of coal-fired and coal-refuse fired electric power generation in more than ten states. MOG Members and Participants also own and operate several fossil-fired generating units in the Commonwealth of Kentucky. They are concerned about the development of technically or legally unsubstantiated interstate air pollution actions and the impacts of those actions on their facilities, their employees, their contractors, and the consumers of their products.

---

[1] Comments or questions about this document should be directed to David M. Flannery, Kathy G. Beckett, or Edward L. Kropp, Legal Counsel, Midwest Ozone Group, Steptoe & Johnson PLLC, 707 Virginia Street East, Charleston West Virginia 25301; 304-353-8000; dave.flannery@steptoe-johnson.com and kathy.beckett@steptoe-johnson.com and skipp.kropp@steptoe-johnson.com respectively. These comments were prepared with the technical assistance of Alpine Geophysics, LLC.

[2] The members of and participants in the Midwest Ozone Group include: American Coalition for Clean Coal Electricity, American Electric Power, American Forest & Paper Association, American Wood Council, Ameren, Alcoa, Appalachian Region Independent Power Producers Association (ARIPPA), ArcelorMittal, Associated Electric Cooperative, Citizens Energy Group, Council of Industrial Boiler Owners, Duke Energy, East Kentucky Power Cooperative, FirstEnergy, Indiana Energy Association, Indiana Utility Group, LGE / KU, National Lime Association, Ohio Utility Group, Olympus Power, and City Water, Light and Power (Springfield IL).

**1.    MOG supports the conclusion that no additional emissions reductions beyond existing and planned controls are necessary to comply with CAA Section 110(a)(2)(D)(i)(I).**

The issue being addressed in the proposed Good Neighbor SIP, is whether these existing measures also satisfy the Good Neighbor requirements of Section 110(a)(2)(D)(i)(I) which prohibits a state from significantly contributing to nonattainment or interfering with maintenance of any primary or secondary NAAQS in another state.

As was identified in the March 27, 2018, memorandum of EPA's Peter Tsirigotis[3], a four step process is to be used by EPA to address Good Neighbor requirements. These four steps are:

Step 1:    identify downwind air quality problems;

Step 2:    identify upwind states that contribute enough to those downwind air quality problems to warrant further review and analysis;

Step 3:    identify the emissions reductions necessary to prevent an identified upwind state from contributing significantly to those downwind air quality problems; and

Step 4:    adopt permanent and enforceable measure needed to achieve those emission reductions.

Central to the Cabinet's proposal is its reliance on the 12km modeling work performed by both EPA and the 4km modeling work performed by Alpine Geophysics on behalf of the MOG. The Cabinet notes that use of the Alpine Geophysics 4km modeling "is appropriate for areas where there are land-water interfaces". With respect to the Alpine Geophysics modeling, the Cabinet goes on to note:

> *This model provides a better analysis of the downwind monitors; however, it does not account for all of the factors contributing to these monitors.*

Among the additional factors addressed by the Cabinet in the proposal that go beyond modeling are the following:

-    the use of an alternative significance threshold

-    downward emission trends in Kentucky;

-    the need to account for local onroad emissions in the northeast before requiring

---

[3] *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I),* prepared by Peter Tsirigotis, March 27, 2018. https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.

2

additional reductions from Kentucky; and

-       the need to consider international emissions.

The ultimate conclusion by the Cabinet as stated on page 55 of its proposal is as follows:

> *The Cabinet concludes that the emissions reductions resulting from on-the-books and on-the-way emissions reductions are adequate to prohibit emissions within Kentucky from significantly contributing to nonattainment, or interfering with the maintenance, of downwind states with respect to the 2015 ozone NAAQS; therefore, meeting the requirements of CAA section 110(a)(2)(D)(i)(I) "prongs 1nad 2.*

MOG not only supports the Cabinet's conclusion but will point out in these comments that such a conclusion is very conservative. MOG will offer in these comments additional data and comments that we believe will further support the conservative nature of the conclusion that no further emission requirements are necessary to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I).

2.      **Independent State-of-the-Art Modeling by Alpine Geophysics on behalf of MOG shows that four monitors identified by EPA as nonattainment are actually predicted to be in attainment in 2023.**

Beyond the modeling work performed by EPA, the Cabinet has relied upon modeling work performed by Alpine Geophysics on behalf of MOG. This modeling by Alpine Geophysics was undertaken to address the concerns about whether modeling with a 12 km grid utilized by EPA is sufficiently refined to address the land/water interface issues. Accordingly, MOG undertook to run EPA's modeling platform at a finer 4km grid. A copy of the Technical Support Document[4] containing these results of this modeling is set forth as an attachment to the proposal being advanced by the Cabinet.

Modeling of this type using a finer grid is specifically recommended under existing EPA guidance which states:

> *The use of grid resolution finer than 12 km would generally be more appropriate for areas with a combination of complex meteorology, strong gradients in emissions sources, and/or <u>land-water interfaces</u> in or near the nonattainment area(s).[5] Emphasis added.*

Accordingly, when state-of-the-art modeling is used to assess air quality downwind of Kentucky at the appropriate attainment date, all monitors are in attainment except for a single

---

[4] http://www.midwestozonegroup.com/files/FinalTSD-OzoneModelingSupportingGNSIPObligationsJune2018.pdf
[5] http://www3.epa.gov/scram001/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf

3

monitor at Harford Maryland with a MOG predicted average DV in 2023 of only 71.1 ppb (0.2 ppb above the 2015 ozone NAAQS). Remarkably, LADCO's predicted average design value for this monitor using its "water" data is 71.0 ppb (0.1 ppb above the 2015 ozone NAAQS), LADCO's "no water" data show this monitor to have an average design value of 70.5 ppb (attainment with the 2015 ozone NAAQS) and EPA's predicted average design value for the same monitor is 70.9 ppb (also attainment with the 2015 ozone NAAQS). It is clear from these various modeling results that the Harford monitor is at or near attainment.

Additionally the Alpine Geophysics prediction for MOG shows that the Sheboygan monitor could be expected to have an average design value of 71.7 ppb. While this value shows this monitor to be in nonattainment, the value predicted in the MOG modeling is lower than the average design value predicted by EPA which is 72.8 ppb. It is worth noting that when the average design value for this monitor was determined by LADCO in its modeling[6], a value of 70.5 ppb was obtained putting it into attainment with the 2015 ozone NAAQS. As will be discussed elsewhere in these comments, Kentucky is not linked to the Sheboygan monitor at an alternative significance threshold of 1 ppb or higher.

Even though there are modeling platforms that predict both Sheboygan and Harford to be in attainment with the 2015 ozone NAAQS, the Cabinet conducted thoughtful and careful analysis of those monitors and others as part of its conservative demonstration that the Kentucky SIP contains adequate provisions to prevent sources and other types of emissions activities within the state from contributing significantly to nonattainment in any other state with respect to the 2015 ozone NAAQS.

3.    **Emission trends in the CSAPR Update region have been decreasing for many years and will continue to do so in the immediate future adding assurance that there will be no interference with any downwind maintenance areas.**

Beyond the data provided by the Cabinet on the reduction on NOx emissions that have occurred in Kentucky in recent years and are expected to continue to decline in the future, we note that NOx emissions across the CSAPR region have also been dramaticaly reduced in recent years. These NOx emission reductions will continueas the result of "on-the-books" regulatory programs already required by states on their own sources, "on-the-way" regulatory programs that have already been identified by state regulatory agencies as efforts that they must undertake as well as from the effectiveness of a variety of EPA programs including the CSAPR Update Rule.

Set forth below are tables developed from EPA modeling platform summaries[7] illustrating the estimated total anthropogenic emission reduction and EGU-only emission reduction in the several eastern states. As can be seen in the first table, total annual anthropogenic NOx emissions are

---

[6] https://protect-us.mimecast.com/s/o6GECG690VcJq2gwcK5t5z?domain=ladco.org.
[7] 83 Fed. Reg. 7716 (February 22, 2018).

predicted to decline by 29% between 2011 and 2017 over the CSAPR domain and by 43% (an additional 1.24 million tons) between 2011 and 2023.

**Final CSAPR Update Modeling Platform Anthropogenic NOx Emissions (Annual Tons).**

| State | Annual Anthropogenic NOx Emissions (Tons) | | | Emissions Delta (2017-2011) | | Emissions Delta (2023-2011) | |
|---|---|---|---|---|---|---|---|
| | 2011 | 2017 | 2023 | Tons | % | Tons | % |
| Alabama | 359,797 | 220,260 | 184,429 | 139,537 | -39% | 175,368 | -49% |
| Arkansas | 232,185 | 168,909 | 132,148 | 63,276 | -27% | 100,037 | -43% |
| Illinois | 506,607 | 354,086 | 293,450 | 152,521 | -30% | 213,156 | -42% |
| Indiana | 444,421 | 317,558 | 243,954 | 126,863 | -29% | 200,467 | -45% |
| Iowa | 240,028 | 163,126 | 124,650 | 76,901 | -32% | 115,377 | -48% |
| Kansas | 341,575 | 270,171 | 172,954 | 71,404 | -21% | 168,621 | -49% |
| Kentucky | 327,403 | 224,098 | 171,194 | 103,305 | -32% | 156,209 | -48% |
| Louisiana | 535,339 | 410,036 | 373,849 | 125,303 | -23% | 161,490 | -30% |
| Maryland | 165,550 | 108,186 | 88,383 | 57,364 | -35% | 77,167 | -47% |
| Michigan | 443,936 | 296,009 | 228,242 | 147,927 | -33% | 215,694 | -49% |
| Mississippi | 205,800 | 128,510 | 105,941 | 77,290 | -38% | 99,859 | -49% |
| Missouri | 376,256 | 237,246 | 192,990 | 139,010 | -37% | 183,266 | -49% |
| New Jersey | 191,035 | 127,246 | 101,659 | 63,789 | -33% | 89,376 | -47% |
| New York | 388,350 | 264,653 | 230,001 | 123,696 | -32% | 158,349 | -41% |
| Ohio | 546,547 | 358,107 | 252,828 | 188,439 | -34% | 293,719 | -54% |
| Oklahoma | 427,278 | 308,622 | 255,341 | 118,656 | -28% | 171,937 | -40% |
| Pennsylvania | 562,366 | 405,312 | 293,048 | 157,054 | -28% | 269,318 | -48% |
| Tennessee | 322,578 | 209,873 | 160,166 | 112,705 | -35% | 162,411 | -50% |
| Texas | 1,277,432 | 1,042,256 | 869,949 | 235,176 | -18% | 407,482 | -32% |
| Virginia | 313,848 | 199,696 | 161,677 | 114,152 | -36% | 152,171 | -48% |
| West Virginia | 174,219 | 160,102 | 136,333 | 14,117 | -8% | 37,886 | -22% |
| Wisconsin | 268,715 | 178,927 | 140,827 | 89,788 | -33% | 127,888 | -48% |
| **CSAPR States** | **8,651,264** | **6,152,990** | **4,914,012** | **2,498,274** | **-29%** | **3,737,252** | **-43%** |

When looking exclusively at the estimated EGU emissions used in these modeling platforms, even greater percent decrease is noted between 2011 and 2017 (40% reduction CSAPR-domain wide) and between 2011 and 2023 (51% reduction). These reductions are particularly significant since the CSAPR Update Rule focus exclusively on EGU sources.

**Final CSAPR Update Modeling Platform EGU NOx Emissions (Annual Tons).**

| State | Annual EGU NOx Emissions (Tons) | | | Emissions Delta (2017-2011) | | Emissions Delta (2023-2011) | |
|---|---|---|---|---|---|---|---|
| | 2011 | 2017 | 2023 | Tons | % | Tons | % |
| Alabama | 64,008 | 23,207 | 24,619 | 40,800 | -64% | 39,388 | -62% |
| Arkansas | 38,878 | 24,103 | 17,185 | 14,775 | -38% | 21,693 | -56% |
| Illinois | 73,689 | 31,132 | 30,764 | 42,557 | -58% | 42,926 | -58% |
| Indiana | 119,388 | 89,739 | 63,397 | 29,649 | -25% | 55,991 | -47% |
| Iowa | 39,712 | 26,041 | 20,122 | 13,671 | -34% | 19,590 | -49% |
| Kansas | 43,405 | 25,104 | 14,623 | 18,301 | -42% | 28,781 | -66% |
| Kentucky | 92,279 | 57,520 | 42,236 | 34,759 | -38% | 50,043 | -54% |
| Louisiana | 52,010 | 19,271 | 46,309 | 32,740 | -63% | 5,701 | -11% |
| Maryland | 19,774 | 6,001 | 9,720 | 13,773 | -70% | 10,054 | -51% |
| Michigan | 77,893 | 52,829 | 33,708 | 25,064 | -32% | 44,186 | -57% |
| Mississippi | 28,039 | 14,759 | 13,944 | 13,280 | -47% | 14,095 | -50% |
| Missouri | 66,170 | 38,064 | 44,905 | 28,106 | -42% | 21,265 | -32% |
| New Jersey | 7,241 | 2,918 | 5,222 | 4,323 | -60% | 2,019 | -28% |
| New York | 27,379 | 10,191 | 16,256 | 17,188 | -63% | 11,123 | -41% |
| Ohio | 104,203 | 68,477 | 37,573 | 35,727 | -34% | 66,630 | -64% |
| Oklahoma | 80,936 | 32,366 | 21,337 | 48,570 | -60% | 59,599 | -74% |
| Pennsylvania | 153,563 | 95,828 | 49,131 | 57,735 | -38% | 104,432 | -68% |
| Tennessee | 27,000 | 14,798 | 11,557 | 12,201 | -45% | 15,442 | -57% |
| Texas | 148,473 | 112,670 | 103,675 | 35,804 | -24% | 44,799 | -30% |
| Virginia | 40,141 | 7,589 | 20,150 | 32,553 | -81% | 19,992 | -50% |
| West Virginia | 56,620 | 63,485 | 46,324 | (6,865) | 12% | 10,296 | -18% |
| Wisconsin | 31,881 | 15,374 | 15,419 | 16,507 | -52% | 16,462 | -52% |
| **CSAPR States** | **1,392,682** | **831,466** | **688,175** | **561,216** | **-40%** | **704,508** | **-51%** |

Importantly, these estimated 2017 emissions used in the EPA modeling are inflated as compared to the actual 2017 CEM-reported EGU emissions. As can be seen in the following table, when the CSAPR-modeled 2017 annual EGU emissions are compared to the actual CEM-reported 2017 annual EGU emissions, it becomes apparent that there is a significant domain-wide overestimation (129,000 annual tons NOx) of the predicted emissions for this category. The modeled values from state-to-state vary between over- and under-estimated, domain-wide, CEM-reported annual NOx ranging from 158% overestimation (2017 actual emissions are 61% of modeled emissions) for Pennsylvania to 54% underestimation (2017 actual emissions are 118% of modeled emissions) for Virginia with a domain-wide overestimation of 18% (129,553 tons) of annual NOx emissions from EGUs.

**Final CSAPR Update Modeling Platform EGU NOx Emissions Compared to CEM-Reported EGU NOx Emissions (Annual Tons).**

| State | Annual EGU NOx Emissions (Tons) | | | Emissions Delta 2017 CEM-2017 EPA | |
|---|---|---|---|---|---|
| | **2011 EPA** | **2017 EPA** | **2017 CEM** | **Tons** | **%** |
| Alabama | 64,008 | 23,207 | 24,085 | 878 | 4% |
| Arkansas | 38,878 | 24,103 | 27,500 | 3,397 | 14% |
| Illinois | 73,689 | 31,132 | 33,066 | 1,934 | 6% |
| Indiana | 119,388 | 89,739 | 63,421 | (26,318) | -29% |
| Iowa | 39,712 | 26,041 | 22,564 | (3,477) | -13% |
| Kansas | 43,405 | 25,104 | 13,032 | (12,072) | -48% |
| Kentucky | 92,279 | 57,520 | 46,053 | (11,467) | -20% |
| Louisiana | 52,010 | 19,271 | 29,249 | 9,978 | 52% |
| Maryland | 19,774 | 6,001 | 6,112 | 111 | 2% |
| Michigan | 77,893 | 52,829 | 37,739 | (15,090) | -29% |
| Mississippi | 28,039 | 14,759 | 12,162 | (2,597) | -18% |
| Missouri | 66,170 | 38,064 | 49,692 | 11,628 | 31% |
| New Jersey | 7,241 | 2,918 | 3,443 | 524 | 18% |
| New York | 27,379 | 10,191 | 11,253 | 1,062 | 10% |
| Ohio | 104,203 | 68,477 | 57,039 | (11,438) | -17% |
| Oklahoma | 80,936 | 32,366 | 21,761 | (10,606) | -33% |
| Pennsylvania | 153,563 | 95,828 | 37,148 | (58,680) | -61% |
| Tennessee | 27,000 | 14,798 | 18,201 | 3,402 | 23% |
| Texas | 148,473 | 112,670 | 109,914 | (2,756) | -2% |
| Virginia | 40,141 | 7,589 | 16,545 | 8,957 | 118% |
| West Virginia | 56,620 | 63,485 | 44,079 | (19,406) | -31% |
| Wisconsin | 31,881 | 15,374 | 17,856 | 2,482 | 16% |
| **CSAPR States** | **1,392,682** | **831,466** | **701,913** | **(129,553)** | **-16%** |

These data conclusively demonstrate that annual anthopogenic NOx emissions in the CSAPR Update region are projected to be significantly reduced through 2017, with overall actual EGU 2017 emissions being even lower than these estimates. Emission trends for these states have been deceasing for many years and will continue to decrease through at least 2023 as the result of nothing more than on-the-books controls.

4.    **Had current air modeling projections taken into account the significant emission reduction programs that are legally mandated to occur prior to 2023, even better air quality would have been demonstrated.**

The State of Maryland has identified[8] nine such programs that have been recommended by the OTC for implementation by its member states to reduce both $NO_X$ and VOC. These programs (set out below) have the potential to reduce a total of nearly 27,000 tons of ozone season $NO_X$ and 22,000 tons of ozone season VOC emission reductions.

**$NO_X$ and VOC Reduction Programs**

| OTC Model Control Measures | Regional Reductions (tons per year) | Regional Reductions (tons per day) |
|---|---|---|
| Aftermarket Catalysts | 14,983 ($NO_X$)<br>3,390 (VOC) | 41 ($NO_X$)<br>9 (VOC) |
| On-Road Idling | 19,716 ($NO_X$)<br>4,067 (VOC) | 54 ($NO_X$)<br>11 (VOC) |
| Nonroad Idling | 16,892 ($NO_X$)<br>2,460 (VOC) | 46 ($NO_X$)<br>7 (VOC) |
| Heavy Duty I & M | 9,326 ($NO_X$) | 25 ($NO_X$) |
| Enhanced SMARTWAY | 2.5% | |
| Ultra Low NOX Burners | 3,669 ($NO_X$) | 10 ($NO_X$) |
| Consumer Products | 9,729 (VOC) | 26 (VOC) |
| AIM | 26,506 (VOC) | 72 (VOC) |
| Auto Coatings | 7,711 (VOC) | 21 (VOC) |

Most recently, Maryland's 75 ppb Ozone Transport SIP dated July 25, 2018[9], confirms the additional emissions-reduction measures that Maryland has applied to such NOx sources as mobile sources, and industrial sources as well as several sources of VOCs. In addition, Maryland lists a series of "Voluntary/Innovative Control Measures" that it identifies as assisting in "the overall clean air goals in Maryland" although these measures have not been quantified.

---

[8] http://midwestozonegroup.com/files/MOG_May_7_Final_050515.pptx
[9] https://mde.maryland.gov/programs/Air/AirQualityPlanning/Documents/OzoneTransportSIP_2008/Proposed_MD0.075ppmOzoneTransportSIP%20.pdf

8

The Cabinet's proposal correctly notes on page 52 that there are several on-the-books NOx emission reductions programs that have not yet been included in the current modeling efforts related to 2023 ozone predictions. These programs, both individually and collectively, will have a material effect on predicted air quality, particularly in the East and in combination with other local control programs discussed elsewhere in these comments will almost certainly improve ozone predictions in 2023. Accounting for the programs and the related emission reductions at this time offers additional support for the Cabinet's conclusion that on-the-books control programs are all that is needed to address the 2015 ozone NAAQS.

**5.    Controls on local sources must be addressed first before any additional emission reductions can be imposed on sources in Kentucky.**

The Cabinet very properly has undertaken a review of monitors in each of Connecticut, the NY-NJ-CT Nonattainment Area, Maryland and Wisconsin and has noted the nonattainment designation status of each of those areas as well as their distance from Kentucky. This analysis also notes the significant impact of mobile sources including the very large amount of vehicle miles traveled. From this analysis it is apparent that Kentucky emissions have little impact on these areas. It is also apparent that significant remaining responsibility rests with the downwind nonattainment areas to address their own local sources.

When an area is measuring nonattainment of a NAAQS, as is the case with the areas linked to Kentucky, the Clean Air Act (CAA) requires that the effects and benefits of local controls on all source sectors be considered first, prior to pursuing controls of sources in upwind states. CAA §107(a) states that "[e]ach State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State." In addition, CAA §110(a)(1) requires that a state SIP "provides for implementation, maintenance, and enforcement" of the NAAQS "in each air quality control region . . . within such State." Moreover, by operation of law, additional planning and control requirements are applicable to areas that are designated to be in nonattainment.

This issue is important because upwind states must be confident this has occurred as they prepare to submit approvable Good Neighbor state implementation plans to address the 2015 ozone NAAQS. EPA's current interstate transport modeling platforms fails to incorporate local emission reductions programs that are required to improve ambient ozone concentration by 2023. Only through a full assessment of these local emissions reductions can EPA determine whether there are any bases for the imposition of additional emissions controls in upwind states. This is because additional control requirements in upwind states can only be legally imposed if, after consideration of local controls, there is a continuing nonattainment issue in downwind areas. [10]

The CAA addresses the affirmative obligations of the states to meet the deadlines for submittal and implementation of state implementation plans designed to specifically address their

---

[10] *EME Homer et.al. v EPA*, 134 S. Ct. at 1608.

degree of nonattainment designation.  Review of Section 172(c)(1) of the CAA provides that State Implementation Plans (SIPs) for nonattainment areas shall include "reasonably available control measures", including "reasonably available control technology" (RACT), for existing sources of emissions.  Section 182(a)(2)(A) requires that for Marginal Ozone nonattainment areas, states shall revise their SIPs to include RACT. Section 182(b)(2)(A) of the CAA requires that for Moderate Ozone nonattainment areas, states must revise their SIPs to include RACT for each category of VOC sources covered by a CTG document issued between November 15, 1990, and the date of attainment.  CAA section 182(c) through (e) applies this requirement to States with ozone nonattainment areas classified as Serious, Severe and Extreme.

The CAA also imposes the same requirement on States in ozone transport regions (OTR). Specifically, CAA Section 184(b) provides that a state in the Ozone Transport Region (OTR) must revise their SIPs to implement RACT with respect to all sources of VOCs in the state covered by a CTG issues before or after November 15, 1990.  CAA Section 184(a) establishes a single OTR comprised of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont and the Consolidated Metropolitan Statistical Area (CMSA) that includes the District of Columbia.

Given the significance of the need for local controls to address concern about any possible residual nonattainment area, MOG urges that this factor be considered as an additional factor supporting the conclusion that no further emission requirements are necessary to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I).

**6.    Consideration of international emissions also adds support to the conclusion that there is no further obligation to reduce emissions.**

As an integral part of the consideration of this proposal, MOG supports consideration of the impact of natural and manmade international emissions on the ultimate question of whether the downwind monitors can be properly considered either nonattainment or maintenance monitors.

The CAA addresses international emissions directly.  Section 179(B)(a) states that -

*(a) Implementation plans and revisions*

> *Notwithstanding any other provision of law, <u>an implementation plan or plan revision</u> required under this chapter shall be approved by the Administrator if—*
> *(1) such plan or revision <u>meets all the requirements applicable to it under the [11] chapter other than a requirement that such plan or revision demonstrate attainment and maintenance</u> of the relevant national ambient air quality standards by the attainment date specified under the applicable provision of this chapter, or in a regulation promulgated under such provision, and*

---

[11] So in original. Probably should be "this".

10

> *(2) the submitting State establishes to the satisfaction of the Administrator that <u>the</u>* *<u>implementation plan of such State would be adequate</u> to attain and maintain the relevant national ambient air quality standards by the attainment date specified under the applicable provision of this chapter, or in a regulation promulgated under such provision, <u>but for emissions emanating from outside of the United States</u>.*

In addition, addressing international emissions is particularly important to upwind states as they implement the requirements of CAA section 110(a)(2)(D)(i)(I).

The U.S. Supreme Court has ruled that it is essential that Good Neighbor states be required to eliminate only those amounts of pollutants that contribute to the nonattainment of NAAQS in downwind States. Specifically, the Supreme Court stated: "EPA cannot require a State to reduce its output of pollution by more than is necessary to achieve attainment in every downwind State. . ." *EPA v. EME Homer City Generation*, 134 S. Ct. 1584, 1608 (2014).

In addition, the D.C. Circuit has commented that ". . . the good neighbor provision requires upwind States to bear responsibility for their fair share of the mess in downwind States."[12] However, this "mess" seems to be related to international emissions for which upwind states and sources have no responsibility.

The D.C. Circuit has also stated "section 110(a)(2)(D)(i)(I) gives EPA no authority to force an upwind state to share the burden of reducing other upwind states' emissions," *North Carolina*, 531 F.3d at 921. Given this ruling by the Court it seems logical that the CAA would not require upwind states to offset downwind air-quality impacts attributable to other *countries'* emissions. Simply put, EPA over-controls a state if the state must continue reducing emissions *after* its linked receptors would attain in the absent of international emissions.

The Projected 2023 ozone design values (ppb) excluding the contribution from boundary condition, initial condition, Canadian and Mexican emission sources) shown below was prepared by Alpine Geophysics for MOG and depicts the projected 2023 8-hour ozone Design Values across the U.S. excluding the international emissions sector. The exclusion of international emissions was executed for all such emissions whether from international border areas or beyond. Note that this projection shows all monitors in the continental U.S. with a design value equal to or less than 56.6 ppb when international emissions are excluded. Modeling the U.S. emissions inventory projected to 2023 but without the impact of uncontrollable international emissions demonstrates that the CAA programs in the U.S. are performing as intended.

---

[12] *EME Homer City Generation, L.P. v EPA*, 696 F3.3d 7, 13 (D.C. Cir. 2012).

11



**Projected 2023 ozone design values (ppb) excluding the contribution from boundary condition, initial condition, Canadian and Mexican emission sources**



In addition to changing emissions resulting from growth and control in the continental U.S., EPA has identified updated projected emissions in both Canada and Mexico that have been integrated into the modeling platform used in this modeling.[13]  EPA's modeling boundary conditions, however, have been held constant at 2011 levels.  This is inconsistent with recent publications that indicate emissions from outside of the U.S., specifically contributing to international transport, are on the rise.[14]

In support of conclusion that boundary conditions are significantly impacted by international emissions, the following chart illustrates that 89% of the emissions being modeled to establish boundary conditions are related to international sources.[15]

---

[13] EPA-HQ-OAR-2016-0751-0009.

[14] Atmos. Chem. Phys., 17, 2943–2970(2017).

[15] European Commission, Joint Research Centre (JRC)/PBL Netherlands Environmental Assessment Agency. Emission Database for Global Atmospheric Research (EDGAR), https://protect-us.mimecast.com/s/N-G6CERPwVI3vMWjhNVQlp?domain=edgar.jrc.ec.europa.eu

**Relative International NOx Emissions (% of Total) Used to Inform Global Model Boundary Concentrations of Ozone**



There can be no doubt that international emissions have a significant impact on ozone measurements at all monitors related to this proposal. MOG urges that the Cabinet not only recognize (as it does on page 53 of its proposal) that consideration of the Canada/Mexico component of the Alpine Geophysics modeling is all that is needed to bring the Harford Maryland monitor into attainment, but also that but for international emissions there would be no downwind problems areas at all and therefore no need to for additional action to be undertaken to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I).

## 7.    Mobile sources have the most significant impact on ozone concentrations at the problem monitors identified in the Cabinet's proposal.

As the Cabinet points out in its proposal, it must be recognized that it is emissions from mobile, including both on-road and non-road, and local area sources that have the most significant impact on ozone concentrations and the problem monitors identified in this proposal.

EPA itself recently recognized the significance of mobile source emissions in preamble to its full remedy proposal. There EPA stated:

> *Mobile sources also account for a large share of the NOx emissions inventory (i.e., about 7.3 million tons per year in the 2011 base year, which represented more than 50% of continental U.S. NOx emissions), and the EPA recognizes that emissions reductions achieved from this sector as well can reduce transported ozone pollution. The EPA has national programs that serve to reduce emissions from all contributors to the mobile source inventory (i.e., projected NOx emissions reductions of about 4.7 million tons per year between the*

13

*2011 base year and the 2023 future analytical year). A detailed discussion of the EPA's mobile source emissions reduction programs can be found at www.epa.gov/otaq.*

*In light of the regional nature of ozone transport discussed herein, and given that NOx emissions from mobile sources are being addressed in separate national rules, in the CSAPR Update (as in previous regional ozone transport actions) the EPA relied on regional analysis and required regional ozone season NOx emissions reductions from EGUs to address interstate transport of ozone.*

83 Federal Register 31918.

We strongly agree that mobile source emissions are the dominant contributor to predicted ozone concentrations across the nation. At the request of MOG, Alpine Geophysics has examined not only the relative contribution of mobile and local area sources to problem monitors but also how a small reduction in these emissions could bring about significant additional reductions in ozone concentrations.

The following table presents the annual mobile source NOx emission totals (onroad plus nonroad) for eastern states as presented in the final CSAPR update emission summary files[16]. As can been seen in this table, consistent with EPA's national assessment of mobile source emissions, annual mobile source NOx emissions in this region comprise 51%, 41%, and 33% of the annual anthropogenic emission totals for 2011, 2017, and 2023, respectively.

---

[16] ftp://ftp.epa.gov/EmisInventory/2011v6/v3platform/reports/

**Eastern State Mobile Source NOx Emissions (Annual Tons).**

| State | Annual Anthropogenic NOx Emissions (Tons) | | | Annual Mobile Source NOx Emissions (Tons) | | | Mobile Sources as % of All Annual Emissions (%) | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2017 | 2023 | 2011 | 2017 | 2023 | 2011 | 2017 | 2023 |
| Alabama | 359,797 | 220,260 | 184,429 | 175,473 | 88,094 | 54,104 | 49% | 40% | 29% |
| Arkansas | 232,185 | 168,909 | 132,148 | 113,228 | 68,949 | 44,583 | 49% | 41% | 34% |
| Connecticut | 72,906 | 46,787 | 37,758 | 49,662 | 26,954 | 18,718 | 68% | 58% | 50% |
| Delaware | 29,513 | 18,301 | 14,511 | 17,788 | 10,387 | 6,819 | 60% | 57% | 47% |
| District of Columbia | 9,404 | 6,052 | 4,569 | 7,073 | 3,947 | 2,500 | 75% | 65% | 55% |
| Florida | 609,609 | 410,536 | 323,476 | 406,681 | 232,319 | 153,275 | 67% | 57% | 47% |
| Georgia | 451,949 | 295,397 | 236,574 | 267,231 | 147,690 | 90,541 | 59% | 50% | 38% |
| Illinois | 506,607 | 354,086 | 293,450 | 261,727 | 166,393 | 114,243 | 52% | 47% | 39% |
| Indiana | 444,421 | 317,558 | 243,954 | 218,629 | 122,633 | 76,866 | 49% | 39% | 32% |
| Iowa | 240,028 | 163,126 | 124,650 | 132,630 | 82,212 | 53,712 | 55% | 50% | 43% |
| Kansas | 341,575 | 270,171 | 172,954 | 115,302 | 68,491 | 43,169 | 34% | 25% | 25% |
| Kentucky | 327,403 | 224,098 | 171,194 | 139,866 | 80,244 | 50,633 | 43% | 36% | 30% |
| Louisiana | 535,339 | 410,036 | 373,849 | 117,529 | 67,331 | 43,962 | 22% | 16% | 12% |
| Maine | 59,838 | 42,918 | 32,186 | 34,933 | 18,380 | 12,240 | 58% | 43% | 38% |
| Maryland | 165,550 | 108,186 | 88,383 | 103,227 | 60,164 | 38,922 | 62% | 56% | 44% |
| Massachusetts | 136,998 | 90,998 | 73,082 | 83,398 | 45,031 | 30,508 | 61% | 49% | 42% |
| Michigan | 443,936 | 296,009 | 228,242 | 250,483 | 135,434 | 88,828 | 56% | 46% | 39% |
| Minnesota | 316,337 | 216,925 | 174,797 | 176,424 | 102,728 | 65,868 | 56% | 47% | 38% |
| Mississippi | 205,800 | 128,510 | 105,941 | 108,198 | 57,751 | 34,561 | 53% | 45% | 33% |
| Missouri | 376,256 | 237,246 | 192,990 | 219,505 | 122,137 | 75,380 | 58% | 51% | 39% |
| Nebraska | 217,427 | 159,062 | 119,527 | 88,985 | 55,067 | 35,556 | 41% | 35% | 30% |
| New Hampshire | 36,526 | 22,413 | 18,794 | 24,919 | 14,780 | 10,322 | 68% | 66% | 55% |
| New Jersey | 191,035 | 127,246 | 101,659 | 133,073 | 75,538 | 51,231 | 70% | 59% | 50% |
| New York | 388,350 | 264,653 | 230,001 | 224,454 | 130,023 | 92,171 | 58% | 49% | 40% |
| North Carolina | 369,307 | 231,783 | 167,770 | 250,549 | 114,952 | 70,812 | 68% | 50% | 42% |
| North Dakota | 163,867 | 135,009 | 128,864 | 57,289 | 37,071 | 23,956 | 35% | 27% | 19% |
| Ohio | 546,547 | 358,107 | 252,828 | 311,896 | 168,799 | 100,058 | 57% | 47% | 40% |
| Oklahoma | 427,278 | 308,622 | 255,341 | 139,550 | 79,830 | 50,525 | 33% | 26% | 20% |
| Pennsylvania | 562,366 | 405,312 | 293,048 | 249,792 | 135,765 | 81,645 | 44% | 33% | 28% |
| Rhode Island | 22,429 | 15,868 | 12,024 | 13,689 | 7,705 | 5,209 | 61% | 49% | 43% |
| South Carolina | 210,489 | 134,436 | 104,777 | 132,361 | 73,359 | 44,886 | 63% | 55% | 43% |
| South Dakota | 77,757 | 49,014 | 37,874 | 48,499 | 30,473 | 19,685 | 62% | 62% | 52% |
| Tennessee | 322,578 | 209,873 | 160,166 | 213,748 | 122,738 | 77,135 | 66% | 58% | 48% |
| Texas | 1,277,432 | 1,042,256 | 869,949 | 554,463 | 292,609 | 189,601 | 43% | 28% | 22% |
| Vermont | 19,623 | 14,063 | 10,792 | 14,031 | 8,569 | 5,958 | 72% | 61% | 55% |
| Virginia | 313,848 | 199,696 | 161,677 | 179,996 | 108,175 | 67,678 | 57% | 54% | 42% |
| West Virginia | 174,219 | 160,102 | 136,333 | 48,294 | 27,487 | 17,494 | 28% | 17% | 13% |
| Wisconsin | 268,715 | 178,927 | 140,827 | 167,753 | 100,814 | 67,201 | 62% | 56% | 48% |
| **Eastern US Total** | **11,455,243** | **8,042,552** | **6,411,386** | **5,852,332** | **3,291,024** | **2,110,555** | **51%** | **41%** | **33%** |

Additionally, when source apportionment is applied to many of the problem monitors in the northeastern states, a distinct signal of mobile and local area source contribution to future year ozone concentrations is demonstrated.

15

Using the Harford, MD (240251001) monitor as an example and the 2023 4km modeling and source apportionment methods outlined elsewhere[17], it can be seen in the following table and figure that area, nonroad, marine/air/rail (MAR) and onroad mobile source emission from within Maryland itself dominate the relative contribution to projected nonattainment.

### Relative Contribution of Source Regions and Categories to Harford, MD Monitor.

| Monitor | 240251001 Harford, Maryland | | | | | | Final CSAPR DV | | 71.1 |
|---|---|---|---|---|---|---|---|---|---|
| | | | 2023 OSAT Results (Modeled ppb) -- MATS/Top 10 Future Method | | | | | | |
| Region | Bio/Fire | Motor Vehicle | Area/NR/MAR | EGU Point | NonEGU Point | Other | Boundary | Initial | Total Anthro |
| CT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| DE | 0.02 | 0.01 | 0.02 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.05 |
| MD | 3.41 | 5.09 | 14.99 | 2.39 | 1.55 | 0.00 | 0.00 | 0.00 | 23.96 |
| NJ | 0.01 | 0.01 | 0.01 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.04 |
| NY | 0.01 | 0.01 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 |
| PA | 0.53 | 0.34 | 0.92 | 1.13 | 0.32 | 0.00 | 0.00 | 0.00 | 2.71 |
| VA/DC | 1.37 | 1.40 | 1.79 | 0.67 | 0.27 | 0.00 | 0.00 | 0.00 | 4.13 |
| IL | 0.32 | 0.17 | 0.33 | 0.34 | 0.22 | 0.00 | 0.00 | 0.00 | 1.06 |
| IN | 0.41 | 0.40 | 0.44 | 0.68 | 0.32 | 0.00 | 0.00 | 0.00 | 1.84 |
| MI | 0.06 | 0.07 | 0.11 | | | 0.01 | 0.00 | 0.00 | 0.27 |
| OH | 0.77 | 0.66 | 0.86 | 1.12 | 0.40 | 0.00 | 0.00 | 0.00 | 3.03 |
| WV | 0.81 | 0.24 | 1.15 | 0.74 | 0.41 | 0.00 | 0.00 | 0.00 | 2.55 |
| KY | 0.62 | 0.53 | 0.84 | 0.38 | 0.34 | 0.00 | 0.00 | 0.00 | 2.09 |
| TX | 0.29 | 0.14 | 0.44 | 0.16 | 0.15 | 0.03 | 0.00 | 0.00 | 0.89 |
| Can/Mex | 0.14 | 0.01 | 0.01 | 0.01 | 0.01 | 0.40 | 0.00 | 0.00 | 0.04 |
| IC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 |
| BC | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.34 | 0.00 | 0.00 |



When focusing only on the anthropogenic contribution from the significant contributing states (1% of NAAQS or greater than or equal to 0.70 ppb), area/nonroad/MAR categories demonstrate more than half (51%; 35% from Maryland) of the total significant contribution from these states. As is shown in the following pie chart, an additional 21% of projected ozone from significant contributing state anthropogenic categories is estimated from onroad motor vehicle

---

[17] "Good Neighbor" Modeling for the 2008 8-Hour Ozone State Implementation Plans, Final Modeling Report, by Alpine Geophysics, LLC, December 2017
(http://www.midwestozonegroup.com/files/Ozone_Modeling_Results_Supporting_GN_SIP_Obligations_Final_Dec_2017_.pdf.

emissions. Of this 21%, 12% is estimated from onroad mobile source emissions originating in Maryland.

**Relative Contribution of Anthropogenic Emission Categories in 2023 from Significant Contributing States to Harford, MD Monitor.**



To further the assessment of which regions and categories have the greatest impact on this monitor's future year ozone concentration, a review of the modeling platform used in the 4km modeling develops relationships between the State-source category specific OSAT modeling and the seasonal NOx emissions used to develop the ozone concentrations. Using monthly, county and source category specific emissions published by EPA[18], relational "impact factors" were developed using these data.

This value represents the relative contribution of modeled emissions (tons) to resultant ozone concentrations (in ppb).

Impact Factor (ppb/ton) = OSAT Contribution (ppb) / Emissions (tons)

---

[18] ftp://ftp.epa.gov/EmisInventory/2011v6/v3platform/reports/2011en_and_2023en/

A primary purpose for this calculation is to determine, at each monitor, from where and what source category, on a ppb per ton basis, we see the greatest relative contribution. In other words, to determine which source category, and from what state, has the greatest per ton NOx contribution to the monitor's modeled ozone concentrations.

After this calculation was conducted for each monitor, results to the maximum individual state/category contributor were normalized, so that in the comparisons, it could easily be identified the greatest ppb per ton state/source category and provide an easy way of determining which categories have greater relative impact compared to all others.

The chart below provides this normalized comparison of significant contributing state-category combinations to the Harford, MD monitor.



In addition to recognizing the usefulness of this impact factor in determining which states and categories are the largest ppb/ton contributors to each monitor, the results may be used to assist in the development of control strategies and their relative impact on ozone concentrations at various locations.

As a further example using these impact factor calculations, and similar to EPA methods[19] with the Air Quality Assessment Tool, assuming a linear relationship of NOx emissions to ozone concentrations at low emission changes, we estimate that a 1.5% NOx emission reduction in Maryland's area, nonroad, and MAR category (226 NOx tons per ozone season) would have enough associated ozone concentration reduction (0.20 ppb) to bring the noted monitor into attainment at 70.9 ppb. Similarly, a reduction of 4% (or 426 tons NOx/ozone season) from onroad mobile source

---

[19] https://www.epa.gov/sites/production/files/2017-05/documents/ozone_transport_policy_analysis_final_rule_tsd.pdf

NOx emissions in Maryland alone would have the same ozone concentration impact (0.20 ppb). This compares to a 7% reduction from EGUs in all the other non-Maryland significant contributing states (PA, VA, DC, IL, IN, OH, WV, KY, and TX) and would be equivalent to an estimated 11,887 tons NOx per ozone season reduction from these sources.

The regulation of mobile sources is specifically addressed in the CAA section 209, which provides guidance on the management roles of mobile sources for the federal government, California and other states. Section 209(a) opens with the statement concerning on-road engines and vehicles, "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." Relative to non-road engines or vehicles, CAA 209(e) provides similar language.

The exception to these prohibitions is set forth in CAA §177 for California and any other state that chooses to adopt an "EPA-approved California control on emissions of new motor vehicles or engines." Regulation of new mobile-source emissions has been principally federally- driven, but states continue to have a role. *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1079 (D.C. Cir. 1996). The CAA §209(d) preserves the authority of the states to control, regulate, or restrict the use, operations, or movement of registered or licensed motor vehicles. The D.C. Circuit has interpreted this as maintaining state power to regulate pollution from motor vehicles once they are no longer new; for instance, through in-use regulations such as car pools and other incentive programs. *Id.* In response to the D.C. Circuit opinion, EPA clarified its position relative to state non-road regulatory authority in 40 CFR 89, Subpart A, Appendix A - State Regulation of Nonroad Internal Combustion Engines as follows:

EPA believes that states are not precluded under section 209 from regulating the use and operation of nonroad engines, such as regulations on hours of usage, daily mass emission limits, or sulfur limits on fuel; nor are permits regulating such operations precluded, once the engine is no longer new. EPA believes that states are precluded from requiring retrofitting of used nonroad engines except that states are permitted to adopt and enforce any such retrofitting requirements identical to California requirements which have been authorized by EPA under section 209 of the Clean Air Act. [62 FR 67736, Dec. 30, 1997]

Given the dominant role of mobile sources in impacting on ozone air quality, MOG urges that the Cabinet offer as an additional basis for its SIP that additional local mobile source controls in downwind states are necessary before requiring additional emission reductions from upwind states such as Kentucky. We urge that downwind states take full advantage of all of the authority provided to each of them under the CAA and to reduce mobile source emissions appropriately to assure continued attainment with the 2015 ozone NAAQS.

8.    **2023 is the appropriate year for assessing Good Neighbor SIP requirements related to the 2015 ozone NAAQS.**

19

It is appropriate for the modeling results relied upon by the Cabinet to have been based on 2023 as the future analytic year. That year was selected by EPA as the basis for its modeling "because it aligns with the anticipated attainment year for the Moderate ozone nonattainment areas".[20] Indeed, 2023 aligns with the last full ozone season before the attainment year for Moderate ozone nonattainment areas.

**9.  The Cabinet is correct in calling for the application of an alternative significance threshold.**

For many months, EPA has had under consideration the appropriateness of the use of its 1% significance test to determine whether an upwind state significantly contributes to downwind non-attainment or interference with downwind maintenance areas. While EPA's March 27, 2018 memo related to interstate transport state implementation plan submission involving the 2015 ozone NAAQS provides a set of contributions by upwind states to downwind states, that data is not based on a particular significance threshold.[21] Indeed, that memo identifies the significance threshold as one of the flexibilities that a state may wish to consider in the development of its Good Neighbor SIP. Specifically, EPA offers the following description of this flexibility:

> "Consideration of different contribution thresholds for different regions based on regional differences in the nature and extent of the transport problem."

In commenting on this flexibility, states have made the point that the significant contribution threshold of 1% of the NAAQS (0.70 ppb for the 2015 ozone NAAQS) value is arbitrary and is not supported by scientific argument.[22]

On August 31, 2018, EPA issued significant new guidance in which it analyzed 1 ppb and 2 ppb alternatives to the 1% significance level that it has historically used.[23] In that memo, EPA offers the following statement:

> Based on the data and analysis summarized here, the EPA believes that a threshold of 1 ppb may be appropriate for states to use to develop SIP revisions addressing the good neighbor provisions for the 2015 ozone NAAQS.

---

[20] *Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I),* prepared by Peter Tsirigotis, March 27, 2018, p. 3. https://www.epa.gov/airmarkets/march-2018-memo-and-supplemental-information-regarding-interstate-transport-sips-2015.

[21] *Id* at p. A-2.

[22] Georgia EPD Comments on EPA's March 27, 2018 Interstate Transport Memo, J.W. Boylan, Air Protection Branch, George EPD, May 4, 2018. https://www.epa.gov/sites/production/files/2018-08/documents/ga_epd_comments_on_epa_march_27_2018_ozone_transport_memo.pdf.

[23] *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards,* Peter Tsirigotis, August 31, 2018. https://www.epa.gov/sites/production/files/2018-09/documents/contrib_thresholds_transport_sip_subm_2015_ozone_memo_08_31_18.pdf.

In reaching its conclusion that a 2 ppb threshold was not recommended, EPA compared the 2 ppb alternative to the 1 ppb alternative using data which averaged all receptors outside California. In that circumstance, EPA determined that using a 1 ppb threshold captures 86 percent of the net contribution captured using a 1% threshold whereas a 2 ppb threshold captures only half of the net contribution using 1%. A different picture is presented, however, when the receptors east of the Mississippi River (involving the states of Connecticut, Maryland, Michigan, New York and Wisconsin) are considered separately from the states of Arizona, Colorado and Texas. In that case, use a 1 ppb threshold captures 92% of the net contribution captured using a 1% threshold compared with 78% for the 2 ppb threshold.

In the case of either a 1 ppb threshold or a 2 ppb threshold, a significant reduction in downwind linkages occurs.

The following chart compares all three alternatives when applied to EPA's modeling result:

| EPA Identified Nonattainment Site ID | State | County | Ozone Concentration (ppb) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2009-2013 Avg DV | 2023 Avg DV | Contrib from Upwind 1% | Contrib from Upwind 1ppb | Contrib from Upwind 2ppb | % of 1ppb from 1% | % of 2ppb from 1% |
| 90013007 | Connecticut | Fairfield | 84.3 | 71.0 | 36.91 | 33.63 | 27 38 | 91% | 74% |
| 90019003 | Connecticut | Fairfield | 83.7 | 73.0 | 38.55 | 36.93 | 32.28 | 96% | 84% |
| 361030002 | New York | Suffolk | 83.3 | 74.0 | 22 31 | 18.74 | 15.74 | 84% | 71% |
| 480391004 | Texas | Brazoria | 88.0 | 74.0 | 7 48 | 4.80 | 3.80 | 64% | 51% |
| 484392003 | Texas | Tarrant | 87.3 | 72.5 | 4.20 | 3.42 | 0.00 | 81% | 0% |
| 550790085 | Wisconsin | Milwaukee | 80.0 | 71.2 | 28.45 | 23.61 | 22 39 | 83% | 79% |
| 551170006 | Wisconsin | Sheboygan | 84.3 | 72.8 | 31.62 | 29.02 | 24.90 | 92% | 79% |

The results of the same comparison when applied to the LADCO modeling results are set forth in the following chart:

| LADCO Identified Nonattainment Monitor | State | County | Ozone Concentration (ppb) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2023 Avg DV | Contrib from Upwind 1% | Contrib from Upwind 1ppb | Contrib from Upwind 2ppb | % of 1ppb from 1% | % of 2ppb from 1% |
| 90019003 | Connecticut | Fairfield | 71.4 | 36.15 | 34.51 | 28.21 | 95% | 78% |
| 240251001 | Maryland | Harford | 71.0 | 19.9 | 17.51 | 14.56 | 88% | 73% |
| 361030002 | New York | Suffolk | 71.6 | 20.85 | 17.42 | 14.6 | 84% | 70% |
| 480391004 | Texas | Brazoria | 74.1 | 7.45 | 4.65 | 3.62 | 62% | 49% |
| 484392003 | Texas | Tarrant | 72.6 | 4.99 | 3.4 | 0 | 68% | 0% |
| 482011039 | Texas | Harris | 71.7 | 8.14 | 5.64 | 4.5 | 69% | 55% |

The results of the same comparison for the MOG modeling results are set forth in the following chart:

| MOG Identified Nonattainment Site ID | State | County | Ozone Concentration (ppb) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | 2009-2013 Avg DV | 2023 Avg DV | Contrib from Upwind 1% | Contrib from Upwind 1ppb | Contrib from Upwind 2ppb | % of 1ppb from 1% | % of 2ppb from 1% |
| 90010017 | Connecticut | Fairfield | 80.3 | 69.2 | 26.85 | 25.98 | 21.68 | 97% | 81% |
| 90013007 | Connecticut | Fairfield | 84.3 | 69.7 | 23.91 | 23.04 | 18.57 | 96% | 78% |
| 90019003 | Connecticut | Fairfield | 83.6 | 69.9 | 27.78 | 26.12 | 21.49 | 94% | 77% |
| 90110124 | Connecticut | New London | 80.3 | 68.2 | 19.60 | 17.86 | 12.98 | 91% | 66% |
| 90099002 | Connecticut | New Haven | 85.7 | 70.3 | 21.08 | 17.92 | 15.04 | 85% | 71% |
| 240251001 | Maryland | Harford | 90.0 | 71.1 | 17.99 | 17.09 | 14.23 | 95% | 79% |
| 340150002 | New Jersey | Gloucester | 84.3 | 68.8 | 30.27 | 30.27 | 20.92 | 100% | 69% |
| 360850067 | New York | Richmond | 81.3 | 69.6 | 29.17 | 26.64 | 20.29 | 91% | 70% |
| 361030002 | New York | Suffolk | 83.3 | 70.7 | 22.52 | 19.85 | 14.50 | 88% | 64% |
| 421010024 | Pennsylvania | Philadelphia | 83.3 | 68.0 | 18.65 | 15.91 | 8.54 | 85% | 46% |

In the case of Kentucky, EPA's modeling data below show that at the 1% threshold, Kentucky would be linked to 4 non-attainment monitors and one maintenance monitor. Applying the 1 ppb threshold to this data would eliminate any linkage to non-attainment monitor reduce to 1 the linkage to any maintenance monitor. Moving to the 2 ppb threshold would completely eliminate all linkage to any non-attainment or maintenance monitor.

| EPA Identified Nonattainment Site ID | State | County | Ozone (ppb) | | Significant Contribution (ppb) | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2009-2013 Avg DV (ppb) | 2023 Avg DV (ppb) | AR | IL | IN | IA | KY | LA | MD | MI | MO | NJ | NY | OH | OK | PA | TX | VA | WV | WI |
| 90013007 | Connecticut | Fairfield | 84.3 | 71.0 | 0.13 | 0.72 | 0.97 | 0.16 | 0.89 | 0.11 | 1.8 | 0.7 | 0.38 | 6.94 | 14.12 | 1.84 | 0.21 | 6.32 | 0.44 | 1.51 | 1.1 | 0.24 |
| 90019003 | Connecticut | Fairfield | 83.7 | 73.0 | 0.13 | 0.67 | 0.83 | 0.17 | 0.79 | 0.11 | 2.17 | 0.63 | 0.37 | 7.75 | 15.8 | 1.6 | 0.21 | 6.56 | 0.45 | 1.91 | 1.14 | 0.2 |
| 361030002 | New York | Suffolk | 83.3 | 74.0 | 0.12 | 0.64 | 0.69 | 0.2 | 0.49 | 0.13 | 1.24 | 0.94 | 0.39 | 8.88 | 18.11 | 1.76 | 0.34 | 6.86 | 0.6 | 0.99 | 0.81 | 0.25 |
| 480391004 | Texas | Brazoria | 88.0 | 74.0 | 0.9 | 1.1 | 0.32 | 0.4 | 0.14 | 3.8 | 0 | 0.22 | 0.88 | 0 | 0 | 0.06 | 0.9 | 0.01 | 26 | 0.02 | 0.02 | 0.4 |
| 484392003 | Texas | Tarrant | 87.3 | 72.5 | 0.78 | 0.29 | 0.18 | 0.19 | 0.13 | 1.71 | 0.01 | 0.13 | 0.38 | 0 | 0.01 | 0.1 | 1.71 | 0.05 | 27.64 | 0.05 | 0.05 | 0.13 |
| 550790085 | Wisconsin | Milwaukee | 80.0 | 71.2 | 0.4 | 15.1 | 5.28 | 0.79 | 0.77 | 0.72 | 0.03 | 2.01 | 0.93 | 0 | 0.02 | 0.87 | 0.76 | 0.33 | 1.22 | 0.12 | 0.59 | 15.39 |
| 551170006 | Wisconsin | Sheboygan | 84.3 | 72.8 | 0.51 | 15.73 | 7.11 | 0.45 | 0.81 | 0.84 | 0.03 | 2.06 | 1.37 | 0 | 0.02 | 1.1 | 0.95 | 0.41 | 1.65 | 0.1 | 0.64 | 9.09 |

| EPA Identified Maintenance Site ID | State | County | 2009-2013 Max DV (ppb) | 2023 Max DV (ppb) | Significant Contribution (ppb) | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | AR | CT | IL | IN | IA | KS | KY | LA | MD | MI | MS | MO | NJ | NY | OH | OK | PA | TX | VA | WV | WI |
| 90010017 | Connecticut | Fairfield | 83.0 | 71.2 | 0.07 | 8.7 | 0.39 | 0.44 | 0.11 | 0.09 | 0.34 | 0.05 | 1.18 | 0.5 | 0.03 | 0.21 | 6.24 | 17.31 | 1.04 | 0.15 | 5.11 | 0.3 | 1.77 | 0.68 | 0.26 |
| 90099002 | Connecticut | New Haven | 89.0 | 72.6 | 0.08 | 9.1 | 0.46 | 0.5 | 0.16 | 0.14 | 0.32 | 0.08 | 1.47 | 0.73 | 0.04 | 0.29 | 5.06 | 15.03 | 1.17 | 0.24 | 4.87 | 0.41 | 1.26 | 0.61 | 0.25 |
| 240251001 | Maryland | Harford | 93.0 | 73.3 | 0.17 | 0 | 0.84 | 1.35 | 0.23 | 0.23 | 1.52 | 0.19 | 22.6 | 0.79 | 0.08 | 0.59 | 0.07 | 0.16 | 2.77 | 0.35 | 4.32 | 0.74 | 5.06 | 2.78 | 0.24 |
| 260050003 | Michigan | Allegan | 86.0 | 71.7 | 1.64 | 0 | 19.62 | 7.11 | 0.77 | 0.77 | 0.58 | 0.7 | 0.01 | 3.32 | 0.4 | 2.61 | 0 | 0 | 0.19 | 1.31 | 0.05 | 2.39 | 0.04 | 0.11 | 1.95 |
| 261630019 | Michigan | Wayne | 81.0 | 71.0 | 0.27 | 0 | 2.37 | 2.51 | 0.44 | 0.44 | 0.65 | 0.22 | 0.02 | 20.39 | 0.09 | 0.92 | 0.01 | 0.06 | 3.61 | 0.62 | 0.18 | 1.12 | 0.16 | 0.23 | 1.08 |
| 360810124 | New York | Queens | 80.0 | 72.0 | 0.09 | 0.57 | 0.73 | 0.69 | 0.26 | 0.19 | 0.42 | 0.13 | 1.56 | 1.76 | 0.04 | 0.38 | 8.57 | 13.55 | 1.88 | 0.32 | 7.16 | 0.58 | 1.56 | 1.01 | 0.38 |
| 481210034 | Texas | Denton | 87.0 | 72.0 | 0.58 | 0 | 0.23 | 0.16 | 0.1 | 0.4 | 0.11 | 1.93 | 0.01 | 0.08 | 0.33 | 0.24 | 0 | 0.01 | 0.08 | 1.22 | 0.04 | 26.69 | 0.05 | 0.04 | 0.08 |
| 482010024 | Texas | Harris | 83.0 | 72.8 | 0.29 | 0 | 0.34 | 0.13 | 0.17 | 0.17 | 0.1 | 3.06 | 0 | 0.06 | 0.5 | 0.38 | 0 | 0 | 0.05 | 0.2 | 0.02 | 25.62 | 0.06 | 0.05 | 0.07 |
| 482011034 | Texas | Harris | 82.0 | 71.6 | 0.54 | 0 | 0.51 | 0.12 | 0.27 | 0.32 | 0.05 | 3.38 | 0 | 0.17 | 0.39 | 0.63 | 0 | 0 | 0.05 | 0.68 | 0.01 | 25.66 | 0.03 | 0.03 | 0.22 |
| 482011039 | Texas | Harris | 84.0 | 73.5 | 0.99 | 0 | 0.88 | 0.24 | 0.33 | 0.33 | 0.11 | 4.72 | 0 | 0.27 | 0.79 | 0.88 | 0 | 0 | 0.05 | 0.58 | 0.01 | 22.83 | 0.02 | 0.01 | 0.28 |

We urge the Cabinet to carefully evaluate these additional flexibilities as further support for the conclusion that Kentucky has already satisfied the requirements of CAA section 110(a)(2)(D)(i)(I).

**10.    An important flexibility that should be considered is an alternative method for determining which monitors should be considered "maintenance" monitors.**

Historically, the CSAPR Update methodology has been to address "interference with maintenance." This approach is, however, not only inconsistent with the CAA, but also inconsistent with both the U.S. Supreme Court and D.C. Circuit decisions on CSAPR. Upon consideration of the

reasonableness test, EPA's emphasis upon the single maximum design value to determine a maintenance problem for which sources (or states) must be accountable creates a default assumption of contribution. A determination that the single highest modeled maximum design value is appropriate for the purpose to determining contribution to interference with maintenance is not reasonable either mathematically, in fact, or as prescribed by the Clean Air Act or the U.S. Supreme Court. The method chosen by EPA must be a "permissible construction of the Statute."

The U.S. Supreme Court in *EPA v. EME Homer City* explains the maintenance concept set forth in the Good Neighbor Provision as follows:

> Just as EPA is constrained, under the first part of the Good Neighbor Provision, to eliminate only those amounts that "contribute…to *nonattainment*," EPA is limited, by the second part of the provision, to reduce only by "amounts" that "interfere with *maintenance,* " *i.e.* by just enough to permit an already-attaining State to maintain satisfactory air quality."[24]

Relative to the reasonableness of EPA's assessment of contribution, the U.S. Supreme Court also provides,

> The Good Neighbor Provision . . . prohibits only upwind emissions that contribute significantly to downwind nonattainment. EPA's authority is therefore limited to eliminating . . . the overage caused by the collective contribution . . ."[25] (Emphasis added.)

EPA's use of a modeled maximum design value, when the average design value is below the NAAQS, to define contribution, results in a conclusion that any modeled contribution is deemed to be a significant interference with maintenance. This concept is inconsistent with the Clean Air Act and the U.S. Supreme Court's assessment of its meaning.

As noted by the D.C. Circuit in the 2012 lower case of *EME Homer City v. EPA*, "The good neighbor provision is not a free-standing tool for EPA to seek to achieve air quality levels in downwind States that are *well below* the NAAQS."[26] "EPA must avoid using the good neighbor provision in a manner that would result in unnecessary over-control in the downwind States. Otherwise, EPA would be exceeding its statutory authority, which is expressly tied to achieving attainment in the downwind States."[27]

The Texas Commission on Environmental Quality (TCEQ) introduced in its 2015 Ozone NAAQS Transport SIP Revision 28 an approach for identifying maintenance monitors that differs from the approach used by the EPA in CSAPR and the 2015 Transport NODA. The EPA used the maximum of the three consecutive regulatory design values containing the base year as the base year

---

[24] 134 S. Ct. at 1064, Ftn 18.

[25] *Id.* at 1604.

[26] *EME Homer City v. EPA*, 696 F.3d 7, 22 (D.C. Cir 2012).

[27] *Id.*

23

design value (DV$_b$) to identify maintenance monitors. Both the EPA's approach and the TCEQ's approach account for three years of meteorological variability in their choice of DV$_b$ to identify maintenance monitors since a single design value is a three-year average of the annual fourth-highest MDA8 ozone concentration. The EPA's approach is to choose the maximum of the three consecutive regulatory design values containing the base year as the DV$_b$ while the TCEQ's approach is to choose the latest of the three consecutive regulatory design values containing the base year as the DV$_b$. For the reasons described in TCEQ's SIP revision, the TCEQ determined that the selection of the most recent DV$_b$ addresses all issues relevant for an independent assessment of maintenance; and therefore, provides a comprehensive assessment of the potential impacts of Texas emissions on potential maintenance monitors.

We urge that the Cabinet offer this alternative calculation of maintenance monitors as an additional statement of the conservative nature of its conclusions that no further action on the part of Kentucky is needed to address the requirements of CAA section 110(a)(2)(D)(i)(I).

**11.    In the development of its Good Neighbor SIP, maintenance areas should not be given the same weight and status as nonattainment areas.**

Maintenance areas should not be subject to the same "significance" test as is applied to nonattainment areas. Maintenance areas do not require the same emission reduction requirements as nonattainment areas, and therefore, require different management. The Cabinet's proposal at page 55, correctly summarizes as follows the manner in which its proposal must address interfere with maintenance:

> *The "interfere with maintenance" prong of the statute is not an open-ended invitation for EPA to impose reductions on upwind states. Rather, it is a "carefully calibrated and commonsense supplement to the "contribute significantly" requirement.*

The U.S. Supreme Court opinion in *EPA v. EME Homer City* offered the following on "interference with maintenance,"

> The statutory gap identified also exists in the Good Neighbor Provision's second instruction. That instruction requires EPA to eliminate amounts of upwind pollution that "interfere with maintenance" of a NAAQS by a downwind State. §7410(a)(2)(D)(i). This mandate contains no qualifier analogous to "significantly," and yet it entails a delegation of administrative authority of the same character as the one discussed above. Just as EPA is constrained, under the first part of the Good Neighbor Provision, to eliminate only those amounts that "contribute . . . to *nonattainment*," EPA is limited, by the second part of the provision, to reduce only by "amounts" that "interfere with *maintenance,*" i.e., by just enough to permit an already-attaining State to maintain satisfactory air quality. (Emphasis added). With multiple

---

[28] https://www.tceq.texas.gov/airquality/airmod/data/gn

24

upwind States contributing to the maintenance problem, however, EPA confronts the same challenge that the "contribute significantly" mandate creates: How should EPA allocate reductions among multiple upwind States, many of which contribute in amounts sufficient to impede downwind maintenance" Nothing in *either* clause of the Good Neighbor Provision provides the criteria by which EPA is meant to apportion responsibility.[29]

The D.C. Circuit opinion in *EME Homer City v. EPA*, also informs the maintenance area issue:

> The statute also requires upwind States to prohibit emissions that will "interfere with maintenance" of the NAAQS in a downwind State. "Amounts" of air pollution cannot be said to "interfere with maintenance" unless they leave the upwind State and reach a downwind State's maintenance area. To require a State to reduce "amounts" of emission pursuant to the "interfere with maintenance" prong, EPA must show some basis in evidence for believing that those "amounts" from an upwind State, together with amounts from other upwind contributors, will reach a specific maintenance area in a downwind State and push that maintenance area back over the NAAQS in the near future. Put simply, the "interfere with maintenance" prong of the statute is not an open-ended invitation for EPA to impose reductions on upwind States. Rather, it is a carefully calibrated and commonsense supplement to the "contribute significantly" requirement.[30]

EPA's January 17, 2018 brief in the CSAPR Update litigation (*Wisconsin et al. v EPA*, Case No. 16-1406) documents with the following statement on pages 77 and 78 that EPA is ready to concede that a lesser level of control is appropriate in situations not constrained by the time limits of the CSAPR Update:

> Ultimately, Petitioners' complaint that maintenance-linked states are unreasonably subject to the "same degree of emission reductions" as nonattainment linked states must fail. Indus. Br. 25. There is no legal or practical prohibition on the Rule's use of a single level of control stringency for both kinds of receptors, provided that the level of control is demonstrated to result in meaningful air quality improvements without triggering either facet of the Supreme Court's test for over-control. So while concerns at maintenance receptors can potentially be eliminated at a lesser level of control in some cases given the smaller problem being addressed, this is a practical possibility, not a legal requirement. See 81 Fed. Reg. at 74,520. Here, EPA's use of the same level of control for both maintenance-linked states and nonattainment-linked states is attributable to the fact that the Rule considered only emission reduction measures available in time for the 2017 ozone season. Id. at 74,520. Under this constraint, both sets of states reduced significant emissions, without over-control, at the same

---

[29] 134 S. Ct. at 1064, Ftn 18.
[30] EME Homer City v. EPA, 96 F.3d 7, 27 Ftn. 25 (D.C. Cir 2012).

level of control. Id. at 74,551-52. Accordingly, EPA's selection of a uniform level of control for both types of receptors was reasonable. Emphasis added.

As an alternative to maintenance monitors being accorded the same weight as nonattainment monitors, we urge that the Cabinet take the position that no additional control would be needed to address a maintenance monitor if it is apparent that emissions and air quality trends make it likely that the maintenance monitor will remain in attainment. Such an approach is consistent with Section 175A(a) of the Clean Air Act which provides:

Each State which submits a request under section 7407 (d) of this title for redesignation of a nonattainment area for any air pollutant as an area which has attained the national primary ambient air quality standard for that air pollutant shall also submit a revision of the applicable State implementation plan to provide for the maintenance of the national primary ambient air quality standard for such air pollutant in the area concerned for at least 10 years after the redesignation. The plan shall contain such additional measures, if any, as may be necessary to ensure such maintenance.

It is also consistent with the John Calcagni memorandum of September 4, 1992, entitled "Procedures for Processing Requests to Redesignate Areas to Attainment", which contains the following statement on page 9:

> A State may generally demonstrate maintenance of the NAAQS by either showing that future emissions of a pollutant or its precursors will not exceed the level of the attainment inventory, or by modeling to show that the future mix of source and emission rates will not cause a violation of the NAAQS. Under the Clean Air Act, many areas are required to submit modeled attainment demonstrations to show that proposed reductions in emissions will be sufficient to attain the applicable NAAQS. For these areas, the maintenance demonstration should be based upon the same level of modeling. In areas where no such modeling was required, the State should be able to rely on the attainment inventory approach. In both instances, the demonstration should be for a period of 10 years following the redesignation.

As stated above, while Kentucky would not be linked to any maintenance monitor at a significance threshold of 2 ppb, it would be linked by EPA's 12km modeling data to a maintenance monitor (Harford Maryland) at a significance threshold of 1 ppb. Accordingly, MOG urges that the Cabinet apply an alternate methodology to assess maintenance monitors that is different than any method it would apply to assess nonattainment monitors. Any impacts which Kentucky has on maintenance areas will certainly be addressed by consideration of controls that are already on-the-books and by emissions reductions that have been and will continue to apply to Kentucky sources as is well-demonstrated by these comments and the Cabinet's proposed GNS.

12.    **An additional element of conservatism in the Cabinet's proposal is recognition of Kentucky's very limited proportional contribution to the Harford Maryland monitor.**

MOG was very pleased that EPA's March 27, 2018 memorandum recognized two methods for apportioning responsibility among upwind states to downwind problem monitors. In its memorandum, EPA offers the following statement:

> For states that are found to significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, apportioning responsibility among states.
>
> -    Consider control stringency levels derived through "uniform-cost" analysis of NOx reductions.
>
> -    Consider whether the relative impact (*e.g.*, parts per billion/ton) between states is sufficiently different such that this factor warrants consideration in apportioning responsibility.

Addressing these issues is particularly important in the situation in which a state's contribution to a downwind problem monitor is greater than the level at which a monitor exceeds the NAAQS. To avoid unlawful over-control, a state must be allowed the option of prorating the reduction needed to achieve attainment over all states that contribute to that monitor. This process allows a state the option of addressing only their prorate portion of responsibility for the portion of the problem monitors ozone concentration that exceeds the NAAQS.

In EPA's March 2018 memorandum, the agency also recognizes that consideration can be given to states based on their relative significant impact to downwind air quality monitors compared to other significant contributing states and whether the contribution values are sufficiently different enough that each state should be given a proportional responsibility for assisting in downwind attainment. Under an analysis like this, reductions should be allocated in proportion to the size of their contribution to downwind nonattainment.

As Alpine Geophysics points out in the Technical Support Document (TSD) relied upon by the Cabinet, the Harford, MD (240251001) monitor and the OSAT-derived significant contribution results from the 4km modeling, the Harford Maryland monitor is required to have a 0.2 ppb reduction to demonstrate attainment with the 2015 ozone NAAQS. In the following calculation taken from that TSD, each significantly contributing (based on 1% NAAQS) upwind State must (1) achieve less than 0.70 ppb significant contribution or (2) the monitor must achieve attainment (70.9 ppb). From these assumptions, the reduction necessary from each upwind state has been calculated.

27

**Proportional contribution and reductions associated with significantly contributing upwind states to Harford, MD (240251001) monitor in 4km modeling domain.**

| Region | Relative Contribution | | Required Reduction |
|--------|------|------|------|
| | ppb | % | ppb |
| VA/DC | 3.92 | 22% | 0.04 |
| OH | 3.02 | 17% | 0.03 |
| PA | 2.70 | 15% | 0.03 |
| WV | 2.52 | 14% | 0.03 |
| KY | 2.07 | 12% | 0.02 |
| IN | 1.81 | 10% | 0.02 |
| IL | 1.05 | 6% | 0.01 |
| TX | 0.90 | 5% | 0.01 |
| **Total** | **17.99** | **100%** | **0.20** |

Even though this modeling predicts Kentucky's contribution to the Harford Maryland monitor to be 2.07 ppb, the result of the proportional reduction requirement associated with the relative significant contribution from each upwind state, Kentucky's required reduction would be lowered to only 0.02 ppb – a level that conservatively addressed by the various factors cited by the Cabinet and reinforced by these comments.

For reasons stated elsewhere in these comments MOG does not favor applying the same weight to maintenance monitors as would be applied to nonattainment monitors. We therefore urge that this same approach not be applied to maintenance monitors. Any impacts which Kentucky has on maintenance areas will certainly be addressed by consideration of controls that are already on the books and by emissions reductions that have been and will continue to apply to Kentucky sources as is well-demonstrated by these comments and the proposed GNS.

**Conclusion.**

Accordingly, the Midwest Ozone Group supports the Cabinet's proposed Good Neighbor SIP as a conservative justification for the conclusion that no additional emissions reductions beyond existing and planned controls are necessary to mitigate any contribution Kentucky may have to any downwind monitors to comply with CAA section 110(a)(2)(D)(i)(I).



**PPL companies**

**CERTIFIED MAIL**
**CERTIFIED NUMBER 7015 1520 000 7958 9403**
**RETURN RECEIPT REQUESTED**

September 21, 2018

Ms. Lauren Hedge
Environmental Scientist II
Kentucky Division for Air Quality
Evaluation Section
300 Sower Blvd
Frankfort, KY 40601

LG&E and KU Energy LLC
Environmental Affairs
220 West Main Street
Louisville, KY 40202
www.lge-ku.com

Jason Wilkerson
Sr. Environmental Engineer
T 502-627-4043
F 502-627-2550
Jason.wilkerson@lge-ku.com

**Comments on Proposed Kentucky Infrastructure State Implementation Plan for the 2015 Ozone National Ambient Air Quality Standard**

Dear Ms. Hedge:

LG&E and KU Energy LLC is pleased to have the opportunity to comment in support of the Proposed Kentucky Infrastructure State Implementation Plan (SIP) for the 2015 Ozone National Ambient Air Quality Standard. LG&E and KU Energy supports the conclusion of the proposed SIP that no additional emission reductions beyond existing and planned controls are necessary to mitigate any contribution Kentucky may have on downwind monitors to comply with CAA section 110(a)(2). Additionally, LG&E and KU Energy concur with the comments submitted on September 21, 2018 by the Midwest Ozone Group in support of the proposed SIP revision.

LG&E and KU Energy has identified one area of the proposed SIP that needs correction as listed here:

**Proposed Infrastructure SIP for the 2015 Ozone NAAQS**

1. Page 31, Emission Totals after CSAPR Implementation, second paragraph: This section makes reference that the "Louisville Gas & Electric Company's (LG&E) Cane Run Station converted Unit 7 to natural gas..." Revisions should be made to correctly state "Louisville Gas & Electric Company's (LG&E) Cane Run Station constructed and began operating a natural gas combined cycle unit (CR7) in 2015 and retired all remaining coal-fired units the same year".

If you have any questions, please feel free to contact me.

Respectfully,

Jason Wilkerson
Sr. Environmental Engineer
LG&E and KU Energy

1 | 1


**SIERRA CLUB**

September 21, 2018

Lauren Hedge
Environmental Scientist
Kentucky Department for Environmental Protection
Energy and Environment Cabinet
Division for Air Quality, Evaluation Section
300 Sower Boulevard
Frankfort, KY 40601
(502) 782-6561
lauren.hedge@ky.gov

Comments Submitted Via Electronic Mail to Lauren.Hedge@ky.gov

**Re:    Proposed Revision to Kentucky's 2015 Ozone Standard Infrastructure State
        Implementation Plan (SIP) Addressing the Clean Air Act (CAA) Section 110
        Requirements Submitted by the Kentucky Energy and Environment Cabinet to the
        U.S. Environmental Protection Agency (EPA) on August 23, 2018**

Dear Ms. Hedge:

Sierra Club submits the following comments in response to the Kentucky Energy and
Environment Cabinet's ("Cabinet") recently proposed revision to Kentucky's 2015 Ozone
Standard Infrastructure State Implementation Plan ("SIP") addressing the Clean Air Act
("CAA") Section 110 requirements (hereinafter "August 2018 SIP Proposal"). Sierra Club is a
national environmental nonprofit organization with over 6,000 members in Kentucky and tens of
thousands of members living in downwind states adversely impacted by Kentucky emissions of
ozone precursors. For reasons identified below, the August 2018 SIP Proposal is unsupported in
the record, unreasonable, and contrary to plain statutory mandate, and therefore may not lawfully
be finalized in its present form.

The Cabinet submitted a letter dated August 23, 2018, to the U.S. Environmental
Protection Agency ("EPA") purporting to certify that Kentucky's existing SIP contains CAA
Section 110 provisions adequately address the requirements necessary to implement the 2015
ozone National Ambient Air Quality Standards ("NAAQS"). The Cabinet requested that EPA

1

approve the accompanying submission as satisfying Kentucky's obligations under CAA Section 110(a)(2) for purposes of implementing the 2015 ozone NAAQS. *See* 42 U.S.C. § 7410(a)(2). The submission asserts its consistency with 2013 EPA guidance on infrastructure SIP elements under Section 110(a). To that end, the Cabinet reasons that that that "existing . . . provisions" in Kentucky's EPA-approved *2008* ozone NAAQS infrastructure SIP suffice to "address the requirements for purposes of implementing the 2015 ozone NAAQS."[1] The Cabinet then suggests that EPA should deem Kentucky's 2015 ozone NAAQS obligations satisfied on the basis of state laws on the books, yet without incorporating and adopting those laws into Kentucky's 2015 infrastructure SIP.[2]

The Cabinet's decision essentially to rely on existing state laws in conjunction with EPA's 2008 approval, for purposes of satisfying the 2015 ozone NAAQS, is arbitrary and capricious, and unsupported by evidence, and fails to satisfy the plain statutory requirement that Kentucky's SIP ensure that the Commonwealth does not contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to the 2015 ozone NAAQS. 42 U.S.C. § 7420(a)(2)(D)(i)(I).

First, the Cabinet's reliance on prior EPA approval, in regards to the 2008 ozone NAAQS, is unsupportable and unreasonable in light of the fact that EPA's own, most recent guidance and modeling, issued in March 2018, projects that Kentucky will contribute more than 1% of the NAAQS at 5 nonattainment or maintenance monitors (namely, two in Fairfield County, CT; one in Harford County, MD; one in Sheboygan County, WI, and one in Milwaukee County, WI). For specific reference, see the attached EPA Memorandum, *Information on the Interstate State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* (March 27, 2018), Attachments B & C (submitted herewith as Appendix A hereto), along with the attached Excel spreadsheet featuring EPA's most updated modeling, with highlighting added (for convenience and clarity) of projected nonattainment monitors in orange and projected maintenance monitors in yellow (submitted herewith as Appendix B hereto). In other words, EPA's own, most recent determinations show that Kentucky's previously approved SIP is stale and does not show compliance with the 2015 ozone NAAQS; Kentucky's attempt simply to point to existing state-law provisions fails to address the Commonwealth's significant contributions to nonattainment and maintenance that EPA projects will persist in 2023.[3] On that critical point, EPA's prior

---

[1] Proposed Kentucky I-SIP Package (Aug. 23, 2018) at 1.

[2] *Id.*

[3] Sierra Club continues to underscore and protest, as it has in prior comments to the Cabinet as well as EPA, the unreasonableness of EPA's modeling being based on 2023, which is beyond relevant attainment dates for marginal areas (which at least the Maryland and Wisconsin counties are) for the 2015 standard. Using an earlier year, as is proper, would only exacerbate the flaws discussed herein; but, as explained above, the August 2018 SIP Proposal is untenable even with EPA's 2023 modeling basis.

conclusion that Kentucky is not contributing significantly to nonattainment or maintenance under the *2008* ozone NAAQS is outdated and simply irrelevant to the instant query.[4]  Thus, because EPA's modeling shows that Kentucky is in fact contributing significantly to nonattainment and maintenance at five monitors in three states under the 2015 standard, Kentucky obviously may not claim that it has no further obligations under the 2015 ozone NAAQS.

Unconvincingly, the August 2018 SIP Proposal acknowledges, but unfoundedly dismisses or dodges, the aforementioned EPA modeling and determinations that are fatal to its claims of adequacy at present.[5]  For instance, the Cabinet's apparent argument that other sources also contribute significantly to failing air quality at downwind monitors is legally irrelevant; it simply does not obviate the need for Kentucky to address *its own* significant contribution.[6]  Also, the submission's observations about meteorological data and HYSPLIT back trajectories are unpersuasive because EPA's CAMx modeling *already* incorporates meteorological inputs and links downwind air quality at specific locations with upwind emissions originating in Kentucky.[7]  Likewise, the Alpine modeling submitted by the Midwest Ozone Group is unpersuasive:  Among other fatal deficiencies, it utilized an inappropriate and arbitrary significance threshold (1 ppb rather than 1% of the NAAQS); and in any event, even if one were to accept the Alpine modeling, four of the five nonattainment or maintenance monitors linked to Kentucky still recorded maximum design values above the 2015 ozone NAAQS, and for all five monitors Kentucky's contribution exceeded 1 percent of the NAAQS.[8]

In addition, the Cabinet's assertion that existing provisions of state law will "address the requirements," vis-à-vis Kentucky's legal obligations to satisfy the 2015 ozone NAAQS, is unreasonably vague and non-committal; more detailed explanation and explicit guarantees, based on binding legal obligations, are required.  The Cabinet points to existing local, state and federal regulations and other legal obligations in attempt to satisfy its obligations under Section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.[9]  However, the submission fails to recognize, importantly, that EPA was unsatisfied this very year by those very laws and regulations when conducting its 2018 modeling, which found that Kentucky *does* contribute significantly to both nonattainment and maintenance monitors in downwind states. Given that EPA already took into

---

[4] Sierra Club previously explained, in comments provided to the Cabinet on March 30, 2018, how the proposed Kentucky SIP revision to address the requirements of Section 110(a)(2)(D)(i)(I) of the Clean Air Act vis-à-vis the *2008* ozone NAAQS was deeply flawed. *See also supra* n.3.  However, even accepting *arguendo* the validity of EPA's conclusions vis-à-vis the 2008 NAAQS, those conclusions are inapposite to satisfying Kentucky's obligations under the 2015 NAAQS, as discussed above.

[5] *See, e.g.*, Proposed Kentucky I-SIP Package at 32-55.

[6] *See id.* at 32-49.

[7] *See, e.g., id.* at 37, 42, 49.

[8] *See id.* at 51.

[9] *Id.* at 19-28.

account the suite of control measures identified in the August 2018 SIP Proposal, and yet still found that Kentucky emissions were significantly interfering with downwind attainment and maintenance of the 2015 ozone NAAQS, Kentucky's submittal is inadequate and unlawful.

In conclusion, the August 2018 SIP Proposal concerning Kentucky's 2015 ozone NAAQS obligations is unsupported, unreasoned, and contrary to the CAA. The Cabinet therefore may not lawfully finalize it, but rather must revise the SIP to include obligations that will satisfy Section 110(a)(2)(D)(i)(I).

Thank you for your consideration. Please feel free to contact us if you have any questions or would otherwise like to discuss these or related issues.

Respectfully submitted,

/s/ Aaron Messing

Aaron Messing
Legal Fellow
Sierra Club
50 F St. NW, 8th Floor
Washington, DC 20001
(202) 548-4593
aaron.messing@sierraclub.org

Matthew E. Miller
Staff Attorney
Sierra Club
50 F St. NW, 8th Floor
Washington, DC 20001
(202) 650-6069
matthew.miller@sierraclub.org



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
RESEARCH TRIANGLE PARK, NC 27711

MAR 2 7 2018

OFFICE OF
AIR QUALITY PLANNING
AND STANDARDS

## MEMORANDUM

**SUBJECT:** Information on the Interstate Transport State Implementation Plan Submissions
for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act
Section 110(a)(2)(D)(i)(I)

**FROM:** Peter Tsirigotis
Director

**TO:** Regional Air Division Directors, Regions 1–10

The purpose of this memorandum is to provide information to states and the Environmental
Protection Agency Regional offices as they develop or review state implementation plans (SIPs)
that address section 110(a)(2)(D)(i)(I) of Clean Air Act (CAA), also called the "good neighbor"
provision, as it pertains to the 2015 ozone National Ambient Air Quality Standards (NAAQS).
Specifically, this memorandum includes EPA's air quality modeling data for ozone for the year
2023, including newly available contribution modeling results, and a discussion of elements
previously used to address interstate transport. In addition, the memorandum is accompanied by
Attachment A, which provides a preliminary list of potential flexibilities in analytical approaches
for developing a good neighbor SIP that may warrant further discussion between EPA and states.

The information in this memorandum provides an update to the contribution modeling
analyses provided in EPA's January 2017 Notice of Data Availability (NODA) of ozone transport
modeling data for the 2015 ozone NAAQS and builds upon information provided in the October
2017 interstate transport memorandum.[1] The October 2017 memorandum provided projected
ozone design values for 2023 based on EPA's updated nationwide ozone modeling with the
primary goal of assisting states in completing good neighbor transport actions for the 2008 ozone
NAAQS.

---

[1] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport
Modeling Data for the 2015 Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6,
2017). This memorandum also supplements the information provided in the memorandum, *Supplemental
Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National
Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)*. Memorandum from Stephen D.
Page, Director, U.S. EPA Office of Air Quality Planning and Standards, to Regional Air Division Directors, Regions
1–10. October 27, 2017. Available at *https://www.epa.gov/sites/production/files/2017-
10/documents/final_2008_o3_naaqs_transport_memo_10-27-17b.pdf.* (The October 27, 2017, memorandum
includes links to all supporting documentation, including modeling and emissions technical support documents.)

EPA's goal in providing this information is to assist states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations. While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking.

**The Good Neighbor Provision**

Under CAA sections 110(a)(l) and 110(a)(2), each state is required to submit a SIP that provides for the implementation, maintenance and enforcement of each primary and secondary NAAQS. Section 110(a)(1) requires each state to make this new SIP submission within 3 years after promulgation of a new or revised NAAQS. This type of SIP submission is commonly referred to as an "infrastructure SIP." Section 110(a)(2) identifies specific elements that each plan submission must meet. Conceptually, an infrastructure SIP provides assurance that a state's SIP contains the necessary structural requirements to implement the new or revised NAAQS, whether by demonstrating that the state's SIP already contains or sufficiently addresses the necessary provisions, or by making a substantive SIP revision to update the plan provisions to meet the new standards.

In particular, CAA section 110(a)(2)(D)(i)(I) requires each state to submit to EPA new or revised SIPs that "contain adequate provisions ... prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other state with respect to any such national primary or secondary ambient air quality standard." EPA often refers to section 110(a)(2)(D)(i)(I) as the good neighbor provision and to SIP revisions addressing this requirement as good neighbor SIPs.

On October 1, 2015, EPA promulgated a revision to the ozone NAAQS, lowering the level of both the primary and secondary standards to 70 parts per billion (ppb).[2] Pursuant to CAA section 110(a), good neighbor SIPs are, therefore, due by October 1, 2018. As noted earlier, EPA intends that the information conveyed through this memorandum should assist states in their efforts to develop good neighbor SIPs for the 2015 ozone NAAQS to address their interstate transport obligations.

**Framework to Address the Good Neighbor Provision**

Through the development and implementation of several previous rulemakings, including most recently the Cross-State Air Pollution Rule (CSAPR) Update,[3] EPA, working in partnership with states, established the following four-step framework to address the requirements of the good neighbor provision for ozone and fine particulate matter ($PM_{2.5}$) NAAQS: (1) identify downwind air quality problems; (2) identify upwind states that contribute enough to those downwind air

---

[2] National Ambient Air Quality Standards for Ozone Final Rule, 80 FR 65292 (October 26, 2015).

[3] *See* Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone (also known as the $NO_X$ SIP Call), 63 FR 57356 (October 27, 1998); Clean Air Interstate Rule (CAIR) Final Rule, 70 FR 25162 (May 12, 2005); CSAPR Final Rule, 76 FR 48208 (August 8, 2011); CSAPR Update for the 2008 Ozone NAAQS (CSAPR Update) Final Rule, 81 FR 74504 (October 26, 2016).

quality problems to warrant further review and analysis; (3) identify the emissions reductions necessary (if any), considering cost and air quality factors, to prevent an identified upwind state from contributing significantly to those downwind air quality problems; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions. EPA notes that, in applying this framework or other approaches consistent with the CAA, various analytical approaches may be used to assess each step. EPA has undertaken several previous regional rulemakings applying this framework, and its analytical approaches have varied over time due to continued evolution of relevant tools and information, as well as their specific application.

This memo presents information regarding EPA's latest analysis for purposes of assisting states in developing SIPs for the 2015 ozone NAAQS, and, in doing so, generally follows approaches that EPA has taken in its regional rulemaking actions addressing prior ozone NAAQS. EPA also notes that, in developing their own rules, states have flexibility to follow the familiar four-step transport framework (using EPA's analytical approach or somewhat different analytical approaches within these steps) or alternative frameworks, so long as their chosen approach has adequate technical justification and is consistent with the requirements of the CAA. In various discussions, states and other stakeholders have suggested specific approaches that may warrant further consideration, and have indicated that they may be exploring other approaches as well. Over the next few months, EPA will be working with states to evaluate potential additional flexibilities for states to consider as they develop their good neighbor SIPs for the 2015 ozone NAAQS. Such potential flexibilities could apply to modeling conducted by states or to states' use of EPA's updated modeling presented here. Attachment A provides a preliminary list of potential flexibilities that may warrant further discussion. EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

## Air Quality Modeling Projection of 2023 Ozone Design Values

As noted previously and as described in more detail in both the 2017 NODA and the October 2017 memorandum, EPA uses modeling to identify potential downwind air quality problems. A first step in the modeling process is selecting a future analytic year that considers both the relevant attainment dates of downwind nonattainment areas impacted by interstate transport[4] and the timeframes that may be required for implementing further emissions reductions as expeditiously as practicable.[5] For the 2015 ozone NAAQS, EPA selected 2023 as the analytic year in our modeling analyses primarily because it aligns with the anticipated attainment year for Moderate ozone nonattainment areas.[6]

---

[4] *North Carolina v. EPA*, 531 F.3d 896, 911–12 (D.C. Cir. 2008) (holding that compliance timeframes for necessary emission reductions must consider downwind attainment deadlines).

[5] *See* October 2017 memorandum, pp. 4-6 (discussion of timing of controls).

[6] On November 16, 2017 (82 FR 54232), EPA established initial air quality designations for most areas in the United States. On December 22, 2017 (83 FR 651), EPA responded to state and tribal recommendations by indicating the anticipated area designations for the remaining portions of the U.S. In addition, EPA proposed the maximum attainment dates for nonattainment areas in each classification, which for Moderate ozone nonattainment is 6 years (81 FR 81276, November 17, 2016). Based on the expected timing for final designations, 6 years from the likely effective date for designations would be summer 2024. Therefore, the 2023 ozone season would be the last full ozone season before the 2024 attainment date.

As noted in the aforementioned October 2017 memorandum, EPA then used the Comprehensive Air Quality Model with Extensions (CAMx v6.40)[7] to model emissions in 2011 and 2023, based on updates provided to EPA from states and other stakeholders.[8] EPA used outputs from the 2011 and 2023 model simulations to project base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide. In projecting these future year design values, EPA applied its own modeling guidance,[9] which recommends using model predictions from the "3 x 3" array of grid cells surrounding the location of the monitoring site.[10] In light of comments on the January 2017 NODA and other analyses, EPA also projected 2023 design values based on a modified version of the "3 x 3" approach for those monitoring sites located in coastal areas. Briefly, in this alternative approach, EPA incorporated the flexibility of eliminating from the design value calculations those modeling data in grid cells that are dominated by water (*i.e.*, more than 50 percent of the area in the grid cell is water) and that do not contain a monitoring site (*i.e.*, if a grid cell is more than 50 percent water but contains an air quality monitor, that cell would remain in the calculation).[11] For each individual monitoring site, the base period 2009-2013 average and maximum design values, 2023 projected average and maximum design values based on both the "3 x 3" approach and the alternative approach affecting coastal sites, and 2014-2016 measured design values are provided in an attachment to the October 27 memorandum. The same information is available in Excel format at *https://www.epa.gov/airmarkets/october-2017-memo-and-information-interstate-transport-sips-2008-ozone-naaqs*.

In the CSAPR Update rulemaking process, EPA considered a combination of monitoring data and modeling projections to identify receptor sites that are projected to have problems attaining or maintaining the NAAQS.[12] Specifically, EPA identified nonattainment receptors as those monitoring sites with current measured values exceeding the NAAQS that also have projected (*i.e.*, in 2023) average design values exceeding the NAAQS. EPA identified maintenance receptors as those monitoring sites with maximum design values exceeding the NAAQS. This included sites with current measured values below the NAAQS with projected average and maximum design values exceeding the NAAQS, and monitoring sites with projected average design values below the NAAQS but with projected maximum design values exceeding the NAAQS. The projected 2023 ozone design values and 2014-2016 measured design values for monitors in the United States have not changed since they were first presented in the October 2017 memorandum.

---

[7] CAMx v6.40 was the most recent public release version of CAMx at the time EPA updated its modeling in fall 2017. ("Comprehensive Air Quality Model with Extension version 6.40 User's Guide" Ramboll Environ, December 2016. *http://www.camx.com/*.)

[8] For the updated modeling, EPA used the construct of the modeling platform (*i.e.*, modeling domain and non-emissions inputs) that we used for the NODA modeling, except that the photolysis rates files were updated to be consistent with CAMx v6.40. The NODA Air Quality Modeling Technical Support Document describing the modeling platform is available at *https://www.epa.gov/airmarkets/notice-data-availability-preliminary-interstate-ozone-transport-modeling-data-2015-ozone*.

[9] *http://www.epa.gov/ttn/scram/guidance/guide/Draft_O3-PM-RH_Modeling_Guidance-2014.pdf.*

[10] EPA's modeling uses 12 kilometer$^2$ grid cells.

[11] A model grid cell is identified as a "water" cell if more than 50 percent of the grid cell is water based on the 2006 National Land Cover Database. Grid cells that meet this criterion are treated as entirely over water in the Weather Research Forecast (WRF) modeling used to develop the 2011 meteorology for EPA's air quality modeling.

[12] *See* 81 FR 74530-74532 (October 26, 2016).

In this memorandum, EPA is identifying 2023 potential nonattainment and maintenance receptors with respect to the 2015 NAAQS, following its approach taken for previous NAAQS. This information is based on applying the CSAPR method for identifying potential nonattainment and maintenance receptors, and presents the design values in two ways: first, following the "3 x 3" approach to evaluating all sites, and second, following the modified approach for coastal monitoring sites in which "overwater" modeling data were not included in the calculation of future year design values. After incorporating these approaches, the modeling results suggest, based on the approach used for previous NAAQS, 11 monitoring sites outside of California as potential nonattainment receptors and 14 monitoring sites outside of California as potential maintenance receptors. *See* Attachment B for this receptor information.

**Air Quality Modeling of 2023 Contributions**

After identifying potential downwind air quality problems by projecting base period 2009-2013 average and maximum ozone design values to 2023 at monitoring sites nationwide, EPA next performed nationwide, state-level ozone source apportionment modeling using the CAMx Anthropogenic Precursor Culpability Analysis (APCA) technique[13] to provide information regarding the expected contribution of 2023 base case nitrogen oxides ($NO_X$) and volatile organic compound (VOC) emissions from all sources in each state to projected 2023 ozone concentrations at each air quality monitoring site. In the source apportionment model run, EPA tracked the ozone formed from each of the following contribution categories (*i.e.*, "tags"):

- States – anthropogenic $NO_X$ and VOC emissions from each of the contiguous 48 states and the District of Columbia tracked individually (EPA combined emissions from all anthropogenic sectors in a given state);
- Biogenics – biogenic $NO_X$ and VOC emissions domain-wide (*i.e.*, not by state);
- Initial and Boundary Concentrations – concentrations transported into the modeling domain from the lateral boundaries;
- Tribal Lands – the emissions from those tribal lands for which EPA has point source inventory data in the 2011 NEI (EPA did not model the contributions from individual tribes);
- Canada and Mexico – anthropogenic emissions from sources in those portions of Canada and Mexico included in the modeling domain (EPA did not separately model contributions from Canada or Mexico);
- Fires – combined emissions from wild and prescribed fires domain-wide (*i.e.*, not by state); and
- Offshore – combined emissions from offshore marine vessels and offshore drilling platforms (*i.e.*, not by state).

EPA performed the CAMx source apportionment model simulation for the period May 1 through September 30 using the 2023 future base case emissions and 2011 meteorology for this

---

[13] As part of this technique, ozone formed from reactions between biogenic and anthropogenic VOC and NOx are assigned to the anthropogenic emissions.

time period.[14] EPA processed hourly contributions[15] from each tag to obtain the 8-hour average contributions corresponding to the time period of the 8-hour daily maximum concentration on each day in the 2023 model simulation. This step was performed for those model grid cells containing monitoring sites to obtain 8-hour average contributions for each day at the location of each site. EPA then processed the model-predicted contributions on each day at each monitoring site location to identify the contributions on the subset of days in the 2023 modeling with the top 10 model-predicted maximum daily 8-hour average concentrations. The daily 8-hour average contributions on the top 10 concentration days in 2023 were applied in a relative sense to quantify the contributions to the 2023 average design value at each site.

In the CSAPR and CSAPR Update modeling efforts, EPA had used a slightly different approach by basing the average future year contribution on future year modeled values that exceeded the NAAQS or the top 5 days, whichever was greater. While technically sound, EPA's previous approach resulted in different contributions for an individual linkage depending on the level of the NAAQS. For the modeling effort described in this memorandum, EPA considered comments on the January 2017 NODA and developed and incorporated the flexibility of calculating the contribution metric using contributions on the top 10 future year days. As some commenters have indicated, this approach makes the contribution metric values more consistent across monitoring sites and more robust in terms of being independent of the level of the NAAQS. The contributions from each tag to each monitoring site identified as a potential nonattainment or maintenance receptor in 2023 are provided in Attachment C.[16]

**Conclusion**

States may consider using this national modeling to develop SIPs that address requirements of the good neighbor provision for the 2015 ozone NAAQS. When doing so, EPA recommends that states include in any such submission state-specific information to support their reliance on the 2023 modeling data. Further, states may supplement the information provided in this memorandum with any additional information that they believe is relevant to addressing the good neighbor provision requirements. States may also choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs. If this is the case, states should submit that information along with a full explanation and technical analysis. EPA encourages collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and implementing a regionally consistent approach. We recommend that states reach out to EPA Regional offices and work together to accomplish the goal of developing, submitting, and reviewing approvable SIPs that address the good neighbor provision for the 2015 ozone NAAQS.

Finally, as indicated previously in this memorandum, in addition to the flexibilities already incorporated into EPA's modeling effort (*i.e.*, considering the removal of modeled values in "over water" grid cells and EPA's modified approach for calculating the contribution metric), EPA is

---

[14] *See* the October 2017 memorandum for a description of these model inputs.

[15] Ozone contributions from anthropogenic emissions under "$NO_X$-limited" and "VOC-limited" chemical regimes were combined to obtain the net contribution from $NO_X$ and VOC anthropogenic emissions in each state.

[16] Given stakeholder input on the 2017 NODA and other analyses, EPA elected to represent the contribution information in this memorandum using the alternative approach for projecting design values for sites in coastal areas.

evaluating whether states may have additional flexibilities as they work to prepare and submit approvable good neighbor SIPs for the 2015 ozone NAAQS (*see* Attachment A). EPA looks forward to discussing these and other potential flexibilities with states over the next few months, which will help inform states' development of their good neighbor SIP submittals, as well as EPA's development of further information on good neighbor SIPs.

Please share this information with the air agencies in your Region.

**For Further Information**

If you have any questions concerning this memorandum, please contact Norm Possiel at (919) 541-5692, *possiel.norm@epa.gov* for modeling information or Beth Palma at (919) 541-5432, *palma.elizabeth@epa.gov* for any other information.

Attachments

A. Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan
B. Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling
C. Contributions to 2023 8-hour Ozone Design Values at Projected 2023 Nonattainment and Maintenance Sites

Attachment A

**Preliminary List of Potential Flexibilities Related to Analytical Approaches for Developing a Good Neighbor State Implementation Plan**

The Environmental Protection Agency believes states may be able to consider certain approaches as they develop good neighbor state implementation plans (SIPs) addressing the 2015 ozone National Ambient Air Quality Standards (NAAQS). To that end, EPA has reviewed comments provided in various forums, including comments on EPA's January 2017 Notice of Data Availability (NODA) regarding ozone transport modeling data for the 2015 ozone NAAQS, and seeks feedback from interested stakeholders on the following concepts. This list is organized in the familiar four-step transport framework discussed on pages 2-3 of the memorandum above, but EPA is open to alternative frameworks to address good neighbor obligations or considerations outside the four-step process. The purpose of this attachment is to identify potential flexibilities to inform SIP development and seek feedback on these concepts. EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches. Determinations regarding states' obligations under the good neighbor provision would be made through notice-and-comment rulemaking.

EPA has identified several guiding principles to consider when evaluating the appropriateness of the concepts introduced in this attachment, including:

- Supporting states' position as "first actors" in developing SIPs that address section 110(a)(2)(D) of the CAA;
- Consistency with respect to EPA's SIP actions is legally required by the statute and regulations (*see* CAA § 301(a)(2) and 40 CFR part 56) and is a particularly acute issue with respect to regional transport issues in which multiple states may be implicated;
- Compliance with statutory requirements and legal precedent from court decisions interpreting the CAA requirements;
- Encouraging collaboration among states linked to a common receptor and among linked upwind and downwind states in developing and applying a regionally consistent approach to identify and implement good neighbor obligations; and
- The potential value of considering different modeling tools or analyses in addition to EPA's, provided that any alternative modeling is performed using a credible modeling system which includes "state-of-the-science" and "fit for purpose" models, inputs, and techniques that are relevant to the nature of the ozone problem. The use of results from each alternative technique should be weighed in accordance with the scientific foundation, construct and limitations of the individual techniques.

EPA intends to reflect on feedback received on these concepts and communicate closely with air agencies as they prepare and submit SIPs to address the good neighbor provisions for the 2015 ozone NAAQS.

**Analytics**
- Consideration of appropriate alternate base years to those used in EPA's most recent modeling (*e.g.*, appropriate alternative base years should be selected consistent with EPA's air quality modeling guidance suggesting that years with meteorology conducive to ozone formation are appropriate).
- Consideration of an alternate future analytic year. EPA has identified 2023 as an appropriate analytic year to consider when evaluating transport obligations for the 2015 ozone NAAQS; however, another year may also be appropriate.
- Use of alternative power sector modeling consistent with EPA's emission inventory guidance.
- Consideration of state-specific information in identifying emissions sources [*e.g.*, electric generating units (EGUs) and non-EGUs] and controls (*e.g.*, combustion/process controls, post-combustion controls) that are appropriate to evaluate.

**Step 1 – Identify downwind air quality problems**
- Identification of maintenance receptors.
  - Evaluate alternative methodologies to give independent meaning to the term "interfere with maintenance" under CAA section 110(a)(2)(D)(i)(I).
  - Identify maintenance receptors that are at risk of exceeding the NAAQS (even if they do not currently violate the standard) using an alternative approach that does not rely on the projection of maximum design values.
  - Identify maintenance receptors where current, presumably "clean," measured data are shown through analysis to occur during meteorological conditions conducive to ozone formation such that exceedances are unlikely to reoccur in the future.
- Consideration of downwind air quality context.
  - Consider the role of designations issued in FY 2018 based on approved air quality monitors.
  - Assess current and projected local emissions reductions and whether downwind areas have considered and/or used available mechanisms for regulatory relief.
- Consideration of model performance.
  - Consider removal of certain data from modeling analysis for the purposes of projecting design values and calculating the contribution metric where data removal is based on model performance and technical analyses support the exclusion.

**Step 2 – Identify upwind states that contribute to those downwind air quality problems to warrant further review and analysis**
- Considerations related to determining contributions.
  - EPA has used the Anthropogenic Precursor Culpability Analysis (APCA) approach for the purpose of quantifying contribution to downwind receptors. We have received questions regarding the use of other modeling approaches (*e.g.*, Ozone Source Apportionment Technology, Decoupled Direct Method, and zero-out brute force sensitivity runs) to help quantify ozone impacts from upwind states.
- Considerations related to evaluating contributions (contributions contained in Attachment C are not based upon a particular significance threshold).
  - Establishing a contribution threshold based on variability in ozone design values that leverage some of the analytics and statistical data created to support the development of the Significant Impact Level for ozone.

A-2

- Consideration of different contribution thresholds for different regions based on regional differences in the nature and extent of the transport problem.
- An evaluation of "collective contribution" in the receptor region to determine the extent to which a receptor is "transport influenced." The results of this analysis could be applied before assessing whether an individual state is linked to a downwind receptor (*i.e.*, above the contribution threshold).

**Step 3 – Identifying air quality, cost, and emission reduction factors to be evaluated in a multifactor test to identify emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, if any**

- Consideration of international emissions, in a manner consistent with EPA's Ozone Cooperative Compliance Task Force efforts to fully understand the role of background ozone levels and appropriately account for international transport.[17]
  - Develop consensus on evaluation of the magnitude of international ozone contributions relative to domestic, anthropogenic ozone contributions for receptors identified in step 1. As contained in Attachment C, EPA recognizes that a number of non-U.S. and non-anthropogenic sources contribute to downwind nonattainment and maintenance receptors.
  - Consider whether the air quality, cost, or emission reduction factors should be weighted differently in areas where international contributions are relatively high.
- For states that are found to significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, apportioning responsibility among states.
  - Consider control stringency levels derived through "uniform-cost" analysis of $NO_x$ reductions.
  - Consider whether the relative impact (*e.g.*, parts per billion/ton) between states is sufficiently different such that this factor warrants consideration in apportioning responsibility.
- Considerations for states linked to maintenance receptors.
  - Consider whether the remedy for upwind states linked to maintenance receptors could be less stringent than for those linked to nonattainment receptors.
  - For example, consider whether upwind states could satisfy linkage(s) to maintenance receptors based on recent historic or base case emissions levels.

**Step 4 – Adopt permanent and enforceable measures needed to achieve emissions reductions (translating the control levels identified in Step 3 into enforceable emissions limits)**

- EPA welcomes concepts from stakeholders regarding Step 4, including potential EPA actions that could serve as a model as well as the relationship to previous transport rules.

---

[17] See *Final Report on Review of Agency Actions that Potentially Burden the Safe, Efficient Development of Domestic Energy Resources Under Executive Order 13783* (October 25, 2017) and *Report to Congress on Administrative Options to Enable States to Enter into Cooperative Agreements to Provide Regulatory Relief for Implementing Ozone Standards* (August 14, 2017).

## Attachment B

### Projected Ozone Design Values at Potential Nonattainment and Maintenance Receptors Based on EPA's Updated 2023 Transport Modeling

This attachment contains projected ozone design values at those individual monitoring sites that are projected to be potential nonattainment or maintenance receptors based on the Environmental Protection Agency's updated transport modeling for 2023. The scenario name for the updated modeling is "2023en." The data are in units of parts per billion (ppb).

The following data are provided in the table below:

1. Base period 2009 – 2013 average and maximum design values based on 2009 – 2013 measured data.

2. Projected 2023 average and maximum design values based on the "3 x 3" approach and a modified "3 x 3" approach in which model predictions in grid cells that are predominately water and that do not contain monitors are excluded from the projection calculations ("No Water"). Note that the modified approach only affects the projection of design values for monitoring sites in or near coastal areas.

3. 2016 ozone design values based on 2014 – 2016 measured data (N/A indicates that a 2016 design value is not available). The following Web site has additional information on the 2016 design values: *https://www.epa.gov/air-trends/air-quality-design-values#report*.

Note: A value of 70.9 ppb (or less) is considered to be in attainment of the 2015 ozone NAAQS, and a value of 71.0 ppb (or higher) is considered to be in violation of the 2015 ozone NAAQS.

Note also: Site 550790085 in Milwaukee Co., WI would be a nonattainment receptor using projected design values based on the "No Water" cell approach, but would not be a receptor with the "3 x 3" approach. Conversely, site 360850067 in Richmond Co., NY would be a nonattainment receptor using the "3 x 3" approach, but would not be a receptor with the "No Water" cell approach.

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---------|----|--------|---------------|---------------|------------------|------------------|----------------------|----------------------|-----------|
| 40130019 | AZ | Maricopa | 76.7 | 79 | 69.3 | 71.4 | 69.3 | 71.4 | 73 |
| 40131004 | AZ | Maricopa | 79.7 | 81 | 69.8 | 71.0 | 69.8 | 71.0 | 75 |
| 60190007 | CA | Fresno | 94.7 | 95 | 79.2 | 79.4 | 79.2 | 79.4 | 86 |
| 60190011 | CA | Fresno | 93.0 | 96 | 78.6 | 81.2 | 78.6 | 81.2 | 89 |
| 60190242 | CA | Fresno | 91.7 | 95 | 79.4 | 82.2 | 79.4 | 82.2 | 86 |
| 60194001 | CA | Fresno | 90.7 | 92 | 73.3 | 74.4 | 73.3 | 74.4 | 91 |
| 60195001 | CA | Fresno | 97.0 | 99 | 79.6 | 81.2 | 79.6 | 81.2 | 94 |
| 60250005 | CA | Imperial | 74.7 | 76 | 73.3 | 74.6 | 73.3 | 74.6 | 76 |
| 60251003 | CA | Imperial | 81.0 | 82 | 79.0 | 80.0 | 79.0 | 80.0 | 76 |
| 60290007 | CA | Kern | 91.7 | 96 | 77.7 | 81.3 | 77.7 | 81.3 | 87 |

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---------|----|--------|------|------|------|------|------|------|------|
| 60290008 | CA | Kern | 86.3 | 88 | 71.3 | 72.8 | 71.3 | 72.8 | 81 |
| 60290014 | CA | Kern | 87.7 | 89 | 74.1 | 75.2 | 74.1 | 75.2 | 84 |
| 60290232 | CA | Kern | 87.3 | 89 | 73.7 | 75.2 | 73.7 | 75.2 | 77 |
| 60295002 | CA | Kern | 90.0 | 91 | 75.9 | 76.8 | 75.9 | 76.8 | 87 |
| 60296001 | CA | Kern | 84.3 | 86 | 70.9 | 72.4 | 70.9 | 72.4 | 81 |
| 60311004 | CA | Kings | 87.0 | 90 | 71.7 | 74.2 | 71.7 | 74.2 | 84 |
| 60370002 | CA | Los Angeles | 80.0 | 82 | 73.3 | 75.1 | 73.3 | 75.1 | 88 |
| 60370016 | CA | Los Angeles | 94.0 | 97 | 86.1 | 88.9 | 86.1 | 88.9 | 96 |
| 60371201 | CA | Los Angeles | 90.0 | 90 | 79.8 | 79.8 | 79.8 | 79.8 | 85 |
| 60371701 | CA | Los Angeles | 84.0 | 85 | 78.1 | 79.1 | 78.1 | 79.1 | 90 |
| 60372005 | CA | Los Angeles | 79.5 | 82 | 72.3 | 74.6 | 72.3 | 74.6 | 83 |
| 60376012 | CA | Los Angeles | 97.3 | 99 | 85.9 | 87.4 | 85.9 | 87.4 | 96 |
| 60379033 | CA | Los Angeles | 90.0 | 91 | 76.3 | 77.2 | 76.3 | 77.2 | 88 |
| 60392010 | CA | Madera | 85.0 | 86 | 72.1 | 72.9 | 72.1 | 72.9 | 83 |
| 60470003 | CA | Merced | 82.7 | 84 | 69.9 | 71.0 | 69.9 | 71.0 | 82 |
| 60650004 | CA | Riverside | 85.0 | 85 | 76.7 | 76.7 | 76.7 | 76.7 | N/A |
| 60650012 | CA | Riverside | 97.3 | 99 | 83.6 | 85.1 | 83.6 | 85.1 | 93 |
| 60651016 | CA | Riverside | 100.7 | 101 | 85.2 | 85.5 | 85.2 | 85.5 | 97 |
| 60652002 | CA | Riverside | 84.3 | 85 | 72.4 | 73.0 | 72.4 | 73.0 | 81 |
| 60655001 | CA | Riverside | 92.3 | 93 | 79.5 | 80.1 | 79.5 | 80.1 | 87 |
| 60656001 | CA | Riverside | 94.0 | 98 | 78.3 | 81.6 | 78.3 | 81.6 | 91 |
| 60658001 | CA | Riverside | 97.0 | 98 | 87.0 | 87.9 | 87.0 | 87.9 | 94 |
| 60658005 | CA | Riverside | 92.7 | 94 | 83.2 | 84.4 | 83.2 | 84.4 | 91 |
| 60659001 | CA | Riverside | 88.3 | 91 | 73.7 | 75.9 | 73.7 | 75.9 | 86 |
| 60670012 | CA | Sacramento | 93.3 | 95 | 74.5 | 75.9 | 74.5 | 75.9 | 83 |
| 60675003 | CA | Sacramento | 86.3 | 88 | 69.9 | 71.3 | 69.9 | 71.3 | 79 |
| 60710005 | CA | San Bernardino | 105.0 | 107 | 96.2 | 98.1 | 96.2 | 98.1 | 108 |
| 60710012 | CA | San Bernardino | 95.0 | 97 | 84.1 | 85.8 | 84.1 | 85.8 | 91 |
| 60710306 | CA | San Bernardino | 83.7 | 85 | 76.2 | 77.4 | 76.2 | 77.4 | 86 |
| 60711004 | CA | San Bernardino | 96.7 | 98 | 89.8 | 91.0 | 89.8 | 91.0 | 101 |
| 60712002 | CA | San Bernardino | 101.0 | 103 | 93.1 | 95.0 | 93.1 | 95.0 | 97 |
| 60714001 | CA | San Bernardino | 94.3 | 97 | 86.0 | 88.5 | 86.0 | 88.5 | 90 |
| 60714003 | CA | San Bernardino | 105.0 | 107 | 94.1 | 95.8 | 94.1 | 95.8 | 101 |
| 60719002 | CA | San Bernardino | 92.3 | 94 | 80.0 | 81.4 | 80.0* | 81.4 | 86 |
| 60719004 | CA | San Bernardino | 98.7 | 99 | 88.4 | 88.7 | 88.4 | 88.7 | 104 |
| 60990006 | CA | Stanislaus | 87.0 | 88 | 74.8 | 75.7 | 74.8 | 75.7 | 83 |
| 61070006 | CA | Tulare | 81.7 | 85 | 69.1 | 71.9 | 69.1 | 71.9 | 84 |
| 61070009 | CA | Tulare | 94.7 | 96 | 76.1 | 77.2 | 76.1 | 77.2 | 89 |

| Site ID | St | County | 2009-2013 Avg | 2009-2013 Max | 2023en "3x3" Avg | 2023en "3x3" Max | 2023en "No Water" Avg | 2023en "No Water" Max | 2014-2016 |
|---|---|---|---|---|---|---|---|---|---|
| 61072002 | CA | Tulare | 85.0 | 88 | 68.9 | 71.4 | 68.9 | 71.4 | 80 |
| 61072010 | CA | Tulare | 89.0 | 90 | 73.1 | 73.9 | 73.1 | 73.9 | 83 |
| 61112002 | CA | Ventura | 81.0 | 83 | 70.5 | 72.2 | 70.5 | 72.2 | 77 |
| 80050002 | CO | Arapahoe | 76.7 | 79 | 69.3 | 71.3 | 69.3 | 71.3 | N/A |
| 80350004 | CO | Douglas | 80.7 | 83 | 71.1 | 73.2 | 71.1 | 73.2 | 77 |
| 80590006 | CO | Jefferson | 80.3 | 83 | 71.3 | 73.7 | 71.3 | 73.7 | 77 |
| 80590011 | CO | Jefferson | 78.7 | 82 | 70.9 | 73.9 | 70.9 | 73.9 | 80 |
| 80690011 | CO | Larimer | 78.0 | 80 | 71.2 | 73.0 | 71.2 | 73.0 | 75 |
| 81230009 | CO | Weld | 74.7 | 76 | 70.2 | 71.4 | 70.2 | 71.4 | 70 |
| 90010017 | CT | Fairfield | 80.3 | 83 | 69.8 | 72.1 | 68.9 | 71.2 | 80 |
| 90013007 | CT | Fairfield | 84.3 | 89 | 71.2 | 75.2 | 71.0 | 75.0 | 81 |
| 90019003 | CT | Fairfield | 83.7 | 87 | 72.7 | 75.6 | 73.0 | 75.9 | 85 |
| 90099002 | CT | New Haven | 85.7 | 89 | 71.2 | 73.9 | 69.9 | 72.6 | 76 |
| 240251001 | MD | Harford | 90.0 | 93 | 71.4 | 73.8 | 70.9 | 73.3 | 73 |
| 260050003 | MI | Allegan | 82.7 | 86 | 69.0 | 71.8 | 69.0 | 71.7 | 75 |
| 261630019 | MI | Wayne | 78.7 | 81 | 69.0 | 71.0 | 69.0 | 71.0 | 72 |
| 360810124 | NY | Queens | 78.0 | 80 | 70.1 | 71.9 | 70.2 | 72.0 | 69 |
| 360850067 | NY | Richmond | 81.3 | 83 | 71.9 | 73.4 | 67.1 | 68.5 | 76 |
| 361030002 | NY | Suffolk | 83.3 | 85 | 72.5 | 74.0 | 74.0 | 75.5 | 72 |
| 480391004 | TX | Brazoria | 88.0 | 89 | 74.0 | 74.9 | 74.0 | 74.9 | 75 |
| 481210034 | TX | Denton | 84.3 | 87 | 69.7 | 72.0 | 69.7 | 72.0 | 80 |
| 482010024 | TX | Harris | 80.3 | 83 | 70.4 | 72.8 | 70.4 | 72.8 | 79 |
| 482011034 | TX | Harris | 81.0 | 82 | 70.8 | 71.6 | 70.8 | 71.6 | 73 |
| 482011039 | TX | Harris | 82.0 | 84 | 71.8 | 73.6 | 71.8 | 73.5 | 67 |
| 484392003 | TX | Tarrant | 87.3 | 90 | 72.5 | 74.8 | 72.5 | 74.8 | 73 |
| 550790085 | WI | Milwaukee | 80.0 | 82 | 65.4 | 67.0 | 71.2 | 73.0 | 71 |
| 551170006 | WI | Sheboygan | 84.3 | 87 | 70.8 | 73.1 | 72.8 | 75.1 | 79 |

**Attachment C**

**Contributions to 2023 8-hour Ozone Design Values at Projected
2023 Nonattainment and Maintenance Sites**

This attachment contains tables with the projected ozone contributions from 2023 anthropogenic nitrogen oxide and volatile organic compound emissions in each state to each potential nonattainment receptor and maintenance receptor (based on the 2015 ozone National Ambient Air Quality Standards) in the United States, following the approach for identification of such receptors EPA has used in the past, with slight modification.[18] In addition to the state contributions, we have included the contributions from each of the other categories tracked in the contribution modeling, including point source emissions on Tribal lands, anthropogenic emissions in Canada and Mexico, emissions from offshore sources, fires, biogenics, and contributions from initial and boundary concentrations.

The contribution information is provided in a three-part table for all of the projected receptors throughout the country, except California, and a separate three-part table for the projected receptors in California. For each monitoring site, we provide the site ID, county name, and state name in the first three columns of the table. This information is followed by columns containing the projected 2023 average and maximum design values based on the "No Water" cell approach. Next, in Parts 1 and 2 of each table, we provide the contributions from each state and the District of Columbia, individually. Finally, in Part 3 of each table, we provide the contributions from the Tribal lands, Canada and Mexico, offshore, fires, initial and boundary concentrations (Boundary), and biogenics categories. The units of the 2023 design values and contributions are parts per billion (ppb). Note that the contributions presented in these tables may not sum exactly to the 2023 average design value due to truncation of the contributions to two places to the right of the decimal.

---

[18] For the purposes of creating the contribution tables, data are provided for sites identified as potential nonattainment and maintenance receptors using projected design values based on the "No Water" cell approach. In addition, we provide the contributions to the Richmond Co., NY site that would be a nonattainment receptor in the "3 x 3" approach.

C-1

## Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 1)

| Site ID | County | State | 2023en Average | 2023en Maximum | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 25.19 | 0.00 | 1.87 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 27.40 | 0.00 | 2.03 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.00 | 0.29 | 0.00 | 1.20 | 22.94 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.00 | 0.00 | 0.00 | 0.28 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.00 | 0.38 | 0.01 | 1.27 | 24.71 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.01 | 0.49 | 0.03 | 1.32 | 25.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.03 | 0.03 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.01 | 0.30 | 0.02 | 1.50 | 24.72 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.02 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.00 | 0.46 | 0.00 | 1.55 | 21.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.01 | 0.49 | 0.02 | 0.95 | 24.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.01 | 0.04 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.08 | 0.03 | 0.07 | 0.03 | 0.07 | 8.70 | 0.18 | 0.04 | 0.02 | 0.09 | 0.01 | 0.39 | 0.44 | 0.11 | 0.09 | 0.34 | 0.05 | 0.01 | 1.18 | 0.06 | 0.50 | 0.17 | 0.03 | 0.21 | 0.03 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 4.64 | 0.35 | 0.06 | 0.05 | 0.17 | 0.01 | 0.72 | 0.97 | 0.16 | 0.13 | 0.89 | 0.11 | 0.01 | 1.80 | 0.12 | 0.70 | 0.15 | 0.07 | 0.38 | 0.02 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.14 | 0.05 | 0.13 | 0.05 | 0.09 | 3.71 | 0.40 | 0.08 | 0.05 | 0.17 | 0.01 | 0.67 | 0.83 | 0.17 | 0.13 | 0.79 | 0.11 | 0.00 | 2.17 | 0.10 | 0.63 | 0.14 | 0.07 | 0.37 | 0.02 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.06 | 0.04 | 0.08 | 0.05 | 0.08 | 9.10 | 0.30 | 0.04 | 0.02 | 0.07 | 0.02 | 0.46 | 0.50 | 0.16 | 0.14 | 0.32 | 0.08 | 0.01 | 1.37 | 0.18 | 0.73 | 0.19 | 0.04 | 0.29 | 0.04 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.31 | 0.07 | 0.17 | 0.07 | 0.12 | 0.00 | 0.03 | 0.65 | 0.11 | 0.32 | 0.02 | 0.84 | 1.35 | 0.23 | 0.23 | 1.52 | 0.19 | 0.00 | 22.60 | 0.00 | 0.79 | 0.13 | 0.08 | 0.59 | 0.04 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.35 | 0.08 | 1.64 | 0.09 | 0.18 | 0.00 | 0.00 | 0.00 | 0.09 | 0.18 | 0.03 | 19.62 | 7.11 | 0.77 | 0.77 | 0.58 | 0.70 | 0.00 | 0.01 | 0.00 | 3.32 | 0.11 | 0.40 | 2.61 | 0.06 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.11 | 0.07 | 0.27 | 0.13 | 0.17 | 0.00 | 0.00 | 0.00 | 0.05 | 0.09 | 0.05 | 2.37 | 2.51 | 0.44 | 0.44 | 0.65 | 0.22 | 0.00 | 0.02 | 0.00 | 20.39 | 0.31 | 0.09 | 0.92 | 0.08 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.11 | 0.06 | 0.09 | 0.08 | 0.11 | 0.57 | 0.38 | 0.05 | 0.07 | 0.16 | 0.03 | 0.73 | 0.69 | 0.26 | 0.19 | 0.42 | 0.13 | 0.00 | 1.56 | 0.24 | 1.26 | 0.17 | 0.04 | 0.38 | 0.05 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.24 | 0.08 | 0.13 | 0.09 | 0.12 | 0.27 | 0.43 | 0.05 | 0.09 | 0.28 | 0.02 | 0.80 | 0.92 | 0.23 | 0.21 | 0.84 | 0.16 | 0.00 | 1.74 | 0.03 | 0.98 | 0.12 | 0.08 | 0.46 | 0.03 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.06 | 0.12 | 0.08 | 0.11 | 0.83 | 0.22 | 0.04 | 0.04 | 0.12 | 0.03 | 0.64 | 0.69 | 0.20 | 0.20 | 0.49 | 0.13 | 0.01 | 1.24 | 0.04 | 0.94 | 0.18 | 0.06 | 0.39 | 0.06 |
| 480391008 | Brazoria | TX | 74.0 | 74.9 | 0.35 | 0.08 | 0.90 | 0.21 | 0.30 | 0.00 | 0.00 | 0.00 | 0.21 | 0.14 | 0.08 | 1.00 | 0.32 | 0.40 | 0.47 | 0.14 | 3.80 | 0.00 | 0.00 | 0.00 | 0.22 | 0.34 | 0.63 | 0.88 | 0.10 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.49 | 0.07 | 0.58 | 0.13 | 0.27 | 0.00 | 0.00 | 0.00 | 0.27 | 0.34 | 0.06 | 0.23 | 0.16 | 0.10 | 0.40 | 0.11 | 1.92 | 0.00 | 0.01 | 0.00 | 0.08 | 0.11 | 0.33 | 0.24 | 0.07 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.39 | 0.04 | 0.29 | 0.12 | 0.13 | 0.00 | 0.00 | 0.00 | 0.39 | 0.26 | 0.05 | 0.34 | 0.13 | 0.17 | 0.17 | 0.10 | 3.06 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.50 | 0.38 | 0.05 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.32 | 0.03 | 0.54 | 0.10 | 0.15 | 0.00 | 0.00 | 0.00 | 0.53 | 0.16 | 0.04 | 0.51 | 0.12 | 0.27 | 0.32 | 0.05 | 3.38 | 0.00 | 0.00 | 0.00 | 0.17 | 0.23 | 0.39 | 0.63 | 0.05 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.37 | 0.04 | 0.99 | 0.12 | 0.20 | 0.00 | 0.00 | 0.00 | 0.23 | 0.13 | 0.05 | 0.88 | 0.24 | 0.33 | 0.33 | 0.11 | 4.72 | 0.00 | 0.00 | 0.00 | 0.27 | 0.20 | 0.79 | 0.88 | 0.07 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.37 | 0.08 | 0.78 | 0.15 | 0.33 | 0.00 | 0.00 | 0.00 | 0.18 | 0.26 | 0.07 | 0.29 | 0.18 | 0.19 | 0.69 | 0.13 | 1.71 | 0.00 | 0.01 | 0.00 | 0.13 | 0.15 | 0.27 | 0.38 | 0.10 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.14 | 0.04 | 0.40 | 0.07 | 0.08 | 0.00 | 0.00 | 0.00 | 0.06 | 0.06 | 0.03 | 15.10 | 5.28 | 0.79 | 0.35 | 0.77 | 0.72 | 0.00 | 0.03 | 0.00 | 2.01 | 0.40 | 0.28 | 0.93 | 0.10 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.14 | 0.08 | 0.51 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.07 | 0.07 | 0.04 | 15.73 | 7.11 | 0.45 | 0.46 | 0.81 | 0.84 | 0.00 | 0.03 | 0.00 | 2.06 | 0.28 | 0.30 | 1.37 | 0.06 |

## Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 2)

| Site ID | County | State | 2023en Average | 2023en Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.00 | 0.09 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.01 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.00 | 0.14 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.06 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.34 | 0.33 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.11 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.30 | 1.23 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.04 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.32 | 0.32 | 0.00 | 0.00 | 0.22 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.36 | 1.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 1.00 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.41 | 0.31 | 0.00 | 0.00 | 0.70 | 0.00 | 0.00 | 0.00 | 0.00 | 0.24 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 1.02 | 0.83 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.81 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.36 | 0.38 | 0.00 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.10 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.94 | 1.04 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 1.03 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.37 | 0.00 | 0.00 | 0.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.40 | 1.05 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.88 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.27 | 0.24 | 0.00 | 0.00 | 0.77 | 0.00 | 0.00 | 0.00 | 0.00 | 0.08 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 1.05 | 0.54 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.58 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.06 | 0.00 | 0.01 | 6.24 | 0.04 | 17.31 | 0.29 | 0.07 | 1.04 | 0.15 | 0.00 | 5.11 | 0.01 | 0.06 | 0.03 | 0.15 | 0.30 | 0.03 | 0.01 | 1.27 | 0.02 | 0.68 | 0.26 | 0.07 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.07 | 0.01 | 0.02 | 6.94 | 0.06 | 14.12 | 0.40 | 0.07 | 1.84 | 0.21 | 0.00 | 6.32 | 0.02 | 0.11 | 0.02 | 0.31 | 0.44 | 0.04 | 0.01 | 1.51 | 0.01 | 1.10 | 0.24 | 0.08 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.07 | 0.01 | 0.02 | 7.75 | 0.06 | 15.80 | 0.43 | 0.06 | 1.60 | 0.21 | 0.01 | 6.56 | 0.02 | 0.12 | 0.02 | 0.28 | 0.45 | 0.04 | 0.01 | 1.91 | 0.01 | 1.14 | 0.20 | 0.08 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.09 | 0.01 | 0.03 | 5.06 | 0.04 | 15.03 | 0.32 | 0.15 | 1.17 | 0.24 | 0.01 | 4.87 | 0.02 | 0.04 | 0.04 | 0.12 | 0.41 | 0.04 | 0.02 | 1.26 | 0.04 | 0.61 | 0.25 | 0.10 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.13 | 0.01 | 0.00 | 0.07 | 0.09 | 0.16 | 0.42 | 0.07 | 2.77 | 0.35 | 0.02 | 4.32 | 0.00 | 0.11 | 0.04 | 0.43 | 0.74 | 0.05 | 0.00 | 5.05 | 0.04 | 2.78 | 0.24 | 0.12 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.16 | 0.02 | 0.00 | 0.00 | 0.16 | 0.00 | 0.05 | 0.09 | 0.19 | 1.31 | 0.01 | 0.05 | 0.00 | 0.04 | 0.05 | 0.65 | 2.39 | 0.06 | 0.00 | 0.04 | 0.05 | 0.11 | 1.95 | 0.12 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.17 | 0.03 | 0.00 | 0.01 | 0.08 | 0.06 | 0.20 | 0.12 | 3.81 | 0.62 | 0.05 | 0.18 | 0.00 | 0.05 | 0.04 | 0.27 | 1.12 | 0.09 | 0.00 | 0.16 | 0.07 | 0.23 | 1.08 | 0.18 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.12 | 0.02 | 0.06 | 8.57 | 0.07 | 13.55 | 0.35 | 0.12 | 1.88 | 0.32 | 0.02 | 7.16 | 0.04 | 0.09 | 0.05 | 0.13 | 0.58 | 0.07 | 0.07 | 1.56 | 0.03 | 1.01 | 0.38 | 0.14 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.12 | 0.02 | 0.00 | 10.53 | 0.09 | 6.57 | 0.37 | 0.09 | 2.05 | 0.36 | 0.01 | 10.41 | 0.00 | 0.10 | 0.04 | 0.36 | 0.70 | 0.07 | 0.00 | 1.67 | 0.02 | 1.54 | 0.30 | 0.12 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.12 | 0.02 | 0.01 | 8.88 | 0.06 | 18.11 | 0.23 | 0.20 | 1.76 | 0.34 | 0.03 | 6.86 | 0.00 | 0.05 | 0.05 | 0.22 | 0.60 | 0.07 | 0.02 | 0.99 | 0.06 | 0.81 | 0.25 | 0.14 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.23 | 0.06 | 0.00 | 0.00 | 0.08 | 0.00 | 0.04 | 0.06 | 0.06 | 0.90 | 0.05 | 0.01 | 0.00 | 0.04 | 0.05 | 0.28 | 26.00 | 0.14 | 0.00 | 0.02 | 0.06 | 0.02 | 0.40 | 0.27 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.15 | 0.04 | 0.00 | 0.00 | 0.13 | 0.01 | 0.09 | 0.03 | 0.08 | 1.23 | 0.03 | 0.04 | 0.00 | 0.09 | 0.03 | 0.14 | 26.69 | 0.10 | 0.00 | 0.05 | 0.05 | 0.04 | 0.08 | 0.25 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.08 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.14 | 0.04 | 0.05 | 0.20 | 0.03 | 0.02 | 0.00 | 0.14 | 0.02 | 0.26 | 25.62 | 0.08 | 0.00 | 0.06 | 0.03 | 0.05 | 0.07 | 0.14 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.09 | 0.04 | 0.05 | 0.68 | 0.02 | 0.01 | 0.00 | 0.10 | 0.03 | 0.09 | 25.66 | 0.07 | 0.00 | 0.03 | 0.02 | 0.03 | 0.22 | 0.15 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.19 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.04 | 0.06 | 0.05 | 0.58 | 0.03 | 0.01 | 0.00 | 0.03 | 0.04 | 0.30 | 22.82 | 0.08 | 0.00 | 0.02 | 0.04 | 0.01 | 0.28 | 0.20 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.30 | 0.04 | 0.00 | 0.00 | 0.14 | 0.01 | 0.09 | 0.05 | 0.10 | 1.71 | 0.05 | 0.05 | 0.00 | 0.08 | 0.07 | 0.15 | 27.64 | 0.15 | 0.00 | 0.05 | 0.09 | 0.05 | 0.13 | 0.28 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.06 | 0.01 | 0.00 | 0.00 | 0.08 | 0.02 | 0.04 | 0.23 | 0.87 | 0.76 | 0.02 | 0.33 | 0.00 | 0.02 | 0.03 | 0.31 | 1.22 | 0.04 | 0.00 | 0.12 | 0.09 | 0.59 | 13.39 | 0.09 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.06 | 0.03 | 0.00 | 0.00 | 0.14 | 0.02 | 0.04 | 0.10 | 1.10 | 0.95 | 0.04 | 0.41 | 0.00 | 0.02 | 0.02 | 0.31 | 1.65 | 0.06 | 0.00 | 0.10 | 0.07 | 0.64 | 9.09 | 0.12 |

## Contributions to 2023 Nonattainment and Maintenance Sites Outside of California (Part 3)

| Site ID | County | State | 2023en Average | 2023en Maximum | Tribal | Canada/ Mexco | Offshore | Fire | Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|
| 40130019 | Maricopa | AZ | 69.3 | 71.4 | 0.06 | 3.29 | 0.37 | 0.49 | 34.74 | 2.52 |
| 40131004 | Maricopa | AZ | 69.8 | 71.0 | 0.06 | 2.70 | 0.34 | 0.56 | 33.85 | 2.24 |
| 80050002 | Arapahoe | CO | 69.3 | 71.3 | 0.22 | 0.55 | 0.14 | 0.46 | 34.84 | 4.24 |
| 80350004 | Douglas | CO | 71.1 | 73.2 | 0.21 | 0.71 | 0.16 | 0.47 | 34.74 | 4.19 |
| 80590006 | Jefferson | CO | 71.3 | 73.7 | 0.21 | 0.90 | 0.17 | 0.66 | 31.41 | 5.40 |
| 80590011 | Jefferson | CO | 70.9 | 73.9 | 0.16 | 0.70 | 0.16 | 0.45 | 32.96 | 4.74 |
| 80690011 | Larimer | CO | 71.2 | 73.0 | 0.25 | 0.78 | 0.19 | 1.74 | 34.54 | 5.71 |
| 81230009 | Weld | CO | 70.2 | 71.4 | 0.23 | 1.04 | 0.15 | 1.57 | 31.11 | 6.08 |
| 90010017 | Fairfield | CT | 68.9 | 71.2 | 0.00 | 1.64 | 0.65 | 0.20 | 16.73 | 3.28 |
| 90013007 | Fairfield | CT | 71.0 | 75.0 | 0.01 | 1.35 | 1.93 | 0.34 | 17.17 | 4.01 |
| 90019003 | Fairfield | CT | 73.0 | 75.9 | 0.01 | 1.37 | 1.96 | 0.33 | 17.00 | 4.09 |
| 90099002 | New Haven | CT | 69.9 | 72.6 | 0.01 | 1.58 | 2.15 | 0.22 | 17.17 | 4.13 |
| 240251001 | Harford | MD | 70.9 | 73.3 | 0.01 | 0.79 | 0.32 | 0.42 | 15.28 | 5.32 |
| 260050003 | Allegan | MI | 69.0 | 71.7 | 0.02 | 0.54 | 0.36 | 0.93 | 11.85 | 8.91 |
| 261630019 | Wayne | MI | 69.0 | 71.0 | 0.02 | 3.13 | 0.17 | 0.44 | 20.06 | 6.93 |
| 360810124 | Queens | NY | 70.2 | 72.0 | 0.01 | 1.73 | 1.39 | 0.25 | 17.87 | 4.45 |
| 360850067 | Richmond | NY | 67.1 | 68.5 | 0.01 | 1.44 | 0.83 | 0.35 | 15.46 | 4.75 |
| 361030002 | Suffolk | NY | 74.0 | 75.5 | 0.01 | 1.85 | 1.24 | 0.30 | 18.94 | 4.49 |
| 480391004 | Brazoria | TX | 74.0 | 74.9 | 0.02 | 0.44 | 2.31 | 2.05 | 24.02 | 5.60 |
| 481210034 | Denton | TX | 69.7 | 72.0 | 0.01 | 0.92 | 1.23 | 0.87 | 24.69 | 6.42 |
| 482010024 | Harris | TX | 70.4 | 72.8 | 0.01 | 0.28 | 4.83 | 0.77 | 27.83 | 2.66 |
| 482011034 | Harris | TX | 70.8 | 71.6 | 0.01 | 0.24 | 3.91 | 1.75 | 25.71 | 3.44 |
| 482011039 | Harris | TX | 71.8 | 73.5 | 0.01 | 0.47 | 4.04 | 2.09 | 24.67 | 4.50 |
| 484392003 | Tarrant | TX | 72.5 | 74.8 | 0.02 | 1.24 | 1.18 | 1.34 | 24.38 | 6.44 |
| 550790085 | Milwaukee | WI | 71.2 | 73.0 | 0.01 | 0.82 | 0.43 | 0.37 | 16.67 | 6.70 |
| 551170006 | Sheboygan | WI | 72.8 | 75.1 | 0.01 | 0.69 | 0.55 | 0.64 | 17.53 | 7.51 |

## Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 1)

| Site ID | County | State | 2023 Average | 2023 Maximum | AL | AZ | AR | CA | CO | CT | DE | DC | FL | GA | ID | IL | IN | IA | KS | KY | LA | ME | MD | MA | MI | MN | MS | MO | MT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.16 | 0.00 | 35.68 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.00 | 0.15 | 0.00 | 35.20 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.21 | 0.00 | 31.98 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.03 | 0.00 | 34.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.12 | 0.00 | 35.79 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.00 | 0.62 | 0.00 | 9.28 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.00 | 0.67 | 0.00 | 11.34 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.07 | 0.00 | 29.99 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.00 | 0.17 | 0.00 | 26.44 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.11 | 0.00 | 31.54 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.03 | 0.00 | 32.66 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.13 | 0.00 | 28.33 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.16 | 0.00 | 28.50 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.00 | 0.23 | 0.00 | 39.68 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.00 | 0.27 | 0.00 | 46.61 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.37 | 0.00 | 35.55 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.00 | 0.27 | 0.00 | 42.09 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.00 | 0.32 | 0.00 | 37.39 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.00 | 0.42 | 0.00 | 39.86 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.00 | 0.34 | 0.00 | 25.79 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.20 | 0.00 | 28.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.10 | 0.00 | 28.52 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.22 | 0.00 | 41.92 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 0.21 | 0.00 | 38.65 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 0.22 | 0.00 | 35.47 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.00 | 0.27 | 0.00 | 16.57 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.00 | 0.20 | 0.00 | 24.70 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 0.17 | 0.00 | 39.14 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.00 | 0.27 | 0.00 | 47.69 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.00 | 0.25 | 0.00 | 45.60 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 0.16 | 0.00 | 37.28 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.01 | 0.00 | 35.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.00 | 0.00 | 34.18 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 0.23 | 0.00 | 48.09 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.00 | 0.46 | 0.00 | 24.28 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.14 | 0.00 | 29.72 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.00 | 0.35 | 0.00 | 47.69 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 0.14 | 0.00 | 51.11 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.21 | 0.00 | 41.23 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.10 | 0.00 | 52.53 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.00 | 0.45 | 0.00 | 22.21 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.10 | 0.00 | 49.35 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 60900006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.03 | 0.00 | 34.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.06 | 0.00 | 7.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.07 | 0.00 | 23.74 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.12 | 0.00 | 30.91 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.03 | 0.00 | 30.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.00 | 0.32 | 0.00 | 29.51 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 2)

| Site ID | County | State | 2023 Average | 2023 Maximum | NE | NV | NH | NJ | NM | NY | NC | ND | OH | OK | OR | PA | RI | SC | SD | TN | TX | UT | VT | VA | WA | WV | WI | WY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.51 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.08 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.00 | 0.44 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.64 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.10 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.38 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.00 | 0.09 | 0.00 | 0.00 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.20 | 0.05 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.04 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.00 | 0.25 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.06 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.03 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.29 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.37 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.03 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.00 | 0.31 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.01 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.38 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.27 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.31 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.06 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.58 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.02 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 |
| 60370047 | Los Angeles | CA | 73.3 | 75.1 | 0.00 | 0.12 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.03 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.00 | 0.14 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.18 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.00 | 0.17 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.09 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.03 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.00 | 0.11 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.19 | 0.03 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.00 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.02 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.00 | 0.18 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.08 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.04 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.00 | 0.15 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.19 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.04 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.65 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.34 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.12 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.02 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.39 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.42 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.13 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.01 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 0.24 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.02 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 0.28 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.09 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.02 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.00 | 0.18 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.04 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.00 | 0.11 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.12 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.26 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.02 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 0.19 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.07 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.02 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.00 | 0.15 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.00 | 0.14 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.17 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.03 | 0.00 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 0.15 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.05 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.01 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.30 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.57 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.44 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.45 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.01 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 0.25 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.03 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.01 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.00 | 0.15 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.06 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.03 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.06 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.04 | 0.01 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.00 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.00 | 0.14 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.22 | 0.04 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.02 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 0.16 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.01 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.19 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.15 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.03 | 0.01 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.21 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.12 | 0.08 | 0.00 | 0.00 | 0.04 | 0.00 | 0.00 | 0.04 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.00 | 0.14 | 0.00 | 0.00 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.05 | 0.10 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.07 | 0.00 | 0.00 | 0.14 | 0.00 | 0.00 | 0.01 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.20 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.23 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.05 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.01 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.24 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.47 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.03 | 0.00 | 0.00 | 0.00 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.05 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.00 | 0.00 | 0.00 | 0.07 | 0.00 | 0.00 | 0.00 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.11 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.21 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.16 | 0.00 | 0.00 | 0.00 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.21 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.32 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.17 | 0.00 | 0.00 | 0.00 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.20 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.40 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.01 | 0.00 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.00 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.00 | 0.18 | 0.00 | 0.00 | 0.05 | 0.00 | 0.00 | 0.00 | 0.00 | 0.02 | 0.16 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.13 | 0.08 | 0.00 | 0.00 | 0.08 | 0.00 | 0.00 | 0.03 |

Contributions to 2023 Nonattainment and Maintenance Sites in California (Part 3)

| Site ID | County | State | 2023 Average | 2023 Maximum | Tribal | Canada/ Mexco | Offshore | Fire | Boundary | Biogenic |
|---|---|---|---|---|---|---|---|---|---|---|
| 60190007 | Fresno | CA | 79.2 | 79.4 | 0.00 | 0.29 | 1.19 | 1.39 | 32.52 | 6.85 |
| 60190011 | Fresno | CA | 78.6 | 81.2 | 0.01 | 0.33 | 1.13 | 1.62 | 32.34 | 6.78 |
| 60190242 | Fresno | CA | 79.4 | 82.2 | 0.00 | 0.31 | 1.24 | 1.48 | 34.92 | 7.88 |
| 60194001 | Fresno | CA | 73.3 | 74.4 | 0.00 | 0.12 | 1.68 | 0.87 | 27.76 | 7.90 |
| 60195001 | Fresno | CA | 79.6 | 81.2 | 0.00 | 0.20 | 1.75 | 1.12 | 32.10 | 7.66 |
| 60250005 | Imperial | CA | 73.3 | 74.6 | 0.01 | 19.87 | 1.17 | 0.71 | 38.68 | 2.11 |
| 60251003 | Imperial | CA | 79.0 | 80.0 | 0.01 | 18.74 | 1.14 | 0.61 | 43.58 | 2.08 |
| 60290007 | Kern | CA | 77.7 | 81.3 | 0.00 | 0.30 | 1.59 | 3.27 | 33.68 | 7.70 |
| 60290008 | Kern | CA | 71.3 | 72.8 | 0.01 | 0.67 | 1.96 | 1.05 | 32.77 | 7.30 |
| 60290014 | Kern | CA | 74.1 | 75.2 | 0.00 | 0.31 | 1.68 | 0.85 | 31.31 | 7.37 |
| 60290232 | Kern | CA | 73.7 | 75.2 | 0.00 | 0.13 | 1.67 | 1.11 | 29.43 | 7.73 |
| 60295002 | Kern | CA | 75.9 | 76.8 | 0.00 | 0.35 | 1.34 | 3.80 | 33.45 | 7.68 |
| 60296001 | Kern | CA | 70.9 | 72.4 | 0.00 | 0.50 | 1.59 | 0.63 | 30.55 | 7.98 |
| 60370002 | Los Angeles | CA | 73.3 | 75.1 | 0.01 | 1.47 | 3.53 | 0.82 | 24.67 | 2.15 |
| 60370016 | Los Angeles | CA | 86.1 | 88.9 | 0.01 | 1.73 | 4.14 | 0.97 | 28.98 | 2.53 |
| 60371201 | Los Angeles | CA | 79.8 | 79.8 | 0.02 | 1.74 | 4.20 | 1.29 | 32.92 | 2.83 |
| 60371701 | Los Angeles | CA | 78.1 | 79.1 | 0.01 | 1.82 | 4.16 | 0.97 | 25.57 | 2.35 |
| 60372005 | Los Angeles | CA | 72.3 | 74.6 | 0.01 | 1.76 | 4.10 | 1.17 | 24.34 | 2.37 |
| 60376012 | Los Angeles | CA | 85.9 | 87.4 | 0.02 | 2.27 | 4.69 | 1.22 | 32.85 | 3.43 |
| 60379033 | Los Angeles | CA | 76.3 | 77.2 | 0.01 | 1.82 | 3.52 | 0.45 | 40.73 | 2.75 |
| 60392010 | Madera | CA | 72.1 | 72.9 | 0.00 | 0.23 | 1.22 | 1.30 | 32.12 | 7.30 |
| 60470003 | Merced | CA | 69.9 | 71.0 | 0.00 | 0.37 | 1.94 | 1.12 | 30.92 | 5.97 |
| 60650004 | Riverside | CA | 76.7 | 76.7 | 0.01 | 1.37 | 3.64 | 0.72 | 25.79 | 2.34 |
| 60650012 | Riverside | CA | 83.6 | 85.1 | 0.00 | 1.30 | 3.33 | 0.31 | 36.48 | 2.66 |
| 60651016 | Riverside | CA | 85.2 | 85.5 | 0.00 | 1.60 | 3.00 | 3.09 | 38.71 | 2.54 |
| 60652002 | Riverside | CA | 72.4 | 73.0 | 0.01 | 2.29 | 1.39 | 2.24 | 46.66 | 2.08 |
| 60655001 | Riverside | CA | 79.5 | 80.1 | 0.01 | 2.71 | 2.67 | 3.03 | 42.81 | 2.40 |
| 60656001 | Riverside | CA | 78.3 | 81.6 | 0.00 | 1.13 | 4.03 | 0.53 | 30.14 | 2.55 |
| 60658001 | Riverside | CA | 87.0 | 87.9 | 0.01 | 1.76 | 4.77 | 0.77 | 28.27 | 2.68 |
| 60658005 | Riverside | CA | 83.2 | 84.4 | 0.01 | 1.68 | 4.56 | 0.73 | 27.04 | 2.57 |
| 60659001 | Riverside | CA | 73.7 | 75.9 | 0.00 | 1.71 | 4.96 | 1.03 | 25.56 | 2.43 |
| 60670012 | Sacramento | CA | 74.5 | 75.9 | 0.00 | 0.12 | 0.88 | 1.16 | 29.33 | 5.92 |
| 60675003 | Sacramento | CA | 69.9 | 71.3 | 0.00 | 0.06 | 0.79 | 1.26 | 26.47 | 6.04 |
| 60710005 | San Bernardino | CA | 96.2 | 98.1 | 0.00 | 1.36 | 3.68 | 0.44 | 38.71 | 2.77 |
| 60710012 | San Bernardino | CA | 84.1 | 85.8 | 0.02 | 1.33 | 1.83 | 0.33 | 53.12 | 1.93 |
| 60710306 | San Bernardino | CA | 76.2 | 77.4 | 0.00 | 0.67 | 2.10 | 0.50 | 40.62 | 2.02 |
| 60711004 | San Bernardino | CA | 89.8 | 91.0 | 0.01 | 2.03 | 4.00 | 0.95 | 31.07 | 2.74 |
| 60712002 | San Bernardino | CA | 93.1 | 95.0 | 0.00 | 1.58 | 4.58 | 0.75 | 31.34 | 2.82 |
| 60714001 | San Bernardino | CA | 86.0 | 88.5 | 0.00 | 0.91 | 2.69 | 0.37 | 37.56 | 2.45 |
| 60714003 | San Bernardino | CA | 94.1 | 95.8 | 0.00 | 0.98 | 4.15 | 0.69 | 31.70 | 2.90 |
| 60719002 | San Bernardino | CA | 80.0 | 81.4 | 0.01 | 2.80 | 2.23 | 3.20 | 45.72 | 2.29 |
| 60719004 | San Bernardino | CA | 88.4 | 88.7 | 0.00 | 0.92 | 3.90 | 0.65 | 29.78 | 2.72 |
| 60990006 | Stanislaus | CA | 74.8 | 75.7 | 0.00 | 0.34 | 2.19 | 1.77 | 30.24 | 5.06 |
| 61070006 | Tulare | CA | 69.1 | 71.9 | 0.00 | 0.33 | 0.55 | 4.43 | 53.61 | 2.46 |
| 61070009 | Tulare | CA | 76.1 | 77.2 | 0.00 | 0.43 | 1.44 | 3.40 | 39.41 | 7.08 |
| 61072002 | Tulare | CA | 68.9 | 71.4 | 0.00 | 0.25 | 1.58 | 0.95 | 26.88 | 7.42 |
| 61072010 | Tulare | CA | 73.1 | 73.9 | 0.00 | 0.15 | 1.78 | 1.17 | 30.26 | 8.67 |
| 61112002 | Ventura | CA | 70.5 | 72.2 | 0.02 | 1.65 | 4.60 | 1.01 | 29.69 | 2.75 |

# STATEMENT OF CONSIDERATION
## Relating to the Proposed SIP Revision for the
## 2015 Ozone Infrastructure State Implementation Plan

## Energy and Environment Cabinet
## Kentucky Department for Environmental Protection
## Division for Air Quality

**Response to Comments for Kentucky's proposed SIP submittal to address Clean Air Act (CAA) Sections 110(a)(1) and (2), regarding the 2015 ozone National Ambient Air Quality Standards (NAAQS) Infrastructure State Implementation Plan (I-SIP).**

Beginning August 23, 2018 until September 21, 2018, the Energy and Environment Cabinet (Cabinet) provided an opportunity for the public to review and comment on the proposed SIP revision addressing CAA sections 110(a)(1) and (2) for the 2015 ozone NAAQS. The Cabinet made available the public notice of the comment period and public hearing on the Division for Air Quality's website, and mailed the public notice to interested individuals registered on the regulatory mailing lists maintained by the Cabinet.

The following people submitted written statements during the public comment period:

| Name | Title/Agency/Organization/Entity/Other |
| --- | --- |
| Scott Davis............................................. | U.S. EPA |
| Steven E. Flint, PE.................................... | Director, Division of Air Resources of New York State Department of Environmental Conservation |
| David M. Flannery.................................... | Legal Counsel, Midwest Ozone Group |
| Jason Wilkerson...................................... | Senior Environmental Engineer, LG&E and KU Energy |
| Aaron Messing, Matthew E. Miller................. | Legal Fellow and Staff Attorney of Sierra Club |

A public hearing was conducted on September 21, 2018, at 10:00 a.m. at 300 Sower Boulevard in Frankfort, Kentucky.

The following people attended this public hearing:

| Name | Title/Agency/Organization/Entity/Other | Testimony |
| --- | --- | --- |
| Brian Clark | Executive Director, Kentucky Petroleum Marketers | No |
| Stephanie Stumbo | Attorney, Goss Samford Attorneys at Law | No |
| Larry Taylor | Environmental Scientist Consultant, Office of the Commissioner, DEP | No |

The following people from the Division for Air Quality attended this public hearing:

Name and Title
Lauren Hedge, Environmental Scientist (Cabinet Representative)
Anna Bowman, Environmental Scientist

## Summary of Comments and Responses

**1. Comment:** The modeling performed by Alpine Geophysics (Alpine) in support of Kentucky's 2015 ozone interstate transport SIP determined downwind nonattainment monitors in 2023 and evaluated the significance of upwind states contributions for the 2015 ozone national ambient air quality standards (NAAQS) based on alternative flexibilities and/or analytics proposed in the EPA's March 27, 2018 Memorandum *(Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone NAAQS under the Clean Air Act Section 110(a)(2)(D)(i)(I).* As discussed on page 50 of the SIP submission, the use of these flexibilities  provide alternative results than the EPA's 2023 modeling platform in terms of downwind receptors and Kentucky's projected contribution. We would like to have further discussions on these differences and below provide examples.

    a. Page 51 - Alpine projects the Harford County, Maryland, monitor as a nonattainment receptor with an average design value of 71.1 parts per billion (ppb). In the submittal, Kentucky indicates that the EPA's modeling platform did not account for newly announced unit retirements, fuel switching and modifications. Please identify any specific emission reductions anticipated in the downwind state that Kentucky believes were not accounted for in the EPA's modeling. To the extent that Kentucky believes anticipated emission reductions would address the average design value of 71.1 ppb identified in the Alpine modeling, Kentucky should also explain how such reductions would address maintenance concerns at this same receptor, given both the EPA modeling and the Alpine modeling identified a maximum design value of 73.3 ppb and 73.5 ppb, respectively.

**Response:** The Cabinet acknowledges this comment. The Cabinet has amended the language on page19, within Kentucky's proposed 2015 ozone I-SIP, to reflect the use of EPA's 1 ppb threshold from its August 31, 2018 memo.[1] The Cabinet believes the 1 ppb threshold is a sound alternative in identifying emissions contributions. EPA's memo states, "Thus, the use of a 1 ppb threshold to identify linked upwind states still provides the potential, at step 3, for meaningful emissions reductions in linked upwind states in order to aid downwind states with attainment and maintenance of the 2015 ozone NAAQS." Further, as stated in the EPA v. EME Homer City Generation case. "EPA does not view the obligation under the good neighbor provision as

---

[1] EPA, *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards.* (August 31, 2018)

a requirement for upwind states to bear all of the burden for resolving downwind air quality problems. Rather, it is an obligation that upwind and downwind states share responsibility for addressing air quality problems. If, after implementation of reasonable emissions reductions by an upwind state, a downwind air quality problem persists, whether due to international emissions or emissions originating within the downwind state, the EPA can relieve the upwind state of the obligation to make additional reductions to address that air quality problem. But the statute does not absolve the upwind state of the obligation to make reasonable reductions in the first instance."[2] Kentucky has made the necessary reasonable reductions, which can be found within the Emission Trends section of the proposed 2015 ozone I-SIP, starting on page 30. EPA's EGU modeling platform for 2023 emissions did not account for the planned shutdown of units 1 and 2 at the E.W. Brown facility in February of 2019 which would reduce Kentucky emissions by another 471 tons of $NO_x$. The Cabinet concludes that EPA's on-the-books regulations and controls, as well as enforceable permit conditions, will continue to limit any impact to the maintenance monitor from Kentucky sources.

    b. Page 53 - Kentucky says that the EPA"... did not run separate models to assess how much the emissions from Canada and Mexico contributed to monitors within the U.S. Alpine determined that accounting for the contribution of emissions from Canada and Mexico would impact the attainment status of several monitors." The EPA believes these statements blend different aspects of accounting for contributions from Canada and Mexico. Specifically, the EPA did provide separate contribution data for emissions from in the portions of Canada and Mexico within the modeling domain, as did Alpine. However, Alpine applied these contributions to the projected 2023 design values to lower the design values by the amount of contribution from Canada and Mexico. Please provide more information to support the technical basis for this approach to calculating design values. The application of this approach does not address the maintenance concerns at this same receptor, given both the EPA modeling and the Alpine modeling identified a maximum design value of 73.3 ppb and 73.5 ppb, respectively, and would still be above the NAAQS even without inclusion of the 2023 Canada and Mexico contributions.

**Response:** The Cabinet acknowledges this comment. International emissions may significantly contribute to the maintenance monitor referenced above. To clarify, the Cabinet included the Alpine modeling to more accurately account for the contributions from international transport. As such, EPA's modeled contribution underestimates the international contributions and overestimates the impacts of emissions from Kentucky sources on the maintenance monitor.

    c. Pages 54-55 - Kentucky suggests that the degree of reductions required of upwind states linked to maintenance receptors should be different than that required for upwind states linked to nonattainment receptors. However, Kentucky does not propose how the obligations of upwind states should differ for the former group of upwind states. As noted, the EPA's modeling links emissions from Kentucky to one

---

[2] 81 FR 74504, 81 FR 74536 (Oct. 26, 2016); Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS

maintenance receptor in Harford County, Maryland, based on the 1 ppb threshold. The Alpine modeling identifies this receptor as nonattainment, which Kentucky asserts would have an average design value below the NAAQS if certain other factors, addressed in prior comments, were considered. The EPA notes that the obligation to address maintenance of the NAAQS also applies to receptors identified as nonattainment receptors. Therefore, considering the results of either modeling platform, Kentucky should explain how it has addressed its projected interference to maintenance of the NAAQS at the Harford County receptor. *(Scott Davis, U.S. EPA)*

**Response:** The Cabinet acknowledges this comment. As provided on pages 20-30, the permanent and enforceable measures to address the requirements of CAA section $110(a)(2)(D)(i)(I)$ control the emissions of $NO_x$ and VOC from Kentucky sources that may impact downwind maintenance receptors. Additional reductions and downward trends of $NO_x$ emissions from point sources in Kentucky are detailed on pages 30-33 of the proposed SIP. Further, on pages 40-45 of the proposed SIP, the Cabinet details the local contributions influencing the Harford maintenance monitor and the local controls that can be implemented to reduce ozone levels. As stated by the Midwest Ozone Group (MOG), "When an area is measuring nonattainment of a NAAQS, as is the case with the areas linked to Kentucky, the Clean Air Act (CAA) requires that the effects and benefits of local controls on all source sectors be considered first, prior to pursuing controls of sources in upwind states. CAA § 107(a) states that "[e]ach State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State." In addition, CAA § 110(a)(1) requires that a state SIP "provides for implementation, maintenance, and enforcement" of the NAAQS "in each air quality control region...within such State." Moreover, by operation of law, additional planning and control requirements are applicable to areas that are designated to be in nonattainment."[3]

**2. Comment:** The analysis of Step 1 and Step 2 includes an intricate combination of the EPA's 12-kilometer (km) modeling and Alpine's 4-km modeling. The outcome of this approach appears to be that Kentucky is linked for nonattainment and maintenance (i.e. prong 1 and prong 2) to the receptor in Harford County, Maryland where the 2023 average design value for this site based on Alpine's modeling is 71.1 ppb. The approach in the SIP involves mixing and matching the contribution data from the EPA's modeling with design values from Alpine's modeling. The EPA is unclear as to how this additional information would provide a basis to conclude that Kentucky does not significantly contribute to downwind receptors. An alternative, more straightforward approach would be to rely entirely upon the EPA's projected design values and contribution data and apply the 1 ppb screening threshold established in the EPA's August 31, 2018 Memorandum to the contributions from Kentucky to downwind receptors. Specifically, the EPA's modeling projects that the Harford site will be a maintenance-only receptor with a 2023 average design value of 70.9 ppb. *See* Analysis of

---

[3] Flannery, David M. (Midwest Ozone Group), *Proposed Infrastructure State Implementation Plan Related to the 2015 Ozone NAAQS.* 21 Sep 2018: Page 9.

Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate
Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air
Quality Standards. The EPA's modeling also shows that this site is the only receptor to which
Kentucky contributes above 1 ppb. Thus, under this approach Kentucky would only be linked
to the maintenance receptor in Harford County, Maryland.
*(Scott Davis, U.S. EPA)*

**Response:** The Cabinet acknowledges this comment. In accordance with 40 CFR 51.102, the
Cabinet made the proposed SIP available for public review and comment on August 23, 2018.
On August 31, 2018, EPA published a memo regarding the analysis of contribution thresholds
for use in CAA section 110(a)(2)(D)(i)(I) interstate transport SIP submissions for the 2015
ozone NAAQS. After review of the memo, the Cabinet concurs with EPA's assessment of the
1 ppb threshold and that the Harford monitor is considered a maintenance monitor.

**3. Comment:** The SIP refers to a number of expected electricity generating units (EGU)
closures, plans for fuel-switching, and other actions that are expected to reduce future
nitrogen oxide ($NO_x$) emissions in Kentucky (page 31). As indicated in comment 1
above, in the SIP revision, please identify which of these actions were not accounted for
in the EPA's 2023 modeling. Also, in support of Kentucky's analysis, please provide an
estimate of the anticipated ozone season $NO_x$ emissions reductions from these actions in
2023. The EPA encourages Kentucky to include information about $NO_x$ reduction
efforts, costs, and air quality impacts which may help provide the Agency with
additional rationales for why further $NO_x$ reduction is not needed. In addition, Kentucky
should consider including information related to steps 3 (identification of emissions
reductions necessary - considering costs and air quality factors - to prevent an identified
upwind state from contributing significantly to those downwind monitors) and 4 of EPA'
s traditional 4-step framework. This discussion should include information about EGU
as well as non-EGU sources. If the Commonwealth intends to rely on the anticipated
reductions related to these facilities as measures to address its contribution to downwind
receptors, then the Commonwealth would need to consider providing a separate SIP
revision that incorporates these emission reductions into the SIP and demonstrates how
the reductions at these facilities will affect the receptors to which the Commonwealth is
linked.
*(Scott Davis, U.S. EPA)*

**Response:** The Cabinet acknowledges this comment. EPA's EGU modeling platform for
2023 emissions did not account for the planned shutdown of units 1 and 2 at the E.W. Brown
facility in February of 2019 which would reduce Kentucky's $NO_x$ emissions by another 471
tons. Kentucky emissions have decreased significantly as detailed in the Emission Trends
section of the proposed 2015 ozone I-SIP, starting on page 30. EPA's updated modeling, along
with the 1 ppb threshold memo, show Kentucky significantly contributing to one maintenance
monitor located in Harford, Maryland. Pages 40-45 of the proposed SIP, discusses the local
contributions influencing the Harford maintenance monitor and the local controls that can
be implemented to reduce ozone levels. The Cabinet does not agree that maintenance

5

monitors should require the same magnitude of reductions as nonattainment monitors from upwind states. The benefits of local controls on all source sectors should be considered first, prior to pursuing controls of sources in upwind states. Additionally, the Cabinet agrees with EPA's ruling "that section 110(a)(2)(D)(i)(I) of the CAA only requires upwind states to prohibit emission that will significantly contribute to nonattainment or interfere with maintenance of the NAAQS in other states. It does not shift to upwind states the full responsibility for ensuring that all areas in downwind states attain and maintain the NAAQS." (81 FR 74515)

**4. Comment:** To obtain full approval for prong 4, a state can either rely on a fully approved regional haze SIP or provide a demonstration in its infrastructure SIP submission that emissions within its jurisdiction do not interfere with other air agencies ' plans to protect visibility. The EPA acknowledges Kentucky's ongoing work to obtain a full approval of its regional haze SIP, including a pending SIP submission that would change the Commonwealth's reliance from the Clean Air Interstate Rule to the Cross-State Air Pollution Rule for for [sic] certain regional haze requirements.
*(Scott Davis, U.S. EPA)*

**Response:** The Cabinet acknowledges the comment. On September 4, 2018, the Cabinet submitted a proposed revision to the Kentucky Regional Haze SIP requesting EPA to change Kentucky's reliance from the Clean Air Interstate Rule (CAIR) to reliance on the Cross State Air Pollution Rule (CSAPR) to satisfy Best Available Retrofit Technology (BART). The proposed submittal was provided to Federal Land Managers (FLMs) for a 60-day review and comment period. The public comment period closed October 4, 2018. The Cabinet intends to submit a final revision in the near future.

**5. Comment:** Kentucky's prehearing submittal discusses use of a 1.0 ppb threshold in relation to the 2015 EPA Significant Impact Level (SIL) guidance. On April 17, 2018, the EPA released guidance on ozone and particulate matter significant impact levels (SILs) for the prevention of significant deterioration (PSD) permitting program. The EPA has not made the determination that the SIL, developed for source-specific (PSD) purposes, could be considered an appropriate threshold to use when assessing contribution from an entire-state. The EPA's August 31, 2018, memorandum regarding use of a 1.0 threshold, stated that the amount of upwind collective contribution captured with the 1 percent and 1.0 ppb thresholds was generally comparable and that it may be reasonable and appropriate for states to use a 1 ppb contribution threshold. The EPA recommends Kentucky consider referring to this memorandum as part of its rationale for comparing its contribution to a 1 ppb threshold. *See* Memorandum from Peter Tsirigotis, Director, OAQPS to Regional Air Division Directors, re: Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, available at https://www.epa.gov/sites/production/files/2018-09/documents/contrib_thresholds_sip_subm_2015_ozone_memo_08_31_18.pdf. If Kentucky believes it is appropriate to use the 1 ppb threshold in its SIP development, then the Commonwealth would only be linked to one potential maintenance receptor for the 2015 ozone

NAAQS in the EPA's 2023 air quality modeling in Harford County, Maryland (which Alpine modeling identifies as a nonattainment receptor). The EPA notes that the contribution threshold alone was not intended to represent a "significant contribution" as suggested on page 51 of the SIP submission, but rather a contribution that merits more consideration to determine *if* a state impacting a downwind receptor above that threshold will significantly contribute to nonattainment or interfere with maintenance of the NAAQS.

**Response:** The Cabinet concurs with the comment and has updated the narrative on page 19.

**6. Comment:** On page 31 of the prehearing submission, the EPA notes that Kentucky cites to the Cross-State Air Pollution Rule (CSAPR) Update as part of its interstate transport demonstration for the 2015 ozone NAAQS. The Update trading program provides for reductions of annual and ozone season nitrogen oxides ($NO_x$) and sulfur dioxide emissions from EGUs, and the analyses used to develop the Update rule were based on data and inputs specific to addressing downwind nonattainment and maintenance issues for the 1997 and 2008 ozone NAAQS. The EPA suggests the Commonwealth modify the discussion on page 31 to clarify that the CSAPR trading programs were developed to address states' 110(a)(2)(D)(i)(I) obligations for the 1997 and 2008 ozone NAAQS but may provide $NO_x$ emission reduction co-benefits for the 2015 ozone NAAQS.
*(Scott Davis, U.S. EPA)*

**Response:** The Cabinet concurs with the comment and has updated the narrative which can now be found on page 32.

**7. Comment:** The EPA recommends that Kentucky include a statement noting that 40 CFR 51.308(i)(4) requires states to maintain continuing consultation procedures with the Federal Land Managers regarding any regional haze plan (or plan revision), and includes progress reports, and that Kentucky maintains such procedures in the Commonwealth's regional haze plan and progress report.
*(Scott Davis, U.S. EPA)*

**Response:** The Cabinet acknowledges the comment. The Code of Federal Regulations (CFR) reference regarding continuing consultation procedures with the FLMs has been changed to "40 CFR 51.308(i)(4)" and a statement concerning this requirement has been added to the narrative on page 58. The Cabinet maintains these required consultation procedures in our regional haze plan, and submitted our progress report for the first regional haze implementation period on September 17, 2014. EPA approved this progress report on October 12, 2017 (82 FR 36707).

**8. Comment:** 40I KAR 51:240 (CSAPR $NO_x$ Annual) and 401 KAR 51:250 (CSAPR $NO_x$ Ozone Season) are currently listed with other SIP-approved provisions. The EPA suggests that the Commonwealth provide a note that it provided these regulations for approval into the SIP on September 13, 2018.

7

*(Scott Davis, U.S. EPA)*

**Response:** The Cabinet concurs with the comment and has updated the narrative.

**9. Comment:** DEC commends Kentucky on the reductions in ozone precursor emissions to date, but requests that KY DEP take additional measures to resolve its current significant contributions to the NYMA for the 2015 ozone NAAQS, rather than waiting to see whether its contributions are resolved years into the future. Most importantly, KY DEP should make enforceable commitments for all control measures and operational changes (e.g., unit shutdowns) discussed in this transport analysis.
*(Steven Flint, New York Division of Air Resources)*

**Response:** The Cabinet does not concur with the comment. Pages 32-33 within Kentucky's proposed 2015 ozone I-SIP discuss additional emission reductions as a result of conversions from coal to gas and permanent closures. Additionally, the Cabinet includes enforceable limitations in the Title V operating permits issued to Kentucky EGUs. All operational changes are enforced through permitting actions. Furthermore, as discussed on 39 within Kentucky's proposed 2015 ozone I-SIP, when additional EGUs operate on High Electric Demand Days (HEDD), $NO_x$ emissions increase, which contributes to higher monitored ozone levels. According to the HEDD Initiative conducted by the Ozone Transport Commission (OTC), most Simple Cycle (SC) turbine units in New York, also referred to as peakers, were installed prior to 1987; peakers installed prior to 1987 emit $NO_x$ at a significantly higher rate than those installed after 1987.[4] During the OTC/MANE-VU Joint Committees' Meeting held on September 21, 2018, New Jersey presented their analysis of an ozone event in the Ozone Transport Region. The analysis concluded that 50% of Simple Cycle (SC) units in New York are significant contributors to $NO_x$ rates greater than 2.8/MWhr, 20% of SC units emit well over 10 lb/MWhr, and 21 units emit greater than 20 lb/MWhr.[5] The Cabinet urges New York to implement local controls first before placing unreasonable burden on Kentucky to implement more controls.

**10. Comment:** Without enforceable emission limits being implemented at facilities as assumed in the faulty 2023 modeling, there is no guarantee that any emission reductions will actually occur. This serves to underrepresent the extent of downwind nonattainment and maintenance issues, and minimizes the extent of ozone transport from upwind states such as Kentucky. Additional monitors in the New York City metropolitan area, including in New York State, would likely be shown to be significantly impacted by Kentucky if not for the various issues in EPA's modeling. Irrespective of projected future design values and emissions contributions, Kentucky is obligated to resolve its current significant contributions to the New York City

---

[4] "Background, High Electric Demand Day (HEDD) Initiative", New York Department of Environmental Conservation. http://midwestozonegroup.com/files/New_York_Peakers.pptx
[5] "OTC/MANE-VU Joint Committees' Meeting", Ozone Transport Commission. https://otcair.org/upload/Documents/Meeting%20Materials/OTC_SAS_Public_09212018.pdf

metropolitan area, which continues to record exceedances of the 2008 and 2015 ozone NAAQS. *(Steven Flint, New York Division of Air Resources)*

**Response:** The Cabinet does not concur with the comment. EPA's March 27, 2018 updated modeling does not link Kentucky to any downwind monitors located in New York. Further, the August 31, 2018 EPA memo demonstrates that Kentucky does not significantly contribute to any downwind nonattainment monitors. As discussed on pages 38-39 within Kentucky's proposed 2015 ozone I-SIP, when additional EGUs operate on High Electric Demand Days (HEDD), $NO_x$ emissions increase, which contributes to higher monitored ozone levels. According to the HEDD Initiative conducted by the OTC, most Simple Cycle (SC) turbine units in New York, also referred to as peakers, were installed prior to 1987; peakers installed prior to 1987 emit $NO_x$ at a significantly higher rate than those installed after 1987.[6] During the OTC/MANE-VU Joint Committees' Meeting held on September 21, 2018, New Jersey presented their analysis of an ozone event in the Ozone Transport Region. The analysis concluded that 50% of Simple Cycle (SC) units in New York are significant contributors to $NO_x$ rates greater than 2.8/MWhr, 20% of SC units emit well over 10 lb/MWhr, and 21 units emit greater than 20 lb/MWhr.[7] The Cabinet urges New York to implement local controls first before placing unreasonable burden on Kentucky to implement more controls.

**11. Comment:** KY DEP claims that "$NO_x$ emissions from EGUs will continue to decrease with the implementation of the CSAPR Update," along with unit retirements. Despite the CSAPR Update being fully implemented, Kentucky sources have not been optimizing their existing controls and NYMA continues to monitor NAAQS exceedances, due in large part to pollution transport from upwind states like Kentucky. *(Steven Flint, New York Division of Air Resources)*

**Response:** The Cabinet does not concur with the comment. EPA's March 27, 2018 updated modeling does not link Kentucky to any downwind monitors located in New York. Further, the August 31, 2018 EPA memo demonstrates that Kentucky does not significantly contribute to any downwind nonattainment monitors. As discussed on pages 38-39 within Kentucky's proposed 2015 ozone I-SIP, when additional EGUs operate on High Electric Demand Days (HEDD), $NO_x$ emissions increase, which contributes to higher monitored ozone levels. According to the HEDD Initiative conducted by the OTC, most Simple Cycle (SC) turbine units in New York, also referred to as peakers, were installed prior to 1987; peakers installed prior to 1987 emit $NO_x$ at a significantly higher rate than those installed after 1987.[8] During the OTC/MANE-VU Joint Committees' Meeting held on September 21, 2018, New Jersey presented their analysis of an

---

[6] "Background, High Electric Demand Day (HEDD) Initiative", New York Department of Environmental Conservation. http://midwestozonegroup.com/files/New_York_Peakers.pptx

[7] "OTC/MANE-VU Joint Committees' Meeting", Ozone Transport Commission. https://otcair.org/upload/Documents/Meeting%20Materials/OTC_SAS_Public_09212018.pdf

[8] "Background, High Electric Demand Day (HEDD) Initiative", New York Department of Environmental Conservation. http://midwestozonegroup.com/files/New_York_Peakers.pptx

ozone event in the Ozone Transport Region. The analysis concluded that 50% of Simple Cycle (SC) units in New York are significant contributors to $NO_x$ rates greater than 2.8/MWhr, 20% of SC units emit well over 10 lb/MWhr, and 21 units emit greater than 20 lb/MWhr.[9] The Cabinet urges New York to implement local controls first before placing unreasonable burden on Kentucky to implement more controls.

**12. Comment:** First, KY DEP must apply enforceable limits to assure projected emission reductions take place. The CAA specifically requires SIPs to "include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements."[10] Indeed, a SIP cannot be considered administratively complete unless it includes "[e]vidence that the plan contains emission limitations, work practice standards and recordkeeping/reporting requirements, where necessary, to ensure emission levels."[11] Without specific enforceable emissions limits and control measures, DEC submits that the SIP is incomplete and does not meet the requirements of the CAA and implementing regulations.[12] *(Steven Flint, New York Division of Air Resources)*

**Response:** The Cabinet does not concur with the comment. The Cabinet includes enforceable limitations in the Title V operating permits issued to Kentucky EGUs, including the regulatory requirements of CSAPR under 40 CFR Part 97. Additionally, the Permanent and Enforceable Measures portion of the SIP, in the Element D section, lists the Kentucky Administrative Regulations that include standards of performance for new and existing facilities, as well as RACT requirements, applicable to VOC and $NO_x$-emitting facilities. Furthermore, as stated by MOG, "When an area is measuring nonattainment of a NAAQS, as is the case with the areas linked to Kentucky, the Clean Air Act (CAA) requires that the effects and benefits of local controls on all source sectors be considered first, prior to pursuing controls of sources in upwind states. CAA § 107(a) states that "[e]ach State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State." In addition, CAA § 110(a)(1) requires that a state SIP "provides for implementation, maintenance, and enforcement" of the NAAQS "in each air quality control region...within such State." Moreover, by operation of law, additional planning and control requirements are applicable to areas that are designated to be in nonattainment."[13] The Cabinet has added this language to the document.

---

[9] "OTC/MANE-VU Joint Committees' Meeting", Ozone Transport Commission.
https://otcair.org/upload/Documents/Meeting%20Materials/OTC_SAS_Public_09212018.pdf

[10] 42 U.S.C. §7410(a)(2)(A)
[11] 40 CFR Part 51, App. V, §2.2(g)
[12] 42 U.S.C. §7410(a)(2) and 40 CFR 60.24
[13] Flannery, David M. (Midwest Ozone Group), *Proposed Infrastructure State Implementation Plan Related to the 2015 Ozone NAAQS.* 21 Sep 2018: Page 9.

**13. Comment:** KY DEP should institute emission limits consistent with SCR optimization at all EGUs forecasted by U.S. EPA to operate at a 0.1 lb/mmBtu emission rate in 2023, including unit 3 at the Paradise Fossil Plant.[14] While KY DEP touts the shutdown of two coal boilers at Paradise, the remaining unit had 2017 ozone season nitrogen oxide ($NO_x$) emissions of 2,425 tons at an emission rate of 0.223 lb/mmBtu.[15] Had it operated its SCR controls to achieve the assumed rate of 0.1 lb/mmBtu, this one unit by itself would have reduced its 2017 ozone season $NO_x$ emissions by an additional 1,338 tons.
*(Steven Flint, New York Division of Air Resources)*

**Response:** The Cabinet does not concur with the comment. The U.S. EPA Air Markets Program Data shows in 2017 that New York had a total of 73 units with an emissions rate above 0.2 lb/mmBtu, 66 of those units operate above 0.4 lb/mmBtu with emissions rates as high as 0.8 lb/mmBtu. The number of units above 0.2 lb/mmBtu in New York is far greater than the units in Kentucky, where only 4 of 27 units are above 0.4 lb/mmBtu. In order to prevent over control of upwind states, the downwind states should be required to reduce emissions from local sources. As stated in the EPA v. EME Homer City Generation case, "EPA does not view the obligation under the good neighbor provision as a requirement for upwind states to bear all of the burden for resolving downwind air quality problems. Rather, it is an obligation that upwind and downwind states share responsibility for addressing air quality problems. If, after implementation of reasonable emissions reductions by an upwind state, a downwind air quality problem persists, whether due to international emissions or emissions originating within the downwind state, the EPA can relieve the upwind state of the obligation to make additional reductions to address that air quality problem. But the statute does not absolve the upwind state of the obligation to make reasonable reductions in the first instance."[16] Sources within Kentucky have made the necessary reasonable reductions, which can be found within the Emission Trends section of the proposed 2015 ozone I-SIP starting on page 30.

**14. Comment:** Second, KY DEP should implement emission controls on its major stationary sources based on a more stringent control threshold. New York and other downwind states, such as Connecticut, have already adopted control measures that are considerable more stringent than most upwind states. For example, DEC applies Reasonable Available Control Technology (RACT) requirements statewide on both EGUs and non-EGUs, at a current cost threshold of $5,500 per ton of $NO_x$ reduced; meanwhile, many upwind states – including Kentucky – unreasonably rely on EPA's flawed claim that EGU $NO_x$ reductions that cost more than $1,400 per ton would not be cost-effective. For the 2017 ozone season, emissions from Kentucky's electric generating sector were 400% (16,000 tons) greater than electric generating emissions in New York, with an average emission rate over 200% higher.[17]
*(Steven Flint, New York Division of Air Resources)*

---

[14] "2023en_Engineering_Analysis_Unit_File.xls" workbook released with October 27, 2017 Page Memorandum
[15] U.S. EPA Air Markets Program Data
[16] 81 FR 74504, 81 FR 74536 (Oct. 26, 2016); Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS
[17] U.S. EPA Air Markets Program Data

**Response:** The Cabinet acknowledges the comment. The Cabinet includes enforceable limitations in the Title V operating permits issued to Kentucky EGUs, including the regulatory requirements of CSAPR under 40 CFR Part 97. Additionally, the Permanent and Enforceable Measures portion of the SIP, in the Element D section, lists the Kentucky Administrative Regulations that include standards of performance for new and existing facilities, as well as RACT requirements, applicable to VOC and $NO_x$-emitting facilities. For EGUs, EPA explained in the CSAPR Update rule the reasoning behind the $1,400 per ton cost threshold, "emission budgets reflecting the $1,400 per ton cost threshold do not over-control upwind states' emissions relative to either the downwind air quality problems to which they are linked or the 1 percent contribution threshold that triggered further evaluation." Furthermore, as discussed on pages 38-39 within Kentucky's proposed 2015 ozone I-SIP, when additional EGUs operate on High Electric Demand Days (HEDD), $NO_x$ emissions increase, which contributes to higher monitored ozone levels. According to the HEDD Initiative conducted by the OTC, most Simple Cycle (SC) turbine units in New York, also referred to as peakers, were installed prior to 1987; peakers installed prior to 1987 emit $NO_x$ at a significantly higher rate than those installed after 1987.[18] During the OTC/MANE-VU Joint Committees' Meeting held on September 21, 2018, New Jersey presented their analysis of an ozone event in the Ozone Transport Region. The analysis concluded that 50% of Simple Cycle (SC) units in New York are significant contributors to $NO_x$ rates greater than 2.8/MWhr, 20% of SC units emit well over 10 lb/MWhr, and 21 units emit greater than 20 lb/MWhr. [19] The Cabinet urges New York to implement local controls first before placing unreasonable burden on Kentucky to implement more controls.

**15. Comment:** While it is true that ozone concentrations are declining over the long term,[20] KY DEP ignores current trends at monitors in the NYMA. Presented below are ozone design value trends for the Stratford and Westport monitors, which show some variation, but both have design values equal to or higher than in 2009 and exhibit an overall flat or increasing design value trend since 2009.[21] This trend has developed despite continual $NO_x$ and volatile organic compound reductions from New York, New Jersey, and Connecticut to fulfill their reasonable further progress obligations pursuant to 2008 ozone NAAQS requirements (with actual reductions having greatly exceeded the required three percent per year), further highlighting the need for upwind emission reductions.
*(Steven Flint, New York Division of Air Resources)*

---

[18] "Background, High Electric Demand Day (HEDD) Initiative", New York Department of Environmental Conservation. http://midwestozonegroup.com/files/New_York_Peakers.pptx
[19] "OTC/MANE-VU Joint Committees' Meeting", Ozone Transport Commission.
https://otcair.org/upload/Documents/Meeting%20Materials/OTC_SAS_Public_09212018.pdf
[20] KY DEP's Proposed Infrastructure State Implementation Plan for the 2015 Ozone National Ambient Air Quality Standards, Table 4 – "Design Values for Kentucky-Linked Downwind Connecticut Monitors"
[21] Note that 2018 design values are preliminary and represent exceedances as of September 5



**Response:** The Cabinet does not concur with the comment. The figure below, located on page 31 of Kentucky's proposed 2015 ozone I-SIP, is comprised of Kentucky EGU ozone season $NO_x$ emissions from 2008-2017. This figure shows a steady decline of Kentucky EGU emissions since 2011. The decline of Kentucky emissions does not correlate with the Connecticut monitors referenced in New York's comments. This is further evidence that Kentucky is not a significant contributor to downwind receptors in the Northeast.

**2008 – 2017 Ozone Season $NO_x$ Emissions for Kentucky EGUs (tpy)**



Note: Chart 2 data obtained from EPA's Air Markets Program Data: https://ampd.epa.gov/ampd/

**16. Comment:** KY DEP chose to utilize the longstanding contribution threshold of 1% of the standard (i.e., 0.70 ppb for the 2015 NAAQS),[22] though it discussed the validity of using a 1 ppb threshold as an alternative. Despite EPA's August 31, 2018 memorandum analyzing the use of a 1 ppb threshold, DEC believes there is not a sound basis for the piecemeal adoption of such threshold.
*(Steven Flint, New York Division of Air Resources)*

**Response:** The Cabinet does not concur with the comment. Refer to page 19 of the Kentucky proposed 2015 ozone I-SIP, which has been revised to reflect using EPA's 1 ppb threshold from its August 31, 2018 memo.[23] The Cabinet believes the 1 ppb threshold is a sound alternative in identifying emissions contributions. EPA's memo states, "Thus, the use of a 1 ppb threshold to identify linked upwind states still provides the potential, at step 3, for meaningful emissions reductions in linked upwind states in order to aid downwind states with attainment and maintenance of the 2015 ozone NAAQS." This avoids putting the over-control burden on upwind states.

**17. Comment:** Rather, the continued use of the 1% threshold is required for consistency across all states and because it is directly tied to the level of the NAAQS; thus, it is a far superior fit to the reductions needed for downwind attainment. If upwind states selectively use a higher contribution threshold while downwind states face a lower, more stringent NAAQS, it will have the inequitable effect of requiring downwind states to reduce their emissions *even more* at greater cost to compensate for upwind states doing *even less* at lower costs. The contribution threshold is tied not only to the linkages established under step 2 of the CSAPR framework, but the resulting emissions budgets for upwind states under step 3. It is unreasonable and clearly inequitable for upwind states, on an ad hoc basis, to use a higher contribution screening threshold at the same time downwind states face a lower NAAQS. For example, while contributions from Kentucky are linked to the two Fairfield, CT monitors at the 1% level, the linkage would not be retained when using a 1 ppb threshold according to the Alpine modeling.[24] Using a higher contribution threshold places the burden of additional reductions at these other downwind monitors entirely on the downwind states (and potentially on other upwind states using a 1% threshold), despite the demonstrable contribution using the settled 1% approach from Kentucky at these monitors. This is clearly not an equitable or cost-effective solution to ensuring downwind states such as New York attain the 2015 ozone NAAQS as expeditiously as practicable, and could mean the difference between attainment and nonattainment.
*(Steven Flint, New York Division of Air Resources)*

---

[22] See, e.g., Cross-State Air Pollution Rule (CSAPR), 76 FR 48208, 48236-38 (Aug. 8, 2011) (using 0.80 ppb as threshold, which is 1% of the 1997 ozone NAAQS); Cross-State Air Pollution Rule Update (CSAPR Update), 81 FR 74504, 74518 (Oct. 26, 2016) (using 0.75 ppb threshold, 1% of the 2008 ozone NAAQS; "much of the ozone nonattainment problem being addressed by this rule is still the result of the collective impacts of relatively small contributions from many upwind states.").

[23] EPA, *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards.* (August 31, 2018)

[24] KY DEP's Proposed Infrastructure State Implementation Plan for the 2015 Ozone National Ambient Air Quality Standards, Table 9 – "Kentucky Significant Contribution using 1.0 ppb Significant Threshold"

**Response:** The Cabinet does not concur with the comment and believes the 1 ppb threshold is a sound alternative in identifying emissions contributions. EPA's August 31, 2018 memo states, "Thus, the use of a 1 ppb threshold to identify linked upwind states still provides the potential, at step 3, for meaningful emissions reductions in linked upwind states in order to aid downwind states with attainment and maintenance of the 2015 ozone NAAQS."[25] This avoids putting the over-control burden on upwind states.

**18. Comment:** Consideration of international emissions also adds support to the conclusion that there is no further obligation to reduce emissions: MOG urges that the Cabinet not only recognize (as it does on page 53 of its proposal) that consideration of the Canada/Mexico component of the Alpine Geophysics modeling is all that is needed to bring the Harford Maryland monitor into attainment, but also that but for international emissions there would be no downwind problems areas at all and therefore no need to for additional action to be undertaken to satisfy the requirements of CAA section 110(a)(2)(D)(i)(I).
(*David M. Flannery, Midwest Ozone Group*)

**Response:** The Cabinet acknowledges the comment.

**19. Comment:** Given the dominant role of mobile sources in impacting on ozone air quality, MOG urges that the Cabinet offer as an additional basis for its SIP that additional local mobile source controls in downwind states are necessary before requiring additional emission reductions from upwind states such as Kentucky. We urge that downwind states take full advantage of all of the authority provided to each of them under the CAA and to reduce mobile source emissions appropriately to assure continued attainment with the 2015 ozone NAAQS. (*David M. Flannery, Midwest Ozone Group*)

**Response:** The Cabinet acknowledges the comment. The Cabinet has referenced CAA section 107(a), encouraging downwind states to first look into local controls on their emission sources before expecting upwind states to enforce more strict control measures, which would lead to over-control. This solidifies statements that were already within Kentucky's proposed 2015 ozone I-SIP, which refer to violating monitors located along Interstate 95.

**20. Comment:** In the case of Kentucky, EPA's modeling data below show that at the 1% threshold, Kentucky would be linked to 4 non-attainment monitors and one maintenance monitor. Applying the 1 ppb threshold to this data would eliminate any linkage to non-attainment monitor reduce to 1 the linkage to any maintenance monitor. Moving to the 2 ppb threshold would completely eliminate all linkage to any non-attainment or maintenance monitor. We urge the Cabinet to carefully evaluate these additional flexibilities as further support for the conclusion that Kentucky has already satisfied the requirements of CAA section

---

[25] EPA, *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards;* page 4 (August 31, 2018)

110(a)(2)(D)(i)(I).
(*David M. Flannery, Midwest Ozone Group*)

**Response:** The Cabinet acknowledges the comment. The Cabinet believes the 1 ppb threshold is a sound alternative in identifying emissions contributions and has updated the narrative on page 19 to rely on EPA's August 31, 2018 memo.

**21. Comment:** An important flexibility that should be considered is an alternative method for determining which monitors should be considered "maintenance" monitors. We urge that the Cabinet offer this alternative calculation of maintenance monitors as an additional statement of the conservative nature of its conclusions that no further action on the part of Kentucky is needed to address the requirements of CAA section 110(a)(2)(D)(i)(I).
(*David M. Flannery, Midwest Ozone Group*)

**Response:** The Cabinet acknowledges the comment. The Cabinet agrees that EPA's current method of determining maintenance monitors needs to be re-evaluated.

**22. Comment:** As an alternative to maintenance monitors being accorded the same weight as nonattainment monitors, we urge that the Cabinet take the position that no additional control would be needed to address a maintenance monitor if it is apparent that emissions and air quality trends make it likely that the maintenance monitor will remain in attainment. Such an approach is consistent with Section 175A(a) of the Clean Air Act...
(*David M. Flannery, Midwest Ozone Group*)

**Response:** The Cabinet acknowledges the comment. The Cabinet agrees that EPA's current method of determining maintenance monitors needs to be re-evaluated.

**23. Comment:** ...while Kentucky would not be linked to any maintenance monitor at a significance threshold of 2ppb, it would be linked by EPA's 12km modeling data to a maintenance monitor (Harford Maryland) at a significance threshold of 1 ppb. Accordingly, MOG urges that the Cabinet apply an alternate methodology to assess maintenance monitors that is different than any method it would apply to assess nonattainment monitors. Any impacts, which Kentucky has on maintenance areas, will certainly be addressed by consideration of controls that are already on-the-books and by emissions reductions that have been and will continue to apply to Kentucky sources as is well-demonstrated by these comments and the Cabinet's proposed GNS.
(*David M. Flannery, Midwest Ozone Group*)

**Response:** The Cabinet acknowledges the comment and agrees that EPA's current method of determining maintenance monitors needs to be re-evaluated and that on-the-books regulations and controls, as well as enforceable permit conditions, will continue to limit any impact to maintenance monitors from Kentucky sources.

**24. Comment:** LG&E and KU Energy supports the conclusion of the proposed SIP that no additional emission reductions beyond existing and planned controls are necessary to mitigate any contribution Kentucky may have on downwind monitors to comply with CAA section 110(a)(2).
*(Jason Wilkerson, LG&E and KU Energy)*

**Response:** The Cabinet acknowledges the comment.

**25. Comment:** Additionally, LG&E and KU Energy concur with the comments submitted on September 21, 2018 by the Midwest Ozone Group in support of the proposed SIP revision.
*(Jason Wilkerson, LG&E and KU Energy)*

**Response:** The Cabinet acknowledges the comment.

**26. Comment:** LG&E and KU Energy has identified one area of the proposed SIP that needs correction as listed here: Page 31, Emission Totals after CSAPR Implementation, second paragraph: This section makes reference that the "Louisville Gas & Electric Company's (LG&E) Cane Run Station converted Unit 7 to natural gas..." Revisions should be made to correctly state "Louisville Gas & Electric Company's (LG&E) Cane Run Station constructed and began operating a natural gas combined cycle unit (CR7) in 2015 and retired all remaining coal-fired units the same year."
*(Jason Wilkerson, LG&E and KU Energy)*

**Response:** The Cabinet acknowledges the comment and made the necessary corrections.

**27. Comment:** The Cabinet decision essentially to rely on existing state laws in conjunction with EPA's 2008 approval, for purposes of satisfying the 2015 ozone NAAQS, is arbitrary and capricious, and unsupported by evidence, and fails to satisfy the plain statutory requirement that Kentucky's SIP ensure that the Commonwealth does not contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to the 2015 ozone NAAQS. 42 U.S.C. § 7420(a)(2)(D)(i)(I).
*(Aaron Messing and Matthew Miller, Sierra Club)*

**Response:** The Cabinet does not concur with the comment. The commenter fails to recognize the control strategies identified in Kentucky's proposed 2015 ozone I-SIP that limit $NO_x$ and VOC emissions from Kentucky sources. Further, the commenter does not acknowledge the significant decline in emissions from Kentucky sources as detailed in the *Emissions Trends* section of Element D of the proposed SIP. EPA has determined that Kentucky does not significantly contribute to any nonattainment monitor for the 2015 ozone NAAQS.

**28. Comment:** EPA's own, most recent determinations show that Kentucky's previously approved SIP is stale and does not show compliance with the 2015 ozone NAAQS; Kentucky's attempt simply to point to existing state-law provisions fails to address the Commonwealth's significant contributions to nonattainment and maintenance that EPA projects will persists in 2023.[26]
*(Aaron Messing and Matthew Miller, Sierra Club)*

**Response:** The Cabinet does not concur with the comment. EPA's March 27, 2018 updated modeling, released to specifically address the 2015 ozone NAAQS, demonstrates that Kentucky does not significantly contribute to any downwind nonattainment monitors.

**29. Comment:** Because EPA's modeling shows that Kentucky is in fact contributing significantly to nonattainment and maintenance at five monitors in three states under the 2015 standard, Kentucky obviously may not claim that is has no further obligations under the 2015 ozone NAAQS.
*(Aaron Messing and Matthew Miller, Sierra Club)*

**Response:** The Cabinet does not concur with the comment. EPA's March 27, 2018 updated modeling was released to specifically address the 2015 ozone NAAQS. Further, the August 31, 2018 EPA memo demonstrates that Kentucky does not significantly contribute to any downwind nonattainment monitor.

**30. Comment:** The Cabinet's apparent argument that other sources also contribute significantly to failing air quality at downwind monitors is legally irrelevant; it simply does not obviate the need for Kentucky to address *its own* significant contribution.[27]
*(Aaron Messing and Matthew Miller, Sierra Club)*

**Response:** The Cabinet does not concur with the comment. The commenter fails to recognize the control strategies identified in Kentucky's proposed 2015 ozone I-SIP that limit $NO_x$ and VOC emissions from Kentucky sources. Further, the commenter does not acknowledge the significant decline in emissions from Kentucky sources as detailed in the *Emissions Trends* section of Element D of the proposed SIP. EPA has determined that Kentucky does not significantly contribute to any nonattainment monitor for the 2015 ozone NAAQS.

---

[26] Sierra Club continues to underscore and protest, as it has in prior comments to the Cabinet as well as EPA, the unreasonableness of EPA's modeling being based on 2023, which is beyond relevant attainment dates for marginal areas (which at least the Maryland and Wisconsin counties are) for the 2015 standard. Using an earlier year, as is proper, would only exacerbate the flaws discussed herein; but, as explained above, the August 2018 SIP Proposal is untenable even with EPA's 2023 modeling basis.

[27] *See id.* at 32-49.

**31. Comment:** The submission's observations about meteorological data and HYSPLIT back trajectories are unpersuasive because EPA's CAMx modeling *already* incorporates meteorological inputs and links downwind air quality at specific locations with upwind emissions originating in Kentucky.[28]
*(Aaron Messing and Matthew Miller, Sierra Club)*

**Response:** The Cabinet does not concur with the comment. The use of HYSPLIT and meteorological data on the noted pages is not to address any projected emissions from EPA's CAMx modeling. Rather, the figures represent ozone exceedance days at monitors that Kentucky was previously linked to using EPA's initial modeling. However, Kentucky is no longer linked to those monitors as they are no longer identified as nonattainment monitors for 2023 based on EPA's 1 ppb threshold memo dated August 31, 2018.

**32. Comment:** Among other fatal deficiencies, [Alpine's modeling] utilized an inappropriate and arbitrary significance threshold (1 ppb rather than 1% of the NAAQS); and in any event, even if one were to accept the Alpine modeling, four of the five nonattainment or maintenance monitors linked to Kentucky still recorded maximum design values above the 2015 ozone NAAQS, and for all five monitors Kentucky's contribution exceeded 1 percent of the NAAQS.[29]
*(Aaron Messing and Matthew Miller, Sierra Club)*

**Response:** The Cabinet does not concur with the comment. Page 19 of the SIP states that "Using the 1 ppb threshold, there is only one monitor that shows a significant contribution from Kentucky."

**33. Comment:** The Cabinet's assertion that existing provisions of state law will "address the requirements," vis-à-vis Kentucky's legal obligations to satisfy the 2015 ozone NAAQS, is unreasonable vague and non-committal; more detailed explanation and explicit guarantees, based on binding legal obligations, are required. The Cabinet points to existing local, state and federal regulations and other legal obligations in attempt to satisfy its obligations under Section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS.[30]
*(Aaron Messing and Matthew Miller, Sierra Club)*

**Response:** The Cabinet does not concur with the comment. The commenter fails to recognize the control strategies identified in Kentucky's proposed 2015 ozone I-SIP that limit $NO_x$ and VOC emissions from Kentucky sources. Further, the commenter does not acknowledge the significant decline in emissions from Kentucky sources as detailed in the *Emissions Trends* section of Element D of the proposed SIP. EPA has determined that Kentucky does not significantly contribute to any nonattainment monitor for the 2015 ozone NAAQS.

---

[28] *See, e.g., id. at* 37, 42, 49.
[29] *See id.* at 51.
[30] *Id.* at 19-28.

**34. Comment:** Given that EPA already took into account the suite of control measures identified in the August 2018 SIP Proposal, and yet still found that Kentucky emissions were significantly interfering with downwind attainment and maintenance of the 2015 ozone NAAQS, Kentucky's submittal is inadequate and unlawful.
*(Aaron Messing and Matthew Miller, Sierra Club)*

**Response:** The Cabinet does not concur with the comment. Kentucky is no longer linked to any downwind nonattainment monitors in 2023 based on EPA's August 31, 2018 memo which provides the option of using the 1 ppb contribution threshold.

# **EXHIBIT 6**

Declaration of Rona Birnbaum ("Birnbaum Declaration"), Signed June 7, 2023.

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____
                                          )
COMMONWEALTH OF KENTUCKY,                  )
                                          )
    Petitioner,                         )
                                          )
    v.                                  )     No. 23-3216
                                          )
UNITED STATES ENVIRONMENTAL               )
PROTECTION AGENCY, et al.,                 )
                                          )
    Respondents.                        )
_____)
                                          )
COMMONWEALTH OF KENTUCKY,                  )
ENERGY AND ENVIRONMENT                     )
CABINET                                    )
                                          )
    Petitioner,                         )
                                          )
    v.                                  )     No. 23-3225
                                          )
UNITED STATES ENVIRONMENTAL               )
PROTECTION AGENCY, et al.,                 )
                                          )
    Respondents.                        )
_____)

**DECLARATION OF RONA BIRNBAUM AS TO THE
COMMONWEALTH OF KENTUCKY**

    1.    I, Rona Birnbaum, under penalty of perjury, affirm and declare that the following statements are true and correct to the best of my knowledge and belief, and are based on my own personal knowledge, or on information contained in the records of the United States Environmental Protection Agency ("EPA"), or supplied to me by EPA employees under my supervision.

1

2.      I am the Director of the Clean Air Markets Division in the Office of Atmospheric Protection within the Office of Air and Radiation at EPA. The Clean Air Markets Division, which was initially created to implement the acid rain provisions of the Clean Air Act Amendments of 1990, designs and operates market-based programs to reduce emissions of sulfur dioxide ("$SO_2$") and nitrogen oxides ("$NO_X$"), generates and provides public access to power plant emissions data, facilitates and oversees emissions monitoring and reporting, assesses emissions control technology options, conducts atmospheric deposition monitoring and analysis, develops information systems for market-based programs, assesses environmental and human health effects, assesses benefits and costs of programs, and educates the public regarding regional air pollution problems and market-based programs. The currently operated market-based programs were established under the Acid Rain Program, the Cross-State Air Pollution Rule ("CSAPR"), the CSAPR Update, and the Revised CSAPR Update.

3.      In my current capacity as Director of the Clean Air Markets Division, I oversee EPA's implementation of components of the Clean Air Act including Title IV (acid deposition control) and parts of Title I (air quality standards and associated emission limitations). In coordination with other EPA offices, I manage the promulgation and implementation of regulations pursuant to the Clean Air Act including the suite of CSAPR programs. I manage all of the Clean Air Markets Division's activities as listed in paragraph 2, including overseeing EPA's collection of emissions data from the power sector (and some other stationary emissions sources) under the Acid Rain Program and the suite of CSAPR programs.

4.      Prior to becoming Director of the Clean Air Markets Division in 2022, I held several management positions in the Office of Atmospheric Protection including in the early years of the Acid Rain Program. I joined EPA in 1988 and the Office of Atmospheric Protection in 1991. I hold a bachelor's and master's degree in environmental and natural resource policy from The George Washington University.

5.      The purpose of this declaration is to provide information responsive to certain allegations made in the Kentucky Petitioners' Motions for Stays filed on May 23 and June 1, 2023, based on the declarations of John Horne, Michael Kennedy, Cristobal Fuentes, Jerry Purvis, Nathaniel Berry, and Jeffrey Brock.

**I.      The Emission Allowance Trading Program Established by the Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards.**

A.      Overview of the Good Neighbor Plan

6.      Once EPA sets new or revised national ambient air quality standards ("NAAQS," or "air quality standard"), states must submit state implementation plans ("SIPs") to satisfy certain Clean Air Act requirements, including the good neighbor provision. 42 U.S.C. § 7410(a)(2)(D)(i)(I). With respect to the 2015 NAAQS for ozone, EPA reviewed states' good neighbor SIPs, and it approved 24 plans, disapproved 19 plans, including Kentucky's, and partially approved / partially disapproved 2 plans. *See* 88 FR 9336 (Feb. 13, 2023). (Ozone is commonly referred to as smog pollution.) A SIP disapproval imposes no legal obligation on the state or sources within the state, but rather imposes a legal obligation on EPA to promulgate a federal implementation plan ("FIP"), at any time, within two years of the disapproval. 42 U.S.C. § 7410(c)(1).

7.      EPA Administrator Michael S. Regan signed a FIP action related to these requirements, referred to as the "Good Neighbor Plan"[1] (or the "Plan"), on March 15, 2023, to achieve emissions reductions required by the good neighbor provision of the Clean Air Act, 42 U.S.C. § 7410(a)(2)(D)(i)(I), with respect to the 2015 NAAQS for ozone. The Plan establishes federal requirements for qualifying power-plant and industrial sources in 23 covered states, to reduce ozone pollution during the May 1-to-September 30 "ozone season" by reducing emissions of $NO_X$, which is an ozone precursor pollutant.

8.      The objective of the Plan is to eliminate the covered states' significant contribution to nonattainment and interference with maintenance of the ozone air quality standard in other states as expeditiously as practicable and in alignment with the statutory attainment schedule.

9.      With respect to fossil fuel-fired power plants in 22 states, including Kentucky, this action will prohibit those emissions by implementing an allowance-based trading program beginning in the 2023 ozone season, although the majority of the emission reductions captured in the trading program will not begin until the

---

[1] Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards, 88 FR 36654 (June 5, 2023). The rulemaking docket is EPA-HQ-OAR-2021-0668 and can be accessed through www.regulations.gov. A number of key supporting materials and additional information are available at EPA's website, Good Neighbor Plan for 2015 Ozone NAAQS, https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs (last visited June 5, 2023).

phase-in of reductions associated with new post-combustion control technology retrofits over the 2026 and 2027 ozone seasons. The Plan also prohibits emissions through emissions limitations and associated requirements for certain other industrial stationary sources in 19 of those 22 states, and one other state, beginning in the 2026 ozone season.[2]

10.    In assisting downwind states with attaining and maintaining the 2015 ozone NAAQS, the Plan will deliver substantial public health and environmental benefits across wide swaths of the United States. The benefits of the Plan far exceed its anticipated costs. Its predecessor programs, the $NO_X$ SIP Call,[3] Clean Air Interstate Rule ("CAIR"),[4] and CSAPR,[5] each were successfully implemented without disruption to the reliability or affordability of the electrical power supply.

**Estimated Monetized Health and Climate Benefits, Compliance Costs, and Net Benefits of the Good Neighbor Plan, 2023 Through 2042 (Millions 2016$, Discounted to 2023)[6]**

|  |  | 3% Discount Rate | 7% Discount Rate |
|---|---|---|---|
| **Present Value** | Health Benefits | $200,000 | $130,000 |
|  | Climate Benefits | $15,000 | $15,000 |

---

[2] Information and data presented in this declaration regarding the Good Neighbor Plan are reflective of the rule as it was signed on March 15, 2023, and do not account for potential impacts of subsequent administrative or judicial stays.

[3] "Finding of Significant Contribution and Rulemaking for Certain States in the Ozone Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone," 63 FR 57356 (Oct. 27, 1998).

[4] "Rule to Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air Interstate Rule)," 70 FR 25162 (May 12, 2005).

[5] "Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals," 76 FR 48208 (Aug. 8, 2011) (generally referred to as the Cross-State Air Pollution Rule, or "CSAPR").

[6] Adapted from Good Neighbor Plan Executive Summary. For explanations, caveats, and table notes associated with these figures, see 88 FR 36654, 36666.

|  | | Compliance Costs | $14,000 | $9,400 |
|---|---|---|---|---|
|  | | **Net Benefits** | **$200,000** | **$140,000** |
| **Equivalent Annualized Value** | Health Benefits | | $13,000 | $12,000 |
|  | Climate Benefits | | $970 | $970 |
|  | Compliance Costs | | $910 | $770 |
|  | **Net Benefits** | | **$13,000** | **$12,000** |

The estimated annualized compliance costs for the Plan of $910 million (3% discount rate, 2016$) or $770 million (7% discount rate, 2016$) are comparable to prior interstate transport rulemakings EPA has undertaken. For example, EPA estimated that the $NO_X$ SIP Call would cost $1.7 billion (1990$) annually to implement. 63 FR at 57478. Similarly, CAIR was estimated to cost the power sector $2.4 billion in 2010 and $3.4 billion in 2015 (1999$). 70 FR at 25305. CSAPR was estimated to cost the power sector $810 million in 2014 (2007$). 76 FR at 48215.

11.    The Plan will deliver substantial public health and environmental benefits. On average, the ozone levels at the identified "receptor" locations around the country are projected to decrease by 0.66 parts per billion (ppb). Good Neighbor Plan, Table V.D.3-1 (88 FR at 36748). The Plan will help many downwind areas make substantial progress toward coming into compliance with the 2015 ozone NAAQS. In some cases, such as for receptors in Colorado, coastal Connecticut, and Texas, the Plan is projected to make substantial progress toward achieving full attainment of the standard.

12.    According to the air quality analysis for the SIP disapproval Final Rule, there are 43 air quality monitoring sites throughout the United States that are identified as "receptors"—i.e., these are areas that are projected to struggle to attain or maintain the 2015 ozone NAAQS. *See* Final Rule, 88 FR at 9351-52. The combined population of the designated ozone nonattainment areas associated with

these receptors in 2021 is 82.3 million people, representing roughly 25 percent of the total U.S. population.

13.    The air quality benefits of the Plan will also reach many other people beyond the specific areas where receptor sites are located. The map below graphically illustrates the reduction in ozone levels that is projected to occur across the United States with full implementation of the Plan.



14.    The emissions control strategies on which the Plan is premised are all conventional, widely-used, at-the-source technologies that have been available to power plants and industrial sources for decades. This level of control is widely mandated for these types of sources in downwind areas with ozone air quality problems. For example, selective catalytic reduction ("SCR") control technology is already installed at roughly two-thirds of the coal-fired power plant capacity in the U.S. fleet. Good Neighbor Plan, 88 FR at 36768.

15.    As can be seen in the figures below, several fossil fuel-fired power plants in the Kentucky that are included in the Good Neighbor Plan have relatively high, poorly controlled $NO_X$ emissions contributing to ozone pollution. These sources along with other anthropogenic emissions sources in Kentucky are impacting air quality hundreds of miles away.





Emissions from Kentucky power plants are highlighted in red.

16.     A delay in the implementation of the Plan would result in the continuation of significant contribution to harmful levels of air pollution across the United States. Delays of as long as three years in the implementation of two prior good neighbor rulemakings (NO$_X$ SIP Call and CSAPR) have been experienced as

a result of stay litigation. In both cases, the regulations were largely upheld once courts were able to adjudicate the merits. EPA is applying this same, now-Supreme Court-upheld analytical framework in this Plan. A delay of three years or more here would delay the full elimination of significant contribution under this Plan until 2029 or later. This would be eight years after the 2021 Marginal area attainment deadline, five years after the 2024 Moderate area attainment deadline, and two years after the 2027 Serious area attainment deadline.[7] In the meantime, many Americans could suffer illness and premature death from the harmful pollution that would be allowed to continue, while downwind areas that fail to attain the health-based NAAQS will be subject to ever more stringent regulatory requirements under the Act without relief from the contributing effects of upwind-state pollution. For example, the forgone emissions reductions in 2023 alone could result in forgone reductions in avoided ozone-related premature mortalities and illnesses equal to as much as $820 million (2016$, 3% discount rate).

B.    Establishment, Applicability, and Relationship to Other Trading Programs

17.    Among other things, the Plan implements a revised and expanded allowance trading program for electricity generating units – the CSAPR $NO_X$ Ozone Season Group 3 Trading Program (the "Trading Program"). This program generally applies to fossil fuel-fired boilers and combustion turbines that are located in covered states and serve generators larger than 25 megawatts producing electricity for sale. 40 CFR 97.1004.

18.    The Plan amends the existing CSAPR $NO_X$ Ozone Season Group 3 Trading Program established for twelve states, including Kentucky, in 2021 under the Revised CSAPR Update.[8] The CSAPR $NO_X$ Ozone Season Group 3 Trading Program was first established to achieve emissions reductions required by the good neighbor provision with respect to the 2008 ozone NAAQS. For several other states, the Trading Program will replace the CSAPR $NO_X$ Ozone Season Group 2 Trading Program established in 2016 under the CSAPR Update and currently still being implemented for ten states.[9] The CSAPR $NO_X$ Ozone Season Group 1 Trading Program was first established in the original CSAPR rulemaking in 2011

---

[7] Further discussion of the disruptive consequences of a stay of the Final Rule is in section V below.

[8] "Revised CSAPR Update for the 2008 Ozone NAAQS," 86 FR 23054 (April 30, 2021).

[9] "CSAPR Update for the 2008 Ozone NAAQS," 81 FR 74504 (October 26, 2016).

to address good neighbor obligations associated with the 1997 ozone NAAQS, and currently applies only in the State of Georgia.[10]

19.     Under the Plan, power plants in seven states will transition from the CSAPR Group 2 Trading Program to the CSAPR Group 3 Trading Program, and power plants in three states not currently covered by a CSAPR trading program for seasonal $NO_X$ emissions will be added to the CSAPR Group 3 Trading Program.

20.     Virtually all of the electric generating units covered by the Plan, including those in the three states not currently covered by a seasonal $NO_X$ emissions program, nonetheless participate in the Acid Rain emissions trading program under Title IV of the Clean Air Act and already meet rigorous monitoring and reporting requirements in compliance with 40 CFR Part 75.[11]

21.     Power plants have deep familiarity with Clean Air Act compliance assurance and permitting obligations and face minimal administrative burdens associated with entry into the Trading Program. All the Kentucky units that will participate in the Trading Program already participate in another CSAPR trading program.

22.     The emissions reduction requirements associated with the new Trading Program emissions budgets established by the Plan will only apply as of the effective date of the Plan, which will be on August 4, 2023, 60 days after publication of the Plan in the Federal Register on June 5 (88 FR 36654).[12]

23.     For units in the states already covered by either the CSAPR $NO_X$ Ozone Season Group 2 or Group 3 trading programs, the Plan has transitional provisions so that the new budgets will apply only after the Plan's effective date.[13] For units in the remaining states that will be newly covered by the Trading Program, no requirements, either in terms of emissions reductions or in terms of other administrative requirements, will apply until the effective date.

---

[10] CSAPR, 76 FR 48208 (Aug. 8, 2011).

[11] Approximately 97 percent of ozone season $NO_X$ emissions reported under Part 75 are determined using continuous emissions monitoring systems ("CEMS"). Gas- or oil-fired units that qualify as peaking units or low mass emissions units under the regulations have options to determine reported emissions using other methodologies.

[12] *See* Good Neighbor Plan Preamble Section VI.B.12.a (88 FR at 36811-13).

[13] *See id.*

C.    How Emissions Trading Programs Work and the Enhancements to the
Trading Program

24.    The Clean Air Markets Division operates or has operated a number of
allowance trading programs, the earliest of which started more than 25 years ago.
These include the $NO_X$ Budget Trading Program for ozone-season $NO_X$ emissions
under the $NO_X$ SIP Call,[14] programs for ozone-season and annual $NO_X$ emissions
under CSAPR and CAIR,[15] and programs for annual $SO_2$ emissions under CSAPR,
CAIR, and the Acid Rain Program.[16] Most of the units that participate in the
Trading Program also participate or participated in some of these other programs.
There has not been, nor have Declarants identified, a single instance where
implementation of these EPA trading programs has caused an adverse reliability
impact.

25.    EPA provides robust technical analysis for identifying its emission
reduction requirements. For power plants, this includes starting with reported data
for recent historical operations. It further tests these requirements against future
expectations for the sector by using a state-of-the-art, peer-reviewed programming
model of the contiguous U.S. electric power sector (the Integrated Planning Model,
or IPM). IPM provides forecasts of least-cost capacity expansion, electricity
dispatch, and emissions control strategies while meeting energy demand and
environmental, transmission, dispatch, and reliability constraints.

26.    The Trading Program, like the other current and former allowance
trading programs operated by the Clean Air Markets Division, does not impose any
fixed limits on the operations or emissions of individual affected units. Instead,
each affected unit is required to monitor and report its emissions, and each source
with affected units is required to hold quantities of emission "allowances" based on
the reported emissions from all its affected units for each "control period" for the
program. (For the Trading Program, the control period is the May-September
ozone season.) Allowances can be traded with other sources covered by the
program in the same or other states or with third parties (e.g., brokers). The

---

[14] "Finding of Significant Contribution and Rulemaking for Certain States in the Ozone
Transport Assessment Group Region for Purposes of Reducing Regional Transport of Ozone,"
63 FR 57356 (Oct. 27, 1998).

[15] "Rule to Reduce Interstate Transport of Fine Particulate Matter and Ozone (Clean Air
Interstate Rule)," 70 FR 25162 (May 12, 2005).

[16] CAA subchapter IV-A, 42 U.S.C. 7651-7651*o*; 40 CFR parts 72-78.

aggregated emissions from all the affected units under such a program are limited by the total number of allowances issued for use in the program, each of which authorizes the emission of up to one ton of $NO_X$.

27.     The Trading Program budgets are set based on an evaluation of available $NO_X$ mitigation control technologies. As in the prior CSAPR rulemakings, as well as the earlier CAIR and $NO_X$ SIP Call rulemakings, EPA assessed several well-understood, widely-available, at-the-source emissions control strategies. Following a multifactor assessment at "Step 3" of the interstate transport framework, EPA arrived at a suite of control strategies that obtain cost-effective emissions reductions delivering meaningful downwind air quality benefits. EPA's assessment of these technologies is set forth in Section V.B-C of the Plan preamble, 88 FR at 36720-40.

28.     The primary strategies for power plants that emerged from this analysis are: starting in 2023, optimizing existing post-combustion controls; starting in 2024, upgrading to state-of-the-art combustion controls at the few remaining coal facilities without them; and, over the 2026-2027 ozone seasons, retrofitting post-combustion controls on large emitting units currently lacking them. *See* Good Neighbor Plan Preamble Section VI.A, 88 FR at 36754-58.

29.     It bears noting that the 2023 and 2024 strategies of optimizing existing post-combustion controls and upgrading combustion controls are essentially identical to the emissions control strategies that were identified in CSAPR, the CSAPR Update, and the Revised CSAPR Update. EPA's analysis in the Good Neighbor Plan is that these strategies remain widely available on a relatively near-term basis and additional, cost-effective emissions reductions can be obtained from these strategies across the fleet of existing power plants in the covered upwind states.

30.     For each control period, the total quantity of allowances is initially allocated among the affected units.[17] Allocations in Good Neighbor trading programs have followed a similar methodology for many years, relying on historical heat input and emissions data to determine how many allowances to allocate to each unit, as well as to new units. The Plan generally follows this approach with some minor changes from prior programs. *See generally* Good

---

[17] CSAPR trading programs are designed to allow states to easily replace EPA's allocation methodology with their own. States may also leave the FIP through adopting the trading program in full (in addition to replacing EPA's allocation methodology) into their state program or developing their own approaches for approvable SIPs that can replace the FIP. *See* Good Neighbor Plan Preamble Section VI.D, 88 FR at 36838-43.

Neighbor Plan Preamble Section VI.B.9, 88 FR at 36801-08. Among the features of the Plan's allocation methodology, similar to prior programs, is a "new unit set aside," which is available for any power plants that would not otherwise receive allocations, mainly (but not exclusively) new power plants that come online after the Plan is issued. Power plants that have gone offline but are then returned to operation also qualify to receive allocations from the new unit set aside if the plants are no longer eligible to receive allocations as existing units. Often, there are allowances remaining in each state's new unit set aside, and if so, these are recycled back to existing units in proportion to their original allocation. Thus, the entire budget for each compliance period is fully allocated, and units typically will receive more allowances than their initial allocation figures suggest.

31.    The allowance allocation methodology is distinct from the method of determining the emissions budget for each state. The number of initial allocations each affected unit receives is not an emission limit, nor is it an express or implied prohibition on how much that source may emit; rather, sources may buy or sell allowances with any other party and use them for compliance. This incentivizes units that can reduce their emissions easily or cheaply to make those reductions and reap the benefits from selling their unneeded allowances, while units relatively more expensive reduction opportunities can comply by purchasing those allowances. For a more comprehensive overview of emissions trading programs, see the Division's website at *https://www.epa.gov/emissions-trading-resources*.

32.    Sources with affected units under the Trading Program are not required to hold allowances to cover their emissions before or at the actual time of the emissions (e.g., in or during the 2023 ozone season). Instead, each source is obligated to surrender allowances to cover its affected units' emissions for a control period by the program's "allowance transfer deadline," which is June 1 of the year *after* the year of the control period.  40 CFR 97.1002, 97.1006(c)(1). For the 2023 ozone season, the allowance transfer deadline will be June 1, 2024. Thus, a source in the Trading Program has an extended period of time—eight months after the end of the ozone-season control period on September 30—in which to acquire any additional allowances that may be needed for compliance.

33.    Each state's budget determines the total number of allowances to be allocated among the state's affected units for each control period. However, a state budget is not a limit on how much $NO_X$ a state's affected units may emit, in the aggregate, during the control period. Under the Trading Program (like the trading programs under the original CSAPR), the aggregated emissions from a state's affected units can exceed the state's budget up to a certain level, called the "assurance level," without triggering any further obligations beyond each source's

basic compliance obligation to hold allowances equal to the sum of its affected units' emissions. If the aggregated emissions from the affected units in a single state exceed the state's assurance level during a control period, the sources that contributed to the state's exceedance must surrender two additional allowances for each ton of their respective shares of the exceedance. 40 CFR 97.1025. The assurance levels include "variability limits" beyond the respective state emissions budgets that allow for potential inter-annual variability in operating needs for each state. At the same time, the assurance levels function within the structure of an interstate trading program to meet the Act's requirement that each state's sources are held to the elimination of the state's significant contribution.

34.    The Trading Program is fully achievable without any need for sources to reduce their operations or retire, because the emission budgets are premised on widely available pollution control technologies described above whose use would achieve the required emission reductions without need to reduce operations or retire any affected EGU. However, under the Trading Program, no power plant is *required* to follow these strategies. In general, a power plant owner has options to operate the emissions controls identified by the EPA for a type of unit (including installation or upgrade of controls), operate other types of emissions controls, or adapt the unit's levels of operation to produce less emissions. The Plan generally preserves the compliance flexibility of prior transport trading programs in reserving these decisions to sources' owners and operators.

35.    In addition to the intrinsic emissions trading compliance flexibilities noted above that are preserved in the Plan, the Trading Program contains several enhancements relative to prior trading programs. These enhancements operate together to ensure that, within the structure of an interstate trading program, sources continue to achieve a degree of emissions reduction consistent with the Act's requirement to eliminate "significant contribution" and "interference with maintenance." As EPA discusses in the Plan, experience with prior trading programs has produced evidence that over time sources may not be properly incentivized to operate emissions controls to the degree needed to eliminate significant contribution on an ongoing basis. The enhancements included in the Trading Program continue to provide flexibility while providing greater assurance that significant contribution will be eliminated on the most critical days of the ozone season and will remain eliminated on a permanent basis. EPA made several adjustments to these enhancements from the proposal in light of comments regarding grid reliability, as discussed in the following section beginning at paragraph 37.

13

36.     There are four enhancements to the Trading Program in the final Plan, compared to prior CSAPR programs: dynamic budgeting; annual bank recalibration; unit-specific backstop daily emissions rates; and a secondary emissions limitation:

a.  *Dynamic Budgets:* Prior trading rules used a single, fixed emissions budget, set based on power sector data as of the date of the action. In the Revised CSAPR Update, EPA established preset budgets for several years into the future, to better reflect known changes in the power sector over time. In the Good Neighbor Plan, EPA is again establishing preset budgets as floors for the 2023 to 2029 control periods. Beginning in 2026, dynamic budgets (i.e., budgets set by applying the emission control strategies selected in the Plan to more recent operating data) will be calculated for each control period. From 2026 through 2029, a state's dynamic budget will be used only if it is higher than the state's preset budget for that control period. Beginning in 2030, dynamic budgeting will be the sole method of budget calculation. *See* Good Neighbor Plan Preamble Section VI.B.4, 88 FR at 36777-79.

b.  *Bank Recalibration:* If a source does not use all of its allowances to demonstrate compliance in a given control period, the Trading Program, like all the other allowance trading programs operated by the Clean Air Markets Division, allows the unused allowances to be banked for use in the program in future control periods. In the CSAPR Update and the Revised CSAPR Update, EPA executed one-time conversions of available banked allowances from prior trading programs into initial allowance banks appropriately scaled to the budgets under the new trading programs. The Plan carries that process forward by limiting the collective allowable number of banked allowances for the Trading Program that can be carried over each year to 21% of the sum of the states' emissions budgets, starting with the 2024 ozone season. This will prevent the buildup of an excessively large bank of allowances that would undermine program stringency in the latter years of a program. *See* Good Neighbor Plan Preamble Section VI.B.6, 88 FR at 36788-91.

c.  *Unit-specific Backstop Daily Emissions Rates:* To ensure more consistent operation of installed controls on sources with the highest level of emissions potential throughout each day of ozone seasons going forward, the Plan includes backstop daily emission rates applied to each of a subset of the covered sources. This rate applies beginning in 2024

14

for large, coal-fired sources that have SCR post-combustion emissions controls already installed. The rate is set at a level that reflects seasonal optimization of the control (not daily maximal performance), and sources must surrender additional allowances for the emissions associated with exceedances of this rate (after a 50-ton threshold, which accommodates the potential unavoidable emissions sources might have above the daily rate associated with activities like start-up). The same rate is applied for large coal-fired units with SCR-retrofit potential in the second control period after such control is installed or in 2030, whichever occurs first. *See* Good Neighbor Plan Preamble Section VI.B.7, 88 FR 36791-97.

 d. *Secondary Emissions Limitations:* To avoid foreseeable exceedances of the state-by-state assurance levels, the Plan establishes the conditions for an enforceable Clean Air Act violation in defined circumstances of egregious failure to operate existing pollution controls, starting with the 2024 ozone season. *See* Good Neighbor Plan Preamble Section VI.B.8, 88 FR at 36797-801.

D.     Key Changes in the Good Neighbor Plan from Proposal

37.     The proposal underwent a comment period of 76 days, and EPA held many stakeholder meetings, including with electricity reliability coordinators, to receive feedback as well. This public engagement provided useful information to the Agency and produced a number of important changes in the Good Neighbor Plan.

38.     It is standard practice in EPA rulemaking development that changes to a proposal contemplated by the Agency are considered deliberative and are not shared on an *ex parte* basis prior to finalization and public release of an action. Therefore, the information regarding the contents of the Good Neighbor Plan, reflective of these changes, became available to the general public on or about March 15, 2023, with the release of the unofficial, pre-publication copy of the Plan on EPA's website.

39.     Several changes in the Good Neighbor Plan bear directly on the claims of harm put forward by Declarants. These changes respond to concerns raised by commenters that the Plan, as proposed, could have unintended effects on power sector grid-reliability.

40.     Commenters observed that the fleet of fossil-fuel fired power plants is undergoing a period of transition to cleaner fuels and technologies. Many power plant owners and operators highlighted their interest in seeing flexibility in this program that would facilitate their business decisions, while, in their view, the Plan as proposed could force uneconomical decisions either to retire power plants earlier than intended or to force expensive pollution-control retrofits for sources that in their judgment would otherwise not continue in operation for much longer. *See* Good Neighbor Plan Preamble Section VI.B.1.d, 88 FR at 36770-75.

41.     During rule development, EPA also actively engaged with key stakeholders in the electricity sector, including system operators, regional transmission operators ("RTOs"), the U.S. Department of Energy ("DOE"), the Federal Energy Regulatory Commission ("FERC"), and other parties that have the responsibility for ensuring reliability. EPA hosted a series of meetings with reliability organizations who had commented on the proposal to ensure we had a solid understanding of their concerns and perspectives. *See* Good Neighbor Plan Preamble Section III.B.1.c, 88 FR 36678-80.

42.     In light of these viewpoints, EPA adopted multiple changes from the proposal to address the reliability-related concerns identified in comments and brought into greater focus through consultations with RTOs and other agencies. These changes have been carefully crafted to ensure the statutory mandate to eliminate significant contribution to interstate pollution problems under the Clean Air Act is met without disrupting the reliable operation of the bulk power grid. *See* Good Neighbor Plan Preamble Section VI.B.1.d, 88 FR at 36770-75.

a.  EPA had proposed to apply "preset" state emissions budgets only for the control periods in 2023 and 2024, with dynamic budgeting allowing for changes in the budget both upward and downward beginning in 2025. EPA had proposed to use only one year of data in the dynamic budget-setting process. In the Final Good Neighbor Plan, preset budgets will operate as floors from 2023 through 2029. This will establish predictable minimum quantities of allowances available during the period when commenters have expressed concern that the reliability-related need for such predictability is greatest. In addition, the dynamic budgets will be set using multiple years of operating data to prevent an anomalous year of data from skewing the budgets. *See* Good Neighbor Plan Preamble Section VI.B.1.b.i, 88 FR at 36764-66.

b. The target percentage of the state emission budgets used to annually recalibrate the allowance bank will not be set at the proposed 10.5 percent level until the 2030 control period. For the control periods from 2024 through 2029, a target percentage of 21 percent will be used instead. The adoption of the higher target percentage for use through the 2029 control period is intended to enhance the availability of allowances during this period by allowing power plant owners and operators to "bank" allowances at a higher level through 2030. *See* Good Neighbor Plan Preamble Section VI.B.1.b.ii, 88 FR at 36766-67.

c. The application of the backstop daily emissions rate for units without existing SCR controls is deferred until the 2030 control period from the 2027 control period as EPA had proposed. This change extends by several years the period during which the highest emitting sources in the fleet may continue surrendering only one allowance per ton emitted, as opposed to three allowances per ton emitted, while operating without widely available pollution control technology within the Trading Program. *See* Good Neighbor Plan Preamble Section VI.B.1.c.i, 88 FR 36767-69.

43.    Additionally, EPA made several other key changes in the Good Neighbor Plan from the proposal that will also help ensure it can be implemented on a feasible and cost-effective basis in light of comments and other record-based considerations that in EPA's judgment warranted attention:

a. The Good Neighbor Plan does not require any emission reductions associated with projected generation shifting using EPA's Integrated Planning Model. *See* Good Neighbor Plan Preamble Section V.B.1.f, 88 FR at 36731-32.

b. EPA finalized a phase-in approach for emission reductions associated with the SCR-retrofit strategy. These reductions are phased in over 2026-2027 in the final Good Neighbor Plan, as opposed to just 2026 at proposal. This change provides an additional year for the full implementation of reductions associated with this strategy relative to the proposal. *See* Good Neighbor Plan Preamble Section VI.A, 88 FR at 36757-58.

c. Emissions control stringency associated with combustion control upgrades does not go into effect for any state until the start of the 2024

17

ozone season. *See* Good Neighbor Plan Preamble Section V.A, 88 FR 36754-55.

## II.    NO$_X$ Mitigation Strategies and Timing: Further Detail

44.    The Plan assumes two mitigation strategies in setting emission budgets for the 2023 ozone season. This is the optimization of two types of existing post-combustion controls—SCR and selective non-catalytic reduction ("SNCR"). Therefore, no new pollution control equipment is assumed in 2023, only the operation of existing equipment. EPA uses its database of reported historical power sector operations and emissions performance to derive state emissions budgets based on these (and other) strategies. According to EPA data, power plants have demonstrated through their historical operation (for more than 90% of such units) that they have already achieved this level in the past, in many cases significantly out-performing the representative performance rates used by EPA to establish budgets based on these strategies.

45.    The vast majority of SCR-controlled units (nationwide and in the 22 states subject to the Trading Program) at least partially operated these controls during the 2021 and 2022 ozone seasons, based on reported emissions rates. Existing SCRs operating at partial capacity still provide functioning, maintained systems that may only require increased frequency or quantity of delivered chemical reagents (i.e., ammonia or urea), which can be accomplished within a few weeks. In many cases, units with SCR have historically achieved more efficient NO$_X$ removal rates than their current performance and therefore are capable of reverting to earlier operation and maintenance plans that achieved demonstrably better SCR performance.

46.    There is ample evidence of units restoring optimal performance of post-combustion controls within a timeframe of two months or less. *See* Good Neighbor Plan Preamble Section V.B.1.a, 88 FR at 36720-25. Not only have units reactivated SCR performance levels at the start of an ozone season or when requirements took effect, but unit-level data also shows instances where sources demonstrated the ability to quickly alter their emissions rate within an ozone-season and even within the same day in some cases. Moreover, this emissions control technique is familiar to sources and was analyzed and included in the Revised CSAPR Update emissions budgets finalized in 2021 and the CSAPR Update emissions budgets finalized in 2016.

47.    The recently implemented Revised CSAPR Update was finalized on March 15, 2021, with emissions reductions premised on the same technology and

nearly identical implementation schedules as this Plan regarding existing control optimization. See paragraph 51. Sources were able to comply with a 100% success rate in meeting their allowance-holding requirements, and units optimized their controls, showing significant improvement in emissions performance relative to prior years.  Neither sources nor state agencies and reliability authorities reported any difficulty maintaining compliance with electric reliability standards as a function of achieving compliance with the Revised CSAPR Update.

48.    The recent experiences with both the Revised CSAPR Update and CSAPR Update underscore the eminently achievable nature of the control strategies informing the establishment of the Trading Program budgets for 2023 and 2024.

49.    In the Plan, EPA finds that new SCR retrofit installation is cost-effective and is included as part of the overall strategy to eliminate significant contribution. Corresponding emission reductions are reflected in state emissions budgets, phasing in over the 2026 and 2027 ozone seasons. EPA extended the timeframe for installation of SCR controls from 36 months at proposal to 36-48 months in the final Plan. There are many instances of individual SCR-retrofit projects being completed well within a three-year timeframe; however, a 36-48 month period corresponds with EPA's expectations regarding timing needs for fleetwide implementation of this strategy. There is significant engineering literature and third-party testimonials as to the feasibility of this timing for sources pursing this compliance option. This technology is widely available. SCR controls already exist on over 60 percent of the coal fleet in the states covered by the Trading Program. Nearly every pulverized coal unit larger than 100 MW built in the last 30 years has installed this control.

50.    The timeframes by which the requirements of the Plan go into effect are all keyed to the finalization of the Plan. Thus, the phasing in of the SCR-retrofit stringency over the 2026-2027 ozone seasons corresponds to a 36-48 month period from the date of issuance of the Plan. *See* Good Neighbor Plan Preamble Sections V.B.1.e, 88 FR at 36726-31, and VI.A, 88 FR at 36757-58.

51.    Even for near-term measures like optimization of existing controls in 2023, EPA's record shows that no work need have occurred prior to finalization of the Plan. The implementation of the Plan's budgets reflecting that control strategy as of the effective date 60 days after publication in the Federal Register accommodates the two-month period EPA finds to be the maximum amount of time needed to implement these strategies. These exact technology and timing assumptions were just successfully implemented on an identical schedule in the

Agency's Revised CSAPR Update rule, which was finalized on March 15, 2021 and included emission reduction requirements premised on optimization of existing controls going into effect upon the effective date of the rule during the 2021 ozone season. *See* Good Neighbor Plan Preamble Section V.B.1.a., 88 FR at 36720-21; *see also* Revised CSAPR Update, 86 FR 23054.

52.    EPA had observed in the proposal that sources could begin "planning now" for compliance, and this would afford them additional time. 87 FR 20036, 20101 (April 6, 2022). Such preparation may indeed be prudent and likely not costly, but it was never required. Preliminary analysis and engineering steps involve no capital costs; these include pre-construction activities, such as engineering studies, conceptual design, schedule, specifications, and cost estimates.[18]

## III.    Achievability of the Good Neighbor Plan

53.    The emissions reductions implemented through the Plan's Trading Program are readily achievable for the covered power plants, and the Program is designed so as not to threaten resource adequacy or otherwise degrade electric system reliability in any state or region.

54.    Under the Trading Program, for each control period EPA allocates an amount of allowances equal to each state budget among the affected units in the respective state. For control periods after 2023, a state may submit a state implementation plan revision replacing EPA's unit-level allocations with unit-level allocations of its choosing, provided that the total number of allocations does not exceed the state budget. 40 CFR 52.38.

55.    The sum of the preset state budgets under the Trading Program for 2023 is 208,119 tons. (For the set of states that would be subject to the trading program for the entire 2023 ozone season, prorating of the budgets to account for the effective date of the plan, as discussed in paragraphs 22-23, will increase this amount by 20,123 tons.) Adding the amount of allowances in the anticipated starting bank (see paragraph below), EPA estimated that the total number of allowances that will be available for compliance in 2023 will be approximately 269,479 allowances.

56.    In addition to allowances allocated for each control period and already banked under the Group 3 Trading Program, the EPA will convert for use in the

---

[18] *See* document titled "Typical SCR and SNCR Schedules 2023" in the docket for the Good Neighbor Plan (EPA-HQ-OAR-2021-0668).

Trading Program an amount of allowances banked under the existing CSAPR NO$_X$ Ozone Season Group 2 trading program. 40 CFR 97.826. Any affected unit (or other entity) that holds banked allowances issued under the CSAPR Group 2 program will be issued a proportional number of converted allowances that can be used under the Trading Program just like allowances allocated from the Trading Program state budgets. Based on preliminary emissions data for 2022, in total, the already-banked and converted allowances collectively will constitute a "starting bank" of approximately 61,360 allowances available for 2023 compliance.

57.     Total emissions from the sources that would be covered by the Trading Program in 2021 were 239,450 tons, and in 2022 were 207,605 tons. As EPA has observed in prior CSAPR trading programs, EPA fully anticipates that sources will in fact optimize existing controls during the 2023 ozone season and/or pursue other emissions reduction opportunities, in response to the allowance price signal and in order to maintain or increase the respective amounts of banked allowances they hold for their own use or for sale to others. Nonetheless, these numbers indicate that even if no sources chose to reduce emissions in 2023 below where they already were in 2022, there would be adequate allowances available for compliance.

58.     EPA conducted a "resource adequacy" assessment for the Good Neighbor Plan. This assessment shows that accredited capacity projections, and therefore reserve margins, are expected to be virtually identical for the power sector between the baseline and the Good Neighbor Plan "policy case." In particular, in 2023, 2025, and 2030, reserve margin projections under the Plan remain consistent with baseline projections and are at or above target reserve margins.[19]

59.     For all North American Electric Reliability Corporation (NERC) reliability assessment regions and for all years, adequate reserve margins are projected to be maintained under the Good Neighbor Plan. Projected changes in reserve margins under the Plan through 2030 are exceedingly small relative to the baseline without the rule.[20]

60.     The Plan's projected effect on retail electricity prices relative to baseline projections is also projected to be exceedingly small. In 2023, there is a

---

[19] *See* Resource Adequacy and Reliability Analysis Final Rule TSD 2, Tbl. 1, *available at* https://www.epa.gov/system/files/documents/2023-03/Resource%20Adequacy%20and%20Reliability%20Analysis%20TSD.pdf.
[20] *Id.* Tbl. A3, B3, C3.

0% change projected. In 2025, the changes are on the order of -1% to 1%. In 2030, the changes are of a similar magnitude, with only one area (not covering Kentucky) projected to see a greater than 2% change in electricity prices.[21]

61.     Compliance with the Good Neighbor Plan is anticipated to be even less costly than EPA's primary analysis of compliance costs in the Plan's regulatory impact analysis (RIA) suggests (see paragraph 10). EPA conducted a supplementary analysis to assess the effects of the Inflation Reduction Act of 2022, Pub. L. 117-169 ("IRA"). That analysis indicates that the annualized cost of the Plan for the power sector over the 2023-2045 period declines under the IRA from $449 million/year to $196 million/year (2016$). *See* RIA Appendix 4A, Table 4A-2. For comparison, the annualized costs of the $NO_X$ SIP Call were estimated at $1.7 billion (1990$), which would be $2.8 billion in 2016$.

62.     There has never been a shortage of allowances in any allowance trading program operated by the Clean Air Markets Division from 1995 – the first year of the Acid Rain Program's trading program for $SO_2$ emissions – to the present. After the allowance transfer deadline for every control period for every such program, a bank of unused allowances has always been available for carryover to future control periods.  See the Division's progress reports at *https://www3.epa.gov/airmarkets/progress/reports/index.html*.

63.     Under the Trading Program, like EPA's other allowance trading programs, affected units are required to report their hourly emissions data to the Clean Air Markets Division on a quarterly basis, and all allowance allocations and transfers are also recorded by the Division. 40 CFR 97.1020—97.1035. The Division maintains publicly accessible databases of the reported emissions data and the recorded allocation and transfer data at *https://campd.epa.gov/*. Sources and other participants in the market for emissions allowances, such as brokers, can use these data to assess the potential supply of and demand for allowances and to identify potential buyers and sellers.

64.     Buyers and sellers of allowances are generally not required to report transaction prices to the Clean Air Markets Division. However, subscription data services regularly survey and report market prices for allowances in EPA's allowance trading programs. As of May 30, 2023, one such service reported a

---

[21] *See* Regulatory Impact Analysis for the Final Federal Good Neighbor Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard 166-68, Tbl. 4-15, 4-16, 4-17, *available at* https://www.epa.gov/system/files/documents/2023-03/SAN%208670%20Federal%20Good%20Neighbor%20Plan%2020230315%20RIA_Final.pdf.

market price of $1,238 per Group 2 allowance and $9,000 per Group 3 allowance.[22] The recently reported Group 3 allowance price of $9,000/ton represents a decline of about one-third from reported prices immediately prior to the mid-March pre-publication release of the Plan.

65.     While prices reported for the first part of the 2022 ozone season were higher than prices in the later part of and after the ozone season, relatively few allowance transfers among unrelated parties took place during the period of the highest reported prices. Moreover, EPA's data indicates that there were more than enough allowances available for compliance with the Group 3 program in 2022. Our data indicate total emissions in the Group 3 program of around 90,458 tons in the 2022 ozone season, while available allowances (including banked allowances) total 128,724 tons.

66.     The allowance price increase that was observed in the summer of 2022 in the pre-existing Group 3 trading program has since declined about 80 percent from its reported peak of $47,250 (see "CSAPR Allowance Price Data" in the docket for the Good Neighbor Plan). It is notable that reported Group 3 allowance trading prices are now close to (and in fact less than) the representative SCR retrofit costs that EPA calculated in the Plan ($11,000/ton as a representative figure).

67.     Finally, reported allowance prices do not necessarily reflect actual costs to sources for each ton emitted. EPA allocates allowances for free to existing source owners and operators. Most sources have all or nearly all of their allowances freely available to them through allocations or existing banks. Therefore, these sources only need to purchase a minority, if any at all, of their total needed allowances, as well as pursuing further emissions reductions as desired.

68.     Multiplying total expected emissions by the highest historically reported allowance price would generate a wildly inflated estimate of compliance burden, not only because that highest historical price is by no means indicative of the average allowance price going forward, but also because it ignores the fundamental expectation within a market-based program that sources will

---

[22] Price data are reported by S&P Global Market Intelligence and are available by subscription at https://www.SNL.com.

rationally pursue any emissions-reduction opportunities that are less costly than the purchase of additional allowances.

## IV.    Achievability of the Plan for Kentucky Power Plants

69.    The proposed and final rules are implemented through an interstate trading program. While there are state emission budgets, no state is limited to its budget level, and if sources in the state need additional allowances to emit up to the state's assurance level, they can use banked allowances or allowances purchased from other states.

70.    In the final Good Neighbor Plan, the Kentucky budget is 13,601 tons in 2023. Kentucky's budgets are 9,697 tons and 7,908 tons in 2026 and 2027, respectively (reflecting the two-year phase in of SCR-retrofit stringency).

71.    As explained in paragraphs 22-23, based on the publication date of June 5, 2023 and corresponding effective date of August 4, 2023, EPA identifies a prorated 2023 state emissions budget for Kentucky of 13,880 tons.

72.    Kentucky's state emissions budget is 12,999 and 12,472 tons in 2024 and 2025 respectively, reflecting known, planned fleet changes in the State and the availability of a combustion-control upgrade at two plants. However, a carryover of banked allowances from 2023 is expected, in light of the above figures and the incentive for sources to reduce emissions and bank allowances when doing so is economical.

73.    The Plan includes provisions to convert most allowances banked under the CSAPR $NO_X$ Ozone Season Group 2 trading program into a quantity of banked Group 3 allowances available for use in the Trading Program. This is no different than the conversion of banked allowances for use in updated trading programs that was done in two prior Good Neighbor rules, the CSAPR Update and the Revised CSAPR Update. While the number of new Group 3 allowances created in the conversion is smaller than the number of Group 2 allowances converted, the new Group 3 allowances each are worth more, preserving value to their holder. Based on the estimated effective date, and the number of Group 2 allowances held by sources in Kentucky that are available for conversion, Kentucky EGUs are anticipated to start with at least 668 banked Group 3 allowances created through conversion of Group 2 allowances and 5,082 Group 3 allowances carried over from previous control periods in addition to receiving unit-level Group 3 allowance allocations of the 2023 emissions budget for Kentucky.

24

74.    This brings the combined anticipated number of allowances initially held by affected EGUs in Kentucky for the 2023 ozone season to around 19,630 allowances. Under the interstate Trading Program, Kentucky EGUs will also have the opportunity to purchase additional allowances from account holders in other states. Based on preliminary emissions data for 2022, in total, we estimate the already-banked and converted allowances collectively will constitute a "starting bank" of approximately 61,360 Group 3 allowances available for 2023 compliance (inclusive of the 5,750 converted and banked allowances estimated above to be initially held by Kentucky EGUs).

75.    For the Trading Program, each state's variability limit is 21 percent of the state budget, and each state's assurance level is therefore the state budget plus 21 percent. 40 CFR 97.1025. *See* paragraph 33. Kentucky's assurance level in 2023 is therefore 16,795 tons. No enhanced allowance-surrender penalty is applied for emissions up to the assurance level.

76.    Kentucky power plants' 2021 ozone season $NO_X$ emissions were 14,571 tons and their 2022 ozone season $NO_X$ emissions were 12,272 tons.

77.    Table 1 summarizes the Trading Program final state budgets and assurance levels in the final Plan, and the actual 2021 and 2022 ozone-season $NO_X$ emissions reported to the Clean Air Markets Division by affected units (available at *https://campd.epa.gov/*). The table also shows the prorated 2023 budget and the estimated starting emissions bank for Kentucky.

**Table 1: Comparison of Expected 2023 Allowance Holdings and Recently Reported Emissions at Kentucky EGUs**

| 2023 Kentucky emissions budget (tons) | 2023 Prorated Kentucky Budget (tons) | 2023 Estimated Banked Allowances Held by Kentucky EGUs | 2023 Kentucky Variability Limit (tons) | 2023 Kentucky Assurance Level (tons) | 2021 Reported Emissions from Kentucky EGUs (tons) | 2022 Reported Emissions from Kentucky EGUs (tons) |
|---|---|---|---|---|---|---|
| 13,601 | 13,880 | 5,750 | 2,915 | 16,795 | 14,571 | 12,272 |

78.    Movant's allegation that "implementation seriously strains and destabilizes Kentucky's power grid" is not borne out at the state-level by the evidence provided above and in the power sector emissions and operating data in the final Plan. There are sufficient allowances available for compliance in 2023

even if emissions were held constant at 2022 levels. Emissions in Kentucky's most recent year of operations were lower than its state emissions budgets for 2023, 2024, and 2025. This means that Kentucky could operate exactly as it did in 2022 for the next three years. Petitioner has not cited any reliability issues in 2022 and has not explained how operating at the same levels as in 2022 would somehow cause reliability issues when operating at the same levels did not cause reliability issues in 2022. While the updated budgets are set to incentivize power plants to continue to optimize emissions performance, this control stringency through 2025 is effectively no different than what EPA previously set for Kentucky in the Revised CSAPR Update rulemaking two years ago, which was upheld by the D.C. Circuit earlier this year (61 F.4th 187) and is currently being successfully implemented in the state with no reliability issues.

79.     Over the 2026 and 2027 control periods, the Trading Program budgets reflect the onset of emissions control strategies (i.e., the retrofit of post-combustion controls such as SCR) that were found to be achievable and cost-effective to eliminate significant contribution in the final Plan, with sufficient lead time built in. See paragraphs 49-50. The fact that budgets will decline as the final Plan is implemented simply reflects the emission reduction measures needed to ensure the elimination of significant contribution as required by the Clean Air Act. See paragraphs 7-8.

80.     The Movants' claims of grid destabilization and increase in cost resulting from the increase in stringency beginning in 2026 are contradicted by the technical analysis and testimony it submits in support of those claims. First, again, the Good Neighbor Plan is premised on installation of conventional control technology, so the choice to retire units in response to it (accepting Movant's claims at face value) is an economic one beyond EPA's control. Further, Movant's supporting evidence for this claim cites testimony regarding plant closures and resource assessment by Stuart Wilson, Director of Energy Planning, Analysis and Forecasting at Louisville Gas and Electric, *see* Horne Decl. ¶ 6. However, in that testimony, Wilson explains to the Kentucky Public Service Commission under oath that Kentucky Utilities Company and Louisville Gas and Electric ("KU and LG&E") performed detailed analysis of alternative portfolio scenarios that factored in not just the Good Neighbor Plan but other important considerations (including fuel prices and regulation of carbon dioxide emissions) while maintaining required

reliability and affordability.[23] These results showed that the optimal resource portfolio the companies put forward that would comply with the Good Neighbor Plan (inclusive of retirements) would provide excellent reliability. The 1,194 MW of retiring older coal capacity Movant references as causing reliability concerns, were in fact described as part of a "no-regrets" scenario by KU and LG&E: "The Companies' optimal resource portfolio is such a no-regrets portfolio. It economically retires three large coal units (1,194 MW total) . . . ."[24]

81.     Declarants' claims that implementation of the Good Neighbor Plan will cause "immediate permitting burdens," Kennedy Decl. ¶ 28-31, or reduce the availability of electricity, Purvis Decl. ¶ 33-34, are not consistent with how the Trading Program is designed and ignore key flexibilities included in the final Plan. The Trading Program establishes emissions budgets *premised* on widely-available and already-widely-implemented pollution control technologies (and so does not force any source to retire). Moreover, these mitigation practices through 2025 are already largely in place and practiced in Kentucky without the State experiencing any of the harms claimed in their Motion. Like the current Revised CSAPR Update Rule, the Good Neighbor Plan does not require or mandate any specific pollution control installation. Rather, it requires allowance surrender for each ton of emissions. For those units facing relatively costly pollution-control retrofit decisions or already-planned retirements the Plan reflects input from power sector stakeholders by deferring the start of a daily backstop emissions rate to 2030 (among other changes). See paragraphs 37-43. Even after 2030, units without SCR may continue to operate so long as they comply with enhanced allowance-surrender requirements for those emissions subject to the backstop rate. See paragraph 37.c.

82.     Movants' other allegations are not supported by evidence. As noted in paragraph 60, EPA's detailed economic analysis of the Good Neighbor Plan indicates that it will have a negligible effect on retail electricity rates at most. Movants' supply no evidence of a net loss in employment in Kentucky, and the assertions of lost jobs in the coal sector (taken at face value), Brock ¶ 14, stem not

---

[23] Direct Testimony of Stuart A. Wilson, In the Matter of Electronic Joint Application of Kentucky Utilities Company and Louisville Gas and Electric Company for Certificates of Public Convenience and Necessity and Site Compatibility Certificates and Approval of a Demand Side Management Plan, Case No. 2022-00402 (Ky. Pub. Service Comm'n).

[24] *Id.* at 36. "In sum, the optimal resource portfolio this Resource Assessment recommends will help ensure that customers receive safe, reliable, and lowest-reasonable-cost service for years to come." *Id.* at 38. *See also id.* 25 ("Interestingly, the lowest-cost portfolio across 17 of 18 scenarios . . . is also the least $CO_2$-emitting.").

from the Good Neighbor Plan but from independent choices by utilities and state authorities regarding whether it is economical to keep power plants in operation. Finally, the permitting burden faced by Kentucky regulators is not adequately explained, Kennedy Decl. ¶ 28-31, but in any case, any such responsibility stems from Kentucky's separate authority to administer permitting programs under the Clean Air Act, rather than from the Good Neighbor Plan itself. Even then, any permitting obligations under the Trading Program are generally streamlined and not onerous. See Good Neighbor Plan Preamble Section VI.E, 88 FR at 36843-44. And the Good Neighbor Plan builds in time for permitting processes for industrial sources not in the Trading Program. *Id.* Section VI.A.2.b, 88 FR at 36759.

## V.    Consequences of a Stay of Kentucky's SIP Disapproval

83.    A stay of the Final Rule as to Kentucky or other upwind states will be harmful to public health, highly disruptive to the implementation of the Good Neighbor Plan, and will undermine the planning efforts for downwind areas that are impacted by the upwind states' emissions, increasing their regulatory burdens.

84.    The implementation of the Good Neighbor Plan has already been substantially disrupted by judicial stays of the Final Rule entered by other circuit courts, as well as the administrative stay entered by this Court as to Kentucky. EPA is now in the process of taking administrative measures to stay the Plan as to these states, including Kentucky, and must undertake a series of revisions to ensure that the status quo is maintained as to these states, including maintaining their prior participation in earlier CSAPR trading programs to ensure they continue to meet their Good Neighbor obligations under prior ozone NAAQS.[25]

85.    Kentucky, for example, has emissions reduction requirements under the Revised CSAPR Update that must be maintained in order to ensure its significant contribution remains eliminated for purposes of the 2008 ozone NAAQS. Because Louisiana has also obtained a stay of the Final Rule in the Fifth Circuit, and these are the only states that were covered by the Revised CSAPR Update to have a stay of the Final Rule at this time, to maintain the status quo, the power plants in these two states must be kept in their own trading program for the time being.

86.    Implementing these administrative measures has necessitated the reallocation of staff time and resources, during a time when the Agency would

---

[25] *See* Notice of Forthcoming EPA Action to Address Judicial Stay Orders (June 1, 2023), *available at* https://www.epa.gov/csapr/notice-forthcoming-epa-action-address-judicial-stay-orders.

have focused its resources on assisting stakeholders in the implementation of the Plan to effectuate its public health and welfare benefits. However, the disruption caused by state-specific judicial stays of the Final Rule extends well beyond EPA's administrative burdens.

87.     By far the most concerning consequence of a stay is the effect on the downwind areas in other states that face continuing violating ozone levels and ratcheting, mandatory ozone-nonattainment requirements. Beyond the continuing harm to public health that ozone levels above the NAAQS signify, the failure to eliminate upwind states' significant contribution under the Good Neighbor Provision is also contributing to downwind areas' increased regulatory burdens under the Act, and staying the Final Rule (and thus the Good Neighbor Plan) will exacerbate the consequences of this already-delayed implementation.[26]

88.     Kentucky's emissions are linked to designated ozone nonattainment areas in five states: the Muskegon, Michigan nonattainment area, the Cleveland, Ohio nonattainment area, and the New York-New Jersey-Connecticut nonattainment area.[27] Each of these areas is now in Moderate nonattainment of the 2015 ozone NAAQS.[28] Downwind state obligations to attain the NAAQS, including for these five states, are now driven by the statutory attainment date of August 3, 2024, for Moderate areas. Areas that fail to attain by that date will be reclassified (or "bumped up") to Serious nonattainment, indicating persistent unhealthy air and triggering even greater regulatory obligations. *See* 42 U.S.C. §§ 7511(b)(2), 7511a(c).

89.     Because attainment is determined using an average of the three prior calendar years' monitoring data, the last year that air quality data may impact whether nonattainment areas are found to have attained by the 2024 attainment date is 2023. Thus, the objective of the Plan is to obtain emissions reductions from power plants that EPA found were achievable using existing, installed control technology in 2023 to improve ozone levels in downwind areas through eliminating, to the extent possible, the upwind states' "significant contribution" by

---

[26] In *Maryland v. EPA*, 958 F.3d 1185, the D.C. Circuit held that states and EPA are obligated to eliminate significant contribution under the Good Neighbor Provision for the 2015 ozone NAAQS no later than the Marginal area attainment date, which fell on August 3, 2021. Thus, 2020 should have been the relevant year for analysis and, to the extent possible, elimination of significant contribution. *See* Final Rule, 88 FR 9336, 9340-41 (discussing EPA's interpretation of the *Maryland* holding).

[27] Air Quality Modeling Final Rule TSD, Appendix C, *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs.

[28] EPA Green Book, 8-Hour Ozone (2015) Nonattainment Areas (data current as of May 31, 2023), https://www3.epa.gov/airquality/greenbook/jnc.html.

this year. This aspect of the Plan's design was done to comply with judicial holdings in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) and *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020), among others. *See* Good Neighbor Plan, 88 FR at 36754-58.

90.     Nonattainment areas that had been classified originally as Marginal nonattainment, including the Muskegon and Cleveland nonattainment areas, have already faced one attainment deadline under the 2015 ozone NAAQS with no relief from the significant contribution of upwind states.[29] Under the CAA, Marginal areas that failed to attain by the August 3, 2021 attainment date were mandatorily reclassified to Moderate nonattainment, making them subject to a January 1, 2023 deadline to submit a new SIP and, by that same date, to implement, among other requirements, reasonably available control measures (RACM) and reasonably available control technology (RACT). *See* 87 FR 60897, 60900 (Oct. 7, 2022).[30]

91.     This schedule is driven by the statute at §§ 7511 and 7511a, as well as EPA's implementation regulations, 40 CFR 51.1312(a)(3)(i). These regulations established a RACT implementation deadline for areas initially classified Moderate as no later than January 1, 2023. The need for emissions reductions in 2023 is also informed by the modeling and attainment demonstration requirements in 40 CFR 51.1308(d), which requires a state to provide for implementation of all control measures needed for attainment no later than the beginning of the attainment year ozone season (i.e., 2023).

92.     This Court's administrative stay of the Final Rule as to Kentucky has in turn required EPA to stay the Good Neighbor Plan as to Kentucky. If the stay of the Final Rule is not lifted, Kentucky's emissions that significantly contribute to the ozone nonattainment areas in five states will continue unabated at least through 2023. If every upwind state obtained a stay of the Final Rule blocking EPA's FIP authority, as Kentucky has, then downwind areas like Muskegon, Michigan, Cleveland, Ohio, and the New York-New Jersey-Connecticut region will once again face an attainment deadline with no relief from the significant contribution from upwind sources.

---

[29] The New York-New Jersey-Connecticut nonattainment area was originally classified as in Moderate nonattainment.

[30] Other substantial requirements are triggered by the Moderate classification, including: making an attainment demonstration, implementing reasonable further progress (RFP) requirements, establishing a motor vehicle inspection and maintenance program, and complying with a higher emissions offset ratio before new major sources can be permitted to construct. *See generally* 42 U.S.C. § 7511a(b).

93.     If these nonattainment areas fail to attain based on the monitoring data for the 2021-2023 period, they would likely be reclassified to Serious nonattainment as of the August 3, 2024 attainment date, meaning a cascade of additional, statutorily mandated requirements would be triggered on top of the requirements already mandated for Moderate areas. *See generally* 42 U.S.C. § 7511a(c). Among other things, the application of RACT on existing sources and major new source permitting requirements begins to apply to sources half the size of those subject to these requirements at lesser ozone-nonattainment classifications (i.e., sources with the potential to emit just 50 tons per year of ozone precursors, rather than 100 tons per year). *Id.*; *id.* § 7511a(f)(1).[31]

94.     These ratcheting statutory requirements have obvious implications for industrial expansion, economic development, and tax base in nonattainment areas. Meanwhile, with no Good Neighbor requirements in place, an upwind state's existing sources may continue to emit at levels that are significantly contributing to the downwind area's ozone violations, even when cost-effective emissions control measures for those sources have been found to be available.

95.     Finally, areas that stand to benefit from and which are relying upon the air quality improvements of the Good Neighbor Plan extend beyond just those "receptor" areas that were identified in EPA's modeling. Areas throughout the country were reclassified to Moderate nonattainment in EPA's October 2022 action (see paragraph 90), including cities such as Baltimore, Cincinnati, Louisville, Philadelphia, St. Louis, and Washington, DC. *See* 88 FR at 60899 (Table 1) (listing all areas that failed to attain). EPA and state air planning agencies had counted on taking the air quality benefits of the Good Neighbor Plan into account in numerous regulatory actions associated with these areas. Indeed, actions have already been planned or have been taken that rely on the air quality benefits of the Good Neighbor Plan, assuming it would take effect in 2023. *See, e.g.,* Air Plan Approval; Michigan; Redesignation of the Detroit MI Area to Attainment for the 2015 Ozone Standards, 88 FR 32594, 32605 (May 19, 2023).

96.     The nationwide improvement in ozone levels from the Plan illustrated in Figure 1 above (see paragraph 13) thus provides both health and regulatory-relief benefits to both upwind and downwind states across a wide swath of the

---

[31] The New York-New Jersey-Connecticut nonattainment area is currently in Severe nonattainment for the 2008 ozone NAAQS. EPA Green Book, 8-Hour Ozone (2008) Nonattainment Areas (data current as of May 31, 2023), https://www3.epa.gov/airquality/greenbook/hnc.html. Muskegon and Cleveland are not designated nonattainment for the 2008 ozone NAAQS or prior ozone NAAQS and so face these requirements for the first time.

country. Staying the Final Rule as to Kentucky or other upwind states disrupts the planning of both EPA and state air agencies, shifts the regulatory compliance burden to the sources in downwind areas, and frustrates the fundamental purpose of the Act to expeditiously meet and maintain the nation's air quality standards.

SO DECLARED:

RONA BIRNBAUM    Digitally signed by RONA BIRNBAUM
Date: 2023.06.07 10:50:28 -04'00'

_____

Rona Birnbaum, Director
Clean Air Markets Division

DATED:  June 7, 2023

**EXHIBIT 7**

EPA, Proposed Rule, Air Plan Disapproval; Kentucky; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 87 Fed. Reg. 9498 (Feb. 22, 2022).

the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), the EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, the EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-step framework for assessing good neighbor obligations for the 2015 ozone NAAQS. The EPA relies on a single set of updated, 2016-base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at Steps 1 and 2 of that framework. Further, the EPA proposes to determine and apply a set of nationally consistent policy judgments to apply the 4-step framework. The EPA has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[61] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[62]

---

[61] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. See H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[62] The EPA may take a consolidated, single final action on all the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and the EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

*Authority:* 42 U.S.C. 7401 *et seq.*

Dated: January 31, 2022.

**Lisa Garcia,**

*Regional Administrator, Region 2.*

[FR Doc. 2022–02946 Filed 2–18–22; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R04–OAR–2021–0841; EPA–HQ–OAR–2021–0663; FRL–9423–01–R4]**

**Air Plan Disapproval; Kentucky; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA or Agency) is proposing to disapprove a State Implementation Plan (SIP) submittal from the Kentucky Energy and Environment Cabinet, Department of Environmental Quality (DAQ) (herein after referred to as Kentucky or the Commonwealth) regarding the interstate transport requirements for the 2015 8-hour ozone national ambient air quality standards (NAAQS or standard). The "Good Neighbor" or "Interstate Transport" provision requires that each state's implementation plan contain adequate provisions to prohibit emissions from within the state from significantly contributing to nonattainment or interfering with maintenance of the NAAQS in other states. This requirement is part of the broader set of "infrastructure" requirements, which are designed to ensure that the structural components of each state's air quality management program are adequate to meet the state's responsibilities under the CAA. This disapproval, if finalized, will establish a 2-year deadline for EPA to promulgate a Federal Implementation Plan (FIP) to address the relevant interstate transport requirements, unless EPA approves a subsequent SIP submittal that meets these requirements. Disapproval does not start a mandatory sanctions clock.

**DATES:** Comments must be received on or before April 25, 2022.

*Withdrawals:* As of February 22, 2022, the proposed rule published in December 30, 2019, at 84 FR 71854, is withdrawn.

**ADDRESSES:** You may submit comments, identified by Docket No. EPA–R04–OAR–2021–0841, through the Federal eRulemaking Portal at *https://www.regulations.gov* following the online instructions for submitting comments.

*Instructions:* All submissions received must include the Docket No. EPA–R04–OAR–2021–0841 for this rulemaking. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided. For detailed instructions on submitting comments and additional information on the rulemaking process, see the "Public Participation" heading of the **SUPPLEMENTARY INFORMATION** section of this document. Out of an abundance of caution for members of the public and staff, the EPA Docket Center and Reading Room are open to the public by appointment only to reduce the risk of transmitting COVID–19. The Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information on EPA Docket Center services and the current status, please visit EPA online at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Evan Adams of the Air Regulatory Management Section, Air Planning and Implementation Branch, Air and Radiation Division, U.S. Environmental Protection Agency, Region 4, 61 Forsyth Street SW, Atlanta, Georgia 30303–8960. Mr. Adams can be reached by telephone at (404) 562–9009, or via electronic mail at *adams.evan@epa.gov.*

**SUPPLEMENTARY INFORMATION:** *Public Participation:* Submit your comments, identified by Docket No. EPA–R04–OAR–2021–0841, at *https://www.regulations.gov.* Once submitted, comments cannot be edited or removed from the docket. EPA may publish any comment received to its public docket. Do not submit to EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system).

There are two dockets supporting this action, EPA–R04–OAR–2021–0841 and EPA–HQ–OAR–2021–0663. Docket No. EPA–R04–OAR–2021–0841 contains information specific to Kentucky, including this notice of proposed rulemaking. Docket No. EPA–HQ–OAR–2021–0663 contains additional modeling files, emissions inventory files, technical support documents, and other relevant supporting documentation regarding interstate transport of emissions for the 2015 8-hour ozone NAAQS which are being used to support this action. All comments regarding information in either of these dockets are to be made in Docket No. EPA–R04–OAR–2021–0841. For the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets.* Due to public health concerns related to COVID–19, the EPA Docket Center and Reading Room are open to the public by appointment only. The Docket Center staff also continues to provide remote customer service via email, phone, and webform. For further information and updates on EPA Docket Center services, please visit EPA online at *https://www.epa.gov/dockets.*

EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and Federal partners so that EPA can respond rapidly as conditions change regarding COVID–19.

The indices to Docket No. EPA–R04–OAR–2021–0841 and Docket No. EPA–HQ–OAR–2021–0663 are available electronically at *www.regulations.gov.* While all documents in each docket are listed in their respective index, some information may not be publicly available due to docket file size restrictions or content (*e.g.,* CBI).

**Table of Contents**

I. Background
  A. Description of Statutory Background
  B. Description of EPA's Four Step Interstate Transport Regulatory Process
  C. Background on EPA's Ozone Transport Modeling Information
  D. EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 8-Hour Ozone NAAQS
II. Summary of Kentucky's 2015 8-Hour Ozone Interstate Transport SIP Submission
  A. Information Related to Emission Trends From Kentucky Sources
  B. Information Related to Connecticut Monitors Provided by Kentucky
  C. Information Related to the Harford, Maryland Monitor Provided by Kentucky
  D. Summary of Conclusions From Kentucky
  E. Summary of Midwest Ozone Group TSD Appended to Kentucky's Submittal
III. EPA's Evaluation of Kentucky's 2015 8-Hour Ozone Interstate Transport SIP Submission
  A. Results of EPA's Step 1 and Step 2 Modeling and Findings for Kentucky
  B. Evaluation of Information Provided by Kentucky Regarding Step 1
  C. Evaluation of Information Provided by Kentucky Regarding Step 2
  D. Evaluation of Information Provided by Kentucky Regarding Step 3
  E. Evaluation of Information Provided by Kentucky Regarding Step 4
  F. Conclusion
IV. Proposed Action
V. Statutory and Executive Order Reviews

## I. Background

The following provides background for EPA's proposed action related to the interstate transport requirements for the 2015 8-hour ozone NAAQS for the Commonwealth of Kentucky.

### A. Description of Statutory Background

On October 1, 2015, EPA promulgated a revision to the ozone NAAQS (2015 8-hour ozone NAAQS), lowering the level of both the primary and secondary standards to 0.070 parts per million (ppm).[1] Section 110(a)(1) of the CAA requires states to submit, within 3 years after promulgation of a new or revised standard, SIP submissions meeting the applicable requirements of section 110(a)(2).[2] One of these applicable requirements is found in CAA section 110(a)(2)(D)(i)(I), otherwise known as the "good neighbor" or "interstate transport" provision, which generally requires SIPs to contain adequate provisions to prohibit in-state emissions activities from having certain adverse air quality effects on other states due to interstate transport of pollution. There are two so-called "prongs" within CAA section 110(a)(2)(D)(i)(I). A SIP for a new or revised NAAQS must contain adequate provisions prohibiting any source or other type of emissions activity within the state from emitting air pollutants in amounts that will significantly contribute to nonattainment of the NAAQS in another state (prong 1) or interfere with maintenance of the NAAQS in another state (prong 2). EPA and states must give independent significance to prong 1 and prong 2 when evaluating downwind air quality problems under CAA section 110(a)(2)(D)(i)(I).[3]

### B. Description of EPA's Four Step Interstate Transport Regulatory Process

EPA is using the 4-step interstate transport framework (or 4-step framework) to evaluate the states' implementation plan submittals addressing the interstate transport provision for the 2015 8-hour ozone NAAQS. EPA has addressed the interstate transport requirements of CAA section 110(a)(2)(D)(i)(I) with respect to prior ozone NAAQS in several regional regulatory actions, including the Cross-State Air Pollution Rule (CSAPR), which addressed interstate transport with respect to the 1997 ozone NAAQS as well as the 1997 and 2006 fine particulate matter standards,[4] the Cross-State Air Pollution Rule Update (CSAPR Update)[5] and the Revised CSAPR Update, both of which addressed the 2008 ozone NAAQS.[6]

Through the development and implementation of the CSAPR rulemakings and prior regional rulemakings pursuant to the interstate transport provision,[7] EPA, working in partnership with states, developed the following 4-step interstate transport framework to evaluate a state's obligations to eliminate interstate transport emissions under the interstate transport provision for the ozone NAAQS: (1) Identify monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS (*i.e.,* nonattainment and/or maintenance receptors); (2) identify

---

[1] National Ambient Air Quality Standards for Ozone, Final Rule, 80 FR 65292 (October 26, 2015). Although the level of the standard is specified in the units of ppm, ozone concentrations are also described in parts per billion (ppb). For example, 0.070 ppm is equivalent to 70 ppb.

[2] SIP revisions that are intended to meet the applicable requirements of section 110(a)(1) and (2) of the CAA are often referred to as infrastructure SIPs and the applicable elements under section 110(a)(2) are referred to as infrastructure requirements.

[3] *See North Carolina* v. *EPA,* 531 F.3d 896, 909–11 (D.C. Cir. 2008).

[4] *See* Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 FR 48208 (August 8, 2011).

[5] Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 FR 74504 (October 26, 2016).

[6] In 2019, the United States Court of Appeals for the District of Columbia Circuit (D.C. Circuit) remanded the CSAPR Update to the extent it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *Wisconsin* v. *EPA,* 938 F.3d 303, 313 (D.C. Cir. 2019). The Revised CSAPR Update for the 2008 Ozone NAAQS, 86 FR 23054 (April 30, 2021), responded to the remand of the CSAPR Update in *Wisconsin* and the vacatur of a separate rule, the "CSAPR Close-Out," 83 FR 65878 (December 21, 2018), in *New York* v. *EPA,* 781 F. App'x. 4 (D.C. Cir. 2019).

[7] In addition to CSAPR rulemakings, other regional rulemakings addressing ozone transport include the "NO_X SIP Call," 63 FR 57356 (October 27, 1998), and the "Clean Air Interstate Rule" (CAIR), 70 FR 25162 (May 12, 2005).

states that impact those air quality problems in other (*i.e.,* downwind) states sufficiently such that the states are considered ''linked'' and therefore warrant further review and analysis; (3) identify the emissions reductions necessary (if any), applying a multifactor analysis, to eliminate each linked upwind state's significant contribution to nonattainment or interference with maintenance of the NAAQS at the locations identified in Step 1; and (4) adopt permanent and enforceable measures needed to achieve those emissions reductions.

## C. Background on EPA's Ozone Transport Modeling Information

In general, EPA has performed nationwide air quality modeling to project ozone design values which are used in combination with measured data to identify nonattainment and maintenance receptors. To quantify the contribution of emissions from specific upwind states on 2023 ozone design values for the identified downwind nonattainment and maintenance receptors, EPA performed nationwide, state-level ozone source apportionment modeling for 2023. The source apportionment modeling provided contributions to ozone at receptors from precursor emissions of anthropogenic nitrogen oxides ($NO_X$) and volatile organic compounds (VOCs) in individual upwind states.

EPA has released several documents containing projected design values, contributions, and information relevant to evaluating interstate transport with respect to the 2015 8-hour ozone NAAQS. First, on January 6, 2017, EPA published a notice of data availability (NODA) in which the Agency requested comment on preliminary interstate ozone transport data including projected ozone design values and interstate contributions for 2023 using a 2011 base year platform.[8] In the NODA, EPA used the year 2023 as the analytic year for this preliminary modeling because that year aligns with the expected attainment year for Moderate ozone nonattainment areas for the 2015 8-hour ozone NAAQS.[9] On October 27, 2017, EPA released a memorandum (October 2017 memorandum) containing updated modeling data for 2023, which incorporated changes made in response to comments on the NODA, and noted that the modeling may be useful for states developing SIPs to address interstate transport obligations for the 2008 ozone NAAQS.[10] On March 27, 2018, EPA issued a memorandum (March 2018 memorandum) noting that the same 2023 modeling data released in the October 2017 memorandum could also be useful for identifying potential downwind air quality problems with respect to the 2015 8-hour ozone NAAQS at Step 1 of the 4-step interstate transport framework.[11] The March 2018 memorandum also included the then newly available contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 8-hour ozone NAAQS under Step 2 of the 4-step interstate transport framework.[12] EPA subsequently issued two more memoranda in August and October 2018, providing additional information to states developing interstate transport SIP submissions for the 2015 8-hour ozone NAAQS concerning, respectively, potential contribution thresholds that may be appropriate to apply in Step 2 of the 4-step interstate transport framework, and considerations for identifying downwind areas that may have problems maintaining the standard at Step 1 of the 4-step interstate transport framework.[13]

Since the release of the modeling data shared in the March 2018 memorandum, EPA performed updated modeling using a 2016-based emissions modeling platform (*i.e.,* 2016v1). This emissions platform was developed under the EPA/Multi-Jurisdictional Organization (MJO)/state collaborative project.[14] This collaborative project was a multi-year joint effort by EPA, MJOs, and states to develop a new, more recent emissions platform for use by EPA and states in regulatory modeling as an improvement over the dated 2011-based platform that EPA had used to project ozone design values and contribution data provided in the 2017 and 2018 memoranda. EPA used the 2016v1 emissions to project ozone design values and contributions for 2023. On October 30, 2020, in the Notice of Proposed Rulemaking for the Revised CSAPR Update, EPA released and accepted public comment on 2023 modeling that used the 2016v1 emissions platform.[15] Although the Revised CSAPR Update addressed transport for the 2008 ozone NAAQS, the projected design values and contributions from the 2016v1 platform are also useful for identifying downwind ozone problems and linkages with respect to the 2015 8-hour ozone NAAQS.[16]

Following the Revised CSAPR Update final rule, EPA made further updates to the 2016 emissions platform to include mobile emissions from EPA's Motor Vehicle Emission Simulator (MOVES) model[17] and updated emissions projections for electric generating units (EGUs) that reflect the emissions reductions from the Revised CSAPR Update, recent information on plant closures, and other sector trends. The construct of the updated emissions platform, 2016v2, is described in the Preparation of Emissions Inventories for the 2016v2 North American Emissions Modeling Platform technical support document (TSD) for this proposed rule and is included in Docket No. EPA–HQ–OAR–2021–0663. EPA performed air quality modeling of the 2016v2 emissions using the most recent public release version of the Comprehensive Air Quality Modeling with Extensions (CAMx) photochemical modeling,

---

[8] *See* Notice of Availability of the Environmental Protection Agency's Preliminary Interstate Ozone Transport Modeling Data for the 2015 8-hour Ozone National Ambient Air Quality Standard (NAAQS), 82 FR 1733 (January 6, 2017).

[9] *See* 82 FR 1733, 1735 (January 6, 2017).

[10] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2008 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), October 27, 2017 (''October 2017 memorandum''), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[11] *See* Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 (''March 2018 memorandum''), available in Docket No. EPA–HQ–OAR–2021–0663 or at *https://www.epa.gov/interstate-air-pollution-transport/interstate-air-pollution-transport-memos-and-notices.*

[12] The March 2018 memorandum, however, provided, ''While the information in this memorandum and the associated air quality analysis data could be used to inform the development of these SIPs, the information is not a final determination regarding states' obligations under the good neighbor provision. Any such determination would be made through notice-and-comment rulemaking.''

[13] *See* Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018) (''August 2018 memorandum''), and Considerations for Identifying Maintenance Receptors for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, October 19, 2018 (''October 2018 memorandum''), available in Docket No. EPA–HQ–OAR–2021–0663 for this action or at *https://www.epa.gov/airmarkets/memo-and-supplemental-information-regarding-interstate-transport-sips-2015-ozone-naaqs.*

[14] The results of this modeling, as well as the underlying modeling files, are included in Docket No. EPA–HQ–OAR–2021–0663.

[15] *See* 85 FR 68964, 68981 (October 30, 2020).

[16] See the Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, included in Docket No. EPA–HQ–OAR–2021–0663.

[17] Additional details and documentation related to the MOVES3 model can be found at *https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves.*

version 7.10.[18] EPA proposes to primarily rely on modeling based on the updated and newly available 2016v2 emissions platform in evaluating these submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework. By using the updated modeling results, EPA is using the most current and technically appropriate information for this proposed rulemaking. Section III of this notice and the Air Quality Modeling TSD included in Docket No. EPA–HQ–OAR–2021–0663 for this proposal contain additional detail on the modeling performed using the 2016v2 emissions modeling.

In this notice, EPA is accepting public comment on this updated 2023 modeling, which uses the 2016v2 emissions platform. Details on the air quality modeling and the methods for projecting design values and determining contributions in 2023 are described in the Air Quality Modeling TSD for 2015 8-hour Ozone NAAQS Transport SIP Proposed Actions. Comments on EPA's air quality modeling should be submitted in Docket No. EPA–R04–OAR–2021–0841. Comments are not being accepted in Docket No. EPA–HQ–OAR–2021–0663.

States may have chosen to rely on the results of EPA modeling and/or alternative modeling performed by states or Multi-Jurisdictional Organizations (MJOs) to evaluate downwind air quality problems and contributions as part of their submissions. In Section III, EPA evaluates how Kentucky used air quality modeling information in its submission.

## D. EPA's Approach to Evaluating Interstate Transport SIPs for the 2015 8-Hour Ozone NAAQS

EPA proposes to apply a consistent set of policy judgments across all states for purposes of evaluating interstate transport obligations and the approvability of interstate transport SIP submittals for the 2015 8-hour ozone NAAQS. These policy judgments reflect consistency with relevant case law and past Agency practice as reflected in CSAPR and related rulemakings. Nationwide consistency in approach is particularly important in the context of interstate ozone transport, which is a regional-scale pollution problem involving many smaller contributors. Effective policy solutions to the problem of interstate ozone transport going back to the $NO_X$ SIP Call have necessitated the application of a uniform framework of policy judgments in order to ensure

an "efficient and equitable" approach. *See EME Homer City Generation, LP* v. *EPA,* 572 U.S. 489, 519 (2014).

In the March, August, and October 2018 memoranda, EPA recognized that states may be able to establish alternative approaches to addressing their interstate transport obligations for the 2015 8-hour ozone NAAQS that vary from a nationally uniform framework. EPA emphasized in these memoranda, however, that such alternative approaches must be technically justified and appropriate in light of the facts and circumstances of each particular state's submittal. In general, EPA continues to believe that deviation from a nationally consistent approach to ozone transport must be substantially justified and have a well-documented technical basis that is consistent with relevant case law. Where states submitted SIPs that rely on any such potential concepts as may have been identified or suggested in the past, EPA will evaluate whether the state adequately justified the technical and legal basis for doing so.

EPA notes that certain potential concepts included in an attachment to the March 2018 memorandum require unique consideration, and these ideas do not constitute Agency guidance with respect to transport obligations for the 2015 8-hour ozone NAAQS. Attachment A to the March 2018 memorandum identified a "Preliminary List of Potential Flexibilities" that could potentially inform SIP development.[19] However, EPA made clear in that attachment that the list of ideas were not suggestions endorsed by the Agency but rather "comments provided in various forums" on which EPA sought "feedback from interested stakeholders." [20] Further, Attachment A stated, "EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor [is EPA] specifically recommending that states use these approaches." [21] Attachment A to the March 2018 memorandum, therefore, does not constitute agency guidance, but was intended to generate further discussion around potential approaches to addressing ozone transport among interested stakeholders. To the extent states sought to develop or rely on these ideas in support of their SIP submittals, EPA will thoroughly review the technical and legal justifications for doing so.

The remainder of this section describes EPA's proposed framework with respect to analytic year, definition

of nonattainment and maintenance receptors, selection of contribution threshold, and multifactor control strategy assessment.

### 1. Selection of Analytic Year

In general, the states and EPA must implement the interstate transport provision in a manner "consistent with the provisions of [title I of the CAA]." *See* CAA section 110(a)(2)(D)(i). This requires, among other things, that these obligations are addressed consistently with the timeframes for downwind areas to meet their CAA obligations. With respect to ozone NAAQS, under CAA section 181(a), this means obligations must be addressed "as expeditiously as practicable" and no later than the schedule of attainment dates provided in CAA section 181(a)(1).[22] Several D.C. Circuit court decisions address the issue of the relevant analytic year for the purposes of evaluating transport air-quality problems. On September 13, 2019, the D.C. Circuit issued a decision in *Wisconsin* v. *EPA,* remanding the CSAPR Update to the extent that it failed to require upwind states to eliminate their significant contribution by the next applicable attainment date by which downwind states must come into compliance with the NAAQS, as established under CAA section 181(a). *See* 938 F.3d 303, 313.

On May 19, 2020, the D.C. Circuit issued a decision in *Maryland* v. *EPA* that cited the *Wisconsin* decision in holding that EPA must assess the impact of interstate transport on air quality at the next downwind attainment date, including Marginal area attainment dates, in evaluating the basis for EPA's denial of a petition under CAA section 126(b). *Maryland* v. *EPA,* 958 F.3d 1185, 1203–04 (D.C. Cir. 2020). The court noted that "section 126(b) incorporates the Good Neighbor Provision," and, therefore, "EPA must find a violation [of section 126] if an upwind source will significantly contribute to downwind nonattainment at the *next downwind attainment deadline.* Therefore, the agency must evaluate downwind air quality at that deadline, not at some later date." *Id.* at 1204 (emphasis added). EPA interprets the court's holding in *Maryland* as requiring the states and the Agency, under the good neighbor provision, to assess downwind air quality as expeditiously as practicable and no later than the next

---

[18] Ramboll Environment and Health, January 2021, *www.camx.com.*

[19] March 2018 memorandum, Attachment A.
[20] *Id.* at A–1.
[21] *Id.*

[22] For attainment dates for the 2015 8-hour ozone NAAQS, refer to CAA section 181(a), 40 CFR 51.1303, and Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

applicable attainment date,[23] which is now the Moderate area attainment date under CAA section 181 for ozone nonattainment. The Moderate area attainment date for the 2015 8-hour ozone NAAQS is August 3, 2024.[24] EPA believes that 2023 is now the appropriate year for analysis of interstate transport obligations for the 2015 8-hour ozone NAAQS, because the 2023 ozone season is the last relevant ozone season during which achieved emissions reductions in linked upwind states could assist downwind states with meeting the August 3, 2024, Moderate area attainment date for the 2015 8-hour ozone NAAQS.

EPA recognizes that the attainment date for nonattainment areas classified as Marginal for the 2015 8-hour ozone NAAQS was August 3, 2021. Under the *Maryland* holding, any necessary emissions reductions to satisfy interstate transport obligations should have been implemented by no later than this date. At the time of the statutory deadline to submit interstate transport SIPs (October 1, 2018), many states relied upon EPA modeling of the year 2023, and no state provided an alternative analysis using a 2021 analytic year (or the prior 2020 ozone season). However, EPA must act on SIP submittals using the information available at the time it takes such action. In this circumstance, EPA does not believe it would be appropriate to evaluate states' obligations under CAA section 110(a)(2)(D)(i)(I) as of an attainment date that is wholly in the past, because the Agency interprets the interstate transport provision as forward looking. *See* 86 FR 23054, 23074; *see also Wisconsin*, 938 F.3d at 322. Consequently, in this proposal EPA will use the analytical year of 2023 to evaluate each state's CAA section 110(a)(2)(D)(i)(I) SIP submission with respect to the 2015 8-hour ozone NAAQS.

### 2. Step 1 of the 4-Step Interstate Transport Framework

In Step 1, EPA identifies monitoring sites that are projected to have problems attaining and/or maintaining the NAAQS in the 2023 analytic year. Where EPA's analysis shows that a site does not fall under the definition of a nonattainment or maintenance receptor, that site is excluded from further analysis under EPA's 4-step interstate transport framework. For sites that are identified as a nonattainment or maintenance receptor in 2023, EPA proceeds to the next step of the 4-step interstate transport framework by identifying the upwind state's contribution to those receptors.

EPA's approach to identifying ozone nonattainment and maintenance receptors in this action is consistent with the approach used in previous transport rulemakings. EPA's approach gives independent consideration to both the "contribute significantly to nonattainment" and the "interfere with maintenance" prongs of CAA section 110(a)(2)(D)(i)(I), consistent with the D.C. Circuit's direction in *North Carolina* v. *EPA*.[25]

For the purpose of this proposal, EPA identifies nonattainment receptors as those monitoring sites that are projected to have average design values that exceed the NAAQS and that are also measuring nonattainment based on the most recent monitored design values. This approach is consistent with prior transport rulemakings, such as the CSAPR Update, where EPA defined nonattainment receptors as those areas that both currently measure nonattainment and that EPA projects will be in nonattainment in the future analytic year (*i.e.,* 2023).[26]

In addition, in this proposal, EPA identifies a receptor to be a "maintenance" receptor for purposes of defining interference with maintenance, consistent with the method used in CSAPR and upheld by the D.C. Circuit in *EME Homer City Generation, L.P.* v. *EPA*, 795 F.3d 118, 136 (D.C. Cir. 2015).[27] Specifically, EPA identified maintenance receptors as those receptors that would have difficulty maintaining the relevant NAAQS in a scenario that takes into account historical variability in air quality at that receptor. The variability in air quality was determined by evaluating the "maximum" future design value at each receptor based on a projection of the maximum measured design value over the relevant period. EPA interprets the projected maximum future design value to be a potential future air quality outcome consistent with the meteorology that yielded maximum measured concentrations in the ambient data set analyzed for that receptor (*i.e.,* ozone conducive meteorology). EPA also recognizes that previously experienced meteorological conditions (*e.g.,* dominant wind direction, temperatures, air mass patterns) promoting ozone formation that led to maximum concentrations in the measured data may reoccur in the future. The maximum design value gives a reasonable projection of future air quality at the receptor under a scenario in which such conditions do, in fact, reoccur. The projected maximum design value is used to identify upwind emissions that, under those circumstances, could interfere with the downwind area's ability to maintain the NAAQS.

Recognizing that nonattainment receptors are also, by definition, maintenance receptors, EPA often uses the term "maintenance-only" to refer to those receptors that are not nonattainment receptors. Consistent with the concepts for maintenance receptors, as described above, EPA identifies "maintenance-only" receptors as those monitoring sites that have projected average design values above the level of the applicable NAAQS, but that are not currently measuring nonattainment based on the most recent official design values. In addition, those monitoring sites with projected average design values below the NAAQS, but with projected maximum design values above the NAAQS are also identified as "maintenance-only" receptors, even if they are currently measuring nonattainment based on the most recent official design values.

### 3. Step 2 of the 4-Step Interstate Transport Framework

In Step 2, EPA quantifies the contribution of each upwind state to each receptor in the 2023 analytic year. The contribution metric used in Step 2 is defined as the average impact from each state to each receptor on the days with the highest ozone concentrations at the receptor based on the 2023 modeling. If a state's contribution value does not equal or exceed the threshold of 1 percent of the NAAQS (*i.e.,* 0.70 ppb for the 2015 8-hour ozone NAAQS), the upwind state is not "linked" to a

---

[23] EPA notes that the court in *Maryland* did not have occasion to evaluate circumstances in which EPA may determine that an upwind linkage to a downwind air quality problem exists at Steps 1 and 2 of the interstate transport framework by a particular attainment date, but for reasons of impossibility or profound uncertainty the Agency is unable to mandate upwind pollution controls by that date. *See Wisconsin*, 938 F.3d at 320. The D.C. Circuit noted in *Wisconsin* that upon a sufficient showing, these circumstances may warrant flexibility in effectuating the purpose of the interstate transport provision.

[24] *See* CAA section 181(a); 40 CFR 51.1303; Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards, 83 FR 25776 (June 4, 2018, effective August 3, 2018).

[25] *See North Carolina* v. *EPA*, 531 F.3d 896, 910–11 (D.C. Cir. 2008) (holding that EPA must give "independent significance" to each prong of CAA section 110(a)(2)(D)(i)(I)).

[26] *See* 81 FR 74504 (October 26, 2016). This same concept, relying on both current monitoring data and modeling to define nonattainment receptor, was also applied in CAIR. *See* 70 FR at 25241, 25249 (January 14, 2005); *see also North Carolina*, 531 F.3d at 913–14 (affirming as reasonable EPA's approach to defining nonattainment in CAIR).

[27] *See* 76 FR 48208 (August 8, 2011). The CSAPR Update and Revised CSAPR Update also used this approach. *See* 81 FR 74504 (October 26, 2016) and 86 FR 23054 (April 30, 2021).

downwind air quality problem, and EPA, therefore, concludes that the state does not significantly contribute to nonattainment or interfere with maintenance of the NAAQS in the downwind states. However, if a state's contribution equals or exceeds the 1 percent threshold, the state's emissions are further evaluated in Step 3, considering both air quality and cost as part of a multi-factor analysis, to determine what, if any, emissions might be deemed "significant" and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

EPA is proposing to rely in the first instance on the 1 percent threshold for the purpose of evaluating a state's contribution to nonattainment or maintenance of the 2015 8-hour ozone NAAQS (i.e., 0.70 ppb) at downwind receptors. This is consistent with the Step 2 approach that EPA applied in CSAPR for the 1997 ozone NAAQS, which has subsequently been applied in the CSAPR Update when evaluating interstate transport obligations for the 2008 ozone NAAQS. EPA continues to find 1 percent to be an appropriate threshold. For ozone, as EPA found in the CAIR, CSAPR, and the CSAPR Update, a portion of the nonattainment problems from anthropogenic sources in the U.S. result from the combined impact of relatively small contributions from many upwind states, along with contributions from in-state sources and, in some cases, substantially larger contributions from a subset of particular upwind states. EPA's analysis shows that much of the ozone transport problem being analyzed in this proposed rule is still the result of the collective impacts of contributions from many upwind states. Therefore, application of a consistent contribution threshold is necessary to identify those upwind states that should have responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute. Continuing to use 1 percent of the NAAQS as the screening metric to evaluate collective contribution from many upwind states also allows EPA (and states) to apply a consistent framework to evaluate interstate emissions transport under the interstate transport provision from one NAAQS to the next. See 81 FR at 74518 (August 8, 2011); see also 86 FR at 23085 (April 30, 2021) (reviewing and explaining rationale from CSAPR, 76 FR at 48237–38 (August 8, 2011), for selection of 1 percent threshold).

EPA's August 2018 memorandum recognized that in certain circumstances, a state may be able to

establish that an alternative contribution threshold of 1 ppb is justifiable. Where a state relies on this alternative threshold, and where that state determined that it was not linked at Step 2 using the alternative threshold, EPA will evaluate whether the state provided a technically sound assessment of the appropriateness of using this alternative threshold based on the facts and circumstances underlying its application in the particular SIP submission.

4. Step 3 of the 4-Step Interstate Transport Framework

Consistent with EPA's longstanding approach to eliminating significant contribution or interference with maintenance, at Step 3, states linked at Steps 1 and 2 are generally expected to prepare a multifactor assessment of potential emissions controls. EPA's analysis at Step 3 in prior Federal actions addressing interstate transport requirements has primarily focused on an evaluation of cost-effectiveness of potential emissions controls (on a marginal cost-per-ton basis), the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which a state is linked; other factors may potentially be relevant if adequately supported. In general, where EPA's or alternative air quality and contribution modeling establishes that a state is linked at Steps 1 and 2, it will be insufficient at Step 3 for a state merely to point to its existing rules requiring control measures as a basis for approval. In general, the emissions-reducing effects of all existing emissions control requirements are already reflected in the air quality results of the modeling for Steps 1 and 2. If the state is shown to still be linked to one or more downwind receptor(s), states must provide a well-documented evaluation determining whether their emissions constitute significant contribution or interference with maintenance by evaluating additional available control opportunities by preparing a multifactor assessment. While EPA has not prescribed a particular method for this assessment, EPA expects states at a minimum to present a sufficient technical evaluation. This would typically include information on emissions sources, applicable control technologies, emissions reductions, costs, cost effectiveness, and downwind air quality impacts of the estimated reductions, before concluding that no

additional emissions controls should be required.[28]

5. Step 4 of the 4-Step Interstate Transport Framework

At Step 4, states (or EPA) develop permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. For a state linked at Steps 1 and 2 to rely on an emissions control measure at Step 3 to address its interstate transport obligations, that measure must be included in the state's implementation plan so that it is permanent and federally enforceable. See CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions. . . ."). See also CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *EPA*, 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by a state to meet CAA requirements must be included in the SIP).

## II. Summary of Kentucky's 2015 8-Hour Ozone Interstate Transport SIP Submission

On January 11, 2019, Kentucky submitted a SIP revision, a portion of which addressed the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements for the 2015 8-hour ozone NAAQS. The Commonwealth's SIP submission provided Kentucky's analysis of its impact to downwind states and concluded that the Commonwealth had met the requirements of CAA section 110(a)(2)(D)(i)(I) (i.e., prongs 1 and 2) because Kentucky's SIP contains adequate provisions to prevent sources and other types of emissions activities within the Commonwealth from significantly contributing to nonattainment, or interfering with the maintenance, of downwind states with respect to the 2015 8-hour ozone NAAQS.

The Commonwealth's submission relied on the results of EPA's modeling of the year 2023, contained in the March 2018 memorandum, to identify downwind nonattainment and

---

[28] As examples of general approaches for how such an analysis could be conducted for their sources, states could look to the CSAPR Update, 81 FR 74504, 74539–51; CSAPR, 76 FR 48208, 48246–63; CAIR, 70 FR 25162, 25195–229; or the NOₓ SIP Call, 63 FR 57356, 57399–405. See also Revised CSAPR Update, 86 FR 23054, 23086–23116. Consistently across these rulemakings, EPA has developed emissions inventories, analyzed different levels of control stringency at different cost thresholds, and assessed resulting downwind air quality improvements.

maintenance receptors that may be "linked" to emissions from sources in Kentucky (which correlates to Step 1 of the 4-step framework).[29] The March 2018 modeling indicates that the Commonwealth was linked to four nonattainment receptors and one maintenance monitor above 1% of the NAAQS. The largest impact from Kentucky sources on any downwind nonattainment receptor in the East was projected to be 0.89 ppb at the Fairfield County, Connecticut (ID: 90013007) site. The other nonattainment receptors to which Kentucky was linked are: a second site in Fairfield County (ID: 90019003); Milwaukee, Wisconsin (ID: 550790085); and Sheboygan, Wisconsin (ID: 551170006). The impact from Kentucky sources on the one downwind maintenance-only receptor to which it was linked in that modeling was 1.52 ppb at the Harford County, Maryland monitor (ID: 240251001).

The Commonwealth reviewed EPA's August 2018 memorandum as it related to the use of a potential alternative contribution threshold of 1 ppb and agreed that use of a 1 ppb contribution threshold is comparable to the amount of collective contribution captured using a threshold equivalent to 1 percent of the NAAQS. Based on the March 2018 modeling and application of a 1 ppb alternative contribution threshold, the Commonwealth found that it would not be linked as a significant contributor to the four nonattainment receptors in Connecticut and Wisconsin (which correlates to EPA's Step 2), and therefore concluded that no further controls were required to address its contribution to those four receptors. Thus, the Commonwealth concluded that Kentucky's SIP contains adequate provisions to prevent sources and other types of emissions activities within the Commonwealth from contributing significantly to nonattainment in any other state (*i.e.*, "prong 1" of CAA section 110(a)(2)(D)(i)(I)) for the 2015 8-hour ozone NAAQS.

After application of the 1 ppb contribution threshold, Kentucky remained linked to the downwind maintenance-only receptor at Harford County, Maryland (ID: 240251001) because the Commonwealth's contribution of 1.52 ppb to this receptor was greater than the 1 ppb alternative threshold. Kentucky's SIP submission asserted that the amount of $NO_X$ emission reductions required for an upwind state should not be the same for a monitor that is already attaining the NAAQS as they are for a nonattainment monitor. The Commonwealth further asserted that local controls should be implemented before requiring upwind states to control their sources. Thus, Kentucky concluded that no further reductions other than on-the-books and on-the-way measures are required to address the Commonwealth's interstate transport obligation to eliminate its contribution to the Harford County, Maryland maintenance receptor.

In addition, Kentucky provided information intended to demonstrate that Kentucky's SIP contains adequate provisions to prevent sources and other types of emissions activities within the Commonwealth from significantly contributing to nonattainment, or interfering with the maintenance, of downwind states with respect to the 2015 8-hour ozone NAAQS, and thus, no additional emissions reductions from Kentucky are necessary. Specifically, Kentucky listed existing state, SIP-approved regulations and Federal programs for sources in the Commonwealth that it concluded address the requirements of CAA 110(a)(2)(D)(i)(I) for the 2015 8-hour ozone NAAQS.[30] Kentucky provided more detailed analyses related to several specific topics, which are summarized in sections below.

The Commonwealth also included documents attached as appendices to its submittal. The March 2018 memorandum and the August 2018 memorandum were attached at appendices A and B, respectively.[31] As Appendix C, the Commonwealth appended several documents developed and/or submitted by the Midwest Ozone Group (a consortium of upwind industries with emitting facilities).[32] This included a modeling analysis developed by Alpine Geophysics titled "Good Neighbor Modeling Technical Support Document for the 8-hour Ozone State Implementation Plans," dated June 2018 (Alpine TSD). The Alpine TSD contains alternative modeling of 2023 performed by Alpine Geophysics sponsored by MOG, as well as additional policy suggestions that MOG suggested states could consider in developing good neighbor SIP submissions (see section 9 of the Alpine TSD).[33] The Alpine TSD also appended a separate set of MOG comments on EPA's March 2018 memorandum.[34] These comments and Alpine's modeling analysis were further summarized in a Microsoft PowerPoint Presentation titled "MOG's Preview of 2015 Ozone NAAQS Good Neighbor SIPs." EPA also summarizes the materials developed by MOG that the Commonwealth included as Appendix C to its submittal, although it is unclear that Kentucky intended to rely on all aspects of these materials.

*A. Information Related to Emission Trends From Kentucky Sources*

With respect to ozone precursors emitted from Kentucky sources, Kentucky focused its analysis on $NO_X$ emissions, as it found that ozone is far more sensitive to $NO_X$ emissions than VOC emissions in the Southeastern United States and that controlling $NO_X$ emissions is a more effective strategy in reducing ozone. Kentucky reviewed $NO_X$ emissions trends in the Commonwealth, comparing annual $NO_X$ emissions from 2008 to 2016, finding that $NO_X$ emissions in Kentucky have significantly decreased since 2008. The Commonwealth asserted that it has significantly lowered $NO_X$ emissions between 2008 and 2017[35] and contended that planned shutdowns and

---

[29] EPA notes that Kentucky's SIP submission is not organized around EPA's 4-step framework for assessing good neighbor obligations, but EPA summarizes the submission using that framework for clarity here.

[30] See Kentucky's January 11, 2019, SIP submission, at pages 20 through 30 for the list of state, SIP-approved regulations and Federal programs identified by Kentucky.

[31] See the following Appendices to Kentucky's January 11, 2019, submission: Appendix A—Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I), March 27, 2018 ("March 2018 memorandum"); Appendix B—Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, August 31, 2018; and Appendix D—Public Hearing & Statement of Consideration.

[32] See Appendix C to Kentucky's January 11, 2019, submission—Midwest Ozone Group Technical Support Document: "Good Neighbor Modeling Technical Support Document for 8-Hour Ozone Implementation Plans."

[33] It is unclear whether Kentucky intends to rely on all of the data and policy approaches in Appendix C as included in its submittal, or if these documents were appended solely to support specific policy and technical arguments relied on by Kentucky in its submittal.

[34] See the following Appendices to Appendix C—Midwest Ozone Group Technical Support Document: "Good Neighbor Modeling Technical Support Document for 8-Hour Ozone Implementation Plans of Kentucky's January 11, 2019: Appendix A—4km Modeling Results for Mid-Atlantic and Lake Michigan Domains Compared to EPA 12 km "No Water" Design Value Calculations from March 2018 Memorandum; Appendix B—Midwest Ozone Group Comments on EPA's March 27, 2018 Memorandum Entitled "Information on the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I); Appendix C—Presentation—Midwest Ozone Group Preview of 2015 Ozone NAAQS Good Neighbor SIPs.

[35] Table 2 in Kentucky's SIP provides historic annual $NO_X$ emissions data for point sources in the state from 2008 through 2016, however, the associated graph at Chart 1 includes annual $NO_X$ emissions from 2008 through 2017.

conversion to natural gas, along with the implementation of Federal and State programs, ensure Kentucky's emissions will continue to decrease. Based on the 2014 national emission inventory (NEI), Kentucky indicated that the major contributor of $NO_X$ emissions in the Commonwealth are point sources, mainly comprised of electric generating units (EGUs).

Kentucky asserted that $NO_X$ emissions from EGUs in the Commonwealth have decreased and would continue to decrease based, in part, on the implementation of CAIR, CSAPR, and the CSAPR Update, as well as retirements of several EGUs in the Commonwealth. The Commonwealth compared Kentucky's $NO_X$ ozone season allocations to actual EGU emissions in the Commonwealth, concluding that Kentucky's $NO_X$ ozone season budgets have decreased since the implementation of CSAPR and the CSAPR Update and actual ozone season $NO_X$ emissions are significantly lower than the trading program budgets.[36] The SIP submission summarized coal-fired unit retirements, shutdowns, and repowering from 2015 through 2017 as well as on-the-way reductions from natural gas conversions and retirements from 2017 through 2023.[37] Kentucky stated that it expected emissions will continue to decline in the future due to continued implementation of CSAPR, the CSAPR Update, and scheduled shutdowns, fuel switches, and retirements of facilities in the Commonwealth.

*B. Information Related to Connecticut Monitors Provided by Kentucky*

EPA's March 2018 modeling showed Kentucky linked to the two receptors located in Fairfield County, Connecticut, which is part of the New York-Northern New Jersey-Long Island, NY-NJ-CT (New York Metro Area) core based statistical area (CBSA).[38] Kentucky applied an alternative contribution threshold of 1 ppb, and thus determined that Kentucky was no longer linked to the Connecticut

receptors. In addition, Kentucky provided information intended to demonstrate that emissions from local sources in the area surrounding the monitors contribute significantly to the continued nonattainment issues, and thus, that local controls should be implemented before requesting upwind states to control facilities.

In particular, Kentucky's SIP submission claims that the Westport Sherwood, Fairfield, Connecticut (ID: 90019003) and Stratford Point Lighthouse, Fairfield County (ID: 90013007) monitors are located less than three miles from the I–95 interstate highway corridor and over 500 miles from Kentucky. Kentucky asserted these monitors have a consistent pattern of violating the 2015 8-hour ozone NAAQS from 2007 to 2016. Kentucky also pointed out that it is not linked in the modeling to two other nonattainment receptors (the Greenwich Point Park and Criscuolo Park monitoring sites) that are in relatively close proximity to the Westport and Stratford monitors. Kentucky compared the distances between these sites with the distances of the sites to Kentucky's nearest border.

Kentucky's SIP submission also provided information related to the New York Metro Area, citing the 2014 NEI to state that the on-road source sector contributed the highest amount of $NO_X$ emissions and that the nonpoint source sector contributed the highest amount of VOC emissions in that area. The Commonwealth further provided information about high vehicle miles traveled (VMT) and commuting patterns in the New York Metro Area, as well as information regarding violating monitors along the I–95 corridor and outlying monitors that show attainment.

Additionally, Kentucky's SIP submission includes Hybrid Single Particle Lagrangian Integrated Trajectory (HYSPLIT) model back trajectory analysis to the two Connecticut receptors,[39] asserting that the HYSPLIT analysis indicates that the monitors are downwind of nonattainment areas in New York, New Jersey, Pennsylvania, and Maryland. The Commonwealth also asserted there is a consistent pattern of violating monitors located along the I–95 corridor. In addition, Kentucky asserted that pollutants are trapped in the marine boundary layer and then transported inland to coastal

Connecticut receptors due to conditions on Long Island Sound.

The Commonwealth's SIP submission also discussed point sources in the New York Metro Area, providing information regarding the largest point sources in that area. In addition, Kentucky provided $NO_X$ and VOC emission information for 13 counties in the New York Metro Area that have $NO_X$ and VOC emission totals above 10,000 tpy, finding that three counties that surround Fairfield County (Suffolk, Queens, and Nassau Counties) had the highest $NO_X$ emissions.

Kentucky further evaluated high electric demand days in New York, discussing a New York Department of Environmental Conservation (NYDEC) determination that peaking units operating on peak electricity demand days are a major contributor of $NO_X$ (particularly units installed before 1987), and that such units can contribute 4.8 ppb of ozone on high ozone days.[40] Kentucky concluded $NO_X$ emission reductions from these EGUs point sources would have a significant impact on ozone levels in the New York Metro Area.

*C. Information Related to the Harford, Maryland Monitor Provided by Kentucky*

Kentucky acknowledged that EPA's March 27, 2018 modeling shows the potential for Kentucky emissions to significantly contribute to the Edgewood, Harford County, Maryland (ID: 240251001) maintenance-only monitor (Edgewood monitor) in 2023. However, Kentucky provided air quality data designed to demonstrate that emissions from local sources in the area surrounding the monitors contribute significantly to the continued air quality issues and concluded that there are local controls that should be implemented before requesting upwind states to control facilities.

Kentucky provided additional information with respect to the Edgewood Monitor, which is located 3 miles from the I–95 corridor and approximately 350 miles from Kentucky. Kentucky provided data to show that the Edgewood monitor consistently violated the 2015 8-hour ozone standard from 2007 to 2016. Kentucky also provided information related to other nonattainment monitors located in Baltimore County and Harford County.

The Commonwealth's SIP submission provided data related to the Baltimore-

---

[36] Kentucky's SIP acknowledged that the CSAPR trading program does not address interstate transport for the 2015 standard but nonetheless provides $NO_X$ emission reductions.

[37] See Kentucky's January 11, 2019, submittal located in Docket No. EPA–R04–OAR–2021–0841, at pages 32–33 for discussion on implementation of CSAPR, the CSAPR Update, EGU retirements, and EGU fuel switches.

[38] EPA's designations for the 2015 8-hour ozone standard divided the state into two areas, Greater Connecticut, CT, with a marginal classification, and New York-Northern New Jersey-Long Island, NY-NJ-CT (New York Metro Area), with a moderate classification. *See https://www.epa.gov/ozone-designations/additional-designations-2015-ozone-standards.*

[39] According to Kentucky, the HYSPLIT analysis were generated using EPA's 2015 Ozone Designation Mapping Tool, available at *https://www.epa.gov/ozone-designations/ozone-designations-guidance-and-data#:~:text=The%20ozone%20designations%20mapping%20tool,for%20the%202015%20Ozone%20NAAQS.*

[40] Kentucky references NYDEC emission analysis entitled "Background, High Electric Demand Day (HEDD) Initiative", New York Department of Environmental Conservation.

Columbia-Towson, MD CBSA (Baltimore Area), citing to the 2014 NEI to state that the on-road source sector contributed the highest amount of $NO_X$ emissions and that the nonpoint source sector contributed the highest amount of VOC emissions in that area. Kentucky further provided information about VMTs and commuting patterns in the Baltimore Area, as well as information regarding violating monitors along the I–95 corridor and outlying monitors that show attainment. The SIP submission asserted that local mobile emissions are a key contributor to the Edgewood monitor, which is also located in close proximity to the 1–95 corridor. Kentucky further cited to a presentation and remarks by Maryland officials, discussing programs to reduce emissions from local sources, specifically focusing on mobile source $NO_X$ reduction programs.

Kentucky cited a 2010 case study in the Chesapeake Bay that suggests the transport of pollution from nearby urban areas accumulates over the Bay and becomes stagnant, creating a bay breeze which is pushed by southerly winds northward towards the Edgewood monitor. Additionally, Kentucky's SIP submission also provided HYSPLIT model back trajectory analysis to the Edgewood receptor,[41] asserting that the HYSPLIT indicates that the monitors are downwind of nonattainment areas in Baltimore County, Baltimore City, Arlington County, and the District of Columbia. Kentucky also asserted that higher altitude particles from the northwest of Baltimore combine with lower-level particles from the south and southeast.

Kentucky's submission used information on local mobile emissions along the I–95 corridor and coastal air pollution formation and accumulation along the Maryland coast to support its conclusion that local air quality problems are the source of ozone violations at these monitors.

Additionally, Kentucky asserted that the implementation of local programs to reduce emissions should be sufficient for monitors in the Maryland area to attain the 2015 8-hour ozone NAAQS. Kentucky cited claims by MOG (appended to the submittal in Appendix C) that the modeling in EPA's March 2018 memorandum does not account for additional retirements, conversions, and

modifications or emission control programs expected to be implemented before 2023. Kentucky concluded that because the Edgewood monitor is a maintenance receptor, the Commonwealth believes that no further reductions from Kentucky sources other than on-the-books controls should be required because maintenance receptors should be treated differently than nonattainment receptors in terms of upwind requirements. The Commonwealth also asserted that states linked to maintenance receptors should be held to less stringent standards of emissions reductions as compared to states linked to a nonattainment receptor.

The Commonwealth also asserted that local emission controls should be implemented before upwind states are required to control their facilities, which is based on Kentucky's concurrence with statements from MOG. The Commonwealth cited MOG's comments on local controls stating: ''When an area is measuring nonattainment of a NAAQS, as is the case with the areas linked to Kentucky, the CAA requires that the effects and benefits of local controls on all source sectors be considered first, prior to pursuing controls of sources in upwind states.'' [42] The Commonwealth concluded that the emissions reductions resulting from on-the-books and on-the-way measures are adequate to prohibit emissions within Kentucky from interfering with the maintenance of downwind states with respect to the 2015 8-hour ozone NAAQS.

*D. Summary of Conclusions From Kentucky*

In summary, based on Kentucky's reliance on the modeling results in EPA's March 2018 memorandum, the Commonwealth found that emissions from Kentucky sources were potentially linked to four nonattainment monitors in Connecticut and Wisconsin and one maintenance receptor in Harford County, Maryland. However, after utilizing a 1 ppb alternative contribution threshold, the Commonwealth concluded that it was no longer linked to the four nonattainment monitors, and thus, that the Kentucky SIP contains adequate provisions to prevent sources and other types of emissions activities within the State from contributing significantly to nonattainment in any other state (*i.e.,* ''prong 1'' of CAA section 110(a)(2)(D)(i)(I)) for the 2015 8-hour ozone NAAQS. Although modeling

results indicated that Kentucky remained linked to the maintenance-only receptor in Harford County, Maryland, even after the application of the 1 ppb alternative threshold, Kentucky asserted that states should not be required to apply the same degree of reductions for maintenance receptors as nonattainment areas, and determined that additional $NO_X$ emission reductions other than those that are on-the-books or on-the-way are not required to address its downwind contribution to that receptor. Kentucky further provided an assessment of local sources in the vicinity of the Connecticut and Maryland monitors and concluded that local (particularly mobile) emissions, high VMTs and commuting patterns, and weather patterns are the primary cause of violating monitors in these areas. Therefore, Kentucky concluded that its SIP has adequate provisions to prohibit emissions from interfering with maintenance in another state (*i.e.,* ''prong 2'' of CAA section 110(a)(2)(D)(i)(I)) with respect to the 2015 8-hour ozone NAAQS.

*E. Summary of Midwest Ozone Group TSD Appended to Kentucky's Submittal*

Kentucky attached several materials developed by MOG to its submittal as Appendix C, which included a document titled '' 'Good Neighbor' Modeling Technical Support Document for 8-Hour Ozone State Implementation Plans'' prepared by Alpine Geophysics.[43] The Alpine Geophysics document also attached the following documents: 4 kilometer (km) modeling results for mid-Atlantic and Lake Michigan domains compared to EPA 12 km ''No Water'' Design Value Calculations from March 2018 memorandum (Appendix A); MOG comments on EPA's March 2018 memorandum (Appendix B); and a Microsoft PowerPoint presentation from MOG previewing 2015 8-hour ozone NAAQS good neighbor SIPs (Appendix C). EPA notes a number of modeling results and technical and policy arguments provided in the MOG attachments are not explicitly discussed in Kentucky's SIP submission narrative. Therefore, it is unclear whether Kentucky intended to rely on Alpine's modeling or MOG's policy argument to support the Commonwealth's overall transport SIP conclusions. To ensure review of all potentially relevant technical and policy issues identified in Kentucky's SIP package, this section summarizes key arguments presented in

---

[41] According to Kentucky, the HYSPLIT analysis were generated using EPA's 2015 Ozone Designation Mapping Tool, available at *https://www.epa.gov/ozone-designations/ozone-designations-guidance-and-data#:~:text=The%20ozone%20designations%20mapping%20tool,for%20the%202015%20Ozone%20NAAQS.*

[42] Kentucky's SIP references MOG's comments that cite CAA sections 107(a) and 110(a)(1).

[43] *See* Appendix C of Kentucky's January 11, 2019, transport SIP submission.

Appendix C. However, in EPA's evaluation of the SIP submittal in section III, EPA will differentiate between those positions clearly adopted by the Commonwealth and those where it is unclear and therefore a position espoused by MOG cannot be attributed to Kentucky.

Appendix C included modeling results performed by the Alpine TSD. The Alpine modeling results identified the Harford, Maryland receptor as a nonattainment receptor, with Kentucky emissions contributing 2.07 ppb. In addition, the Alpine modeling results identified Kentucky linkages above 1 percent to the following maintenance-only receptors: Gloucester, New Jersey (ID: 340150002), with a Kentucky contribution of 1.69 ppb; Richmond, New York (ID: 360850067), with a Kentucky contribution of 0.93; and Philadelphia, Pennsylvania (ID: 421010024), with a Kentucky contribution of 1.53. (While MOG asserts in separate comments that emission reductions not accounted for in EPA's modeling suggests there will be no receptors by 2023, this is not consistent with Alpine's modeling.)

The Alpine TSD also evaluated additional approaches and flexibilities that states could apply in SIP revisions, based on the potential concepts provided in Appendix A of EPA's March 2018 memorandum.[44] These included reliance on alterative modeling data, evaluation of international contributions (both anthropogenic contribution and as an additional percentage of boundary conditions), alternate contribution thresholds, proportional control of upwind emissions by level of upwind state contribution, and addressing interference with maintenance obligations through use of 10-year projections.

MOG suggested states should be allowed to select multiple sources of modeling data rather than a single modeling simulation if such information is considered equally credible when making policy decisions related to the development of good neighbor SIPs.

With respect to international emissions, MOG cited to an attachment to EPA's 2018 memorandum and asserts

that EPA's and Alpine's contribution modeling tracks and reports the relative impact contributions of anthropogenic emissions located within the 36 km modeling domain. Considering this information, MOG concluded that states seeking to avoid overcontrol may wish to consider removing that portion of the projected design value that is explicitly attributed to international anthropogenic contribution, which may be enough to demonstrate attainment with the 2008 or 2015 8-hour ozone NAAQS at multiple monitors in the U.S.

With respect to potential use of alternative contribution thresholds, MOG pointed to states raising concerns that the 1 percent threshold is more stringent than the 2016 EPA Significant Impact level (SIL) guidance of 1 ppb, which is designed as an individual source or group of sources' contribution limit (in the context of prevention of significant deterioration (PSD) permitting).[45] MOG suggested that states could submit SIP revisions citing the SIL of 1 ppb as an acceptable total state anthropogenic contribution threshold under Step 2 of the 4-step process, and request relief from the 1 percent threshold in lieu of using an alternate value.

MOG presented an alternative approach to how upwind-state emission reduction obligations could be allocated. Specifically, MOG proposed that upwind reductions could be allocated in proportion to the size of their contribution to downwind nonattainment. To illustrate this approach, MOG determined a proportional reduction requirement associated with the relative contribution from each upwind state to the Harford County, Maryland monitor. Under this analysis, MOG's approach indicated that Kentucky would be responsible for a 0.02 ppb reduction at the monitor and "would then need to craft a [good neighbor SIP] revision to generate reductions associated with this proportional amount."

With respect to "interference with maintenance" obligations, MOG suggested that an upwind state could

choose to indicate that no additional controls would be needed to address a maintenance monitor if the upwind state can show that either the monitor is likely to remain in attainment for a period of 10 years or that the upwind state's emissions will not increase for 10 years after the attainment date.

## III. EPA's Evaluation of Kentucky's 2015 8-Hour Ozone Interstate Transport SIP Submission

EPA is proposing to find that Kentucky's January 11, 2019, SIP submission does not meet the Commonwealth's obligations with respect to prohibiting emissions that contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state based on EPA's evaluation of the SIP submission using the 4-step interstate transport framework, and therefore EPA is proposing to disapprove Kentucky's SIP submission.

### A. Results of EPA's Step 1 and Step 2 Modeling and Findings for Kentucky

As described in section I, EPA performed updated air quality modeling to project design values and contributions for 2023. These data were examined to determine if Kentucky contributes at or above the threshold of 1 percent of the 2015 8-hour ozone NAAQS (0.70 ppb) to any downwind nonattainment or maintenance receptor. As shown in Table 1, the data[46] indicate that in 2023, emissions from Kentucky contribute greater than 1 percent of the standard to nonattainment or maintenance-only receptors in Bucks County, Pennsylvania (ID: 420170012), New Haven County, Connecticut (ID: 90099002), and Fairfield County, Connecticut (ID: 90019003 and 90013007).[47]

---

[44] *See* Section 9.0—Selected SIP Revision Approaches in Appendix C—MOG's TSD of Kentucky's January 11, 2019 transport SIP submission.

[45] MOG cited to the Georgia Environmental Protection Division's comment on EPA's March 2018 Memorandum to support this claim. *See* Section 9.0—Selected SIP Revision Approaches in Appendix C—MOG's TSD of Kentucky's January 11, 2019 transport SIP submission, *citing* Boylan, J. W. (May 4, 2018). Georgia EPD Comments on EPA's March 27, 2018 Interstate Transport Memo [Memorandum].

[46] The ozone design values and contributions at individual monitoring sites nationwide are provided in the file "2016v2_DVs_state_contributions.xlsx" which is included in Docket No. EPA–HQ–OAR–2021–0663.

[47] These modeling results are consistent with the results of a prior round of 2023 modeling using the 2016v1 emissions platform which became available to the public in the fall of 2020 in the Revised CSAPR Update, as noted in section I. That modeling showed that Kentucky had a maximum contribution greater than 0.70 ppb to at least one nonattainment or maintenance-only receptor in 2023. These modeling results are included in the file "Ozone Design Values And Contributions Revised CSAPR Update.xlsx" in Docket No. EPA–HQ–OAR–2021–0663.

Table 1—Kentucky Linkage Results Based on EPA Updated 2023 Modeling

| Receptor ID | Location | County | Nonattainment/ maintenance | 2023 average design value (ppb) | 2023 maximum design value (ppb) | Kentucky contribution (ppb) |
|---|---|---|---|---|---|---|
| 420170012 .................... | Pennsylvania ............ | Bucks ....................... | Maintenance .............. | 70.7 | 72.2 | 0.88 |
| 90099002 ...................... | Connecticut .............. | New Haven ............... | Nonattainment .......... | 71.8 | 73.9 | 0.83 |
| 90019003 ...................... | Connecticut .............. | Fairfield ................... | Nonattainment .......... | 76.1 | 76.4 | 0.82 |
| 90013007 ...................... | Connecticut .............. | Fairfield ................... | Nonattainment .......... | 74.2 | 75.1 | 0.77 |

*B. Evaluation of Information Provided by Kentucky Regarding Step 1*

At Step 1 of the 4-step interstate transport framework, Kentucky relied on EPA modeling released in the March 2018 memorandum to identify nonattainment and maintenance receptors in 2023 and also included results from modeling performed by Alpine. As described previously in this notice, EPA has recently updated its 2023 modeling using the most current and technically appropriate information. EPA proposes to rely on EPA's most recent modeling to identify nonattainment and maintenance receptors in 2023. However, even using EPA modeling available to Kentucky at the time of its SIP submittal, three nonattainment receptors and one maintenance-only receptor were projected in 2023 to which Kentucky was linked above 1 percent of the NAAQS. In addition, the Alpine modeling that Kentucky appended to its submittal also indicated that Kentucky was linked to several receptors in 2023.[48] Kentucky appended comments from MOG arguing that states should be allowed to select multiple sources of modeling data rather than a single modeling simulation if such information is considered equally credible when making policy decisions related to the development of good neighbor SIPs. Whether EPA's most recent 2023 modeling is relied on, or whether it is considered in conjunction with its older 2023 modeling and/or the Alpine modeling, the results consistently identify several nonattainment or maintenance receptors to which Kentucky is linked above 1 percent of the 2015 8-hour ozone NAAQS.

As discussed in section II.E, Kentucky attached documents from MOG that discussed international transport of emissions and their contribution to U.S. ozone monitors, and argued that states could remove that portion of the projected design value explicitly attributed to international anthropogenic contribution. MOG asserted that excluding the international anthropogenic contributions could result in attainment with the 2008 or 2015 8-hour ozone NAAQS at ozone monitors in the United States, thus potentially eliminating 2023 receptors. Kentucky did not explicitly discuss in its SIP submittal MOG's arguments regarding contributions from international emissions and therefore it is unclear if the Commonwealth intended to rely on this argument to support their conclusion, however, EPA is providing its analysis related to these arguments.

EPA disagrees that excluding international contribution (whether from North American international anthropogenic, boundary conditions, or other international sources) from the projected design value of receptors is acceptable under the CAA.[49] The good neighbor provision requires states and EPA to address interstate transport of air pollution that *contributes* to downwind states' ability to attain and maintain NAAQS. Whether emissions from other states or other countries also contribute to the same downwind air quality issue is irrelevant in assessing whether a downwind state has an air quality problem, or whether an upwind state is significantly contributing to that problem. States are not obligated under CAA section 110(a)(2)(D)(i)(I) to reduce emissions sufficient on their own to resolve downwind receptors' nonattainment or maintenance problems. Rather, states are obligated to eliminate their own "significant contribution" or "interference" with the ability of other states to attain or maintain the NAAQS.

Indeed, the D.C. Circuit in *Wisconsin* specifically rejected petitioner arguments suggesting that upwind states should be excused from good neighbor obligations on the basis that some other source of emissions (whether international or another upwind state) could be considered the "but-for" cause of downwind air quality problem. *See* 938 F.3d at 323–324. The court viewed petitioners' arguments as essentially an argument "that an upwind State 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." *See* 938 F.3d at 324. The court explained that "an upwind State can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause." *Id.* at 324–325. *See also Catawba County* v. *EPA,* 571 F.3d 20, 39 (D.C. Cir. 2009) (rejecting the argument "that 'significantly contribute' unambiguously means 'strictly cause'" because there is "no reason why the statute precludes EPA from determining that [an] addition of [pollutant] into the atmosphere is significant even though a nearby county's nonattainment problem would still persist in its absence"); *Miss. Comm'n on Envtl. Quality* v. *EPA,* 790 F.3d 138, 163 n.12 (D.C. Cir. 2015) (observing that the argument that "there likely would have been no violation at all . . . if it were not for the emissions resulting from [another source]" is "merely a rephrasing of the but-for causation rule that we rejected in *Catawba County*"). Therefore, a state is not excused from eliminating its significant contribution on the basis that international emissions also contribute some amount of pollution to the same receptors to which the state is linked.

*C. Evaluation of Information Provided by Kentucky Regarding Step 2*

At Step 2 of the 4-step interstate transport framework, Kentucky relied on EPA modeling released in the March 2018 memorandum to identify upwind state linkages to nonattainment and maintenance receptors in 2023 and included results from modeling run by

---

[48] The Alpine modeling results identified the Harford, Maryland receptor as a nonattainment receptor, with Kentucky emissions contributing 2.07 ppb. In addition, the Alpine modeling results identified Kentucky linkages above 1 percent to the following maintenance-only receptors: Gloucester, New Jersey (ID: 340150002), with a Kentucky contribution of 1.69 ppb; Richmond, New York (ID: 360850067), with a Kentucky contribution of 0.93; and Philadelphia, Pennsylvania (ID: 421010024), with a Kentucky contribution of 1.53.

[49] To the extent that MOG cited Attachment A to EPA's March 2018 memorandum as suggesting support for this approach, this is incorrect. As discussed in section I.D, the attachment summarized ideas from outside stakeholders, and EPA did not endorse such approaches as technically or legally appropriate. Further, nothing in Attachment A suggested that international contribution could simply be subtracted from a downwind receptor's projected design value.

Alpine. Both EPA's modeling released in the March 2018 memorandum as well as Alpine's modeling indicate that Kentucky is linked to downwind monitors.[50] As Kentucky attached Alpine's modeling without discussing it in the narrative of the submittal, it is unclear whether Kentucky intended to rely on Alpine's modeling in its submittal.

As described in section I.C of this notice, EPA has recently updated modeling to identify upwind state contributions to nonattainment and/or maintenance receptors in 2023. In this notice, EPA proposes to rely on the Agency's most recently available modeling to identify upwind contributions and "linkages" to downwind air quality problems in 2023 using a threshold of 1 percent of the NAAQS. *See* section I.D for a general explanation of the use of 1 percent of the NAAQS.

As shown in Table 1, updated EPA modeling identifies Kentucky's maximum contribution to a downwind nonattainment or maintenance receptor is greater than 1 percent of the standard (i.e., 0.70 ppb).

Kentucky, however, argued in its SIP submittal for the use of an alternative 1 ppb contribution threshold at Step 2 to attempt to demonstrate that it was no longer "linked" to projected downwind nonattainment receptors. Specifically, Kentucky cited EPA's August 2018 memorandum as supporting the use of a 1 ppb alternative contribution threshold at Step 2 to assert that the Commonwealth was no longer "linked" to projected downwind nonattainment receptors, while conceding that even under this alternative threshold, it was linked above 1 ppb to the projected Harford, Maryland maintenance-only receptor. EPA's most recent modeling of 2023 no longer identifies the Harford, Maryland monitoring site as either a maintenance or nonattainment receptor. Nonetheless, Kentucky is linked above 1 percent of the NAAQS but less than 1 ppb to the four receptors in EPA's most recent modeling. Therefore, whether Kentucky's use of an alternative 1 ppb contribution threshold is approvable is potentially a dispositive question in EPA's evaluation.

EPA proposes to find that Kentucky's reliance on an alternative contribution threshold of 1 ppb at Step 2 is not approvable. EPA acknowledges that the

August 2018 memorandum generally recognized that a 1 ppb threshold may be appropriate for states to use, but also made clear that this guidance would be applied under the facts and circumstances of each particular SIP submittal.[51] However, Kentucky did not provide a technical analysis to sufficiently justify use of an alternative 1 ppb threshold at the linked, downwind monitors. Kentucky's SIP submission simply stated that the Commonwealth agrees with EPA's rationale set out in the August 2018 memorandum that the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds was generally comparable. But the guidance anticipated that states would evaluate whether the alternative threshold was appropriate under their specific facts and circumstances, not that the use of the alternative threshold would be automatically approvable.[52] With respect to the assertion that 1 ppb was generally comparable to 1 percent, Kentucky did not provide discussion or analysis containing information specific to Kentucky or a receptor analysis for the affected monitors, as anticipated in the 2018 memorandum, to evaluate whether the alternative threshold was appropriate to apply with respect to the monitors to which Kentucky was linked. Such state-specific information is necessary to thoroughly evaluate the state-specific circumstances that could support approval. Given the absence of technical analysis to support the use of a 1 ppb threshold under the facts and circumstances relevant to Kentucky and its linked receptors, EPA proposes that the use of 1 ppb as a contribution threshold is not approvable.[53] (As discussed in section III.C.1 below, EPA no longer intends to dedicate resources to supplement state submittals with

insufficient analysis in this regard, and also has identified other policy and programmatic concerns with attempting to recognize alternative thresholds at Step 2 or otherwise deviating from its historical, consistent practice since CSAPR of applying a threshold of 1 percent of the NAAQS at Step 2.)

The MOG materials appended to Kentucky's submission argued that a 2016 EPA SIL guidance could be cited as acceptable to support a 1 ppb contribution threshold. As an initial matter, Kentucky appears not to have relied on this rationale. In EPA's comments on Kentucky's draft SIP submittal, EPA stated, "EPA has not made a determination that the SIL, developed for source-specific (PSD) purposes, could be considered an appropriate threshold to use when assessing contribution from an entire state."[54] Kentucky stated in response that it "concurs with the comment" and had adjusted its SIP submittal accordingly.[55] Further, even if the State had attempted to rely on the SIL as support for a 1 ppb threshold, the basis supplied by MOG is inadequate. The SIL is an analytical metric used in the context of PSD permitting, a part of the CAA's "prevention of significant deterioration" program, which generally is applicable in areas that designated attainment [56] or unclassifiable for the NAAQS. Good neighbor analysis for the ozone NAAQS, by contrast, addresses the degree of significant contribution to nonattainment and interference with maintenance of the NAAQS resulting at downwind receptors from the collective contribution of many upwind sources. Further, it is not correct to conflate the

---

[50] Although the various modeling runs (EPA's March 2018 modeling, Alpine's modeling and EPA's updated modeling) indicate that Kentucky is linked to different receptors and with differing amounts of contribution, all three sets of modeling are consistent in that each indicates linkages between Kentucky and downwind receptors.

[51] *See* August 2018 memorandum at 1.

[52] As an example of the type of analysis that EPA anticipated states might conduct under the guidance, in one instance, EPA itself attempted to conduct a state- and receptor-specific analysis that could support approval of the use of a 1 ppb threshold. *See* Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard, 85 FR 12232 (March 2, 2020). The Agency received adverse comment on this proposed approval and has not taken final action with respect to this proposal.

[53] Kentucky applied the 1 ppb contribution threshold to the Connecticut, Wisconsin, and Maryland receptors, as the Commonwealth found that Kentucky was linked to these receptors based on the modeling released with the March 2018 memorandum. Under EPA's updated modeling, Kentucky is no longer linked to the Wisconsin and Maryland receptors and is linked to receptors in Pennsylvania and New Haven, Connecticut. *See* Table 1. However, as Kentucky did not provide any state-specific information, the rationale is also applicable to the Pennsylvania and New Haven, Connecticut linkages.

[54] *See* Kentucky's January 11, 2019, submission, Appendix D, Summary of Comments and Responses, at 6–7.

[55] *Id.* at 7. EPA directed Kentucky instead to the August 2018 memorandum if it wished to rely on a 1 ppb threshold; however, EPA's comments noted that this memorandum was only a "part" of the rationale the Commonwealth should develop. *Id.* at 6.

[56] Pursuant to section 107(d) of the CAA, EPA must designate areas as either "nonattainment," "attainment," or "unclassifiable." Historically for ozone, the EPA has designated most areas that do not meet the definition of nonattainment as "unclassifiable/attainment." This category includes areas that have air quality monitoring data meeting the NAAQS and areas that do not have monitors but for which the EPA has no evidence that the areas may be violating the NAAQS or contributing to a nearby violation. In the designations for the 2015 ozone NAAQS, the EPA reversed the order of the label to be "attainment/unclassifiable" to better convey the definition of the designation category and so that the category is more easily distinguished from the separate unclassifiable category. An "attainment" designation is reserved for a previous nonattainment area that has been redesignated to attainment as a result of the EPA's approval of a CAA section 175A maintenance plan submitted by the state air agency.

use of the term "significance" as used in the SIL guidance, with the term "contribution," which is the appliable statutory term that EPA applies at Step 2 of the 4-step interstate transport framework. ("Significance" within the 4-step framework is evaluated at Step 3 through a multifactor analysis, for those states that are determined to "contribute" to downwind receptors at Steps 1 and 2. See section I.D.4.) Given the fundamentally different statutory objectives and context, EPA disagrees with MOG's contention that the SIL guidance is applicable in the good neighbor context.

1. EPA's Experience With Alternative Step 2 Thresholds

EPA here shares further evaluation of its experience since the issuance of the August 2018 memorandum regarding use of alternative thresholds at Step 2. This experience leads the Agency to now believe it may not be appropriate to continue to attempt to recognize alternative contribution thresholds at Step 2. The August 2018 memorandum stated that "it may be reasonable and appropriate" for states to rely on an alternative threshold of 1 ppb threshold at Step 2.[57] (The memorandum also indicated that any higher alternative threshold, such as 2 ppb, would likely not be appropriate.) However, EPA also provided that "air agencies should consider whether the recommendations in this guidance are appropriate for each situation." Following receipt and review of 49 good neighbor SIP submittals for the 2015 8-hour ozone NAAQS, EPA's experience has been that nearly every state that attempted to rely on a 1 ppb threshold did not provide sufficient information and analysis to support a determination that an alternative threshold was reasonable or appropriate for that state.

For instance, in nearly all submittals, the states did not provide EPA with analysis specific to their state or the receptors to which its emissions are potentially linked. In one case, the proposed approval of Iowa's SIP submittal, EPA expended its own resources to attempt to supplement the information submitted by the state, in order to more thoroughly evaluate the state-specific circumstances that could support approval.[58] It was at EPA's sole discretion to perform this analysis in

support of the state's submittal, and the Agency is not obligated to conduct supplemental analysis to fill the gaps whenever it believes a state's analysis is insufficient. The Agency no longer intends to undertake supplemental analysis of SIP submittals with respect to alternative thresholds at Step 2 for purposes of the 2015 8-hour ozone NAAQS.

Furthermore, EPA's experience since 2018 is that allowing for alternative Step 2 thresholds may be impractical or otherwise inadvisable for a number of additional policy reasons. For a regional air pollutant such as ozone, consistency in requirements and expectations across all states is essential. Based on its review of submittals to-date and after further consideration of the policy implications of attempting to recognize an alternative Step 2 threshold for certain states, the Agency now believes the attempted use of different thresholds at Step 2 with respect to the 2015 8-hour ozone NAAQS raises substantial policy consistency and practical implementation concerns.[59] The availability of different thresholds at Step 2 has the potential to result in inconsistent application of good neighbor obligations based solely on the strength of a state's implementation plan submittal at Step 2 of the 4-step interstate transport framework. From the perspective of ensuring effective regional implementation of good neighbor obligations, the more important analysis is the evaluation of the emissions reductions needed, if any, to address a state's significant contribution after consideration of a multifactor analysis at Step 3, including a detailed evaluation that considers air quality factors and cost. Where alternative thresholds for purposes of Step 2 may be "similar" in terms of capturing the relative amount of upwind contribution (as described in the August 2018 memorandum), nonetheless, use of an alternative threshold would allow certain states to avoid further evaluation of potential emission controls while other states must proceed to a Step 3 analysis. This can create significant equity and consistency problems among states.

Further, it is not clear that national ozone transport policy is best served by allowing for less stringent thresholds at Step 2. EPA recognized in the August 2018 memorandum that there was some

similarity in the amount of total upwind contribution captured (on a nationwide basis) between 1 percent and 1 ppb. However, EPA notes that while this may be true in some sense, that is hardly a compelling basis to move to a 1 ppb threshold. Indeed, the 1 ppb threshold has the disadvantage of losing a certain amount of total upwind contribution for further evaluation at Step 3 (*e.g.,* roughly 7 percent of total upwind state contribution was lost according to the modeling underlying the August 2018 memorandum;[60] in EPA's updated modeling, the amount lost is 5 percent). Considering the core statutory objective of ensuring elimination of all significant contribution to nonattainment or interference with the NAAQS in other states and the broad, regional nature of the collective contribution problem with respect to ozone, there does not appear to be a compelling policy imperative in allowing some states to use a 1 ppb threshold while others rely on a 1 percent of the NAAQS threshold.

Consistency with past interstate transport actions such as CSAPR, and the CSAPR Update and Revised CSAPR Update rulemakings (which used a Step 2 threshold of 1 percent of the NAAQS for two less stringent ozone NAAQS), is also important. Continuing to use a 1 percent of NAAQS approach ensures that as the NAAQS are revised and made more stringent, an appropriate increase in stringency at Step 2 occurs, so as to ensure an appropriately larger amount of total upwind-state contribution is captured for purposes of fully addressing interstate transport. *See* 76 FR 48208, 48237–38 (August 8, 2011).

Therefore, notwithstanding the August 2018 memorandum's recognition of the potential viability of alternative Step 2 thresholds, and in particular, a potentially applicable 1 ppb threshold, EPA's experience since the issuance of that memorandum has revealed substantial programmatic and policy difficulties in attempting to implement this approach. Nonetheless, EPA is not at this time rescinding the August 2018 memorandum. The basis for disapproval of Kentucky's SIP submission with respect to the Step 2 analysis is, in the Agency's view, warranted even under the terms of the August 2018 memorandum. EPA invites comment on this broader discussion of issues associated with alternative thresholds at Step 2. Depending on comment and further evaluation of this issue, EPA may determine to rescind the August 2018 memorandum in the future.

---

[57] *See* August 2018 memorandum at 4.

[58] *Air Plan Approval; Iowa; Infrastructure State Implementation Plan Requirements for the 2015 Ozone National Ambient Air Quality Standard,* 85 FR 12232 (March 2, 2020). The Agency received adverse comment on this proposed approval and has not taken final action with respect to this proposal.

[59] EPA notes that Congress has placed on EPA a general obligation to ensure the requirements of the CAA are implemented consistently across states and regions. *See* CAA section 301(a)(2). Where the management and regulation of interstate pollution levels spanning many states is at stake, consistency in application of CAA requirements is paramount.

[60] *See* August 2018 memorandum at 4.

In summary, EPA's updated modeling indicates that emissions from Kentucky sources are linked to downwind receptors identified in Table 1, and application of 1 ppb alternative threshold is not supported by Kentucky's SIP submission. Thus, EPA preliminarily finds that Kentucky is linked to downwind nonattainment and maintenance receptors, and proceeds to Step 3 of the 4-step framework.

### D. Evaluation of Information Provided by Kentucky Regarding Step 3

At Step 3 of the 4-step interstate transport framework, a state's emissions are further evaluated, in light of multiple factors, including air quality and cost considerations, to determine what, if any, emissions significantly contribute to nonattainment or interfere with maintenance and, thus, must be eliminated under CAA section 110(a)(2)(D)(i)(I).

To effectively evaluate which emissions in the state should be deemed "significant" and therefore prohibited, states generally should prepare an accounting of sources and other emissions activity for relevant pollutants and assess potential, additional emissions reduction opportunities and resulting downwind air quality improvements. EPA has consistently applied this general approach (*i.e.,* Step 3 of the 4-step interstate transport framework) when identifying emissions contributions that the Agency has determined to be "significant" (or interfere with maintenance) in each of its prior Federal, regional ozone transport rulemakings, and this interpretation of the statute has been upheld by the Supreme Court. *See EME Homer City,* 572 U.S. 489, 518–520 (2014). While EPA has not directed states that they must conduct a Step 3 analysis in precisely the manner EPA has done in its prior regional transport rulemakings, state implementation plans addressing the obligations in CAA section 110(a)(2)(D)(i)(I) must prohibit "any source or other type of emissions activity within the State" from emitting air pollutants which will contribute significantly to downwind air quality problems. Thus, states must complete something similar to EPA's analysis (or an alternative approach to defining "significance" that comports with the statute's objectives) to determine whether and to what degree emissions from a state should be "prohibited" to eliminate emissions that will "contribute significantly to nonattainment in, or interfere with maintenance of" the NAAQS in any

other state. Kentucky did not conduct such an analysis in its SIP submission.

Kentucky did not include a comprehensive accounting of facilities in the Commonwealth and did not include a sufficient analysis of potential $NO_X$ emissions control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements for the purpose of identifying what additional emission controls may be necessary to eliminate their significant contribution. Rather, Kentucky's SIP included air quality analysis related to downwind receptors and relied on existing $NO_X$ emission measures in the Commonwealth without any rationale to show how or why existing measures would eliminate the Kentucky's downwind contribution. Further, the Commonwealth provided information related to programs that it asserted were responsible for a 10-year decline in ozone season $NO_X$ emissions in Kentucky, such as regulations and Federal programs (including the CSAPR Update), EGU shutdowns, retirements, and fuel switches. However, Kentucky did not quantify the $NO_X$ emission reduction potential of on-the-books regulations or Federal programs or on-the-way measures for 2023, nor does the submission consider cost-effectiveness of potential emissions controls, the total emissions reductions that may be achieved by requiring these controls, or an evaluation of the air quality impacts such emissions reductions would have on the downwind receptors to which Kentucky is linked. Identifying a range of on-the-books emissions control measures that have been or may be enacted at the state or local level, without analysis of the impact of those measures on the downwind receptors, is not a sufficient analysis.

Furthermore, the emissions-reducing effects of on-the-books emissions control requirements are already reflected in the air quality results of EPA's modeling under Steps 1 and 2 of the 4-step framework. Kentucky, and MOG in the materials it submitted to Kentucky, maintain that there were additional emission reductions that have occurred that were not accounted for in EPA's 2023 modeling as presented in the March 2018 memorandum. Kentucky cites the 2019 retirement of units 1 and 2 at the E.W. Brown coal-fired power plant (see Appendix D, Response to Comments, at 5), and MOG claims a variety of unidentified changes not accounted for in EPA's emissions inventory at the time of the modeling in the March 2018 memorandum, as well as certain downwind state measures apparently under consideration but not

adopted, and certain changes in the Wisconsin EGU fleet (*see* Alpine TSD, Appendix B, at pages B–5, B–6). In general, any changes in the emissions inventory and on-the-books controls relevant to emissions in 2023 have now been incorporated into EPA's most recent modeling of 2023. This includes changes in Kentucky EGU emissions.

As previously discussed, EPA's updated modeling indicates sources in Kentucky are linked to downwind air quality problems for the 2015 8-hour ozone standard. However, Kentucky's SIP submittal did not include a sufficient accounting of emissions sources or activity in the Commonwealth, along with an analysis of potential $NO_X$ emissions control technologies, associated costs, estimated emissions reductions, and downwind air quality improvements to eliminate the Kentucky's downwind contribution.

EPA therefore propose to find that Kentucky was required to analyze emissions from the sources and other emissions activity from within the Commonwealth to determine whether its contributions were significant, and EPA proposes to disapprove its submission because Kentucky failed to do so.

The subsections below contain additional detail with respect to arguments made by the Commonwealth in its SIP submission.[61]

#### 1. Evaluation of Kentucky's Reliance on Existing and Future $NO_X$ Emission Reductions

The Commonwealth's SIP submission does not contain a Step 3 analysis regarding future emissions reduction opportunities beyond pointing to $NO_X$ emission reductions from expected retirements, fuel switching, and shutdowns. While the Commonwealth claimed there would be an estimated 471 tons of $NO_X$ emissions from potential shutdown of units at the E.W. Brown Generating Station facility in Harrodsburg, Kentucky, the Commonwealth did not clarify how these planned reductions would resolve the Commonwealth's downwind contribution to the Harford County, Maryland maintenance-only receptor by 2023. (Nor did the Commonwealth evaluate whether emissions may increase at other sources whose generation would replace that lost at E. W. Brown.) Further, the E.W. Brown facility retired coal-fired units 1 and 2

---

[61] These subsections provide brief summaries of the issues as presented in Kentucky's SIP as context; please see section II of this notice for additional detail on the contents of Kentucky's SIP.

in February 2019,[62] the units' retirement is included in the recently updated modeling for Steps 1 and 2, and yet emissions from Kentucky sources remain linked to one or more downind receptors.

While the Commonwealth generally asserted that on-the-books or on-the-way regulations and programs may provide future emissions reductions, Kentucky did not quantify these reductions in a meaningful way or demonstrate that the downind improvements from these regulations and programs would be sufficient to eliminate the Commonwealth's significant contribution or interference with maintenance. In addition, the SIP submission did not evaluate or even attempt to identify additional control measures for EGUs or non-EGUs, nor did it include a determination of emission reduction potential for these potential additional controls or consider their cost-effectiveness or downind air quality effects. This is not a sufficient Step 3 analysis.

2. Evaluation of Kentucky's Reliance on Prior Transport FIPs

The 10-year emission reductions discussed by Kentucky relies in part on the implementation of CAIR, CSAPR, and the CSAPR Update. Kentucky's SIP relied on its EGUs being subject to the CSAPR Update (which reflected a stringency at the nominal marginal cost threshold of $1,400/ton (in 2011 dollars) for the 2008 8-hour ozone NAAQS) to argue that it has already implemented all cost-effective emissions reductions to support its conclusion that additional $NO_X$ emission reductions are not necessary from sources in Kentucky. Kentucky did not conduct a comprehensive Step 3 analysis or provide any justification for reliance on the CSAPR Update beyond identifying the $NO_X$ emission reductions that the Commonwealth believes are the source of the 10-year decline in $NO_X$ emissions at EGUs in the Commonwealth and noting that the actual emissions from EGUs in the Commonwealth are well below the CSAPR Update $NO_X$ ozone season trading budget.

EPA disagrees with the Commonwealth. Reliance on the CSAPR Update (or the subsequent Revised CSAPR Update, which fully resolved Kentucky's good neighbor obligations for the 2008 ozone NAAQS, 86 FR 23056–57), is insufficient because those policies addressed section 110(a)(2)(D)(i)(I) only for the *2008* ozone

NAAQS. Additionally, reliance on an alleged cost-threshold stringency from the CSAPR Update is insufficient without additional Step 3 analysis and justification. First, the CSAPR Update did not regulate non-EGUs, and thus this analysis would have been incomplete, even with respect to obligations under the 2008 ozone NAAQS. *See Wisconsin,* 938 F.3d at 318–20. Second, relying on the CSAPR Update's (or any other CAA program's) determination of cost-effectiveness without further Step 3 analysis is not approvable. Cost-effectiveness must be assessed in the context of the specific CAA program; assessing cost-effectiveness in the context of ozone transport should reflect a more comprehensive evaluation of the nature of the interstate transport problem under the relevant NAAQS, the total emissions reductions available at alternative cost thresholds, and the air quality impacts of the reductions at downind receptors. While EPA has not established a benchmark cost-effectiveness value for 2015 8-hour ozone NAAQS interstate transport obligations, because the 2015 8-hour ozone NAAQS is a more stringent and more protective air quality standard, it is reasonable to expect control measures or strategies to address interstate transport under this NAAQS to reflect higher marginal control costs. As such, the marginal cost threshold of $1,400/ ton for the CSAPR Update (which addresses the 2008 ozone 8-hour NAAQS and is in 2011 dollars) is not an appropriate cost threshold and cannot be approved as a benchmark to use for interstate transport SIP submissions for the 2015 8-hour ozone NAAQS.

In addition, the updated EPA modeling captures all existing CSAPR trading programs in the baseline, and that modeling confirms that these control programs were not sufficient to eliminate the Kentucky's linkage at Steps 1 and 2 under the 2015 8-hour ozone NAAQS. Kentucky was therefore obligated at Step 3 to assess *additional* control measures using a multifactor analysis.

Finally, relying on a FIP at Step 3 is per se not approvable if the state has not adopted that program into its SIP and instead continues to rely on the FIP. States may not rely on non-SIP measures to meet SIP requirements. *See* CAA section 110(a)(2)(D) ("Each such [SIP] shall . . . contain adequate provisions. . . ."). *See also* CAA section 110(a)(2)(A); *Committee for a Better Arvin* v. *U.S. E.P.A.,* 786 F.3d 1169, 1175–76 (9th Cir. 2015) (holding that measures relied on by state to meet CAA requirements must be included in

the SIP). Kentucky has not adopted the Group 3 $NO_X$ Ozone Season Trading Program promulgated in the Revised CSAPR Update into its SIP.

3. Evaluation of Kentucky's Analysis of Air Quality and Emission Reductions Near the Linked Monitors

Kentucky's SIP also evaluated air quality in the vicinity of the Fairfield County, Connecticut (IDs: 090013007 and 090019003) and Harford County, Maryland (ID: 240251001) monitors for which the Commonwealth is linked based on EPA's modeling in the March 2018 memorandum. Kentucky's submission asserts that the primary cause of nonattainment problems at the Connecticut and Maryland monitors are due to local emissions of ozone precursors (particularly $NO_X$) and meteorological conditions.

Kentucky's SIP submittal argues against control requirements on Kentucky sources to address the two nonattainment receptors in Fairfield, Connecticut (IDs: 090013007, 090019003) and the maintenance-only monitor in Harford County, Maryland monitor, claiming that additional emission reductions from Kentucky EGUs (the only Kentucky source category discussed in the submittal) are not necessary. Kentucky concludes that local emissions reductions should be applied before requiring Kentucky to control its sources, and that the implementation of local programs to reduce emissions should be sufficient for monitors in the area to attain the 2015 8-hour ozone NAAQS.[63]

With respect to the information Kentucky provided that is related to local emissions and the impact on air quality at the Connecticut and Maryland receptors, this information is insufficient to approve Kentucky's SIP submission. Regardless of whether local emissions are the largest contributor to a specific nonattainment or maintenance receptor, the good neighbor provision requires that upwind states prohibit emissions that contribute significantly to nonattainment or interfere with maintenance of the NAAQS in downind states. EPA evaluates a state's obligations to eliminate interstate transport emissions under the interstate transport provision according to EPA's 4-step process, and EPA's updating modeling at Steps 1 and

---

[62] *See* Retired Unit exemption forms for E.W. Brown Generating station in Docket No.: EPA–R04–OAR–2021–0841.

[63] The Commonwealth's submission cites to MOG's statements regarding controls on local sources "When an area is measuring nonattainment of a NAAQS, as is the case with the areas linked to Kentucky, the CAA requires that the effects and benefits of local controls on all source sectors be considered first, prior to pursuing controls of sources in upwind states."

2 has identified a linkage between emission from Kentucky sources and downwind nonattainment and maintenance receptors.

Further, EPA disagrees with Kentucky's claims that local emissions reductions from the jurisdiction where the downwind receptor is located must first be implemented and accounted for before imposing obligations on upwind states under the interstate transport provision. There is nothing in the CAA that supports that position, and it does not provide grounds on which to approve Kentucky SIP submission. The D.C. Circuit has held on five different occasions that the timing framework for addressing interstate transport obligations must be consistent with the downwind areas' attainment schedule. In particular, for the ozone NAAQS, the states and EPA are to address interstate transport obligations ''as expeditiously as practicable'' and no later than the attainment schedule set in accordance with CAA section 181(a). *See North Carolina,* 531 F.3d at 911–13; *Wisconsin,* 938 F.3d at 313–20; *Maryland,* 958 F.3d at 1204; *New York* v. *EPA,* 964 F.3d 1214, 1226 (D.C. Cir. 2020); *New York* v. *EPA,* 781 Fed. App'x 4, 6–7 (D.C. Cir. 2019). The court in *Wisconsin* explained its reasoning in part by noting that downwind jurisdictions often may need to heavily rely on emissions reductions from upwind states in order to achieve attainment of the NAAQS, 938 F.3d at 316–17; such states would face increased regulatory burdens including the risk of bumping up to a higher nonattainment classification if attainment is not reached by the relevant deadline. *Maryland,* 958 F.3d at 1204. The statutory framework of the CAA and these cases establish clearly that states and EPA must address interstate transport obligations in line with the attainment schedule provided in the Act in order to timely assist downwind states in attaining and maintain the NAAQS, and this schedule is ''central to the regulatory scheme.'' *Wisconsin,* 938 F.3d at 316 (quoting *Sierra Club* v. *EPA,* 294 F.3d 155, 161 (D.C. Cir. 2002)).

In addition, Kentucky's SIP does not provide a technical justification to support its conclusion that local emissions reductions at the receptors will achieve attainment without upwind reductions from sources within Kentucky. Specifically, Kentucky does not provide any information to support its claim that the implementation of local programs alone will address the air quality problems at the Connecticut and Maryland monitors. Even with the consideration of on-the-books control

measures to reduce mobile source emissions, EPA's modeling projects that the total contribution from upwind states is a substantial part of the ozone problem at the nonattainment and maintenance receptors to which Kentucky is linked. To illustrate this, at the four receptors to which Kentucky is linked in EPA's latest 2023 modeling, the total percent of U.S. anthropogenic emissions from upwind states is 55 percent (Bucks Co., Pennsylvania), 90 percent (New Haven Co., Connecticut), 90 percent (Fairfield Co.—Stratford, Connecticut), and 94 percent (Fairfield Co.—Westport, Connecticut) of the total design values at these receptors. Clearly, emissions reductions from upwind states would have an impact on the design values at the identified receptors.[64]

Additionally, the SIP submission does not assess whether the Commonwealth's own emissions contributed to nonattainment or interfered with maintenance at the linked receptors, or rather substantiate that emissions from the Commonwealth's sources were not interacting with these monitors. Consequently, the application of local emission reduction measures does not absolve upwind states and sources from the responsibility of addressing their significant contribution. Moreover, Kentucky still has an obligation under the Act to address its downwind contribution to ozone nonattainment or interference with maintenance regardless of the emission reduction potential for local control measures. Furthermore, given that EPA's updated modeling indicates that Kentucky is linked to nonattainment and maintenance receptors at Step 2 including the same Fairfield County, Connecticut nonattainment receptors as were linked in the modeling released with the March 2018 memorandum, EPA disagrees with Kentucky's claims regarding the application of local emission reduction measures with respect to its downwind linkages in the most recent modeling.

4. Evaluation of Kentucky's HYSPLIT Analysis

Kentucky's SIP submittal also included HYSPLIT model back trajectory analysis, which Kentucky used to emphasize the local nature of the ozone precursor emissions at the two Connecticut receptors, mobile sources along the I–95 Corridor, and the proximity of large point sources and ozone nonattainment areas in New York, New Jersey, Pennsylvania, and Maryland. Similarly, Kentucky also evaluated HYSPLIT back-trajectory for the Harford County, Maryland monitor and noted similar localized emissions impacts with respect to the Maryland monitor as discussed previously for the two Fairfield County, Connecticut monitors.

However, the limited information provided by Kentucky is not adequate to support approval of Kentucky's SIP on this basis and in the absence of a more complete Step 3 evaluation. Kentucky's SIP submittal did not address that the HYSPLIT back-trajectories indicate that ozone precursor emissions sources in Kentucky are upwind of the linked nonattainment receptors in Connecticut (regardless of the existence of other upwind nonattainment areas that may also be contributing to those receptors). Additionally, the HYSPLIT trajectory information provided by Kentucky was developed by EPA to inform the 2015 8-hour ozone NAAQS area designations and was not intended to evaluate long-distance interstate transport.[65]

Attachment 3 of the 2015 8-hour ozone Area Designations memorandum states that the line thickness displayed on trajectory plots ''does not imply coverage other than to represent the centerline of an air parcel's motion calculated to arrive at the starting location at the starting time. Uncertainties are clearly present in these results and these uncertainties change with trajectory time and distance traveled. One should avoid concluding a region is not along a trajectory's path if the center line of that trajectory missed the region by a relatively small distance.'' [66]

---

[64] In contrast to the receptors to which Kentucky is linked, EPA has found that certain receptors are so heavily impacted by local emissions that they should not be considered ''transport'' receptors for purposes of the ozone NAAQS. Typically, in such cases, only one state is linked above 1 percent to that receptor and the total upwind state contribution is on the order of 2 percent to 4 percent of the receptor's DV. *See, e.g.,* 81 FR 15200 (March 22, 2016), 81 FR 31513 (May 19, 2016), and 81 FR 36179 (June 6, 2016) (approving Arizona's transport SIP on basis that certain California receptors should not be considered impacted by interstate ozone transport).

[65] *See* Area Designations for the 2015 Ozone National Ambient Air Quality Standards memorandum from Janet G. McCabe to EPA Regional Administrators, February 25, 2016 (2015 ozone Area Designations memorandum).

[66] *See id.* It is important to understand that HYSPLIT back trajectory analyses use archived meteorological modeling that includes actual observed data (surface, upper air, airplane data, etc.) and modeled meteorological fields to estimate the most likely route of an air parcel transported to a receptor at a specified time. The method essentially follows a parcel of air backward in hourly steps for a specified length of time. HYSPLIT
Continued

Further, the back trajectories used by Kentucky to evaluating transport of air parcels over a relatively short 24-hour period, which limits their use for evaluating long-distance transport of emissions from Kentucky to the Fairfield, Connecticut receptors and the Harford, Maryland receptor. In contrast, EPA's analysis of transported emissions as discussed in section III.A uses updated, photochemical grid modeling designed to assess ozone transported to downwind monitors across the entire region and over extended timeframes that fully account for fate and transport of ozone-precursors over longer distances.

Kentucky's SIP submission states that the Fairfield County ozone monitors are located in the New York Metro Area, in close proximity to the I–95 transportation artery. The Commonwealth's analysis asserts a high VMT and number of commuters in the area indicating the presence of mobile emissions that could be the cause of violating monitors along the I–95 corridor. Kentucky's SIP also mentions two additional coastal monitor sites (Westport Sherwood and Stratford Point Lighthouse) located less than three miles from the I–95 corridor that also show a pattern of ozone violations. Kentucky raises similar points regarding the effect of mobile source emissions along the I–95 corridor in Maryland near the Edgewood monitor. Further, Kentucky asserts that both the Connecticut and Maryland receptor sites may be particularly impacted by unique coastal conditions associated with the Long Island Sound and the Chesapeake Bay. While it is true that both of these monitors are affected by coastal meteorological conditions such as complex land-water wind flows and mixing heights, a large portion of anthropogenic ozone at these locations is the result of transport from upwind states. In addition, as noted above, EPA's most recent modeling shows that Kentucky is linked to a receptor in Bucks County, Pennsylvania which is inland and not influenced by coastal meteorology.

The relevance of the points raised by Kentucky regarding the HYSPLIT back trajectories related to the evaluation of Kentucky's good neighbor obligations is

not clear. As already discussed, the statute and the case law (particularly the holdings in *Wisconsin* and *Maryland*) make clear that good neighbor obligations are not merely supplementary to or deferable until after local emission reductions are achieved. Further, all of the receptors to which Kentucky is linked are heavily impacted by upwind state emissions in addition to local sources and conditions. The *Wisconsin* decision's holding regarding international contribution (discussed in section III.A) is equally applicable to an upwind state's claims that some other state's emissions, or local emissions, are "more to blame" than its own emissions. *See* 938 F.3d 303 at 323–25 ("an upwind State can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause").

5. Evaluation of Kentucky's Approach to Maintenance Receptors

Kentucky's SIP argues that states linked only to maintenance receptors should be held to less stringent standards of emissions reductions compared to states linked to a nonattainment receptor. Thus, as the Edgewood monitor was identified as a maintenance receptor in EPA's March 2018 memorandum modeling, the Commonwealth asserts that no further reductions from Kentucky sources other than on-the-books controls should be required. Although the Harford monitor is no longer linked to Kentucky based on EPA's updated modeling,[67] emissions from the Commonwealth are linked to the Bucks County, Pennsylvania (ID: 420170012) maintenance-only receptor. Additionally, MOG argues that states should be absolved from additional emissions controls to address a maintenance monitor if the upwind state can show that either the monitor is likely to remain in attainment for a period of 10 years or that the upwind state's emissions will not increase for 10 years after the attainment date.[68]

Under the D.C. Circuit's decision in *North Carolina*, states and EPA are required to give independent significance to the "interference with maintenance" prong of section 110(a)(2)(D)(i)(I). *See* 531 F.3d at 910. Since CSAPR, EPA's nationally consistent policy framework for addressing interstate ozone transport has given meaning to this prong through a separate definition of maintenance receptors at Step 1 of the 4-step interstate transport framework. For states linked only to those receptors, EPA has found it appropriate to apply an emissions control solution that is uniform with the strategy applied for states that are linked to nonattainment receptors. *See* 76 FR at 48271. EPA's approach to addressing interference with maintenance under prong 2 for ozone NAAQS has been upheld twice. *See EME Homer City Generation, L.P.,* 795 F.3d at 136; *Wisconsin,* 938 F.3d at 325–27. *See also* 86 FR at 23054 (April 30, 2021).[69]

Particularly given this context, Kentucky's SIP submission does not provide information sufficient to support less stringent standards of emissions reductions than would result from EPA's historical approach of addressing emissions activities from upwind states that are linked to maintenance-only receptors. The Commonwealth does not explain how the obligations of upwind states linked to maintenance-only receptors should be treated differently than the obligations of upwind states linked to nonattainment receptors.

Further, EPA believes it would be inconsistent with the CAA for EPA to identify receptors that are at risk of NAAQS violations given certain conditions due to transported upwind emissions and then not prohibit the emissions that place the receptor at risk. The Supreme Court held that it was a permissible interpretation of the statute to apportion responsibility for states

___

estimates the central path in both the vertical and horizontal planes. The HYSPLIT central path represents the centerline with the understanding that there are areas on each side horizontally and vertically that also contribute to the end point at the monitor. The horizontal and vertical areas from the centerline grow wider the further back in time the trajectory goes. Therefore, a HYSPLIT centerline does not have to pass directly over emissions sources or emission source areas but merely relatively near emission source areas.

[67] *See* Table 1, shown previously in this notice.

[68] Kentucky did not rely on MOG's proposed approach in its SIP submittal, therefore EPA does not comprehensively evaluate MOG's suggestion. However, EPA's definition of maintenance receptors already accounts for, and projects whether, receptors may have trouble attaining the NAAQS, through the use of projected maximum design values in the relevant analytic year. Further, EPA's modeling of the relevant analytic year also already accounts for projected emissions trends of the upwind state (among others) and may (and often does) identify a linkage to areas that may struggle to maintain the NAAQS despite an overall declining emissions trend. This is not surprising. First, most maintenance receptors in EPA's projections are currently measuring nonattainment, meaning that, despite projecting improved air quality in the future analytic year, the receptor

location is currently, and may continue to be, near the level of the NAAQS. Second, ozone levels are influenced by meteorological variability and thus high ozone levels may persist despite declining emissions as a result of recurring or worsening ozone-conducive atmospheric conditions (*e.g.,* higher temperatures). It is unclear how MOG's approach would account for this variability or ensure that projected emissions reductions from linked states are rendered certain and enforceable.

[69] In the main text of its SIP submittal conclusion regarding interstate transport, Kentucky incorrectly attributes statements regarding the "interfere with maintenance" prong to the U.S. Supreme Court. *See* Submittal at 45–46. A footnote, however, correctly attributes this language to the D.C. Circuit's original opinion in *EME Homer City* v *EPA,* 696 F.3d 7 (D.C. Cir. 2012). This decision was reversed and remanded by the Supreme Court, and on remand, the D.C. Circuit affirmed EPA's approach to implementing prong 2, *see* 795 F.3d at 136.

linked to nonattainment receptors considering ''both the magnitude of upwind States' contributions and the cost associated with eliminating them.'' *EME Homer City,* 134 S. Ct. at 1606. It is equally reasonable and permissible to use these factors to apportion responsibility among upwind states linked to maintenance receptors because the goal in both instances is to prohibit the ''amounts'' of pollution that will either significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind. EPA's updated modeling indicates that the Commonwealth is still linked to downwind nonattainment and maintenance receptors for the 2015 8-hour ozone standard. Consequently, EPA believes Kentucky's assertion that upwind states linked to maintenance-only receptors should be held to less stringent standards of emissions reductions (as compared to states linked to a nonattainment receptor) is also inappropriate for new downwind linkages.

6. Evaluation of Weighted Step 3 Approach

Although Kentucky did not adopt this approach in its SIP submittal, the MOG materials Kentucky appended provided arguments suggesting a ''weighted'' approach to Step 3 similar to an approach that stakeholders had identified to EPA (as listed in Attachment A to EPA's March 2018 memorandum). Under this approach, upwind-state emission reduction obligations would be allocated in proportion to the size of their contribution to downwind nonattainment. MOG determined the proportional reduction requirement associated with the relative significant contribution from each upwind state to the Harford County, Maryland monitor including Kentucky, which resulted in an additional emission reduction obligation for Kentucky of 0.02 ppb, as MOG proposed would be the appropriate proportion of reductions necessary for attainment at the Harford receptor. This approach would have imposed additional emissions reductions for Kentucky sources. Kentucky's final SIP did not consider MOG's proposal, and did not provide an explanation for why it was rejecting this approach to allocating upwind emission reductions, even though it appended this recommendation to its SIP submittal.

In summary, EPA has newly available information that confirms sources in Kentucky are linked to downwind air quality problems for the 2015 8-hour ozone standard. Kentucky's SIP submittal did not include an accounting of emissions sources and activity in the Commonwealth along with an analysis of potential $NO_X$ emissions control technologies, their associated costs, estimated emissions reductions, and downwind air quality improvements. Nor did Kentucky present an alternative approach to assess which of its emissions should be deemed ''significant.'' EPA proposes to find that Kentucky's analysis—including reliance on on-the-books state and Federal measures (including prior CSAPR programs) and claimed on-the-way emission reductions, as well as other air quality, emissions, and geographic factors—is insufficient to support the Commonwealth's claim that its SIP adequately prohibits emissions within Kentucky in a manner sufficient to address the State's interstate transport obligations for the 2015 8-hour ozone.

*E. Evaluation of Information Provided by Kentucky Regarding Step 4*

Step 4 of the 4-step interstate transport framework calls for development of permanent and federally enforceable control strategies to achieve the emissions reductions determined to be necessary at Step 3 to eliminate significant contribution to nonattainment or interference with maintenance of the NAAQS. Kentucky indicates that certain upcoming planned fuel switches or shutdowns at EGUs will occur before the end of 2023, for which Kentucky cites a press release and a closure plan developed by each plant's parent company.[70] As discussed in section III.D., Kentucky's analysis is insufficient to demonstrate that these reductions are sufficient to address the Commonwealth's interstate transport obligations; however, the Commonwealth also did not provide a separate SIP revision to ensure the reductions were permanent and enforceable. As a result, EPA proposes to disapprove Kentucky's January 11, 2019, submittal on the separate, additional basis that the Commonwealth has not developed permanent and enforceable emissions reductions necessary to meet the obligations of CAA section 110(a)(2)(d)(i)(I).

*F. Conclusion*

Based on EPA's evaluation of Kentucky's SIP submission, EPA is proposing to find that the interstate transport portion of Kentucky's January 11, 2019, SIP submission addressing CAA section 110(a)(2)(D)(i)(I) does not meet the Commonwealth's interstate transport obligations because it fails to contain the necessary provisions to eliminate emissions that will contribute significantly to nonattainment or interfere with maintenance of the 2015 8-hour ozone NAAQS in any other state.

**IV. Proposed Action**

EPA is proposing to disapprove the 2015 8-hour ozone good neighbor interstate transport SIP revision from Kentucky, dated January 11, 2019. Under CAA section 110(c)(1), if finalized, this disapproval would establish a 2-year deadline for EPA to promulgate a FIP for Kentucky to address the CAA section 110(a)(2)(D)(i)(I) interstate transport requirements pertaining to significant contribution to nonattainment and interference with maintenance of the 2015 8-hour ozone NAAQS in other states, unless EPA approves a SIP that meets these requirements. However, under the CAA, a good neighbor SIP disapproval does not start a mandatory sanctions clock.

**V. Statutory and Executive Order Reviews**

*A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review*

This proposed action is not a significant regulatory action and was therefore not submitted to the Office of Management and Budget for review.

*B. Paperwork Reduction Act (PRA)*

This proposed action does not impose an information collection burden under the PRA because it does not contain any information collection activities.

*C. Regulatory Flexibility Act (RFA)*

This action merely proposes to disapprove a SIP submission as not meeting the CAA for Kentucky. EPA certifies that this proposed rule will not have a significant economic impact on a substantial number of small entities under the RFA (5 U.S.C. 601 *et seq.*).

*D. Unfunded Mandates Reform Act (UMRA)*

This proposed action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This proposed action imposes no enforceable duty on any state, local, or tribal governments or the private sector.

---

[70] Pointing to anticipated upcoming emission reductions, even if they were not included in the analysis at Steps 1 and 2, is not sufficient as a Step 3 analysis, for the reasons discussed in section III.C. In this section, EPA explain that to the extent such anticipated reductions are not included in the SIP and rendered permanent and enforceable, reliance on such anticipated reductions is also insufficient at Step 4.

*E. Executive Order 13132: Federalism*

This proposed action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

*F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This proposed action does not have tribal implications as specified in Executive Order 13175. This proposed action does not apply on any Indian reservation land, any other area where EPA or an Indian tribe has demonstrated that a tribe has jurisdiction, or non-reservation areas of Indian country. Thus, Executive Order 13175 does not apply to this action.

*G. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that EPA has reason to believe may disproportionately affect children, per the definition of "covered regulatory action" in section 2–202 of the Executive Order. This proposed action is not subject to Executive Order 13045 because it merely proposes to disapprove a SIP submission from Kentucky as not meeting the CAA.

*H. Executive Order 13211, Actions That Significantly Affect Energy Supply, Distribution or Use*

This proposed action is not subject to Executive Order 13211, because it is not a significant regulatory action under Executive Order 12866.

*I. National Technology Transfer and Advancement Act*

This proposed rulemaking does not involve technical standards.

*J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

EPA believes the human health or environmental risk addressed by this action will not have potential disproportionately high and adverse human health or environmental effects on minority, low-income or indigenous populations. This action merely proposes to disapprove a SIP submission as not meeting the CAA.

*K. CAA Section 307(b)(1)*

Section 307(b)(1) of the CAA governs judicial review of final actions by EPA. This section provides, in part, that petitions for review must be filed in the D.C. Circuit: (i) When the agency action consists of "nationally applicable regulations promulgated, or final actions taken, by the Administrator," or (ii) when such action is locally or regionally applicable, if "such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination." For locally or regionally applicable final actions, the CAA reserves to EPA complete discretion whether to invoke the exception in (ii).[71]

If EPA takes final action on this proposed rulemaking, the Administrator intends to exercise the complete discretion afforded to him under the CAA to make and publish a finding that the final action (to the extent a court finds the action to be locally or regionally applicable) is based on a determination of "nationwide scope or effect" within the meaning of CAA section 307(b)(1). Through this rulemaking action (in conjunction with a series of related actions on other SIP submissions for the same CAA obligations), EPA interprets and applies section 110(a)(2)(d)(i)(I) of the CAA for the 2015 8-hour ozone NAAQS based on a common core of nationwide policy judgments and technical analysis concerning the interstate transport of pollutants throughout the continental U.S. In particular, EPA is applying here (and in other proposed actions related to the same obligations) the same, nationally consistent 4-step framework for assessing good neighbor obligations for the 2015 8-hour ozone NAAQS. EPA relies on a single set of updated, 2016-base year photochemical grid modeling results of the year 2023 as the primary basis for its assessment of air quality conditions and contributions at Steps 1 and 2 of that framework. Further, EPA proposes to determine and apply a set of nationally consistent policy judgments to apply the 4-step framework. EPA has selected a nationally uniform analytic year (2023) for this analysis and is applying a nationally uniform approach to

nonattainment and maintenance receptors and a nationally uniform approach to contribution threshold analysis.[72] For these reasons, the Administrator intends, if this proposed action is finalized, to exercise the complete discretion afforded to him under the CAA to make and publish a finding that this action is based on one or more determinations of nationwide scope or effect for purposes of CAA section 307(b)(1).[73]

**List of Subjects in 40 CFR Part 52**

Environmental protection, Air pollution control, Incorporation by reference, Ozone.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: February 3, 2022.

**Daniel Blackman,**
*Regional Administrator, Region 4.*
[FR Doc. 2022–02947 Filed 2–18–22; 8:45 am]
**BILLING CODE 6560–50–P**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

[EPA–R03–OAR–2021–0873; EPA–HQ–OAR–2021–0663; FRL–9494–01–R3]

**Air Plan Disapproval; West Virginia; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standard**

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Proposed rule.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA) is proposing to disapprove a State Implementation Plan (SIP) submittal from West Virginia intended to address interstate transport for the 2015 8-hour ozone national ambient air quality standards (2015 8-hour ozone NAAQS). The "good neighbor" or "interstate

---

[71] In deciding whether to invoke the exception by making and publishing a finding that an action is based on a determination of nationwide scope or effect, the Administrator takes into account a number of policy considerations, including his judgment balancing the benefit of obtaining the D.C. Circuit's authoritative centralized review versus allowing development of the issue in other contexts and the best use of agency resources.

[72] A finding of nationwide scope or effect is also appropriate for actions that cover states in multiple judicial circuits. In the report on the 1977 Amendments that revised section 307(b)(1) of the CAA, Congress noted that the Administrator's determination that the "nationwide scope or effect" exception applies would be appropriate for any action that has a scope or effect beyond a single judicial circuit. *See* H.R. Rep. No. 95–294 at 323, 324, reprinted in 1977 U.S.C.C.A.N. 1402–03.

[73] EPA may take a consolidated, single final action on all of the proposed SIP disapproval actions with respect to obligations under CAA section 110(a)(2)(D)(i)(I) for the 2015 8-hour ozone NAAQS. Should EPA take a single final action on all such disapprovals, this action would be nationally applicable, and EPA would also anticipate, in the alternative, making and publishing a finding that such final action is based on a determination of nationwide scope or effect.