Case Nos. 23-3216, 23-3225

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

COMMONWEALTH OF KENTUCKY (23-3216),
KENTUCKY ENERGY & ENVIRONMENT CABINET (23-3225)

*Petitioners*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL S. REGAN, Administrator, United States Environmental Protection
Agency

*Respondents.*

_____

On Petition for Review of a Final Agency Action of
the United States Environmental Protection Agency

_____

## MERITS BRIEF OF
## THE COMMONWEALTH OF KENTUCKY

_____

Russell Coleman                    Office of the Kentucky
*Attorney General*                 Attorney General
Matthew F. Kuhn                    700 Capital Avenue, Suite 118
*Solicitor General*                Frankfort, Kentucky 40601
                                   (502) 696-5300
                                   Matt.Kuhn@ky.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ................................. vi

STATEMENT OF JURISDICTION ..................................................... 1

STATEMENT OF ISSUES ................................................................ 2

INTRODUCTION ........................................................................... 3

STATEMENT OF THE CASE ............................................................ 5

   I.    Statutory Framework ........................................................... 5

   II.   Factual Background and Administrative History ................... 7

     A.  EPA revises the ozone NAAQS ........................................ 7

     B.  EPA's pre-submission guidance ...................................... 8

     C.  Kentucky's SIP ............................................................. 10

     D.   EPA proposes to disapprove Kentucky's SIP and promulgate a replacement FIP ..................................................................... 12

     E.  EPA finalizes disapproval of Kentucky's SIP and litigation begins ................ 15

     F.  EPA unlawfully publishes the Kentucky FIP and then applies a fig leaf ........ 18

SUMMARY OF THE ARGUMENT .................................................... 20

STANDARD OF REVIEW ............................................................... 21

ARGUMENT ................................................................................ 22

   I.    EPA's reliance on data that became available only after its statutory duty to act was arbitrary and capricious. ...................................................... 22

   II.   EPA bypassed Kentucky's reliance on the Agency's guidance ......................... 30

   III.  EPA's engineered machinations to impose a FIP on Kentucky frustrate the CAA's cooperative-federalism structure. ........................................ 35

CONCLUSION ............................................................................. 40

CERTIFICATE OF COMPLIANCE ................................................... 41

CERTIFICATE OF SERVICE ........................................................... 42

ADDENDUM ............................................................................... 43

# TABLE OF AUTHORITIES

## Cases

*Alaska Dep't of Env't Conservation v. EPA*,
540 U.S. 461 (2004) .................................................................... 22

*BCCA Appeal Grp. v. EPA*,
355 F.3d 817 (5th Cir. 2003) ................................................. 6, 36

*Christopher v. SmithKline Beecham Corp.*,
567 U.S. 142 (2012) .................................................................... 30

*City of Arlington v. FCC*,
569 U.S. 290 (2013) .................................................................... 22

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ............................................................... 37

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ........................................................ *passim*

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ............................................................ *passim*

*Env't Integrity Project v. EPA*,
425 F.3d 992 (D.C. Cir. 2005) ............................................. 24, 32

*EPA v. EME Homer City Generation, L.P.*,
572 U.S. 489 (2014) ............................................................ 6, 7, 32

*FCC v. Fox Tele. Stations, Inc.*,
556 U.S. 502 (2009) ............................................ 21, 23, 33, 35

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ............................................................... 22

*Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*,
454 U.S. 27 (1981) ...................................................................... 36

*Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n*,
790 F.2d 154 (D.C. Cir. 1986) ................................................... 30

*Gen. Elec. Co. v. EPA*,
290 F.3d 377 (D.C. Cir. 2002) ................................................... 32

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022) ...................................................................... 37

*Kreis v. Sec'y of the Air Force,*
    406 F.3d 684 (D.C. Cir. 2005) .................................................................... 28

*Lansing Dairy, Inc. v. Espy,*
    39 F.3d 1339 (6th Cir. 1994) ...................................................... 21, 36, 37, 39

*Michigan v. EPA,*
    268 F.3d 1075 (D.C. Cir. 2001) ...............................................................5, 36, 39

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)......................................................................20, 22, 39

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005)..................................................................................... 30

*Nat'l Cotton Council of Am. v. EPA,*
    553 F.3d 927 (6th Cir. 2009).................................................................... 23

*New York v. EPA,*
    964 F.3d 1214 (D.C. Cir. 2020)...........................................................26, 30, 32

*Sierra Club v. EPA,*
    356 F.3d 296 (D.C. Cir. 2004) .................................................................. 29

*Sierra Club v. EPA,*
    60 F.4th 1008 (6th Cir. 2023) ................................................................ 5, 6

*Sierra Club v. Korleski,*
    681 F.3d 342 (6th Cir. 2012).................................................................... 36

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016)................................................................6, 37, 39

*Train v. Nat. Res. Def. Council, Inc.,*
    421 U.S. 60 (1975)......................................................................6, 36, 39

*Union Elec. Co. v. EPA,*
    427 U.S. 246 (1976)................................................................................ 6, 25

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) .............................................................................. 5

*Wisconsin v. EPA,*
    938 F.3d 303 (D.C. Cir. 2019) .................................................................. 17

**Statutes**

42 U.S.C § 7607(b)(1) ............................................................................... 21

42 U.S.C. § 7407(a) ........................................................................... *passim*

42 U.S.C. § 7407(c)(1) ........................................................................ 26, 27

42 U.S.C. § 7408(a) .................................................................................... 5

42 U.S.C. § 7409(a) .................................................................................... 5

42 U.S.C. § 7409(d)(1) ............................................................................... 5

42 U.S.C. § 7410(a)(1) .............................................................................. 37

42 U.S.C. § 7410(a)(2)(D)(i)(I) ................................................................... 7

42 U.S.C. § 7410(c)(1) .......................................................................... 7, 19

42 U.S.C. § 7410(k)(1) .......................................................................... 6, 38

42 U.S.C. § 7410(k)(1)(B) .................................................................... 23, 24

42 U.S.C. § 7410(k)(2) .......................................................................... 6, 23

42 U.S.C. § 7410(k)(3) ................................................................................ 6

42 U.S.C. § 7410(k)(5) ........................................................................ 15, 26

42 U.S.C. § 7602(y) .................................................................................... 7

**Rules**

2015 Ozone NAAQS,
  80 Fed. Reg. 65,292 (Oct. 26, 2015) ....................................................... 7

Air Plan Approvals,
  68 Fed. Reg. 19,106 (Apr. 17, 2003) ..................................................... 27

Final Omnibus FIP,
  88 Fed. Reg. 36,654 (June 5, 2023) ....................................................... 19

Final SIP Disapprovals,
  88 Fed. Reg. 9,336 (Feb. 13, 2023) ................................................. *passim*

Interim Final Rule,
  88 Fed. Reg. 49,295 (July 31, 2023) ................................................. 19, 39

Motor Vehicle Emission Model,
  87 Fed. Reg. 68,483 (Nov. 15, 2022) ..................................................... 28

Partial Approval and Partial Disapproval of California SIP for 1997 NAAQS,
   86 Fed. Reg. 67,329 (Nov. 26, 2021) ................................................................ 28

Partial Approval and Partial Disapproval of California SIP for 2006 NAAQS,
   81 Fed. Reg. 59,876 (Aug. 31, 2016) ................................................................ 28

Proposed Kentucky SIP Disapproval,
   87 Fed. Reg. 9,498 (Feb. 22, 2022) ..................................................... 11, 24, 38

Proposed Omnibus FIP,
   87 Fed. Reg. 20,036 (Apr. 6, 2022) ...................................................... 8, 15, 24

San Francisco Ozone Attainment Plan Approval,
   69 Fed. Reg. 21,717 (Apr. 22, 2004) ................................................................ 27

Second Interim Final Rule,
   88 Fed. Reg. 67,102 (Sept. 29, 2023) ............................................................... 19

## STATEMENT REGARDING ORAL ARGUMENT

The Commonwealth requests oral argument. This petition for review of the Environmental Protection Agency's disapproval of Kentucky's state implementation plan (SIP) carries significant consequences for the Bluegrass State and its citizens. If Kentucky prevails, as the Court has held is likely, the Commonwealth will remain the primary regulator of emissions within its borders, like Congress intended. But if EPA's disapproval is upheld, the Agency will have authority to impose a federal implementation plan (FIP) on Kentucky, which will harm the Commonwealth's economy and energy sector. Given these stakes and the importance of the issues presented, Kentucky believes that oral argument is warranted and would assist the Court.

## STATEMENT OF JURISDICTION

On February 13, 2023, EPA published its disapproval of Kentucky's SIP addressing the Clean Air Act's (CAA) interstate-transport requirements for the 2015 8-hour ozone National Ambient Air Quality Standards (NAAQS) in the Federal Register under 42 U.S.C. § 7410(c). That final action was part of Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9,336 (Feb. 13, 2023). JA1–49 (Final Rule). Kentucky petitioned for review of its SIP disapproval on March 13, 2023, JA69–71 (Petition for Review), invoking this Court's jurisdiction under 42 U.S.C. § 7607(b)(1). A motions panel of the Court has held that venue for the petition lies in this Court. Dkt. 39-2 at 2–7.

## STATEMENT OF ISSUES

The issues for the Court to decide are:

1. Whether EPA's disapproval of Kentucky's SIP was unlawful, arbitrary, and capricious because the Agency relied on factors that Congress did not intend for it to consider and deviated from past agency practice without proper explanation.

2. Whether EPA's disapproval of Kentucky's SIP arbitrarily and capriciously discounted Kentucky's reliance on EPA's guidance for crafting an approvable plan.

3. Whether EPA's disapproval of Kentucky's SIP as part of a scheme to impose top-down regulation violates the CAA's cooperative-federalism structure.

## INTRODUCTION

When it comes to air regulation, Congress created separate lanes for the States and for EPA. Relevant here, the CAA directs EPA to set NAAQS for certain pollutants. But the States decide in the first instance how to meet those standards within their borders. They do so by creating SIPs. EPA gets to review each State's SIP, but it lacks the authority to question the wisdom of a State's plan. Rather, EPA plays only a ministerial role, reviewing SIPs for compliance with the CAA's requirements. One such requirement is that States be good neighbors and regulate emissions within their borders to avoid pollution problems in downwind States.

In this case, EPA disapproved Kentucky's SIP addressing the CAA's interstate-transport requirements for the 2015 8-hour ozone NAAQS even though Kentucky drafted its plan by following guidance that EPA issued to help States craft approvable SIPs. The Commonwealth's SIP relied on modeling data that EPA published predicting where and in what amounts Kentucky emissions would travel to downwind States. Kentucky also used a 1-part-per-billion (ppb) screening threshold to determine which of its downwind contributions needed further consideration—because EPA recommended that threshold. And using those metrics, the Commonwealth determined that current measures were sufficient for Kentucky to meet its obligations under the CAA.

But after Kentucky submitted its SIP for approval, EPA changed its rubric. Well after EPA was statutorily required to act on Kentucky's SIP, the Agency published *new* modeling data, which came with *new* downwind sites that Kentucky's emissions

3

allegedly contributed to in significant ways. And although EPA had recommended a 1 ppb contribution screening threshold to Kentucky, the Agency faulted the Commonwealth for not justifying its decision to follow that recommendation rather than use a stricter one-percent-of-the-NAAQS threshold. Indeed, according to EPA, Kentucky's reliance on the Agency's pre-submission guidance was illegitimate. And based on that stricter one-percent threshold and EPA's post-submission modeling, the Agency disapproved Kentucky's SIP.

EPA's bait-and-switch is unlawful—several times over. By relying on data that did not exist when Kentucky submitted its SIP or even when EPA was statutorily required to act on it, the Agency relied on factors that Congress did not intend for it to consider in disapproving Kentucky's plan. And even though EPA has recognized before that using post-submission data to evaluate SIPs creates a moving target that is impossible for States to hit, the Agency never explained why this time is different. EPA also dismissed Kentucky's serious reliance interests on the pre-submission guidance that the Agency provided. EPA excused its about-face by claiming that it was not required to issue its guidance in the first place, and in any event, Kentucky (and other States) had allegedly misunderstood EPA's position.

All of this—EPA's missing its statutory deadline, inexplicably using post-submission modeling data, and reversing course without accounting for Kentucky's reliance interests—disrupts the CAA's cooperative-federalism structure. Disapproving Kentucky's SIP means that EPA can impose a FIP on the Commonwealth. But

4

Congress's directive that each State should be the primary regulator of emissions within its borders is meaningless if EPA can direct States to write a SIP to meet one metric and then disapprove that SIP under another metric developed years later in a star chamber in Washington, D.C.

Each of these fundamental administrative-law errors renders EPA's disapproval of Kentucky's SIP unlawful; taken together, Kentucky's entitlement to relief is beyond dispute. The Court should grant the petition for review and vacate EPA's disapproval of Kentucky's SIP.

## STATEMENT OF THE CASE

### I.    Statutory Framework

The CAA is "an experiment in cooperative federalism." *Michigan v. EPA*, 268 F.3d 1075, 1083 (D.C. Cir. 2001). It establishes a basic division of labor between EPA and the States. *See Sierra Club v. EPA*, 60 F.4th 1008, 1012–13 (6th Cir. 2023). EPA must identify air pollutants—like ozone—and establish NAAQS for those pollutants, revising each NAAQS every five years as appropriate. 42 U.S.C. §§ 7408(a), 7409(a), (d)(1). "EPA, though, does not choose which sources must reduce their pollution and by how much to meet the ambient pollution target"; the CAA "leaves that task in the first instance to the States." *West Virginia v. EPA*, 142 S. Ct. 2587, 2600 (2022). Indeed, "[e]ach state has 'the primary responsibility' for ensuring that its ambient air meets the

NAAQS for the identified pollutants." *Sierra Club*, 60 F.4th at 1013 (quoting 42 U.S.C. § 7407(a)).

Part of that responsibility entails developing a SIP to implement the NAAQS and establish "compliance with the Act's requirements." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 507 (2014); *see also Union Elec. Co. v. EPA*, 427 U.S. 246, 249 (1976) (describing the States' authority to formulate a SIP "subject to EPA approval" as "[t]he heart" of the CAA). A new SIP or SIP revision is required each time EPA establishes or revises a NAAQS. *See* 42 U.S.C. § 7407(a). And States have "wide discretion" in formulating SIPs. *Union Elec. Co.*, 427 U.S. at 250. "[S]o long as the ultimate effect of a State's choice of emission limitations is compliance with the [NAAQS], the State is at liberty to adopt whatever mix of emission limitations it deems best suited to its particular situation." *Train v. Nat. Res. Def. Council, Inc.*, 421 U.S. 60, 79 (1975). Thus, States have "broad authority to determine the methods and particular control strategies they will use to achieve the statutory requirements." *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 822 (5th Cir. 2003).

Once a State submits a SIP, EPA has 18 months to review it for compliance with the CAA. *See* 42 U.S.C. § 7410(k)(1)–(3). That review, however, is "secondary," as the Agency has "no authority to question the wisdom of a State's choices of emissions limitations if they are part of a plan which satisfies the standards of [the CAA]." *Train*, 421 U.S. at 79; *see also Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016) (describing EPA's back-end review of SIPs as "ministerial" (citation omitted)). Indeed, if the SIP meets

the statutory requirements, EPA must approve it. *See* 42 U.S.C. § 7410(k)(3) ("[T]he Administrator *shall* approve [a SIP] as a whole if it meets all of the applicable requirements of [the CAA]." (emphasis added)). "Only if the state has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator by drafting a [FIP]." *Texas*, 829 F.3d at 412; *see* 42 U.S.C. § 7410(c)(1); *id.* § 7602(y) (defining a FIP, in part, as "a plan . . . promulgated by the [EPA] Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a [SIP]"). Even still, the CAA includes a two-year window for EPA to work with a State to "correct[] the deficiency" in the SIP and avoid the need for top-down regulation. *See* 42 U.S.C. § 7410(c)(1).

One requirement with which SIPs must comply is the CAA's good-neighbor provision, which generally requires "upwind States to reduce emissions to account for pollution exported beyond their borders." *EME Homer City*, 572 U.S. at 499. More specifically, a SIP must "contain adequate provisions" to prevent in-state emissions from "contribut[ing] significantly to nonattainment in, or interfer[ing] with maintenance by, any other State" in its own NAAQS compliance. 42 U.S.C. § 7410(a)(2)(D)(i)(I). The CAA does not define significant contribution.

## II.   Factual Background and Administrative History

### A.   EPA revises the ozone NAAQS

EPA lowered the ozone NAAQS in 2015 from 75 ppb to 70 ppb. *See* 2015 Ozone NAAQS, 80 Fed. Reg. 65,292, 65,292 (Oct. 26, 2015). That triggered Kentucky's

obligation to revise its ozone SIP to address interstate transport. So the Commonwealth set to work.

## B.    EPA's pre-submission guidance

Rather than try to promulgate nationally applicable regulations addressing good-neighbor obligations under the new ozone NAAQS, EPA issued guidance memoranda. In March 2018, EPA issued a memorandum explicitly designed to "assist states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS." JA76 (March 2018 Memorandum at 2). EPA laid out the four-step process it had used to promulgate good-neighbor FIPs before, and suggested States could use it to craft their SIPs: (1) identify sites throughout the country that likely will struggle to satisfy the NAAQS; (2) through modeling, identify States that affect those air-quality problems in downwind States sufficiently such that the States are considered "linked" and therefore warrant further analysis; (3) if necessary, assess whether States could achieve cost-effective emissions reductions that would eliminate those contributions; and (4) evaluate a SIP's emissions-reductions measures, if any. *See* JA76–77 (*id.* at 2–3). States may, but need not, follow this process in crafting their SIPs. *See* Proposed Omnibus FIP, 87 Fed. Reg. 20,036, 20,054 (Apr. 6, 2022).

The March 2018 Memorandum also shared what were then EPA's most recent "contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS[.]" Final SIP Disapprovals, 88 Fed. Reg. 9,336, 9,339 (Feb. 13, 2023); *see* JA77–80 (March 2018

Memorandum at 3–6); JA88–94 (March 2018 Memorandum Attachment C). That modeling was based on data gathered from the years 2009–2013 (base year 2011).[1] JA77–78 (*id.* at 3–4). Although EPA did not require States to use this data to formulate their SIPs, the Agency told States that they could use it if they wished.[2] *See* JA80 (*id.* at 6) ("States may consider using this national modeling to develop SIPs that address the requirements of the good neighbor provision," or "States may also choose to use other information to identify nonattainment and maintenance receptors relevant to development of their good neighbor SIPs.").

EPA issued another guidance memorandum not long before Kentucky's SIP was due. JA98–105 (August 2018 Memorandum). The August 2018 Memorandum "provide[d] recommendations for states" about "what thresholds may be appropriate for use" in determining whether their contributions to downwind States were significant or not. JA98 (*id.* at 1). EPA advised that "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold" to formulate their SIPs. JA101 (*id.* at 4). That threshold, EPA explained, is "generally comparable" to the stricter threshold of one percent of the NAAQS—or .7 ppb. *Id.* (finding a 1 ppb threshold would capture just seven percent less of the nationwide upwind contribution). EPA noted that a 1 ppb

---

[1] EPA's guidance spoke in terms of base-year modeling of ozone concentrations. The base year is the "center" year in a multi-year period of data collected from air-quality monitors.

[2] EPA later reaffirmed its reliance on the downwind-receptor linkage data provided in the March 2018 Guidance. *See* JA107 (October 2018 Memorandum at 2 n.3).

threshold might not be appropriate "in all instances," depending on "the facts and circumstances underlying a particular SIP." JA98 (*id.* at 1).

The March 2018 Memorandum "recommend[ed] that states reach out to EPA Regional offices and work together to accomplish the goal of developing, submitting, and reviewing approvable SIPs." JA80 (March 2018 Memorandum at 6). Kentucky did just that. *See* Dkt. 24-2 at 13–15; JA126 (EPA Comments on Kentucky's Pre-Submission SIP at 2). For example, Kentucky provided EPA Region 4 with a preliminary draft of its SIP and considered comments from the office, like its suggestion that Kentucky refer to the August 2018 Memorandum to justify using a 1 ppb contribution threshold. Dkt. 24-2 at 15; JA126 (EPA Comments on Kentucky's Pre-Submission SIP at 2). EPA Regional Offices gave similar feedback to other States. *See, e.g.*, JA111 (EPA Comments on Draft Ohio SIP at 1) ("Ohio can avail itself of the higher, 1 ppb, threshold from the August 18, 2018 memo if it so chooses . . . ."); JA115 (EPA Comments on Draft Oklahoma SIP at 2) (advising that the August 2018 Memorandum "would be better justification for use of a 1 [ppb] threshold"); JA121 (EPA Comments on Draft Louisiana SIP at 3) (advising Louisiana to consider the August 2018 Memorandum to justify using a 1 ppb contribution threshold).

### C.    Kentucky's SIP

Kentucky submitted its SIP on January 11, 2019. JA129–469 (Kentucky SIP). Kentucky's SIP explained that it satisfies the good-neighbor provision because it "contains adequate provisions to prevent sources and other types of emissions activities

within the Commonwealth from significantly contributing to nonattainment, or interfering with the maintenance, of downwind states with respect to the 2015 8-hour ozone NAAQS." Proposed Kentucky SIP Disapproval, 87 Fed. Reg. 9,498, 9,503 (Feb. 22, 2022). It reached that conclusion by following EPA's guidance, including by adopting EPA's general framework for evaluating compliance with the good-neighbor provision. *See id.* at 9,503–04.

At step one, Kentucky used the modeling data in the March 2018 Memorandum to identify nonattainment and maintenance receptors nationwide.[3] JA151 (Kentucky SIP at 18). Using that modeling, Kentucky determined that it contributed more than one percent of the NAAQS to four nonattainment receptors (two in Connecticut and two in Wisconsin) and one maintenance receptor (in Maryland). JA152 (*id.* at 19). But Kentucky "agree[d] with the rationale" of EPA's analysis in the August 2018 Memorandum that "the use of a 1 ppb contribution threshold is comparable to the amount captured using" a .7 ppb threshold. *Id.* And under a 1 ppb contribution threshold, Kentucky was "linked" to only the maintenance monitor in Maryland. *Id.*

Even so, Kentucky distinguished between nonattainment receptors and maintenance monitors because the latter "are already in attainment." JA178 (*id.* at 45). And

---

[3] Nonattainment receptors are sites that are expected to have problems attaining the NAAQS, and maintenance receptors are sites that currently meet the NAAQS but are expected to have trouble maintaining them. *See* Proposed Omnibus FIP, 87 Fed. Reg. at 20,054.

"[u]pwind states should not be required to apply the same degree of reductions that are required for nonattainment areas" to maintenance receptors. *Id.* Thus, the Commonwealth concluded that no more reductions were needed other than existing on-the-books and on-the-way measures. JA179 (*id.* at 46). Indeed, Kentucky noted it had decreased its emission of NOx (an ozone precursor). JA163, 178 (*id.* at 30, 45). And Kentucky outlined "coal-fired unit retirements, shutdowns, and repowering . . . as well as on-the-way reductions from natural gas conversions and retirements." Proposed Kentucky SIP Disapproval, 87 Fed. Reg. at 9505. So Kentucky concluded that it needed to take no further steps to achieve compliance with the CAA's good-neighbor provision.

### D.    EPA proposes to disapprove Kentucky's SIP and promulgate a replacement FIP

While Kentucky waited on word from EPA about whether its SIP was approvable, the Agency released new modeling data in September 2021. *See* JA470–509 (2016v2 Modeling); JA510 (2016v2 Technical Support Document). The base year for the "2016v2" model was 2016—not 2011, like the modeling in the March 2018 Memorandum. *See* Final SIP Disapprovals, 88 Fed. Reg. at 9,338–39, 9,344. But EPA initially did not hand over the results of the new modeling to the States. *See id.* at 9,344; JA510 (2016v2 Technical Support Document). Thus, the Agency gave no indication that it would use its new modeling to review the States' already-submitted SIPs. But when EPA released the new model's results in January 2022, it stated that "[w]hile these data do not reflect any policy or regulatory decisions, EPA expects to use this information

12

in upcoming rulemaking actions, including ozone transport actions." Environmental Protection Agency, 2016v2 Platform, https://perma.cc/2WKR-BBUJ.

Sure enough, EPA cited the 2016v2 model a month later when it proposed to disapprove Kentucky's SIP for noncompliance with the good-neighbor provision—almost two years after the Agency's statutory deadline to act. Proposed Kentucky SIP Disapproval, 87 Fed. Reg. at 9,501 ("EPA proposes to primarily rely on modeling based on the updated and newly available 2016v2 emissions platform in evaluating these submissions with respect to Steps 1 and 2 of the 4-step interstate transport framework."). According to the 2016v2 model, "Kentucky contribute[s] greater than 1 percent of the standard to nonattainment or maintenance-only receptors" at four sites. *Id.* at 9,507. Some of those sites—like Bucks County, Pennsylvania—had not been identified in EPA's earlier modeling, so Kentucky could not have possibly considered them when crafting its SIP. The new modeling also showed that Kentucky was no longer contributing one percent of the NAAQS to other sites that Kentucky *had* analyzed in its SIP. *Compare id.* at 9,504 (discussing how Kentucky's SIP addressed sites in Maryland and Wisconsin), *with id.* at 9,507 (only discussing sites in Pennsylvania and Connecticut). In other words, the new modeling purported to make the analysis in Kentucky's SIP obsolete.

EPA's use of post-submission data was not the only surprise in its proposed disapproval. To make its linkage determinations, EPA used "a threshold of 1 percent of the NAAQS" and rejected the 1 ppb threshold that it had suggested in its August

13

2018 Memorandum and in its comment to Kentucky. *Id.* at 9,509. And that decision mattered: Kentucky contributed less than 1 ppb to all four sites that EPA identified in its proposed disapproval. *See id.* at 9,507. EPA "acknowledge[d] that the August 2018 memorandum generally recognized that a 1 ppb threshold may be appropriate for states to use." *Id.* at 9,509. But even though EPA repeatedly suggested this standard, it faulted Kentucky for "not provid[ing] a technical analysis to sufficiently justify use of an alternative 1 ppb threshold at the linked, downwind monitors." *Id.*

EPA also disagreed that on-the-books and on-the-way reductions were enough to address cross-state emissions. *Id.* at 9,511–12. And it disagreed with "Kentucky's claims that local emissions reductions from the jurisdiction where the downwind receptor is located must first be implemented and accounted for before imposing obligations on upwind states under the interstate transport provision." *Id.* at 9,513. EPA ultimately found that Kentucky's treatment of maintenance monitors was nondeterminative "given that EPA's updated modeling indicate[d] that Kentucky is linked to nonattainment *and* maintenance receptors." *Id.* (emphasis added). Based on its new data and its about-face on using a 1 ppb contribution threshold, EPA concluded that Kentucky's SIP fell short on its good-neighbor obligation. *Id.* at 9,515.

As if part of a larger plan, EPA then quickly published a proposed FIP for Kentucky, even though the Agency had not taken final action on Kentucky's SIP and the CAA gives the Agency two years to promulgate a FIP. Proposed Omnibus FIP, 87 Fed. Reg. at 20,038; 42 U.S.C. § 7410(c)(1).

14

### E.    EPA finalizes disapproval of Kentucky's SIP and litigation begins

Kentucky pointed out the flaws in EPA's proposed disapproval. JA511–15 (EEC Comment Letter). The Commonwealth's Energy and Environment Cabinet (EEC) explained that EPA's use of new modeling data from after Kentucky submitted its SIP—and well after EPA's statutory deadline to act—"prevented Kentucky from addressing deficiencies or submitting SIP revisions." JA513 (*id.* at 1). EEC also objected to EPA's unexplained reversal from its August 2018 position that 1 ppb is an acceptable contribution threshold. JA515 (*id.* at 3). "In the spirit of cooperative federalism," EEC explained, "Kentucky would appreciate and expect the opportunity to submit a revised SIP in accordance with the revised data and modeling, rather than having the SIP disapproved after the fact." *See* JA514–15 (*id.* at 2–3) (noting EPA's authority under 42 U.S.C. § 7410(k)(5) to initiate a SIP call).

Yet EPA doubled down. On February 13, 2023, EPA finalized its disapproval of Kentucky's SIP relying on yet *another* updated model, 2016v3. Final SIP Disapprovals, 88 Fed. Reg. at 9,343, 9,356. The 2016v3 model was "comprised of data from various sources including data developed using models, methods, and source datasets that became available in calendar years 2020 through 2022." *Id.* at 9,345. Under that modeling, Kentucky contributed more than one percent of the NAAQS to two nonattainment sites and one maintenance monitor, with its largest contribution to any site being only

.84 ppb in Fairfield County, Connecticut.[4] *See id.* at 9,356; JA516–71 (2016v3 Modeling); JA572–78 (2016v3 Technical Support Document). Thus, under the 2016v3 modeling, Kentucky contributed less than 1 ppb at all three sites, making EPA's refusal to honor the guidance in its August 2018 Memorandum outcome-determinative.[5]

Even so, EPA was unapologetic about pulling the rug out from under a sovereign State. In response to Kentucky's complaint that it had relied on EPA's models to draft its SIP, EPA argued that under *EME Homer City* it had no obligation "to issue guidance or quantify" States' contributions at all. Final SIP Disapprovals, 88 Fed. Reg. at 9,363; *see id.* at 9,364. And the Agency insisted it could "hardly be the case that the EPA is prohibited from [disapproving SIPs] using the best information available to it at the time it takes such action." *Id.* at 9,366 (relying on *Wisconsin v. EPA*, 938 F.3d 303, 322 (D.C. Cir. 2019)). Of course, EPA did not address that *Wisconsin* considered only whether EPA could *approve* a SIP based on one-time nonattainment that *improved* post-submission. *See* 938 F.3d at 322. That case, which merely tracks the CAA's preference for State-led regulation, is not like this one.

---

[4] Note that Kentucky's linkages changed again from the 2016v2 model—which linked Kentucky to four sites—to the 2016v3 model.

[5] Another aspect of EPA's final disapproval was a whole new category of maintenance receptors—"violating monitor" receptors. *See* Final SIP Disapprovals, 88 Fed. Reg. at 9,349. But EPA chose to use that category, which its "traditional modeling . . . would otherwise have identified. . . as being in attainment," only on a "confirmatory basis." *Id.* So while Kentucky contributed more than 1 ppb to one of these newly announced receptors, that is not why EPA disapproved Kentucky's SIP. *See id.* at 9,349–50, 9,356.

As for the appropriate contribution threshold, EPA "finaliz[ed] its proposed approach of consistently using a 1 percent" threshold. Final SIP Disapprovals, 88 Fed. Reg. at 9,371. Now, EPA denied "impos[ing] a requirement that states must use a 1 percent of the NAAQS threshold" because such a requirement "would reflect a change in position from the August 2018 memorandum." *Id.* at 9,373. Rather, EPA reinterpreted its guidance to require state-specific justification for a 1 ppb threshold, and according to the Agency, no State had "made a sufficient showing that the use of [1 ppb] is justified." *Id.* And even if its position had changed, EPA argued, the States lacked reliance interests on the August 2018 Memorandum because they had not "incurred any compliance costs based on" it, or "invested much . . . resources in developing state-specific arguments in support of a 1 ppb threshold." *Id.*

Kentucky timely petitioned for review in this Court following EPA's final disapproval. Dkt. 1-2. Soon after, EPA moved to transfer the petition to the D.C. Circuit or dismiss it, claiming that the D.C. Circuit is the proper venue. Dkt. 8. Given the threat that EPA would impose a harmful FIP on Kentucky, the Commonwealth moved to stay EPA's SIP disapproval pending review, arguing that EPA's shifting models and standards had rendered its disapproval arbitrary and capricious and incompatible with the cooperative-federalism principles underlying the CAA. Dkt. 24-1 at 11–19.

On May 31, 2023, this Court administratively stayed EPA's disapproval of Kentucky's SIP. Dkt. 28. And on July 25, the Court held that Kentucky is entitled to a full-

blown stay pending review and confirmed that the Sixth Circuit is the appropriate venue to review Kentucky's petition. Dkt. 39.

Kentucky is not the only State to secure a stay of its SIP disapproval. At this point, eleven other States in six other circuit courts have secured stays. *See* Order, *Alabama v. EPA*, Nos. 23-11173 & 23-11196 (11th Cir. Aug. 17, 2023) (staying Alabama's SIP disapproval); Order, *West Virginia v. EPA*, No. 23-1418 (4th Cir. Aug. 10, 2023) (staying West Virginia's SIP disapproval pending oral argument); Order, *Utah v. EPA*, No. 23-9509 (10th Cir. July 27, 2023) (staying Utah's and Oklahoma's SIP disapprovals); Order, *ALLETE, Inc. v. EPA*, No. 23-1776 (8th Cir. July 5, 2023) (staying Minnesota's SIP disapproval); Order, *Nev. Cement Co. v. EPA*, No. 23-682 (9th Cir. July 3, 2023) (staying Nevada's SIP disapproval); Order, *Missouri v. EPA*, No. 23-1719 (8th Cir. May 26, 2023) (staying Missouri's SIP disapproval); Order, *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023) (staying Arkansas's SIP disapproval); Order, *Texas v. EPA*, No. 23-60069 (5th Cir. June 8, 2023) (staying Mississippi's SIP disapproval); Order, *Texas v. EPA*, No. 23-60069 (5th Cir. May 1, 2023) (staying Texas's and Louisiana's SIP disapprovals). Thus, more than half of EPA's SIP disapprovals have been judicially stayed.

## F. EPA unlawfully publishes the Kentucky FIP and then applies a fig leaf

Because States have the primary responsibility for regulating emissions within their borders, EPA can impose a FIP for a State only after it lawfully disapproves the

State's SIP. 42 U.S.C. § 7410(c)(1). Thus, this Court's administrative stay stripped EPA of any authority to promulgate a FIP for Kentucky. But that did not stop EPA.

On June 5, 2023, soon after this Court's administrative stay, EPA published a FIP for Kentucky in the Federal Register. Final Omnibus FIP, 88 Fed. Reg. 36,654 (June 5, 2023). EPA packaged the Kentucky FIP with FIPs for 22 other States, several of which had also received judicial stays of their SIP disapprovals. *Id.* (including, for example, Missouri, Louisiana, and Texas). That violated this Court's order.[6]

Recognizing as much, EPA promulgated an interim final rule staying imposition of FIPs on States whose SIP disapprovals had been stayed by that date, including Kentucky.[7] Interim Final Rule, 88 Fed. Reg. 49,295 (July 31, 2023). EPA acknowledged that its "authority . . . to establish . . . FIP requirements for the sources in a given state" depends on "the EPA's disapproval of the state's . . . SIP." *Id.* at 49,297. Therefore, EPA recognized it "must act to ensure that the [FIP's] requirements . . . that apply to . . . sources in each of the states for which a stay order has been issued will not take effect while the stay of the SIP Disapproval action as to that state remains in place." *Id.*

---

[6] The Agency downplayed this violation by issuing a June 1, 2023 memorandum promising that it "will take action in the near future." JA885 (Goffman Memorandum), available at https://perma.cc/5DGX-RUX9.

[7] EPA has since published a second interim final rule staying the imposition of FIPs as to six other States that secured judicial stays of their SIP disapprovals. Second Interim Final Rule, 88 Fed. Reg. 67,102 (Sept. 29, 2023).

On July 27, 2023, Kentucky filed a protective petition for review in this Court challenging EPA's issuance of the Kentucky FIP. *Kentucky v. EPA*, No. 23-3624 (6th Cir.). The Commonwealth promptly sought to hold that petition in abeyance pending resolution of this matter. EPA, however, opposed abeyance.

## SUMMARY OF THE ARGUMENT

It's administrative law 101 that agencies must follow Congress's instructions and make reasoned decisions. So too are the principles that agencies must provide fair warning to regulated parties about what is required of them and thus that agencies need to give a reasoned explanation if they reverse a prior policy. EPA broke each of these ground rules in disapproving Kentucky's SIP.

Congress never meant for EPA to disapprove SIPs using data that did not exist until after the Agency's deadline to act. Congress set a deadline for EPA to act on Kentucky's submission, so it did not intend for EPA to disapprove that submission considering data collected after that deadline. The CAA's cooperative-federalism structure and its built-in mechanism for revising SIPs based on new data make that even clearer. Thus, it was arbitrary and capricious for EPA to disapprove Kentucky's SIP using data the Commonwealth never had a chance to consider. *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That is doubly so given EPA's past position that States are not required to account for post-submission data, which EPA abandoned here without explanation. *See FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009).

Indeed, EPA tripled down on its arbitrary and capricious behavior when it scrapped its prior policies and guidance without accounting for Kentucky's reliance. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). It's no excuse that EPA could have let Kentucky go it alone and provided the Commonwealth with no advice. That is not this case. Here, EPA gave Kentucky specific instructions for drafting an approvable SIP; Kentucky followed those instructions; and EPA moved the goal posts while the ball was in the air. EPA cannot pull such a bait-and-switch on a sovereign State. And EPA's attempt to reimagine its pre-submission guidance is unpersuasive.

EPA's end goal is clear: it wants to regulate emissions in Kentucky. Congress, however, prefers that the Commonwealth do that. *See* 42 U.S.C. § 7407(a). EPA's cascade of arbitrary and capricious conduct to disapprove Kentucky's SIP and impose a FIP for the Commonwealth frustrates the CAA's cooperative-federalism structure. EPA may not circumvent Congress's wishes like that. *See Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1350 (6th Cir. 1994). For these reasons, Kentucky's petition for review should be granted, and EPA's disapproval of Kentucky's SIP should be set aside.

## STANDARD OF REVIEW

The CAA provides a mechanism to challenge EPA's disapproval of a SIP. 42 U.S.C § 7607(b)(1). Courts judging such actions "apply the familiar default Administrative Procedure Act [(APA)] standard" and ask "whether [EPA's] action was arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 496–97 (2004) (cleaned up).

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Thus, courts must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State Farm*, 463 U.S. at 43 (citation omitted). And agency action must be set aside "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* The action must be evaluated solely "on the basis articulated by the agency itself." *Id.* at 50.

## ARGUMENT

### I.    EPA's reliance on data that became available only after its statutory duty to act was arbitrary and capricious.

It is black-letter administrative law that federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Thus, agency action is arbitrary and capricious when "the agency has relied on factors that Congress has not intended it to consider." *Nat'l Cotton Council of Am. v. EPA*, 553 F.3d 927, 934 (6th Cir. 2009) (citation omitted). Similarly

foundational is the rule that before an agency changes a longstanding policy, it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars*, 579 U.S. at 221 (quoting *Fox Tele. Stations*, 556 U.S. at 515). EPA's use of the post-submission model to disapprove Kentucky's SIP violates both bedrock principles of administrative law.

**1.** Congress established a clear cut-off for what data EPA can use to assess States' SIP submissions by setting a deadline by which EPA "shall act on the submission." *See* 42 U.S.C. § 7410(k)(2). But EPA ignored its statutory deadline—for more than a year and a half—and used that extra time to collect new data that it then employed to disapprove Kentucky's already-submitted SIP. That was arbitrary and capricious.

After submitting its SIP in January 2019, Kentucky was statutorily entitled to a thumbs-up or thumbs-down from EPA no later than July 2020. *See* 42 U.S.C. § 7410(k)(1)(B), (2)–(3). But it was not until February 2022—almost two years late— that EPA notified Kentucky that it intended to disapprove the Commonwealth's SIP. And when EPA finally disapproved Kentucky's SIP, it relied on modeling based on data that became available not only years after Kentucky had submitted its SIP, but also well after EPA needed to act on it. *See* Final SIP Disapprovals, 88 Fed. Reg. at 9,345 ("The 2016v3 emissions platform is comprised of data from various sources including data developed using models, methods, and source datasets that became available in calendar years *2020 through 2022*[.]" (emphasis added)).

23

Although EPA's use of the 2016v3 platform to disapprove Kentucky's SIP is what ultimately matters, *see Regents of the Univ. of Cal.*, 140 S. Ct. at 1907 ("[J]udicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (citation omitted)), it is notable that this was the second time EPA changed its modeling after Kentucky submitted its SIP. In proposing to disapprove Kentucky's SIP, EPA used the 2016v2 platform, which also relied on data collected after Kentucky had submitted its SIP. *See* Proposed Kentucky SIP Disapproval, 87 Fed. Reg. at 9,500–01; Proposed Omnibus FIP, 87 Fed. Reg. at 20,063. And the results of the 2016v2 models were released just weeks before EPA proposed disapproving Kentucky's SIP. *See* Final SIP Disapprovals, 88 Fed. Reg. at 9,344. Thus, the Commonwealth never could have incorporated this updated modeling into its submission. And that mattered: the 2016v2 and 2016v3 platforms flagged Kentucky's contributions at different sites than those identified by the earlier modeling in EPA's March 2018 Memorandum. *Compare, e.g.*, Proposed Kentucky SIP Disapproval, 87 Fed. Reg. at 9,504 (discussing how Kentucky's SIP addressed sites in Maryland and Wisconsin), *with id.* at 9,507 (only discussing sites in Pennsylvania and Connecticut).

Congress never meant to allow such a shell game. *See Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (recognizing that EPA may not "use the rulemaking process to pull a surprise switcheroo on regulated entities"). It placed a duty on EPA to act on Kentucky's SIP within 18 months of January 2019. *See* 42 U.S.C. § 7410(k)(1)(B), (2)–(3). And EPA had to approve Kentucky's SIP if it met established

criteria at that time. "Each State is given wide discretion in formulating its plan, and the [CAA] provides that the Administrator '*shall approve*' the proposed plan if it has been adopted after public notice and hearing and if it meets eight specified criteria." *Union Elec.*, 427 U.S. at 251 (emphasis added) (citation omitted).

Given the statutory deadline it imposed, Congress did not contemplate that EPA would reject Kentucky's SIP based on data that arose only after the Agency had to act. In granting Kentucky's stay motion this Court recognized that "Kentucky has made a strong showing that it is likely to succeed on its arbitrary-and-capricious claim because EPA based its disapproval of Kentucky's SIP in part on modeling data and policy changes developed after Kentucky submitted it." Dkt. 39-2 at 7. The Fifth Circuit held the same in staying EPA's disapproval of the Texas and Louisiana SIPs. Order, *Texas v. EPA*, No. 23-60069, Dkt. 269-2 at 19 (holding that EPA acted "arbitrarily and capriciously by grounding its Final SIP Denial in modeling data that wasn't available when Louisiana and Texas submitted their SIPs[,] . . . slow-walk[ing] for years beyond CAA's statutory deadline . . . [and] rel[ying] upon various significant changes to its modeling data that it adopted long after the statutory deadline").[8]

---

[8] Although it provided less analysis, the Ninth Circuit's order staying the disapproval of Nevada's SIP likewise relied on the rule that "EPA action was arbitrary and capricious where [the] agency relied on one data set over another without providing adequate explanation for its choice." Order, *Nevada Cement Co. v. EPA*, No. 23-682, Dkt. 27.1 at 2 (9th Cir. July 3, 2023) (citation omitted).

EPA's statutory deadline to act is not the only proof that Congress did not intend for SIPs to be judged on post-submission, post-deadline data. The CAA has a built-in mechanism for EPA to require revisions based on new data: a SIP call. *See* 42 U.S.C. § 7410(k)(5) ("Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate . . . , the Administrator shall require the State to revise the plan as necessary to correct such inadequacies."). Under a SIP call, States must submit plan revisions within "reasonable deadlines" set by EPA. *Id.* By setting a hard deadline for EPA to act on a SIP submission while allowing the Agency flexibility to address newly discovered inadequacies later, Congress clearly did not intend for SIPs to be judged on post-deadline data.

And the CAA's cooperative-federalism structure is the nail in the coffin for EPA's claim that Congress meant to allow the Agency to disapprove SIPs based on post-submission data. Congress made the States the "primary" regulators of emissions within their borders. 42 U.S.C. § 7407(a). EPA can step in only if a State proposes an inadequate SIP. *Id.* § 7407(c)(1). But by EPA's lights, the Agency can circumvent Congress's wishes by simply waiting after a State submits its SIP until new data justifies disapproving it. That cannot be. "The reasoned agency decisionmaking that the Clean Air Act demands does not allow the EPA to keep moving the finish line." *New York v. EPA*, 964 F.3d 1214, 1223 (D.C. Cir. 2020) (citation omitted).

Indeed, if EPA can ignore its deadline to wait on new modeling data, submitting an approvable SIP becomes like searching for a needle in a haystack while more, and

different, hay keeps getting added. EPA has identified dozens and dozens of receptor sites that States must consider when crafting good-neighbor SIPs. *See, e.g.*, JA88–94 (March 2018 Memorandum Attachment C). Yet EPA suggests that after a State expends significant resources to identify the sites that matter and to analyze them, all that effort can be for naught based on data the State could not have possibly considered. And given the large number of receptors sites, it's highly likely that something in the data will change, at which point, according to EPA, the State's SIP is not approvable. In other words, unless a State is lucky enough that its downwind receptors do not change between models (Kentucky's have changed with every new modeling), submitting an approvable SIP becomes impossible. Congress did not intend for crafting an approvable SIP to be a Sisyphean task. *See* 42 U.S.C. § 7407(a) (making States primary regulators); 42 U.S.C. § 7407(c)(1) (giving EPA a secondary role).

**2.** Before now, EPA has long recognized that assessing SIPs based on post-submission data "would create a moving target that is impossible to meet." San Francisco Ozone Attainment Plan Approval, 69 Fed. Reg. 21,717, 21,727 (Apr. 22, 2004). As this Court observed in granting Kentucky's stay motion, "EPA has stated in the past that, in general, it has not required changes to submitted SIPs that result from changes in factors and methodologies that occur after the SIP is submitted . . . . But that is precisely what it appears to have done here." Dkt. 39-2 at 8 (cleaned up) (quoting Air Plan Approvals, 68 Fed. Reg. 19,106, 19,120 (Apr. 17, 2003)).

27

EPA has reiterated its policy of not holding States to post-submission modeling over and over. *See* Motor Vehicle Emission Model, 87 Fed. Reg. 68,483, 68,486 (Nov. 15, 2022) (explaining that EPA "does not require [state] agencies that have already submitted SIP revisions or will submit SIP revisions shortly after the release of a new model to revise th[o]se SIP revisions simply because a new motor vehicle emissions model is now available"); Partial Approval and Partial Disapproval of California SIP for 1997 NAAQS, 86 Fed. Reg. 67,329, 67,333 (Nov. 26, 2021) (explaining that "it would be unreasonable to require a state to revise such a submission after significant work had already occurred"); Partial Approval and Partial Disapproval of California SIP for 2006 NAAQS, 81 Fed. Reg. 59,876, 59,878 n.15 (Aug. 31, 2016) (citing EPA's "longstanding policy" of only "requiring states to use the most current emission estimate models available at the time of SIP development"); *cf.* San Francisco Ozone Attainment Plan Approval, 69 Fed. Reg. at 21,727 ("Once a plan has been adopted, EPA does not generally require plan elements such as emissions inventories and attainment demonstrations to be revisited and updated in response to new information.").[9]

---

[9] While some of these statements are about mobile-source emissions modeling, that data is a component of EPA's overall emissions modeling. *See* Final SIP Disapprovals, 88 Fed. Reg. at 9,339 (explaining that EPA's updated modeling included "updated onroad mobile emissions" from a new mobile-source emissions model). And in any event, there is no reasonable basis to distinguish between the types of modeling data here. *See Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005) ("[A]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.").

Or consider EPA's position in *Sierra Club v. EPA*, 356 F.3d 296 (D.C. Cir. 2004). There, an environmental group challenged EPA's approval of SIPs because the plans were not based on the most updated modeling, which was released after the States had submitted their plans. *Id.* at 297, 308. "EPA respond[ed] that, although it requires that states use the latest model available at the time a plan is developed," States "that have already submitted SIPs" are not required "to revise these SIPs simply because a new . . . emissions model is now available." *Id.* at 308 (citations omitted). With then-Judge Garland writing, the D.C. Circuit agreed that EPA's position was reasonable because "emissions factors, as well as inventory calculation methodologies, are continually being improved." *Id.* (citation omitted). The court emphasized that "[t]o require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval processes." *Id.*

Here, EPA abandoned that prior stance. Final SIP Disapprovals, 88 Fed. Reg. at 9,366 ("disagree[ing] . . . that [its] evaluation of these submissions must be limited to the information available to states at the time they made their submissions, or information at the time of the deadline for the EPA to act on their submissions"). But EPA never reasonably explained its change of heart, simply asserting that it "can hardly be the case" that the Agency cannot rely on newer modeling. *Id.* Indeed, EPA barely (if at all) acknowledged its prior position, dismissing its statutory deadline to act on SIP submissions as "'procedural' and therefore not 'central to the regulatory scheme.'" *Id.* (citation omitted). Such an "[u]nexplained inconsistency" with past practice supports

29

holding EPA's disapproval of Kentucky's SIP "to be an arbitrary and capricious change from agency practice." *See Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); *see also Encino Motorcars*, 579 U.S. at 221.

## II.    EPA bypassed Kentucky's reliance on the Agency's guidance.

The APA requires agencies to "provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (quoting *Gates & Fox Co. v. Occupational Safety & Health Rev. Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986)). And when an agency provides regulated parties notice of its position, it must "take[] into account" "serious reliance interests" that position may have engendered before "chang[ing] course." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1913 (quoting *Encino Motorcars*, 579 U.S. at 222). Otherwise, the agency creates "a constantly moving target, with the words of explanation from the agency variously meaning and not meaning what they say," which "falls far short of reasoned decisionmaking." *New York*, 964 F.3d at 1224.

At EPA's urging, Kentucky relied on several representations from the Agency in crafting its SIP. It used the modeling data EPA provided in the March 2018 Memorandum, which was explicitly meant to "assist states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS." JA76 (March 2018 Memorandum at 2). Kentucky also used the 1 ppb contribution threshold that EPA suggested in its August 2018 Memorandum—guidance that was also meant to help States develop approvable SIPs. JA98 (August 2018 Memorandum at 1) (explaining that the August 2018 Memorandum was

30

intended to "provide[] recommendations for states . . . in developing SIP submissions, and for [EPA] Regional offices in acting on them"). Kentucky's reliance was made even more reasonable when EPA commented on Kentucky's draft SIP, encouraging the Commonwealth to adopt the "straightforward approach" of "rely[ing] entirely upon the EPA's projected design values and contribution data and apply the 1 ppb screening threshold established in the EPA's [August 2018 Memorandum] to the contributions from Kentucky to downwind receptors." JA126 (EPA Comments on Kentucky's Pre-Submission SIP at 2).

Yet in disapproving Kentucky's SIP, EPA reneged on the guidance it had provided to Kentucky. The Agency disapproved Kentucky's SIP based on post-submission modeling data to which Kentucky was not privy. And EPA rejected its recommended 1 ppb contribution threshold as "problematic," looking again to new modeling data to claim that threshold was "not necessarily support[ed]." Final SIP Disapprovals, 88 Fed. Reg. at 9,342, 9,370. Instead, EPA employed a stricter .7 ppb threshold, which made all the difference for Kentucky. *Id.* at 9,353, 9,356 (Kentucky's highest contribution to any of the three sites EPA relied on to disapprove the Commonwealth's SIP was .84 ppb). But EPA inadequately accounted for Kentucky's reliance on the Agency's past advice. In fact, EPA found Kentucky's reliance "[il]legitimate." *See id.* at 9,373. That was arbitrary and capricious. *See Regents of the Univ. of Cal.*, 140 S. Ct. at 1913; *Encino Motorcars*, 579 U.S. at 222.

31

**1.** EPA's primary response is that the CAA does not "place[] EPA under an obligation to provide specific metrics to States before they undertake to fulfill their good neighbor obligations." Final SIP Disapprovals, 88 Fed. Reg. at 9,363 (quoting *EME Homer City*, 572 U.S. at 510). Fair enough, but that misses the point here. Consider the modeling data in EPA's March 2018 Memorandum. Under the CAA, EPA may stay silent and make States generate or acquire their own emissions modeling. But here, EPA spoke clearly, providing modeling data to Kentucky with the express intent of helping the Commonwealth evaluate its contributions. *See id.* at 9,339. Having done so, EPA must account for the reliance interests that its advice engendered. *See Encino Motorcars*, 579 U.S. at 222; *see also* Order, *Texas v. EPA*, No. 23-60069, Dkt. 269-2 at 20–21 (holding the same). The same goes for the threshold guidance in the August 2018 Memorandum. To hold otherwise would allow EPA to hoodwink regulated entities indiscriminately, but the CAA "does not allow the EPA to keep moving the finish line." *New York*, 964 F.3d at 1223.

Neither can EPA downplay the arbitrary and capricious nature of its "surprise switcheroo," *Env't Integrity Project*, 425 F.3d at 996, by claiming that its guidance documents were nonbinding. *See, e.g.*, Final SIP Disapprovals, 88 Fed. Reg. at 9,364, 9,373. "[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding . . . or is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation omitted). Here, both the March 2018 Memorandum and August 2018 Memorandum

32

expressly were "designed to assist states' efforts to develop good neighbor SIPs for the 2015 ozone NAAQS." JA76 (March 2018 Memorandum at 2); *see* JA98 (August 2018 Memorandum at 1). EPA even reaffirmed in October 2018 that States could use the March 2018 Memorandum's modeling data. JA107, 109 (October 2018 Memorandum at 2, 4). If more were needed, EPA went so far as to comment on Kentucky's proposed SIP, emphasizing its recommendation that Kentucky use the 1 ppb threshold. JA126 (EPA Comments on Kentucky's Pre-Submission SIP at 2). And in any event, agencies act arbitrarily when they depart without reasoning from even non-binding guidance that has induced reliance. *See Encino Motorcars*, 579 U.S. at 217–22 (reliance on opinion letters and field operations manuals); *Fox Tele. Stations*, 556 U.S. at 512, 517, 521 (reliance on staff rulings and FCC dicta).

**2.** EPA offers an alternative explanation for why its advice to use a 1 ppb screening threshold did not induce "legitimate reliance interest[s]." *See* Final SIP Disapprovals, 88 Fed. Reg. at 9,373. According to EPA, States did not incur compliance costs under the August 2018 Memorandum or invest many resources in making "state-specific arguments in support of a 1 ppb threshold." *Id.* That's because every State that relied on the August 2018 Memorandum's threshold recommendation allegedly "misunderst[ood]" EPA's position to be that a 1 ppb threshold was presumptively approvable. *Id.*

But there was no misunderstanding. In advising States how to craft their SIPs, EPA explained that a 1 ppb contribution screening threshold was "generally

comparable" with a stricter one-percent-of-the-NAAQS threshold. JA101 (August 2018 Memorandum at 4) (finding only a seven-percent nationwide gap between the standards). Thus, the Agency instructed States that "it may be reasonable and appropriate for [them] to use a 1 ppb contribution threshold." *Id.* And Kentucky relied on that representation, formulating its SIP around it.

EPA argues that Kentucky's reliance was unreasonable because the August 2018 Memorandum stated that its "guidance may not apply to the facts and circumstances underlying a particular SIP" and that "EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation." JA98 (*id.* at 1). That boilerplate language, EPA claims, meant that States had to provide "technical justification" and "compelling policy reason[s]" for merely following the Agency's guidance. Final SIP Disapprovals, 88 Fed. Reg. at 9,373, 9,374. But EPA has things backwards: the guidance itself justifies and recommends use of a 1 ppb threshold. *See* JA101 (August 2018 Memorandum at 4) (finding a minimal difference between using a 1 ppb threshold and a one-percent-of-the-NAAQS threshold); *supra* at 10 (collecting comments from EPA telling States to rely on the August 2018 Memorandum to justify using a 1 ppb threshold).[10] States that deviated from that recommendation likely would need to explain themselves, but it is illogical for EPA to issue guidance with a

_____

[10] In denying Kentucky's SIP, EPA determined that the gap between the two standards is only five percent nationwide. Final SIP Disapprovals, 88 Fed. Reg. at 9,374.

recommendation and then require States to justify following it. What would have been the point of the guidance in the first place?

In sum, Kentucky's reliance on EPA's repeated advice that a 1 ppb threshold would be approvable was not "[il]legimate." Final SIP Disapprovals, 88 Fed. Reg. at 9,373. The most logical reading of EPA's guidance is that it established a presumptively approvable threshold (1 ppb) that States could use to craft their SIPs, although state-specific reasons to depart from the guidance might exist. And Kentucky followed that guidance to craft its SIP. EPA's contrary reading of the guidance makes it meaningless. According to EPA, States were just as obligated to justify using a 1 ppb threshold as if the guidance had never been written. *See id.* at 9,372–74. And EPA's own reasoning— that a 1 ppb threshold was "generally comparable" to a one-percent-of-the-NAAQS threshold—was apparently insufficient justification for adopting that standard. *Id.* at 9,374 (claiming that the August 2018 Memorandum did not provide a "compelling basis" to adopt the 1 ppb threshold). It's unsurprising that few, if any, States read the guidance in such a self-defeating way. EPA's about-face, *see Fox Tele. Stations, Inc.*, 556 U.S. at 515, and its failure to account for States' "serious reliance interests" in its prior guidance, *see Regents of the Univ. of Cal.*, 140 S. Ct. at 1913, is arbitrary and capricious.

## III. EPA's engineered machinations to impose a FIP on Kentucky frustrate the CAA's cooperative-federalism structure.

EPA's disregard for the statutory deadline, its reliance on post-submission modeling data, and its reversal of prior guidance were all calculated toward one end: usurping

35

the primary role Congress gave to Kentucky so that EPA could unilaterally impose a FIP on the Bluegrass State. After all, while EPA was disapproving Kentucky's SIP on obviously deficient grounds, it was simultaneously drafting a FIP to immediately impose on Kentucky. *Supra* Section II.D. Indeed, even after this Court administratively stayed EPA's SIP disapproval, EPA charged forward with publishing a FIP for Kentucky. Final Omnibus FIP, 88 Fed. Reg. at 36,654. Only later did EPA issue an interim final rule staying the Kentucky FIP's effect. Interim Final Rule, 88 Fed. Reg. at 49,295.

Taken together, all this conduct frustrates the "model of cooperative federalism" central to the CAA. *See Sierra Club v. Korleski*, 681 F.3d 342, 343 (6th Cir. 2012) (citation omitted). And because courts may invalidate agency action that is "inconsistent with the statutory mandate or that frustrate[s] the policy that Congress sought to implement," *Lansing Dairy*, 39 F.3d at 1350 (quoting *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32 (1981)), EPA's disapproval of Kentucky's SIP should be set aside on this further ground.

As outlined above, the CAA assigns the States "primary responsibility" for ensuring that their ambient air meets the NAAQS. *See* 42 U.S.C. § 7407(a). The CAA gives States "broad authority . . . to determine the methods and particular control strategies they will use to achieve the statutory requirements." *BCCA Appeal Grp.*, 355 F.3d at 822. On the other hand, EPA's "overarching role is in setting standards, not in implementation." *Michigan*, 268 F.3d at 1083. Thus, at the SIP stage, EPA plays only a "secondary role" to review the SIP for compliance with the CAA. *Train*, 421 U.S. at 79. If

the SIP meets the statutory requirements, EPA *must* approve it. *See* 42 U.S.C. § 7410(k)(3).

As the Fifth Circuit explained, "EPA does not possess any discretionary authority in th[e] [SIP-approval] process. Only the states enjoy discretion in implementing the dictates of the [CAA]." Order, *Texas v. EPA*, No. 23-60069, Dkt. 269-2 at 16 (citation omitted). And "[o]nly if the state has not complied with the requirements of the Clean Air Act does EPA assume the role of primary regulator by drafting a [FIP]." *Texas*, 829 F.3d at 412. This cooperative-federalism structure "reflects the balance of state and federal rights and responsibilities characteristic of our federal system of government" and "indicates a congressional preference that states, not EPA, drive the regulatory process." *Id.* at 411 (citation omitted).

Here, EPA did more than ignore the balance that Congress struck. It made move after move to circumvent Congress's intent, all in order to box out Kentucky and impose a top-down FIP. EPA's conduct can be understood no other way. *See Kentucky v. Biden*, 23 F.4th 585, 609 n.15 (6th Cir. 2022) (Courts are "not required to exhibit a naiveté from which ordinary citizens are free." (quoting *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019))). And EPA cannot act "'inconsistent with [its] statutory mandate or . . . frustrate the policy that Congress sought to implement.'" *Lansing Dairy*, 39 F.3d at 1350 (citation omitted).

When EPA revised the ozone NAAQS, it triggered Kentucky's obligation to revise its SIP, 42 U.S.C. § 7410(a)(1), which Kentucky did. JA129–469 (Kentucky SIP).

Following EPA's advice, Kentucky determined that its plan satisfied the CAA's inter-state-transport requirements. JA178 (*id.* at 45). Despite having at most 18 months to approve or disapprove the SIP, 42 U.S.C. § 7410(k)(1)–(3), EPA did not act on Kentucky's submission until almost two years after the statutory deadline had passed. Proposed Kentucky SIP Disapproval, 87 Fed. Reg. at 9,498. By then, EPA had accumulated new data and developed a new modeling platform, and the Agency had reimagined its pre-submission threshold guidance to say something other than what it says. *Id.* at 9,501, 9,509–10. Using the information derived from its new data set and its new contribution-threshold requirement, EPA disapproved Kentucky's SIP. *Id.* at 9,515.

While EPA was busy moving the goal posts it established for Kentucky's SIP, it was also getting a two-year head start on imposing a FIP on Kentucky. Indeed, EPA showed no appetite for working with the Commonwealth. When EEC pointed out that Kentucky's SIP could not have possibly considered EPA's new data and asked for an opportunity to address it in a SIP call, JA514 (EEC Comment Letter at 2), EPA had none of it. According to EPA, nothing—not its statutory deadline, not its advice to Kentucky, and not its past policy on post-submission data—prohibits the Agency from "taking rulemaking action using the best information available to it at the time it takes such action." Final SIP Disapprovals, 88 Fed. Reg. at 9,366. And although EPA delayed nearly two years in acting on Kentucky's SIP, EPA acted with lightning speed (uncharacteristic for the government) in imposing the Kentucky FIP—indeed, roughly two years early. *See* 42 U.S.C. § 7410(c). And EPA was so eager to impose top-down

regulation on Kentucky that not even this Court's administrative stay stopped it from publishing the Kentucky FIP, which it followed up with a band-aid interim final rule. *See* Interim Final Rule, 88 Fed. Reg. at 49,297.

Upholding EPA's SIP disapproval under these circumstances would render the CAA's cooperative-federalism structure meaningless. "EPA may not use its own delay as an excuse for imposing burdens" on Kentucky that the CAA "does not permit." *See Texas*, 829 F.3d at 430. Allowing EPA to second-guess Kentucky's technical analysis based on data that became available after the Commonwealth's SIP-revision deadline would all but eliminate Kentucky's "'wide discretion' in formulating [its SIP]" and "transform the EPA's statutory role from that of a 'ministerial' overseer to one of a freewheeling dictatorial regulator.'" Order, *Texas v. EPA*, No. 23-60069, Dkt. 269-2 at 3, 22 (citation omitted). Yet nothing in the Act "suggests that the agency has some overarching jurisdiction to implement federal programs," much less "default . . . jurisdiction, authority, or power." *Michigan*, 268 F.3d at 1083. Instead, the Act relegates EPA "to a secondary role" at the SIP stage. *Train*, 421 U.S. at 79. EPA's failure to account for this "relevant factor[]," *State Farm*, 463 U.S. at 43, and its machinations to frustrate the CAA's cooperative-federalism structure, *see generally Lansing Dairy*, 39 F.3d at 1350, were classic arbitrary and capricious behaviors designed to impose a FIP on Kentucky at the earliest possible moment.

39

## CONCLUSION

The Court should grant the petition for review and vacate EPA's disapproval of

Kentucky's SIP.

Respectfully submitted by,

*s/ Matthew F. Kuhn*
Russell Coleman                           Office of the Kentucky Attorney General
 *Attorney General of Kentucky*       700 Capital Avenue, Suite 118
Matthew F. Kuhn                           Frankfort, Kentucky 40601
 *Solicitor General*                           (502) 696-5300
                                                          Matt.Kuhn@ky.gov

*Counsel for the Commonwealth of Kentucky*

## CERTIFICATE OF COMPLIANCE

I certify that this 9,978-word brief complies with the type-volume limitation in the Court's August 18, 2023 Order because combined with the brief filed by EEC in *Kentucky Environment & Energy Cabinet v. EPA*, No. 23-3225 (6th Cir.), Petitioners have not exceeded 22,000 words, excluding the parts of the briefs exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Garamond font using Microsoft Word.

*s/ Matthew F. Kuhn*

**CERTIFICATE OF SERVICE**

I certify that on January 25, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*s/ Matthew F. Kuhn*

# ADDENDUM

The Commonwealth designates the following documents as relevant to this administrative appeal:

1. March 2018 Memorandum (JA75–94);

2. August 2018 Memorandum (JA98–105);

3. October 2018 Memorandum (JA106–10);

4. EPA Comments on Kentucky's Pre-Submission SIP (JA124–28);

5. Kentucky's SIP (JA129–469);

6. 2016v2 Modeling (JA470–509);

7. Comment Letter, Kentucky's Energy & Environment Cabinet (JA511–15);

8. 2016v3 Modeling (JA516–71);

9. Air Plan Disapproval; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards, 88 Fed. Reg. 9,336 (Feb. 13, 2023) (JA1–49);

10. Petition for Review (JA69–71); and

11. Goffman Memorandum (JA885)