Case Nos. 23-3216, 23-3225

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

COMMONWEALTH OF KENTUCKY (No. 23-3216),
KENTUCKY ENERGY & ENVIRONMENT CABINET (No. 23-3225),
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

Petition for Review of Final Agency Action of the
United States Environmental Protection Agency

**RESPONDENTS' BRIEF**
(Deferred Appendix Appeal)

TODD KIM
*Assistant Attorney General*

Of Counsel:

ROSEMARY HAMBRIGHT KABAN
DANIEL P. SCHRAMM
JEANHEE HONG
U.S. Environmental Protection Agency

JEFFREY HAMMONS
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7611
Washington, D.C. 20044
(202) 598-6925
Jeffrey.Hammons@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY................................................................................... xiii

STATEMENT ON ORAL ARGUMENT ...............................................1

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION.....................................................3

STATEMENT OF THE ISSUES..........................................................3

STATEMENT OF THE CASE.............................................................3

I.     Legal Background.................................................................3

       A.     National Ambient Air Quality Standards for Ozone and
              Attainment Areas.......................................................3

       B.     State Implementation Plans.........................................5

       C.     The Good Neighbor Provision ....................................6

              1.     EPA's Past Rulemakings Related to the Good
                     Neighbor Provision ..........................................7

              2.     EPA's 4-Step Framework for Evaluating Good
                     Neighbor State Implementation Plans ....................10

II.    Factual Background ...........................................................14

       A.     Modeling for the 2015 Ozone Standard. ............................14

       B.     2018 Memoranda.....................................................19

       C.     Kentucky's Submission..............................................20

       D.     EPA's Disapproval ..................................................22

III.    Procedural Background ...................................................27

SUMMARY OF ARGUMENT ................................................28

STANDARD OF REVIEW ....................................................30

ARGUMENT ..........................................................................31

I.    Venue Lies Exclusively in the D.C. Circuit. ...................31

    A.    The Disapproval is Nationally Applicable. ..........................32

    B.    EPA Properly Found and Published that the Disapproval
        is Based on Determinations of Nationwide Scope or
        Effect. ..................................................................42

        1.    EPA's Finding is Supported by the Record and
            Warrants Deference.................................................43

        2.    The July Order Misconstrues the Clean Air Act. ...................50

II.    EPA Must Disapprove a State Implementation Plan That Does
    Not Meet the Clean Air Act's Requirements. .................................53

III.    Petitioners' Arguments on the Screening Threshold and
    Updated, State-of-the-Science Modeling Are Unavailing. ..........................56

    A.    EPA Rested its Disapproval on Independent Grounds that
        Petitioners Have Not Challenged, So Any Error Would
        Be Harmless. ..................................................57

        1.    Kentucky's Submission Did Not Justify Treating
            Maintenance Receptors Differently than
            Nonattainment Receptors.......................................59

        2.    Local Emission Sources Do Not Alleviate
            Kentucky's Obligations. .........................................60

        3.    Kentucky's Claimed Existing Emission Reductions
            Did Not Demonstrate Compliance with Good
            Neighbor Provision. ................................................63

B.   EPA's Rejection of Kentucky's 1 ppb Screening
Threshold Was Reasonable. ...............................................68

    1.   EPA Applied the Threshold Memo Correctly. .........................68

    2.   The Threshold Memo Was Not "Longstanding"
Policy From Which Reliance Interests Could Flow. ...............72

C.   EPA's Consideration of Best Available Information Was
Reasonable...........................................................................75

    1.   Under the Administrative Procedure Act, EPA
Cannot Simply Ignore the State-of-the-Science
2016-based Modeling.................................................................75

    2.   EPA's Consideration of the State-of-the-Science
2016-based Modeling is Supported by the Clean
Air Act and the Good Neighbor Provision. .............................79

    3.   Case Law Cited by Petitioners Is Inapposite. ..........................84

    4.   There Was No "Longstanding" Policy Prohibiting
EPA From Considering Updated Modeling. ............................88

    5.   There Was No Reliance Interest Regarding EPA's
2011-based Modeling.................................................................92

IV.   If The Court Determines That EPA Erred, It Should Remand
But Not Vacate the Disapproval.....................................................94

CONCLUSION ...................................................................................97

CERTIFICATE OF COMPLIANCE.........................................................99

CERTIFICATE OF SERVICE ................................................................100

STATUTORY AND REGULATORY ADDENDUM ........................................101

# TABLE OF AUTHORITIES

## CASES

*1000 Friends of Md. v. Browner,*
 265 F.3d 216 (4th Cir. 2001) ....................................................................80

*Alcoa, Inc. v. EPA,*
 No. 04-1189, 2004 WL 2713116 (D.C. Cir. Nov. 24, 2004)..................47

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
 998 F.2d 146 (D.C. Cir. 1993) ............................................................95, 96

*Ariz. ex rel. Darwin v. EPA,*
 815 F.3d 519 (9th Cir. 2016) ....................................................................54

*Ass'n of Irritated Residents v. EPA,*
 686 F.3d 668 (9th Cir. 2012) ..............................................................79, 80

*ATK Launch Sys., Inc. v. EPA,*
 651 F.3d 1194 (10th Cir. 2011) .............................. 32, 34, 35, 36, 41, 42

*ATK Launch Sys., Inc. v. EPA,*
 669 F.3d 330 (D.C. Cir. 2012) ..................................................................80

*Barnhart v. Peabody Coal Co.,*
 537 U.S. 149 (2003)....................................................................................81

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA,*
 72 F.4th 284 (D.C. Cir. 2023).......................................................77, 83, 84

*Breeze Smoke, LLC v. FDA,*
 18 F.4th 499 (6th Cir. 2021) .........................................70, 73, 74, 75, 90

*Calumet Shreveport Refining, LLC. v. EPA,*
 No. 22-60266, 2023 WL 8102586 (5th Cir. Nov. 22, 2023) ..........40, 41, 47, 52, 53

*Catawba Cnty. v. EPA,*
 571 F.3d 20 (D.C. Cir. 2009) ....................................................................77

*Cnty. of Los Angeles v. Shalala*,
  192 F.3d 1005 (D.C. Cir. 1999) .......................................................76, 77

*Dalton Trucking, Inc. v. EPA*,
  808 F.3d 875 (D.C. Cir. 2015) ........................................................42, 47

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ...........................................................................73

*Dist. Hosp. Partners, L.P. v. Burwell*,
  786 F.3d 46 (D.C. Cir. 2015) ................................................................76

*Dressman v. Costle*,
  759 F.2d 548 (6th Cir. 1985) .................................................................30

*EME Homer City Generation, L.P. v. EPA*,
  696 F.3d 7 (D.C. Cir. 2012) ....................................................................8

*EME Homer City Generation, L.P. v. EPA*,
  795 F.3d 118 (D.C. Cir. 2015) ....................................................9, 10, 39

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ............. 5, 6, 7, 8, 10, 11, 12, 13, 14, 26, 48, 53, 55, 62, 89, 97

*Exelon Wind 1, L.L.C. v. Nelson*,
  766 F.3d 380 (5th Cir. 2014) ................................................................47

*Gen. Motors Corp. v. United States*,
  496 U.S. 530 (1990) .........................................................................81, 82

*Greenbaum v. EPA*,
  370 F.3d 527 (6th Cir. 2004) .................................................................31

*Hearth, Patio & Barbecue Ass'n v. EPA*,
  11 F.4th 791 (D.C. Cir. 2021) ...............................................................76

*Hercules, Inc. v. EPA*,
  598 F.2d 91 (D.C. Cir. 1978) .................................................................56

*Ky. Res. Council, Inc. v. EPA,*
  467 F.3d 986 (6th Cir. 2006) ...................................... 31, 54, 60, 63, 66, 72, 79, 93

*Maryland v. EPA,*
  958 F.3d 1185 (D.C. Cir. 2020) ......................................25, 62, 77, 83, 95

*Michigan v. EPA,*
  213 F.3d 663 (D.C. Cir. 2000) .............................................................7, 8

*Michigan Dep't of Envtl. Quality v. Browner,*
  230 F.3d 181 (6th Cir. 2000) ...................................... 57, 63, 67, 79, 80, 81, 85, 97

*Midwest Ozone Grp. v. EPA,*
  61 F.4th 187 (D.C. Cir. 2023) ........................................................10, 40

*Miss. Comm'n on Env't Quality v. EPA,*
  790 F.3d 138 (D.C. Cir. 2015) ............................................................4, 7

*Mont. Sulphur & Chem. Co. v. EPA,*
  666 F.3d 1174 (9th Cir. 2012) ................................................................82

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)........................................................................76, 80

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA,*
  891 F.3d 1041 (D.C Cir. 2018) ................................................................47

*Nat. Res. Def. Council v. Wheeler,*
  955 F.3d 68 (D.C. Cir. 2020) ................................................................96

*New York v. EPA,*
  964 F.3d 1214 (D.C. Cir. 2020) ................................................................87

*Nielsen v. Preap,*
  139 S. Ct. 954 (2019)........................................................................51

*North Carolina v. EPA,*
  531 F.3d 896 (D.C. Cir. 2008)..........................................................8, 11, 12, 60, 82

*North Carolina v. EPA,*
  550 F.3d 1176 (D.C. Cir. 2008) ................................................................98

*North Dakota v. EPA,*
  730 F.3d 750 (8th Cir. 2013) ..............................................................54, 55

*N. Ohio Lung Ass'n v. E.P.A.,*
  572 F.2d 1143 (6th Cir. 1978) ................................................................30

*NRDC v. EPA,*
  512 F.2d 1351, 1357 (D.C. Cir. 1975) ....................................................38

*NRDC v. Thomas,*
  838 F.2d 1224 (D.C. Cir. 1988) ........................................................37, 38

*Oklahoma v. EPA,*
  723 F.3d 1201 (10th Cir. 2013) ....................................................6, 55, 82

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) ..........................................................................39, 94

*Ramos v. Louisiana,*
  140 S. Ct. 1390 (2020) ..........................................................................94

*R.E. Dailey & Co. v. John Madden Co.,*
  983 F.2d 1068 (table), 1992 WL 405282 (6th Cir. Dec. 15, 1992) ......................32

*RMS of Ga., LLC v. EPA,*
  64 F.4th 1368 (11th Cir. 2023) ..............................................33, 34, 36

*St. Marys Cement Inc. v EPA,*
  782 F.3d 280 (6th Cir. 2015) ..........................................30, 31, 68, 79

*Sierra Club v. EPA,*
  294 F.3d 155 (D.C. Cir. 2002) ................................................................83

*Sierra Club v. EPA,*
  926 F.3d 844 (D.C. Cir. 2019) ................................................................42

*Sierra Club v. EPA (Sierra Club 2004)*,
  356 F.3d 296 (D.C. Cir. 2004) ........................................................85, 86

*Sierra Club v. EPA (Sierra Club 2012)*,
  671 F.3d 955 (9th Cir. 2012) ....................................................76, 79, 86

*Sierra Club v. EPA (Sierra Club 2019)*,
  939 F.3d 649 (5th Cir. 2019) ..........................................................57, 69

*Sierra Club v. EPA (Sierra Club 2023)*,
  60 F.4th 1008 (6th Cir. 2023) .........................................................95, 96

*Sierra Club v. Slater*,
  120 F.3d 623 (6th Cir. 1997) ................................................................31

*Solenex LLC v. Bernhardt*,
  962 F.3d 520 (D.C. Cir. 2020) .............................................................95

*S. Ill. Power Coop. v. EPA*,
  863 F.3d 666 (7th Cir. 2017) ........................................... 32, 33, 34, 35, 36, 41, 42

*Texas v. EPA (Texas 2011)*,
  No. 10-60961, 2011 WL 710598 (5th Cir. Feb. 24, 2011) ...............................38, 46

*Texas v. EPA (Texas 2016)*,
  829 F.3d 405 (5th Cir. 2016) .......................................33, 40, 44, 45, 47

*Texas v. EPA*,
  983 F.3d 826 (5th Cir. 2020) ................................................................43

*Texas Oil & Gas Ass'n v. EPA*,
  161 F.3d 923 (5th Cir. 1998) ................................................................40

*Thomas v. Cohen*,
  304 F.3d 563 (6th Cir. 2002) ................................................................39

*Train v. NRDC*,
  421 U.S. 60 (1975) ..............................................................................4

*Union Elec. v. EPA,*
  427 U.S. 246 (1976) ............................................................4, 5, 54

*Wallace v. FedEx Corp,*
  764 F.3d 571 (6th Cir. 2014) ......................................................32

*W. Va. Chamber of Com. v. Browner,*
  166 F.3d 336 (Table), 1998 WL 827315 (4th Cir. 1998) ......................41

*Westar Energy, Inc. v. EPA,*
  608 F. App'x 1 (D.C. Cir. 2015) .....................................10, 39, 62, 66, 72

*Wisconsin v. EPA,*
  938 F.3d 303 (D.C. Cir. 2019) ........... 6, 9, 12, 61, 62, 67, 81, 82, 83, 84, 86, 97, 98

*Wynnewood Refining Co. v. EPA,*
  --- F.4th ---, 2023 WL 8102583 (Nov. 22, 2023) ....................................53

*Zen Magnets, LLC v. Consumer Prod. Safety Comm'n,*
  841 F.3d 1141 (10th Cir. 2016) ...................................................77

**STATUTES**

5 U.S.C. § 706 ..............................................................................31

42 U.S.C. § 7401(b)(1) ..................................................................3, 4

42 U.S.C. §§ 7401-7515 ................................................................6

42 U.S.C. § 7407(d) ......................................................................4

42 U.S.C. § 7409(b)(1) ..................................................................4

42 U.S.C. § 7410(a) ......................................................................5

42 U.S.C. § 7410(a)(1) ..................................................................6

42 U.S.C. § 7410(a)(2)(D) ................................................6, 11, 14, 55, 67

42 U.S.C. § 7410(a)(2)(D)(i)............................................................11, 12, 13, 82

42 U.S.C. § 7410(a)(2)(D)(i)(I) ........................................6, 12, 13, 54, 60

42 U.S.C. § 7410(c)(1) ...................................................................................5

42 U.S.C. § 7410(k)(1) ...................................................................................5

42 U.S.C. § 7410(k)(1)(B) ..............................................................................5

42 U.S.C. § 7410(k)(2) .................................................................................81

42 U.S.C. § 7410(k)(3) ................................................................5, 54, 56, 80

42 U.S.C. § 7410(k)(4) .................................................................................92

42 U.S.C. § 7410(k)(5) ...................................................................................7

42 U.S.C. § 7410(i) .........................................................................................5

42 U.S.C. § 7410(*l*) ................................................................................5, 54

42 U.S.C. § 7413 .............................................................................................5

42 U.S.C. § 7426 ...........................................................................................87

42 U.S.C. § 7426(b)-(c) ..............................................................................6, 7

42 U.S.C. §§ 7501-15 .....................................................................................4

42 U.S.C. § 7502(b) ......................................................................................85

42 U.S.C. § 7502(c)(3)...............................................................85, 86, 89, 91

42 U.S.C. § 7607(b)(1)............................ 1, 3, 28, 32, 36, 38, 39, 42, 43, 44, 51, 52

**CODE OF FEDERAL REGULATIONS**

40 C.F.R. pt. 50, App. U 1(c)......................................................................12

40 C.F.R. pt. 50, App. U 4 ................................................................12

40 C.F.R. Part 52 ................................................................................37

40 C.F.R. Part 81 ................................................................................37

**FEDERAL REGISTER**

41 Fed. Reg. 56767 (Dec. 30, 1976) ..................................................46

63 Fed. Reg. 57356 (Oct. 27, 1998) .....................................................8

68 Fed. Reg. 19106 (Apr. 17, 2003) ..............................................91, 92

70 Fed. Reg. 25162 (May 12, 2005) .....................................................8

76 Fed. Reg. 48208 (Aug. 8, 2011) ......................................................8

81 Fed. Reg. 38957 (June 15, 2016) ..............................................90, 91

81 Fed. Reg. 45039 (July 12, 2016) ....................................................37

81 Fed. Reg. 53284 (Aug. 12, 2016) ..............................................91, 92

81 Fed. Reg. 74504 (Oct. 26, 2016) ...........................................9, 90, 91

83 Fed. Reg. 25776 (June 4, 2018) .....................................................19

83 Fed. Reg. 33730 (July 17, 2018) ....................................................90

84 Fed. Reg. 24712 (May 29, 2019) ...................................................92

85 Fed. Reg. 68964 (Oct. 30, 2020) ...................................................90

86 Fed. Reg. 23054 (Apr. 30, 2021) .....................................9, 10, 16, 90

86 Fed. Reg. 31645 (June 15, 2021) ...................................................91

86 Fed. Reg. 43960 (Aug. 11, 2021) ...................................................91

86 Fed. Reg. 67329 (Nov. 26, 2021) ........................................................92

87 Fed. Reg. 9498 (Feb. 22, 2022) ...................... 15, 20, 22, 23, 24, 25, 26, 59, 60,
.................................................... 61, 62, 63, 65, 66, 67, 68, 71, 88

87 Fed. Reg. 31495 (May 24, 2022) ........................................................84

87 Fed. Reg. 60897 (Oct. 7, 2022) ........................................................19

88 Fed. Reg. 9336 (Feb. 13, 2023) ...... 10, 11, 12, 13, 14, 15, 16, 22, 23, 24, 25, 26,
.................................................... 27, 33, 35, 37, 39, 42, 43, 44, 45, 46, 48, 56,
.................................................... 60, 61, 62, 63, 64, 65, 66, 67, 68, 73, 74, 75,
.................................................... 76, 78, 79, 81, 82, 83, 84, 87, 88, 89, 94, 95,

88 Fed. Reg. 10464 (Feb. 21, 2023) ........................................................92

88 Fed. Reg. 36654 (June 5, 2023) ...........................................27, 97, 98

88 Fed. Reg. 54998 (Aug. 14, 2023) ........................................................84

# GLOSSARY

| | |
|---|---|
| Disapproval | "Air Plan Disapprovals; Interstate Transport of Air Pollution for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 88 Fed. Reg. 9336 (Feb. 13, 2023), JA1. |
| EPA | U.S. Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| Good Neighbor Provision | 42 U.S.C. § 7410(a)(2)(D)(i)(I). |
| KY Br. | Merits Brief of the Commonwealth of Kentucky, Case No. 23-3216 (filed Oct. 10, 2023) |
| KY EEC Br. | Brief of Petitioner Kentucky Energy and Environment Cabinet, Case No. 23-3225 (filed Oct. 11, 2023) |
| NAAQS | National Ambient Air Quality Standards |
| $NO_X$ | Nitrogen oxides |
| ppb | Parts per billion (unit of measurement) |
| Proposal | "Air Plan Disapproval; Kentucky; Interstate Transport Requirements for the 2015 8-Hour Ozone National Ambient Air Quality Standards," 87 Fed. Reg. 9498 (Feb. 22, 2022), JA50. |
| SIP | State Implementation Plan |
| Submission | Kentucky Infrastructure State Implementation Plan for 2015 Ozone National Ambient Air Quality Standards, EPA-R04-OAR-2021-0841-0008 (Jan. 11, 2019), JA129. |
| VOCs | Volatile organic compounds |

## STATEMENT ON ORAL ARGUMENT

Respondent EPA believes that oral argument would aid the Court's consideration of this case.

## INTRODUCTION

Air pollution is heedless of state boundaries. To ensure that one state's pollution does not inhibit another state's ability to meet health-based air quality standards, Congress enacted the Clean Air Act's Good Neighbor Provision. That provision prohibits a state's emissions from significantly contributing to any other state's nonattainment of National Ambient Air Quality Standards, including the 2015 Ozone Standard, or interfering with any state's ability to maintain air quality meeting those standards. The Act required Kentucky to submit a plan for EPA's approval that meets the requirements of the Good Neighbor Provision, but Kentucky's submission concluded it had no obligation to reduce its emissions even though it was linked to air quality problems in downwind states. Because Kentucky's submission provided no cogent analysis to support its conclusions, EPA could not approve it.

To begin, the Clean Air Act's venue provision directs these petitions to the D.C. Circuit because EPA's Disapproval is either nationally applicable or, if locally or regionally applicable, is based on at least one determination of nationwide scope or effect. *See* 42 U.S.C. § 7607(b)(1). The Disapproval applies to 21 states and is thus nationally applicable. And it is based on many legal, policy, and technical determinations of nationwide scope or effect, as EPA found and published. This Court should transfer this case to the D.C. Circuit.

If venue is proper here, this Court should deny the petitions. EPA can only approve state submissions that meet the requirements of the Good Neighbor Provision, and Kentucky's submission does not. Petitioners argue that EPA should have used Kentucky's preferred screening threshold, but that ultimately does not matter because under either modeling platform developed by EPA – the 2011-based modeling Kentucky relied on or the updated 2016v3 modeling – Kentucky is still linked to at least one downwind receptor above its preferred screening threshold.

Kentucky also contests EPA's use the most up-to-date, state-of-the-science 2016v3 modeling and recent data from monitoring sites. Not only is considering the best available information not arbitrary and capricious, but this too does not matter because Kentucky is linked to downwind air quality problems under either the 2011-based or 2016v3 modeling. EPA has a longstanding policy of considering the best available information when evaluating Good Neighbor obligations because the Good Neighbor provision is concerned with whether upwind states "will" significantly contribute to downwind air quality problems. Kentucky's arguments to the contrary lack merit.

EPA could not approve Kentucky's submission because Kentucky is linked to downwind air quality problems and the submission failed to provide adequate analysis of whether and to what extent its emissions "significantly contribute" to

2

other states' ozone problems. Petitioners' focus on two issues that are not dispositive leave EPA's many other reasons for disapproval unrebutted, so any potential error on those two issues is harmless. The Disapproval should be upheld.

## STATEMENT OF JURISDICTION

The Disapproval constitutes final agency action subject to judicial review pursuant to 42 U.S.C. § 7607(b)(1), and Petitioners timely filed their petitions for judicial review. But the petitions should be transferred to the D.C. Circuit pursuant to 42 U.S.C. § 7607(b)(1). *Infra* ARGUMENT § I.

## STATEMENT OF THE ISSUES

1.      Whether venue lies exclusively in the D.C. Circuit under 42 U.S.C. § 7607(b)(1).

2.      Whether EPA's disapproval of Kentucky's submission is arbitrary, capricious, or not otherwise in accordance with law when Kentucky was contributing to downwind air quality problems even under Kentucky's preferred screening threshold and air quality modeling.

## STATEMENT OF THE CASE

### I.  Legal Background

#### A.      National Ambient Air Quality Standards for Ozone and Attainment Areas

The Clean Air Act seeks "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare" and to control air

pollution through a system of shared federal and state responsibility. 42 U.S.C.
§ 7401(b)(1). The Act, as amended, reflects "sharply increased federal authority"
following "congressional dissatisfaction with the progress of existing air pollution
programs and a determination to . . . guarantee the prompt attainment and
maintenance of specified air quality standards." *Train v. NRDC*, 421 U.S. 60, 64
(1975); *Union Elec. v. EPA*, 427 U.S. 246, 249 (1976).

The Clean Air Act directs EPA to set National Ambient Air Quality
Standards ("NAAQS") for specific pollutants, including ozone, at levels requisite
to protect public health and welfare. 42 U.S.C. § 7409(b)(1). EPA then must
designate areas as being in "attainment," "nonattainment," or "unclassifiable" for
each standard *Id*. § 7407(d). Failure to meet attainment deadlines leads to areas
being reclassified to higher classifications and more stringent requirements. *Id*.
§§ 7501-15.

Ozone at ground level (commonly known as smog) is harmful to public
health and welfare—it "can cause lung dysfunction, coughing, wheezing, shortness
of breath, nausea, respiratory infection" and widely affects "trees, vegetation, and
crops." *Miss. Comm'n on Env't Quality v. EPA* (*MCEQ*), 790 F.3d 138, 147 (D.C.
Cir. 2015) (quotation omitted). To sufficiently protect public health and welfare,
EPA has strengthened the NAAQS for ozone multiple times, most recently in 2015

by setting the standard to 70 ppb. 80 Fed. Reg. 65292 (Oct. 26, 2015) ("2015 Ozone Standard").

### B.    State Implementation Plans

All states bear the initial responsibility to adopt State Implementation Plans ("SIPs") that are adequate to implement, maintain, and enforce the NAAQS. 42 U.S.C. § 7410(a). States must submit SIPs for EPA's review and approval within three years of the promulgation or revision of a NAAQS. *Id.* The Clean Air Act places "primary responsibility for formulating pollution control strategies" on states and subjects states "to strict minimum compliance requirements" to attain the NAAQS. *Union Elec.*, 427 U.S. at 256-57. Once a state submits a SIP deemed complete either by EPA or by operation of law, EPA reviews it for compliance with the Clean Air Act. 42 U.S.C. § 7410(k)(1)(B), (k)(3).

EPA can only approve a SIP if it meets the Clean Air Act's applicable requirements. *Id*. § 7410(k)(3). If approved, the SIP becomes federally enforceable and cannot be modified except by EPA's approval of a revision. *Id.* §§ 7410(i), (*l*), 7413. If EPA finds that a state either failed to submit a complete plan under Section 7410(k)(1) or disapproves it because it did not meet the Act's applicable requirements under Section 7410(k)(3), EPA must promulgate a Federal Implementation Plan ("FIP") within two years, *id*. § 7410(c)(1) and need not "postpone its action even a single day." *EPA v. EME Homer City Generation, L.P.*,

572 U.S. 489, 509 (2014); *see also Oklahoma v. EPA*, 723 F.3d 1201, 1223 (10th Cir. 2013).

Unless the Clean Air Act specifies, EPA need not provide guidance or specifically define the Act's applicable requirements for states. *EME Homer*, 572 U.S. at 510. Nor is EPA required to provide states with opportunities to correct a deficient SIP before issuing a FIP. *Id*. at 509.

### C.    The Good Neighbor Provision

Congress enacted the Good Neighbor Provision to hold upwind states accountable for their fair share of emissions reductions so that downwind states do not bear the sole burden of attaining and maintaining the NAAQS. 42 U.S.C. § 7410(a)(2)(D)(i)(I); *EME Homer*, 572 U.S. at 496-99.

Under the Good Neighbor Provision, states must submit a SIP that contains "adequate provisions" that "prohibit[]" in-state emissions from "any source or other type of emissions activity" that "will" "contribute significantly to nonattainment" or "interfere with maintenance" of NAAQS in other states. 42 U.S.C. § 7410(a)(1), (2)(D). The Clean Air Act does not define the terms "contribute significantly" or "interfere with maintenance," though it does require that the Good Neighbor Provision be implemented consistent with Title I of the Act (42 U.S.C. §§ 7401-7515). *See Wisconsin v. EPA*, 938 F.3d 303, 315-16 (D.C. Cir. 2019).). Separately, section 126 of the Clean Air Act provides EPA authority

to directly enforce the Good Neighbor Provision against sources upon granting the petition of a downwind jurisdiction. 42 U.S.C. § 7426(b)-(c).

The Good Neighbor Provision is important for ozone because ozone travels great distances, subject to "the vagaries of the wind." *EME Homer*, 572 U.S. at 497. Ozone and its precursors, primarily $NO_X$ and VOCs, "travel easily through the atmosphere, which can result in NAAQS violations hundreds of miles away from the source of the ozone precursors." *MCEQ*, 790 F.3d at 147.

### 1.   EPA's Past Rulemakings Related to the Good Neighbor Provision

"Over the past 50 years, Congress has addressed interstate air pollution several times and with increasing rigor." *EME Homer*, 572 U.S. at 497. The current Good Neighbor Provision evolved from earlier versions that relied on states' cooperation, which proved ineffective. *Id.* at 497-99. Even under the current, more prescriptive Good Neighbor Provision, many states still failed to submit or adopt plans containing adequate provisions addressing their Good Neighbor obligations, including for ozone, leading to successive rounds of rulemaking and judicial decisions.

In 2000, the D.C. Circuit affirmed EPA's 1998 $NO_X$ SIP Call, including the use of cost as part of the determination of significant contribution, and upheld EPA's ability to set $NO_X$ budgets under the authority of 42 U.S.C. § 7410(k)(5) notwithstanding a state's authority to develop SIPs. *Michigan v. EPA*, 213 F.3d

663, 674-79, 685-88 (D.C. Cir. 2000) (per curiam); 63 Fed. Reg. 57356 (Oct. 27, 1998) ("NO$_X$ SIP Call," addressing the 1979 ozone standard).

In 2008, the D.C. Circuit invalidated EPA's next Good Neighbor rule, the Clean Air Interstate Rule, holding that EPA (and states) must align Good Neighbor emission reductions with attainment dates faced by downwind areas, that EPA (and states) must give independent effect to the Clean Air Act's "interference with maintenance" clause, and that each state must eliminate its own significant contribution to nonattainment or interference with maintenance. *North Carolina v. EPA*, 531 F.3d 896, 909-12, 920-21 (D.C. Cir. 2008); 70 Fed. Reg. 25162 (May 12, 2005) ("Clean Air Interstate Rule," addressing the 1997 ozone standard).

In 2011, EPA replaced the Clean Air Interstate Rule with the Transport Rule. 76 Fed. Reg. 48208 (Aug. 8, 2011) ("Transport Rule," addressing the 1997 ozone standard). In that rule, to comply with the holdings in *North Carolina,* EPA made "error corrections" converting its earlier approval of 22 states' submissions into disapprovals and promulgated FIPs for 27 states. *Id.* at 48220-22. The D.C. Circuit vacated the Transport Rule and held that EPA must define Good Neighbor obligations and allow states to submit approvable SIP before promulgating a FIP. *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 30-31 (D.C. Cir. 2012).

In 2014, the Supreme Court rejected the D.C. Circuit's holding and reversed. *EME Homer*, 572 U.S. at 496. The Supreme Court held that EPA is not obligated

to first define Good Neighbor obligations for states before acting on SIPs or promulgating FIPs and that EPA need not wait a single day to promulgate FIPs after disapproving states' SIPs. *Id.* at 509-10. The Court held that Congress delegated to EPA the authority to determine what constitutes significant contribution to nonattainment or interference with maintenance. *Id*. at 513-20. The Court upheld as reasonable EPA's 4-step analytical framework, including EPA's cost-based analysis for defining significant contribution across all upwind states, as an "efficient and equitable" interpretation of the Good Neighbor Provision. *Id.* at 519-20. On remand, the D.C. Circuit largely affirmed the Transport Rule but remanded to EPA on record-based grounds for certain states. *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015).

During those proceedings, EPA revised the NAAQS for ozone to 75 ppb in 2008, and, in 2016, following the decisions in *EME Homer*, promulgated the Update Rule, comprising FIPs for 22 states. 81 Fed. Reg. 74504 (Oct. 26, 2016) ("Update Rule," addressing the 2008 ozone standard). The D.C. Circuit remanded the Update Rule on the narrow ground that EPA did not fully address states' Good Neighbor obligations by the next downwind attainment date. *Wisconsin*, 938 F.3d at 312-20. In response to this remand, EPA promulgated the Revised Update Rule, which fully resolved Good Neighbor obligations for the 2008 ozone NAAQS for 21 states. 86 Fed. Reg. 23054 (Apr. 30, 2021) ("Revised Update Rule," addressing

the 2008 ozone standard); *see also Midwest Ozone Grp. v. EPA*, 61 F.4th 187

(D.C. Cir. 2023) (upholding Revised Update Rule).

While litigation over EPA's Good Neighbor rules have focused on EPA's

FIPs and actions defining Good Neighbor obligations, the D.C. Circuit (and no

other court to date) has also addressed EPA's authority to disapprove SIPs under

the Good Neighbor Provision. In *EME Homer*, 795 F.3d at 132-35, the court

upheld EPA's error correction of 22 approvals to disapprovals. And in *Westar*

*Energy, Inc. v. EPA*, 608 F. App'x 1 (D.C. Cir. 2015) (per curiam), the D.C.

Circuit upheld EPA's disapproval of Kansas's Good Neighbor submission for the

2006 NAAQS for fine particulate matter.

### 2.    EPA's 4-Step Framework for Evaluating Good Neighbor State Implementation Plans

For decades, when evaluating SIPs or formulating a FIP, EPA has

consistently used a 4-step framework to implement the Good Neighbor Provision,

including for ozone. Response to Comments ("RTC") at 431, JA598. EPA

developed this framework to give meaning to the critical statutory terms in the

provision, and it has been upheld as "permissible, workable, and equitable." *EME*

*Homer*, 572 U.S. at 524; *see also, e.g.*, *Midwest Ozone Grp.*, 61 F.4th at 189 n.1

(listing other cases); *Westar*, 608 F. App'x at 2-3.

The 4-step framework "provide[s] a reasonable organization to the analysis

of the complex air quality challenge of interstate ozone transport." Disapproval at

9338, JA3. For this reason, many states generally follow this framework when preparing their Good Neighbor SIPs. *Id.; see also* Submission at 18-19, JA151-52 (Kentucky applying EPA's Step 1 and Step 2). Regardless of the approach states take, the Clean Air Act requires EPA to evaluate whether a SIP contains "adequate provisions" that comply with the Good Neighbor Provision. 42 U.S.C. § 7410(a)(2)(D), (k)(3). Given the multistate nature of ozone pollution, EPA conducts this evaluation "with an eye to ensuring national consistency and avoiding inconsistent or inequitable results." Disapproval at 9381, JA46.

Assessing Good Neighbor obligations first requires identifying an appropriate future analytic year. *See id.* at 9340-41, JA9340; *North Carolina*, 531 F.3d at 911-12. EPA identified 2023 as the appropriate analytic year, which reflects the last year that emissions reductions may be implemented in a full ozone season (May 1 through September 30) before the next attainment date of August 3, 2024. Disapproval at 9341, JA6.

Next, under the 4-step framework, a regulator would:

**Step 1:** Identify downwind "nonattainment" and "maintenance" receptors, which are monitoring sites that "will" not attain or will struggle to maintain the relevant NAAQS in a future year. 42 U.S.C. § 7410(a)(2)(D)(i); *EME Homer*, 572 U.S. at 495. "Nonattainment" receptors are those monitors that are measuring violations of the relevant standard and are projected to continue to violate the

standard in the future analytic year, and "maintenance" receptors are those monitors at risk of violating the standard in the future. Disapproval at 9348, JA13; *see also North Carolina*, 531 F.3d at 909-11.

Ozone concentration levels are represented as regulatory "design values," which are the average of three consecutive years' fourth-highest daily eight-hour average ozone concentration. 40 C.F.R. pt. 50, app. U 1(c), 4. Here, EPA and Kentucky used EPA's air quality modeling to evaluate whether any air quality monitor's projected design value for 2023 (the analytic year) is exceeding or at risk of exceeding 70 ppb (the 2015 Ozone Standard). Disapproval at 9343-44, JA8; Submission at 19, JA152.

**Step 2:** Determine whether upwind-state "emissions" "contribute" to those downwind "nonattainment" and "maintenance" receptors by applying a screening threshold. 42 U.S.C. § 7410(a)(2)(D)(i). If a state's contribution to an identified receptor meets or exceeds the threshold, the state is considered linked to that receptor, thus warranting further evaluation in Step 3 to determine whether it will "contribute significantly to nonattainment" or will "interfere with maintenance" of the NAAQS in other states. *Id.*; Disapproval at 9342, JA7; *see also EME Homer*, 572 U.S. at 502-03; *Wisconsin*, 938 F.3d at 311. States with contributions below the threshold are screened out and are excluded from further consideration. Disapproval at 9342, JA7. Thus, Step 2 identifies those states that "should have

responsibility for addressing their contribution to the downwind nonattainment and maintenance problems to which they collectively contribute." *Id.*

EPA has used a screening threshold equal to 1% of the relevant NAAQS since 2011 because ozone air-quality problems are affected by "a great number of geographically dispersed emissions sources" and 1% is "a reasonably small enough value to identify only the greater-than-de minimis contributers yet is not so large that it unfairly focuses attention for further action only on the largest single or few upwind contributers." *Id.* at 9371, JA36; *see also EME Homer*, 572 U.S. at 500. One percent of the 2015 Ozone Standard (70 ppb) is 0.70 ppb.

**Step 3:** Evaluate the "amounts" of air pollution that "contribute significantly" or "interfere with maintenance." 42 U.S.C. § 7410(a)(2)(D)(i). The allocation of responsibility is determined among contributing upwind states. A state or EPA would determine the amount by which a state is contributing significantly to nonattainment or interfering with maintenance by evaluating how emissions control strategies broadly applied across linked upwind states would benefit air quality downwind. 572 U.S at 514-20. In doing so, EPA considers the cost-effectiveness of potential emissions controls, the total emissions reductions that may be achieved by requiring such controls (if applied across all linked upwind states), and an evaluation of the air-quality impacts such emissions reductions would have on the downwind receptors. Disapproval at 9342-43, JA7,

13

9375-76, JA40. In this way, each state is held responsible for its fair share of a

collective air pollution problem. *See EME Homer*, 572 U.S. at 519 (deeming

equitable EPA's assessment of significant contribution by subjecting states that

have "done relatively less in the past to control their pollution" to stricter

regulation).

**Step 4:** Implement "adequate provisions" "prohibiting" those emissions. *See*

42 U.S.C. § 7410(a)(2)(D). At this step, a state or EPA would develop permanent

and federally enforceable strategies to achieve emissions reductions found to be

necessary at Step 3 to eliminate significant contribution to nonattainment or

interference with maintenance. Disapproval at 9343, JA8. Thus, emissions-control

measures identified as necessary at Step 3 must be included in the SIP or FIP. *Id*.

## II. Factual Background

### A.    Modeling for the 2015 Ozone Standard.

EPA and Kentucky relied on EPA's air quality modeling, based on the

CAMx photochemical grid model, and methodology to identify downwind

nonattainment and maintenance receptors at Step 1 and upwind state contributions

to these receptors at Step 2. *See id.* at 9343-44, JA8-9; Submission at 19, JA152.

The modeling for Steps 1 and 2 is based on a "platform" that incorporates a base

year (i.e., historic year) of meteorological data and emissions inventories, which

include data on emissions throughout the country for that base year and changes in

ozone precursor emissions expected to occur in the analytic year (i.e., future year). 2016v3 Air Quality Technical Support Document ("TSD") at 3-7, JA572-76.

EPA released iterations of its modeling based on two platforms, the 2011-based modeling, and the 2016-based modeling.

The 2011-based modeling used 2011 as the base year. *See* Disapproval at 9338, JA3. In March 2018, EPA issued a memorandum ("Modeling Memo") containing the 2011-based modeling and the "potential" receptors for the 2015 Ozone Standard for the analytic year 2023, along with contribution modeling data, to "assist[]" states in developing their Good Neighbor submissions for the 2015 Ozone Standard. Modeling Memo at 2-6, JA76-80; Disapproval at 9338-39, JA3-4. EPA stated that the information included in the Modeling Memo "[wa]s not a final determination regarding states' obligations under the good neighbor provision," and "[a]ny such determination would be made through notice-and-comment rulemaking." Modeling Memo at 2. Many states, including Kentucky, used the 2011-based modeling in their submissions. *See* 87 Fed. Reg. 9498, 9504-05 (Feb. 22, 2022) ("Proposal"), JA56-57.

To ensure that the modeling applies an appropriately recent base year, EPA periodically updates its photochemical grid modeling for various regulatory applications in accordance with its modeling guidance. *See* Modeling Memo at 4, JA78. In collaboration with states, multi-jurisdictional organizations, and local

15

agencies, EPA updated its 2011-based modeling platform with updated emissions inventories and other emissions data to a 2016 base year and 2023 analytical year for use by states and EPA for regulatory air-quality modeling purposes. *See* Disapproval at 9339, JA4. EPA released this "2016v1" modeling in October 2020. *Id.*; 86 Fed. Reg. at 23078-82. Based on comments and stakeholder engagement, EPA updated the emissions inventories to incorporate improved data and stakeholder feedback. The resulting "2016v2" modeling was considered in EPA's proposed evaluation of submissions for the 2015 Ozone Standard. *See* Disapproval at 9339, JA4, 9343-44, JA8-9.

Incorporating public comments on that 2016v2 modeling, EPA considered the resulting "2016v3" modeling in the Disapproval. Disapproval at 9339, JA4; *see generally* 2016v3 Air Quality TSD, JA572. EPA found the 2016v3 modeling to be "state-of-the-science" and that it performed within acceptable model performance criteria. *See* Disapproval at 9344-45, JA9-10, 9366, JA31.

Recognizing that measured ozone levels well exceeded the 2015 Ozone Standard at many monitoring stations in 2021 and 2022, EPA also identified "violating monitors" as an additional class of maintenance receptors that were very likely to struggle to maintain the 2015 Ozone Standard in 2023. *Id.* at 9349, JA14. Many of the states subject to the Disapproval, including Kentucky, were projected to be linked to violating monitors in 2023, in addition to those receptors identified

in the 2016v3 modeling. *Id*. All of Kentucky's linkages are to receptors within designated nonattainment areas for the 2015 Ozone Standard. Table 1 below shows Kentucky's linkages across modeling iterations.

**TABLE 1**

| Receptor ID | Nonattainment Area[1] | 2011-based Modeling[2] | 2016v2 Modeling[3] | 2016v3 Modeling[4] |
|---|---|---|---|---|
| 90013007 Fairfield CT | New York-Northern New Jersey-Long Island | 0.89 ppb | 0.77 ppb | 0.80 ppb |
| 90019003 Fairfield CT | New York-Northern New Jersey-Long Island | 0.79 ppb | 0.82 ppb | 0.84 ppb |
| 90099002 New Haven CT | New York-Northern New Jersey-Long Island | 0.32 ppb | 0.83 ppb | 0.79 ppb |
| 360850067 Richmond NY | New York-Northern New Jersey-Long Island | 0.84 ppb | n/a[5] | n/a |
| 361030002 Suffolk NY (VM)[6] | New York-Northern New Jersey-Long Island | 0.49 ppb[7] | n/a | 0.74 ppb |
| 90079007 Middlesex CT (VM) | New York-Northern New Jersey-Long Island | n/a | n/a | 0.88 ppb |
| 261210039 Muskegon MI (VM) | Muskegon County | n/a | n/a | 0.74 ppb |
| 390850003 Lake OH (VM) | Cleveland | n/a | n/a | **1.57 ppb** |
| 420170012 Bucks PA | Philadelphia-Wilmington-Atlantic City | n/a | 0.88 ppb | n/a |
| 240251001 Harford MD | Baltimore | **1.52 ppb** | n/a | n/a |
| 550790085 Milwaukee WI | Milwaukee | 0.77 ppb | n/a | n/a |
| 551170006 Sheboygan WI | Sheboygan County | 0.81 ppb | n/a | 0.34 ppb |

B.    **2018 Memoranda**

Attachment A to EPA's Modeling Memo listed potential ideas from outside stakeholders for addressing Good Neighbor obligations, which EPA did not expressly endorse but on which EPA invited feedback. Modeling Memo, Att. A, JA82, ("EPA is not at this time making any determination that the ideas discussed below are consistent with the requirements of the CAA, nor are we specifically recommending that states use these approaches."). Attachment A provided a set of "guiding principles" for how states and EPA should approach their obligations, which emphasized regional consistency, collaboration in addressing shared ozone problems, and compliance with judicial precedent. *Id.*

---

[1] The New York-Northern New Jersey-Long Island, NY-NJ-CT nonattainment area was designated as Moderate in 83 Fed. Reg. 25776 (June 4, 2018). The Baltimore, MD; Cleveland, OH; Milwaukee, WI; Muskegon County, MI; Philadelphia-Wilmington-Atlantic City, PA-NJ-MD-DE; and Sheboygan County, WI nonattainment areas were reclassified to Moderate in 87 Fed. Reg. 60897 (Oct. 7, 2022).

[2] Modeling Memo at C-1, JA88.

[3] 2016v2 Air Quality Technical Support Document ("TSD") at C-2, JA510.

[4] 2016v3 Air Quality TSD at C-2, C-4, JA577, JA578.

[5] If a receptor was not designated under a certain modeling iteration, then "n/a" (for "not applicable") is used as a placeholder.

[6] "VM" means "violating monitor."

[7] This receptor was a modeled receptor under 2011-based modeling and a violating monitor receptor under 2016v3 modeling.

EPA issued another memorandum in August 2018 ("Threshold Memo"), which suggested that, at Step 2, "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold." Threshold Memo at 4, JA101. The Memo noted that a 1 ppb contribution threshold might adequately account for the collective contribution nature of interstate ozone pollution, but EPA emphasized that regulators "should consider whether the recommendations . . . are appropriate for each situation," and that "[f]ollowing these recommendations does not ensure" approval. Threshold Memo at 1, JA98.

### C.    Kentucky's Submission

On January 11, 2019, Kentucky submitted its SIP for the 2015 Ozone Standard. *See* Proposal at 9503, JA55. At Step 1, Kentucky used the 2011-based modeling from the Modeling Memo. Submission at 18, JA151. At Step 2, the 2011-based modeling showed Kentucky was linked above the 1% screening threshold at four nonattainment receptors and one maintenance receptor. *Id*. at 18-19. Citing the Threshold Memo and with no further analysis or explanation, Kentucky used an alternative 1 ppb screening threshold. *Id*. at 19. Under the 1 ppb threshold, Kentucky concluded that it would not be linked to any nonattainment receptor. *Id*. But Kentucky was still linked to one maintenance receptor in Harford County, Maryland (also called the "Edgewood monitor"). *Id*. Kentucky's modeled contribution at the Edgewood monitor was 1.52 ppb. *Id*. Table 1 above shows all of

Kentucky's linkages under the 2011-based modeling. *Supra* FACTUAL

BACKGROUND § II.A (Table 1).

At Step 3, Kentucky stated its belief that Good Neighbor obligations should

be lessened for maintenance receptors, such as the Edgewood monitor, compared

to a nonattainment receptor. *Id*. Kentucky did not explain the reason for its belief,

nor did Kentucky suggest an approach to defining what constitutes "interference

with maintenance." *Id*.

Kentucky argued that it should be excused from reducing its emissions

because sources closer to the Edgewood monitor should reduce their emissions

instead. *Id*. at 44, JA177. ("The implementation of local programs to reduce

emissions should be sufficient for monitors in the area to attain the 2015 ozone

NAAQS."). Kentucky also argued that the 2011-based modeling it relied on at

Steps 1 and 2 was deficient for Step 3 purposes because it did "not account for

newly announced unit retirements, fuel switching and modifications, or emission

control programs that will be or are required to be adopted and implemented prior

to 2023." *Id*. at 45, JA178. Thus, Kentucky concluded that "emissions reductions

resulting from on-the-books and on-the-way emissions reductions are adequate to

prohibit emissions within Kentucky" from violating the Good Neighbor Provision.

*Id*. at 46, JA179.

### D.    EPA's Disapproval

On February 22, 2022, EPA proposed to disapprove 19 states' submissions, including Kentucky's submission. Proposal at 9498, JA50. In reviewing submissions, EPA considered each state's submission on its own merits. *See* Disapproval at 9354, JA19, 9360, JA25. EPA evaluated modeling, methodologies, and analyses submitted by states and did not disapprove any state through rote application of the 4-step framework. *Id.* at 9338, JA3. However, to ensure equity among states and considering the collective contribution problem caused by interstate ozone transport, EPA assessed all submissions with an eye toward national consistency in determining whether states adequately justified that they should have no Good Neighbor obligations and whether states did their fair share to address the collective contribution problem. *Id.* at 9354, JA19, 9381, JA46.

In assessing Kentucky's submission using the 2011-based modeling and a 1% screening threshold, at Step 1, EPA agreed that Kentucky was linked to four nonattainment receptors and one maintenance receptor, including one above 1 ppb. Proposal at 9504, JA56; Disapproval at 9351-52, JA16, 9356, JA21. EPA explained that under the 2016v3 modeling, Kentucky was linked to three modeled receptors above 1%. *Id.* at 9356, JA21. EPA considered the most recent measured ozone data from monitoring stations in 2021 and 2022, leading it to identify another class of maintenance receptors that it termed "violating monitor"

receptors—these "strengthen[ed] the analytical basis" for EPA's Step 2 determinations on Kentucky's submissions (among others).[8] *Id.* at 9349-51, JA14-16. EPA found that Kentucky was linked to four violating monitors, along with the three other linkages identified in the 2016v3 modeling. *Id.* at 9356. JA21. Kentucky's contribution to one of those violating monitors was above 1 ppb. *Supra* FACTUAL BACKGROUND § II.A (Table 1).

At Step 2, EPA found that Kentucky had not adequately supported its use of a 1 ppb threshold and, even under Kentucky's chosen 1 ppb contribution threshold, Kentucky was still linked to the downwind Edgewood monitor.[9] Proposal at 9504, JA56. EPA evaluated each of Kentucky's proffered reasons for why it should be excused from reducing its emissions. At Step 2, on the issue of Kentucky's use of a 1 ppb screening threshold, EPA could not approve a 1 ppb screening threshold because "Kentucky did not provide a technical analysis to sufficiently justify use

---

[8] Where a state was found to be linked to only a violating-monitor receptor (i.e., Tennessee), EPA did not take final action on that state's submission in the Disapproval. Disapproval at 9349, JA14.

[9] Kentucky's submission attached modeling conducted by Alpine Geophysics, though the submission does not appear to rely on that modeling. Submission at 45. But one Petitioner says they consulted Alpine Geophysics in preparing the submission. KY EEC Br. 12. The Alpine modeling identified the Edgewood monitor as a nonattainment receptor and showed that Kentucky contributed 2.07 ppb to it. Proposal at 9508 n.48, JA60 n.48. The Alpine modeling also showed Kentucky linked to other receptors, including a Gloucester County, New Jersey receptor (1.69 ppb contribution) and a Philadelphia County, Pennsylvania receptor (1.53 ppb contribution). *Id*.

of an alternative 1 ppb threshold." *Id*. at 9509, JA61; Disapproval at 9356, JA21; *see also id*. at 9372-75, JA37-40 (explaining that, like Kentucky, many states sought to use 1 ppb threshold and failed to provide sufficient justification to do so).

At Step 3, where Kentucky said it had no obligation to reduce emissions because "on-the-books and on-the-way emissions reductions" were sufficient, Submission at 46, JA179, EPA could not approve Kentucky's conclusion because Kentucky did not quantify those emissions nor demonstrate, after quantification, how they would impact the downwind receptors Kentucky was linked to, such as the Edgewood monitor under 2011-based modeling. Proposal at 9511, JA63. For example, Kentucky claimed that the then-planned retirement of units at the E.W. Brown power plant would reduce $NO_X$ emissions by 471 tons, but Kentucky "did not clarify how these planned reductions would resolve the Commonwealths' downwind contribution" to the Edgewood monitor. *Id*. "Nor did the Commonwealth evaluate whether emissions may increase at other sources whose generation would replace that lost at E.W. Brown." *Id*.

Kentucky's submission said the 2011-based modeling failed to account for certain planned retirements, Submission at 45, JA178, and EPA explained that the 2016-based modeling included those emission reductions. Proposal at 9511, JA63. For example, the retirement of the E.W. Brown units was considered in the 2016-based modeling. *Id*. at 9511-12, JA63-64. With continuing linkages above the Step

24

2 threshold, EPA could not approve Kentucky's submission because it "did not evaluate or even attempt to identify additional control measures" for power plants or other ozone-producing sources or otherwise offer a satisfactory alternative Step 3 analysis. *Id.* at 9512, JA64; Disapproval at 9375-76, JA40-41.

As to Kentucky's other argument at Step 3, that local emissions near the Edgewood monitor should be reduced first before requiring Kentucky to reduce its emissions, EPA could not approve that excuse because "[r]egardless of whether local emissions are the largest contributor to a specific nonattainment or maintenance receptor, the good neighbor provision requires that upwind states prohibit emissions that contribute significantly to nonattainment or interfere with maintenance of the NAAQS in downwind states." *Id.* at 9513, JA65; Disapproval at 9377, JA42 (explaining why whether local sources also contribute to a linked receptor is not relevant under the Good Neighbor Provision). EPA explained that the statute and case law do not permit the deferral of upwind-state obligations pending downwind-state implementation of measures but rather require Good Neighbor obligations to be addressed as expeditiously as practicable and on the same attainment schedule that downwind states face. Disapproval at 9368, JA33 (citing *Maryland v. EPA*, 958 F.3d 1185, 1204 (D.C. Cir. 2020).).

EPA finalized its disapproval of Kentucky's submission on January 31, 2023, along with 20 other state submissions that had similar inadequacies.

Disapproval at 9343, JA8. Each state's submission failed, despite at least one confirmed linkage to an out-of-state receptor, to include a technically and legally adequate analysis to support its conclusion that its contributions to linked receptors were not significant. *Id.* Although some of Kentucky's linkages over modeling iterations differ, EPA explained that different modeling iterations "are consistent in that each indicates linkages between Kentucky and downwind receptors." Proposal at 9509 n.50, JA60 n.50. EPA explained that any differences did not make EPA's analysis of the states' submissions unreliable or prejudicial because year-to-year meteorological variability is a natural occurrence that affects the magnitude and geographic distribution of ozone concentrations and contributions, such that it is "not at all unexpected that an upwind state could be linked to different receptors using 2011 versus 2016 meteorology." Disapproval at 9367, JA32; *see also id.* at 9341, JA6; RTC at 148, JA584; *EME Homer*, 572 U.S. at 497 ("[R]egulators must account for the vagaries of the wind."). So, rather than discredit the 2011-based modeling or a state's submission based on that modeling, the 2016-based modeling's identification of different linkages confirms that a state's emissions impact at least one receptor under varying sets of meteorological data. Disapproval at 9367, JA32.

EPA's updated 2016v3 modeling confirmed its proposed bases for disapproval because it showed Kentucky was linked above 1% at multiple

receptors and even above 1 ppb at one receptor. *Id*. at 9356, JA21. In finalizing the reasoning outlined in its proposals, EPA responded to many issues raised in comments common to multiple states. *Id.* at 9380-81, JA45-46; RTC at 391-93, JA595-97. EPA determined that, on top of the cross-cutting issue of the appropriate Step 2 contribution threshold, "other arguments from states regarding the other three steps of the 4-step interstate transport framework are insufficient to support approval of the SIP submissions" and that these arguments are "highly similar to one another." *Id*. at 392, JA596. EPA noted that "Section V of the preamble presents consolidated responses to comments on these cross-cutting issues" and that "[a]ll of these determinations have nationwide scope or effect." *Id*.

The Disapproval obligated EPA to promulgate FIPs for the covered states, including Kentucky, which it did on March 15, 2023, in a rule known as the "Good Neighbor Plan." 88 Fed. Reg. 36654 (June 5, 2023).

## III.    Procedural Background

Petitioners sued in this Court and moved to stay the Disapproval as to Kentucky pending judicial review. EPA moved to transfer venue to the D.C. Circuit. A divided motions panel of this Court granted Petitioners' motion to stay and denied EPA's motion to transfer venue. *Commonwealth of Kentucky*, No. 23-3216, Doc. 39-2 (July 25, 2023) ("July Order"); *but see id*. at 10-21 (Cole, J., dissenting).

## SUMMARY OF ARGUMENT

1.     The D.C. Circuit is the exclusive venue for petitions for review of the Disapproval under the Clean Air Act's venue provision and should be transferred there. 42 U.S.C. § 7607(b)(1). The Disapproval is "nationally applicable" because it applies to 21 states spanning ten federal judicial circuits. EPA used a nationally consistent framework to evaluate and ultimately disapprove the covered states' Good Neighbor submissions. If the Disapproval is a locally or regionally applicable action, the D.C. Circuit is still the appropriate venue because it is based on multiple determinations of "nationwide scope or effect" made and published by EPA.

2.     If this Court determines venue is proper here, the petitions for review of the Disapproval should be denied. The Clean Air Act charges EPA with the responsibility to approve or disapprove SIPs, and EPA must disapprove SIPs unless they meet all applicable requirements of the Act. Petitioners are wrong that the Act requires EPA to rubber-stamp state submissions.

3.     Petitioners' challenges to EPA's reasoning are unavailing.

A. Petitioners argue that Kentucky's preferred air-quality model version and 1 ppb screening threshold were appropriate. But even had EPA agreed, it would still disapprove Kentucky's submission as noncompliant with the Clean Air Act. Kentucky's submission contained no technical or legal justification for its

conclusion that it need not analyze whether and how much its emissions contribute to downwind air quality problems even though Kentucky was linked to downwind receptors under every iteration of air quality monitoring. Petitioners' comments on EPA's proposal did not address most of the technical or legal deficiencies identified by EPA, so any argument Petitioners might have had is waived. Even if Petitioners' arguments on the appropriate screening threshold or air quality modeling had merit, any error on those issues would be harmless.

B. In disapproving Kentucky's submission, EPA did not fail to consider any reliance interests. As noted above, even under Kentucky's preferred modeling and screening threshold, Kentucky was linked to downwind receptors and its submission was not approvable. Putting that aside, EPA did not act arbitrarily or capriciously in rejecting the 1 ppb threshold because Kentucky offered no justification.

C. Nor did EPA act arbitrarily or capriciously when considering the state-of-the-science 2016v3 modeling and recent monitoring data. Kentucky has shown no reliance interest cognizable under law on this issue and, even if it had, EPA provided a thorough explanation supporting its decisions.

4.    If the Court finds error in the Disapproval, the appropriate remedy is remand without vacatur because EPA's bases for its Disapproval can be substantiated on remand. Vacating the Disapproval would further delay Kentucky

sources' compliance with Good Neighbor obligations and disrupt the

implementation of EPA's Good Neighbor Plan.

## STANDARD OF REVIEW

"Judges are not executive-branch administrators." *St. Marys Cement Inc. v*

*EPA*, 782 F.3d 280, 285 (6th Cir. 2015). "When reviewing an EPA action

concerning a SIP, this Court's standard of review is an extremely narrow one," and

the Administrative Procedure Act's standard of review controls. *Dressman v.*

*Costle*, 759 F.2d 548, 555 (6th Cir. 1985) (cleaned up). In *Dressman*, this Court

stated the standard of review as follows:

> A reviewing court may set aside the Agency's actions only if it finds
> that the actions were "arbitrary, capricious, an abuse of discretion, or
> otherwise not in accordance with law." …
>
> To make this finding the court must consider whether the decision was
> based on a consideration of the relevant factors and whether there has
> been a clear error of judgment. Although this inquiry into the facts is to
> be searching and careful, the ultimate standard of review is a narrow
> one. The court is not empowered to substitute its judgment for that of
> the agency.

*Id*. (cleaned up) (quoting *N. Ohio Lung Ass'n v. EPA*, 572 F.2d 1143, 1148 (6th

Cir. 1978)). This "narrow" standard of review "requires the agency only to have

examined the relevant data and articulated a satisfactory explanation for its action."

*St. Marys Cement Inc*., 782 F.3d at 285 (internal quotation marks and citation

omitted); *see also Greenbaum v. EPA*, 370 F.3d 527, 533 (6th Cir. 2004) ("This

court reviews the EPA's action with deference.").

When reviewing an action under the Administrative Procedure Act, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706; *Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir. 1997) ("[T]his court applies a harmless-error rule to APA cases, such that a mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination.").

When the challenge concerns the agency's scientific or technical determinations, this Court "will defer in large part to the agency's expertise" and "should be at its most deferential in reviewing an agency's scientific determinations in an area within the agency's expertise." *Ky. Res. Council, Inc. v. EPA*, 467 F.3d 986, 991 (6th Cir. 2006) (internal quotation marks and citations omitted); *see also id*. at 997 ("This decision falls within the technical expertise of the agency and is entitled to deference.").

## ARGUMENT

## I.    Venue Lies Exclusively in the D.C. Circuit.

All challenges to the Disapproval belong in the D.C. Circuit and should be transferred there. The Clean Air Act makes the D.C. Circuit the exclusive venue for two categories of EPA actions: those that are "nationally applicable," and those that are "locally or regionally applicable" but "based on a determination of nationwide scope or effect" made and published by EPA. 42 U.S.C. § 7607(b)(1).

The Disapproval falls within one or the other category and should be transferred to the D.C. Circuit.

The motion panel's July Order erred in several ways on venue, so the merits panel should reexamine the issue. Merits panels in this Court give some measure of deference to motions-panel decisions but are not bound by them. *Wallace v. FedEx Corp.*, 764 F.3d 571, 583 (6th Cir. 2014); *R.E. Dailey & Co. v. John Madden Co.*, 983 F.2d 1068 (table), 1992 WL 405282, at *1 n.1 (6th Cir. Dec. 15, 1992) ("[W]e are not bound to follow the decision of the motions panel.").

### A.    The Disapproval is Nationally Applicable.

A petition for review that challenges a "nationally applicable" "action" under the Act may be filed "*only* in the United States Court of Appeals for the District of Columbia." 42 U.S.C. § 7607(b)(1) (emphasis added). Whether an action is "nationally applicable" is a narrow inquiry based on the "face of [the] rule, rather than [its] practical effect." *ATK Launch Sys., Inc. v. EPA*, 651 F.3d 1194, 1197 (10th Cir. 2011). The inquiry turns on the nature of the action, not the nature of a petitioner's challenge. *Id*.; *see also S. Ill. Power Coop. v. EPA*, 863 F.3d 666, 670 (7th Cir. 2017) ("Under the straightforward (if wordy) statutory text, venue depends entirely on—and is fixed by—the nature of the agency's action ...."); *RMS of Ga., LLC v. EPA*, 64 F.4th 1368, 1372-73 (11th Cir. 2023) (venue turns on "the nature of the EPA's action, not the specifics of the petitioner's

grievance."). Notwithstanding Petitioners' attempt to redefine the "action" to suit the specifics of their grievance, the "action" here is EPA's Disapproval as a whole. *See Texas v. EPA (Texas 2016)*, 829 F.3d 405, 419 (5th Cir. 2016) ("[t]he question of applicability turns on the legal impact of the action *as a whole*.") (emphasis added).

On its face, the Disapproval is nationally applicable because it applies to submissions from 21 states across the country, spanning eight EPA regions and ten federal judicial circuits. Disapproval at 9380, JA45. To address the same requirement under the Clean Air Act (Good Neighbor obligations for the 2015 Ozone Standard), EPA applied a nationally consistent analytical framework to evaluate all 21 submissions in a single action. *Id.*

The figure below shows the 21 states whose plans EPA disapproved (colored green) for failing to comply with the Good Neighbor Provision:



That the Disapproval "reaches geographic areas from coast to coast" is "a strong indicator that the regulation is nationally applicable." *ATK Launch Sys.*, 651 F.3d at 1197.

Case law makes clear that whether an "action" is "nationally applicable" turns on the nature of the agency's entire action, regardless of whether petitioners challenge just one piece of it. *See ATK Launch Sys.*, 651 F.3d at 1200; *RMS of Ga.*, 64 F.4th at 1372-73; *S. Ill. Power Coop.*, 863 F.3d at 671.

For example, in *ATK Launch Systems*, the Tenth Circuit concluded that a similar action, where EPA addressed multiple states in a single rule, was nationally applicable. 651 F.3d at 1200. *ATK Launch Systems* involved a statutory requirement that EPA evaluate each state's recommended nonattainment designations and promulgate final designations. *Id.* at 1195. EPA did so in one action, designating 31 areas in 18 states across the country as nonattainment areas. *Id.* at 1197. The petitioner sued in a regional circuit, arguing that EPA's "case-by-case consideration of areas and boundaries transforms a national standard to a regional or local rule." *Id.* at 1198. The Tenth Circuit rejected these arguments, noting that "EPA's listing of the designations applied to each locality does not . . . constitute a mere amalgamation of numerous local actions into a single rule" and concluding instead that the action was nationally applicable and could be challenged only in the D.C. Circuit. *Id.* at 1200. Highlighting the "uniform process

and standard" that EPA used to designate nonattainment areas across the country, the court noted that "[a]ll of these standards and methodologies are part of EPA's nationwide approach to giving content to the Clean Air Act's mandate that nonattainment designations be assigned to areas that contribute to a nearby NAAQS violation." *Id.* at 1197, 1198; *see also S. Ill. Power Coop.*, 863 F.3d at 671 (finding nationally applicable "a final rule of broad geographic scope containing air quality attainment designations covering 61 geographic areas across 24 states— from New York to Hawaii—and promulgated pursuant to a common, nationwide analytical method").

Similarly, in the Disapproval, EPA evaluated each state's submission and technical rationales on their merits but developed a nationwide approach to its review of the submissions. Disapproval at 9354, JA19. EPA explained that ozone transport presents a "collective contribution" challenge in which many contributors across a broad region combine to generate a downwind air quality problem. *Id.* at 9342, JA7. Given the "interdependent nature of interstate pollution transport," EPA used "a uniform legal interpretation and common, nationwide analytical methods" to avoid "inconsistent or inequitable results among upwind states . . . and between upwind and downwind states." *Id.* at 9380-81, JA45-46. While EPA acknowledged states could develop methodologies different from its 4-step framework, EPA employed "a consistent set of policy judgments across all states for purposes of

evaluating interstate transport obligations" to evaluate and ultimately disapprove all 21 states' submissions. *Id.* at 9339, JA4.

It makes no difference that Petitioners purport to challenge the alleged effects of the Disapproval only as to Kentucky. The question is whether the "action" itself is "nationally applicable," 42 U.S.C. § 7607(b)(1), not whether the nature and scope of the arguments raised, or relief sought are nationally applicable. *ATK Launch Sys.*, 651 F.3d at 1199 (to suggest that "the manner in which a petitioner frames his challenge to a regulation" may alter venue "is inconsistent with the language of [§ 7607(b)(1)]"); *RMS of Ga.*, 64 F.4th at 1372-73; "A petition-centric method for determining venue . . . is flatly inconsistent with the actual terms of § 7607(b)(1)." *S. Ill. Power Coop.*, 863 F.3d at 672 (finding venue proper in the D.C. Circuit and overruling prior circuit precedent that improperly focused on the localized nature of petitioners' claims). The July Order's contrary approach to "national applicability" needlessly complicates the venue analysis and creates difficult line-drawing problems. *See NRDC v. Thomas*, 838 F.2d 1224, 1249 (D.C. Cir. 1988); *see also* July Order at 11 (Cole, J., dissenting) (citing *Thomas* for the proposition that the nature of Petitioners' challenge should not control the venue analysis).

Nor is "national applicability" limited only to those actions that "amend[] sections of the Code of Federal Regulations that are not state-specific," *Kentucky*

*FIP Order*[10] at 6, because "[a]n EPA rule need not span 'from sea to shining sea' to be nationally applicable." *Browner*, 1998 WL 827315, at *7. For example, the area designations at issue in *ATK Launch Systems* and *S. Ill. Power Coop.* were deemed to be nationally applicable even though the regulations amended the Code of Federal Regulations in the same, statewide fashion as the SIP Disapproval. *Compare* 81 Fed. Reg. 45039, 45045-55 (July 12, 2016) (codifying designations for 24 states into 40 C.F.R. Part 81) *with* Disapproval at 9381-84, JA46-49 (codifying disapprovals for 21 states into 40 C.F.R. Part 52).

Petitioners and their counterparts in other regional circuits invite multiple courts to review concurrently the merits of the same legal interpretations, policy decisions, and analytical methodology that EPA used in a consistent manner, in a single action, to evaluate submissions from states across the country. In doing so, courts may well reach inconsistent outcomes on whether (and, if so, why) that action is unlawful. This is precisely the result that Congress sought to avoid in enacting Section 7607(b)(1). *See NRDC v. EPA*, 512 F.2d 1351, 1357 (D.C. Cir. 1975) (Bazelon, J., concurring in part) (explaining that by vesting the D.C. Circuit with exclusive review of nationally applicable actions, Congress sought "to ensure uniformity in decisions concerning issues of more than purely local or regional

---

[10] Order at 6, *Kentucky Env. & Energy Cabinet v. EPA*, No. 23-3605, ECF 19 (6th Cir. Nov. 9, 2023) ("*Kentucky FIP Order*")

impact"); *Texas v. EPA (Texas 2011)*, No. 10-60961, 2011 WL 710598, at *4 (5th

Cir. Feb. 24, 2011).

The July Order held that "[t]he relevant unit of administrative action here is

the EPA's individual SIP denials" for each of the states. July Order at 4. The only

support provided in the July Order for this conclusion is another divided motions-

panel order issued by the Fifth Circuit, Order at 9, *Texas v. EPA*, No. 23-60069

(5th Cir. May 1, 2023), ECF No. 269-1 ("*Texas* Order"). Both orders drew

persuasive dissents. *See Texas* Order at 25-28 (Douglas, J., dissenting) (finding the

Disapproval nationally applicable and opining that the panel's ruling conflicts with

in-circuit precedent as well as precedents of sister circuits); July Order at 11 (Cole,

J., dissenting) ("[L]imiting the 'action' to Kentucky's state-specific challenge is

inappropriate." (citing *Thomas*, 838 F.2d at 1249)). This Court should not rely on

the *Texas* Order because it is not even binding on the merits panel of the Fifth

Circuit, let alone this Court. *See Texas* Order at 24; *Thomas v. Cohen*, 304 F.3d

563, 579 (6th Cir. 2002) ("Needless to say, we are not bound by a decision from

another circuit."). More importantly, the *Texas* Order is fundamentally flawed. *See*

*Texas* Order at 25-28 (Douglas, J., dissenting) (finding the Disapproval nationally

applicable and opining that the motion panel's ruling conflicts with Fifth Circuit

precedent as well as precedents of sister circuits).

Both the *Texas* Order and the July Order conflict with Section 7607(b)(1)'s text, which bases venue on the nature of EPA's final action, whether that action covers one or multiple submissions. Nothing in the Act constrains EPA to acting on submissions individually. Applying such a requirement "would violate the very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (cleaned up). Indeed, it was reasonable for EPA to take a single final action disapproving multiple submissions under the Good Neighbor Provision, where the evidence shows that there are many complex, interwoven, and overlapping linkages between and among states and EPA had found the need for consistency "critically important." Disapproval at 9365, JA30.[11]

The *Texas* Order also conflicts with past Fifth Circuit decisions. For example, EPA's actions are "entitled to a presumption of regularity," and this presumption "places a considerable burden on the challenger to overcome the EPA's chosen course of action." *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 934 (5th Cir. 1998) (internal quotation marks and citation omitted). But the *Texas*

---

[11] Notably, the D.C. Circuit is the only circuit court that has decided challenges to EPA's actions on Good Neighbor implementation plans. *See Westar*, 608 F. App'x 1 (reviewing EPA's action on Kansas's Good Neighbor submission); *EME Homer*, 795 F.3d at 132-36 (reviewing EPA's error correction of 22 Good Neighbor approvals).

Order ignores this presumption entirely, disregarding EPA's choice to take nationally unified action on a national problem.

Both the *Texas* Order and July Order conflict with prior Fifth Circuit case law that held, for venue purposes, "[t]he 'action' is the rule or other final action taken by the agency that the petitioner seeks to prevent or overturn." *Texas 2016,* 829 F.3d at 419. In *Texas 2016*, the Fifth Circuit held that the "action" was "EPA's final rule disapproving portions of the Texas and Oklahoma SIPs and imposing a FIP." *Id*. Whereas the *Texas 2016* decision recognized that the "action" at issue comprised two SIP disapprovals and a FIP, *id.*, the 2023 *Texas* Order ignored this precedent, impermissibly carving up EPA's Disapproval into individual "unit[s] of administrative action." *Texas* Order at 9. Nothing in the Clean Air Act provides courts authority to divide EPA actions into multiple sub-actions for venue purposes.

More recently, the Fifth Circuit has further strayed from the text of the statute and deepened its conflict with other circuits, including the Sixth Circuit. In *Calumet Shreveport Refining, LLC v. EPA*, the Fifth Circuit found that a different EPA action was not nationally applicable because it did not directly operate in "all states." --- F.4th ---, 2023 WL 8102586, at *5 (5th Cir. Nov. 22, 2023). This reading "does violence to the structure and language of the statute."." *Id*. at *15 (Higginbotham, J., dissenting) (noting intracircuit conflict with *Texas 2011*, which

deemed nationally applicable a SIP call directly operating on only 13 states).). In evident disagreement with *Calumet*, the Third, Seventh, and Tenth Circuits each transferred challenges to the same EPA action to the D.C. Circuit. *Id*. at *17 (Higginbotham, J., dissenting).

The prevailing view in the courts of appeals, including the Sixth Circuit, is that an action need not directly operate in every state for it to be nationally applicable. *See Kentucky FIP Order* at 4-8 (action operative in 23 states); *ATK Launch*, 651 F.3d at 1195-1200 (action operative in 18 states); *S. Ill. Power Coop.*, 863 F.3d at 671 (action operative in 24 states); *W. Va. Chamber of Com. v. Browner*, 166 F.3d 336 (Table), 1998 WL 827315, at *6 (4th Cir. Dec. 1, 1998) (action based on "a common core of information and analysis involving 37 states").

In fact, much of the national-applicability analysis in the *Kentucky FIP Order* applies here too. For example, the panel correctly cited to *ATK Launch Systems* and related cases for the principle that "national applicability rests on the scope of the challenged action, not the scope of Petitioners' challenges." *Id.* at 4. The panel correctly rejected Petitioners' assertion that they were challenging the Good Neighbor Plan "only as to the obligations in their respective state's FIP." *Id.* at 6. Under the panel's action-centric analysis, the Disapproval is indistinguishable from the Good Neighbor Plan in the most salient respects, because it *also* applies

41

to "far flung" states and is "based on national analysis and uniform standards." *Id.* at 5, 7.

Lastly the *Texas* Order and July Order also conflict with the Tenth Circuit's holding in *ATK Launch Systems*, the Seventh Circuit's holding in *Southern Illinois Power*, and other cases that have addressed the "nationally applicable" provision of Section 7607(b)(1). Like the actions at issue in those cases, EPA's Disapproval evaluated submissions from states located across the country, using "uniform legal interpretation and common, nationwide analytical methods." Disapproval at 9380, JA45; *see also ATK Launch*, 651 F.3d at 1200; *S. Ill. Power Coop.,* 863 F.3d at 671; *cf. Sierra Club v. EPA*, 926 F.3d 844, 849 (D.C. Cir. 2019) (finding locally or regionally applicable an EPA order addressing "a single permit for a single plant located in a single state"); *Dalton Trucking, Inc. v. EPA*, 808 F.3d 875, 881 (D.C. Cir. 2015) (finding locally or regionally applicable an EPA action "limited to fleets operating in California"). So, under precedent of every circuit to have considered this question, the Disapproval would be considered nationally applicable.

In sum, the Disapproval is nationally applicable and challenges to the rule may be filed only in the D.C. Circuit.

### B.    EPA Properly Found and Published that the Disapproval is Based on Determinations of Nationwide Scope or Effect.

If this Court determines that the Disapproval is locally or regionally applicable, venue still lies only in the D.C. Circuit because the Disapproval is

based on several determinations of "nationwide scope or effect" made and published by EPA. Disapproval at 9380-81, JA45-46. These non-local determinations underlie both the Disapproval as a whole and EPA's decision as to Kentucky in particular.

A locally or regionally applicable action may be challenged only in the D.C. Circuit if (1) the action is "based on a determination of nationwide scope or effect" and (2) "the Administrator finds and publishes that such action is based on such a determination." 42 U.S.C. § 7607(b)(1). No one disputes that EPA satisfied the second prong by making and publishing the requisite finding, which is committed to EPA's discretion by law and is unreviewable. Disapproval at 9380-81, JA45-46; *Texas v. EPA*, 983 F.3d 826, 834-35 (5th Cir. 2020). So the only question here is whether the "action" being challenged is "based on a determination of nationwide scope or effect." The answer is yes.

### 1.    EPA's Finding is Supported by the Record and Warrants Deference.

As the statutory language makes clear, EPA's action can be based on multiple determinations. 42 U.S.C. § 7607(b)(1); *see also Texas 2016*, 829 F.3d at 419 (explaining determinations are "justifications the agency gives for the action" and "can be found in the agency's explanation of its action"). Per the statute's language–*i.e.*, "based on *a* determination"–if at least one determination underlying a "locally or regionally applicable" action has "nationwide scope or effect" (and

43

EPA publishes a corresponding finding), then venue lies in the D.C. Circuit. 42

U.S.C. § 7607(b)(1) (emphasis added).[12] That such an action might also be based

on determinations lacking nationwide scope or effect is irrelevant. The statute does

not require that such an action be based *solely* on a "determination of nationwide

scope or effect." When Congress intends such a limitation, it creates one explicitly.

*See id.* (if a petition for review is "based *solely* on grounds arising after" the initial

60-day window after publication of EPA's action, then the petition shall be filed

"within [60] days after such grounds arise") (emphasis added).

The Disapproval is based on multiple determinations of nationwide scope or

effect. *See* RTC at 392, JA596 (identifying each determination discussed in the

Disapproval at 9361-79, JA26, as such). For example, EPA determined that: (1) it

was appropriate for EPA to evaluate Good Neighbor obligations using the 2016v3

modeling and recent monitoring information, rather than limiting its review to the

information available to states at the time of their submissions, Disapproval at

9365-66, JA30-31;[13] and (2) use of any alternative contribution threshold at Step 2

---

[12] The Fifth Circuit's distinction between "core" and "peripheral" determinations, *Texas 2016*, 829 F.3d at 419, contravenes the statute's plain statement that just *one* determination of nationwide scope or effect is sufficient to establish venue in the D.C. Circuit.

[13] *See also* Disapproval at 9351-54, JA16-19 (displaying 2016v3 and violating-monitor results for all covered states); *id.* at 9354, JA19 (declining to finalize disapproval action for Wyoming and Tennessee based on changes from prior

must be adequately justified, and neither bare reliance on EPA's Threshold Memo nor EPA's "significant impact levels" Guidance provided adequate justification, Disapproval at 9372-74, JA37-39.[14] These are just two examples of many. *See* Disapproval at 9361-79, JA26-44; *see also* July Order at 18 (Cole, J., dissenting) (explaining that EPA determined "[w]hether or to what extent the merits of each state's plan were sufficient to comply with its good neighbor obligations… *based on* nationwide modeling") (emphasis in original).

None of these determinations are "related to the particularities of the emissions sources" in specific states. *Texas 2016*, 829 F.3d at 421. Rather, these determinations reflect EPA's nationwide policy judgments and analyses on interstate ozone transport, which EPA applied uniformly across the covered states to avoid inconsistent or inequitable results. Disapproval at 9380-81, JA45-46; *see also* July Order at 16 (Cole, J., dissenting) (finding Disapproval "based on a determination of nationwide scope or effect" because "EPA set national benchmarks for a comprehensive plan that looked beyond state boundaries due to the nature of air quality issues"). EPA thus reasonably found and published that the

---

modeling); *id.* at 9357-58, JA22-23 (using this data to disapprove Minnesota and Nevada despite change from 2011-based modeling).

[14] *See* Disapproval at 9354-60, JA19-25, 9373, JA38 (identifying state failure to support use of alternative contribution threshold as basis for disapproving Kentucky's submission as well as submissions from Alabama, Arkansas, Illinois, Indiana, Michigan, Mississippi, Missouri, Nevada, Ohio, Oklahoma, and Utah).

Disapproval is "based on a determination of nationwide scope or effect." Disapproval at 9380-81, JA45-46.

The legislative history of the "nationwide scope or effect" provision evinces clear congressional intent to centralize review of national SIP issues in the D.C. Circuit and a recognition that, although such actions "usually involve issues peculiar to the affected States, such actions sometimes involve generic determinations of nationwide scope or effect." ADMIN. CONFERENCE OF THE U.S., RECOMMENDATIONS ON JUDICIAL REVIEW UNDER THE CLEAN AIR ACT, 41 Fed. Reg. 56767, 56768-69 (Dec. 30, 1976) (Comments of G. William Frick); *see also Texas 2011*, 2011 WL 710598, at *4 (citing same legislative history and noting that "[c]entralized review of national issues is preferable to piecemeal review of national issues in the regional circuits, which risks potentially inconsistent results"); July Order at 18 (Cole, J., dissenting) (explaining that transferring this case to the D.C. Circuit is consistent with the legislative history of the statute).

Under the statute, EPA's finding that certain determinations have nationwide scope or effect should be reviewed under a highly deferential standard. *See Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 891 F.3d 1041, 1053 (D.C. Cir. 2018) (Silberman, J., concurring); *Alcoa, Inc. v. EPA*, No. 04-1189, 2004 WL 2713116, at *1 (D.C. Cir. Nov. 24, 2004). The Act assigns to EPA the authority to make the requisite finding, such a finding reflects EPA's expert judgment

regarding the nature of its action under a statute it is tasked with administering, and it is based on the administrative record. Thus, EPA's finding that an action is based on a determination of nationwide scope or effect is within the realm of matters on which courts defer. *Supra* STANDARD OF REVIEW.[15] Regardless, EPA's determinations here should be upheld under any standard of review.

Consistent implementation of the Good Neighbor Provision is particularly important because, to safeguard the health and welfare of millions of people nationwide living in areas of unacceptably high ozone, the Good Neighbor Provision requires EPA to ensure that no states' emissions interfere with other states' air quality. *EME Homer*, 572 U.S. at 495-96. Given the Good Neighbor Provision's interstate focus and the broad geographic scale associated with ozone-pollution transport in particular—which can travel "hundreds or thousands of miles away," Disapproval at 9372, JA37—EPA's evaluation in the Disapproval of states'

---

[15] This Court is not bound to follow the Fifth Circuit's approach in *Texas 2016*, 829 F.3d at 421, and it should not review EPA's finding *de novo*. *Texas 2016* relied on inapposite case law to support its holding. *See id.* at 421 (citing *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 392 (5th Cir. 2014)). *Exelon Wind 1* holds only that courts have an independent obligation to determine their own subject-matter jurisdiction. It says nothing about how venue is determined under the Act. Likewise, in *Calumet*, the Fifth Circuit cited *Dalton Trucking* for the proposition that it reviews EPA's finding de novo. 2023 WL 8102586, at *6. But that case was not about the appropriate standard of review; instead, it merely rejected EPA's prior-held position that a finding of nationwide scope or effect compels venue in the D.C. Circuit. 808 F.3d at 881. Although EPA's finding does not, by itself, compel transfer, it should be reviewed like other technical determinations.

Good Neighbor submissions for the 2015 ozone NAAQS considered complex, interwoven, and overlapping linkages between and among multiple states across the country, as illustrated below.[16]



The concurrent petitions for review of the Disapproval in eight regional courts of appeals underscore the potential for inconsistent results if litigation proceeds in regional courts. Take the examples listed above. Petitioners challenge those determinations and argue that the Disapproval should be set aside because: (1) EPA unlawfully considered the 2016v3 modeling and recent monitoring

---

[16] EPA, Interstate Pollution Linkages Under the Good Neighbor Plan, *available at* https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs#maps.

information, KY Br. 22-30; KY EEC Br. 20-24; and (2) EPA arbitrarily rejected the alternative 1 ppb contribution threshold some states applied at Step 2. KY Br. 30-35; KY EEC Br. 26-27. Other petitioners challenging the Disapproval in multiple other regional circuits also (1) challenge EPA's determination that use of the 2016v3 modeling and recent monitoring information is appropriate;[17] and (2) challenge EPA's contribution-threshold determinations.[18] Litigation in the regional circuits may lead to conflicting rulings on matters of nationwide consequence. *See* July Order at 18 (Cole, J., dissenting) ("That multiple circuit courts face the same question about this same final rule across the country is all the more reason to leverage the textual path and send this to the D.C. Circuit.").

It is easy to envision a scenario where some upwind states are required to reduce their emissions under the Good Neighbor Provision for the 2015 Ozone Standard while others are not because the judicial circuits where they challenge the Disapproval resolve the same issues differently. This high risk of inconsistent

---

[17] S*ee, e.g., Utah*, 23-9509 (10th Cir.), ECF No. 11013577 at 44; *Oklahoma*, 23-9514 (10th Cir.), ECF No. 11013681 at 41-43, 50-53; *Texas*, 23-60069 (5th Cir.), ECF Nos. 335 at 25-29 (Miss.), 332 at 35-36 (La.), 328 at 26-28 (Tex.); *Missouri*, 23-1719 (8th Cir.), ECF No. 5304774 at 28-29; *Allete*, 23-1776 (8th Cir.) ECF No. 5305346 at 17.

[18] *See, e.g., Utah*, 23-9509 (10th Cir.), ECF No. 11013577 at 44; *Oklahoma*, 23-9514 (10th Cir.), ECF No. 11013681 at 41-43, 50-53; *Texas*, 23-60069 (5th Cir.), ECF Nos. 335 at 25-29 (Miss.), 332 at 35-36 (La.), 328 at 26-28 (Tex.); *Alabama*, No. 23-11173 (11th Cir.), ECF No. 35, at 26-35; *Missouri*, 23-1719 (8th Cir.), ECF No. 5304774 at 28-29; *Allete*, 23-1776 (8th Cir.).

results on determinations that pertain to the interstate-pollution obligations of 21 states with downwind impacts spanning coast to coast vindicates EPA's finding that the Disapproval is based on multiple determinations of nationwide scope or effect, even if that finding received no deference.

### 2.    The July Order Misconstrues the Clean Air Act.

Both the July Order and *Texas* Order essentially read the venue exception in Section 7607(b)(1) entirely out of the statute. All "locally or regionally applicable actions" invariably are based, to some extent, on factual determinations that are unique to the relevant locality. In fact, an action cannot simultaneously be locally or regionally applicable *and* not depend in some way on local or regional facts. If EPA can never invoke the venue exception when the action is based, even in part, on unique facts and circumstances, then EPA's finding that a "locally or regionally applicable action" is "based on a determination of nationwide scope or effect" will never effectuate Congress's intent to route this subset of challenges to the D.C. Circuit.

So, not only do these motion panel orders "gut" Congress's decision to centralize judicial review in the D.C. Circuit on issues of national import, *Texas* Order at 29 (Douglas, J., dissenting), they also render meaningless an entire clause of the venue statute. This outcome flouts the interpretive canon against surplusage. *See Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) ("[E]very word and every

provision is to be given effect and [none] should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.") (cleaned up); *see also* July Order at 17-18 (Cole, J., dissenting) ("That the EPA provided more detailed, individualized evaluations to each state does not alter this reality."). Indeed, it is hard to imagine what action may be considered locally or regionally applicable yet "based on a determination of nationwide scope or effect" if the Disapproval is not.

The reasoning of both the July Order and the *Texas* Order appears to rest on the assumption that Congress limited the venue exception in Section 7607(b) to actions "based *solely* on" such a determination. But that is not the language of the statute. Moreover, the motions panels' erroneous conclusions are inconsistent with the facts. As explained above, it is simply not correct that EPA's action is merely a collection of state-specific determinations. For example, a different motions panel of this Court found that the Good Neighbor Plan, even if considered at the individual state level, is "based on determinations of nationwide scope or effect" given EPA's "collective approach" to resolving the interstate ozone problem. *Kentucky FIP Order* at 8. Likewise, EPA's determinations underlying the Disapproval were motivated by the same need for coordination, equity, and consistency that panel identified in the Good Neighbor Plan. *See id.*

In *Calumet*, the Fifth Circuit again departed from the text of the statute by finding that, because EPA's denial of small refinery exemptions relied, in part, on facts specific to the individual small refineries, then EPA's action could not be based on a determination of nationwide scope or effect. 2023 WL 8102586, at *6. As the dissent noted, however, "there can be multiple determinations that influence an agency's actions," and because EPA's action was based, in part, on determinations of nationwide scope or effect that apply to all refineries, venue belongs in the D.C. Circuit. *Id*. at *17 (Higginbotham, J., dissenting). The D.C. Circuit's exclusive venue is not limited to actions based "solely" on determinations of nationwide scope or effect.

In any case, *Calumet* must be read alongside the Fifth Circuit's opinion released on the same day in *Wynnewood Refining Co. v. EPA*, --- F.4th ---, 2023 WL 8102583 (Nov. 22, 2023). In *Wynnewood*, the court found that EPA's "alternative compliance approach" was based on a determination of nationwide scope or effect because it was "based on the *collective impact* flowing from the April Denial challenged in *Calumet*." *Id*. at *4. The Disapproval is likewise based on the "collective impact" of ozone-forming pollution crossing state lines. Due to the "collective contribution" of many states' ozone pollution that travels hundreds of miles into other states' boundaries, EPA—in considering an individual state's submission—must address, on a nationwide scale, the "thorny causation problem"

of how to best "allocate responsibility among multiple contributors." *EME Homer*, 572 U.S. at 492, 514. Here, EPA properly acted on each SIP in the Disapproval using uniform national policy judgments regarding the duty each state owes to others under the Good Neighbor Provision. As in *Wynnewood*, to address the "collective impact" of interstate ozone pollution, the Disapproval's determinations of nationwide scope or effect are essential to achieve the purpose of the Good Neighbor Provision – to "prohibit" emissions in amounts that will "contribute significantly to nonattainment in, or interfere with maintenance by, any other State." 42 U.S.C. § 7410(a)(2)(D)(i)(I).

In sum, applying the only reasonable construction of the Clean Air Act's text, purpose, and history, this Court should transfer the petitions for review of the Disapproval to the D.C. Circuit to decide the merits of these petitions.

## II.   EPA Must Disapprove a State Implementation Plan That Does Not Meet the Clean Air Act's Requirements.

Petitioners incorrectly describe EPA's role as "ministerial" or that of a "secondary reviewer," but that misconstrues the Clean Air Act. KY Br. 39; KY EEC Br. 1, 23. States must submit SIPs to EPA, and EPA cannot approve a SIP unless "it meets all of the applicable requirements" of the Act. 42 U.S.C. § 7410(k)(3), (*l*); *Ky. Res. Council,* 467 F.3d at 988. The Act subjects states "to strict minimum compliance requirements" to attain the NAAQS, and it is "the Administrator" who "must assure that the minimal, or 'necessary,' requirements

are met." *Union Elec.*, 427 U.S. at 256-57, 263. Whether a SIP complies with the Act is thus for EPA to determine. *See Ariz. ex rel. Darwin v. EPA*, 815 F.3d 519, 532 (9th Cir. 2016) (recognizing "Congress intended that EPA, not the states alone, ultimately ensure that state determinations . . . comply with the Act" and rejecting contention that "EPA bears the burden of proving that the State's BART determinations are unreasonable") (citing *North Dakota v. EPA*, 730 F.3d 750, 761 (8th Cir. 2013)); *Oklahoma*, 723 F.3d at 1210 ("EPA monitors SIPs for compliance with the statute").

EPA's oversight role is particularly important in regulating interstate air pollution because states' emissions create problems not just "within their borders," *North Dakota*, 730 F.3d at 760-61, but travel downwind and affect *other* states. *See EME Homer*, 572 U.S. at 495. Thus, the Good Neighbor Provision requires that state plans "contain adequate provisions prohibiting" emission sources "within the State from emitting any air pollutant in amounts which will contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any" NAAQS. 42 U.S.C. § 7410(a)(2)(D). This requires EPA to ensure responsibility for downwind pollution is equitably allocated among contributing upwind states. *EME Homer*, 572 U.S. at 515–16, 520. EPA's role and the Good Neighbor Provision itself would be meaningless if states could unilaterally dictate their own Good Neighbor obligations.

Petitioners argue that EPA's actions were engineered to "usurp[]" Kentucky's role under the Clean Air Act. KY Br. 35-36. But that argument presumes EPA's bases for disapproval were unlawful, which they are not. *Infra* ARGUMENT § III. Thus, if the Court agrees with EPA on those issues, this argument necessarily fails. In any event, EPA's actions enjoy a presumption of regularity that "when administrative officials purport to decide weighty issues within their domain they have conscientiously considered the issues" and thus it "is not the function of the court to probe the mental processes of an agency decisionmaker." *Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978) (internal quotation marks and citations omitted). This presumption can be overcome "only upon a strong showing of bad faith or improper behavior." *Id*. EPA had many, good faith reasons for the determinations Petitioners complain of, grounded in law and fact. *Infra* ARGUMENT §§ III.B (on the use of 1% threshold), III.C (on the use of 2016-based modeling). Far from acting inconsistently or with improper motive, EPA made consistent determinations across all states and in a manner consistent with its longstanding approach to addressing Good Neighbor obligations across multiple prior NAAQS. Disapproval at 9339-42, JA4-7 (describing EPA's consistent analytic framework for reviewing Good Neighbor submissions).

Contrary to Petitioners' claims, EPA *must* fulfill its oversight role and determine whether Kentucky's submission "meets all the applicable requirements"

of the Clean Air Act. 42 U.S.C. § 7410(k)(3); *see also* Disapproval at 9368, JA33

("EPA must ultimately determine whether state plans satisfy the requirements of

the Act or not" and "[i]f they are deficient, the EPA must so find."); RTC at 436;

KY EEC Br. 7 (citing statutory and case law that EPA can only approve SIP "if it

meets all of the applicable requirements" of the Act).

## III. Petitioners' Arguments on the Screening Threshold and Updated, State-of-the-Science Modeling Are Unavailing.

The two overarching arguments Petitioners advance in their briefing are that

EPA's decision should be set aside because: (1) EPA relied on a 1% screening

threshold and objected to Kentucky's 1 ppb threshold, even though EPA's

Threshold Memo allowed the use of 1 ppb and Kentucky relied on that memo, KY

Br. 30-35; KY EEC Br. 25-27; and (2) EPA relied on 2016-based modeling, which

was unavailable at the time Kentucky made its SIP submission. KY Br. 22-30; KY

EEC Br. 20-24. Both arguments lack merit.

More importantly, even under Kentucky's preferred modeling and screening

threshold, it's linked to at least one downwind receptor, and EPA provided many

reasons why it could not approve Kentucky's submission under that set of

information.[19] *Infra* ARGUMENT § III.A. So even if Petitioners were to succeed on

---

[19] Under 2016v3 modeling, Kentucky was still linked to a receptor above 1 ppb, so for the same reasons above, Kentucky's submission is not approvable under 2016v3 modeling, either, even using Kentucky's chosen threshold. *Supra* BACKGROUND § II.A (Table 1).

their two arguments on the screening threshold and appropriate base-year modeling, EPA's decision should still be upheld. *See, e.g., Sierra Club v. EPA (Sierra Club 2019)*, 939 F.3d 649, 687 (5th Cir. 2019) (holding that the court need not address challenges to EPA's additional modeling if it could otherwise uphold EPA's action based on the state's reliance on other EPA modeling). Thus, any potential error on the two issues raised by Kentucky would be harmless.

> **A.    EPA Rested its Disapproval on Independent Grounds that Petitioners Have Not Challenged, So Any Error Would Be Harmless.**

Kentucky's submission was inadequate and based on many legal and technical deficiencies that have nothing to do with the issues raised in Petitioners' briefs. EPA's reasons for disapproval are unrebutted because, in their comments on EPA's proposed disapproval, Kentucky Energy and Environment Cabinet included no response to these deficiencies nor tried to rebut EPA's conclusions on these issues (nor did Petitioners do so in their opening briefs). *See generally* KY EEC Comments at 1-3, JA511-13. Thus, any arguments on the merits of the submission have been waived and EPA's reasons remain unrebutted on appeal. *Mich. Dep't of Env't Quality v. Browner*, 230 F.3d 181, 183 n.1 (6th Cir. 2000) (noting that an argument petitioners failed to sufficiently raise during a comment period is waived for purposes of appellate review). This section reviews the bases for EPA's

disapproval to illustrate why the Court need not even reach the issues raised by Petitioners.

Using the 2011-based modeling that Petitioners prefer, Kentucky was linked to the Edgewood receptor in Harford County, Maryland, with a contribution of 1.52 ppb (above Kentucky's preferred 1 ppb threshold).[20] *Id*. at 19, JA152. Kentucky nevertheless determined it was not required to reduce its emissions for three reasons:

1. Maintenance receptors should be treated differently than nonattainment receptors. *Id.*; *see also id*. at 46, JA179;

2. Emission reductions from sources local to the receptor should be required before Kentucky reductions. *Id*. at 46, JA179;

3. Existing (on-the-way and on-the-books) emission reductions are already adequate. *Id*. at 45, JA178.

Based on those three reasons, Kentucky "conclude[d] that the emissions reductions resulting from on-the-books and on-the-way emissions reductions are adequate to prohibit emissions within Kentucky from interfering with the maintenance of downwind states with respect to the 2015 ozone NAAQS." *Id*.

-------------------

[20] Even under 2016v3 modeling, Kentucky is still linked to the Lake County, Ohio violating monitor with a contribution of 1.57 ppb – above Kentucky's preferred 1 ppb threshold. *Supra* FACTUAL BACKGROUND § II.A (Table 1). Under the Alpine modeling attached to Kentucky's submission, it was linked to the Edgewood receptor (2.07 ppb contribution), to the Gloucester, New Jersey receptor (1.69 ppb contribution), and to the Philadelphia, Pennsylvania receptor (1.53 ppb contribution). Proposal at 9508 n.48, JA60 n.48.

EPA found this conclusion flawed, and EPA's reasons for doing so were not challenged in comments to the agency or in Petitioners' opening briefs.

### 1. Kentucky's Submission Did Not Justify Treating Maintenance Receptors Differently than Nonattainment Receptors.

As EPA explained, Kentucky did "not explain how the obligations of upwind states linked to maintenance-only receptors should be treated differently than the obligations of upwind states linked to nonattainment receptors." Proposal at 9514, JA66. Kentucky did not explain how this general policy position supported its conclusion it has no Good Neighbor obligations, nor did Kentucky provide any guiding standard by which to differentiate between an upwind states' obligations to maintenance-only receptors and nonattainment receptors. *Id*. EPA determined that "it would be inconsistent with the CAA for EPA to identify receptors that are at risk of NAAQS violations given certain conditions due to transported upwind emissions and then not prohibit the emissions that place the receptor at risk." *Id.;* Disapproval at 9356, JA21 (finding Kentucky's differing treatment of monitor types to be "inadequately supported"); *Ky. Res. Council*, 467 F.3d at 997 (deferring to EPA's technical determinations). Kentucky's conclusion that it does not have to reduce its contribution at a linked receptor just because that receptor is a maintenance-only receptor conflicts with the Clean Air Act and case law. Proposal at 9514, JA66; *North Carolina*, 531 F.3d at 910 ("An outcome that

fails to give independent effect to the 'interfere with maintenance' prong violates the plain language of section 110(a)(2)(D)(i)(I).").  Kentucky's disregard for maintenance receptors "unlawfully nullifies that aspect of the statute and provides no protection for downwind areas that… still find themselves struggling to meet NAAQS due to upwind interference." *Id*. at 910-11.

Nowhere in Kentucky Energy and Environment Cabinet's comments on the Proposal do they respond to EPA's technical and legal reasons for rejecting their position on maintenance monitors. *See generally* KY EEC Comments at 1-3, JA511-13. Thus, EPA's conclusion remains unrebutted, Petitioners waived this issue on appeal, and it was therefore not arbitrary and capricious for EPA to finalize this basis for disapproval. Disapproval at 9354, JA19 (explaining that, unless otherwise noted, EPA is adopting the reasoning from the proposal into the final disapproval); *Browner*, 230 F.3d at 183 n.1.

### 2.    Local Emission Sources Do Not Alleviate Kentucky's Obligations.

Kentucky's position that it need not reduce its emissions because local sources near the receptor also contribute to the problem "incorrectly assumes that an upwind State 'contributes significantly' to downwind nonattainment only when its emissions are the sole cause of downwind nonattainment." *Wisconsin*, 938 F.3d at 324. As EPA and courts have explained, EPA explained that the Good Neighbor Provision is not a causation standard, so the fact that other sources also contribute

to ozone at the same receptors does not demonstrate Kentucky's contributions are not significant. Proposal at 9509, JA61, 9512, JA64; Disapproval at 9378, JA43; *Wisconsin*, 938 F.3d at 323-24 (under the plain text of the Good Neighbor Provision, "an upwind State can 'contribute' to downwind nonattainment even if its emissions are not the but-for cause"). And the whole point of the Good Neighbor Provision, as amended in 1990, is to reduce *collective* contribution to downwind air quality problems. *EME Homer*, 572 U.S. at 499. If the 2011-based modeling and screening threshold indicate Kentucky is linked to a receptor – and it was – then Kentucky cannot simply point to local sources around the receptor to excuse its own compliance with the Clean Air Act. Proposal at 9512-13, JA64-65; Disapproval at 9377, JA42 (explaining why whether local sources also contribute to a linked receptor is not relevant under the Good Neighbor Provision).

Putting aside that Kentucky's position conflicts with the Good Neighbor Provision, Kentucky also "does not provide a technical justification to support its conclusion that local emissions reductions at the receptors will achieve attainment without upwind reductions from sources within Kentucky." Proposal at 9513, JA54*; Westar*, 608 F. App'x at 2-3 (upholding EPA's disapproval of Good Neighbor submission because submission "failed to provide any analysis" of downwind effect of its in-state emissions). As EPA explained, the air pollution modeling (whether 2011-based or 2016-based) already considers emissions from

local sources at each receptor. Proposal at 9513, JA65. For example, using 2016-based modeling, of the receptors Kentucky is linked to, out-of-state emissions comprise anywhere from 55% to 94% of all emissions at those receptors. *Id*. That means out-of-state emissions (e.g., from Kentucky and other states) are the largest contributor to ozone nonattainment or maintenance problems at those receptors. *Id*. EPA explained that the statute and case law do not permit the deferral of upwind-state obligations pending downwind-state implementation of measures; instead, it requires Good Neighbor obligations to be addressed as expeditiously as practicable and on the same attainment schedule that downwind states face. Disapproval at 9368-69, JA33- (citing *Maryland*, 958 F.3d at 1204).

Lastly, Kentucky's submission includes a Hybrid Single Particle Lagrangian Integrated Trajectory back trajectory analysis,[21] which Kentucky used to support its position that local sources contribute to the Edgewood receptor. Proposal at 9513, JA65. As EPA explained: the "trajectory information provided by Kentucky was developed by EPA to inform the 2015 8-hour ozone NAAQS area designations and was not intended to evaluate long-distance interstate transport."

---

[21] Back trajectories are a method of tracing the centerline of the likely path a parcel of air traveled in the past on a map and not all potential areas that contributed to downwind pollutant concentrations. Proposal at 9513-14 n.66, JA65-66 n.66. They are most useful for assessing wind direction on local and urban scales and, unlike photochemical grid modeling, have limited utility for assessing the dispersion or formation of ozone and its precursor pollutants on a regional scale since the back trajectories do not include dispersion of pollutants or chemical reactions for the formation of ozone. RTC at 357-64, JA586-93, 363, JA592.

*Id; see also Ky. Res. Council*, 467 F.3d at 997 (deferring to EPA's technical determinations). Further, "the back trajectories used by Kentucky were limited to evaluating transport of air parcels over a relatively short 24-hour period, which limits their use for evaluating long-distance transport of emissions from Kentucky." *Id*. at 9514, JA66. In contrast, EPA's 2011-based and 2016-based modeling is "designed to assess ozone transported to downwind monitors across the entire region and over extended timeframes that fully account for fate and transport of ozone-precursors over longer distances." *Id*.

Nowhere in Kentucky Energy and Environment Cabinet's comments on the Proposal do they respond to EPA's many technical and legal reasons for rejecting Kentucky's position about local sources and back trajectories. *See generally* KY EEC Comments at 1-3, JA511-13. Thus, EPA's conclusion remains unrebutted, Petitioners waived this issue on appeal, and it was not arbitrary and capricious for EPA to finalize these bases for disapproval. Disapproval at 9354, JA19; *Browner*, 230 F.3d at 183 n.1.

### 3. Kentucky's Claimed Existing Emission Reductions Did Not Demonstrate Compliance with Good Neighbor Provision.

Prior to submitting its SIP to EPA, Kentucky sent EPA the draft submission for comment. EPA's pre-submission comments, dated September 20, 2018, noted that, under the 2011-based modeling, Kentucky was still linked to the Edgewood

receptor above 1 ppb and identified several deficiencies in Kentucky's conclusion that it should not have to reduce its emissions. Submission at pdf p. 234-37, JA125-128. EPA also asked Kentucky to identify what power plant closures, fuel switching, or other changes were not included in EPA's 2011-based modeling and to provide an estimate of those emission reductions. *Id*. at pdf p. 235, JA126.

In response to EPA's pre-submission comments, attached to its submission, Kentucky identified the closure of units 1 and 2 at the E.W. Brown coal plant as missing from EPA's 2011-based modeling and estimated that it would reduce the state's $NO_X$ emissions by 471 tons. *Id*. at pdf p. 326, JA454. Kentucky identified no other missing emission reductions from EPA's 2011-based modeling or quantified any other emission reductions. *See id*.

In response, EPA explained that "the Commonwealth did not clarify how these planned reductions [from closure of units 1 and 2] would resolve the Commonwealth's downwind contribution to the Harford County, Maryland [Edgewood] maintenance-only receptor by 2023." Proposal at 9511, JA63. "Nor did the Commonwealth evaluate whether emissions may increase at other sources whose generation would replace that lost at E. W. Brown." *Id*. Lastly, EPA noted that its 2016-based modeling does consider the closure of units 1 and 2 at E.W. Brown, and that, based on that modeling, Kentucky is still linked to downwind

receptors above 1% of the 2015 Ozone Standard.[22] *Id;* Disapproval at 9356, JA21. This illustrates that the retirements of those two units were not sufficient to delink Kentucky from elevated ozone levels at downwind receptors. Proposal at 9511, JA63*; see also Ky. Res. Council*, 467 F.3d at 997 (deferring to EPA's technical determinations); *Westar*, 608 F. App'x at 2-3.

Similarly, EPA's pre-submission comments expressed the concern that Kentucky's draft submission contained no quantification or analysis of how "on the books" emission reductions would comply with the Good Neighbor Provision. Submission at pdf p. 235, JA126. Kentucky did not fix this deficiency in its submission, as EPA explained: "Kentucky did not quantify these reductions in a meaningful way or demonstrate that the downwind improvements from these regulations and programs would be sufficient to eliminate the Commonwealth's significant contribution or interference with maintenance." Proposal at 9512, JA64; Disapproval at 9356, JA21 (Kentucky's submission "included an insufficient evaluation of additional emissions control opportunities" to support its conclusions); *Westar*, 608 F. App'x at 2-3. Given modeling data showing Kentucky emissions reached downwind receptors violating or struggling to maintain the 2015 Ozone Standard, states must present a legally and technically

---

[22] Further, under 2016v3 modeling, Kentucky is linked to four violating monitor receptors above 1%, including above 1 ppb at the Lake County, Ohio receptor, with a contribution of 1.57 ppb.

supported approach to defining "significant contribution," and merely pointing to claimed upcoming emissions reductions or other trends does not satisfy the Clean Air Act's requirements or provide EPA any basis to conclude the submission complies with the Act. Disapproval at 9375, JA40 (e.g., "each state must show that its decision-making was based on a 'technically appropriate or justifiable' evaluation").

In *Wisconsin*, the court faulted EPA's failure to analyze emission reductions from non-power plant sources of ozone-precursors under the Good Neighbor Provision. 938 F.3d at 319. Similarly, EPA's pre-submission comments on Kentucky's draft submission questioned the lack of any evaluation of opportunities to reduce emissions from non-power plant sources. Submission at pdf p. 235, JA126. Kentucky did not fix this deficiency. As EPA explained, the "submission did not evaluate or even attempt to identify additional control measures for EGUs or non-EGUs, nor did it include a determination of emission reduction potential for these potential additional controls or consider their cost-effectiveness or downwind air quality effects." Proposal at 9512, JA64.

Finally, the Act requires that measures relied on to "prohibit[]" "significant[] contribut[ion]" be "contain[ed]" in the SIP and enforceable. 42 U.S.C. § 7410(a)(2)(D). EPA's pre-submission comments expressed concern that the "actions" the draft submission identifies as emission reductions were not included

as requirements in the submission for EPA to approve into Kentucky's SIP and render federally enforceable. Submission at pdf p. 235, JA126. EPA advised Kentucky that, if it wants to rely on those actions, it would need to provide "a separate SIP revision that incorporates these emission reductions into the SIP." *Id*. Kentucky did not fix this deficiency in its submission, either. Proposal at 9515, JA67; Disapproval at 9356 (Kentucky's submission "may not rely on non-SIP measures to meet SIP requirements").

Nowhere in Kentucky Energy and Environment Cabinet's comments on the Proposal does it respond to the many legal and technical deficiencies EPA found regarding Kentucky's claims that existing measures were sufficient to resolve its significant contribution. *See generally* KY EEC Comments at 1-3, JA511-13. Thus, EPA's conclusion remains unrebutted, Petitioners waived this issue on appeal, and it was not arbitrary and capricious for EPA to finalize these bases for disapproval. Disapproval at 9354, JA19; *Browner*, 230 F.3d at 183 n.1.

\*      \*      \*      \*      \*

In sum, even accepting Petitioners' two arguments in their opening briefs, the 2011-based modeling Kentucky used in its submission showed Kentucky was linked to the Edgewood receptor above Kentucky's preferred 1 ppb screening threshold. EPA reasonably found each of Kentucky's arguments that it need not evaluate its emissions contributions further to be legally and technically deficient.

Thus, EPA properly "examined the relevant data and articulated a satisfactory explanation for its action." *St. Marys Cement Inc*., 782 F.3d at 285.

Because Kentucky did not even try to challenge any of these reasons when provided the opportunity to comment, EPA's many reasons for disapproving Kentucky's submission are unrebutted. So it was not arbitrary or capricious to finalize the Disapproval on those bases. Indeed, had EPA approved Kentucky's submission given the many legal and technical deficiencies EPA identified, that approval could have been an arbitrary and capricious action.

Thus, the Court need not reach the lawfulness of EPA's consideration of updated 2016-based modeling or any alleged change in EPA policy on screening thresholds. *See, e.g., Sierra Club 2019*, 939 F.3d at 687. Because Kentucky's inadequate submission was not approvable, even under its preferred modeling and screening threshold, EPA's Disapproval was not arbitrary or capricious.

**B.    EPA's Rejection of Kentucky's 1 ppb Screening Threshold Was Reasonable.**

**1.    EPA Applied the Threshold Memo Correctly.**

Petitioners argue that EPA's rejection of their 1 ppb threshold failed to consider their reliance interests stemming from EPA's nonbinding 2018 Threshold Memo. KY Br. 30-31; KY EEC Br. 25-26. Petitioners' position rests on the premise that, under the Threshold Memo, EPA would automatically approve the use of a 1 ppb threshold. But the memo does not say this. It states that "it *may* be

reasonable and appropriate for states to use a 1 ppb contribution threshold, as an alternative to a 1 percent threshold." Threshold Memo at 4, JA101 (emphasis added). EPA emphasized that state regulators "should consider whether the recommendations . . . are appropriate for each situation"; that the memo "may not apply to the facts and circumstances underlying a particular SIP"; and that "[f]ollowing these recommendations does not ensure" approval. Threshold Memo at 1, JA98. So the Threshold Memo was clear that it did not endorse the 1 ppb threshold without further, circumstance-specific justifications.

This circumstance is much like a recent case in this Court. In *Breeze Smoke, LLC v. FDA*, regarding guidance issued in July 2019 about what type of evidence the FDA "might" accept in a petitioner's September 2020 application, this Court held that the petitioner's reliance on that guidance was misplaced because the guidance did not compel FDA to accept petitioner's evidence. 18 F.4th 499, 507 (6th Cir. 2021). And this Court found that FDA's guidance did not require it to consider additional evidence when "the FDA found the evidence unsatisfactory." *Id*. Like the guidance in *Breeze Smoke*, nothing in the Threshold Memo required EPA to accept technically inadequate justifications for the use of a 1 ppb screening threshold.

Petitioners also claim that EPA's pre-submission comments engendered reliance interests, but that too is mistaken. KY Br. 31. Although EPA's pre-

submission comments said Kentucky could "apply the 1 ppb screening threshold established in the [Threshold Memo]," this does not change that the memo itself still required a technical justification, as described above and below. Submission at pdf p. 235, JA126 (also noting that, even under 1 ppb, Kentucky would still be linked to a receptor). In its pre-submission comments, EPA also echoed the Threshold Memo and said, "it *may* be reasonable and appropriate for states to use a 1 ppb contribution threshold." *Id*. at pdf p. 236, JA127 (emphasis added).[23] Nowhere in the pre-submission comments does EPA indicate Kentucky can do so without conducting further analysis and offering technical justification.

As EPA explained in its proposed disapproval, the Threshold Memo "would be applied under the facts and circumstances of each particular SIP submittal" and "Kentucky did not provide a technical analysis to sufficiently justify use of an alternative 1 ppb threshold at the linked, downwind monitors." Proposal at 9509, JA61. In its submission, all Kentucky did was state that it agrees "with EPA's rationale set out in the August 2018 memorandum that the amount of upwind collective contribution captured with the 1 percent and 1 ppb thresholds was generally comparable." *Id*. But, as EPA explained, "the guidance anticipated that

---

[23] State air agencies generally know that regional offices' preliminary feedback on draft submissions is not "binding" or "definitive guidance." *See* RTC at 75-76, JA582-83. If EPA's feedback was unclear, Kentucky could have followed up with EPA to seek clarification.

states would evaluate whether the alternative threshold was appropriate under their specific facts and circumstances, not that the use of the alternative threshold would be automatically approvable." *Id*. Because Kentucky's submission "did not provide discussion or analysis containing information specific to Kentucky or a receptor analysis for the affected monitors, as anticipated in the 2018 memorandum," EPA concluded that Kentucky's "use of 1 ppb as a contribution threshold is not approvable." *Id*.

Kentucky Energy and Environment Cabinet's comments on the proposed disapproval even admitted that the Threshold Memo only provided for the "*potential* use of 1ppb as a screening threshold." KY EEC Comments at 3, JA513 (emphasis added). Kentucky explained that it chose a 1 ppb threshold because of the "close correlation between the use of a 1% threshold and a 1 ppb threshold." *Id*. But, as EPA explained in its response to this comment, Kentucky's explanation did not get at the fundamental problem identified by EPA: "Given the absence of technical analysis to support the use of a 1 ppb threshold under the facts and circumstances relevant to Kentucky and its linked receptors, the EPA determines that Kentucky's submission does not provide a sufficient justification to support the use of a 1 ppb contribution threshold." RTC at 298, JA585; *Westar*, 608 F. App'x at 2-3 (upholding EPA's disapproval of Good Neighbor submission because submission "failed to provide any analysis" of downwind effect of its in-state

emissions); *see also Ky. Res. Council*, 467 F.3d at 997 (deferring to EPA's technical determinations).

This Court should conclude, like the guidance at issue in *Breeze Smoke, LLC*, nothing in the Threshold Memo provided any assurance that Kentucky could use 1 ppb threshold automatically and without adequate (or any) technical analysis. 18 F.4th at 507.

Because Kentucky Energy and Environment Cabinet's comments did not grapple with EPA's primary rationale for why the use of 1 ppb was unsupported (i.e., Kentucky's lack of any technical analysis), EPA's conclusion remains unrebutted. So it was not arbitrary and capricious for EPA to finalize this basis for disapproval. Disapproval at 9354, JA19.

### 2. The Threshold Memo Was Not "Longstanding" Policy From Which Reliance Interests Could Flow.

For reliance interests to flow, there must be some "longstanding" policy to base the reliance on. *Breeze Smoke, LLC*, 18 F.4th at 507 (finding that only recently issued guidance does not constitute a "longstanding" policy on which petitioner had reliance interests). When an agency changes course, it "must be cognizant that longstanding policies may have engendered serious reliance interests"—that parties may lose the significant resources they spent based on the old policy. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020) (holding that the agency engendered reliance interests in recipients of

a program because they "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the program).

Here, there was no policy change. Disapproval at 9373, JA38. As explained above, the Threshold Memo's guidance only suggested that a state could rely on a 1 ppb threshold in its Good Neighbor submission for the 2015 Ozone Standard if it included an adequate technical justification. *Supra* ARGUMENT § III.B.1. Kentucky did not do so, and that was the primary reason EPA rejected Kentucky's use of 1 ppb threshold. *Id.*

Regardless of the substance of the Threshold Memo, that memo was issued in August 2018 – just five months before Kentucky's submission in January 2019, so it was not "longstanding" for reliance purposes.[24] This case is like the nonbinding guidance at issue in *Breeze Smoke, LLC*, which this Court held did not constitute "longstanding" precedent for reliance interest purposes. 18 F.4th at 507. In that case, the issue was the petitioner's claimed reliance interest in its September 2020 application based on FDA's nonbinding guidance issued in July 2019. *See* Corrected Petitioner Brief, Case No. 21-3902, Doc. No. 30 at 12, 16 (filed November 16, 2021) (providing the dates of the FDA guidance and petitioner's

---

[24] EPA also explained that the Threshold Memo had been issued without notice and opportunity for public comment and did not constitute a consummated agency decision making process. Disapproval at 9374, JA39.

application). Similarly, EPA's nonbinding guidance – issued just five months before Kentucky's submission – cannot constitute "longstanding" precedent or policy from which a reliance interest could flow. *Breeze Smoke, LLC*, 18 F.4th at 507.

Also, as the Threshold Memo noted, the only "longstanding" policy at the time of its issuance was EPA's use of a 1% threshold in all its Good Neighbor rulemakings since 2011. *See* Threshold Memo at 2, JA("In previous federal actions, EPA's analysis of collective contribution concluded that a screening threshold equivalent to 1 percent of the 1997 and 2008 ozone NAAQS was appropriate at Step 2."); *see also* Disapproval at 9370-71, JA35-36 (EPA has consistently applied 1% threshold in past ozone actions); *id*. at 9373, JA38 ("affirming that a threshold higher than 1 ppb would not be justified under any circumstances for purposes of this action.").

Thus, the Threshold Memo did not constitute "longstanding" policy for reliance interest purposes. Even if it did, EPA did not change its position because the Threshold Memo never recommended use of a 1 ppb threshold in the absence of an adequate technical justification.

### C.   EPA's Consideration of Best Available Information Was Reasonable.

#### 1.   Under the Administrative Procedure Act, EPA Cannot Simply Ignore the State-of-the-Science 2016-based Modeling.

EPA's collection, development, and consideration of novel data or analysis when evaluating states' submissions for compliance with the Clean Air Act is lawful and consistent with the Administrative Procedure Act's standard of review. Under the Administrative Procedure Act, an agency must examine the "relevant data" and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted); *see also* Disapproval at 9366, JA31. Thus, "agencies do *not* have free rein to use inaccurate data." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56 (D.C. Cir. 2015). In other words, agencies "cannot *ignore* new and better data" that conflicts with their decision making and their statutory requirements. *Id.* at 57; *see, e.g.*, *Sierra Club v. EPA (Sierra Club 2012)*, 671 F.3d 955, 968 (9th Cir. 2012) (holding that EPA acted arbitrarily and capriciously by ignoring new data in its rulemaking on a SIP).[25]

---

[25] *See also, e.g.*, *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 807-08 (D.C. Cir. 2021) (holding that the agency "acted responsibly by taking account of the more recent analysis of the older data used . . . and by considering the newer data used"); *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1020-21 (D.C. Cir.

To be sure, courts have recognized that agencies may use older information in some cases when accompanied by a reasoned explanation. *See, e.g.*, *Catawba Cnty. v. EPA*, 571 F.3d 20, 45 (D.C. Cir. 2009) ("EPA was not obligated to upend [its rulemaking] process" because EPA "used the best information available in making its designations" and "dealt with newly acquired evidence in a reasonable fashion by explaining why it would not have changed [its decision-making]"); *Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 289-90 (D.C. Cir. 2023) (upholding EPA's use on remand of older data that was used in its initial rulemaking because EPA reasonably explained that using the same data for designating attainment areas would facilitate consistent treatment of all affected areas).

That EPA *may* consider older information in certain contexts if reasonably justified does not also mean EPA is limited in this context to only considering older information available to states or otherwise restricted from considering newer, relevant information. Petitioners cite no authority to that effect and, indeed, none exists.

---

1999) (remanding an agency rule that calculated future threshold based on outdated data instead of using newer, yet preliminary, data because the agency provided no reasoned explanation for its reliance on the outdated data and the newer data materially affected the agency's analysis); *Zen Magnets, LLC v. Consumer Prod. Safety Comm'n*, 841 F.3d 1141, 1149-50 (10th Cir. 2016) (remanding an agency rule that relied on outdated data and ignored newer data that cast doubt on the agency's reasoning for its final action).

The state-of-the-science 2016-based modeling for projecting future ozone concentrations and contributions is relevant to EPA's obligation under the Good Neighbor Provision to approve only those SIPs that adequately analyze and address downwind ozone air quality and contribution levels by the 2023 analytic year. *See* Disapproval at 9364, JA29, 9366, JA31. It's difficult to envision what data is more relevant to this issue than the nationwide modeling and monitoring data that EPA and the states rely on in making those projections and determining compliance with the Good Neighbor Provision. So it's important that EPA use up-to-date information.

EPA, along with state collaborators, updated its modeling to a 2016 base year, as it periodically does in accordance with its modeling guidance, to ensure that its modeling results do not grow stale. *Supra* BACKGROUND § II.A. EPA further refined its 2016-based modeling to improve reliability and reduce underpredictions in projecting 2023 ozone concentrations and contributions. *See id.* Consistent with its prior modeling, EPA's 2016v3 modeling showed that monitoring sites, associated with nonattainment areas throughout the country, were likely to continue to violate the 2015 Ozone Standard in 2023 as well. *Id.* at 9367, JA32. And the recent monitoring data from 2021 and 2022 confirmed the likely persistence of violating ozone levels at still other monitoring sites. *Id.* at 9349,

77

JA14, 9370, JA35. This includes Kentucky's consistent linkages to downwind states. *Supra* BACKGROUND § II.A (Table 1).

In short, the best available information—the state-of-the-science 2016-based modeling and recent monitoring data—was a relevant factor in this context that EPA could not ignore in conducting the "substantive inquiry" the Good Neighbor provision requires. *Maryland*, 958 F.3d at 1201; *see also infra* ARGUMENT § III.C.2. In considering the 2016v3 modeling, EPA provided a reasoned response to comments and gave a thorough explanation for why the 2016v3 modeling is reliable to support the Disapproval. Disapproval at 9344-50, JA9-15, 9366-67, JA31-32. *Ky. Res. Council, Inc.*, 467 F.3d at 991 (this Court "will defer in large part to the agency's expertise" and "should be at its most deferential in reviewing an agency's scientific determinations in an area within the agency's expertise"); *see also id*. at 997 ("This decision falls within the technical expertise of the agency and is entitled to deference."). Thus, EPA properly "examined the relevant data and articulated a satisfactory explanation for its action." *St. Marys Cement Inc*., 782 F.3d at 285.

Indeed, it could have been arbitrary and capricious for EPA to have ignored the 2016-based modeling. *See*, *e.g.*, *Sierra Club 2012*, 671 F.3d at 968 (holding that EPA acted arbitrarily and capriciously by disregarding new data in its rulemaking); *Ass'n of Irritated Residents v. EPA*, 686 F.3d 668, 677 (9th Cir. 2012)

(holding that, when new modeling revealed an implementation plan was deficient, EPA's failure to evaluate adequacy of that plan was arbitrary and capricious); *ATK Launch Sys., Inc. v. EPA*, 669 F.3d 330, 340 (D.C. Cir. 2012) (upholding EPA's analysis of pollution transport because it "was reasonably based upon the best available information" and petitioner "fail[ed] to demonstrate that EPA ignored new information."); *State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43 ("Normally, an agency rule would be arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem ...."); *1000 Friends of Md. v. Browner,* 265 F.3d 216, 235 (4th Cir. 2001) ( "[T]here may be cases where previously performed modeling is inadequate to demonstrate attainment such that EPA's failure to require new modeling in those cases might be found to be arbitrary or capricious[.]").

> **2.     EPA's Consideration of the State-of-the-Science 2016-based Modeling is Supported by the Clean Air Act and the Good Neighbor Provision.**

EPA's consideration of post-submission data when evaluating Good Neighbor submissions also comports with the plain text of the Clean Air Act. The Act provides that EPA may only approve a submission "if it meets all of the applicable requirements." 42 U.S.C. § 7410(k)(3). In making this determination, EPA must substantively evaluate states' Good Neighbor submissions in accordance with the statutory timetable downwind areas face. *See Maryland*, 958 F.3d at 1203-

04. That timing is as expeditiously as practicable and no later than the next attainment date. *See* Disapproval at 9340-41, JA5-6. The Act's procedural deadlines—e.g., the timing of a state's submission or EPA's review of such submission—impose no bar on EPA from considering newer data. *See Wisconsin*, 938 F.3d at 322; Disapproval at 9366, JA31. The attainment schedule is the "Act's central object," rather than the Act's procedural deadlines, which are not "central to the regulatory scheme." *Wisconsin*, 938 F.3d at 316-18, 322. Thus, the plain text and purpose of the Clean Air Act obligate EPA to evaluate and approve only those submissions that meet the Act's substantive requirements and do not limit the data that EPA may consider when making this determination. *See* Disapproval at 9364-65, JA29-30.

While the Clean Air Act provides that EPA "shall" act on SIP submissions within a specified time, 42 U.S.C. § 7410(k)(2), the Supreme Court has consistently declined to treat that text, without more, as a limit precluding action later. *Barnhart v. Peabody Coal Co*., 537 U.S. 149, 158 (2003). In upholding EPA's action despite its failure to timely act on a related SIP submission, the Supreme Court observed that when "there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act." *Gen. Motors Corp. v. United States*, 496 U.S. 530, 541-42 (1990) (quotation omitted). The Act addresses agency delay

through providing for citizen suit enforcement of statutory deadlines, not altering the scope of what EPA may consider. *See* Disapproval at 9365, JA30 (citing *Oklahoma*, 723 F.3d at 1223-24; *Mont. Sulphur & Chem. Co. v. EPA*, 666 F.3d 1174, 1190-91 (9th Cir. 2012)).

The forward-looking nature of the Good Neighbor Provision reinforces this position. Its plain text prohibits upwind states from emitting in amounts which "will" contribute significantly to nonattainment or "will" interfere with maintenance. 42 U.S.C. § 7410(a)(2)(D)(i). Thus, EPA has consistently defined Good Neighbor obligations by reference to modeling projections of a future analytical year, here 2023. *See North Carolina*, 531 F.3d at 913-14. The best available information about that future year is relevant to meeting the Act's substantive obligation, and procedural deadlines do not cabin EPA's authority to consider such information. *See Wisconsin*, 938 F.3d at 321-22; Disapproval at 9366, JA31. Given the Good Neighbor Provision's forward-looking language, it would be "anomalous" for EPA to rely exclusively on older data when more recent, reliable data exist for making projections of whether downwind states will attain air-quality standards. *Wisconsin*, 938 F.3d at 321-22; *see also* Disapproval at 9366; JA31. After all, the purpose of the Act, including the Good Neighbor provision, is not to conduct a round of modeling and call it a day, but to ensure health-based air quality standards are actually met.

Indeed, in *Wisconsin*, the D.C. Circuit upheld EPA's use of its updated modeling of 2017 because of the future-looking analysis of the Good Neighbor Provision. 938 F.3d 303. Rejecting a state's argument that EPA's analysis should be limited to air-quality conditions in existence at the time of the statutory deadline for SIP submissions, the court found "SIP submission deadlines, unlike attainment deadlines, are 'procedural' and therefore not 'central to the regulatory scheme.'" *Id.* at 322 (quoting *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) (invalidating EPA's extension of the attainment deadline notwithstanding missed procedural deadlines)). *Wisconsin* provides that EPA is not prohibited from considering the best available information when evaluating Good Neighbor SIP submissions. *See* Disapproval at 9366, JA31. In highlighting the Act's substantive obligation, the D.C. Circuit in *Wisconsin* further held that when EPA disapproves a SIP submission, it "must issue a FIP that will bring that State into compliance before upcoming attainment deadlines, even if the outer limit of the statutory [§ 7410] timeframe gives EPA more time to formulate the FIP." *Wisconsin*, 938 F.3d at 318; Disapproval at 9361-62, JA26-27 (explaining the same).

In short, nothing in the Clean Air Act requires EPA to rely on outdated modeling in its Good Neighbor analysis or to reject more recent modeling and monitoring data to project conditions in 2023. *See Weld Cnty.*, 72 F.4th at 290 (recognizing that EPA generally must base its decisions on the best available data);

*see also* Disapproval at 9366, JA31. And the Act's procedural deadlines impose no bar on EPA from considering newer data. *See Wisconsin*, 938 F.3d at 322; Disapproval at 9366, JA31.

Absurd results would occur if EPA were prohibited from considering updated data. For example, Wyoming submitted a SIP based on the 2011-based modeling that showed Wyoming contributed above its chosen threshold to downwind ozone nonattainment in 2023. *See* 87 Fed. Reg. 31495, 31508-09 (May 24, 2022). The state-of-the-science 2016v3 modeling results showed that Wyoming is not projected to contribute to downwind ozone air-quality problems. *See* 88 Fed. Reg. 54998, 55004 (Aug. 14, 2023). Under Petitioners' contention, EPA would need to use the 2011-based modeling, and thus (if it disagreed with Wyoming's arguments about why its contributions were not significant) would need to disapprove Wyoming's submission, even though the most up-to-date data suggests that Wyoming is *not* projected to contribute to downwind ozone nonattainment in 2023 and that Wyoming's submission is approvable. *Id.* at 54998. *See also* RTC at 62, JA581(explaining that Petitioners' position would frustrate the very purpose of notice-and-comment rulemaking by forcing EPA to "ignore many of the comments on the[] [Proposals] providing updates to the EPA's emissions inventories, which [EPA] considered in developing the 2016v3 modeling"). The Good Neighbor

provision focuses on real-world emissions that significantly contribute to real-world air quality problems. *Maryland*, 958 F.3d at 1200-01.

### 3.    Case Law Cited by Petitioners Is Inapposite.

To reach Petitioners' position, EPA would have to ignore the Administrative Procedure Act and the plain language of the Clean Air Act and the Good Neighbor Provision. Petitioners cite a few cases to support their argument, but none suggest an affirmative limitation on the information EPA can consider when acting on a Good Neighbor SIP.

One of the primary cases Petitioners rely on for their position is *Sierra Club v. EPA (Sierra Club 2004)*, 356 F.3d 296 (D.C. Cir. 2004). KY Br. 29; KY EEC Br. 24. But that case does not support Petitioners' position that EPA may consider only data available at the time of a state's submission. In that case, the rule at issue pertained to a different type of implementation plan called an attainment plan,[26] which different statutory provisions govern, including a requirement to provide a "current inventory of actual emissions" in the attainment plan. 42 U.S.C. § 7502(c)(3); *see also* RTC at 61, JA580. Notwithstanding this plain difference with the requirements EPA evaluates under the Good Neighbor Provision, *Sierra Club* only illustrates EPA's discretion to weigh many factors in reviewing

---

[26] A State must submit an attainment plan for EPA's review for any area that EPA designates or reclassifies as nonattainment with respect to any NAAQS. 42 U.S.C. § 7502(b).

submissions for compliance with statutory requirements. 356 F.3d at 308-09. In that case, the court upheld EPA's decision to allow the jurisdictions to use older data in meeting the 42 U.S.C. § 7502(c)(3) requirements because requiring states to redo their submissions using an updated model released one month before the SIPs were submitted to EPA would cause unnecessary delay in the process of implementing emissions control strategies to meet the attainment date. *Sierra Club 2004*, 356 F.3d at 308. Thus, *Sierra Club 2004* simply underscores that the driving motivation of SIP development is expeditious attainment of the NAAQS and avoiding delay of implementation of necessary emission reductions through redevelopment of SIP submissions. *See Wisconsin*, 938 F.3d at 316 (holding that the Act's central objective is to achieve attainment of healthy air quality by the statutory deadline). Here, EPA did not disapprove any SIP based on choice of modeling but based on the substantive inquiry the Good Neighbor Provision requires. RTC at 60, JA579.

In *Sierra Club 2012,* which concerns the same statutory provision at issue in *Sierra Club 2004*, the Ninth Circuit held that EPA arbitrarily and capriciously approved a SIP submission (which had been submitted six years prior) based on data that was available at the time of submission because, in doing so, EPA ignored newer data. 671 F.3d at 966-68. The court did not view this holding as inconsistent with the D.C. Circuit's decision in *Sierra Club 2004* because it found

there was little burden in EPA's considering the newer data and doing so would not have prolonged EPA's final action, as the newer data had been available for some time. *Id.* at 966-67.

At most, the D.C. Circuit's holding in *Sierra Club 2004* means that, sometimes, it may be appropriate for EPA to approve states' use of an out-of-date model when doing so is consistent with the larger objectives of the Clean Air Act. That case does not endorse the position or mandate that EPA cannot consider information not available to states when they developed their submissions. *See* RTC at 61, JA580.

Petitioners also cite *New York v. EPA*, 964 F.3d 1214 (D.C. Cir. 2020). KY Br. 26; KY EEC Br. 22. But that case is inapposite. There, in the context of EPA's denial of a downwind state's petition under 42 U.S.C. § 7426 alleging that upwind sources were violating the Good Neighbor Provision, EPA had suggested that a downwind petitioner could demonstrate an upwind state's noncompliance with the Good Neighbor Provision at Step 3 through four possible analyses but then: (1) reversed its position on the first possible option "without any reasoned explanation," *New York*, 964 F.3d at 1222; and (2) stated that an adequate analysis may require detailed and technically particularized information on emissions from upwind state's sources, much of which is not typically accessible to the public, including the petitioning, downwind state, *id.* at 1223-24. Thus, the D.C. Circuit

held that EPA arbitrarily and capriciously failed to provide a reasoned decision, provided contradictory messages, and set informational requirements that would be near-impossible for a downwind jurisdiction to meet. *Id.*

Unlike the issue in *New York*, there is nothing inconsistent between the Modeling Memo and the Disapproval. EPA's general ozone-transport modeling methodologies have remained constant, with each iteration simply incorporating updated information. BACKGROUND § II.A. Nor did EPA erect an insurmountable informational hurdle for states preparing SIP submissions. EPA provided the 2011-based modeling results as information that states may consider, but EPA was clear in the Modeling Memo that it did not constitute any final decision by EPA, which would be made only through subsequent notice-and-comment rulemaking. Modeling Memo at 2, JA76. EPA also evaluated and accepted the alternative Alpine modeling attached to Kentucky's submission, noting that it demonstrated linkages above 1% and 1 ppb at multiple receptors, along with those identified by EPA's 2011-based modeling. Proposal at 9509, JA61, 9508 n.48, JA60, n.50, JA61. In no way did the Modeling Memo confine EPA's assessment of the SIP submissions to the 2011-based modeling, and EPA made no policy change in relying on newer modeling and other data.

Had Kentucky conducted an appropriate Step 3 analysis based on the 2011-modeling, the application of a new set of modeling would not necessarily have

been a basis for disapproval, and EPA said as much. Disapproval at 9343, JA8, 9367, JA32, 9375-76, JA40-41; RTC at 60, JA579. Changes in modeled linkages depending on meteorological inputs do not "mov[e] the goal posts," KY Br. 38; the phenomenon is inherent to projecting future ozone conditions. EPA's approach reflects that scientific reality and respects the "vagaries of the wind." *EME Homer*, 572 U.S. at 497. Kentucky's complaint might have had more force had the Submission taken a receptor-specific approach at step 3. But it did not. In fact, Kentucky notably declined to adopt a receptor-specific method of allocating upwind-state responsibility. Disapproval at 9376, JA41.

In sum, the Act's substantive objective and the Good Neighbor Provision's forward-looking focus supports EPA's consideration of updated modeling.

### 4. There Was No "Longstanding" Policy Prohibiting EPA From Considering Updated Modeling.

As an initial matter, this argument—that the Disapproval is unlawful for deviating from an allegedly "longstanding" EPA policy—is waived. *Browner*, 230 F.3d at 183 n.1. EPA received no comments that: (1) claimed that EPA deviated from any "longstanding policy" that purportedly exists under Section 7502(c)(3) or other provisions of the Act; (2) explained any relationship between the provision at issue in *Sierra Club 2004* and the Good Neighbor Provision; or (3) provided citations to EPA Clean Air Act actions to establish that any such longstanding

policy exists. EPA thus had no opportunity to respond to these arguments on the record, and this "longstanding-policy" argument is waived.

But even if not waived, for a reliance interest to flow, it must be based on a "longstanding" policy. *Breeze Smoke, LLC*, 18 F.4th at 507. And the only longstanding policy is that EPA consistently considers the best available information, including its most recent round of modeling and current monitoring data in evaluating Good Neighbor SIP submissions for substantive compliance with the Act. *See, e.g.*, 81 Fed. Reg. at 74507 (addressing *EME Homer*'s remand of part of Transport Rule by relying on updated modeling prepared after remand); 81 Fed. Reg. 38957, 38958 (June 15, 2016) (disapproving Ohio's and Indiana's Good Neighbor SIPs for the 2008 ozone NAAQS based in part on updated modeling).

In fact, EPA just did so in acting on Kentucky's *last* Good Neighbor SIP submission, for the 2008 ozone NAAQS. EPA relied on modeling developed after EPA's approval of Kentucky's SIP, 83 Fed. Reg. 33730 (July 17, 2018), to propose and finalize an error correction of that approval to a disapproval and promulgate a FIP. *See* 86 Fed. Reg. at 23068; 85 Fed. Reg. 68964, 68978 (Oct. 30, 2020). So Petitioners are wrong in claiming that EPA departed from a longstanding policy on the modeling it considers. The Disapproval follows EPA's longstanding practice of considering the best available information.

EPA has also considered and rejected comments in multiple Good Neighbor actions across multiple NAAQS asserting that EPA cannot consider updated modeling information that post-dates a state's Good Neighbor submission. 81 Fed. Reg. at 38959-60; *see also* 81 Fed. Reg. 53284, 53285 (Aug. 12, 2016) (citing new modeling indicating Texas was linked to receptors for the 2008 ozone NAAQS); 81 Fed. Reg. at 74507 (using same modeling to conclude that Texas did *not* have further Good Neighbor obligations for the 1997 ozone NAAQS). EPA has also taken a similar approach in addressing Good Neighbor obligations for other NAAQS. *See* 86 Fed. Reg. 31645, 31648-49, 31654 (June 15, 2021) (proposing to approve Kansas's and Nebraska's Good Neighbor SIPs for the 2010 sulfur dioxide NAAQS based in part on analysis EPA developed after submission), *approved on those grounds in* 86 Fed. Reg. 43960 (Aug. 11, 2021).

Petitioners cite several EPA actions in other contexts (not the Good Neighbor Provision) to argue that EPA has a "longstanding" policy of limiting its analysis to modeling available at the time of a submission. KY Br. 27-28. But none of these cited EPA actions supports Petitioners proposition that EPA has a "longstanding" policy to not consider new information generated after a SIP submission.

For example, in conditionally approving the SIPs at issue in *Sierra Club 2004* under Section 7502(c)(3), EPA stated that consideration of an updated motor

vehicle emissions model was not required if the SIP submissions were "*otherwise approvable*." 68 Fed. Reg. 19106, 19121 (Apr. 17, 2003). Further, one of the conditions of approval was for the jurisdictions to update their SIPs using the more recent model within one year of EPA's conditional approval, otherwise the approval would revert to a disapproval. *Id.* at 19107; 42 U.S.C. § 7410(k)(4).

Whether EPA requires states to incorporate more up-to-date information to meet this requirement, EPA itself often considers updated information in assessing attainment plans. *See, e.g.*, 84 Fed. Reg. 24712, 24714 (May 29, 2019) (approving Louisiana's attainment plan based in part on EPA's supplemental modeling); 88 Fed. Reg. 10464, 10465 (Feb. 21, 2023) (approving Illinois's attainment plan based partially on EPA's supplemental modeling to state's modeling). Whatever the circumstances of the notices cited by Petitioners, the purported "longstanding policy" they allege is at a minimum tempered by other considerations because "it would be inappropriate for the EPA to ignore monitoring data that clearly establish, as a factual matter, that the [state's] attainment demonstration failed to provide for attainment." *See, e.g.*, 86 Fed. Reg. 67329, 67332 (Nov. 26, 2021).

In short, none of the actions cited by Petitioners support their position that EPA has a longstanding policy of limiting its consideration to the information available to states at a certain point in time when acting on SIP submissions. And when EPA exercises its discretion (if not duty) to consider newer, better

information, this Court's role is to determine whether EPA's exercise of that discretion was arbitrary or capricious. *See also Ky. Res. Council*, 467 F.3d at 997 (deferring to EPA's technical determinations).

For the reasons above, EPA's decision to consider the 2016-based modeling and most recent monitoring data was reasonable and grounded in the Act. *Supra* ARGUMENT § III.C.

### 5.    There Was No Reliance Interest Regarding EPA's 2011-based Modeling.

Petitioners argue that EPA's consideration of 2016-based modeling violates their reliance interest in EPA's 2011-based modeling. KY Br. 30-33; KY EEC Br. 25-27. But as explained above, Kentucky is linked above 1% and 1 ppb under both 2011-based and 2016v3 modeling. Thus, Kentucky's submission was not approvable even under the 2011-based modeling. *Supra* ARGUMENT § III.A. And Kentucky was offered a chance to comment, but Kentucky Energy and Environment Cabinet's comments on EPA's proposal included no argument that they had a reliance interest in the 2011-based modeling, so it is waived on appeal. *Browner*, 230 F.3d at 183 n.1.

As a threshold matter, EPA's proposal explained why it was basing its decision, in part, on the state-of-the-science 2016-based modeling, so Kentucky's failure to raise any reliance interest in its comments not only waives that issue but also undermines its position here. All the Administrative Procedure Act requires is

that Kentucky have an opportunity to comment, and EPA cannot be faulted for allegedly not considering reliance interests if Kentucky did not even raise them when provided the opportunity to do so. *Perez*, 575 U.S. at 106.

In any event, all the Modeling Memo did was provide the most up-to-date modeling available in March 2018; it did not determine states' obligations under the Clean Air Act's Good Neighbor Provision. Modeling Memo at 2, JA76; *see also* Disapproval at 9368, JA33. EPA stated: while states may use "the information in th[e] memorandum and the associated air quality analysis data" in order "to inform the development of the[ir] SIPs, the information [wa]s not a final determination regarding states' obligations under the good neighbor provision." Modeling Memo at 2, JA76; *see also* Disapproval at 9340, JA5.

Courts have recognized that whether parties have incurred substantial costs in reliance on an agency policy is a relevant factor for agencies to consider before changing that policy. Here, Petitioners cannot claim a reliance interest "anything like [the] prospective economic, regulatory, or social disruption" associated with reliance interests found cognizable in case law. *Ramos v. Louisiana*, 140 S. Ct. 1390, 1406 (2020) (rejecting states' reliance interest in having to retry case). Petitioners just used EPA's 2011-based modeling to develop a SIP that imposed no obligations to reduce emissions, and Petitioners do not identify any investments or incurred expenses that are now lost. Nor did EPA reject the 2011-based modeling

out of hand but explained why Kentucky's submission was not approvable based on the entire record. Disapproval at 9343, JA8; RTC at 60, JA579. "[U]nidentified and unproven reliance interests are not a valid basis on which to undo agency action. Instead, the harm occasioned must be specifically identified, reasonably incurred, and causally tied" to the federal action. *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020) (rejecting argument that government delay inevitably harmed reliance interests).

Because they failed to raise in their comments or support their claims in their briefs regarding any protected reliance interests, Petitioners cannot show that EPA violated any reliance interest.

## IV.    If The Court Determines That EPA Erred, It Should Remand But Not Vacate the Disapproval.

EPA's Disapproval is lawful and should be upheld. But even if the Court finds some flaw with the Disapproval, it should not vacate the action as it relates to Kentucky's submission. Instead, the Court should remand to EPA and allow the Disapproval to remain in place pending prompt completion of remand proceedings, allowing the stay entered by the motions panel to expire by its own terms.

Whether vacatur is appropriate depends (1) "on the seriousness of the agency error" and (2) "the disruptive consequences of vacatur." *Sierra Club v. EPA (Sierra Club 2023)*, 60 F.4th 1008, 1022 (6th Cir. 2023) (cleaned up) (citing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 998 F.2d 146, 150-51 (D.C.

Cir. 1993)). On the first factor, remand without vacatur is appropriate "[w]hen an agency may be able readily to cure a defect in its explanation of a decision." *Id.; see also Allied-Signal*, 988 F.2d at 1511 (remanding without vacatur where there was a "possibility" that the agency could justify its inadequately supported decision). On the second factor, remand without vacatur is appropriate when the disruption caused by vacatur would be more than just "the regulatory uncertainty that typically attends vacatur of any rule." *Sierra Club 2023*, 60 F.4th at 1023 (quoting *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 85 (D.C. Cir. 2020)).

Here, both factors support remand without vacatur.

*First*, Petitioners primarily allege procedural defects and record-based deficiencies that EPA could address and correct on remand. For example, if the Court were to conclude that EPA erred in considering the best available information to inform its rulemaking judgment, EPA can support its Disapproval for Kentucky based on the myriad of elaborated reasons why, even under 2011-based modeling, Kentucky's submission was inadequate. *Supra* ARGUMENT § III.A.

*Second*, vacating the Disapproval would disrupt and impede polluting sources' compliance with the Clean Air Act, further delaying EPA's efforts through the federal Good Neighbor Plan to implement Congress's mandate that upwind states must prohibit emissions contributing significantly to nonattainment

or interfering with maintenance as expeditiously as practicable. *Maryland*, 958
F.3d at 1203-04; *see also Wisconsin*, 938 F.3d at 317. Vacatur would thus leave
downwind areas to suffer continuing poor air quality and inequitable regulatory
burdens, hindering downwind states' efforts to attain the 2015 Ozone Standard
while permitting upwind states to "reap[] the benefits of the economic activity
causing the pollution without bearing all the costs." *EME Homer*, 572 U.S. at 495.

Without the Disapproval, EPA would lack the authority to implement its
federal Good Neighbor Plan for Kentucky. Without the Good Neighbor Plan or
approved state plans that meet the Good Neighbor Provision, there is significant
inequity, as sources in some upwind states are reducing their harmful pollution
while others are not. This in turn means only some downwind areas are benefitting
from the protection Congress afforded them; areas downwind of Kentucky
continue to see no relief from the State's significant contribution, forcing them to
bear increased economic and regulatory burdens. The Good Neighbor Plan was
designed to comply with prior court rulings and deliver air quality benefits already
delayed by several years under the statutory schedule. *See, e.g.*, 88 Fed. Reg. at
36690 (noting Marginal attainment date has already passed).

Thus, vacating EPA's action as applied to Kentucky would disrupt the
schedule of emissions reductions, *see* 88 Fed. Reg. at 36737-39, and delay
"meaningful downwind air quality improvement," *id*. at 36748, that the Clean Air

Act and Good Neighbor Plan are designed to deliver. Out of concerns for public health and the environment, courts have a history of not vacating EPA actions implementing the Good Neighbor Provision, even when remand of some aspect of those actions may be appropriate. *See, e.g.*, *Wisconsin*, 938 F.3d at 336 ("[W]e do not vacate regulations when doing so would risk significant harm to the public health or the environment."); *North Carolina v. EPA*, 550 F.3d 1176, 1178 (D.C. Cir. 2008) ("[I]t is appropriate to remand without vacatur in particular occasions where vacatur would at least temporarily defeat . . . the enhanced protection of the environmental values covered by [the EPA rule at issue]." (quotation omitted)). So if this Court determines that remand is proper, EPA asks the Court to remand the Disapproval without vacatur and let its stay orders expire by their own terms.

## CONCLUSION

For all these reasons, the petitions for review should be transferred to the D.C. Circuit or denied.

Dated: January 29, 2024

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

*/s/ Jeffrey Hammons*

Of Counsel:

JEFFREY HAMMONS
Environment and Natural Resources Division
ROSEMARY HAMBRIGHT KABAN
DANIEL P. SCHRAMM
JEANHEE HONG
U.S. Environmental Protection Agency
U.S. Department of Justice
Post Office Box 7611
Washington, D.C. 20044
(202) 598-6925
Jeffrey.Hammons@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 21,995 words according to the count of Microsoft Word, excluding the parts of the brief exempted under Fed. R. App. P. 32(f) and Sixth Circuit Rule 32(b)(1).

s/ *Jeffrey Hammons*
JEFFREY HAMMONS

*Counsel for Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/ *Jeffrey Hammons*
JEFFREY HAMMONS

*Counsel for Respondents*

# STATUTORY AND REGULATORY ADDENDUM

# TABLE OF CONTENTS

5 U.S.C. § 706 ......................................................................... Add. 001

42 U.S.C. § 7410 .................................................................... Add. 003

42 U.S.C. § 7426 .................................................................... Add. 012

42 U.S.C. § 7502 .................................................................... Add. 013

42 U.S.C. § 7607 .................................................................... Add. 016

to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to the report.

**Editorial Notes**

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

### § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof,

that: ''This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].''

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a rule that would not take effect by reason of subsection (a)(3) may take effect, if the President makes a determination under paragraph (2) and submits written notice of such determination to the Congress.

(2) Paragraph (1) applies to a determination made by the President by Executive order that the rule should take effect because such rule is—

(A) necessary because of an imminent threat to health or safety or other emergency;

(B) necessary for the enforcement of criminal laws;

(C) necessary for national security; or

(D) issued pursuant to any statute implementing an international trade agreement.

(3) An exercise by the President of the authority under this subsection shall have no effect on the procedures under section 802 or the effect of a joint resolution of disapproval under this section.

(d)(1) In addition to the opportunity for review otherwise provided under this chapter, in the case of any rule for which a report was submitted in accordance with subsection (a)(1)(A) during the period beginning on the date occurring—

(A) in the case of the Senate, 60 session days, or

(B) in the case of the House of Representatives, 60 legislative days,

before the date the Congress adjourns a session of Congress through the date on which the same

other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

ROLE OF SECONDARY STANDARDS

Pub. L. 101–549, title VIII, §817, Nov. 15, 1990, 104 Stat. 2697, provided that:

''(a) REPORT.—The Administrator shall request the National Academy of Sciences to prepare a report to the Congress on the role of national secondary ambient air quality standards in protecting welfare and the environment. The report shall:

''(1) include information on the effects on welfare and the environment which are caused by ambient concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

''(2) estimate welfare and environmental costs incurred as a result of such effects;

''(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

''(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

''(5) estimate the costs and other impacts of meeting secondary standards; and

''(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

''(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

''(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

''(3) There are authorized to be appropriated such sums as are necessary to carry out this section.''

## § 7410. State implementation plans for national primary and secondary ambient air quality standards

### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any pollut-

ant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,

(ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional

agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require, as may be prescribed by the Administrator—

(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

(iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for—

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c), shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

---

[1] See References in Text note below.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

(C) For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)¹ of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, §101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

(C) Repealed. Pub. L. 101–549, title I, §101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing

which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title, as in effect before August 7, 1977, or section 7413(d)[1] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title as in effect before August 7, 1977, or under section 7413(d)[1] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

### (h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

### (i) Modification of requirements prohibited

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d)[1] of this title (relating to compliance orders), a plan promulgation under subsection (c), or a plan revision under subsection (a)(3); no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

### (j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

### (k) Environmental Protection Agency action on plan submissions

#### (1) Completeness of plan submissions

##### (A) Completeness criteria

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

##### (B) Completeness finding

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

##### (C) Effect of finding of incompleteness

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

#### (2) Deadline for action

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

### (3) Full and partial approval and disapproval

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

### (4) Conditional approval

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

### (5) Calls for plan revisions

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D, unless such date has elapsed).

### (6) Corrections

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

### (l) Plan revisions

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

### (m) Sanctions

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

### (n) Savings clauses

#### (1) Existing plan provisions

Any portion of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

#### (2) Attainment dates

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

#### (3) Retention of construction moratorium in certain areas

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) (as in effect immediately before November 15, 1990) applied by virtue of a finding

of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development[2] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, § 110, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, § 4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§ 107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, § 14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, § 3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§ 101(b)–(d), 102(h), 107(c), 108(d), title IV, § 412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

### Editorial Notes

#### REFERENCES IN TEXT

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§ 791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and (i), was amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original "section 119, as in effect before the date of the enactment of this paragraph", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsecs. (f)(5) and (g)(3) of this section by Pub. L. 95–95, § 107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

#### CODIFICATION

Section was formerly classified to section 1857c–5 of this title.

#### PRIOR PROVISIONS

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

#### AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, § 101(d)(8), substituted "3 years (or such shorter period as the Administrator may prescribe)" for "nine months" in two places.

Subsec. (a)(2). Pub. L. 101–549, § 101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof and listing the conditions under which the plan or portion thereof was to be approved after reasonable notice and hearing.

Subsec. (a)(3)(A). Pub. L. 101–549, § 101(d)(1), struck out subpar. (A) which directed Administrator to approve any revision of an implementation plan if it met certain requirements and had been adopted by the State after reasonable notice and public hearings.

Subsec. (a)(3)(D). Pub. L. 101–549, § 101(d)(1), struck out subpar. (D) which directed that certain implementation plans be revised to include comprehensive measures and requirements.

Subsec. (a)(4). Pub. L. 101–549, § 101(d)(2), struck out par. (4) which set forth requirements for review procedure.

Subsec. (c)(1). Pub. L. 101–549, § 102(h), amended par. (1) generally, substituting present provisions for provisions relating to preparation and publication of regulations setting forth an implementation plan, after opportunity for a hearing, upon failure of a State to make required submission or revision.

Subsec. (c)(2)(A). Pub. L. 101–549, § 101(d)(3)(A), struck out subpar. (A) which required a study and report on necessity of parking surcharge, management of parking supply, and preferential bus/carpool lane regulations to achieve and maintain national primary ambient air quality standards.

Subsec. (c)(2)(C). Pub. L. 101–549, § 101(d)(3)(B), struck out subpar. (C) which authorized suspension of certain regulations and requirements relating to management of parking supply.

---

[2] So in original. Probably should be followed by a comma.

Subsec. (c)(4). Pub. L. 101–549, §101(d)(3)(C), struck out par. (4) which permitted Governors to temporarily suspend measures in implementation plans relating to retrofits, gas rationing, and reduction of on-street parking.

Subsec. (c)(5)(B). Pub. L. 101–549, §101(d)(3)(D), struck out ''(including the written evidence required by part D),'' after ''include comprehensive measures''.

Subsec. (d). Pub. L. 101–549, §101(d)(4), struck out subsec. (d) which defined an applicable implementation plan for purposes of this chapter.

Subsec. (e). Pub. L. 101–549, §101(d)(5), struck out subsec. (e) which permitted an extension of time for attainment of a national primary ambient air quality standard.

Subsec. (f)(1). Pub. L. 101–549, §412, inserted ''or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets)'' in subpar. (A) and in last sentence.

Subsec. (g)(1). Pub. L. 101–549, §101(d)(6), substituted ''12 months of submission of the proposed plan revision'' for ''the required four month period'' in closing provisions.

Subsec. (h)(1). Pub. L. 101–549, §101(d)(7), substituted ''5 years after November 15, 1990, and every three years thereafter'' for ''one year after August 7, 1977, and annually thereafter'' and struck out at end ''Each such document shall be revised as frequently as practicable but not less often than annually.''

Subsecs. (k) to (n). Pub. L. 101–549, §101(c), added subsecs. (k) to (n).

Subsec. (o). Pub. L. 101–549, §107(c), added subsec. (o).

Subsec. (p). Pub. L. 101–549, §108(d), added subsec. (p).

1981—Subsec. (a)(3)(C). Pub. L. 97–23 inserted reference to extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations).

1977—Subsec. (a)(2)(A). Pub. L. 95–95, §108(a)(1), substituted ''(A) except as may be provided in subparagraph (I)(i) in the case of a plan'' for ''(A)(i) in the case of a plan''.

Subsec. (a)(2)(B). Pub. L. 95–95, §108(a)(2), substituted ''transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D)'' for ''land use and transportation controls''.

Subsec. (a)(2)(D). Pub. L. 95–95, §108(a)(3), substituted ''it includes a program to provide for the enforcement of emission limitations and regulation of the modification, construction, and operation of any stationary source, including a permit program as required in parts C and D and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure'' for ''it includes a procedure''.

Subsec. (a)(2)(E). Pub. L. 95–95, §108(a)(4), substituted ''it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement'' for ''it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region''.

Subsec. (a)(2)(F). Pub. L. 95–95, §108(a)(5), added cl. (vi).

Subsec. (a)(2)(H). Pub. L. 95–190, §14(a)(1), substituted ''1977;'' for ''1977''.

Pub. L. 95–95, §108(a)(6), inserted ''except as provided in paragraph (3)(C),'' after ''or (ii)'' and ''or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977'' after ''to achieve the national ambient air quality primary or secondary standard which it implements''.

Subsec. (a)(2)(I). Pub. L. 95–95, §108(b), added subpar. (I).

Subsec. (a)(2)(J). Pub. L. 95–190, §14(a)(2), substituted ''; and'' for ''. and''.

Pub. L. 95–95, §108(b), added subpar. (J).

Subsec. (a)(2)(K). Pub. L. 95–95, §108(b) added subpar. (K).

Subsec. (a)(3)(C). Pub. L. 95–95, §108(c), added subpar. (C).

Subsec. (a)(3)(D). Pub. L. 95–190, §14(a)(4), added subpar. (D).

Subsec. (a)(5). Pub. L. 95–95, §108(e), added par. (5).

Subsec. (a)(5)(D). Pub. L. 95–190, §14(a)(3), struck out ''preconstruction or premodification'' before ''review''.

Subsec. (a)(6). Pub. L. 95–95, §108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, §108(d)(1), (2), substituted ''plan which meets the requirements of this section'' for ''plan for any national ambient air quality primary or secondary standard within the time prescribed'' in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, §108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, §108(f), substituted ''and which implements the requirements of this section'' for ''and which implements a national primary or secondary ambient air quality standard in a State''.

Subsec. (f). Pub. L. 95–95, §107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, §108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, §107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (i). Pub. L. 95–190, §14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, §108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, §14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, §108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 §14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, §108(g), as (j) and in subsec. (j) as so redesignated, substituted ''will enable such source'' for ''at such source will enable it''.

1974—Subsec. (a)(3). Pub. L. 93–319, §4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, §4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

#### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official

duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Pub. L. 91–604, §16, Dec. 31, 1970, 84 Stat. 1713, provided that:

''(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

''(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

''(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter].''

FEDERAL ENERGY ADMINISTRATOR

''Federal Energy Administrator'', for purposes of this chapter, to mean Administrator of Federal Energy Ad-

ministration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the intent to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

## § 7411. Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term ''standard of performance'' means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term ''new source'' means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term ''stationary source'' means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term ''modification'' means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term ''owner or operator'' means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term ''existing source'' means any stationary source other than a new source.

(7) The term ''technological system of continuous emission reduction'' means—

(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

(B) a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

(8) A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 792(a)] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C. 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii)[1]

---

[1] See References in Text note below.

### (h) "Locally or regionally available coal or coal derivatives" defined

For the purpose of this section the term "locally or regionally available coal or coal derivatives" means coal or coal derivatives which is, or can in the judgment of the State or the Administrator feasibly be, mined or produced in the local or regional area (as determined by the Administrator) in which the major fuel burning stationary source is located.

(July 14, 1955, ch. 360, title I, § 125, as added Pub. L. 95–95, title I, § 122, Aug. 7, 1977, 91 Stat. 722.)

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE

Section effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### § 7426. Interstate pollution abatement

#### (a) Written notice to all nearby States

Each applicable implementation plan shall—

(1) require each major proposed new (or modified) source—

(A) subject to part C (relating to significant deterioration of air quality) or

(B) which may significantly contribute to levels of air pollution in excess of the national ambient air quality standards in any air quality control region outside the State in which such source intends to locate (or make such modification),

to provide written notice to all nearby States the air pollution levels of which may be affected by such source at least sixty days prior to the date on which commencement of construction is to be permitted by the State providing notice, and

(2) identify all major existing stationary sources which may have the impact described in paragraph (1) with respect to new or modified sources and provide notice to all nearby States of the identity of such sources not later than three months after August 7, 1977.

#### (b) Petition for finding that major sources emit or would emit prohibited air pollutants

Any State or political subdivision may petition the Administrator for a finding that any major source or group of stationary sources emits or would emit any air pollutant in violation of the prohibition of section 7410(a)(2)(D)(ii) of this title or this section. Within 60 days after receipt of any petition under this subsection and after public hearing, the Administrator shall make such a finding or deny the petition.

#### (c) Violations; allowable continued operation

Notwithstanding any permit which may have been granted by the State in which the source is located (or intends to locate), it shall be a violation of this section and the applicable implementation plan in such State—

(1) for any major proposed new (or modified) source with respect to which a finding has been made under subsection (b) to be constructed or to operate in violation of the prohibition of section 7410(a)(2)(D)(ii) of this title or this section, or

(2) for any major existing source to operate more than three months after such finding has been made with respect to it.

The Administrator may permit the continued operation of a source referred to in paragraph (2) beyond the expiration of such three-month period if such source complies with such emission limitations and compliance schedules (containing increments of progress) as may be provided by the Administrator to bring about compliance with the requirements contained in section 7410(a)(2)(D)(ii) of this title or this section as expeditiously as practicable, but in no case later than three years after the date of such finding. Nothing in the preceding sentence shall be construed to preclude any such source from being eligible for an enforcement order under section 7413(d)[1] of this title after the expiration of such period during which the Administrator has permitted continuous operation.

(July 14, 1955, ch. 360, title I, § 126, as added Pub. L. 95–95, title I, § 123, Aug. 7, 1977, 91 Stat. 724; amended Pub. L. 95–190, § 14(a)(39), Nov. 16, 1977, 91 Stat. 1401; Pub. L. 101–549, title I, § 109(a), Nov. 15, 1990, 104 Stat. 2469.)

EDITORIAL NOTES

REFERENCES IN TEXT

Section 7413(d) of this title, referred to in subsec. (c), was amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders.

AMENDMENTS

1990—Subsec. (b). Pub. L. 101–549, § 109(a)(1), inserted "or group of stationary sources" after "any major source" and substituted "section 7410(a)(2)(D)(ii) of this title or this section" for "section 7410(a)(2)(E)(i) of this title".

Subsec. (c). Pub. L. 101–549, § 109(a)(2)(A), which directed the insertion of "this section and" after "violation of", was executed by making the insertion after first reference to "violation of" to reflect the probable intent of Congress.

Pub. L. 101–549, § 109(a)(2)(B), substituted "section 7410(a)(2)(D)(ii) of this title or this section" for "section 7410(a)(2)(E)(i) of this title" in par. (1) and penultimate sentence.

1977—Subsec. (a)(1). Pub. L. 95–190 substituted "relating to significant deterioration of air quality)" for ", relating to significant deterioration of air quality".

STATUTORY NOTES AND RELATED SUBSIDIARIES

EFFECTIVE DATE

Section effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### § 7427. Public notification

#### (a) Warning signs; television, radio, or press notices or information

Each State plan shall contain measures which will be effective to notify the public during any calendar[1] on a regular basis of instances or areas in which any national primary ambient air quality standard is exceeded or was exceeded

---

[1] See References in Text note below.

[1] So in original. Probably should be "calendar year".


(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent.

In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance.

(4) The terms "modifications" and "modified" mean the same as the term "modification" as used in section 7411(a)(4) of this title.

(July 14, 1955, ch. 360, title I, § 171, as added Pub. L. 95–95, title I, § 129(b), Aug. 7, 1977, 91 Stat. 745; amended Pub. L. 101–549, title I, § 102(a)(2), Nov. 15, 1990, 104 Stat. 2412.)

### Editorial Notes

#### AMENDMENTS

1990—Pub. L. 101–549, § 102(a)(2)(A), struck out "and section 7410(a)(2)(I) of this title" after "purpose of this part".

Pars. (1), (2). Pub. L. 101–549, § 102(a)(2)(B), (C), amended pars. (1) and (2) generally. Prior to amendment, pars. (1) and (2) read as follows:

"(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part and section 7410(a)(2)(I) of this title and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 7502(a) of this title.

"(2) The term 'nonattainment area' means, for any air pollutant an area which is shown by monitored data or which is calculated by air quality modeling (or other methods determined by the Administrator to be reliable) to exceed any national ambient air quality standard for such pollutant. Such term includes any area identified under subparagraphs (A) through (C) of section 7407(d)(1) of this title."

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Part effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7502. Nonattainment plan provisions in general

### (a) Classifications and attainment dates

#### (1) Classifications

(A) On or after the date the Administrator promulgates the designation of an area as a nonattainment area pursuant to section 7407(d) of this title with respect to any national ambient air quality standard (or any revised standard, including a revision of any standard in effect on November 15, 1990), the Administrator may classify the area for the purpose of applying an attainment date pursuant to paragraph (2), and for other purposes. In determining the appropriate classification, if any, for a nonattainment area, the Administrator may consider such factors as the severity of nonattainment in such area and the availability and feasibility of the pollution control measures that the Administrator be-

lieves may be necessary to provide for attainment of such standard in such area.

(B) The Administrator shall publish a notice in the Federal Register announcing each classification under subparagraph (A), except the Administrator shall provide an opportunity for at least 30 days for written comment. Such classification shall not be subject to the provisions of sections 553 through 557 of title 5 (concerning notice and comment) and shall not be subject to judicial review until the Administrator takes final action under subsection (k) or (l) of section 7410 of this title (concerning action on plan submissions) or section 7509 of this title (concerning sanctions) with respect to any plan submissions required by virtue of such classification.

(C) This paragraph shall not apply with respect to nonattainment areas for which classifications are specifically provided under other provisions of this part.

### (2) Attainment dates for nonattainment areas

(A) The attainment date for an area designated nonattainment with respect to a national primary ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable, but no later than 5 years from the date such area was designated nonattainment under section 7407(d) of this title, except that the Administrator may extend the attainment date to the extent the Administrator determines appropriate, for a period no greater than 10 years from the date of designation as nonattainment, considering the severity of nonattainment and the availability and feasibility of pollution control measures.

(B) The attainment date for an area designated nonattainment with respect to a secondary national ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable after the date such area was designated nonattainment under section 7407(d) of this title.

(C) Upon application by any State, the Administrator may extend for 1 additional year (hereinafter referred to as the "Extension Year") the attainment date determined by the Administrator under subparagraph (A) or (B) if—

(i) the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan, and

(ii) in accordance with guidance published by the Administrator, no more than a minimal number of exceedances of the relevant national ambient air quality standard has occurred in the area in the year preceding the Extension Year.

No more than 2 one-year extensions may be issued under this subparagraph for a single nonattainment area.

(D) This paragraph shall not apply with respect to nonattainment areas for which attainment dates are specifically provided under other provisions of this part.

### (b) Schedule for plan submissions

At the time the Administrator promulgates the designation of an area as nonattainment

with respect to a national ambient air quality standard under section 7407(d) of this title, the Administrator shall establish a schedule according to which the State containing such area shall submit a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title. Such schedule shall at a minimum, include a date or dates, extending no later than 3 years from the date of the nonattainment designation, for the submission of a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title.

### (c) Nonattainment plan provisions

The plan provisions (including plan items) required to be submitted under this part shall comply with each of the following:

#### (1) In general

Such plan provisions shall provide for the implementation of all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology) and shall provide for attainment of the national primary ambient air quality standards.

#### (2) RFP

Such plan provisions shall require reasonable further progress.

#### (3) Inventory

Such plan provisions shall include a comprehensive, accurate, current inventory of actual emissions from all sources of the relevant pollutant or pollutants in such area, including such periodic revisions as the Administrator may determine necessary to assure that the requirements of this part are met.

#### (4) Identification and quantification

Such plan provisions shall expressly identify and quantify the emissions, if any, of any such pollutant or pollutants which will be allowed, in accordance with section 7503(a)(1)(B) of this title, from the construction and operation of major new or modified stationary sources in each such area. The plan shall demonstrate to the satisfaction of the Administrator that the emissions quantified for this purpose will be consistent with the achievement of reasonable further progress and will not interfere with attainment of the applicable national ambient air quality standard by the applicable attainment date.

#### (5) Permits for new and modified major stationary sources

Such plan provisions shall require permits for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area, in accordance with section 7503 of this title.

#### (6) Other measures

Such plan provisions shall include enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment of such standard in such area by the applicable attainment date specified in this part.

#### (7) Compliance with section 7410(a)(2)

Such plan provisions shall also meet the applicable provisions of section 7410(a)(2) of this title.

#### (8) Equivalent techniques

Upon application by any State, the Administrator may allow the use of equivalent modeling, emission inventory, and planning procedures, unless the Administrator determines that the proposed techniques are, in the aggregate, less effective than the methods specified by the Administrator.

#### (9) Contingency measures

Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part. Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.

### (d) Plan revisions required in response to finding of plan inadequacy

Any plan revision for a nonattainment area which is required to be submitted in response to a finding by the Administrator pursuant to section 7410(k)(5) of this title (relating to calls for plan revisions) must correct the plan deficiency (or deficiencies) specified by the Administrator and meet all other applicable plan requirements of section 7410 of this title and this part. The Administrator may reasonably adjust the dates otherwise applicable under such requirements to such revision (except for attainment dates that have not yet elapsed), to the extent necessary to achieve a consistent application of such requirements. In order to facilitate submittal by the States of adequate and approvable plans consistent with the applicable requirements of this chapter, the Administrator shall, as appropriate and from time to time, issue written guidelines, interpretations, and information to the States which shall be available to the public, taking into consideration any such guidelines, interpretations, or information provided before November 15, 1990.

### (e) Future modification of standard

If the Administrator relaxes a national primary ambient air quality standard after November 15, 1990, the Administrator shall, within 12 months after the relaxation, promulgate requirements applicable to all areas which have not attained that standard as of the date of such relaxation. Such requirements shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation.

(July 14, 1955, ch. 360, title I, §172, as added Pub. L. 95–95, title I, §129(b), Aug. 7, 1977, 91 Stat. 746;

amended Pub. L. 95–190, § 14(a)(55), (56), Nov. 16, 1977, 91 Stat. 1402; Pub. L. 101–549, title I, § 102(b), Nov. 15, 1990, 104 Stat. 2412.)

### Editorial Notes

#### Amendments

1990—Pub. L. 101–549 amended section generally, substituting present provisions for provisions which related to: in subsec. (a), expeditious attainment of national ambient air quality standards; in subsec. (b), requisite provisions of plan; and in subsec. (c), attainment of applicable standard not later than July 1, 1987.

1977—Pub. L. 95–190, § 14(a)(55), substituted "subsection (a)" for "paragraph (1)".

Subsec. (c). Pub. L. 95–190, § 14(a)(56), substituted "December 31" for "July 1".

### Statutory Notes and Related Subsidiaries

#### Nonattainment Areas

Pub. L. 95–95, title I, § 129(a), Aug. 7, 1977, 91 Stat. 745, as amended by Pub. L. 95–190, § 14(b)(2), (3), Nov. 16, 1977, 91 Stat. 1404, provided that:

"(1) Before July 1, 1979, the interpretative regulation of the Administrator of the Environmental Protection Agency published in 41 Federal Register 55524–30, December 21, 1976, as may be modified by rule of the Administrator, shall apply except that the baseline to be used for determination of appropriate emission offsets under such regulation shall be the applicable implementation plan of the State in effect at the time of application for a permit by a proposed major stationary source (within the meaning of section 302 of the Clean Air Act) [section 7602 of this title].

"(2) Before July 1, 1979, the requirements of the regulation referred to in paragraph (1) shall be waived by the Administrator with respect to any pollutant if he determines that the State has—

"(A) an inventory of emissions of the applicable pollutant for each nonattainment area (as defined in section 171 of the Clean Air Act [section 7501 of this title]) that identifies the type, quantity, and source of such pollutant so as to provide information sufficient to demonstrate that the requirements of subparagraph (C) are being met;

"(B) an enforceable permit program which—

"(i) requires new or modified major stationary sources to meet emission limitations at least as stringent as required under the permit requirements referred to in paragraphs (2) and (3) of section 173 of the Clean Air Act [section 7503 of this title] (relating to lowest achievable emission rate and compliance by other sources) and which assures compliance with the annual reduction requirements of subparagraph (C); and

"(ii) requires existing sources to achieve such reduction in emissions in the area as may be obtained through the adoption, at a minimum of reasonably available control technology, and

"(C) a program which requires reductions in total allowable emissions in the area prior to July 1, 1979, so as to provide for the same level of emission reduction as would result from the application of the regulation referred to in paragraph (1).

The Administrator shall terminate such waiver if in his judgment the reduction in emissions actually being attained is less than the reduction on which the waiver was conditioned pursuant to subparagraph (C), or if the Administrator determines that the State is no longer in compliance with any requirement of this paragraph. Upon application by the State, the Administrator may reinstate a waiver terminated under the preceding sentence if he is satisfied that such State is in compliance with all requirements of this subsection.

"(3) Operating permits may be issued to those applicants who were properly granted construction permits, in accordance with the law and applicable regulations

in effect at the time granted, for construction of a new or modified source in areas exceeding national primary air quality standards on or before the date of the enactment of this Act [Aug. 7, 1977] if such construction permits were granted prior to the date of the enactment of this Act and the person issued any such permit is able to demonstrate that the emissions from the source will be within the limitations set forth in such construction permit."

#### State Implementation Plan Revision

Pub. L. 95–95, title I, § 129(c), Aug. 7, 1977, 91 Stat. 750, as amended by Pub. L. 95–190, § 14(b)(4), Nov. 16, 1977, 91 Stat. 1405, provided that: "Notwithstanding the requirements of section 406(d)(2) [set out as an Effective Date of 1977 Amendment note under section 7401 of this title] (relating to date required for submission of certain implementation plan revisions), for purposes of section 110(a)(2) of the Clean Air Act [section 7410(a)(2) of this title] each State in which there is any nonattainment area (as defined in part D of title I of the Clean Air Act) [this part] shall adopt and submit an implementation plan revision which meets the requirements of section 110(a)(2)(I) [section 7410(a)(2)(I) of this title] and part D of title I of the Clean Air Act [this part] not later than January 1, 1979. In the case of any State for which a plan revision adopted and submitted before such date has made the demonstration required under section 172(a)(2) of the Clean Air Act [subsec. (a)(2) of this section] (respecting impossibility of attainment before 1983), such State shall adopt and submit to the Administrator a plan revision before July 1, 1982, which meets the requirements of section 172(b) and (c) of such Act [subsecs. (b) and (c) of this section]."

## § 7503. Permit requirements

### (a) In general

The permit program required by section 7502(b)(6)[1] of this title shall provide that permits to construct and operate may be issued if—

(1) in accordance with regulations issued by the Administrator for the determination of baseline emissions in a manner consistent with the assumptions underlying the applicable implementation plan approved under section 7410 of this title and this part, the permitting agency determines that—

(A) by the time the source is to commence operation, sufficient offsetting emissions reductions have been obtained, such that total allowable emissions from existing sources in the region, from new or modified sources which are not major emitting facilities, and from the proposed source will be sufficiently less than total emissions from existing sources (as determined in accordance with the regulations under this paragraph) prior to the application for such permit to construct or modify so as to represent (when considered together with the plan provisions required under section 7502 of this title) reasonable further progress (as defined in section 7501 of this title); or

(B) in the case of a new or modified major stationary source which is located in a zone (within the nonattainment area) identified by the Administrator, in consultation with the Secretary of Housing and Urban Development, as a zone to which economic development should be targeted, that emissions of such pollutant resulting from the proposed

---

[1] See References in Text note below.

SEC. 11. *Uniformity.* Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded.* Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),,[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

### (b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

### (c) Additional evidence

In any judicial proceeding in which review is sought of a determination under this chapter re-

[1] See References in Text note below.
[2] So in original. Probably should be ''this''.
[3] So in original.
[4] So in original. Probably should be ''subsection,''.

quired to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to [5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F)[6] of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent find-

---

[5] So in original. The word "to" probably should not appear.

[6] So in original. There are no subpars. (D) and (F) of section 7412(g)(1) of this title.

ings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation

of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b)) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section [7] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, § 307, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, § 302(a), Nov. 18, 1971, 85 Stat. 464; Pub. L. 93–319, § 6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§ 303(d), 305(a), (c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, § 14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§ 108(p), 110(5), title III, § 302(g), (h), title VII, §§ 702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

## Editorial Notes

### REFERENCES IN TEXT

Section 7521(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, § 230(2), Nov. 15, 1990, 104 Stat. 2529.

Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, § 230(3), Nov. 15, 1990, 104 Stat. 2529.

Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977), referred to in subsec. (b)(1), was in the original "section 119(c)(2)(A), (B), or

[7] So in original. Probably should be "sections".

(C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Part C of subchapter I, referred to in subsec. (d)(1)(J), was in the original "subtitle C of title I", and was translated as reading "part C of title I" to reflect the probable intent of Congress, because title I does not contain subtitles.

### CODIFICATION

In subsec. (h), "subchapter II of chapter 5 of title 5" was substituted for "the Administrative Procedures Act" on authority of Pub. L. 89–554, § 7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

Section was formerly classified to section 1857h–5 of this title.

### PRIOR PROVISIONS

A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly § 14, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

### AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, § 703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out "or section 7521(b)(5)" after "section 7410(f)".

Subsec. (b)(1). Pub. L. 101–549, § 706(2), which directed amendment of second sentence by striking "under section 7413(d) of this title" immediately before "under section 7419 of this title", was executed by striking "under section 7413(d) of this title," before "under section 7419 of this title", to reflect the probable intent of Congress.

Pub. L. 101–549, § 706(1), inserted at end: "The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action."

Pub. L. 101–549, § 702(c), inserted "or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title," before "or any other final action of the Administrator".

Pub. L. 101–549, § 302(g), substituted "section 7412" for "section 7412(c)".

Subsec. (b)(2). Pub. L. 101–549, § 707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

Subsec. (d)(1)(C). Pub. L. 101–549, §110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: ''the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title,''.

Subsec. (d)(1)(D), (E). Pub. L. 101–549, §302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101–549, §302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101–549, §110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: ''promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),''.

Subsec. (d)(1)(G), (H). Pub. L. 101–549, §302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101–549, §710(b), which directed that subpar. (H) be amended by substituting ''subchapter VI'' for ''part B of subchapter I'', was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101–549, §302(h), see below.

Pub. L. 101–549, §302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101–549, §302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101–549, §302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101–549, §110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (O).

Subsec. (d)(1)(O) to (T). Pub. L. 101–549, §302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101–549, §110(5)(C), added subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101–549, §302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101–549, §110(5)(C), redesignated former subpar. (N) as (U).

Subsec. (d)(1)(V). Pub. L. 101–549, §302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101–549, §108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95–190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review under section 1857c–10(c)(2)(A), (B), or (C) to the period prior to Aug. 7, 1977, and provisions authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95–95, §305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95–95, §305(a), added subsec. (d).

Subsec. (e). Pub. L. 95–95, §303(d), added subsec. (e).

Subsec. (f). Pub. L. 95–95, §305(b), added subsec. (f).

Subsec. (g). Pub. L. 95–95, §305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93–319 inserted reference to the Administrator's action under section 1857c–10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1971—Subsec. (a)(1). Pub. L. 92–157 substituted reference to section ''7545(c)(3)'' for ''7545(c)(4)'' of this title.

## Statutory Notes and Related Subsidiaries

### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7608. Mandatory licensing

Whenever the Attorney General determines, upon application of the Administrator—

    (1) that—

        (A) in the implementation of the requirements of section 7411, 7412, or 7521 of this